IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2005 DEC 21  P 4:10

| | |
|---|---|
| JOHN COGGIN, | ) |
| | ) CIVIL ACTION NO: |
| Plaintiff | ) |
| | ) |
| VS. | ) 2:05cv1214-F |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant | ) |

## COMPLAINT

1. Jurisdiction is founded on 28 USC § 1346(b)(1) and venue is founded on 28 USC § 1402(b).

2. The Plaintiff, John Coggin, is a resident citizen of Birmingham, Alabama.

3. The defendant, United States of America, provided medical care to plaintiff while he was incarcerated at the B.O.P. Federal Prison facility at Maxwell Air Force Base in Montgomery, Alabama (hereinafter referred to as "BOP/FPC-Maxwell").

4. The matter in controversy exceeds the sum of Seventy Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

5. Plaintiff timely filed Claims for Damage, Injury or Death (Standard Form 95) in this matter on or about January 9, 2003, copies of which are attached. Six months have expired from the filing of the claim without resolution by the Bureau of Prisons Agency.

1

6. On August 26, 1999, the plaintiff reported to BOP/FPC-Maxwell, Montgomery, Alabama, to serve a thirty-six (36) month sentence pursuant to a plea agreement for a one count of conspiracy relating to bankruptcy fraud. The plaintiff was released from BOP/FPC-Maxwell on November 13, 2001. At the time the plaintiff reported to BOP/FPC-Maxwell the plaintiff was in excellent general health and at the time he was released he was on medical convalescence having nearly died as the result of the BOP/FPC-Maxwell's gross negligence and deliberate failure to provide adequate and prompt medical care.

7. On or about July 20, 2001, the plaintiff began to experience pain in his abdomen. It was so severe that plaintiff had to curtail all physical activity. When the pain did not abate over the next few days, plaintiff prepared a written B.O.P. request form (a "cop-out" form) for medical treatment. On or about Tuesday, July 24, 2001, the plaintiff went to the "Emergency Sick" call at 6:00 a.m. at the BOP/FPC-Maxwell medical clinic. Plaintiff was seen but not examined by Oscar Rodriguez ("Rodriguez"), a physician assistant at the medical clinic at BOP/FPC-Maxwell. Despite complaints of severe pain, plaintiff was told that he would not be treated that day and Rodriguez repeated sarcastically that he would take care of him and promised he would put him on the call-out for the next day. The failure to examine plaintiff, including taking vital signs, constituted a failure to follow the medical clinic's own newly adopted procedures for treating inmate patients. Plaintiff's pain continued to get worse. That night, the plaintiff checked the computer "call-out" sheets and despite Rodriguez's promise that plaintiff would be scheduled to be treated by medical personnel, the plaintiff's name was not listed to be

seen by medical staff the next day.

    8.    On Wednesday, July 25, 2001, the plaintiff went again to the Emergency Sick Call at 6:00 a.m. After convincing the nurse on duty of his symptoms, he was allowed to come back to the clinic later to be seen. Rodriguez came out and began yelling at the plaintiff "Coggin, why are you being a pain in the ass? What's this about you wanting to see the doctor? What the hell do you think I am? I have as much training as any P.A. in the entire B.O.P". At which point the plaintiff responded that he was seeking attention for his medical condition. The plaintiff again complained of severe pain and asked for immediate medical treatment. At this point a cursory exam was performed and plaintiff was informed that he would have to return to see O. Garcia-Brenes, M.D. ("Garcia"), Director of Medical Services at the BOP/FPC-Maxwell. Plaintiff was seen later that day by both Garcia and Rodriguez. They laughed and told the plaintiff they were going to "fix him up good". The plaintiff was then given two shots which he was told were a pain shot and an antibiotic shot. The plaintiff was then taken to the X-ray Room where three x-rays were taken of his abdominal area. The x-rays showed what appeared to be a kidney stone in the plaintiff's left kidney but that no stones were present in his gall bladder. On July 26, 2001, the plaintiff was called back to the clinic for another x-ray. The plaintiff was told he was again being x-rayed to see if the stone in his kidney had moved. The pain was in plaintiff's mid-epigastric region. The x-rays did not reveal gallstones, however, the BOP/FPC-Maxwell medical staff continued to treat the plaintiff for what they contended was a "gallbladder problem". No tests were performed to detect the presence of a stomach ulcer.

