**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| JOHN COGGIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.: **2:05-CV-1214-MEF** |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM IN SUPPORT OF UNITED STATES'
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff, John C. Coggin, III, brings this medical malpractice action against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346 (b); 2671-2680.  This action arises from medical care that plaintiff received while a prisoner at the Federal Prison Camp at Maxwell Air Force Base in Montgomery, Alabama (FPC Maxwell).  The United States is entitled to summary judgment on plaintiff's claim because: (1) Bureau of Prisons (BOP) guards cannot be liable for medical malpractice; (2) the BOP doctor and physician's assistant who treated plaintiff are not health care providers within the coverage of the Alabama Medical Liability Act; (3) the specialist who evaluated plaintiff and recommended gallbladder surgery is not an employee of the Government; and (4) plaintiff waived his claim for economic damages.

**LEGAL STANDARD**

Summary judgment should be entered when the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.  P. 56 (c).

**FACTS**

Plaintiff, John C. Coggin, III, was a practicing attorney in Birmingham, Alabama, from 1974 until 1996.[1]  On November 21, 1995, he was indicted in the Northern District of Alabama for making false statements to the Internal Revenue Service (IRS) and Bank Fraud on First Commercial Bank in violation of 18 U.S.C. §§ 1001 and 1344.  *United States v. John C. Coggin, III*, CR-95-N-0328-S (N.D. Ala.).  He pled guilty on January 22, 1996, and was sentenced to five months imprisonment followed by three years supervised release including five months of home detention.

In August 1998, while still on probation, a Federal grand jury indicted plaintiff and his wife, Mickie Coggin, in a sixteen-count indictment.[2]  *United States v. John C. Coggin, et al.*, CR-98-A-234-S (N.D. Ala.).  In January 1999, the Government dismissed the indictment and filed a one-count information against plaintiff charging him with Conspiracy to Commit Bankruptcy Fraud in violation of 18 U.S.C. § 152; Conspiracy to Make a False and Material Statement and Representation to the U.S. Probation Office in

---

[1]He was recently reinstated to the practice of law by the Alabama Bar.

[2]Mrs. Coggin received pre-trial diversion.  *United States v. John C. Coggin, et al.*, CR-98-A-234-S (N.D. Ala.)

violation of 18 U.S.C. § 1001; and Conspiracy to Commit Money Laundering in violation

of 18 U.S.C. § 1956; all in violation of 18 U.S.C. § 371. *United States v. John C. Coggin,*

*III*, CR-99-A-018-S (N.D. Ala.). Plaintiff pled guilty to that information in February

1999, and the Court sentenced him to thirty-six months imprisonment to be served at the

Federal Prison Camp at Maxwell Air Force Base (FPC Maxwell).

      Plaintiff voluntarily surrendered to FPC Maxwell on August 26, 1999. At his

intake physical, plaintiff stated that his present health was "good" and that he had a

history of high blood pressure, frequent urination, and kidney stones. From August 1999

through May 2001, plaintiff had several visits to the prison Health Services Unit for

various complaints including left knee pain; an injured right hand/wrist; several colds,

and an infected boil. He also had periodic hypertension clinic visits for monitoring of his

high blood pressure. The prison Health Services Unit was staffed by one doctor, Orencio

Garcia-Brenes, M.D. (Dr. Garcia); a physician's assistant, Oscar Rodriguez, and two

nurse practitioners, Daphne Essex and Doris Little. Def. Ex. 1, Garcia Decl. ¶ 3. As

Clinical Director, Dr. Garcia supervised all health care providers working in the prison.

*Id.*

      The medical care giving rise to this lawsuit began on July 25, 2001. On that date,

plaintiff submitted an inmate sick call sign-up sheet stating that he had "severe intense

pain in my abdomen" for three days.[3] Def. Ex. 3, BOP Health Record at Bates No.

---

[3]Prison commissary purchase records show that the day before, July 24, 2001, plaintiff
purchased two boxes of Ibuprofen, two bottles of aspirin, and two boxes of Acetaminophen.

00165,   Sick Call Sign-up Sheet.  Plaintiff's chart shows that he was examined by physician's assistant (P.A.) Oscar Rodriguez at 7:05 that morning.[4] Def. Ex. 3, BOP Health Record at Bates No. 00017, progress note dated 7/25/01.  Plaintiff told PA Rodriguez that he had discomfort in the right upper quadrant for four days, that the pain radiates straight back, and that "it increases especially after I eat." *Id.*  Physician's Assistant Rodriguez performed a physical examination and noted that the right upper quadrant of the abdomen was extremely sensitive to the touch, that bowel sounds were decreased, and that the pain radiated to the scapular region.  *Id.*  He noted that plaintiff had no pain on the left side.  *Id.*

Physician's Assistant Rodriguez consulted with Dr. Garcia concerning the patient. Def. Ex. 4 Garcia's Dep at 111, Ln. 3-14.  They made an initial assessment of cholelithiasis (gallstones) and ordered abdominal x-rays.  Def. Ex. 3, BOP Health Record at Bates No. 00017, progress note dated 7/25/01.  The chart reflects that the x-ray was done and showed a stone on the left side.  *Id.*  Doctor Garcia prescribed an injection of an antibiotic, Rocephin, and an injection of Toradol, a non-steroidal anti-inflammatory drug (NSAID), for pain.  *Id.*  Doctor Garcia also prescribed Tylenol number 3 with codeine for

Def. Ex. 2, Commissary Purchase Records.  On August 14, 2001, he purchased another box of Ibuprofen and another box of Acetaminophen.  *Id.*  Plaintiff denies taking any of the over the counter medication that he purchased.  The Government disputes this.  However, this disputed issue of fact is not material to this summary judgment motion.