9. On or about Friday, July 27, 2001, the plaintiff returned to the clinic because the abdominal pain had worsened. Mr. Rodriguez changed the plaintiff's medication to 800 mg Motrin tablets. The plaintiff was not advised of the potential serious side effects or dangers in taking Motrin in large doses.

10. Over the weekend the plaintiff's pain increased to unbearable levels. The plaintiff was unable to eat without severe pain. On or about Sunday night, July 29, 2001, the plaintiff reported to the Lieutenant's Office for help. The plaintiff requested to be sent to the emergency room for treatment. Officer Snyder called the medical staff: Mr. Rodriguez and Dr. Garcia. Plaintiff was thereafter instructed to return to his bunk and take more Motrin for pain. The plaintiff did as instructed by the medical personnel.

11. On or about Monday, July 30, 2001, the plaintiff was sent to Medical Imaging Associates for an epigastric ultrasound. Despite the prior x-rays indicating the non-presence of any gallstones, the medical personnel at BOP/FPC-Maxwell continued to treat the plaintiff for a gallstone, including prescribing high dosage Motrin. Despite ongoing requests during this time, the medical staff refused to send the plaintiff to an emergency room or other medical facility for additional evaluation of his symptoms. On or about Wednesday, August 1, 2001, the plaintiff was sent back to the Medical Imaging clinic for an IVP test and additional x-rays.

12. The plaintiff remained symptomatic for the remainder of the week. On Friday, August 3, 2001, plaintiff was advised by Mr. Rodriguez of the results of the ultrasound and IVP tests. Mr. Rodriguez stated that the tests showed the presence of a kidney stone in the left kidney, however they had determined that the stone could not be

the cause of his pain. He also advised the plaintiff that the tests revealed no evidence at all of any gallstones to cause such severe pain. He told the plaintiff that there was nothing else to be done and further advised the plaintiff to continue taking the Motrin for the pain. The plaintiff was never advised or told of the dangers to his gastrointestinal tract that could result from taking high doses of Motrin. The BOP/FPC-Maxwell medical staff still failed to perform any tests to ascertain the presence of a potential bleeding ulcer.

13.  For the following few days the plaintiff continued to suffer worsening pain and his condition worsened until he was unable to eat solid foods. The BOP/FPC-Maxwell medical staff during this period continued to refuse to perform any further tests or prescribe any further treatments other than to instruct plaintiff to continue taking the Motrin for pain.

14.  The pain worsened to the point that plaintiff could not even lay down to sleep. On or about Saturday night, August 18, 2001 at about 2:00 a.m. BOP/FPC-Maxwell security officer Davis discovered the plaintiff lying bent over on the desk in his cube groaning in agony. The plaintiff told Officer Davis that he was in extreme pain, had been coughing up blood. Plaintiff pleaded to be sent immediately to the outside hospital emergency room. Officer Davis called the Lieutenant's Office and advised the officer on duty, Officer Snyder, of the situation and then assisted the plaintiff down to the Lieutenant's Office. Plaintiff complained to Snyder that he was in extreme pain, coughing up blood, and needed to be sent to the emergency room. Officer Snyder called Mr. Rodriguez at about 2:30 a.m. and described the plaintiff's symptoms and condition to Mr. Rodriguez. Mr. Rodriguez asked to speak with plaintiff via the phone.

15.  The plaintiff pleaded with Mr. Rodriguez to send him to the emergency room

5

for treatment.  Rodriguez laughed at the plaintiff and told him it was just his "gallbladder" acting up and ordered him back to the inmate dorm.  Mr. Rodriguez's refusal to treat the plaintiff or send him to the emergency room for treatment, in addition to falling below the standard of care, also failed to follow the BOP/FPC-Maxwell's own rules and policies for giving prompt emergency medical care.  Mr. Rodriguez further told the plaintiff to keep taking his Motrin.  Officer Snyder then threatened to lock the plaintiff up in a holding cell if he kept on complaining and returned the plaintiff back to his cube.