[4]BOP progress notes are written in a SOAP format: Subjective, Objective, Assessment, and Plan.

4

pain.  *Id.*  He also ordered a complete set of laboratory tests including urinalysis and

blood work.  *Id.*  Bureau of Prisons medical staff took blood and urine samples and sent

them to Alabama Reference Labs in Montgomery for analysis.  Def. Ex. 3, BOP Health

Records at Bates Nos. 0043-44, Lab results.  Alabama Reference Labs performed and

reported plaintiff's lab work that same day.  *Id.*  All of plaintiff's lab results were normal.

*Id.*

      Plaintiff returned to the prison clinic the following day, July 26, 2001, for follow-

up. Def Ex.3, BOP Health Record at Bates No. 00018, progress note dated 7/26/01.   In

the Subjective portion of the progress note, PA Rodriguez noted that plaintiff complained

that the Tylenol Number 3 was causing him G.I. discomfort.  *Id.*   In the Objective portion

of the note he stated that there were no changes in plaintiff's condition.  *Id.*  His

Assessment was cholelithiasis (gallstones) and nephrolithiasis (kidney stones).  In his

Plan, PA Rodriguez ordered an abdominal ultrasound and indicated that he would follow-

up post ultrasound.  *Id.*  He also ordered an intravenous pyelogram (IVP).[5] *Id.*  He

discontinued the Tylenol Number 3 and prescribed Motrin (Ibuprofen) for the pain.  The

prison pharmacist, Public Health Service Lieutenant David Folmar, made a chart entry

showing that he discontinued the Tylenol Number 3, filled the Motrin, and gave plaintiff

written patient information concerning this prescription.  *Id.*

      On July 27, 2001, the Warden granted plaintiff medical furloughs for July 30,

_____

      [5]An IVP is an x-ray of the kidneys and urinary tract using an injected contrast
medium.

2001, and August 1, 2001, for diagnostic tests at Advanced Medical Imaging in Montgomery. Def. Ex. 5, BOP Central File at Bates Nos. 00705-707, Medical Furloughs for Advanced Medical Imaging. Doctor E.P. Vining of Advanced Medical Imaging performed an abdominal ultrasound exam of plaintiff on July 30, 2001. Def. Ex. 3, BOP Health Record at Bates No. 00051, E.P. Vining, M.D., ultrasound report. Doctor Vining's ultrasound report states that he found a 0.5 cm hyperechoic area in plaintiff's gallbladder that "may represent a poorly calcified gallstone, polyp, or small area of tumefactive sludge." *Id.* He noted that the gallbladder wall was normal thickness and the common bile duct had normal measurements. He also noted a 1.5 cm calculus (stone) at the upper pole of the left kidney. *Id.*

Doctor Vining performed an intravenous pyelogram (IVP) with tomography on August 1, 2001. Def. Ex. 3, BOP Health Record at Bates No. 00050, IVP Report. His IVP report states that he saw a 1.5 cm calculus in a caliceal diverticulum at the upper pole of the left kidney. *Id.* Doctor Vining's impression was a left renal calculus. *Id.*

Plaintiff returned to the prison clinic for follow-up on August 6, 2001. Def. Ex. 3, BOP Health Record at Bates No. 00018, Progress note dated 08/06/01. In his progress note, PA Rodriguez noted that plaintiff had "no pain." *Id.* His Assessment was gallstone / kidney stone, and his Plan was to obtain a 24 hour urinalysis and creatin clearance. *Id.* Physician's Assistant Rodriguez wanted these laboratory tests to check plaintiff's kidney function in light of his large kidney stone. Def. Ex. 6, Rodriguez Dep. at 134. These

laboratory tests were performed by Alabama Reference Laboratories in Montgomery on August 10, 2001, and reported on August 11, 2001. Def. Ex. 3, BOP Health Record at Bates No. 00039, Lab Report.

On August 8, 2001, plaintiff returned to the prison clinic for a periodic check of his chronic high blood pressure. Def. Ex. 3, BOP Health Record at Bates No. 00015, Progress Note, Chronic Care Clinic: Hypertension dated 8/08/01. Physician's Assistant Rodriguez noted in the Subjective portion of his progress note that plaintiff had "[n]o somatic complaints." *Id.* In the Objective portion he noted that plaintiff's abdomen showed no tenderness, masses, or palpable organomegaly. *Id.* The chart shows that pharmacist David Folmar refilled plaintiff's prescription for high blood pressure medication, Lisinopril, and gave him written patient information. Def. Ex. 3, BOP Health Record at Bates No. 00016, Administrative Progress Noted dated 8/08/01 by David Folmar.