16.    On or about Tuesday night, August 21, 2001, the plaintiff began vomiting all night what appeared to be dark bloody matter.  First thing Wednesday morning, August 22, 2001, the plaintiff reported to the BOP/FPC-Maxwell medical clinic for the "Emergency Sick Call".  Plaintiff informed the clinic nurses that he was in pain and that he vomited blood the previous night.  She assured him she would promptly inform Rodriguez and Garcia.

17.    The plaintiff waited at the clinic from 6:00 a.m. to 11:00 a.m. without any evaluation by medical personnel.  Plaintiff went on to work and informed his supervisor of his condition and was allowed to return to the clinic. The plaintiff returned to the clinic and waited till 1:00 p.m. without being seen, but had to return to his dorm due to vomiting more blood.  When returning to the clinic thereafter, plaintiff met his case manager Ms. Beasley and explained the circumstances of his condition and that he could not get medical treatment.  She promptly called over to the clinic and spoke to Dr. Garcia who referred her to Mr. Rodriguez.  Plaintiff was instructed to go to the clinic for immediate treatment. Plaintiff returned to the medical clinic around 1:30 p.m.  About 3:15 p.m. Dr. Garcia came

out into the medical clinic lobby and told the plaintiff to keep waiting. At 3:45 p.m. (the usual time for recall to all the dorms for the 4:00 p.m. count) Mr. Rodriguez walked out and led the plaintiff out to the reception area.

18.    The plaintiff described to Rodriguez that he was in severe pain and had vomited blood all night. Rodriguez then said to the plaintiff, "Coggin, what are you trying to pull over on me?". Plaintiff pleaded with Rodriguez to be sent to the hospital emergency room or to at least be seen by Dr. Garcia.

19.    At this point, Mr. Rodriguez began shouting at plaintiff, "I'm not going to see you now or ever, Coggin! If you have a problem in here, you need to keep it in house. I'm sick of you having all these people call me. Coggin, I don't like your attitude . You come in here saying you want to see a doctor like we're not qualified. I'm the most qualified P.A. in this place. I'm not going to see you now or ever again." Plaintiff again asked for medical attention.

20.    That night the plaintiff continued in severe pain, unable to lie flat and followed the medical staff's instruction to continue taking the Motrin for the pain.

21.    At 10:00 a.m. the next day, Thursday, August 23, 2001, the plaintiff was called back to the clinic and was seen by a Ms. Little, a new nurse practitioner at the medical clinic. The plaintiff told her that he was getting weaker and weaker. Nurse Little examined the plaintiff and gave him a pain shot. She told him she would recommend that he be seen by an outside consultant the next week. The plaintiff described to her the terrible pain he was in and that he really needed to be seen by someone to help him immediately. Later that day Nurse Little told the plaintiff that she had called the office of

an outside surgeon to discuss with him removing plaintiff's gallbladder, but had not been able to speak with him. The plaintiff was sent back to his dorm.

22. As the plaintiff's pain became more and more severe, other inmates began telling the medical clinic staff how bad the plaintiff appeared to be getting. On Friday afternoon, August 24, 2001, the plaintiff was called down to the medical clinic and met with Nurse Practitioner Essex. She told him there was nothing they could do until they spoke with the outside surgeon. The plaintiff was told to return to the dorm and continue taking his Motrin.

23. The next day on Saturday, August 25, 2001, the plaintiff's condition worsened further. Since the medical clinic was closed on the weekend, the plaintiff went to the pill line (where the medications are dispensed to the inmates) and told the nurse on duty that he needed help and needed to be sent out to the hospital. The nurse told him that there was nothing she could do for him and he would have to wait till next week to see the medical staff.

24. On Sunday, August 26, 2001, the plaintiff once again went to the pill line to plead for medical help for his condition. Again the nurse on duty told the plaintiff there was nothing she could do and that he would have to wait till Monday to see the doctor. She told him to take the Motrin for his pain.

25. On Sunday evening, plaintiff was discovered around 2:00 a.m. on the floor of his cube by security guard Ramadue. Plaintiff told her he was in excruciating pain and needed to be sent to the outside hospital emergency room. She radioed to the Lieutenant's office and she told the duty officer, Officer Snyder, that a man was down in

the Montgomery dorm. She was instructed to bring the plaintiff down to the Lieutenant's office. She and other inmates assisted plaintiff to a golf cart and transported the plaintiff to the Lieutenant's office.