Plaintiff returned to the prison clinic on Wednesday August 22, 2001, and was seen by Nurse Practitioner Doris Little. Def. Ex. 3, BOP Health Record at Bates No. 00016, Progress Note dated 8/22/01. Plaintiff complained of pain in the right upper abdomen with nausea and vomiting (N+V) since last night. *Id.* Plaintiff told Nurse Practitioner Little that he had not been able to eat for three days and that the pain was aggravated by food and had no identifiable alleviating factors. *Id.* In the objective portion of her note, Nurse Practitioner Little wrote that plaintiff's right upper quadrant

7

(RUQ) was tender to palpitation with guarding. *Id.* Her Assessment was possible cholelithiasis (gallbladder disease), and her Plan was to give plaintiff a shot of Nubain, a synthetic opiod, for pain, perform another urinalysis (U/A), and have him return to the clinic (RTC) the next morning for further evaluation. *Id.*

Plaintiff returned to the clinic the next morning, Thursday August 23, 2001, and was again seen by Nurse Practitioner Little. Def. Ex. 3, BOP Health Record at Bates No. 00016, Progress Note dated 8/23/01. Plaintiff continued to complain of right upper quadrant (RUQ) pain and stated that the painkiller Nubain was only effective for a couple of hours. *Id.* He reported nausea and vomiting (N+V) with any food intake three times during the night. *Id.* In the Objective portion of her note, she noted that plaintiff's abdomen was tender with guarding in the right upper quadrant (RUQ). *Id.* Her Assessment was Cholelithiasis (gallstones) versus Cholecystitis (gallbladder inflamation). *Id.* Her Plan was to recommend referral to a surgeon for evaluation through Dr. Garcia and to prescribe Anaprox[6] for pain. *Id.* She instructed plaintiff to return to the clinic (RTC) as needed (PRN). *Id.*

The next Monday, August 27, 2001, plaintiff returned to the clinic and was seen by Dr. Garcia. Def. Ex. 3, BOP Health Record at Bates Nos. 00013-14, Progress Note dated 8/27/01. Plaintiff told Dr. Garcia that for approximately the last three weeks "I've had this pain, which comes and goes, in the right upper front of [my] abdomen." *Id.* He

---

[6]Anaprox is a non-steroidal anti-inflammatory drug (NSAID) used to relieve pain. The over-the-counter version of this drug is marketed as Aleve.

further reported that "I sometimes get nausea and vomiting associated with it" and explained that "not this last weekend, but Wednesday and Thursday night, I had some vomiting." *Id.* He explained that I "have problems eating because I don't feel like it, and then when I eat something like a plain turkey sandwich, I get pain. I think I lost about 15 pounds in [the] last three weeks." *Id.*

Doctor Garcia performed a physical examination and reviewed plaintiff's abdominal ultrasound report of 7/30/01 and his IVP of 8/01/01. *Id.* In the Objective portion of his progress note, Dr. Garcia noted that plaintiff's abdomen showed slight tenderness in the right upper quadrant. His Assessment was hypertension (HTN); renal calculi (kidney stones); and cholelithiasis (?) / sludge. *Id.* Doctor Garcia discontinued plaintiff's Motrin and Anaprox prescriptions and prescribed Sulindac for pain. *Id.* Plaintiff never picked up his Sulindac prescription. Def. Ex. 7, Coggin Dep. at 94-95, Ln. 15-25, 1-8. Doctor Garcia also ordered new laboratory tests including a complete blood count [CBC] and urinalysis [U/A]. Def. Ex.3, BOP Health Record at Bates No. 00013-14, Progress Note dated 8/27/01. The prison medical staff collected plaintiff's blood and urine samples and the laboratory tests were performed and reported that same day by Alabama Reference Laboratories. Def. Ex. 3, BOP Health Record at Bates No 00034-35, Lab reports dated 8/27/2001.

Doctor Garcia is a general practitioner. Def. Ex. 4, Garcia Decl. ¶ 2. He decided that plaintiff needed to be seen by a specialist for expert evaluation and treatment. *Id.* at ¶

9

5. On August 28, 2001, he had Nurse Pactitioner Daphne Essex call Dr. Antonio J. Williams, a board-certified surgeon practicing in Montgomery, to schedule a consult. *Id.* Nurse Practitioner Essex explained to Dr. Williams that plaintiff had been complaining of abdominal pain for a few weeks and had an abnormal ultrasound report. Def. Ex. 8, Dr. Williams Decl. ¶ 3; Def. Ex. 3, BOP Health Record at Bates No. 00014, Progress Note dated 8/28/01.