26. As the Plaintiff entered the office, Defendant Snyder yelled at the plaintiff, "Coggin, you again!!! What's your problem???". Plaintiff explained that he was in excruciating pain, throwing up blood and needed to go to the emergency room. Officer Snyder called Mr. Rodriguez and described the plaintiff's condition. Thereafter, Officer Snyder called Dr. Garcia. Plaintiff was returned to the dorm, without any treatment except to take more Motrin for his pain and to report to the medical clinic first thing Monday morning for a pain shot at 7:00 a.m.

27. The failure to send an inmate in such a condition to the emergency room constitutes a violation of the Bureau of Prison's medical policies for prompt and competent inmate care and treatment.

28. On or about Monday morning, August 27, 2001, the plaintiff went to the BOP/FPC-Maxwell medical clinic at 6:00 a.m. as directed by Dr. Garcia. Plaintiff was made to wait for 4 hours before being seen. Dr. Garcia briefly examined the plaintiff, told him that his pain was being caused by his gallbladder and that his gallbladder might need to be removed. Garcia told the plaintiff that he was going to send him out to a local surgeon, a Doctor Williams, to examine him for prospective gallbladder surgery.

29. Plaintiff told Garcia that he was still in extreme pain, vomiting blood and that the Motrin medicine he had been prescribed was severely upsetting his stomach. Dr. Garcia said he would prescribe additional medicine, but to continue taking the Motrin as

9

needed for pain. Dr. Garcia thereafter failed to prescribe any additional medication for the pain of the plaintiff other than the Motrin.

30. On or about Wednesday, August 29, 2001, the plaintiff was sent to see Dr. Antonio J. Williams, M.D., a surgeon with Advanced Surgical Associates in Montgomery. Dr. Williams gave the plaintiff a brief examination and looked at the x-rays and ultrasound report provided to him by Dr. Garcia. Dr. Williams stated that he had spoken with Dr. Garcia who had advised him that plaintiff's gallbladder had some "sludge" in it and that it should be removed. He stated he would call and give Dr. Garcia a report.

31. Upon returning to the BOP/FPC-Maxwell, the plaintiff went to the medical clinic to return the medical charts. At that time, the plaintiff asked Dr. Garcia if he could be examined by his own outside doctors at his own expense. Dr. Garcia refused that request. Defendant Garcia stated he was scheduling surgery to remove plaintiff's gallbladder as soon as he obtained the necessary "approvals".

32. At that point, the plaintiff asked Dr. Garcia about the medicine he had promised at the last clinic visit to replace the Motrin. Dr. Garcia got very angry and told the plaintiff to "just put in a copout request form and go to the clinic to see someone about prescribing it".

33. Thereafter, plaintiff submitted request forms to both the Assistant Warden and Warden De Rosa requesting a medical furlough as permitted under B.O.P. procedures in order for the plaintiff to obtain medical treatment at his own expense from his own doctors. The plaintiff's spouse on numerous occasions called and spoke with the plaintiff's case manager, the BOP/FPC-Maxwell Clinic Staff and the Warden's office

pleading that the plaintiff be permitted to go to the hospital emergency room, or be granted a medical furlough to be treated by outside medical personnel. None of these requests were granted.

34. On or about Saturday, September 1, 2001, at approximately 10:00 p.m., plaintiff began vomiting blood uncontrollably. Security Officer Thomas, finding plaintiff in extremis, radioed the Lieutenant's office and was instructed to bring plaintiff down to the office.

35. Officer Thomas got another inmate, Jim Johnson, to help the plaintiff down to the office and was met thereafter by Security Officer Estep. Mr. Johnson explained to officers Thomas and Estep how sick the plaintiff had been for many weeks.

36. A few minutes later Officer Snyder entered the office. He began shouting, "Coggin, I knew it was you!!! I knew when they called and said there was someone down that it was you. Coggin, I'm damn sick and tired of you getting sick on my shift. Why can't you get sick on somebody else's shift? Every time I come in you've got to come down here sick." Plaintiff replied that he was sorry, but he was in terrible pain and throwing up blood again.