Nurse Practitioner Little filled out an SF 513 consultation sheet addressed to Dr. Williams. Def. Ex. 8, Williams Decl ¶ 5, Ex. B; Def. Ex. 3, BOP Health Record at Bates No. 00077, SF 513 dated 8/28/01. In the "reason for request" block she wrote "abdominal pain RUQ [right upper quadrant] - see Abd U/S [abdominal ultrasound] and attached labs. Please Evaluate and tx [treat] accordingly." *Id.* In the "provisional diagnosis" block she wrote "Abdominal Pain." *Id.* Doctor Garcia signed and approved the consultation sheet. *Id.*

The next day, Wednesday August 29, 2001, Dr. Williams examined plaintiff and reviewed his ultrasound report. Def. Ex. 8, Dr. Williams Decl. ¶ 4; Def. Ex. 3, BOP Health Record at Bates No. 00014, Progress note dated 8/29/01. Doctor Williams' impression was that plaintiff was suffering from biliary colic, and he recommended laparoscopic cholescystectomy (gallbladder removal). *Id.* at ¶ 5. He dictated a full consultation report and wrote his impression and plan on the SF 513 consultation sheet. *Id.*, Ex. 8, A; B. While plaintiff was in his office, Dr. Williams called Nurse Practitioner

Essex at the prison and informed her that his diagnosis was biliary colic and that he recommended gallbladder surgery. *Id.* ¶ 5; Def. Ex. 3, BOP Health Record at Bates No. 00014, Progress note dated 8/29/01. Nurse Practitioner Essex informed Dr. Garcia. *Id.*

Thereafter, Dr. Garcia followed Dr. Williams' advice and was planning to schedule the gallbladder surgery. Def. Ex. 4, Garcia Decl. at ¶ 6. However, the gallbladder surgery never took place because that weekend, on Sunday, September 2, 2001, plaintiff was transferred by ambulance from the prison to the emergency room at Baptist Medical Center (Baptist) due to suspected gastrointestinal bleeding.[7] *Id.* at ¶ 7.

He was admitted to Baptist at 1:35AM the next morning with a chief complaint of vomiting blood and an admitting diagnosis of GI [gastrointestinal] bleed. Def. Ex. 9, Baptist Health Records at Bates Nos. 00186; 00191. Doctor John C. Hendrix performed an endoscopy (EGD) on September 3, 2001, that showed a large fresh clot presumably covering a duodenal ulcer. His impression was a duodenal ulcer with no active bleeding. Def. Ex. 9, Baptist Health Records at Bates Nos. 00196, 00187. Late on September 5, 2001, plaintiff's hemoglobin and hematocrit began to drop, and he was transfused two units of blood. Def. Ex. 9, Baptist Health Records at Bates No. 00187. On September 6, 2001, Dr. W. Penn White performed a second endoscopy that showed a large duodenal ulcer with a large visible blood vessel with a clot on the end. Def. Ex. 9, Baptist Health

---

[7]Plaintiff alleges that he began vomiting blood as early as Saturday, August 18, 2001. Def. Ex. 7, Coggin Dep. 54-55, Ln. 20-25, 1. There is no support in the medical records for plaintiff's contention, and the Government disputes it. This disputed issue of fact is not material to this summary judgment motion.

Records at Bates No. 00194. There was no active bleeding at that time. *Id.*

Doctor Alexander Kreher, a surgeon, felt that the chances or re-bleeding were high and recommended surgery to correct the problem. Def. Ex. 9, Baptist Health Records at Bates No. 00193. On September 6, 2001, Dr. Kreher performed surgery (exploratory laparotomy) to correct a contained perforation of the duodenum and bleeding gastric duodenal artery. Def. Ex. 9, Baptist Health Records at Bates Nos. 00195, 00187. Doctor Kreher's operative report notes that plaintiff's gallbladder was chronically inflamed. Def. Ex. 9, Baptist Health Records at Bates No. 00195. Plaintiff did well after the surgery with no complications. Def. Ex. 9, Baptist Health Records at Bates No. 00187. Baptist discharged him on September 17, 2001, and he returned to the prison. *Id.* The Government paid for all of plaintiff's health-care expenses including his $54,377 bill from Baptist. Def. Ex. 10, Baptist Bill; Def. Ex. 7, Coggin Dep. at 122-23, Ln. 22-25, 1-12.

On November 13, 2001, the BOP transferred plaintiff from FPC Maxwell to the Birmingham Community Center half-way house. Def. Ex. 5, BOP Central File at Bates No. 00561. Although he resided at the half-way house, he was permitted to work out of his home in Birmingham. Def. Ex. 5, BOP Central File at Bates No. 00637, Agreement dated October 30, 2001. On January 1, 2001, plaintiff was given Home Confinement status. *Id.* As part of his agreement to be released to the half-way house, plaintiff agreed to be responsible for all of his future medical expenses. *Id.*

12

**ARGUMENT**

I.    **The United States is Entitled to Judgment on
      Plaintiff's Claim Alleging That BOP Guards
      <u>Failed to Provide Adequate Medical Care.</u>**

Plaintiff brings a one-count medical malpractice claim against the United States

pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346 (b), 2671-2680.

Complaint ¶¶ 1, 43.  The FTCA is a limited waiver of sovereign immunity that must be

strictly construed in favor of the Government.  *Dept of the Army v. Blue Fox, Inc.,* 525

U.S. 255, 261 (1999)(holding that "a waiver of sovereign immunity is to be strictly

construed, in terms of its scope, in favor of the sovereign"); *United States v. Orleans*, 425

U.S. 807, 813 (1976); *Dalrymple v. United States*, 460 F.3d 1318, 1324 (11th Cir. 2006).