37. Officer Snyder responded shouting, " I'm sick of this!! I can tell you right now I am not going to send you to any Emergency Room!!! You can just sit there until after the count and go back to the dorm or I can lock you up in the holding cell for the night!!"

38. Snyder called Dr. Garcia and told the plaintiff that Garcia had instructed him not to send plaintiff to the hospital emergency room. Thereafter the plaintiff was returned

11

to the Montgomery dorm.

39.     Later that night, while plaintiff showered to clean off the bloody vomitus, he passed out unconscious. Another inmate alerted Security Officer Estep, who radioed the Lieutenant's office of the circumstance and was instructed to "put him in his bunk".

40.     On the following Sunday, September 2, 2001, the plaintiff once again fainted and vomited blood. Security Officer Timmons called an ambulance and plaintiff was emergently taken to Baptist Hospital Emergency Room. Upon arrival the medical staff determined that plaintiff was critical due to a loss of blood due to a severe bleeding ulcer which had been caused and/or grossly aggravated by the Motrin medication prescribed by the BOP/FPC-Maxwell medical staff. Plaintiff thereafter had to undergo emergent surgery for a life-threatening ulcer condition that required numerous transfusions and intensive care treatment and an extended convalescence.

41.     As a result of the failure of this defendant to meet the standard of care, plaintiff has been caused the following damages:

    a.     He nearly died and was caused to undergo surgeries, procedures, transfusions and medical care in an attempt to correct his condition and will do so in the future;

    b.     He has experienced pain and suffering and has become ill and had a complete inability to function and perform many of his routine activities for a period of time including normal eating habits, and will continue to do so in the future;

    c.     He has been caused to suffer extreme emotional and mental distress and will continue to do so in the future;

      d.     He has been caused to incur medical bills in and about his efforts to heal and cure said condition and will continue to do so in the future.

      42.     Plaintiff avers that in and about the care and treatment provided to him, the health care providers, including Dr. Garcia and PA Rodriguez, as well as the staff of the prison, who were likewise charged with following and executing the B.O.P. policies and procedures for providing healthcare to inmates, fell below a reasonable standard of care.

      43.     Plaintiff avers that his injuries were proximately caused by the following culpable acts of the defendant, United States of America:

      a.     For that defendant negligently provided medical care in that it, by and through its agents and employees:

      (1)     Failed to provide medical care that met the standard of care;

      (2)     Failed to follow and execute the B.O.P. policies and procedures for providing prompt medical care and treatment to him as an inmate;

      (3)     Failed to properly evaluate and monitor plaintiff's ongoing condition and complaints;

      (4)     Prescribed high dose Ibuprofen (Motrin) to treat plaintiff's pain in the face of signs and symptoms that would contraindicate such prescription;

      (5)     Failed to instruct and warn plaintiff of the dangers of taking Ibuprofen (Motrin);

      (6)     Failed to provide and obtain prompt medical care for the

symptoms plaintiff presented with including severe epigastric pain and vomiting of blood;

(7) Failed to order further diagnostic studies and labwork that would evaluate ongoing condition.

WHEREFORE, Plaintiff demands judgment against the defendant in the sum of Fifteen Million Dollars ($15,000,000.00) plus interest and costs.

_____
JULIA T. COCHRUN
Attorney for Plaintiff

_____
R. GORDON PATE
Attorney for Plaintiff

OF COUNSEL:
PATE & COCHRUN, LLP
P. O. Box 10448
Birmingham, AL 35202-0448
Telephone: (205) 323-3900
Fax: (205) 323-3906

SERVE DEFENDANTS, VIA CERTIFIED MAIL, AS FOLLOWS:

UNITED STATES OF AMERICA
Federal Prison Camp-Montgomery
Southeast Region
Maxwell Air Force Base
Montgomery, Alabama 362112

U.S. Attorney Alberto R. Gonzales
5137 Robert F. Kennedy Building
10th Street & Constitution Avenue NW
Washington, DC 20530

U.S. Attorney Leura G. Canary
One Court Square, Suite 201
Montgomery AL 36104