Sovereign immunity is jurisdictional, and the terms of the United States' consent to be

sued in the FTCA define this Court's jurisdiction.  *FDIC v. Meyer*, 510 U.S. 471, 476

(1994).

The FTCA waives sovereign immunity for certain "claims against the United

States, for money damages . . . [for] personal injury . . . caused by the negligent or

wrongful act or omission of any employee of the Government while acting within the

scope of his office or employment, **under circumstances where the United States, if a

private person, would be liable to the claimant in accordance with the law of the

place where the act or omission occurred**."  28 U.S.C. § 1346 (b) (emphasis added).

*See also, Meyer*, 510 U.S. at 478-79.  "The United States shall be liable . . . in the same

manner and to the same extent as a private individual under like circumstances. 28

U.S.C. § 2674. The Supreme Court explains that "we have consistently held that § 1346

(b)'s reference to the 'law of the place' means the law of the State - the source of

substantive liability under the FTCA." *Meyer*, 510 U.S. at 479. Accordingly, plaintiff's

claim is governed by Alabama law. *Id.*; *United States v. American Scrap Metal Co.*, 617

F.2d 1197, 1199 (11th Cir. 1980).

Bureau of Prisons' (BOP) guards and other non-medical staff cannot be held liable

under Alabama law for allegedly breaching the standard of care. Plaintiff alleges that

"the health care providers . . . **as well as the staff of the prison, who were likewise**

**charged with following and executing the B.O.P. policies and procedures for**

**providing healthcare to inmates**, **fell below the standard of care**." Complaint ¶ 42

(emphasis added). Plaintiff devotes much of his deposition testimony to allegations that

BOP guards failed to provide adequate medical care. *See*, Def. Ex. 7, Coggin Dep. at 33,

Ln. 9-12; 36, Ln. 5-25; 37-38, all; 41, Ln. 9-12; 44-4, all, 55, Ln. 13-25. 138-140, Ln. 12-

25, all, 1-16.. He also peppers his complaint with allegations that BOP guards failed to

render adequate medical care. *See,* Complaint ¶¶ 10, 14-15, 25-27, 34-40. Plaintiff

explains that "the thing that I think outrages me the most and I think is the worst thing **as**

**far as the standard of care** is the fact that when I was passing out, unconscious, when I

was throwing up blood all over, that they still did not send me out to an emergency room.

They did not take any action to help me." Def. Ex. 7, Coggin Dep. at 138, Ln. 13-19

14

(emphasis added).  When asked "is that the guards who failed to do that" plaintiff

answered "[t]he guards, the medical staff, Dr. Garcia, Dr. Rod — I mean Rodriguez.  It

was . . . a complete failure of all of them."  *Id.* at 139, Ln. 3-6.  None of plaintiff's

allegations against non-medical BOP staff can support malpractice liability under

Alabama law.

Under Alabama law, all claims for "medical injury" are governed by the Alabama

Medical Liability Act, Ala. Code §§ 6-5-480 - 6-5-488 (2007), and the Alabama Medical

Liability Act of 1987, Ala. Code §§ 6-5-540 - 6-5-552 (2007)(collectively "AMLA").[8]

*Houston County Health Care Authority v. Williams*, 961 So.2d 795, 810 (Ala. 2006).

Only a "health care provider," as defined in the statute, may be held liable for a breach of

the standard of care.  Ala. Code § 6-5-542 (2) (2007)(providing that "[a] breach of the

standard of care is the failure by a **health care provider** to comply with the standard of

care, which failure proximately causes personal injury or wrongful death.")

The AMLA defines "heath care provider" as a "medical practitioner, dental

practitioner, medical institution, physician, dentist, hospital, or other health care provider

as those terms are defined in Section 6-5-481."  Ala. Code § 6-5-542 (1).  Section 6-5-481

(1) defines a "medical practitioner" as "[a]nyone licensed to practice medicine or

osteopathy in the State of Alabama, engaged in such practice, including medical

---

[8]The Alabama Medical Liability Act of 1987 is intended to supplement the Alabama
Medical Liability Act and the two statutes should be construed consistently.  Ala. Code § 6-5-541
(2007).

professional corporations, associations, and partnerships." Section 6-5-481 (5) defines

"physician" as "[a]nyone licensed to practice medicine in Alabama," and § 6-5-481 (8)

defines "other health care providers" as "[a]ny professional corporation or **any person**

**employed by physicians, dentists, or hospitals who are directly involved in the**

**delivery of health care services**."(emphasis added)

Bureau of Prisons' guards and other non-medical prison staff are not "health care

providers" under the AMLA because they do not meet this definition of "other health care

providers." Bureau of Prisons Correctional Officers are not responsible for providing

health care services to prisoners and are not supervised by the Clinical Director of the

Health Services Unit. Def. Ex. 1, Garcia Decl. at ¶ 3. Therefore, they are not "employed

by physicians, dentists, or hospitals" and they are not "directly involved in the delivery of

health care services." *See*, Ala. Code §§ 6-5-542 (1); 6-5-481 (8) (defining "other health

care providers"). Accordingly, the United States cannot be held liable under the AMLA,

as incorporated by reference in the FTCA, for the alleged failure by BOP guards to render

adequate medical care. Alabama law does not impose a duty to provide adequate medical

care on anyone other than "health care providers." Ala. Code § 6-5-542 (2) (2007).

Plaintiff argues that BOP regulations and policies impose a duty on non-medical

staff to provide prompt and adequate medical services. Complaint ¶¶ 27, 42, 43 (a)(2).

He alleges that the United States "[f]ailed to follow and execute B.O.P. policies and

procedures for providing prompt medical care to him as an inmate." Complaint ¶ 43

(a)(2).  *See also*, Def. Ex. 4, Coggin Dep. at 139-40, Ln. 22-25, 1-7.  In discovery,

plaintiff produced excerpts from BOP Program Statement 3420.09 § 10 (b); and Program

Statement 6000.05 §§ 1, 2; Chapter 6, §§ 1, 3 in support of his claim.  Def. Ex. 11, BOP

Program Statements produced by plaintiff.  Plaintiff relies upon these generic BOP

Program Statements to establish a duty by BOP guards and other non-medical prison staff

to provide adequate medical care.[9]

Federal regulations do not create an actionable duty under the FTCA.  *American*

*Scrap Metal*, 617 F.2d at 1199 (holding that Federal safety regulations do not create an

actionable duty under the FTCA); *Art Metal-USA, Inc. v. United States*, 753 F.2d 1151,

1157 (D.C. Cir. 1985)(holding that "the violation of a federal statute or regulation by

government officials does not of itself create a cause of action under the FTCA").

Liability under the FTCA is determined strictly "in accordance with the law of the place

where the act or omission occurred."  28 U.S.C. § 1346 (b).  Therefore, as is explained

---

[9]Examination of the BOP Program Statements relied upon by plaintiff shows that they do not impose a duty on BOP guards to provide medical care.  For example, Program Statement 3420.09, Section 10 (b) provides in whole that "[b]ecause failure to respond to an emergency may jeopardize the security of the institution as well as the staff or inmates, it is mandatory that employees respond immediately and effectively to all emergency situations."  This program statement has nothing to do with health care services.  Program Statement 6000.05 Section 1 defines the terms medically mandatory and presently medically necessary; Section 2 addresses potential incompatibility between medical and correctional guidelines; Chapter 6, Section 1 provides that each institution shall develop and maintain written plans and procedures defining the scope of healthcare provided in the Health Services Unit; and Chapter 6, Section 3 provides that each institution shall have written plans and procedures for providing urgent medical and dental services.  None of the BOP Program Statements relied upon by plaintiff provides that BOP guards provide health care services to prisoners.  That is the role of the prison medical staff in the Health Services Unit.

above, liability in this case is determined under the AMLA. *Meyer*, 510 U.S. at 479;

*American Scrap Metal*, 617 F.2d at 1199.

BOP Policy Statements are internal BOP guidelines for operating Federal prisons.

*Parsons v. Pitzer*, 149 F.3d 734, 738 (7th Cir. 1998). By definition, these Policy

Statements are Federal, not State, guidelines. The United States cannot be held liable

under the FTCA for the alleged violation of a Federal Policy Statement. *American Scrap*

*Metal*, 617 F.2d at 1199. The "United States has simply not rendered itself liable under §

1346 (b) for" a claim alleging the violation of a Federal statute or regulation. *Meyer*, 510

U.S. at 479.

Finally, plaintiff's allegations against BOP guards appears to be an attempt to

bring an Eighth-Amendment claim in the guise of an FTCA malpractice claim. In his

deposition, plaintiff explained his claim by stating that "[e]ven the United States Supreme

Court has provided that . . . people that are in that situation [prisoners] have a

constitutional right to prompt, reasonable, and diligent medical care. . . . You know, a

person may make a mistake, but they're not sentenced to go in there and die." Def. Ex. 7,

Coggin Dep. at 140, Ln. 7-14.

The Eighth Amendment "establish[es] the government's obligation to provide

medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429

U.S. 97, 103 (1976). "[D]eliberate indifference to serious medical needs of prisoners

constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth

Amendment." *Id.* at 104 (internal quotes and citation omitted). *See also*, *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). A prisoner may state a constitutional claim under the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05; *Brown*, 387 F.3d at 1351.

Plaintiff has not filed *Bivens*[10] claims against any of the BOP guards, and he cannot bring constitutional claims directly against the United States under the FTCA. *Myer*, 510 U.S. at 478-79. The Eighth Amendment imposes a duty on prison guards with respect to prisoners' medical care; Alabama law does not. Accordingly, the United States is entitled to judgment on plaintiff's claim alleging a violation of the standard of care by BOP guards and other non-medical prison staff.

## II.    The United States is Entitled to Judgment Because the BOP Doctor and Physician's Assistant Who Treated Plaintiff Do Not Satisfy the AMLA's Definition of Health Care Provider.

As is explained above, plaintiff's claim is governed by the AMLA. Under the statute, only a "health care provider" has a duty to comply with the standard of care. Ala. Code § 6-5-542 (2)(19xx)(providing that "a breach of the standard of care is the failure by a **health care provider** to comply with the standard of care, which failure proximately causes personal injury or wrongful death")(emphasis added). A careful reading of the

---

[10]*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

19

statute shows that Dr. Garcia and physician's assistant Oscar Rodriguez are not health care providers as defined by the Alabama legislature.

The AMLA defines a health care provider as "[a] medical practitioner, dental practitioner, medical institution, physician, dentist, hospital, or other health care provider as those terms are defined in Section 6-5-481." Ala. Code § 6-5-542 (1) (19XX). Section 6-5-481 (5) defines "physician" as "[a]ny person **licensed to practice medicine in Alabama**"(emphasis added). Section 6-5-481 (1) defines "medical practitioner" as "**[a]nyone licensed to practice medicine or osteopathy in the State of Alabama, engaged in such practice**, including medical professional corporations, associations, and partnerships"(emphasis added). Doctor Garcia does not satisfy either of these definitions because he is not licensed to practice medicine in Alabama. Def. Ex. 1, Garcia Decl. ¶ 2.

Doctor Garcia is licensed to practice medicine in the Commonwealth of Puerto Rico. *Id.* He is permitted to work as a doctor for the BOP pursuant to his Puerto Rico medical license and BOP regulations. *Id.* He is not licensed to practice in Alabama. *Id.* Accordingly, Dr. Garcia does not qualify as a health care provider under the AMLA, and the United States cannot be held liable for his alleged breach of the standard of care.

Similarly, BOP physician's assistant Oscar Rodriguez does not satisfy the AMLA's definition of health care provider. Section 6-5-481 (8) defines "other health care providers" as "any professional corporation, or any person employed by physicians, dentists, or hospitals who are directly involved in the delivery of health care services."

20

Oscar Rodriguez was not employed by a physician, dentist, or hospital as those terms are

defined in the statute.  He holds a medical degree from the University of the Dominican

Republic and was recruited by the BOP to work as a physician's assistant.  Def. Ex. 6,

Rodriguez Dep. at 6, Ln. 1-25.  He is not licensed in the United States to work as a

physician.  *Id.* at 11, Ln. 14-24; 14, Ln. 1-4.  He works as a BOP physician's assistant

pursuant to his Dominican medical training and BOP regulations.

As the Alabama legislature has not included physician's and physician's assistants

authorized by BOP regulations to practice in Federal prisons within the AMLA's

definition of health care provider, the United States cannot be liable under Alabama law

for their alleged breach of the standard of care.  Plaintiff's only available remedy is an

Eighth Amendment *Bivens* claim against Dr. Garcia and Oscar Rodriguez individually for

deliberate indifference to serious medical needs.  *See Estelle*, 429 U.S. at 104-05; *Brown*,

387 F.3d at 1351.  He has not brought such constitutional claims.

### III.   The United States is Entitled to Judgment Because the Specialist Who Evaluated Plaintiff is not an Employee of the Government

Doctor Garcia satisfied his duty of care as a general practitioner by referring

plaintiff to a specialist, Dr. Antonio Williams.  Williams Decl. ¶ 8  The United States

cannot be held liable for any breach of the standard of care by the specialist because he is

not a Government employee.  *Logue v. United States*, 412 U.S. 521, 526-32 (1973);

*Means v. United States*, 176 F.3d 1376, 1379-80 (11th Cir. 1999).  The FTCA only waives

sovereign immunity for claims arising from the "negligent or wrongful act or omission of

any **employee of the Government** while acting within the scope of his office or

employment[.]"  28 U.S.C. § 1346 (b)(1)(emphasis added).  The Court of Appeals

explains that "[a]n individual cannot be an 'employee of the government' under the

FTCA absent governmental authority to supervise or control that person's daily activities.

*Means*, 176 F.3d at 1380.  *See also*, *Logue*, 412 U.S. at 526-32.

     The Government lacked any authority to supervise or control Dr. Williams' day-to-

day professional medical activities.  Doctor Williams testifies that "I exercised

independent medical judgment at all times in my consultation on Mr. Coggin.  The

Bureau of Prisons did not control or direct the manner in which I performed my

examination of Mr. Coggin."  Def. Ex. 8, Williams Declaration ¶ 7.  Accordingly, Dr.

Williams is not an "employee of the government" under the FTCA, and the United States

cannot be liable for any failure by him to properly diagnose or treat plaintiff.  *See,*

*Simpson v. Holder*, 184 Fed. Appx. 904, 909-910, 2006 WL 1674265 *5 (11th Cir.2006)

(unpublished) (holding that  the United States is not liable under the FTCA for the alleged

malpractice of community doctors who treated a federal prisoner because they were not

employees of the Government under 28 U.S.C. § 1346 (b)(1)) .

     Doctor Garcia is a general practitioner.  Def. Ex. 4, Garcia Dec. ¶ 12.  He is not a

specialist in any particular field of medicine.  *Id.*  Doctor Williams testifies that **"Doctor**

**Garcia fulfilled his role as a general practitioner by sending the patient to me, a**

**specialist, for a consult.  Thereafter, I was responsible for evaluating and treating**

**this patient**." Def. Ex. 8, Williams Decl. ¶ 8 (emphasis added). Dr. Garcia's care of plaintiff culminated in his decision to refer him to a specialist for expert evaluation and treatment on August 28, 2001. *Id.* This referral to a specialist satisfied Dr. Garcia's duty of care and absolved him of further responsibility for diagnosing and treating plaintiff. *Id.*

Doctor Williams was the last physician who examined plaintiff before he was admitted to Baptist. He had the last, best chance to diagnose any existing peptic ulcer disease or gastrointestinal bleeding. However, the United States cannot be liable for any breach of the standard of care by Dr. Williams because he is not an employee of the Government. 28 U.S.C. § 1346 (b); *Logue*, 412 U.S. at 526-32; *Means*, 176 F.3d at 1379-80.

**IV.     The United States is Entitled to Judgment
          on Plaintiff's Economic Damages Claim.**

Plaintiff has waived any claim for future medical expenses, and he claims no other economic damages. On October 30, 2001, plaintiff entered into a written agreement with the Government in which he agreed to be responsible for his future medical expenses. Def. Ex. 5, BOP Central File at Bates No. 00637, Agreement dated October 30, 2001. The agreement was drafted by plaintiff, an attorney, and addressed to his case manager Ms. Rosetta Beasley. It states in full:

> Per our telephone conference call today among yourself, Mr Larry Spencer, and myself, this will confirm that due to my medical convalescence status, I will be given Home Confinement status immediately upon my ten percent

23

date, January 1, 2002.  From November 13, 2001 to December 31, 2001, I
will reside at the Birmingham Community Center [half-way house], and
will be permitted to be at my home during the day, and to work out of the
home . . . .

**I agree to be responsible for my future medical expenses** and home
confinement fees that arise after my release from FPC Maxwell.

Def. Ex. 5, BOP Central File at Bates No. 00637, Agreement dated October 30, 2001

(emphasis added). The agreement is signed "agreed to and witnessed" by plaintiff and

Rosetta Beasley.  Therefore, plaintiff has waived his claim for any medical expenses since

his release from prison to the half-way house.

Despite the clear waiver that he drafted and signed, plaintiff now seeks to recover

for future medical expenses.  In response to the United States' interrogatory asking him to

specify his economic damages, plaintiff itemized his economic damages as: "[c]harges for

medications to treat ulcer, potential future medical expenses for additional surgery for

incisional hernia, scar tissue on chest and potential re-bleeds.  My medications run about

$1, 560/yr on average and I incur from $150-300 for doctors visits per year.  I cannot

predict what the surgical costs will be for the hernia repair, however, it will include the

surgeon's fee, facility charge, and anesthesia and lab charges." Def. Ex. 12, Plaintiff's

Response to Defendant's interrogatory No. 11.  Plaintiff makes no other claim for

economic damages and admits that the Government paid for all of his medical expenses

while he was a prisoner.  Def. Ex. 7, Coggin Dep. at 122-23.  Plaintiff's only remaining

claim is for non-economic damages.  See, Def. Ex. 12, Pl's response to Def's

Interrogatory No. 12.[11]

## CONCLUSION

For all of the above reasons, the United States is entitled to summary judgment,

and plaintiff's cause of action should be dismissed in its entirety with prejudice.

Respectfully submitted this 12th day of October 2007.

LEURA G. CANARY
United States Attorney


By:     /s/Stephen M. Doyle_____
STEPHEN M. DOYLE
Chief, Civil Division
Assistant United States Attorney
Attorney for Defendant
Post Office Box 197
Montgomery, AL  36101-0197
District of Columbia Bar No. 422474
Telephone No.: (334) 223-7280
Facsimile No.: (334) 223-7418
**E-mail:  stephen.doyle@usdoj.gov**

---

[11]Section 6-5-544 of the AMLA caps non-economic damages at $400,000.  In 1992, the Alabama Supreme Court declared this cap invalid under the Alabama Constitution because it violated the right to trial by jury and the guarantee of equal protection.  *Moore v. Mobile Infirmary Assoc.*, 592 So.2d 156, 171 (Ala. 1992).  The Alabama Supreme Court subsequently held that the Alabama Constitution does not contain an equal protection clause, but declined to revisit its holding in *Moore.  Mobile Infirmary Medical Center v. Hogden*, 884 So. 2d 801, 814 (Ala. 2004)(*citing, Ex party Melof*, 735 So. 2d 1172 (Ala. 1999)).  *See also, Mobile Infirmary Assoc. v. Tyler*, 2007 WL 2687321 **23-24 (acknowledging that a damages cap does not violate the right to trial by jury, but holding same).

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to plaintiff's attorney, Julia T. Cochrun, Esquire.

/s/Stephen M. Doyle
Assistant United States Attorney