# DEFENDANT'S EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JOHN COGGIN,

     Plaintiff,

vs.                          CASE NO. 2:05-cv-1214-F

UNITED STATES OF AMERICA,

     Defendant.

\* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JOHN COGGIN, taken pursuant to stipulation and agreement before Wendy Lewis, Court Reporter and Commissioner for the State of Alabama at Large, in the Law Offices of Pate, Lloyd & Cochrun, 400 Title Building, 300 North 21st Street, Birmingham, Alabama, on Thursday, September 20, 2007, commencing at 9:58 a.m.

\* \* \* \* \* \* \* \* \* \* \*

JOHN COGGIN v. UNITED STATES OF AMERICA                      9/20/2007
DEPOSITION OF JOHN COGGIN

2 (Pages 2 to 5)

---

**Page 2**

```
 1           APPEARANCES
 2  FOR THE PLAINTIFF:
 3  Ms. Julia Truesdell Cochrun
    PATE, LLOYD & COCHRUN
 4  Attorneys at Law
    400 Title Building
 5  300 North 21st Street
    Birmingham, Alabama 35203
 6
    FOR THE DEFENDANT:
 7
    Mr. Stephen M. Doyle
 8  Chief, Civil Division
    UNITED STATES DEPARTMENT OF JUSTICE
 9  OFFICE OF THE UNITED STATES ATTORNEY
    131 Clayton Street
10  Montgomery, Alabama 36104
11           * * * * * * * * * *
12           EXAMINATION INDEX
13  JOHN COGGIN
      DIRECT BY MR. DOYLE          4
14    CROSS BY MS. COCHRUN        145
15           EXHIBIT INDEX
16  PLAINTIFF'S EXHIBIT NO.:
17  1  Program Statements    145,146
18  DEFENDANT'S EXHIBIT NO.:
19  1  FPC Montgomery Admissions    28
       and Orientation Booklet
20
    2  Alabama Emergency Medical    58
21     Services Narrative/PMO
22  3  Baptist Health ER Record     65
23  4  Baptist Medical Center       66
       Medical Record
24
25
```

**Page 3**

```
 1  DEFENDANT'S EXHIBITS, continued:
 2  5  Prison Commissary Purchase    71
       Records
 3
    6  10/30/01 Letter to Rosetta    109
 4     Beasley from John Coggin
 5  7  U.S. Department of Justice    131
       Incident Report
 6
    8  Presentence Investigative    135,136
 7     Report
 8           * * * * * * * * * *
 9           STIPULATIONS
10      It is hereby stipulated and agreed by and
11  between counsel representing the parties that the
12  deposition of JOHN COGGIN is taken pursuant to the
13  Federal Rules of Civil Procedure and that said
14  deposition may be taken before Wendy Lewis, Court
15  Reporter and Commissioner for the State of Alabama at
16  Large, without the formality of a commission; that
17  objections to questions other than objections as to
18  the form of the questions need not be made at this
19  time but may be reserved for a ruling at such time as
20  the deposition may be offered in evidence or used for
21  any other purpose as provided for by the Federal Rules
22  of Civil Procedure.
23      It is further stipulated and agreed by and
24  between counsel representing the parties in this case
25  that said deposition may be introduced in the trial of
```

**Page 4**

```
 1  this case or used in any manner by either party hereto
 2  provided for by the Federal Rules of Civil Procedure.
 3           * * * * * * * * * *
 4           JOHN COGGIN
 5      The witness, having first been duly sworn to
 6  speak the truth, the whole truth and nothing but the
 7  truth, testified as follows:
 8           DIRECT EXAMINATION
 9  BY MR. DOYLE:
10      Q.  And, Mr. Coggin, can you state your present
11  address?
12      A.  Shelby County, Alabama, Birmingham.
13      Q.  Your address.  Give me your street.
14      A.  1034 Waters Edge.
15      Q.  And is that a single family home or --
16      A.  Huh?
17      Q.  Is that a single family home?
18      A.  Yes.
19      Q.  How long have you lived at that address?
20      A.  A year.  Maybe less than a year.
21      Q.  Do you rent or own that home?
22      A.  It's -- my wife owns it.
23      Q.  So that's in the name of Mickie Coggin; is
24  that correct?
25      A.  Uh-huh.
```

**Page 5**

```
 1      Q.  You're an attorney; is that right?
 2      A.  Yes.
 3      Q.  What, if anything, did you do to prepare for
 4  today's deposition?
 5      A.  I read the complaint, looked over the -- the
 6  claim that was filed.  I think I also looked at the
 7  depositions that have been taken so far.
 8      Q.  Did you look at any other documents?
 9      A.  Looked at, I think, the affidavits that had
10  been secured in the case.
11      Q.  Anything else?
12      A.  That's about it.
13      Q.  I want to run through your education.  Where
14  are you from?
15      A.  I grew up in Montgomery, Alabama.
16      Q.  And where did you go to high school?
17      A.  Sidney Lanier.
18      Q.  And when did you graduate?
19      A.  Do I have to say that?
20      Q.  Yeah.
21      MS. COCHRUN:  The first mean question.
22      A.  Since we're talking about birthdays.  1966.
23      Q.  And if you could chronologically run forward
24  your education after you graduated from high school.
25      A.  After getting out of high school, I went to
```

JOHN COGGIN v. UNITED STATES OF AMERICA                          9/20/2007
DEPOSITION OF JOHN COGGIN

3 (Pages 6 to 9)

## Page 6

1  University of Alabama, went there for undergraduate,
2  then -- and went to graduate school.
3      Q.  What was your undergraduate degree in?
4      A.  Money, banking.
5      Q.  And when did you receive that degree?
6      A.  1970.
7      Q.  Any honors or awards with that degree?
8      A.  Beta Gama Sigma.
9      Q.  Which is?
10     A.  I guess the business equivalent of Phi Beta
11 Kappa.
12     Q.  Okay.  Any -- you're a lawyer.  When did you
13 go to law school?
14     A.  Well, after I -- I went to graduate school
15 after college --
16     Q.  Oh, okay.
17     A.  -- and got a -- go ahead.
18     Q.  Where did you go to grad school?
19     A.  University of Alabama.
20     Q.  What did you study?
21     A.  Finance.
22     Q.  And did you receive a degree?
23     A.  Yeah, a master's.
24     Q.  And when was that?
25     A.  Also in 1970.

## Page 7

1      Q.  So you receive a Master of Science or --
2      A.  I guess it's an MA, Master of Arts, yes, sir.
3      Q.  -- in finance in 1970; is that correct?
4      A.  Yes, sir.
5      Q.  Did you go to any school after that?
6      A.  Law school.
7      Q.  Where did you attend law school?
8      A.  University of Alabama.
9      Q.  And when did you graduate?
10     A.  '73.
11     Q.  And did you receive any honors or awards with
12 your degree?
13     A.  Order of the Coif.
14         MS. COCHRUN:  His CV is in that stuff I gave
15 you in case you want to read it.
16         MR. DOYLE:  Okay.
17         MS. COCHRUN:  I mean, it will give a little
18 bit of a map, might make life easier.
19     Q.  Have you ever served in the Armed Forces?
20     A.  Yes, sir.  I was in the United States Air
21 Force.
22     Q.  And when was that?
23     A.  After I graduated from law school.  I served
24 on active duty at Maxwell Air Force base.
25     Q.  In what capacity?

## Page 3

1      A.  Actually, I worked in the Judge Advocates
2  Office.
3      Q.  And for how long were you on active duty for
4  the Air Force?
5      A.  Well, I had a four-year commitment, but the
6  Vietnam War was winding down, so I -- I was really
7  stalling, so I was in for like 91 days.
8      Q.  And was that commitment from ROTC?
9      A.  Yes.
10     Q.  Did ROTC pay for your undergraduate
11 education?
12     A.  No.
13     Q.  But you were commissioned through the ROTC
14 program at University of Alabama; is that correct?
15     A.  Yes.
16     Q.  How many years were you in ROTC?
17     A.  I think it was either two or four.  I'm not
18 sure.  I was in it in high school and then went in,
19 in -- I think it was two years, but it might have been
20 four.  You know, I'm really not sure.
21     Q.  But you were commissioned --
22     A.  I think it was four.
23     Q.  Were you commissioned when you graduated?
24     A.  Yes.  I was commissioned as a second
25 lieutenant when I graduated.

## Page 9

1      Q.  And then you continued --
2      A.  And then I got a deferment to go to law
3  school.
4      Q.  Are you a member of any bar?
5      A.  Yes, sir.
6      Q.  And what bar is that?
7      A.  The American Bar Association and the
8  Birmingham Bar Association.
9      Q.  Okay.  Not a bar association.  A state bar.
10     A.  Oh, I'm sorry.  The Alabama State Bar.
11     Q.  When did you first join that, or when did you
12 take the bar examination in Alabama?
13     A.  1973.
14     Q.  Upon graduation from law school?
15     A.  Yes.  July of '73.
16     Q.  What is your current bar status?
17     A.  Good -- active, in good standing.
18     Q.  I'm going to run through your criminal
19 convictions; but at some point, did you surrender your
20 license or were you disbarred as a result of your
21 convictions?
22     A.  Yes, sir.  I voluntarily surrendered in 1996.
23     Q.  And when did you reapply for membership?
24     A.  Well, I was reinstated in 2004.
25     Q.  Beginning today, let's go through your

JOHN COGGIN v. UNITED STATES OF AMERICA                          9/20/2007
DEPOSITION OF JOHN COGGIN

4 (Pages 10 to 13)

Page 10

1  employment history. Where do you work now?
2      A. I'm self-employed, Coggin & Associates.
3      Q. And is that a law firm?
4      A. Well, actually, it's -- I'm an attorney, but
5  it's actually doing business brokerage. It would be
6  more mortgages and acquisitions.
7      Q. Are you incorporated or a professional
8  association?
9      A. Sole proprietor.
10     Q. Sole proprietor?
11     A. Yes.
12     Q. And what's the address of that business?
13     A. I work out of my home.
14     Q. The same address you gave me at the beginning
15 of the deposition?
16     A. Yes.
17     Q. Any other employees of that firm?
18     A. No.
19     Q. Can you give me some of your major clients?
20     A. Well, no, not really.
21     Q. Do you have any clients?
22     A. I have -- you know, I work on a case-by-case
23 basis. You know, I just recently worked for Arrow,
24 it's a corporation doing garbage disposal business.
25     Q. Let's work backwards from there. What was

Page 11

1  your last employment before that?
2      A. It was with -- a CFO position with a company
3  called Stewart Lubricants.
4      Q. Okay. And what is Stewart Lubricants?
5      A. They are an oil distribution business.
6      Q. And can you give me your years of employment
7  with Stewart Lubricants, please?
8      A. I served as their -- well, actually, I worked
9  as a CFO from 1996 through 1999.
10     Q. And why did you --
11     A. Prior to them -- prior to that, prior to
12 working for them as a CFO, I was their general
13 counsel, outside counsel.
14     Q. Oh. Outside counsel?
15     A. Outside counsel.
16     Q. Started as CFO in '96; is that correct?
17     A. Yes.
18     Q. Where were you when you were outside
19 counsel? Were you with a law firm or what was your --
20     A. I was with a law firm.
21     Q. And what firm was that?
22     A. Coggin & Associates.
23     Q. Who else worked for that firm?
24     A. Well, at -- over the years, it was different,
25 different people that worked.

Page 12

1      Q. Were you the only partner?
2      A. Yes.
3      Q. And you hired --
4      A. I had different people that were hired over
5  the years.
6      Q. How long did you operate that firm?
7      A. From '80 -- 1981 through 1996, when I
8  surrendered my license.
9      Q. Prior to '81, where did you work?
10     A. I worked for a law firm.
11     Q. Which law firm?
12     A. The firm in '81 was Haskell Slaughter.
13     Q. What's the current name of that firm?
14     A. I'm not sure. It changes quite rapidly. I
15 haven't checked.
16         MS. COCHRUN: It's some form of that.
17     A. Actually, you know, when I got out of law
18 school, I went, you know, in the Air Force and then
19 went to work for Bradley, Arant, Rose & White and
20 worked with them from '73 to 1977 and then left there.
21     Q. You were an associate there; is that right?
22     A. Yes. Yes, sir.
23     Q. And what kind of matters did you work on?
24     A. Pretty much, you know, business related type
25 matters.

Page 13

1      Q. And after Bradley Arant?
2      A. Then I -- another lawyer and I left Bradley
3  Arant and went to at that time Haskell Slaughter. And
4  it was from there I left and formed my own firm.
5      Q. When you were -- at the Haskell law firm,
6  were you a partner or associate?
7      A. Yes. Yes, sir.
8      Q. You were a partner? Okay. Prior to this
9  lawsuit, have you been a party in any other lawsuits?
10     A. Yes.
11     Q. And please list them for me.
12     A. The -- I was a plaintiff in a lawsuit against
13 Stewart Lubricants.
14     Q. And what was the nature of that lawsuit?
15     A. It was a -- I guess, basically, it was a
16 breach of contract claim. And that was settled in
17 2002.
18     Q. What was that settled for, approximately?
19     A. Well, it's subject to a confidentiality
20 agreement.
21     Q. I won't probe that, then. Did you have your
22 deposition taken in that case?
23     A. Yes, sir.
24     Q. Do you have a copy of that?
25     A. No.

JOHN COGGIN v. UNITED STATES OF AMERICA                                    9/20/2007
DEPOSITION OF JOHN COGGIN

5 (Pages 14 to 17)

## Page 14

1    Q. Other lawsuits that you -- and you were a
2 plaintiff in the suit against Stewart Lubricants; is
3 that correct?
4    A. Yes.
5    Q. And what court was that?
6    A. It was in the Jefferson County Circuit Court.
7    Q. Any other lawsuits that you've been a party
8 to?
9    A. I was a plaintiff in a case against the IRS.
10   Q. And where was it? When and where was that?
11   A. It was filed in 1998.
12   Q. Okay. And what court?
13   A. Filed in the Northern District of Alabama,
14 federal court.
15   Q. And what was the nature of your claim?
16   A. It was basically a suit on violation of the
17 automatic stay in bankruptcy.
18   Q. What was the disposition of that case?
19   A. I voluntarily dismissed the suit.
20   Q. Was that defended by the U.S. Attorney's
21 Office?
22   A. Yes.
23   Q. Do you remember who had it?
24   A. No, I really don't.
25   Q. Any other cases you've been a party to?

## Page 15

1    A. There was a suit in the mid '80s in which I
2 was a defendant. It was a suit by an individual named
3 Charles Jelm.
4    Q. Jim, J-I-M?
5    A. J-E-L-M.
6    Q. J-E-L-M.
7    A. Yeah. And what that involved was --
8 actually, I was -- it was a suit against an
9 individual, Richard McIntyre, who was an NSD
10 broker-dealer. And my law firm, my prior law firm,
11 and I were added as additional defendants. It was a
12 Rule 10(b)(5) case.
13   Q. And that was Coggin & Associates as a
14 defendant?
15   A. Well, they named me individually and the --
16 more the Haskell firm. It arose out of a partnership
17 offering that the law firm did in I think it was 1980,
18 so -- '80 or '81.
19   Q. What court was that filed in?
20   A. It was filed in district court in Ohio, which
21 whatever -- I think it was -- whatever court is in
22 Cleveland. I think it was in Cleveland.
23   Q. And what was the disposition of that case?
24   A. I and the law firm were dismissed out as
25 prejudice.

## Page 16

1    Q. Was your deposition taken in that case?
2    A. No.
3    Q. Do you remember if that was a Rule 12 motion
4 or Rule 56?
5    A. I really don't.
6    Q. An early dispositive motion?
7    A. It was after about a year, I think. Several
8 motions were filed.
9    Q. Other than the Stewart Lubricants lawsuit,
10 have you ever been deposed in any other cases?
11   A. No.
12   Q. Have you ever given sworn testimony in any
13 other cases?
14   A. I can't think of any, you know.
15   Q. And --
16   A. I think when I had my -- when I went through
17 personal bankruptcy, I think there was like a hearing
18 with that. I forget what they called it.
19   Q. Like a 341 hearing?
20   A. Yeah, something like that. I think I gave
21 sworn testimony then. I can't think of any others.
22   Q. And when was your bankruptcy?
23   A. In '95. December of '95.
24   Q. When was the first time that you were
25 arrested?

## Page 17

1    A. I wasn't -- I really wasn't ever arrested.
2    Q. Well, when was the first time that you were
3 indicted or charged with a crime?
4    A. There was an information filed in 1995.
5    Q. And what was the charge there?
6    A. It was a Section 1001, misrepresentation to
7 the I -- it involved the IRS.
8    Q. And what was the disposition of that case?
9    A. The case had a consent judgment entered by
10 Judge Nelson in February of 1996, and that's what led
11 to my voluntarily surrendering my license.
12   Q. When you say consent judgment, did you plead
13 guilty?
14   A. Yes. I entered a guilty plea.
15   Q. Can you just describe for me what you
16 actually did?
17      MS. COCHRUN: You mean the allegations?
18      MR. DOYLE: The crime that he pleaded guilty
19 to.
20   Q. What did you do?
21   A. The -- the case involved a -- and this is --
22      THE WITNESS: Now, this is not the one that I
23 was at Maxwell for. This is the one that was like 12
24 years ago.
25      MS. COCHRUN: Right.

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

6 (Pages 18 to 21)

Page 18

1      THE WITNESS: This is the first one he just
2  told me about, in '95.
3      MS. COCHRUN: Yeah.
4      You know, we would object to going into this,
5  Steve, just because, A, it's more than 10 years ago.
6  It wouldn't be admissible. It's not really relevant
7  to what's going on here in terms of his health
8  issues or his incarceration at Maxwell.
9      MR. DOYLE: Are you objecting to the form of
10  the question?
11      MS. COCHRUN: Well, I'm -- since we didn't
12  have any stipulations as to what kind of objections,
13  I'm objecting --
14      MR. DOYLE: It's governed by the Federal
15  Rules of Civil Procedure.
16      MS. COCHRUN: Right. Well, I'm objecting to
17  any inquiry as to something that, you know, is --
18      MR. DOYLE: Are you directing the witness not
19  to answer the question?
20      MS. COCHRUN: Yeah.
21      MR. DOYLE: You are?
22      MS. COCHRUN: Well, I mean, I guess my point
23  is what -- going into the details of that will have no
24  relevance whatsoever in this case, and it won't be
25  admissible because it exceeds the 10-year rule. So I

Page 19

1  guess --
2      MR. DOYLE: I certainly don't agree with
3  that, and I would like you to have the witness to
4  answer the question. There is no basis for
5  instructing him not to answer the question whatsoever.
6      MS. COCHRUN: Well, my objection is on the
7  record. Let me talk to John for a minute. Okay?
8      MR. DOYLE: Sure.
9      (Brief recess)
10  Q.  Mr. Coggin, you just testified that you
11  pleaded guilty to a crime in 1995; is that correct?
12  A.  Yes, before Judge Nelson.
13  Q.  And please describe for me what you actually
14  did.
15  A.  Well --
16      MS. COCHRUN: Same objections as before, but
17  you can answer.
18  A.  All right. It was a two-count information.
19  And basically what it involved, I had represented a
20  number of limited partners in the early 1980s, and all
21  these cases got consolidated in the Northern
22  District. And as a result of that, there was, I
23  guess, some ill feeling between the IRS and myself,
24  because I had like 200 cases here. And I started
25  getting audited like every year, just about, in the

Page 20

1  '80s. And there was one year where I agreed to an
2  adjustment, which involved about $7,000. And in 1991,
3  I made a payment of $1,000 on that matter. And then
4  later in the year, in -- I forget what the date was --
5  there was another payment that I thought had been made
6  paid, and which was $6,000.
7      And I was called by the collection division
8  regarding the matter; and I told them that it had been
9  paid, when in fact it had not been paid. And they --
10  they -- you know, I was in the middle of a trial.
11  They said, well, all we need to close the case is just
12  evidence that it had been paid. And so I took the --
13  I had one canceled check. I didn't have the other
14  canceled check. And so I marked up that canceled
15  check and sent it to them, showing that it had been
16  fully paid.
17      After that occurred, I got out of trial and I
18  later -- like a week or two later discovered that it
19  had not been, in fact, paid; and I sent the full
20  balance. But a week or so after it was sent, CID
21  showed up at my door and I was -- they raised
22  questions as to the fact that it had been marked up.
23      Now, when they did, I told them exactly what had
24  happened that -- you know, said, look, you can look at
25  anything you want to. And that started an -- you

Page 21

1  know, an investigation of every financial statement,
2  every credit statement I had ever done in the last six
3  or seven years. And that led to the information that
4  was filed in 1995, which alleged misrepresentation
5  with respect to the check that I had given to the
6  IRS.
7      And also that in the course of their
8  investigation over the next five years, they found a
9  financial statement that I had given to one of my
10  banks that they said was wrong, that it wasn't
11  accurate, that I had misrepresented my -- matters on
12  this financial statement were misrepresented. The
13  bank and -- I had always paid the bank off and, you
14  know, had a long-term relationship with them and they
15  had never raised a problem.
16      But those were the two matters that were part of
17  that consent order.
18  Q.  And what was your sentence?
19  A.  It was five months in a local halfway house
20  here and five months of home confinement.
21  Q.  What was the halfway house?
22  A.  What was it?
23  Q.  Yeah.
24  A.  Where was it?
25  Q.  Yeah.

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

Page 22

1    A.  It was here in Birmingham.
2    Q.  Birmingham Community Center or --
3    A.  Yes.  Yes.
4    Q.  And then were you on a period of probation
5  following that?
6    A.  Yes, sir.
7    Q.  Do you recall how long that was?
8    A.  Three years.
9    Q.  During your period of probation, do you
10  recall who your probation officer was?
11   A.  No.
12   Q.  Did you have to meet with a probation officer
13  periodically?
14   A.  You know, I think I did maybe once or twice,
15  once, maybe, after I got out of the Birmingham
16  Community Center; but after that, it was -- you know,
17  it was basically over the phone.
18   Q.  Did you have to check in periodically over
19  the --
20   A.  No.  You just -- all you did is send like a
21  monthly report, whatever, but I didn't have to go in
22  every month, no.
23   Q.  You testified that you had 200 limited
24  partnership cases?
25   A.  Well, that's just a -- not cases.  It was

Page 23

1  like limited partners.  It was quite a few.  I'm not
2  sure exactly how many it was.
3    Q.  What was the nature of that?
4    A.  It was a limited partnership --
5    Q.  In other words, just describe it in laymen's
6  terms for me.
7    A.  Tax shelter, you would say.  It was an
8  investment partnership involving coal properties that
9  were in the 19 -- early 1980s.
10   Q.  And did you have dealings with the IRS on
11  those?
12   A.  Yes, sir.
13   Q.  And is it your testimony you think the IRS
14  had some animosity toward you because of your tax
15  shelter work?
16   A.  Well, in one case, they -- regional counsel
17  said, we're going to make your life miserable.  So --
18  which I thought was just a joke; but as it turned out,
19  it was pretty accurate, but -- I'm sure that in any
20  highly litigated case, you know, there can be some ill
21  feelings.  I certainly don't have ill feelings.  They
22  were just doing their job.
23   Q.  And if you recall, when did you get out of
24  the halfway house?
25   A.  August of 1996.

Page 24

1    Q.  And when were you next charged with a crime?
2    A.  July of 1998.
3    Q.  And what was the nature of that criminal
4  charge?
5    A.  It related to an allegation that in
6  connection with my bankruptcy, I had left out an
7  asset.
8    Q.  And what was that asset?
9    A.  It was a corporation that my wife owned where
10  she was the sole stockholder, sole director, sole
11  officer.
12   Q.  What was the name of that corporation?
13   A.  M&A Capital Corporation.
14   Q.  And just in laymen's terms, can you describe
15  for me the nature of what -- or, first, what was the
16  disposition of that case?
17   A.  A consent order was entered.
18   Q.  You pleaded guilty?  Is that right?
19   A.  Yes, in February of 1999 to one count of -- I
20  think it's 18 USC 371.  It's a conspiracy relating to
21  the bankruptcy case.
22   Q.  And can you just describe in your own
23  language what was the nature of the crime that you
24  committed --
25   A.  Well --

Page 25

1    Q.  -- what you actually did?
2    A.  The -- well, the essence of it was that I --
3  that should have been listed on the bankruptcy
4  filings.  It was -- it was a case -- it was a company
5  that had done a -- represented another corporation
6  that was seeking a -- a loan, and the finder's fee was
7  basically awarded to that corporation.  I was a
8  signatory on the account and wrote checks off the
9  account that were used to pay personal expenses.  And,
10  basically, the essence of the charge was that because
11  of that control, there was like constructive ownership
12  and that should have been disclosed.
13      That's basically the essence of what the case
14  was.  I mean, there were other things they alleged,
15  but --
16   Q.  Do you know how you got caught, how you came
17  to the attention of the authorities?
18   A.  Well, when -- when I entered into the
19  original plea agreement, I requested that there be --
20  you know, that this be the end of it, there be no
21  further cases or whatever; but I had at the time
22  made -- a friend had lent -- actually lent my wife a
23  sum of money that was used to pay down the balance
24  that was due on the bank loan that -- for the bank
25  that I mentioned earlier.  And I think that basically

Page 26

1    raised a question, the fact I was in bankruptcy and
2    the loan had been paid down. And so they started
3    investigating the bankruptcy at that point.
4        Q.  What was the investigating agency?
5        A.  The IRS. The IRS, FBI.
6        Q.  You were charged as a -- this was charged as
7    a conspiracy; is that correct?
8        A.  Yes, sir.
9        Q.  Who else was involved in the conspiracy?
10       A.  It was an unnamed.
11       Q.  Was your wife ever charged?
12       A.  She was -- she was listed. When the case was
13   originally filed, it was filed as an indictment; and
14   she was named as a defendant.
15       Q.  And what was the disposition of the charge
16   against your wife?
17       A.  She was dismissed out of the case in exchange
18   for me agreeing to enter a guilty plea.
19       Q.  Did she go under pretrial diversion?
20       A.  Yes, sir.
21       Q.  Do you know what the terms of her pretrial
22   diversion were?
23       A.  Basically, it was just pretrial diversion
24   for --
25       Q.  In other words, was she supervised or --

Page 27

1        A.  No. Well, I guess she was, but it was only
2    for like five months or something. She didn't have to
3    report to anybody or anything like that.
4        Q.  And what was your sentence?
5        A.  The sentence was for 36 months.
6        Q.  Where did you serve that sentence?
7        A.  Maxwell Air Force Base.
8        Q.  And did you voluntarily surrender?
9        A.  Yes.
10       Q.  Do you remember when that was?
11       A.  Yes. August 26th, 1999.
12       Q.  Please describe the intake procedure that you
13   went through when you surrendered at Maxwell.
14       A.  You really want that description?
15       Q.  I do.
16       A.  You do? I was escorted there by Judge Bowen,
17   former judge of the -- I guess the criminal court here
18   in Alabama. Judge Bowen actually drove me down and
19   took me to the -- I guess the control center. The
20   guard came out and got me and took me to the intake
21   processing facility. You're taken into a room.
22   You're basically stripped, searched, given some
23   clothes. And I was put in a holding cell for several
24   hours and then, after that, taken to I guess the
25   medical clinic and, after that, sent to the dorm.

Page 28

1        Q.  Were you given briefings on the camp's rules
2    and regulations?
3        A.  Not really. I -- you know.
4        Q.  If you recall.
5        A.  I may have, but --
6        Q.  Did you receive a copy of an admission and
7    orientation booklet?
8        A.  I remember that I met with -- I guess it
9    was -- I guess they call them counselors. I believe
10   his name was Mr. Brown. He may have given me a book.
11   I -- I really don't -- you know, it was such a
12   traumatic experience that I really don't remember. I
13   remember that I got a pillow that was like a rock.
14       Q.  And I'm not limiting this to the 26th. The
15   first week or so.
16       A.  Yeah. There was a -- there was a -- I think
17   during the first week, there is an orientation they
18   have for people that have just came in, in the last
19   two weeks or whatever. They have a committee or group
20   of people that come in and basically give you an
21   orientation.
22       Q.  I'm going to show you what's been marked as
23   Defendant's Exhibit #1. It is a -- it doesn't have
24   page numbers, but it's a fairly -- it's a 20-plus page
25   document. The first page says, FPC Montgomery

Page 29

1    Admissions and Orientation Booklet. Actually, some of
2    the pages do have numbers. It's numbered 1 through
3    25. And if you will just look at that.
4        MS. COCHRUN:  Is this the one from '99 when
5    John would have gone in?
6        MR. DOYLE:  I believe it is. That's what I'm
7    going to ask him.
8        MS. COCHRUN:  Steve, is there any way to --
9    is there anything on here that designates it so you
10   would know? I can't imagine that I would have
11   memorized it from '99.
12       MR. DOYLE:  No.
13       A.  I honestly don't remember getting this; but,
14   you know, I may very well have. I don't remember
15   this.
16       Q.  Do you recognize it at all?
17       A.  No, not really; but, you know, it's been a
18   few years ago. But, you know.
19       Q.  Do they give you a stack of documents when
20   you get there?
21       A.  I really don't remember getting a stack. I
22   may very well have, but I -- you know, we got so much
23   stuff in the first -- clothes and bedding material.
24   And if there were some handouts included in it, it may
25   very well have been. I -- I don't remember.

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

9 (Pages 30 to 33)

Page 30

1    Q.  Fair enough.  I'm going to direct your
2   attention now to Sunday, September 2nd of 2001.  At
3   approximately 7:30, you got sick and were transported
4   by ambulance to the emergency room at Baptist Medical
5   Center South; is that correct?
6        MS. COCHRUN:  Object to the form.
7    A.  Sunday, September the 2nd, 2001?
8    Q.  Yes.
9    A.  Yes.  I -- well, I had passed out.  And I
10  think Officer Timmons discovered -- well, he came and
11  called an ambulance when I was in a pool of blood,
12  yes.  I was taken to Baptist Medical, yes, sir.
13   Q.  And why were you taken to the ER?
14   A.  Why was I taken to the ER?
15   Q.  Yeah.
16   A.  I -- I guess because I was unconscious and
17  lying in a pool of blood.
18   Q.  Did you vomit?  You just described some
19  blood.  Where did the blood come from, if you know?
20   A.  Well, actually, I passed out and was
21  unconscious; and when I woke up, I was in a pool of
22  blood and Officer Timmons was calling for the safety
23  people to come clean it up.  I presumed that I had
24  thrown up again.
25   Q.  What did the -- where was this?

Page 31

1    A.  Where was it?
2    Q.  Yeah.
3    A.  It was in Montgomery dorm.
4    Q.  Whereabouts in the dorm?
5    A.  In the laundry room.
6    Q.  And where is the laundry room?
7    A.  It's on the second floor.
8    Q.  And approximately what time was that, if you
9   know?
10   A.  I don't really recall the exact time.  I'm
11  sure it was --
12   Q.  Around 7:30 p.m.?
13   A.  No.  It -- it was in the afternoon.
14   Q.  And we can look at some documents in a
15  second, but what did this blood look like?  How did
16  you know it was blood?
17   A.  How did I know it was blood?
18   Q.  Yes.
19   A.  Well, on that occasion, Officer Timmons was
20  referring to it as blood.
21   Q.  Would it have --
22   A.  I was so out of it, you know, I really wasn't
23  looking at it.  I mean, I saw that it was there, but
24  it wasn't the first time that I had been throwing up
25  blood.  I had been doing that for several weeks.

Page 32

1    Q.  I'm not interested right now in what Officer
2   Timmons may have told you.  What did you see?
3   Describe it for me.
4    A.  On that occasion?
5    Q.  Yes.
6    A.  It just looked like coffee grounds.
7    Q.  Because you testified a pool of blood.  I
8   mean, was it a bright red pool?  How big?  Now you say
9   coffee grounds.  I'm just trying to -- what exactly
10  did you see?
11   A.  Just like vomit with, you know, reddish stuff
12  in it.
13   Q.  How much vomit?
14   A.  I really don't remember how much on that
15  occasion.  By that time, I was so weak and so -- you
16  know, I was really going in and out of consciousness
17  at that point.
18   Q.  Who else was there?  You mentioned Officer
19  Timmons.  Anyone else?
20   A.  Well, when I woke up, there was an inmate
21  that was there who was calling for help; and he was
22  telling me to stay still.  And then Officer Timmons
23  came.
24   Q.  And who was that inmate?
25   A.  I don't remember his name.  I know another

Page 33

1   inmate came at the time, Inmate Rankin, right after
2   Timmons got there.  And he was shouting, you know,
3   this man has been sick for weeks; he needs -- you
4   know, he needs to go to the emergency room.
5    Q.  The person shouting, was that an inmate or
6   was that --
7    A.  That was an inmate.  It was Inmate Rankin.
8    Q.  Can you spell that for me?
9    A.  R-A-N-K-I-N.  And he was -- he was telling,
10  you know, Officer Timmons that this man has been sick
11  for weeks; he needs to go to the emergency room.  And
12  Officer Timmons told him to leave.
13   Q.  Did you --
14   A.  I think the other -- excuse me.
15   Q.  Sure.  Continue.
16   A.  I think you were asking who else was there.
17  I remember that Chaplain Fisher came shortly after
18  that.  And he took me by the hand, and I -- I asked
19  Chaplain Fisher to pray for me and, he prayed and --
20   Q.  Is Chaplain Fisher a member of the prison
21  staff?
22   A.  Yes, sir.  And he said, John, I'm praying for
23  you.  And --
24   Q.  And anyone else?
25   A.  That's -- that's all I can remember.

JOHN COGGIN v. UNITED STATES OF AMERICA                              9/20/2007
DEPOSITION OF JOHN COGGIN

10 (Pages 34 to 37)

---

Page 34

1    Q. Do you remember being transported by
2  ambulance to Baptist?
3    A. I do. I remember being put in the gurney,
4  or whatever it is, being taken to the ambulance, being
5  put in the ambulance; but I believe at some point, I
6  must have passed out in the ambulance because I don't
7  remember the whole trip. The next thing I remember
8  was waking up in the ER.
9    Q. What was your reaction to vomiting blood on
10  the 2nd, on September 2nd?
11    A. I asked Officer Timmons to please help me get
12  back to my bunk because that was basically the -- you
13  know, I thought this -- I had been through so many
14  times when I would ask for help and they wouldn't do
15  anything. And Officer Timmons said, no, the ambulance
16  is already on its way.
17    Q. When I say what was your reaction, were you
18  scared? Did you think it was serious? What --
19    A. Well, I already knew it was serious, but I
20  wouldn't say I was scared. But, you know, it -- it
21  was at a point where I guess in the last few days, I
22  had reached a point where I knew I was pretty near
23  death in there.
24    Q. How did you know it was serious?
25    A. I guess -- why did I know it was serious?

---

Page 35

1    Q. Yeah.
2    A. Because I had been throwing up blood for so
3  long and, you know, passing out and such extreme
4  pain.
5    Q. And you knew throwing up blood was a very
6  serious symptom, right?
7    A. Well, I would think so, yes.
8    Q. Prior to the day you went to the hospital,
9  September 2nd, when had you thrown up blood before
10  that, the most recent time prior to that?
11    A. The most recent?
12    Q. Yes.
13    A. You don't want all of them? You want
14  chronology backwards?
15    Q. We're going to go backwards.
16    A. Oh, okay. The -- would be the night before,
17  would be Saturday night that -- September the 1st.
18    Q. And please describe that for me.
19    A. It was about the time of the -- they call it
20  the ten o'clock count, where they take a count around
21  ten o'clock. And you're supposed to be in your cube
22  or room at that time. I started getting very, very
23  sick, nauseated; and I did not -- I knew I wasn't
24  going to be able to wait until the count was over. So
25  I went to the -- because I did not want to throw up

---

Page 36

1  in -- in the cube. And I made it to the bathroom and
2  threw up all over the -- the bathroom floor and then
3  started throwing up into the toilet. It was just
4  uncontrollable, just one after the other.
5    And at that time, Officer Thomas came in, who was
6  taking the count. And I think another inmate came in
7  and was also telling Officer Thomas that, you know,
8  this guy has been sick for weeks; he needs to go to
9  the emergency room. And so Officer Thomas --
10    Q. Who was that inmate?
11    A. I believe that was Rankin. Yeah, he -- he
12  had the cube right next to me. So Officer Thomas
13  called I guess the lieutenant's office and told them,
14  you know, there's an inmate down in C who is throwing
15  up blood; and they told him to bring me down to the
16  lieutenant's office.
17    Q. And did that happen?
18    A. Yes. Officer Thomas and then another inmate
19  helped me get down to the lieutenant's office.
20    Q. Do you remember who that inmate was?
21    A. Yes, sir. It was Jim Johnson.
22    Q. How did he help you get down there?
23    A. Well, one was on one side and one on the
24  other basically helping me walk down there.
25    Q. And what happened in the lieutenant's office?

---

Page 37

1    A. Well, when we got to the lieutenant's office,
2  the lieutenant was not in there. There was an
3  officer, a woman officer, named -- Security Officer
4  Estep, I believe her name was. And Jim was -- Jim
5  Johnson started telling Officer Thomas that, hey, this
6  guy has been sick for weeks. He needs to go to the
7  emergency room.
8    And Officer Thomas told me and Jim, said, look, I
9  think he needs to definitely go to the emergency room,
10  but it's not my call. You know, it's not my
11  decision. It's the lieutenant's decision.
12    And then Officer Thomas said, look, I've got to
13  go finish the ten o'clock count. And he told Jim
14  Johnson to stay there in case I were to fall out or
15  whatever. Then he left me there with Officer Estep.
16    Q. Can you -- I'm just going to interrupt you
17  briefly. Can you describe Officer Thomas for me?
18    A. You know --
19    Q. Black? White? Male? Female?
20    A. He's a black officer.
21    Q. Male or female?
22    A. Male. I believe he's still at -- I can't
23  really --
24    Q. Please continue.
25    A. After he left, shortly thereafter, Lieutenant

JOHN COGGIN v. UNITED STATES OF AMERICA                                    9/20/2007
DEPOSITION OF JOHN COGGIN

11 (Pages 38 to 41)

Page 38

1  Snyder came in. And Lieutenant Snyder, when he came
2  in, he said -- he started screaming words to the
3  effect, Coggin, I knew it was you when they called and
4  said a man was down in C. Of course, you know, I'm
5  saying it, but he was like shouting it.
6     Q.  Sure.
7     A.  And he -- and I said, well, I've been
8  throwing up blood. I'm in, you know, extreme agony.
9  I need to go to the emergency room.
10    And Lieutenant Snyder screamed, literally, at the
11 top of his lungs. And I won't repeat exactly what he
12 said. But he said, I'm not sending you to the
13 blankety blank hospital or emergency room. I can lock
14 you up in the holding cell in the back until you quit
15 complaining. And then he started shouting at Jim
16 Johnson, who was the other inmate. And he told him,
17 he said, Johnson, Coggin doesn't need a babysitter;
18 you know, get on out of here and go back to the dorm.
19    At that point, he said, I'm going to go call
20 Dr. Garcia.
21    Q.  Who said that?
22    A.  Lieutenant Snyder. And he left me in the
23 room with Security Officer Estep. He did not make the
24 call in my presence. I guess he went back -- I was
25 in -- actually, I wasn't in the lieutenant's office.

Page 39

1  I was in another room across the hall from the
2  lieutenant's office.
3     He came back a little while later and said,
4  you're not going to the hospital. He says, you need
5  to sit here until the ten o'clock count, or the twelve
6  o'clock count, whatever, is finished. And so I -- I
7  just sat there, and he left. And then a little while
8  later, the captain came in. I forget what time it
9  was; but he came in and he said, what's wrong, what --
10 and I had told him what had happened, that I had been
11 throwing up a lot of blood and in extreme pain. And
12 he left. And I --
13    Q.  Who was that captain? Do you know his name?
14    A.  You know, I should, but I don't remember what
15 his name -- last name was. He was just referred to as
16 the captain. He was the person that was really in
17 charge of all of the security officers. He left. And
18 I believe he went and talked to Lieutenant Snyder.
19    Q.  Did you witness that conversation?
20    A.  No, sir. But shortly after that, Lieutenant
21 Snyder came back into the room; and he said, Coggin,
22 go on back up to the dorm. So I went on back up to
23 the dorm. And I -- you know, my clothes were like
24 covered in where I had thrown up. So I took them off,
25 changed clothes to take a shower, try to clean up.

Page 40

1  And when I was taking a shower, I knew I was going to
2  pass out. I could feel -- you know, getting really
3  light-headed. So I dried off, threw my clothes on,
4  and started to try to go back to the cube; but before
5  I could even get out the door, I passed out.
6     Q.  So this is in the shower?
7     A.  Pardon?
8     Q.  Is that in the shower or --
9     A.  It was in the bathroom. I had already gotten
10 out of the shower and actually had put my clothes on,
11 and I passed out in the bathroom. And when I woke up,
12 there was an inmate next to me; and he was shouting,
13 this man needs -- you know, he needs to be taken to
14 the hospital. And he was actually shouting to
15 Security Officer Estep, who was there, the woman
16 security officer.
17    Q.  Who was that inmate, if you know?
18    A.  Derrick Mosley. He had a -- Derrick's bunk
19 was like right outside the door to the -- to the
20 bathroom door. So he was telling, you know, Security
21 Officer Estep, the man needs to go to the hospital.
22 And so Security Officer Estep called on the radio to
23 the lieutenant's office, Lieutenant Snyder, and told
24 him that I had passed out, you know, unconscious. And
25 Lieutenant Snyder told her to put -- just put me back

Page 41

1  in my bunk. And so they helped me --
2     Q.  How do you know what Lieutenant Snyder told
3  Officer Estep?
4     A.  That's what she said.
5     Q.  Did you personally hear that conversation?
6  Please answer yes, no. She can't pick up your --
7     A.  No, no. She was talking on the radio.
8     Q.  And did she --
9     A.  She just said, well -- you know, Officer
10 Snyder said, we need to just take you back and put you
11 in the bunk. It was really at that point that I -- I
12 really knew that I was very close to death and --
13    Q.  How did you know that?
14    A.  I just was so weak and I had thrown up so
15 much blood, I mean, that night and prior occasions
16 that I -- it just -- I don't know how, but it was --
17 it was just a feeling that I had. I was so -- and I
18 can remember praying so hard, you know, God help me.
19    Q.  On that Saturday night when you described
20 vomiting blood, can you tell me what the blood -- what
21 the vomit looked like?
22    A.  Looked like vomit, you know.
23    Q.  No. How did you know it was blood? Was it
24 red? Black?
25    A.  It looked like brownish, reddish brown,

JOHN COGGIN v. UNITED STATES OF AMERICA                                    9/20/2007
DEPOSITION OF JOHN COGGIN

12 (Pages 42 to 45)

---

**Page 42**

1  reddish, sort of brownish.
2      Q.  And you knew that was blood?
3      A.  Yes.
4      Q.  And on Saturday, how much was there?
5      A.  A lot.  I mean, it was like covering the -- I
6  mean, I don't know what the volume or anything was,
7  but I threw up a pretty good size part of the floor,
8  and then I was in the toilet, but I was -- it was
9  like -- I don't know if you've ever been -- if you've
10  had food poisoning where you're like throwing up and
11  you just can't control it.  It was sort of like that.
12      Q.  Well, that's Saturday.  Let me ask, on
13  Saturday, do you know whether or not Lieutenant Snyder
14  ever talked to Dr. Garcia?
15      A.  I can't confirm it one way or the other
16  because he left the room to call him.  He told me he
17  was going to call him.  On the other occasions that --
18  you know, the other occasions that I had gone down to
19  the lieutenant's office, the calls have been made to
20  either Rodriguez or to Garcia in my presence, so --
21  you know, and I talked to them on those occasions; but
22  on this particular occasion, he made the call outside
23  my presence.
24      Q.  That was Saturday, September 1st, that you
25  just described; is that right?

---

**Page 43**

1      A.  Yes, sir.
2      Q.  Prior to that, when was the next prior time
3  that you vomited blood?  I brought in an '01 calendar
4  if it helps.
5      A.  I brought one, too.  Is yours the same as
6  mine?
7      Q.  Let's check.
8      A.  I think it was the Sunday.
9      Q.  I just have July, August and September.
10      A.  Oh, okay.
11      Q.  They're just blank calendar pages.
12      A.  Sunday night, August the 26th.
13      Q.  All right.  So just to confirm, your
14  testimony is you vomited --
15      A.  Yeah.  That -- that night I had gotten sick,
16  but it wasn't anything as -- it was -- it wasn't
17  uncontrollable like it was that night.
18      Q.  So to confirm, your testimony is that you
19  vomited blood on Sunday, the 2nd; is that right?
20      A.  Uh-huh.
21      Q.  You vomited blood on Saturday, the 1st?
22  These are September 2001.
23      A.  Uh-huh.
24      Q.  And when was the closet in time previous to
25  that, that you --

---

**Page 44**

1      A.  I threw up on the Sunday night, the 26th.
2      Q.  That's Sunday, August the 26th?
3      A.  Yes, sir.
4      Q.  Can you describe that incident for me?
5      A.  I had been sick all that weekend.  I mean, it
6  was just agony.  I had been through the -- Saturday I
7  had gone to the pill line window and asked for help;
8  and they said there was nothing they can do, you need
9  to see the doctor next week.  Sunday morning --
10  Sunday, during the day, I had gone to the pill line
11  window asking for help.  They said you need to see the
12  doctor.
13      Later that night, the night of Sunday, I had been
14  sick; I had thrown up.  Later, about -- I guess after
15  the ten o'clock or twelve o'clock count, I was in such
16  pain that I was actually on the floor of the cube
17  and --
18      Q.  And this -- I want you to continue, but we're
19  talking about Sunday, August 26th?
20      A.  Yes, sir.  And Officer -- Security Officer
21  Ramideau came by.  You know, they periodically come
22  through and do counts and checks.  And I was like on
23  the floor.
24      Q.  Approximately what time is that?
25      A.  I -- twelve or two o'clock, something like

---

**Page 45**

1  that.
2      Q.  P.m.?  Afternoon or --
3      A.  A.m.
4      Q.  Oh, a.m.
5      A.  Like two in the morning.  Said, what's
6  wrong?  And I said, I am in just excruciating pain; I
7  threw up tonight.  I told her I threw up blood and I
8  had been throwing up blood the prior week, too.
9  And --
10      Q.  On that Sunday?  You testified you threw up
11  blood on Sunday, the 26th?
12      A.  Well, I had thrown up.
13      Q.  You had thrown up.
14      A.  And it looked like it had blood in it, yes,
15  sir.
16      Q.  What did the vomit look like?
17      A.  Well, you know, I didn't really study it.  It
18  did look like just reddish brown, sort of what vomit
19  looks like.
20      Q.  Did you know it was blood?
21      A.  Yes.
22      Q.  You knew it was blood on Sunday, the 26th?
23      A.  Yes.
24      Q.  What was your reaction to that?
25      A.  Well, I told Ramideau that I needed to go to

---

Page 46

1  the emergency room.
2      Q.  Did you think it was serious?
3      A.  Yes.  I wouldn't have been requesting to go
4  to the emergency room if I didn't think it was
5  serious.
6      Q.  Why did you think it was serious?
7      A.  Because I was in agony.
8      Q.  Okay.  That's the pain.
9      A.  Right.
10     Q.  Did your impression that it was serious have
11 anything to do with the vomit?
12     A.  Not really at that time.  I mean, I had been
13 throwing up for the prior week.  I mean, it was just
14 all sort of all together at that point.
15     Q.  At that point --
16     A.  I was taken to --
17     Q.  You testified that you knew you were throwing
18 up blood on Sunday, the 26th?
19     A.  I did throw up blood on the 26th, yes, sir.
20     Q.  Did you -- you didn't think that was serious?
21     A.  Yes.  Of course I thought it was serious,
22 yes.
23     Q.  And who did you tell?
24     A.  I told Security Officer Ramideau.  She called
25 to the lieutenant's office.  And she got another

---

Page 48

1      Q.  Okay.
2      A.  But --
3      Q.  We'll get there, but when was that
4  approximately?
5      A.  When was what?
6      Q.  What you just described.
7      A.  When did Rodriquez do that?
8      Q.  Yeah.
9      A.  The prior week.  Wednesday, the 22nd.  So I
10 think Rodriquez told Lieutenant Snyder that he -- you
11 know, you need to call Snyder -- I mean -- excuse
12 me -- you need to call Dr. Garcia.  So he called
13 Dr. Garcia and --
14     Q.  Just so we're clear, who called Dr. Garcia?
15     A.  Lieutenant Snyder.
16     Q.  And what happened?
17     A.  Lieutenant Snyder described for him what had
18 happened, I had gotten sick, I was extremely -- you
19 know, in a lot of pain.  And he put -- he put me on
20 the phone with Dr. Garcia.
21     Q.  Is this a cell phone or hard-wire phone?
22     A.  I think it was a wire phone.
23     Q.  Okay.
24     A.  It was in his office.
25     Q.  And what did you discuss with Dr. Garcia?

---

Page 47

1  inmate to help me, to -- actually, she got me on a --
2  I was in such pain I really couldn't walk.  She got me
3  on a -- put me on a golf cart.  She had one of the
4  inmates help me out to the golf carts she had out
5  there and took me down to the lieutenant's office.
6      Q.  And what happened there?
7      A.  When I came in, Lieutenant -- when the
8  lieutenant came in, he started shouting, Coggin --
9  like Coggin, you again?  What is your problem?  Why do
10 you keep coming down here?  And I told him what had
11 happened; that I, you know, was in extreme pain; that
12 I had thrown up earlier.  And he called -- he called
13 PA Rodriquez.
14     Q.  How do you know he called him?
15     A.  I was there when he called him.  He took me
16 in his office.
17     Q.  Could you hear both sides of the conversation
18 or just one?
19     A.  At that point, I could only hear his side of
20 the conversation; but apparently, Rodriquez told him
21 that he needed to call Garcia.  This was after
22 Rodriquez had blown up and gone ballistic the prior --
23 prior time during the week before that and said he
24 would never have anything to do with me, he wouldn't
25 see or treat me again.

---

Page 49

1      A.  I told him what had happened and asked to go
2  to the emergency room.  And Dr. Garcia said, look, you
3  are -- it's sludge; you got sludge in your
4  gallbladder, and you're going to have -- you're going
5  to have to have your gallbladder out.  He said, come
6  into the office first thing in the morning, and I will
7  give you a pain shot, and we'll talk about trying to
8  get you set up to go to have your gallbladder out.
9  And that was it.  And I was sent back to the dorm.
10     Q.  In your life, I take it you've thrown up
11 before.
12     A.  Yes.
13     Q.  And is that usually an alarming experience
14 just to vomit?
15     A.  Sure.
16     Q.  Is there a big difference between just
17 vomiting and vomiting blood, in your mind?
18     A.  It is.
19     Q.  That's a significant difference, isn't it?
20     A.  Yes.  The thing that was so frightening about
21 this was the fact that this had been going on for so
22 long and the pain was, you know, so intense.  This had
23 been transpiring for, you know, so many weeks, really.
24     Q.  Let's keep -- keep working back.  Prior to
25 Sunday, the 26th, had you vomited blood prior to that?

JOHN COGGIN v. UNITED STATES OF AMERICA                                  3/20/2007
DEPOSITION OF JOHN COGGIN

14 (Pages 50 to 53)

Page 50

1    A.  Yes.
2    Q.  When was that?
3    A.  The night of the -- Tuesday, the 21st.
4    Q.  Now, please describe that for me.
5    A.  It was pretty bad.  I was like -- I had
6  thrown up two or three times the night of the 21st.  I
7  think that was the night that our -- let me just back
8  up a second.  A couple of weeks earlier or a week
9  earlier, I had met with Rodriquez and he had basically
10  said, look, you got sludge in your gallbladder; you're
11  going to just need to endure it and maybe have your
12  gallbladder out when you get out in four -- which was
13  four months.  And so that was basically what I was
14  looking at, I'm going to have to put up with this
15  until I get out.
16    But that -- I think the night of the 21st, when I
17  had thrown up, you know, pretty much all night, I
18  realized I was not going to make it until November.
19    Q.  And this is the --
20    A.  That's when the following morning, I
21  immediately went into the emergency sick call.
22    Q.  You seem pretty precise on these dates.  How
23  are you recalling these dates?
24    A.  Just -- you gave me a calendar.
25    Q.  Well, that -- the calendar I gave you --

Page 51

1    MS. COCHRUN:  The Tuesday before and the
2  Sunday before.
3    A.  You know, I guess, how do you recall the date
4  of 9/11?  You know, some things get -- that you
5  experience are so graphic in your mind.  And this is
6  something that was so traumatic that --
7    Q.  You're clear on the dates?
8    A.  Yes.
9    Q.  So we got Tuesday, the 21st.  That was in the
10  evening, is that correct, when you were throwing up?
11    A.  Yes.  And then the next morning, I went into
12  the emergency call and told --
13    Q.  What did your vomit look like that night?
14    A.  The same thing.
15    Q.  Please describe it.
16    A.  Like coffee grounds or --
17    Q.  And you went to an emergency sick call the
18  next morning?
19    A.  Right.  Well, I went in.  And I guess that
20  was a Wednesday.  They really weren't having sick
21  call, but knocked on the door and got the attention of
22  one of the nurses and told her that, you know, I
23  really needed to see Dr. Garcia or Rodriquez, you
24  know, that I had been throwing up blood the night
25  before and was in extreme pain.  And she said, I will

Page 52

1  tell them, and I will call you as soon as they get in.
2    Q.  And what happened?
3    A.  I went back -- well, I waited like -- this
4  was like six o'clock, and I waited until like 11.
5  They never saw me.  So I went over to education, where
6  I -- where I worked, and told Mr. Hudson, who was in
7  charge of the education department, that I really
8  wasn't physically able to work that day.  And he said,
9  you know, what's wrong?  I told him.  And he said,
10  haven't they seen you?  And I said, no, sir, I've been
11  waiting.  He said, well, go back over there.  He said,
12  I'm going to call.  So I think Mr. Hudson called to
13  ask them to see me.
14    Q.  This is Wednesday, the 22nd?
15    A.  Yes, sir.  And so I went back over there and
16  waited again.  And this was like one or, you know, a
17  couple more hours; and they still hadn't seen me or
18  wouldn't see me or whatever.  So I was getting sick
19  again, so I went back up to the dorm.  And I saw
20  Ms. Beasley, who was actually my case manager.  And
21  she said, what is it, you know, what's wrong?  Because
22  I looked so bad.  And I told her what had happened;
23  and she said, come in my office.  So I went in her
24  office; and she said, let me call Dr. Garcia and see
25  if they can see you right now.

Page 53

1    So she called Dr. Garcia; and Dr. Garcia said,
2  Rodriquez is handling his case, or whatever, because
3  she was referred over to Garcia -- Rodriquez.
4  Rodriquez told him, Send him right over.  And so she
5  told me that, and I went right back over.  This is
6  about 1:30.
7    And so I waited there and they still hadn't seen
8  me.  It was I guess about 3:30 or 3:45, right when
9  you're supposed to go back to the dorm for four
10  o'clock count.  Everybody else was out of -- out of
11  the clinic.  Rodriquez comes out and he says to me --
12  he says, Coggin, what are you doing here?  And I said,
13  well, I've been in extreme pain; it's getting worse;
14  I've thrown up.  And he starts shouting at me,
15  literally screaming.  He said, Coggin, what are you
16  trying to pull over on me?  I said, sir, I'm not
17  trying to pull over anything on you; I'm in desperate
18  pain; I need some help.  And he said, what do you keep
19  asking for doctors for?  Don't you think I'm -- then
20  he started shouting that he was the most qualified PA
21  in the BOP.
22    And then he literally started screaming.  He
23  said, I'm not going to send you to the emergency
24  room.  I'm not going to send you to the hospital.  In
25  fact, I'm never going to see you or treat you again.

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

15 (Pages 54 to 57)

Page 54

1  He said -- he said, if you have a problem with our
2  clinic, he said, you need to keep it in house and quit
3  having all these people call me. And I -- I told him,
4  I'm sorry, I had not asked anybody to call him; they
5  had just offered to call; and I just needed some help,
6  some medical treatment. And he just told me to go
7  back up to the dorm.
8      Q. Did he examine you that day?
9      A. No, sir.
10     Q. Did anyone?
11     A. I was later -- I think later that afternoon
12 or the next morning was called back to the clinic.
13 And I think one of the nurses called me back and gave
14 me a pain shot. I forget her name. I think it was
15 Nurse Little, but I'm not sure about that.
16     Q. Little?
17     A. Little. She was the most recently hired
18 nurse, very kind. And I think she also said she was
19 going to prescribe some other medicine or something.
20     Q. That was -- you talked about vomiting on --
21 vomiting blood on Tuesday, the 21st? Had you vomited
22 blood prior to that?
23     A. I think once before.
24     Q. And when was that?
25     A. The 18th.

Page 55

1      Q. Saturday, the 18th?
2      A. Yes, sir.
3      Q. Please describe that for me.
4      A. The -- the pain had really started getting a
5  lot worse that week and I had thrown up. At that
6  point, I just thought I was sick because of the
7  intense pain. And I -- I really wasn't sure whether
8  it was blood or not. It -- it looked sort of reddish
9  at that point. But I was in such pain I couldn't
10 sleep, and I was in the cube with my -- I think my
11 head on the desk. There's like a little desk in
12 there.
13     And Officer Davis was coming through the dorm. I
14 think it was like after twelve o'clock. And he -- he
15 said, what's wrong? And I said, I'm in -- I'm very,
16 very sick. I need to go to the emergency room I
17 think. And he -- he called lieutenant's office,
18 talked to Lieutenant Snyder; and they told him to
19 bring me down. So I went down to the lieutenant's
20 office.
21     Q. And what happened there?
22     A. There Lieutenant Snyder said, what's wrong?
23 And I told him that, you know, I had been sick, I was
24 in extreme pain, it was getting worse and worse, I
25 really thought I needed to go to the emergency room.

Page 56

1  And so he called Dr. -- no. He called PA Rodriquez.
2      Q. How do you know that?
3      A. Because he put me on the phone with
4  Rodriquez.
5      Q. And what happened in that conversation?
6      A. I told Rodriquez what had happened, that I
7  had thrown up, that I was in extreme -- you know, it
8  was getting -- the pain was getting so intense that I
9  didn't think I could stand it. And he just told me;
10 he said, look, he said, you're going to have pain;
11 you've got sludge in your gallbladder; you're going to
12 have it until, you know, your gallbladder is taken
13 out. And he basically said, you know, take your pain
14 medicine and if it, you know, doesn't get better by
15 next week, come back into the clinic.
16     And then after that, Lieutenant Snyder sent me
17 back up to the dorm.
18     Q. Just to be sure, so Saturday, the 18th, was
19 the first time that you vomited?
20     A. Yeah.
21     Q. And you suspected it might be blood, but you
22 weren't sure; is that correct?
23     A. Yeah, I think so.
24     Q. Did you have any other symptoms that you
25 might have gastrointestinal bleeding?

Page 57

1      A. I think that, you know, in hind -- in the
2  final week, I had like -- I guess you would call them
3  tarry stools or whatever, but I thought that was just
4  because, you know, I wasn't eating enough or
5  whatever. I didn't really -- I did not -- I did not
6  realize because it was -- it was -- I -- when I think
7  of, you know -- I guess at that point, when I imagine
8  someone bleeding from the intestine or rectum, I would
9  think of it as being bright red or whatever. I never
10 thought that, you know, black, tarry stools would be
11 blood; but, you know, later I learned that that was
12 actually because I was bleeding internally.
13     Q. And in hindsight, you may have had tarry
14 stools the week of -- the week prior to --
15     A. Yes.
16     Q. -- September 2nd?
17     A. Yes, that's right.
18     Q. Did you tell anyone that?
19     A. You know, I can't really remember telling
20 anyone about the tarry stools because I didn't really
21 understand that was blood, you know. I was throwing
22 up. I realized I could see that, but I thought that
23 was just -- I mean it was like black, so I didn't
24 focus on that being blood.
25     MR. DOYLE: Take a five-minute break?

Page 58

1       MS. COCHRUN:  Sure.
2          (Brief recess)
3      Q.  I'm going to direct your attention back to
4   Sunday, the 2nd of September.  Did you take any
5   medication that day?
6      A.  I don't -- I don't remember.  I don't really
7   remember taking any that day.
8      Q.  Let me show you documents.  When the
9   ambulance picked you up, do you remember the EMS crew
10  asking you any questions?
11     A.  No.
12     Q.  I'm going to show you a document that has
13  been marked as Defendant's Exhibit #2.  It says at the
14  top service name, Haynes; incident location,
15  Montgomery Federal Prison.  It's a one-page document.
16  And ask you to take a look at that.  Just let me know
17  when you've had a chance to look at it.
18     And that's a terrible copy.  I'm going to show
19  you -- that one you can read the form.
20     A.  I can't read that one at all.
21     Q.  Okay.  But can you -- one you can see the
22  black part, and one you can see -- see the entry where
23  it says current meds?  Do you see what I'm talking
24  about?
25     A.  Current meds?

Page 59

1      Q.  Yes.
2         MS. COCHRUN:  Steve --
3      A.  I can't -- what's that say?  Motrin?
4      Q.  Yeah.
5         MS. COCHRUN:  I guess.  I can't -- oh, I
6   see.  How is it these are different, Steve?
7         MR. DOYLE:  It's the same page.  One you can
8   see the black part, and one you can see the writing.
9         MS. COCHRUN:  That's -- is it the same --
10        MR. DOYLE:  It's the same page.
11        MS. COCHRUN:  That's just weird that the
12  black part doesn't Xerox.
13        MR. DOYLE:  Apparently not.
14        MS. COCHRUN:  Can we just make copies of both
15  of them, then?
16        MR. DOYLE:  Yeah.  We're going to try -- you
17  have copies of both of them, but we're going to try
18  and do better on them.
19     A.  I see what you're saying, but I don't think
20  I've ever seen this document.
21     Q.  Looking at that, could you have told them
22  that you were taking Motrin?
23     A.  Well, I probably -- seemed like I remember --
24  I thought it was Dr. Kendricks or someone in the ER
25  that asked me, you know, what medications I was on.  I

Page 60

1   believe I told them that, you know, I had been
2   prescribed 800 milligrams of Motrin three times a day,
3   had been taking that for some time.  I really don't --
4   I don't remember really talking to the guys in the
5   ambulance.
6      Q.  But you could have told them that?
7      A.  That I was taking Motrin?
8      Q.  Yeah.
9      A.  Well, I -- sure, I could have.  You know, I
10  had been for the prior month.  That's what PA
11  Rodriquez had prescribed.
12     Q.  Directing your attention to that Sunday, do
13  you recall --
14     A.  Do I need to look at this?
15     Q.  That's fine.  No.  That was just a question
16  about that.  You testified you couldn't recall whether
17  you took any medication on Sunday?
18     A.  I -- I can't recall.
19     Q.  How about Saturday?
20     A.  I really can't.
21     Q.  How about Friday?  You can't shake your
22  head.  You've got to answer.
23     A.  No, I can't recall.  I'm sorry.  I should
24  know that.
25     Q.  What is the generic name for Motrin?

Page 61

1      A.  The generic name?
2      Q.  Yeah.
3      A.  I think it's ibuprofen, isn't it?  I -- you
4   know, that's my understanding now.
5      Q.  If you recall, when was the last time you
6   took Motrin?
7      A.  The last time I took Motrin?
8      Q.  Prior to going to the ER on the 2nd.
9      A.  I really don't recall.  You know, I had
10  gotten the prescription from PA Rodriquez I think on
11  July the 26th or July the 27th.  And it was for 800
12  milligrams for three times a day and had one refill,
13  which I refilled.  And that's what I took.  And that
14  is all that I took during the month of July and
15  August.
16     Q.  Did you --
17     A.  I don't know whether that ran out the last
18  week or I -- I was taking something else.  I had
19  asked -- I do remember when -- I think we talked about
20  going in and seeing Dr. Garcia.  I don't know whether
21  we talked about it or not, but I saw Garcia on the
22  27th, maybe the 27th.  And at that time, I had told
23  him that I was -- you know, I needed something for the
24  pain; it was so bad; I had been taking the Motrin, but
25  it seemed to be upsetting my stomach; could he

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

17 (Pages 62 to 65)

Page 62

1  prescribe something else. And he said he was going
2  to, but he didn't.
3      Q.  And that was on Monday, the 20 -- I'm sorry.
4      A.  27th. yeah. But to know exactly the last day
5  that I took the Motrin that -- you know, that he had
6  prescribed, I really -- I can't -- I don't know.
7      Q.  And --
8      A.  Basically, I was taking it the three times a
9  day as needed for the pain, which was constant.
10     Q.  And that's how you took it, how it was
11 prescribed?
12     A.  Yes, sir.
13     Q.  Do you recall whether you were supposed to
14 take it with food or anything of that nature?
15     A.  Yes.
16     Q.  And --
17     A.  With food.
18     Q.  And did you always adhere to those
19 prescription directions?
20     A.  Yes, tried to.
21     Q.  Let's see. When you checked into the ER at
22 Baptist South --
23     MS. COCHRUN:  Can I go grab my set of those
24 records? That way, you don't have to do it upside
25 down.

Page 63

1      MR. DOYLE:  Yes.
2          (Brief pause)
3      Q.  When you checked into the emergency room at
4  Baptist South on Sunday, the 2nd of September, one of
5  the first things they did was get a patient history
6  from you; is that right?
7      A.  I think so, yes. I remember talking to
8  them. Whether it was, you know --
9      Q.  And did they ask you if you were taking any
10 medications?
11     A.  I think they did. I believe -- I don't
12 remember the doctor's name. Doctor Hendrix or
13 whoever. But I told them what I had been taking at
14 Maxwell, the 800 milligrams of Motrin.
15     Q.  Okay. And when you -- and I'm just going to
16 invite your attention to the document. I'm not going
17 to mark this, but it's the ER record, and it's Bates
18 number 00177. And it says adult. It's got your plate
19 on the upper right-hand corner. I call that plate,
20 but your name and social security number. And there
21 is an entry on it that says home meds. Do you see
22 where I'm referring?
23     A.  Uh-huh.
24     Q.  And they entered Motrin?
25     A.  Uh-huh. I do see that.

Page 64

1      Q.  Did you tell them that?
2      A.  Well, like I said earlier, I remember telling
3  them that I took, you know, basically what I was
4  prescribed at Maxwell, which was the 800 milligrams of
5  Motrin.
6      Q.  So that's --
7      A.  Yeah.
8      Q.  And this is just your initial ER intake
9  sheet?
10     A.  I don't think I've ever seen that, but --
11     Q.  And then I will show you what I think you're
12 talking about is early the next morning, were you
13 examined by Dr. Reid and Dr. Maya, in the middle of
14 the night?
15     A.  Yeah. It's all sort of a blur whether it
16 was, you know, that night, in the morning. And then I
17 was in the ICU unit for a couple of days, I guess.
18     Q.  And --
19     MS. COCHRUN:  Steve, are you going to -- are
20 you going to attach that?
21     MR. DOYLE:  You've got it. I gave you Bates
22 numbers of Baptist records.
23     MS. COCHRUN:  I don't think I have that Bates
24 number. Everything I have -- I don't have the -- when
25 you said 770, I don't have that stack.

Page 65

1      MR. DOYLE:  I can --
2      MS. COCHRUN:  I was going to say okay.
3      MR. DOYLE:  Let's mark that one page that --
4      MS. COCHRUN:  I have numbers running up to
5  that; but, no, I don't have 770. I mean if you're
6  going to use those numbers, I don't have that set.
7      MR. DOYLE:  That was --
8      Q.  Mr. Coggin, that page we just discussed I'm
9  going to mark as Defendant's Exhibit #3, which is the
10 one page of the ER record.
11     MS. COCHRUN:  I guess my question is that you
12 think you've produced a set of Baptist medical records
13 to me that are Bates stamped?
14     MR. DOYLE:  They're not -- I got --
15     MS. COCHRUN:  Let me say this. Guess what?
16 No, you haven't, but I mean that's the one that you're
17 going to work out of?
18     MR. DOYLE:  Yes.
19     MS. COCHRUN:  Okay. I'll just try to catch
20 up with you. I mean, I don't have -- I mean,
21 unfortunately, that means we may have to mark those
22 since I don't have that Bates stamped set.
23     MR. DOYLE:  And I'm just going to pull them.
24     MS. COCHRUN:  Can I just get that set?
25     MR. DOYLE:  Yes.

JOHN COGGIN v. UNITED STATES OF AMERICA                  9/20/2007
DEPOSITION OF JOHN COGGIN

18 (Pages 66 to 69)

Page 66

1     MS. COCHRUN: Okay. Good.
2     Q.  And at some point in your admission, were you
3  examined by Dr. Reid and Dr. Maya?
4     A.  Yes, sir.
5     Q.  Did they take a patient history from you?
6     A.  I'm sure they did.  I -- you know, I don't
7  really remember it.
8     Q.  I'm going to show you a document that has
9  Bates numbers, from Baptist medical records, 189 and
10  190.  It's been marked as Defendant's Exhibit #4.
11  It's a two-page document.  It says History and
12  Physical at the bottom.  And take a look at that,
13  please.
14     A.  Uh-huh.
15     Q.  Have you seen that before?
16     A.  Yes, sir.
17     Q.  And I am going to direct your attention to
18  the paragraph which has the heading on it History of
19  Present Illness and the sentence -- first, the
20  sentence that begins midway through the one, two,
21  three -- fourth line there: Mr. Coggin also tells me
22  that he takes a lot of ibuprofen on a daily basis.
23     Did you tell Drs. Reid and Maya that?
24     A.  I don't recall telling him words exactly to
25  that effect.  Basically, what I recall telling him was

Page 67

1  that I was taking the 800 milligrams of Motrin, you
2  know, that I had been prescribed at Maxwell.
3  Honestly, I can't tell you that I might have used
4  those exact words in describing that, but I think what
5  I said to him was I -- I had been taking 800
6  milligrams three times a day.
7     Q.  We've looked at the Haynes Ambulance sheet,
8  your ER intake sheet, and then Drs. Reid and Maya's
9  history and physical.  And the Motrin is mentioned in
10  all three of those places.  Would you agree with me?
11     A.  Yes, sir.
12     Q.  Did you suspect at that time that the
13  ibuprofen was causing your GI bleeding?
14     A.  No.  No.
15     Q.  You're pretty adamant about telling people
16  that you were taking ibuprofen.  You thought it was
17  important?
18     A.  No.  I wouldn't really characterize it that I
19  was adamant in doing it, no.  I mean, I was just
20  really responding to what they asked.
21     Q.  And you think that you told them that your
22  dosage was 800 milligrams three times a day?
23     A.  Yes.
24     Q.  Could you have told them the words used here,
25  that you were taking a large amount of -- let me read

Page 68

1  it exactly: takes a lot of ibuprofen on a daily
2  basis.  Those could be the words that you used?
3     A.  I could have.  I can't tell you that I didn't
4  say it that way.  I'm sure that I did tell them that
5  it was 800 -- you know, 800 milligrams and that -- you
6  know, that is a lot.
7     Q.  How did you know that was a lot?
8     A.  It's a big pill.  I mean like a horse pill.
9     Q.  And you're not sure whether you had taken any
10  ibuprofen in the week prior to being admitted into the
11  emergency room?
12     A.  I -- you had asked me when was the last time
13  that I took it.  And I honestly cannot tell you the
14  last day or when.  You know, I was taking it as they
15  had prescribed it, you know, and taking it for the
16  pain, which was indescribable; but whether it was the
17  27th or the 28th or whatever, I -- I really don't
18  know.
19     I do know that I -- I had asked Dr. Garcia if he
20  could give me some other medicine, and he said that he
21  would.  When I brought the records back on the 29th, I
22  asked him about it.  And at that point, he said, well,
23  just put a -- I think he said, just, you know, put a
24  request in.  And I said, well, why do I need to put
25  another request in?  You just told me Monday that

Page 69

1  you -- you know, you were going to prescribe something
2  else?  He said, well, that's just the procedure around
3  here, and just walked off.
4     Q.  Did the --
5     A.  What was the last day, I really -- I don't
6  know.
7     Q.  Did the ibuprofen help with the pain?
8     A.  You mean the Motrin?
9     Q.  Yeah.
10     A.  It did.  It did.  But, you know, it kept
11  getting -- it would -- it would help for a while; but
12  then it would seem like it would get, you know, worse.
13     Q.  Do you recall Dr. Garcia mentioning a drug
14  called psuendac (phonetic)?
15     A.  I think so, yeah.
16     Q.  Did you ever --
17     A.  Either Dr. Garcia or one of the nurses.
18  Yeah, I remember something like that.  Seems like I
19  was given that at one point.
20     Q.  Do you know whether you ever picked up that
21  prescription?
22     A.  Seems like I did.  It seems like that there
23  was -- I think that Nurse Little had prescribed
24  something and that I picked it up at the drug window,
25  which was a thing you can take there.

JOHN COGGIN v. UNITED STATES OF AMERICA                        9/20/2007
DEPOSITION OF JOHN COGGIN

19 (Pages 70 to 73)

Page 70

1    Q.  But you had asked Dr. Garcia for --
2    A.  I had asked Dr. Garcia for something, you
3  know, to replace the Motrin; but I never got any,
4  never -- never got that.  If he prescribed something,
5  I never got it.  And I asked him about it on the 29th;
6  and he said, you know, put in a request form.
7    Q.  And you --
8    A.  And, actually, he said come back to the
9  clinic and put one in and see a PA, which I thought
10  was -- since I had just seen him, which I thought was
11  sort of a run-around.
12    Q.  And did that discussion with respect to a
13  different pain killer -- was that on Monday, the 27th,
14  when you saw Dr. Garcia?
15    A.  Yes, sir.
16    Q.  How does the prison commissary at Maxwell
17  work?  Like just describe how you buy stuff.  Do you
18  walk in and buy stuff?
19    A.  No.  No.  You -- there are like set times
20  that you can go.  You are limited when you can go.
21    Q.  Do you actually go in?
22    A.  It's usually like Monday through Thursday
23  that you have certain hours during the day that you
24  can purchase items at the commissary.
25    Q.  And do you actually go in, or do you feel out

Page 71

1  a sheet and give it to staff and they pull the stuff?
2    A.  We -- I think you fill out a sheet and you
3  hand it to them, and then they collect it and bring it
4  to you.
5    Q.  I'm going to show you some commissary records
6  that are marked as Defendant's Exhibit #5.  And they
7  have Bates numbers on them 397 through 403.
8        MS. COCHRUN:  What's on 403?  I have 397
9  through 402.
10       MR. DOYLE:  403 should be the -- like that.
11       MS. COCHRUN:  Well, let's see.  Okay.  I'm
12  just telling you in this thing, you didn't give me
13  403.
14       MR. DOYLE:  You can have this one.
15       MS. COCHRUN:  Okay.  Let's see.  No, I don't
16  have 403.  Of the ones that were produced, Steve, 403
17  is not in there.
18       MR. DOYLE:  Okay.  And it could be that there
19  is an extra page in there or vice versa, but I'll ask
20  about some specific things in there.
21       MS. COCHRUN:  Okay.
22    Q.  Mr. Coggin, can you take a look at the page
23  with the Bates number 397 in the lower right-hand
24  corner.  And it's got photocopies of three receipts on
25  it?

Page 72

1    A.  Uh-huh.
2    Q.  Is that your signature on them?
3    A.  Yeah, it looks like it.
4    Q.  Have you seen these before?
5    A.  Yes, I have.
6    Q.  Let's look at the one that's marked 7/24/01.
7  And that reflects, about midway down, one ibuprofen
8  tablet.  I take it that's one box of ibuprofen
9  tablets; is that correct?
10    A.  Yeah, I presume so.
11    Q.  And below that, another box, one box
12  ibuprofen tablets.  Then skip down, one non-aspirin
13  regular; below that, one non-aspirin regular.  Then
14  one GS aspirin, one GS aspirin, one Tums, one Tums.
15  Did you buy that stuff on July 24th of '01?
16    A.  Yes, sir.
17    Q.  And let me invite your attention to the page
18  with Bates number 401.  And it's got a Xerox.  I
19  apologize for the quality.
20    A.  401?
21    Q.  Yes.
22    A.  Uh-huh.
23    Q.  It's got a Xerox, Good Sense ibuprofen
24  tablets.  You see that?
25    A.  Uh-huh.  Yes.

Page 73

1    Q.  Is that what you bought in the commissary?
2    A.  I honestly can't recall if that's what it was
3  or not.
4    Q.  Looked like it?
5    A.  I presume it is.
6    Q.  And did you buy two boxes of that on the
7  24th?
8    A.  Yes.
9    Q.  And then I invite your attention to the next
10  page.  It has a picture -- again, I apologize for the
11  Xerox -- of bottled aspirin.  And then when I look at
12  the receipt from the 24th, it has one GS aspirin, Good
13  Sense being the brand, one GS aspirin.  Did you buy
14  two bottles of that?
15    A.  Yes.
16    Q.  And then I don't have the Tums; but it says
17  one Tums, one Tums.  I take it that's a roll of Tums?
18    A.  I presume so.
19    Q.  Well, you bought it.  You tell me.
20    A.  Should have bought more.  In hindsight, I
21  should have bought a whole bunch more.
22    Q.  And then above the GS aspirin is one
23  non-aspirin regular and one non-aspirin regular.  Do
24  you see that?
25    A.  Yes.

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

20 (Pages 74 to 77)

Page 74

1    Q.  And on page 403, there is a picture of Good
2  Sense regular strength pain reliever, contains no
3  aspirin; and it's acetaminophen, 100 tabs.  Is that
4  the non -- the -- I'm sorry -- the non-aspirin regular
5  that you purchased?
6    A.  I presume so, yes.
7    Q.  Would you agree with me you bought those
8  over-the-counter medications on the 24th?
9    A.  Yes.
10    Q.  Did you take any of them?
11    A.  I did take a -- the ones on the 24th, when
12  I -- that morning I had gone into the clinic and put a
13  cop-out in because I was experiencing severe pain.
14    Q.  Tell me what a cop-out is.
15    A.  Well, a request form.  That's what they call
16  them in there.  But it's a medical request form.  And
17  that particular day, doc -- PA Rodriquez refused to
18  see me.  He -- you know, he said, well, I will set you
19  up for an appointment.  And --
20    Q.  And the 24th is Tuesday?
21    A.  Yes, sir.  And so after that, I went to the
22  commissary and thought, man, I need to load up on some
23  painkillers.  And so that's basically what I bought.
24  And I did take two or three of the Tylenols, and I did
25  tell the medical staff I think the next day that I had

Page 75

1  taken the Tylenol.
2    Q.  And do you --
3    A.  But I didn't --
4    Q.  Do you recall the generic name for Tylenol?
5    A.  The generic name?
6    Q.  Yeah.  Is it acetaminophen?
7    A.  I think so, yes.
8      MS. COCHRUN:  Well, it's actually
9  acetaminophen.
10    A.  I think so, yeah.  I took two or three of
11  those.  And I told the staff that I did not take
12  any of the ibuprofen or the aspirin that day or at any
13  time thereafter.
14    Q.  What did you do with it?
15    A.  What did I do with that?
16    Q.  Uh-huh.
17    A.  Well, I just left it in the locker.  The --
18  when I got the prescription for the Motrin, I was
19  taking the Motrin that I had been prescribed.  When I
20  got back from the hospital the -- September the 17th,
21  they -- when you leave the camp, they come in and they
22  basically clean out your locker.  And they had cleaned
23  out the locker and everything.  And then when I came
24  back, they brought it back in a big duffel bag with
25  all the materials in it, and those were still in

Page 76

1  there.
2      And I actually thought at that point I would -- I
3  had become vividly aware of what Motrin can do.  Prior
4  to that, I had no idea that it can cause what it can
5  do.  I was fully aware that from, you know, this time
6  forward, I could never take an NSAID drug like a
7  Motrin or ibuprofen or whatever.  And so I had those,
8  and I threw all those bottles away.  It sort of
9  surprised me they were still in there.  I thought they
10  would just, you know, throw that away.
11    Q.  And that was on the 17th, when you got out of
12  the hospital?
13    A.  It was whenever I got my, you know, stuff
14  back which --
15    Q.  Sometime shortly --
16    A.  Yeah.  It might have been the next day.
17    Q.  -- after your release?
18    A.  Yeah.  It was either that night or the next
19  day.  I think it was late that night.  I think I got
20  it back that night.
21    Q.  Did you --
22    A.  I was so weak someone had to help me, you
23  know.
24    Q.  In this time frame around July 24th, were you
25  taking aspirin for any purpose?

Page 77

1    A.  I -- I may have taken an aspirin, you know,
2  prior to that.  I don't remember.  I wasn't taking
3  them --
4    Q.  Like do you take one a day for your heart or
5  anything, like any routine use of aspirin?
6    A.  No.
7    Q.  How about -- now, you bought both the -- and
8  I'm going to butcher my pronunciation, but the
9  acetaminophen and the ibuprofen.  Why did you take the
10  acetaminophen?
11    A.  Why did I take it?
12    Q.  Yeah, versus the ibuprofen or the aspirin.
13  You bought all this stuff.
14    A.  I don't know.  I guess I thought in my
15  nonmedical, that it was stronger for some reason, you
16  know.  You know, I had taken Tylenol over the years.
17  I hadn't -- I don't think I've ever really -- until I
18  ever got to Maxwell, I don't think I had ever taken an
19  ibuprofen or Motrin in my life.  I had taken Tylenol
20  or maybe an aspirin.
21    Q.  And how about the Tums?  Did you take those?
22    A.  I think I did.
23    Q.  Did they give you any relief?
24    A.  You know, I really think -- they must have
25  because I -- I didn't -- I'm not sure I attributed it

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

21 (Pages 78 to 81)

---

**Page 78**

1  to the Tums, because I think the next day or two is
2  when I got the Motrin from Dr. -- well, first they
3  prescribed a Tylenol codeine. And I remember asking
4  Dr. Garcia. I said, you know, I'm already taking
5  Tylenol. And he said, well, this is a lot stronger;
6  this is going to be -- you know, I said, the Tylenol
7  I'm taking is not effective. He said, well, this is a
8  lot stronger. And then it was really like upsetting
9  my stomach, so then they changed it to Motrin. And it
10  gave me some, I think, relief; but it might have been
11  the Tums. I don't know.
12    Q.  And you're absolutely certain you didn't take
13  this ibuprofen?
14    A.  Absolutely, yes, sir.
15    Q.  Then I'm going to invite your attention to
16  the next page with Bates number 398 on it. And you
17  see the receipt that is marked August 14th?
18    A.  Right.
19    MS. COCHRUN:  Steve, our copy -- oh, you've
20  got a good copy. My copy you can't read, but okay.
21    THE WITNESS:  Here it is.
22    MS. COCHRUN:  That's okay.
23    Q.  And would you agree that that's your
24  signature on that receipt 8/14?
25    A.  Yes, sir.

---

**Page 79**

1    Q.  And you see about two-thirds of the way down
2  purchase of one ibuprofen and one non-aspirin regular?
3    A.  Right.
4    Q.  If you weren't taking it and you had bought a
5  bunch on 7/24, why did you buy more on the 14th of
6  August?
7    A.  Well, what happened was that I had several
8  tests that were done, like ultrasound and an IVP
9  test. And then after that -- I forget the exact date,
10  either the 3rd or the 10th or whatever. I think I met
11  with Rodriquez. And Rodriquez told me, he said, well,
12  your problem is your gallbladder; it's sludge. He
13  said, you're -- you are going to have to put up with
14  the pain. He said, the only way you're going to get
15  rid of it is if you remove your gallbladder. He told
16  me. he said, you will be much better off to have the
17  surgery when you get out. And my release date was
18  like three or four months away. He said, you know,
19  you're better just to wait.
20    And so after that, the pain started getting more;
21  and I realized if I was going to try to make it four
22  months, I needed -- and the medication I had, the
23  Motrin, was only going to go for like 30 days, I
24  think. So I needed to basically start storing up some
25  pain medication.

---

**Page 80**

1    And you had asked me earlier how does the
2  commissary thing work. And one of the reasons that
3  I -- I try to like keep stuff stored up that I would
4  need, because it's not -- it's hard to understand when
5  you haven't been in that situation, but it's not like
6  you can just go down to the drugstore and buy
7  something. You can only go when it's open. And there
8  are certain dollar amounts that you can spend. So
9  even if you want something and you've already spent
10  your limit, you can't get it. They also have like
11  weeks that the commissary is completely closed.
12    So it was trying to prepare to have some
13  medication that I could try to help with this pain
14  over the next few months once the Motrin ran out.
15    Q.  So at that point, is it your testimony that
16  you had three bottles of ibuprofen?
17    A.  Yes, sir.
18    Q.  And did you take any of the pills from those
19  three bottles?
20    A.  No, never.
21    Q.  Now, why did you buy more of the non-aspirin
22  pain reliever?
23    A.  Where is that?
24    Q.  8/14.
25    A.  8/14?

---

**Page 81**

1    Q.  Yeah. Right below the ibuprofen.
2    A.  I guess just to store more pain reliever.
3  You know, I wasn't discriminating between ibuprofen or
4  Tylenol. It was just a matter of, you know, trying to
5  have something that I could treat this pain with that
6  I thought was going to be sort of a chronic situation
7  for the next four months.
8    Q.  Did the ibuprofen that you purchased at the
9  commissary -- did it have any warning labels on the
10  box?
11    A.  On the box?
12    Q.  Yeah.
13    A.  I don't recall any.
14    Q.  Would you have read the package?
15    A.  May have or -- I don't remember.
16    Q.  Do you recall whether there was an insert in
17  the package that had any warning?
18    A.  Uh-huh.
19    Q.  Do you recall having read that?
20    A.  No.
21    Q.  Were you allowed to store over-the-counter
22  medications like that at the prison?
23    A.  Yes.
24    Q.  We talked about on the 24th, you were in
25  pain, so you bought this medication. Take me through

JOHN COGGIN v. UNITED STATES OF AMERICA                          9/20/2007
DEPOSITION OF JOHN COGGIN

22 (Pages 82 to 85)

---

Page 82

1  your --
2      A.  The 24th of July?
3      Q.  I'm sorry. July, yes. Was that the -- start
4  me with the onset of your symptoms.
5      A.  I think they actually started like the
6  week -- maybe the Friday or the weekend before. It
7  was like just a severe pain.
8      Q.  And where was it?
9      A.  My right abdomen, about right in here, right
10 midpoint of your -- where your stomach is, way higher
11 than you would -- your belt line. It started -- you
12 know, at first I thought maybe it was indigestion
13 or -- and it just got -- kept getting worse and
14 worse. And I think Monday night it was so severe I
15 realized I needed to go into the clinic. And that's
16 when I prepared the medical request form and submitted
17 it, took it in actually Tuesday morning, the 24th, and
18 handed it to I think the x-ray guy, the x-ray
19 technician, and requested to see the doctor then.
20     Q.  And when did you in fact see the doctor?
21     A.  Well, he told me to wait. And I think I
22 waited like four hours or so, and then Rodriquez came
23 out. And he said, well, I'll -- you know, I'm going
24 to take care of you. And I said, well, I really need
25 to see someone like right away, it's -- you know, it's

---

Page 83

1  so bad. And he got sort of irritated and said, look,
2  I'm going to set you up for an appointment, check the
3  call-out list tonight and see when your appointment
4  is. And so I did. And he didn't have -- he did not
5  set me up for an appointment on the call-out list that
6  night, so I went in the next day with another request
7  form.
8      Q.  And what happened that day?
9      A.  That day was July the 25th. I took the
10 request form in, and I think I was called back over to
11 the clinic, and Rodriquez saw me. He did a -- like
12 a -- he brought me back to his office and did like a
13 very cursory -- cursory exam, took my blood pressure,
14 asked me what the problem was. He then looked at my
15 file and said, well, you're really Dr. Garcia's
16 patient; you're going to have to come back and see
17 Dr. Garcia. So he told me to leave and that I would
18 be called back.
19         And I was called back later that day, and
20 Dr. Garcia and Rodriquez both saw me, and they -- I
21 think they were both there. And I got a pain shot and
22 I think another -- another either an antibiotic shot
23 or whatever. And it was at that point that I think
24 Dr. Garcia prescribed the Tylenol with codeine. And
25 they also took x-rays, too. They took several

---

Page 84

1  x-rays. And they came back and told me that the
2  x-rays showed that I had a kidney stone, but they
3  couldn't correlate the kidney stone to the pain,
4  because the kidney stone was in the left kidney and
5  the pain was over in the right side, so they didn't
6  think it was that. But they had me come back the next
7  day, and they took more x-rays to maybe see if the
8  stone had moved and it was -- I was trying to pass the
9  stone and maybe it was radiating over. But it was
10 still in the same place.
11     Q.  Did they do any other tests that you recall?
12     A.  I think they drew blood.
13     Q.  Anything else?
14     A.  I can't remember anything else that day.
15     Q.  At that point, did you feel they were giving
16 you a thorough examination?
17     A.  I wouldn't characterize it as a thorough
18 examination, but --
19     Q.  What would you characterize it as?
20     A.  Well, I think it was an inadequate
21 examination, you know, in hindsight; but at the time,
22 I didn't -- I didn't know. I had no idea what was
23 causing the pain.
24     Q.  And was it that day they prescribed the
25 Tylenol 3 or was that the previous day?

---

Page 85

1      A.  I think it was on Wednesday, the -- July the
2  25th. I think it was.
3      Q.  How did you react to the Tylenol 3?
4      A.  It's the codeine, I think, was sort of
5  upsetting my stomach real bad. So I asked them if
6  there was some other pain medicine, and that's when
7  they prescribed the -- I think PA Rodriquez prescribed
8  the Motrin.
9      Q.  And did he explain how to take the Motrin?
10     A.  No, I don't recall if he explained it or not.
11     Q.  How did you get the Motrin?
12     A.  All the prescribed medications, you go to
13 a -- what they call the pill line. It's like a window
14 where you go and pick up the --
15     Q.  And is that staffed by a pharmacist?
16     A.  I think so, yes, sir.
17     Q.  And did he --
18     A.  At the time, there was a pharmacist there.
19     Q.  Do you recall his name?
20     A.  Sometimes it's staffed by a nurse, but
21 usually it's a pharmacist.
22     Q.  Do you recall who the pharmacist was?
23     A.  No.
24     Q.  Did the pharmacist give you written
25 information with the medication?

JOHN COGGIN v. UNITED STATES OF AMERICA                                9/20/2007
DEPOSITION OF JOHN COGGIN

Page 86

1    A.  I don't recall any.  He may have, but I don't
2  recall any.
3    Q.  Did they set you up for some other
4  diagnostic procedures?
5    A.  They did for the following week.  They set me
6  up for a -- the following Monday, they did an
7  ultrasound at Medical Imaging.  And then the following
8  Wednesday, I went to the same place and they did a --
9  I think what they call an IVP test, which is like
10  x-rays of your kidneys.
11    Q.  And the ultrasound, who did that?  And I'm
12  sorry if you've already testified to that.
13    A.  That's all right.  It was done by an outside
14  group, Medical Imaging in Montgomery.  It's up on
15  Lawrence Street.
16    Q.  And do you get a medical furlough to go to
17  those --
18    A.  Yes.  It's a day -- day thing.
19    Q.  Do the correctional officers escort you
20  there?
21    A.  No.
22    Q.  How do you get there?
23    A.  They send -- it's a -- a van comes and drops
24  you off; and then when you're ready to go back, you
25  call them and they come and pick you up.  And,

Page 87

1  actually, I think they have an inmate that actually
2  drives.  I think an inmate drove.
3    Q.  Do you recall, prior to the ultrasound, were
4  you given instructions not to eat food or anything of
5  that nature?
6    A.  Prior to the ultrasound?
7    Q.  Yes.
8    A.  You know, I honestly don't remember.
9    Q.  All right.  And then did the IVP involve
10  injection of a dye?
11    A.  I think so.  And then they did x-rays with
12  the dye in there.
13    Q.  After those diagnostic tests were run, did
14  you have a follow-up examination?
15    A.  Yes.  I met with PA Rodriquez.
16    Q.  And when was your next visit with him?
17    A.  It was Friday, the -- I think it was that
18  Friday, August the 3rd.  I think the IVP was
19  Wednesday, the 1st, and then he called me in on
20  Friday, the 3rd.
21    Q.  And what happened in that exam?
22    A.  He -- he basically said, you know, the
23  ultrasound showed that I had sludge, as he called it,
24  in the gallbladder and they thought that was what was
25  causing the pain.  I had a kidney stone, but it was in

Page 88

1  the left kidney, and that wasn't -- but that it was a
2  gallbladder sludge.  And that's when he told me, he
3  said that you're probably going to have to take your
4  gallbladder out, but you'll be a lot better off having
5  the surgery when you get out, you know, of Maxwell,
6  and it's just something you're going to have to put up
7  with the pain until then.
8    Q.  What was your next visit if you recall?
9    A.  I think --
10    Q.  Let me back up.  At that point, did PA
11  Rodriquez have the ultrasound report?  Do you know?
12    A.  Yes.
13    Q.  Did he go over that with you?
14    A.  Well, he did -- he basically told me what it
15  was.  They didn't go over it with me at the Medical
16  Imaging, but he had gotten back the ultrasound and
17  IVP, and he told me this is what the results are.
18    Q.  Okay.  And is that where the sludge
19  information came from?
20    A.  Yes, sir.
21    Q.  Did you have a visit subsequent to that?
22    A.  I think the next time I went over to the
23  clinic, they called me over to do a urine test and
24  maybe a blood test.  That might have been the
25  following week.

Page 89

1    Q.  What was that associated with?
2    A.  Honestly, I don't know.  I mean it was part
3  of their -- more diagnostic, to see what was going
4  on.
5    Q.  Do you recall a visit subsequent to that?
6    A.  I think there was some -- a Wednesday in
7  there, like either the 8th or maybe the 15th; but I
8  was called over to I guess do a regular what they call
9  hypertension test, where they just take your blood
10  pressure and -- because I was on a very low blood
11  pressure medicine when I went in there.
12    Q.  When were you first diagnosed with high blood
13  pressure?
14    A.  When I got out of law school.  I'm not sure
15  exactly when, but it was --
16    Q.  A long-term condition?
17    A.  Pretty much so.  It wasn't really very high.
18  It was more like borderline, and I was prescribed like
19  10 milligrams of accupril, which is really low grade.
20  So it's more like trying to maintain it as, you know,
21  below borderline.
22    Q.  When did you start taking blood pressure
23  medication?
24    A.  I think in the '80s.  So it's something I had
25  taken way before I went there.

JOHN COGGIN v. UNITED STATES OF AMERICA                          9/20/2007
DEPOSITION OF JOHN COGGIN

24 (Pages 90 to 93)

Page 90

1    Q. Were you on them continuously from the '80s
2 until you were incarcerated?
3    A. Yes.
4    Q. And who conducted the hypertension follow-up
5 visit?
6    A. I think it was Garcia. You know, I'm
7 really -- I'm not sure.
8    Q. Is that the same clinical setting as your
9 other visits with him?
10    A. Yes. It might have been a nurse. I'm not --
11 that -- but I had several of those while I was there.
12    Q. And after that, how did your symptoms
13 progress?
14    A. They started getting more intense, more
15 severe. And I really had a hard time walking, it was
16 so bad. It started getting difficult to work. I
17 worked in the library; and part of it was, you know,
18 putting books up. And I really had a hard time even
19 raising my arm. So they got worse and worse the next
20 couple of -- few days.
21    Q. And did you go back to the clinic for further
22 care?
23    A. Well, I think I just followed -- you know, I
24 was basically at that point trying to do what
25 Garcia was -- I mean -- excuse me -- PA Rodriquez --

Page 91

1 and trying to deal with it. And it was getting
2 progressively more and more difficult. And I think
3 the next time that I had any real contact with the
4 medical staff was the night of the 18th, when Officer
5 Davis found me. And I talked to I guess the -- talked
6 to PA Rodriquez. And that's when I -- I think I told
7 you he told me that, well, it's your gallbladder
8 acting up; you know, you're going to have that until
9 you have it taken out.
10    Q. That was on the 18th. When did you go back
11 to the clinic?
12    A. I went back to the clinic on the morning of
13 the -- the following week, the morning of the 22nd.
14    Q. On Wednesday?
15    A. Yes.
16    Q. Who did you see then?
17    A. I put a request form in, saw the nurse,
18 explained to her exactly what was -- what was -- you
19 know, what was going on. And she said, well, wait
20 here; I will have either Dr. Garcia or Rodriquez see
21 you. And I waited, you know, the several
22 hours and then had to go back over to the education
23 department to tell Mr. Hudson that -- you know, what
24 my condition was and I really wasn't going to be able
25 to work. And that's when he said, look, have they

Page 92

1 seen you? And I said, no. And he said, well, I'm
2 going to call over there and see if they can see you.
3 So that's when I went back over there.
4    Q. Did she give you a shot for pain that day?
5    A. She? Who are you referring to?
6    Q. Nurse Little. Is that who you saw that day?
7    A. Yeah. Well, actually, remember, I saw --
8 finally that -- later that afternoon, I saw Rodriquez,
9 when he went ballistic and told me he wouldn't -- you
10 know, criticized me for having people call and needed
11 to keep it in house and told me he was not going to
12 send me to an emergency room and wasn't going to -- he
13 wasn't -- actually, he wasn't going to see me at all
14 and told me to go back to the dorm.
15    And I think later that afternoon after the four
16 o'clock count, I was actually called back. And Nurse
17 Little saw me and gave me a pain shot, some kind of
18 shot. I think it was that afternoon. But I think I
19 actually saw her the next day, too.
20    Q. What did she do the next day?
21    A. I think she -- I think she prescribed the --
22 the medicine, the Zolac (phonetic), Zoledac. And I
23 think she also told me at that time that they were
24 going to try to set me up with a doctor to have the
25 gallbladder taken out.

Page 93

1    Q. And that was on Thursday, the 23rd; is that
2 right?
3    A. Yes, sir.
4    Q. And when was your next appointment at the
5 clinic?
6    A. Appointment?
7    Q. Or when did you come back to the clinic?
8    A. Well, the next -- I guess the next contact I
9 had with the medical staff was that Saturday, the
10 25th, when I went to the pill line to try to get help
11 or go to the emergency room. And they told me --
12 that's -- on the weekend, it's actually staffed by a
13 nurse. And she said there was nothing she could do, I
14 would have to see, you know, the doctor next week.
15 And the next time I went back to the clinic was the
16 Monday, the 26th.
17    Q. And who did you see then?
18    A. Dr. Garcia.
19    Q. And what did he do?
20    MS. COCHRUN: I don't mean to interrupt, but
21 we're saying Monday, the 26th.
22    MR. DOYLE: I'm sorry.
23    MS. COCHRUN: And I think we just got off the
24 date somewhere.
25    THE WITNESS: Oh, you're correct. I'm sorry.

JOHN COGGIN v. UNITED STATES OF AMERICA                          9/20/2007
DEPOSITION OF JOHN COGGIN

25 (Pages 94 to 97)

Page 94

1   Monday, the 27th.
2       MS. COCHRUN:  Yeah.  It's just going to read
3   wrong in the long run.  So --
4       A.   Sunday, the 26th, I went to the pill line
5   again.  I went to the pill line twice on the weekend,
6   the 25th and the 26th.  Then the following -- the next
7   time I actually went to the clinic was the 27th,
8   Monday, the 27th.
9       Q.   In those pill line visits --
10      A.   I'm sorry.  I didn't look at the calendar.
11      Q.   In your pill line visits, did you pick up any
12  medication?
13      A.   No.  I was telling them how intense the pain
14  was.  I felt like I needed to go out.
15      Q.   At approximately what time did you see
16  Dr. Garcia that Monday, the 27th?
17      A.   I was there at six o'clock that morning
18  waiting for him.  And I think -- I'm not sure exactly
19  what time he saw me, but it was ten or eleven o'clock
20  probably.
21      Q.   And do you recall what happened in that
22  examination?
23      A.   He said that it was the gallbladder, it was
24  the sludge, that they were going to try to set me up
25  with a surgeon or a doctor to see.  I talked to him

Page 95

1   about the -- you know, I said I really needed some
2   kind of more pain medicine or something because it's
3   so -- so bad.  And he said, I'll -- I'll try to set
4   you -- I'll prescribe you something else, which he
5   didn't do.  He said it would be -- check -- check with
6   the pharmacy or the pill line that afternoon.  And I
7   did and it wasn't there.  And I did the next day and
8   it wasn't there.
9       Q.   Did he tell you to discontinue taking your
10  Motrin at that point?
11      A.   No.  No, he did not.
12      Q.   Did he in fact set up an outside consult for
13  you?
14      A.   Yes, he did.
15      Q.   And with whom was that?
16      A.   I believe his name was Antonio Williams.
17  He's a surgeon.  I don't really remember the name of
18  his association, but it was across from Jackson
19  Hospital.
20      Q.   In Montgomery?
21      A.   Yes, sir.
22      Q.   And do you recall what day you went to see
23  Dr. Williams?
24      A.   Wednesday, the 29th, August the 29th.
25      Q.   And how did you get there?

Page 96

1       A.   The van from the camp took me there.
2       Q.   Did you bring your medical records with you?
3       A.   Yes.  I had to go by the clinic, pick up the
4   brown folder with the medical records; and I took them
5   with me.
6       Q.   Tell me about your examination by
7   Dr. Williams.
8       A.   Well, it really wasn't much of an
9   examination.  He took the medical records.  He stuck
10  the x-rays up in the thing and looked at the x-rays.
11  I mean, he turned around and said, you know, we're
12  going to have to take your gallbladder out; I'll talk
13  to Dr. Garcia about it.  And that was about it.
14      Q.   Did he --
15      A.   It wasn't more than, you know, two or three
16  minutes, really.
17      Q.   Did he take a history from you?
18      A.   I don't recall him taking any.  He may have
19  asked some questions, but it was very -- you know,
20  very short.
21      Q.   Did he go over the ultrasound with you?
22      A.   No.  I don't recall him doing that, no.
23      Q.   Any discussion about the sludge or --
24      A.   No.
25      Q.   Do you remember him talking about potential

Page 97

1   polyps?
2       A.   No.  He may have said, you know, the
3   ultrasound had the -- could have been a polyp or could
4   be an ultrasound or whatever, but I -- I really -- I
5   don't recall a lot of discussion with him.  It was so
6   brief.
7       Q.   How long did you say you were there?
8       A.   Probably no more than five minutes and it was
9   all.  I mean, I waited a long time, like to see any
10  doctor; but the actual exam time was got the file,
11  looked at the x-ray, and then --
12      Q.   Did he have to take your shirt off, touch
13  your chest --
14      A.   I think so, yes.
15      Q.   -- palpate the region, that --
16      A.   Yes.  Uh-huh.  I think so.
17      Q.   Take your vitals?
18      A.   I don't remember.  I really don't.  He may
19  have, but I don't remember that.  I don't think so.
20      Q.   You testified earlier that you had talked
21  about gallbladder surgery with Dr. Garcia; is that
22  correct?
23      A.   Well, Dr. Garcia had told me, you know,
24  that's what needed to be done.
25      Q.   Were you pleased to be going to see this

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

26 (Pages 98 to 101)

Page 98

1  surgeon outside the --
2     A.  Well, actually, I really was.  I was.  I
3  thought, well, you know, this will be the, you know,
4  solution to the -- to my agony.
5     Q.  And at that point, did that sound like a
6  reasonable plan to you?
7     A.  Well, I didn't know, you know.  I just knew
8  I was not going to be able to last four months with
9  this kind of pain.
10    Q.  Did you ever get a date for the surgery?
11    A.  No.  I had -- you know, the -- I had asked
12 Dr. Garcia when I got -- I redelivered the -- the
13 medical records back when I got back from Dr. Williams
14 and happened to run into Dr. Garcia.  And he said he
15 would talk to him and they were going to set it up,
16 but it -- it might be weeks before the surgery was
17 done is what he told me.  And I -- I didn't think I
18 could wait.
19    Q.  And you went to the emergency room prior to
20 the surgery being scheduled; is that right?
21    A.  I think so, yeah.  I was never informed there
22 was any date set for a surgery.  Never.
23    Q.  Okay.  I'm going to invite your attention to
24 a document -- and I'm not going to -- I know we've all
25 got this -- dated --

Page 99

1     MS. COCHRUN:  You don't have to do it upside
2  down if you want, Steve.  I've got one.
3     MR. DOYLE:  Yeah.  I've got another one, too.
4     Q.  But it's got a date of 8/30/01 in the upper
5  right-hand corner.  Is says to Warden DeRosa, and it's
6  a two-sided document, and it's signed on the back by
7  John Coggin.  Mr. Coggin, is that your signature at
8  the end?
9     A.  Uh-huh.
10    Q.  And is that your --
11    MS. COCHRUN:  Yes?  You got to say it out
12 loud.
13    A.  Yes.  Yes.  Excuse me.
14    Q.  Did you write this document, the parts that
15 are in printing?
16    A.  Yes.
17    Q.  Is that your handwriting?
18    A.  Yes.
19    Q.  And did you write this -- when did you see
20 Dr. Williams?
21    A.  On the 29th.
22    Q.  And this is dated the 30th, so you wrote this
23 the next day?
24    A.  Uh-huh.  Looks like I did, yes.
25    Q.  Have you had a chance to give it a quick

Page 100

1  read?
2     A.  Yes.
3     Q.  And you're asking to have the surgery done
4  at -- I'll just read the sentence.  Second paragraph:
5        I respectfully request this emergency medical
6  furlough in order to go to the UAB Kirkland Clinic in
7  Birmingham in order to have this surgery done right
8  away.  I have complete medical insurance to cover, so
9  I will be saving the BOP and the camp substantial
10 costs.  I cannot stand this pain much longer.  I now
11 beseech you to grant my request.
12    A.  Right.
13    Q.  Why did you write this request?
14    A.  Well, as I indicated, when I took the --
15 the files back, Dr. Garcia said it might be weeks, it
16 might be months before they could actually get it
17 scheduled.  They had to go through, quote, procedures
18 going through Washington and whatever.  It could be
19 weeks or maybe even months before they could even
20 schedule the surgery.
21        And I had -- I guess this day would be Thursday.
22 I had gone back to the education department, and I was
23 talking to Mr. Hudson.  And I explained to him what
24 the situation was and that, you know, there was a
25 provision under the program statements of the BOP that

Page 101

1  I could actually request a medical furlough and go
2  have my own doctors do it at my own expense and also
3  the fact I wasn't getting a real warm and fuzzy
4  feeling with the surgeon when I went over there.  You
5  know, someone who is going to go do -- operate on you
6  and he gives you like a five-minute exam was not a
7  confidence builder for me.
8        So it was really two factors, that I didn't think
9  I could wait.  The pain was so great, I didn't think I
10 could wait weeks or whatever.  And Mr. Hudson
11 suggested -- he said, look, why don't you write this
12 up as a request and I will personally hand deliver it
13 to the warden today.  So at Mr. Hudson's suggestion, I
14 did this.
15    Q.  Is there a name for these type of forms?
16    A.  I call -- I guess they call them the camp
17 cop-outs.  And why that name is, I have no idea.
18    Q.  Had you filled a -- had you written cop-outs
19 before?
20    A.  I'm sure.  It's a request to the medical
21 staff.
22    Q.  You're a lawyer.  Did you look up the reg on
23 medical furloughs or just rely on --
24    A.  No, I had -- I had actually -- you know, when
25 all this was going on and -- and I was very concerned,

JOHN COGGIN v. UNITED STATES OF AMERICA                                      9/20/2007
DEPOSITION OF JOHN COGGIN

27 (Pages 102 to 105)

Page 102

1  I had looked up the programs to see if that was
2  available.
3      Q.  And your understanding is that it was?
4      A.  Yes, it was.  It only -- it only really
5  required the -- it required the approval of the warden
6  and then a sign-off with whoever was I guess in the
7  BOP.
8      Q.  And were those what you referred to as
9  program statements or regulations, were they available
10 in the library?
11     A.  Yes.
12     Q.  And you pulled them and looked at them?
13     A.  Yes, sir.
14     Q.  And what happened with your request?
15     A.  Well, it was submitted, and I didn't hear
16 anything back from it.  And that weekend is when I
17 went, you know, from Saturday passing out and throwing
18 up blood.  And then the following next day, I went to
19 the -- I was sent to the -- Baptist.
20     Q.  Do you recall ultimately, in Baptist, the
21 surgery was done to sew up a perforation; is that
22 right?
23     A.  Well, the -- when they did the -- you know, I
24 had a rebleed when I got in there, and they did a --
25 actually, they did a second endoscope.  When they did

Page 103

1  the scope down into your stomach, they discovered
2  that -- I think this was on Thursday morning -- that
3  not only did I have a massive ulcer, but that it had
4  actually eaten into an artery, and that there was like
5  a projection out of the artery that had a clot in it.
6  And Dr. Kreher said, you know, it's obvious that this
7  was about to burst.  And so that's why he recommended
8  we do the immediate emergency surgery.
9      And later he -- he told me, he said the -- once
10 they got me open and they were doing the surgery, that
11 that artery burst.  And he said that if it had burst
12 while I was at Maxwell, I would have died.  If it had
13 burst in the hospital, I would have died.  If it had
14 burst any other time, they wouldn't have -- he said
15 they would not have had time to open me up to save
16 me.  And so it's, you know, just by the grace of God
17 that I made it.
18     Q.  Do you recall when they did the surgery?
19     A.  It was on Thursday, the -- September the 6th.
20     Q.  And then how long did you stay at Baptist?
21     A.  They -- I -- I was there like 17 days total
22 in the hospital.  Well, I was discharged back to
23 Maxwell on September the 17th.  So a couple of weeks,
24 a little over a couple of weeks.
25     Q.  And when you went -- when you were discharged

Page 104

1  from Baptist, did you return to Maxwell?
2      A.  Yes.
3      Q.  And what was your status at that point?
4      A.  Pretty poor.  I was in pretty bad shape.
5  I -- you know, I did not see how I was going to be
6  able to convalesce and make it.  You know, I was so
7  weak, in such bad shape; but I guess my technical
8  status, I was put on medical convalescence.
9      Q.  Were you allowed to stay in the dormitory
10 area all day?
11     A.  Yes.  Just basically go back -- you know,
12 when I could, I could go.
13     Q.  Did you have any follow-up care with the
14 doctors from Baptist?
15     A.  Yes.
16     Q.  Who did you see?
17     A.  Dr. Kreher?
18     Q.  Was Dr. Kreher -- go through the doctors, if
19 you can, for me that you saw at Baptist, who you
20 recall and what their roles in your care was.
21     A.  Dr. Kreher, of course, was the surgeon that
22 did the surgery on the 6th and saved my life.
23         MS. COCHRUN:  It's K-H-E-H-E-R (sic).
24     A.  There was Dr. -- I think a Dr. Hendrix and a
25 Dr. Reid who I think were staff physicians and are

Page 105

1  wonderful doctors.  And they did basically the
2  convalescent care and so forth.  There was a Dr. Maya
3  who was there as well.  I think he was another staff
4  physician.  He had formerly been a physician out at
5  Maxwell.  There was Dr. Kendricks, who I believe was
6  with the group that did the endoscope, and then a
7  Dr. White, who did the scope -- another scope.
8      Q.  You had two endoscopies?
9      A.  Yes, I did.  I had one when I was in the ICU,
10 when they discovered that it was -- that I had an
11 ulcer and that it had clotted over.  And Dr. Maya had
12 said, you know, well -- he thought, we'll just release
13 you in a couple of days, which really concerned us
14 gravely that we were going to be released, you know.
15 And that's -- they did another scope on Thursday, and
16 Dr. White said -- and I think Dr. Kreher was there
17 when he did the scope.  And he said, he's got to be
18 operated on immediately.
19     And when I woke up out of the -- after the scope
20 procedure, Dr. Kreher came and said, you know, we've
21 got to do emergency surgery on you.  So he explained
22 it to me and my -- and my wife.
23     Q.  When you were released to Maxwell, did you
24 have any follow-up care with any of the doctors from
25 Baptist?

JOHN COGGIN v. UNITED STATES OF AMERICA                                    3/20/2007
DEPOSITION OF JOHN COGGIN

28 (Pages 106 to 109)

Page 106

1     A.  When I was released to Maxwell?
2     Q.  Yes.
3     A.  Yes.
4     Q.  And who did you see?
5     A.  Dr. Kreher.
6     Q.  How many times?
7     A.  I believe I saw him once.
8     Q.  And what was the nature of that follow-up?
9     A.  He wanted to do a follow-up on the surgery to
10  see how I was convalescing and recovering. He also
11  did another -- he did a -- a test that he said should
12  have been done at Maxwell, which is a bacteria test to
13  see if you have an ulcer to make sure that, you know,
14  I didn't have the -- whatever, the HP --
15    Q.  H-pylori?
16    A.  -- that would be causing a reoccurrence of
17  the ulcer. He did some other things. Basically, it
18  was a follow-up. He also prescribed some type of
19  medication.
20    Q.  Do you recall what the results of the
21  H-pylori test were?
22    A.  I think they were negative.
23    Q.  What did he tell you about your recovery?
24    A.  He thought I was recovering. He said, you
25  know, you're going to have to make sure you never take

Page 107

1  any Motrin or ibuprofen again as far as -- you know,
2  you have to watch, you know, sort of what you eat and
3  be guarded for the ulcer that you have, but said --
4  you know, you should --
5     Q.  Was he pleased with the surgical result?
6     A.  I think so. I sure was. I hated I had to go
7  through it.
8     Q.  So you got -- you testified you got back to
9  Maxwell on September 17th, is that right, a Monday?
10    A.  Yes, sir.
11    Q.  How long did you stay at Maxwell thereafter?
12    A.  Until November the 13th, 2001.
13    Q.  And what happened then?
14    A.  I was released to Birmingham, basically
15  discharged from Maxwell --
16    Q.  And --
17    A.  -- and reported to Birmingham Community
18  Center.
19    Q.  Did you have to live there or just check in?
20    A.  I lived there for six weeks.
21    Q.  Were you allowed to go to your house during
22  the day?
23    A.  Yes. And, basically, I was released from
24  Maxwell. You know, they had a form they sent up
25  there, you know, as far as my medical condition.

Page 108

1     Q.  So you were at Birmingham Community Center
2  from --
3     A.  November 13th to, really, I think the first
4  week in January of '02.
5     Q.  And what happened then?
6     A.  Basically, you know, released.
7     Q.  Were you under any supervision at that
8  point?
9     A.  I was. I was under supervised release
10  status.
11    Q.  And what did that entail?
12    A.  Basically, I, you know, reported to the --
13  once I was released to the community center -- to the
14  probation officer once and then after that, just, you
15  know, a monthly report.
16    Q.  Do you recall who your probation officer was?
17    A.  I really should. He was -- he was a great
18  guy. You know, offhand, I can't remember his name.
19  But I was -- I was terminated from supervised release
20  early. The Honorable Judge Alaimo entered an order
21  terminating the release and -- you know, terminated
22  supervised release in October of 2002.
23    Q.  I'm going to show you a document, a one-page
24  document, that's been marked as Defendant's Exhibit
25  #6. It's got a signature of Rosetta Beasley and yours

Page 109

1  on it.
2     A.  Uh-huh.
3         MS. COCHRUN:  Have we been given this
4  before?
5         MR. DOYLE:  Yeah, it's in the central file.
6         MS. COCHRUN:  Oh, okay. I wasn't sure
7  which. This is out of central file?
8         MR. DOYLE:  Right.
9         MS. COCHRUN:  Okay. Good. Thanks. Just
10  want to kind of put this in the same perspective.
11    Q.  Mr. Coggin, are you familiar with this
12  document?
13    A.  Yes, sir.
14    Q.  Is that your signature on it?
15    A.  Yes, uh-huh.
16    Q.  And does this document reflect the agreement
17  that you reached for your release?
18    A.  Uh-huh.
19    Q.  How did that come about?
20    A.  I think it reflects in there, it's a
21  telephone conversation.
22    Q.  How did it come about?
23    A.  Yeah. Just because of my medical
24  convalescent status and I was in such bad shape, that
25  Ms. Beasley --

JOHN COGGIN v. UNITED STATES OF AMERICA                          9/20/2007
DEPOSITION OF JOHN COGGIN

29 (Pages 110 to 113)

Page 110

1  Q. Just for the record, who is Ms. Beasley?
2  A. She was a case manager. She wanted me to
3  have something that would basically allow me to work
4  out of my home instead of having to, you know, work
5  when I was in the community center; but that while I
6  was, you know, working out of my home, you know, I
7  would be responsible for -- you know, the community
8  center wouldn't have to cover my medical expenses
9  basically is what that was.
10  Q. When you wrote the request to the warden to
11  have your surgery done at the Kirkland Clinic, had you
12  had a prior relationship with doctors at the Kirkland
13  Clinic? I mean, you specifically mentioned that
14  medical facility in the request; isn't that right?
15  A. I did. And I'm trying to -- I'm trying to
16  remember if I had actually seen someone there before.
17  And I -- I don't believe I had. The doctor that I had
18  been using before, that was actually out at Baptist
19  Montclair.
20  Q. And who was that?
21  A. You know, I forget his name.
22  Q. You mentioned you had hypertension.
23  A. Right. Right.
24  Q. Was he treating you for that?
25  A. But, you know, I think it was just -- I had

Page 111

1  friends who had had surgery, and they had been treated
2  at UAB and Kirkland Clinic, and I knew they were an
3  excellent facility. And I think that's why I put
4  that.
5  Q. The --
6  A. But I -- the -- you know, the Dr. Roddam that
7  I had started seeing at Kirkland Clinic, I don't
8  believe I actually had seen him until after I was
9  released.
10  Q. Can you spell his name for the record?
11  A. R-O-D-D-A-M.
12  Q. And when did you first see him?
13  A. Sometime in 2002.
14  Q. And is he still your --
15  A. No. He's retired.
16  Q. Who do you see now?
17  A. Dr. Cummings.
18  Q. Please you spell that for the record?
19  A. C-U-M-M-I-N-G-S.
20  Q. And where is he?
21  A. At Kirkland Clinic.
22  Q. How frequently do you see him?
23  A. Once or twice a year.
24  Q. When was the last time you saw him?
25  A. February or March of this year.

Page 112

1  Q. Why did you see him?
2  A. Annual checkup.
3  Q. Prior to that?
4  A. Prior to that?
5  Q. Yeah. Work backwards, please.
6  A. You know, I really don't remember. It was
7  probably a year earlier.
8  Q. Has it --
9  A. I may have seen him -- I may have had a -- an
10  occasion where I got the flu and went in one day, so
11  it may have been, you know, an occasion during the
12  year. You know, I do see him every year for an
13  annual, and he looks at it.
14  Q. Did Dr. Garcia come visit you at Baptist?
15  A. He did.
16  Q. And do you recall that visit?
17  A. I do.
18  Q. What was the nature of the visit?
19  A. He visited. He actually came on the -- I
20  think he came on the day after I got out of the ICU,
21  which was before my surgery. And he came and,
22  basically, he, I guess, talked to the nurses and he
23  came in to see me. And I do recall that he said that
24  the reason, that he really thought that I was faking
25  that he didn't really think I was sick, and that he

Page 113

1  realized how gravely ill I was when he found out what
2  my blood levels were when I got to the hospital.
3  Q. Was anyone else present when he said that?
4  A. Yes. My wife was present, and her -- her
5  parents were present.
6  Q. What did you say to him?
7  A. I was -- I really -- you know, I sort of let
8  it pass because I -- I tried to -- and, you know, I
9  tried to thank him for what medical treatment they had
10  given me, because I realized that I probably was going
11  to have to go back under their care at some point. So
12  I was nice to him, even though it was extremely
13  distressful that he would say something like that both
14  to me and my wife. We also were talking about the
15  fact that we were concerned that they were talking
16  about discharging me within a day; and at that point,
17  I was not eating solid food.
18  Q. This is pre-surgery?
19  A. This is pre-surgery, yes. And, of course, we
20  were very concerned that I would be discharged and go
21  back to Maxwell. And then if I had a bleed back
22  there, that there would be no way that I would be sent
23  out again because of how the hospital sent me back.
24  And so he -- you know, he tried to say, well, it's not
25  his decision; you know, it's the hospital's decision

JOHN COGGIN v. UNITED STATES OF AMERICA                          9/20/2007
DEPOSITION OF JOHN COGGIN

30 (Pages 114 to 117)

Page 114

1   what happens.
2       He also made the comment that -- he said, why
3   didn't -- you know, why didn't you tell me that you
4   had been, you know, throwing up blood or whatever?
5       And I told him. I said, well, I did in fact tell
6   you; you knew it. You know, I had told you on the
7   phone. I had told you, you know, when we met. And I
8   said, you know, the staff all knew it. And he made no
9   response.
10      Q.   Do you recall anything else about that
11  conversation?
12      A.   That's about it.
13      Q.   When you got back to -- when you were
14  discharged to Maxwell, did you have follow-up care by
15  Maxwell medical staff?
16      A.   Yes, sir.
17      Q.   What did that consist of?
18      A.   Primarily, it consisted of going to see
19  Dr. Garcia. I had no further contact with Rodriquez.
20  Dr. Garcia -- there was another meeting. Dr. Garcia
21  did come back over to the hospital.
22      Q.   Tell me about that.
23      A.   Actually, he came back over on the 6th,
24  September the 6th, when I went in surgery.
25      Q.   Okay.

Page 115

1       A.   And he -- he came in, and the first thing
2   he -- my wife -- I had already been taken to the
3   emergency surgery. My wife was there. And he told
4   her -- he told my wife, he said, please tell me
5   they're taking his gallbladder out. And she -- he --
6   you know, she said, well, they've taken him to
7   surgery; he's got the ulcer. And he -- he told her,
8   he said, well, I really thought he was faking the
9   whole time.
10      Q.   And this is a conversation that --
11      A.   He had with my wife.
12      Q.   And you weren't present for that
13  conversation?
14      A.   No. No.
15      Q.   But she's told you that?
16      A.   Yes, sir. I believe -- and I -- I think he
17  came back one more time. I'm not sure. The warden --
18  the warden came back. The warden came to see me.
19      Q.   How many times did the warden --
20      A.   He came once. And I -- I believe Garcia came
21  with him, but I'm not sure about that occasion because
22  I was in such -- I was in pretty bad shape. I had a
23  tube down my throat; and I had, like I said, a
24  six-inch needle in my neck. I had a respirator and a
25  million tubes out. And the warden came in. And he

Page 116

1   was so shaken by it that he, like, dropped his radio
2   like twice. He -- he turned to someone, and I -- I
3   think it was Garcia, but I -- I'm -- I really can't --
4       Q.   This was Warden DeRosa?
5       A.   Warden DeRosa, yes, sir. And he said, I want
6   to know how a simple gallbladder problem got like
7   this. He said, I want some answers. And I think
8   Garcia was with him, but I -- it may have been
9   somebody else, but I know -- I can remember -- I can
10  remember Mr. Rosa -- DeRosa saying that.
11      Q.   Anyone --
12      A.   I think that was the only other time he came.
13      Q.   Did anyone else from Maxwell visit you in the
14  hospital?
15      A.   Yes.
16      Q.   Who else?
17      A.   Chaplain Fisher came by to see me a couple of
18  times. Actually, Chaplain Fisher came over -- he came
19  when I was in the emergency room that night. He came
20  over and prayed with me, and then he came back a
21  couple of times during the course of my stay there
22  after my operation. Mr. Hudson, who was my supervisor
23  in the education department, he came by. He came by
24  once, maybe twice.
25      Q.   Anyone else?

Page 117

1       A.   That's -- that's the only people I can
2   remember.
3       Q.   Let's start today --
4           THE WITNESS:   Can we take a --
5           MR. DOYLE:   Yes. Five minutes?
6               (Brief recess)
7       Q.   Starting today, do you have any current
8   injury as a result of your episode of GI bleeding in
9   September?
10      A.   I do. I still have, you know, continuing
11  susceptibility to, you know, a rebleed, you know,
12  ulcer. I have to take various medications that I've
13  been prescribed: Prilosec, Nexium. Right now I'm
14  taking Pepcid every day. I have to take, you know,
15  something like that for the rest of my life.
16      Q.   Who do you see for that treatment?
17      A.   Dr. Cummings, Kirkland Clinic. And I still
18  have pain.
19      Q.   And what is the nature of the pain?
20      A.   If I eat the wrong thing, it's pretty bad.
21      Q.   What's the wrong thing for you?
22      A.   Any kind of hot food.
23          MS. COCHRUN:   Meaning spicy hot?
24          THE WITNESS:   Yes, spicy hot.
25          MS. COCHRUN:   Okay. Not temperature-wise.

Page 118

1    THE WITNESS: Yes.
2    A.  Anything that's got a lot of salt in it or
3    something. I had a bowl of onion soup the other
4    night, and it was -- I thought I was going to die. I
5    also have -- I have like a -- I have like a knot on my
6    chest. It's like a -- like a tennis ball right in the
7    center of my chest that is painful. And that's from
8    the surgery. And then I also have a -- I guess what
9    they call incisional hernias. I've got two of them.
10   Q.  And what is your understanding about what
11   that is?
12   A.  Well, I got referred to a surgeon about it.
13   Basically, my understanding is that when they did the
14   operation, they cut through the muscle and the
15   tissues; and that causes the muscles to weaken and
16   actually causes the hernia. Instead of like a heavy
17   lifting, stretching, causing the hernia, it's caused
18   by the actual incision. It's like two -- two pretty
19   bad places right there where it's from the incisional
20   hernia. And he had indicated that, you know, I may or
21   may not have to have surgery later. It's something
22   that we're just going to have to monitor.
23   Q.  Does it --
24   A.  But I --
25   Q.  -- limit your ability to work in any way?

Page 119

1    A.  No, not as -- not as an attorney, no.
2    Q.  How else does it affect you?
3    A.  I've had to give up running. I used to be a
4    pretty active runner, and I can't run anymore.
5    Q.  And why is that?
6    A.  It just -- it hurts.
7    Q.  What hurts?
8    A.  You know, where the incision, the ulcer was.
9    And also I have -- you know, I guess an apprehension
10   or lingering fear of a rebleed. You know, I really
11   don't want to do anything that causes that. But
12   that's probably the primary thing that I had to give
13   up. No weight lifting.
14   Q.  When did you stop running?
15   A.  Well, actually in the summer of 2001, when I
16   started hurting then, I haven't run since then.
17   Q.  And how long had you been running?
18   A.  Oh, since the '60s.
19   Q.  Could you run at Maxwell?
20   A.  Could I? Oh, yeah. Oh, yeah. When I got
21   there -- when I arrived at Maxwell, I was running like
22   five miles every day at Maxwell.
23   Q.  The -- since your release from Baptist, have
24   you had a rebleed?
25   A.  No.

Page 120

1    Q.  When was your convalescence completed?
2    A.  I'm not sure -- I don't understand the
3    question.
4    Q.  You testified earlier that you went back and
5    saw Dr. Kreher to follow up, you know, when you got
6    released from the hospital. Take me through the
7    recovery upon your release from Baptist on the 17th.
8    I mean how long before you were feeling like you are
9    today?
10   A.  It probably was a year. You know, when I got
11   out on September the 17th, I was -- it's hard to
12   describe how weak I was. When I got back to Maxwell,
13   I was so weak that I could not make up my bed. You
14   know, to pull the sheets over to put them on the
15   corner, I -- I couldn't do that. And I had no color.
16   You know, I looked as white as your legal pad sheet of
17   paper, still -- still that way. So it was a matter of
18   weeks and months as I convalesced and gathered
19   strength, you know. I was still pretty -- pretty weak
20   when I left Maxwell; but it -- you know, within, you
21   know, eight or nine months, I was a little bit better,
22   more strength.
23   Q.  And when would you say you were fully
24   recovered?
25   A.  I don't think I -- I haven't fully recovered.

Page 121

1    Q.  Okay. When did you get as good as you are
2    today?
3    A.  It was probably a year. Probably took a
4    year.
5    Q.  Did you have any -- we talked about the
6    follow-up visit with Dr. Kreher. Any other medical
7    follow-up during that year?
8    A.  With Dr. Kreher?
9    Q.  With anyone.
10   A.  Dr. Kreher and then Dr. Roddam.
11   Q.  Can you spell that?
12   A.  R-O-D-D-A-M. Dr. Roddam is at the Kirkland
13   Clinic.
14   Q.  How many times did you see him?
15   A.  A couple of times.
16   MR. DOYLE:  And, of course, I will want to
17   see those records.
18   Q.  Do you remember what Dr. Roddam -- did he
19   give you any treatment?
20   A.  Yeah. He basically, you know, evaluated it,
21   and then he treated it with I think either Prilosec --
22   he started off with Prilosec, and he may have changed
23   over to Nexium at some point, but one of those two. I
24   don't even know what you call them, antacid, proton
25   inhibitors. They're different. But primarily to

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

32 (Pages 122 to 125)

Page 122

1  combat the ulcer decease.
2      Q.  Did you stay on -- whether it's Prilosec or
3  Nexium -- on those type of medications?
4      A.  Yes.  I've been on that ever since I got out.
5      Q.  How frequently do you take that?
6      A.  Every day.
7      Q.  In this lawsuit, your demand is for $15
8  million, I believe; is that correct?
9      A.  Uh-huh.
10     Q.  How did you arrive at that?  How did you
11 calculate your damages?
12     A.  Based on consultation with my attorneys.
13     Q.  And I don't want to know about that, but --
14     A.  You know, how do you -- you know, it's really
15 indescribable.  How can you describe the pain that I
16 went through?  You know, it's just -- it's really
17 unimaginable.  If you can just imagine being stabbed
18 in -- in your side with a knife and then having
19 someone just like twist it and then have that go on
20 for weeks and weeks and weeks.  It's just -- I mean
21 it's --
22     Q.  Did you have any medical expenses for your
23 treatment that you received at Maxwell?
24     A.  I'm not sure I understand your question.
25     Q.  Did you have to pay anything for that?

Page 123

1      A.  Did I have to pay anything?
2      Q.  Yeah.
3      A.  No.  No.  while I was at Maxwell, I never
4  paid.
5      Q.  Did you have to pay anything for the
6  treatment that you received at Baptist?
7      A.  In 2001?
8      Q.  Yes.
9      A.  No.
10     Q.  Do you know who paid for that?
11     A.  No, I don't.  I presume the BOP, but
12 I don't -- I really don't know.
13     Q.  Have you had any medical expenses at all
14 associated with the condition that's the basis of the
15 lawsuit?
16     A.  Just the ongoing medications that I have to
17 take, doctor visits.
18     Q.  And those are with whom?
19     A.  Well, they have been with Dr. Roddam,
20 Dr. Cummings, also with Dr. Christian, who is a
21 surgeon.
22     Q.  And where is Dr. Christian?
23     A.  He's also at the Kirkland Clinic.  He's in
24 the surgery department.
25     Q.  And I'm sorry.  The first -- I've got

Page 124

1  Dr. Christian, Dr. Cummings.  Who was the first?
2      A.  Dr. Roddam.
3      Q.  And I know we spelled that for the record
4  already.  Was he also at Kirkland?
5      A.  Yes, sir.
6      Q.  And he's retired now?
7      A.  Yes, sir.
8      Q.  And were their visits all paid for by health
9  insurance?
10     A.  Yeah.
11     Q.  And who was --
12     A.  Other than --
13     Q.  Copay?
14     A.  Copay.
15     Q.  Who was your insurance carrier?
16     A.  BlueCross.
17     Q.  Have you -- post release from Maxwell, have
18 you had any contact with any former or present inmates
19 there?
20     A.  Yes.
21     Q.  Who?
22     A.  Jim Johnson.
23     A.  Anyone else?
24     A.  Ron Rankin.
25     Q.  Can you spell that?

Page 125

1      A.  Rankin, R-A-N-K-I-N.
2      Q.  Anyone else?
3      A.  Don't ask me to spell this one.  Mario --
4         MS. COCHRUN:  I can spell it.
5      A.  -- Canizares.  He was my -- he was in the
6  cube with me during the time period that's applicable
7  here.
8         MS. COCHRUN:  His name is spelled
9  C-A-N-I-Z-A-R-E-S, Canizares.
10     Q.  Anyone else?
11     A.  I think the only other person would be
12 probably Joe Williamson.  That's all I can -- I think
13 that's all.
14     Q.  I'm going to run through these.  Who is Jim
15 Johnson?
16     A.  Jim Johnson was the person that had the -- he
17 was in the cube to my -- to my right.  He was in the
18 cube next to me.
19     Q.  And this was in the Montgomery housing unit?
20     A.  Yes, sir.
21     Q.  Would you characterize him as a friend?
22     A.  Yeah.  I mean --
23     Q.  What's the nature of your contact with him
24 post your release from Maxwell?
25     A.  I requested that he -- to see if he would

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

33 (Pages 126 to 129)

Page 126

1  prepare an affidavit when I filed the claim with BOP.
2  And he did. He prepared an affidavit.
3      Q. And do you remember where he lives?
4      A. Florida.
5      Q. Any other contact with him?
6      A. No.
7      Q. Did you discuss the nature of the lawsuit
8  with him?
9      A. Yeah. Well, at the time, I got the
10  affidavit, it wasn't a lawsuit. It was --
11      Q. Administrative claim?
12      A. Yes.
13      Q. How about Ron Rankin? Who is he?
14      A. He was on the other side. He had the cube on
15  the other side of me.
16      Q. Would you also characterize him as a friend?
17      A. Yeah. I mean they're not people -- when I
18  say friends, they're not people I socialize with or --
19  or, you know, go to church with or whatever; but I do
20  characterize them as friends because they were very --
21  when I was in that condition, they were very
22  compassionate and very helpful to me in very dire
23  straits.
24      Q. And what's the nature of your contact with
25  Ron Rankin?

Page 127

1      A. I also requested to see if he would do an
2  affidavit.
3      Q. And did he?
4      A. Yes, sir.
5          MR. DOYLE: I'll need a copy of that.
6          MS. COCHRUN: You got them.
7          MR. DOYLE: I don't. Oh, unless they're --
8          MS. COCHRUN: You really do have what I say.
9      Q. How did you get in touch with these guys?
10  I'll go through the others, but how did you find them?
11      A. The -- when I left, they -- I -- you know,
12  because they had been so helpful, I gave them my
13  telephone number, and they called me and gave me their
14  telephone number.
15      Q. Other than getting the affidavit from Ron
16  Rankin, have you had any other contact with him?
17      A. Not really. I -- I -- you know, sent him a
18  birthday card or whatever, but that's -- that's all.
19  No other contact. I have not -- you know, I haven't
20  met with any of them personally.
21      Q. Where does he live? So this was all done
22  over the phone?
23      A. Yes, sir.
24      Q. Did you --
25      A. Where does he live? He lives someplace south

Page 128

1  of Montgomery.
2      Q. In Alabama?
3      A. Yes, sir.
4      Q. Did you help them write their affidavits?
5      A. I talked to them over the phone and said what
6  do you remember happening. And then I prepared it and
7  said, look at this and if you need to make changes,
8  make changes, or have anybody look at it that you want
9  to. And that's what we did.
10      Q. So you personally typed it up?
11      A. Yes. But it was based on I first called them
12  and said what do you remember as happening.
13      Q. And then did they mail it back to you once
14  they signed it?
15      A. Yes. They -- they signed it and got -- I
16  think they got it notarized and then sent it back to
17  me, mailed it back.
18      Q. How about Mario? I'm not even going to try.
19  Do you know who I'm talking about?
20      A. Mario? That's all I ever called him, Mario.
21  Same thing. He was --
22      Q. Where -- how did you get to know him?
23      A. He was actually the individual that shared
24  the cube with me from --
25      Q. A cube has two bunks in it; is that right?

Page 129

1      A. Yeah, it has two bunks, an upper and a lower.
2  And he was the upper. And he -- he came in, in April
3  of 2001, and he was there when I left, so he was there
4  when all this stuff happened.
5      Q. And where is he located?
6      A. He's in Puerto Rico. Could you have
7  guessed?
8      Q. Same as your earlier testimony, you called
9  him on the phone --
10      A. Yes, sir.
11      Q. -- requested an affidavit; is that right?
12      A. Yes, sir.
13      Q. And then after a conversation, you wrote up
14  an affidavit?
15      A. Yes.
16      Q. And mailed it to him?
17      A. Yes.
18          MR. DOYLE: And I've been given a copy of
19  that?
20          MS. COCHRUN: Yes.
21      A. I assume so.
22      Q. Joe Williamson?
23      A. He was just a friend. And he -- when I
24  reapplied for reinstatement to the Bar, he gave me a
25  letter of support. He was a former I think state

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

34 (Pages 130 to 133)

Page 130

1 administrative personnel board with the State of
2 Alabama.
3     Q.  And --
4     A.  He was just a friend that knew me.
5     Q.  Was he your friend and he was also a prisoner
6 at Maxwell?
7     A.  Yes, he was there.  He was at Maxwell.
8     Q.  Does he know anything about the --
9     A.  No, he doesn't.
10    Q.  -- facts of this lawsuit?
11    A.  No.  No.
12    Q.  Who else have you had conversations with
13 about the -- and, of course, I'm not interested in
14 your attorneys -- the subject matter of this lawsuit?
15    A.  Really, just my attorneys.  And I -- of
16 course, I've, you know, spoken with my wife.  She
17 knows about it.  But other than -- other than her and
18 my attorneys, no one.
19    Q.  Apart from the --
20    A.  Apart from those three that have given
21 affidavits.  That's correct.
22    Q.  You submitted -- I'm looking at the incident
23 report when you smuggled a set of head phones into the
24 prison.  Do you recall that?  I'll mark the incident
25 report as Defendant's Exhibit #7 while we're here.

Page 131

1 Just let me know when you've had a chance to look at
2 it.
3         (Brief pause)
4     Q.  Do you recall that incident?
5     A.  Do I recall the incident?
6     Q.  Yes.
7     A.  Yes.
8     Q.  And does paragraph one on the first page of
9 the exhibit, which says Description of Incident -- is
10 that accurate?
11    A.  Right.
12    Q.  Who brought you the head phones?
13    A.  Who brought them?
14    Q.  Yeah.
15    A.  You know, I really don't recall.
16    Q.  Well, it must have been someone from the
17 outside, though; is that right?
18    A.  Yeah.  It's not a -- something that I
19 really -- you know, I had several visitors, but as far
20 as who personally brought them or --
21    Q.  Well, you went to some trouble.  I mean you
22 had them safety-pinned to your underwear in a leather
23 pouch.
24    A.  Yeah.  That's what it says, yeah.
25    Q.  You don't remember who brought them?

Page 132

1     A.  No.
2     Q.  But you don't dispute that this happened?
3     A.  No, I don't dispute it.
4     Q.  And, clearly, that was against the rules of
5 the prison?
6     A.  To -- well, I -- I'm not going to dispute
7 that it was against the rules, no.
8     Q.  Are you familiar with -- oh, I'm sorry.  You
9 did an affidavit in the administrative claim, didn't
10 you?
11    A.  Uh-huh.
12    Q.  How was that put together?
13        MS. COCHRUN:  Excuse me.  What was the
14 question?
15        MR. DOYLE:  How did he --
16    A.  How did I put the affidavit together?
17    Q.  Yeah.
18        MS. COCHRUN:  I'm going to object to any
19 inquiry into that in that it --
20    Q.  Well, did you write it yourself?
21        MS. COCHRUN:  -- invades -- well, let me say
22 this.  Anything he did pursuant to his attorney's
23 instruction or --
24        MR. DOYLE:  Are you asserting privilege?
25        MS. COCHRUN:  Yeah.  That's what I'm doing.

Page 133

1 Thanks.  After I quit cracking this candy.
2        MR. DOYLE:  You're not going to answer any
3 questions about putting that affidavit together?
4        MS. COCHRUN:  Well, I mean, he put it
5 together with his --
6        MR. DOYLE:  With advice of counsel?
7        MS. COCHRUN:  Yeah.  I mean, he put it
8 together with his lawyer.  I don't -- I don't --
9        MR. DOYLE:  Okay.
10        MS. COCHRUN:  I mean, putting -- the question
11 is how did you put it together.  And with that
12 question, certainly, we would have to assert
13 privilege.
14    Q.  I'm going to -- I will try and ask something
15 more focused.  Did you use any -- in putting it
16 together -- or, actually, let's not even talk about
17 it.  Did you have any calendars, diaries, notes,
18 anything of that nature that you maintained while you
19 were in prison?
20        MS. COCHRUN:  While you were in prison?
21        MR. DOYLE:  Yes.
22    A.  Okay.  You're not asking about the affidavit?
23    Q.  No.
24    A.  I did not keep a diary, but I did keep some
25 notes of what was happening during this period.

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

35 (Pages 134 to 137)

Page 134

1    Q.  And do you have those notes?
2    A.  Yeah, I did have the notes.  And I -- it sort
3  of surprised me that, you know, when I came back after
4  the -- after getting out of the hospital that they
5  were still there.  But that's basically what was used
6  to prepare the statement of facts, the dates and so
7  forth.
8    Q.  Where are those notes now?
9    A.  When I, you know, prepared the statement of
10 facts, they were just discarded.
11   Q.  What was the nature of those?  Were they
12 handwritten or --
13   A.  Yes.
14   Q.  -- were they in a calendar?
15   A.  Yeah, just handwritten on a legal pad.
16   Q.  And when did you decide --
17   A.  Because I was -- go ahead.
18   Q.  When did you start taking notes?
19   A.  I think it was sometime in August.  I was
20 concerned that my wife was going to have a wrongful
21 death action on her hands.
22   Q.  And you preserved those notes until when?
23   A.  Until I got out and prepared the statement of
24 facts for the claim.  It was -- it was just a
25 handwritten thing.

Page 135

1    Q.  Approximately how many notes, if you know?
2    A.  I don't know.
3    Q.  Did you keep a calendar or anything else that
4  you would have kept notes in?
5    A.  No, sir.
6    Q.  Day Planner?
7    A.  No.
8       MS. COCHRUN:  They don't issue those when you
9  check into the BOP.
10   Q.  I'm going to show you a lengthy document that
11 is your pre-sentence investigative report dated -- it
12 says in the lower -- it's been marked Defendant's
13 Exhibit #8.  It's got -- in the lower right-hand
14 corner, it says, Date report revised, July 20th, '99.
15 And then there is a --
16      MS. COCHRUN:  And these are the Bates stamped
17 587 to --
18      MR. DOYLE:  Yeah.  But let me tell you what
19 it does.  This came out of the central file, and it
20 goes 587 through 609, and then I move because it was
21 on top.  It says addendum to the pre-sentence report,
22 which goes 581 to 586.
23      MS. COCHRUN:  Okay.
24      MR. DOYLE:  And I just moved that behind.
25      MS. COCHRUN:  Thank you.

Page 136

1    Q.  Mr. Coggin, do you recognize this?
2    A.  Yeah.  I --
3    Q.  I'm not going to ask you detailed questions
4  about it.  Have you seen it before?
5    A.  Yes.  Yes.  I remember it.
6    Q.  And you had an opportunity to submit rebuttal
7  to that, didn't you?
8    A.  Mark White and Mr. Bowen, who were
9  representing me at the time, did, yes, sir.
10   Q.  That's all.
11   A.  That's it?
12   Q.  Yeah.  I just wanted you to identify it.  Do
13 you have a copy of that?
14   A.  You know, I -- I -- I'm sure I did at one
15 point, but it's -- you know, a lot of these -- these
16 are not documents I preserved for --
17      MS. COCHRUN:  Well, in answer to your
18 question, you asked him if he had any of the documents
19 from all the episodes from the indictment forward.
20 And the answer is no, so -- Mark White may have it in
21 his office, but --
22      THE WITNESS:  Yeah.  I doubt if he's retained
23 it.  It's been five or six years.
24      MR. DOYLE:  If you'll give me about five
25 minutes.

Page 137

1       MS. COCHRUN:  Sure.
2          (Brief recess)
3    Q.  Mr. Coggin, after you were released from
4  Maxwell, have you had any contact with any of the
5  doctors that treated you at Baptist?
6    A.  No, sir.  No.
7    Q.  And I was going to show you -- I'll do this
8  very quickly.  This is your complaint.  And I'm at
9  page 13 of it.
10   A.  Page 13?
11   Q.  Yes.
12   A.  Uh-huh.
13   Q.  Your final paragraph 43 and then it's A and
14 then number.  And you allege that, Defendant
15 negligently provided medical care and that it, by and
16 through its agents and employees, number one, failed
17 to provide medical care that met the standard of
18 care.  Specifically -- and I'm not asking you for a
19 medical opinion.
20      MS. COCHRUN:  Yeah.  Because I'm going to
21 object to any medical --
22   Q.  Can you tell me --
23      MS. COCHRUN:  If you can just ask him what
24 his lay opinion is --
25   Q.  -- what the basis for that claim is.

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

36 (Pages 138 to 141)

Page 138

1    MS. COCHRUN: Okay.
2    A. Well, you know, one of the first things that
3  Dr. Kreher said to me when I recovered is, you know, I
4  just don't understand why they didn't do a simple test
5  to determine that you had an ulcer as part of their
6  diagnosis.
7    Q. And what test was that?
8    A. I don't know. But, I mean, he's indicated,
9  you know, there were some simple tests or procedures
10 they could have done to eliminate the fact that I had
11 ulcer disease.
12    And, you know, the other -- and I think that's
13 the medical thing. But, really, the thing that I
14 think that outrages me the most and I think is the
15 worst thing as far as the standard of care is the fact
16 that when I was passing out, unconscious, when I was
17 throwing up blood all over, that they still did not
18 send me out to an emergency room. They did not take
19 any action to help me.
20    And to this day, that is mind boggling to me. I
21 do not understand that. I mean -- and I understand
22 that, you know, this is a -- you know, a prison
23 setting or whatever, but my goodness. If you have a
24 child and they're falling out unconscious or throwing
25 up blood, you don't have to have a medical degree to

Page 139

1  know that you need to get that child to -- to an
2  emergency room or a doctor right away.
3    Q. And is that the guards who failed to do that?
4    A. The guards, the medical staff, Dr. Garcia,
5  Dr. Rod -- I mean Rodriquez. It was a sent -- you
6  know, a complete failure of all of them. You know, a
7  parent that has a child that's acting like that, I
8  mean it's almost -- it -- it would be like for a
9  prosecutor to come in and be some kind of criminal
10 misconduct on the parents' part.
11    And, you know, when you're in this type of
12 setting, you just can't say well, look, I need to walk
13 down to the hospital. I need to call an ambulance to
14 come get me. You are literally at their mercy. I
15 mean obviously. It's that setting. And maybe there
16 is some question that they might have, you know, in
17 the first day or two that, well, it's this or it's
18 that; but when you got to the point where it was so
19 severe that these symptoms were manifesting, you
20 didn't need a medical degree to know that something
21 needed to be done.
22    Q. On what's labeled two, failed -- you alleged
23 failed to follow and execute the BOP policies and
24 procedures for providing prompt medical care and
25 treatment to him as an inmate. What specific policies

Page 140

1  and procedures are you talking about?
2    A. Well, I don't know the program statements or,
3  you know, the book and the page number; but I know
4  that there are policies and procedures that mandate
5  that they have a standard of care for those that are
6  entrusted to them and that they promptly provide that
7  care. Even the United States Supreme Court has
8  provided that, you know, people that are in that
9  situation have a constitutional right to prompt,
10 reasonable, and diligent medical care. Because they
11 can't get it themselves, I mean, for whatever reason
12 that they're in there. You know, a person may make a
13 mistake, but they're not sentenced to go in there and
14 die. And -- and, you know, apart from my case,
15 something needs to be done to correct the way they're
16 handling and treating people in there.
17    Q. You've --
18    A. And I don't believe it was just in my case.
19 I think it is a systemic, systemwide failure of the
20 medical staff in there.
21    Q. And you've testified certain points today
22 about program statements. Can you tell me what those
23 are?
24    A. What are program statements?
25    Q. Yes.

Page 141

1    A. Well, the BOP has certain rules and
2  regulations that govern their institutions, and
3  they're set out in different guidelines and program --
4  what they call program statements.
5    Q. And --
6    A. And, you know, they're basically the
7  governing body for how, you know, the institution is
8  supposed to be run, you know, from food service to
9  visitation to, you know, different areas of medical
10 care.
11    Q. And is that what you're talking about in two,
12 BOP regulations or --
13    A. Uh-huh.
14    Q. You got to --
15    A. I think so, but part of the -- you know, I
16 guess that's part of the attorney's --
17    MS. COCHRUN: My mental operations, but --
18    Q. And are program statements something that I
19 believe you testified earlier that you had access to
20 and research while you were in prison?
21    A. Well, they were there in the library, yes,
22 sir. You know, I worked in education. I was
23 basically in charge of the library.
24    Q. And --
25    A. And just the general reading and also the law

JOHN COGGIN v. UNITED STATES OF AMERICA                           9/20/2007
DEPOSITION OF JOHN COGGIN

Page 142

1    library, which they had the program statements. All
2    the program statements --
3       Q.  Were there --
4       A.  -- were there.
5       Q.  -- in the law library?
6       A.  Yes.
7       Q.  And certainly as an attorney, you didn't have
8    any trouble reading that sort of thing.
9       A.  Well, they're written pretty simple to
10   understand, or you really didn't need to be an
11   attorney to follow them.
12      Q.  But you know how to look up a regulation.
13      A.  Yes, sir.
14      Q.  And three, you allege failure to properly
15   evaluate minor claims, ongoing condition, and
16   complaints.  Is it fair to say that's all part of the
17   standard of care?
18      A.  Yes, it is.
19      Q.  Anything else there that that's not part of,
20   anything in addition to?  I know it's more detailed
21   than what you've alleged in one, but it really is a
22   part of the failure to meet the standard of care?
23      A.  I think so, yes.  I mean there are probably a
24   lot of medical things that are in there that they
25   should have done that I'm just totally unaware of.

Page 143

1       Q.  And would the same be true for four, five,
2    six, and seven?  Would they all be part of the
3    standard of care?  Would that be your understanding?
4    Would they all be allegations that --
5       A.  Uh-huh, yes.  Yes, sir.
6       Q.  Other than paragraphs that we just went over,
7    43A, 1 through 7, are you suing for anything else?
8          MS. COCHRUN:  I am going to object to the
9    form of that question because --
10         MR. DOYLE:  Okay.
11      Q.  Are there any other -- I'm reading from your
12   complaint here.  Am I missing anything?  Is there any
13   other basis for your lawsuit?
14      A.  Other than what we've already referred to and
15   is referred to in the complaint?
16      Q.  Yes.
17      A.  All the other documents?  Exhibits?  No, I
18   can't think of anything.  I mean, I'm sure there's
19   some medical tests and so forth that they should have
20   done that I'm really -- you know, I'm not qualified
21   really to say, well, they should have done this or
22   that.  I know what they should have done they didn't
23   do.
24      Q.  You testified today about Dr. Garcia,
25   Physician's Assistant Oscar Rodriquez, Nurse Little.

Page 144

1    Who else in the medical staff was involved in your
2    care?
3       A.  Let's see.  Dr. Garcia, Rodriquez.  Of
4    course, there was Dr. -- PA Patchell that was there.
5    I think he -- I don't think he was involved in the
6    time period that we're talking about.  Nurse Little.
7    It seems like there was another.  There was a Daphne
8    or --
9       Q.  Was there a Nurse Essex (phonetic)?
10      A.  Essex?  Yes.  Yes, there was.  There was a
11   Nurse Essex, yes.  I think I even met with her once, I
12   think.
13      Q.  Anyone else?
14      A.  I can't think.  I'm just trying to get
15   through all of the potential witnesses.  That's the
16   only ones I can recall.
17      Q.  Can you think of any other witnesses that I
18   should talk to that you haven't mentioned today?
19      A.  No.
20      Q.  We went through the four -- four prisoners
21   and medical staff, people at Baptist.
22      A.  Well, the three really didn't have any --
23      Q.  I'm sorry.  Yeah.
24      A.  The three didn't have any knowledge of this.
25      Q.  Can you think of anyone else that has

Page 145

1    knowledge?
2       A.  No.  I guess we've listed -- you know.
3          MS. COCHRUN:  We've talked about everybody.
4          MR. DOYLE:  That concludes my questions.
5          CROSS-EXAMINATION
6    BY MS. COCHRUN:
7       Q.  John, I am going to ask you to look at what
8    is Plaintiff's Exhibit #1 and --
9          MR. DOYLE:  Can I see that?
10         MS. COCHRUN:  Oh, I'm sorry.
11      Q.  Are those the program statements that you're
12   referring to that you had an opportunity to look up
13   when you were -- or in response to the ongoing
14   circumstance medically that you were experiencing
15   while at BOP Maxwell?
16      A.  Yes.
17      Q.  All right.  And are those what you were just
18   describing to Mr. Doyle about medical treatment and
19   the program directives for the employees of the
20   Maxwell facility to follow?
21      A.  Yes.
22      Q.  All right.  And those -- I mean you pulled
23   these out of that section, but did those segregate
24   these directives to be simply executed by the medical
25   staff, or were these program statements for the entire

JOHN COGGIN v. UNITED STATES OF AMERICA                                  9/20/2007
DEPOSITION OF JOHN COGGIN

38 (Pages 146 to 149)

---

Page 146

1  prison?
2      A.  I think they were for everyone that was in
3  the prison.
4      Q.  All right.
5      A.  The whole staff.
6      MS. COCHRUN:  All right.  We offer #1.
7      Q.  John, prior to your incarceration at Maxwell,
8  had you had any experience with GI bleeding or any
9  kind of -- I mean, knew anything about it?
10     A.  No, never.
11     Q.  You had physically never had any issues with
12 that, had you?
13     A.  No.  No.
14     Q.  So this circumstance is the first time you've
15 had any contact or interaction with physicians or
16 other people in regards to such a situation?
17     A.  Yes, absolutely.
18     Q.  All right.  Motrin.  You had told Mr. Doyle
19 earlier that prior to coming to Maxwell, you don't
20 think you had ever taken Motrin before?
21     A.  No.  I don't believe I have.
22     Q.  All right.  When you first met with
23 Mr. Rodriquez about your pain and problems in the end
24 of July, do you have any recollection as to whether or
25 not he inquired of you as to the nature of your

---

Page 147

1  stools?
2      A.  No, never.  Never in July or August.
3      Q.  All right.  Prior to getting to Baptist
4  Hospital in September, had any employee, medical or
5  otherwise, at BOP Maxwell ever inquired of you as to
6  the nature of your stools?
7      A.  No, never.
8      Q.  All right.  At that first visit with
9  Mr. Rodriquez, did he do a stool sample?  Did he do a
10 rectal exam and take a stool sample?
11     A.  No.
12     Q.  Did anyone while you were -- up through the
13 September transfer to Baptist -- anyone at BOP do a
14 rectal exam and stool sample on you that you're aware
15 of?
16     A.  No.  No, they never did.
17     Q.  Did you ever take the Motrin beyond the
18 prescribed amount; that is, the 800 milligrams three
19 times a day?
20     A.  No, I did not.
21     Q.  When you got to Baptist, did the medical
22 staff ask you about the nature of your stools then?
23     A.  I think they did, yes.
24     Q.  All right.
25     A.  Well, they did.  But, also -- I don't know

---

Page 148

1  how to say this delicately; but at that point, I
2  was -- had uncontrolled bowel movements that was
3  actually --
4      Q.  Bloody?
5      A.  -- loose and tarry stools in great amounts,
6  so it was like uncontrollable.  So it wasn't really
7  something they had to inquire about.  It was just a
8  condition that was happening.
9      Q.  All right.  But the first time any medical
10 person actually inquired of you about the nature of
11 your stools was at Baptist?
12     A.  Yes.  Yes, absolutely.
13     Q.  When you were prescribed the Motrin by
14 Rodriquez, did he discuss with you about being alert
15 to any change in the nature of your stools?
16     A.  No.  No.
17     Q.  You had been taking the Tylenol 3 for, what,
18 a day or so?
19     A.  Yes.  Right.
20     Q.  And you were having -- it was making you sick
21 to your stomach?
22     A.  Yeah.  Nauseated, uh-huh.
23     Q.  And was the Motrin substituted for the
24 Tylenol 3 to try to avoid the GI distress you were
25 having?

---

Page 149

1      A.  It -- it was.
2      Q.  All right.  You've been shown medical records
3  here today?
4      A.  Uh-huh.
5      Q.  That which is written by the physicians, in
6  fairness, John, are those your exact words that are
7  written down there in those charts?
8      A.  I don't think so.
9      Q.  All right.  Would it be fair to say that it
10 appears to be an interpretation of whatever
11 information you were providing to them?
12     A.  Yes.
13     Q.  All right.  Did you ever tell them that the
14 Motrin you were taking was something that you had not
15 been prescribed?
16     A.  No, never.
17     Q.  Do you believe you actually did tell them
18 that you were taking the 800 t.i.d.?
19     A.  Yes.
20     Q.  Initially, when you did start taking the
21 Motrin, did it help the pain?  Did the pain go away?
22     A.  It seemed to alleviate it and make it, you
23 know, less initially.
24     Q.  All right.  How many personnel or employees
25 of Maxwell did you tell that you had vomited blood?

JOHN COGGIN v. UNITED STATES OF AMERICA                           9/20/2007
DEPOSITION OF JOHN COGGIN

39 (Pages 150 to 153)

Page 150

1    A.  How many employees?
2    Q.  Yeah.  Can we name them?
3    A.  Well, certainly, Garcia, Rodriquez.  I think
4  there was a nurse.  I don't remember who it was on the
5  22nd.  Certainly, it was Officer Davis, Officer
6  Ramideau, Officer Thomas.  Of course, Officer Timmons,
7  you know, was there and saw it.  Officer Estep and --
8  and the nurse at the -- I think one of the nurses at
9  the -- you know, at the pill line.  I don't know.  I
10  don't remember who they were, but them.  That's --
11    Q.  Officer Snyder?  Was --
12    A.  Yeah, of course.  Yeah.  Officer Snyder,
13  yeah.  Officer Snyder as well.
14    Q.  All right.  How many pounds of weight did you
15  lose during this period of time?
16    A.  I think it was like 15, 15 or 20 pounds.
17    Q.  Any medical personnel at Maxwell inquire of
18  you as to your weight loss?
19    A.  No.
20    Q.  Did you ever have an upper GI done as part of
21  your workup at Maxwell?
22    A.  No.  No, never.
23    Q.  Did you ever have an H-pylori test done as
24  part of your workup at Maxwell, to your knowledge?
25    A.  Oh.  No, I didn't.

Page 151

1    Q.  Did anyone ever discuss -- let me back up.
2  Let me start over.  You told us that they discussed
3  gallbladder disease.  They talked about your kidney
4  stone.  Did anyone at Maxwell discuss with you the
5  possibility that your symptoms could be related to a
6  GI bleed or some kind of peptic ulcer disease?
7    A.  Never.  It was always the gallbladder from
8  day one.
9    Q.  Did anyone at Maxwell ever inform you of what
10  signs and symptoms would be of peptic ulcer disease?
11    A.  No, never.
12    Q.  Anyone at Maxwell give you any information
13  about what the signs and symptoms would be of a GI
14  bleed?
15    A.  No.
16    Q.  At each visit that you had with any medical
17  personnel at Maxwell, did they ask you about your
18  stools?
19    A.  No, they never did.
20    Q.  About weight loss?
21    A.  No, they never did.
22    Q.  About vomiting?
23    A.  Did they ask about vomiting?
24    Q.  Yeah.
25    A.  I don't remember their ever asking about

Page 152

1  vomiting.  Of course, I -- I told them I had.
2    Q.  All right.  At each visit, was there ever any
3  inquiry as to what medication you would be -- that you
4  were taking on a daily basis during this period of
5  time?
6    A.  Ask that again, now.
7    Q.  During --
8    A.  At Maxwell?
9    Q.  Right, at Maxwell.  Each visit you would go
10  into, would there be any discussion about your
11  medication and what you were taking?
12    A.  Well, I guess the only discussion is when,
13  you know, I first went in there and they prescribed
14  the Tylenol with the codeine and then that was changed
15  to the Motrin; and then the only other discussion was
16  really, you know, on occasions when, you know, they
17  would say, you know, just take your pain medicine,
18  the Motrin and then the others on the 27th
19  when I, I guess, met with Dr. Garcia and had the
20  discussion that we talked about earlier; but that's
21  really the only times I can remember.
22    Q.  During this period of time, did any employee
23  of Maxwell tell you that you were precluded or not
24  allowed to take aspirin?
25    A.  No, never.

Page 153

1    Q.  Did anyone at Maxwell during this period of
2  time tell you you were not allowed to take Tylenol?
3    A.  No.
4    Q.  Did anyone at Maxwell tell you that you were
5  not allowed to take ibuprofen?
6    A.  No.
7    Q.  Did they limit in any way your access to any
8  of those medications?
9    A.  No.
10    Q.  You were asked about this writeup on the head
11  phones.  Let me ask you a question.  Did you have head
12  phones already at the facility prior to this time that
13  just didn't work?  I'm just reading what the prison --
14  what Lieutenant Mitchell wrote up.  It says on here
15  you had asked a visitor to bring you another set
16  because the other two that he's in possession of give
17  poor reception.
18    A.  Yeah.  I don't remember if they didn't work
19  or not.
20    Q.  I mean, you were allowed to have head phones?
21    A.  Oh, yeah.
22    Q.  You just screwed up and got them in there the
23  wrong way?
24    A.  Yeah.
25    Q.  Could you buy head phones at the commissary?

JOHN COGGIN v. UNITED STATES OF AMERICA                    9/20/2007
DEPOSITION OF JOHN COGGIN

40 (Pages 154 to 157)

---

Page 154

1    A. Oh, yeah. Yeah.
2    Q. All right. And have you ever had your
3  gallbladder taken out since this time?
4    A. Oh, no. No. That was one of the questions
5  that --
6    Q. Well, no. My question is, have you ever had
7  it taken out?
8    A. No. No. Never.
9    Q. Has any physician suggested to you to have it
10  taken out?
11    A. No. Dr. Kreher, when he did the surgery,
12  said the gallbladder was fine. Actually, he said that
13  the -- ironically, the gallbladder probably helped
14  save my life because it adhered to the ulcer that had
15  eaten completely into the duodenal wall out, and the
16  gallbladder had actually come in and sealed it and
17  closed off as the ulcer was eating into the artery.
18  And it was when he lifted the gallbladder to inspect
19  the gallbladder that the artery burst. So he said
20  there was nothing wrong with the gallbladder. It
21  didn't need to -- it was fine, so he didn't remove it.
22    Q. All right. And since that time and up until
23  this point in time, has any physician indicated to you
24  that you need to have the gallbladder removed?
25    A. No. No.

---

Page 155

1    Q. Have they done anything in terms of further
2  workup or treatment for gallbladder disease?
3    A. No, none at all.
4        MS. COCHRUN: I think that's all I have.
5        MR. DOYLE: We're done.
6        (The deposition concluded at
7         1:10 p.m.)
8    * * * * * * * * * *
9    FURTHER DEPONENT SAITH NOT
10   * * * * * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 156

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  CHILTON COUNTY
4    I, Wendy Lewis, Court Reporter and Commissioner
5  for the State of Alabama at Large, hereby certify that
6  on Thursday, September 20, 2007, I reported the
7  deposition of JOHN COGGIN, who was first duly sworn or
8  affirmed to speak the truth in the matter of the
9  foregoing cause, and that pages 4 through 155 contain
10  a true and accurate transcription of the examination
11  of said witness by counsel for the parties set out
12  herein.
13    I further certify that I am neither of kin nor of
14  counsel to any of the parties to said cause, nor in
15  any manner interested in the results thereof.
16    This 26th day of September, 2007.
17
18
19
                                        _____
20                                      WENDY LEWIS, Court Reporter
                                        Commissioner for the State
21                                      of Alabama at Large

                                        MY COMMISSION EXPIRES: 2/4/08
22
23
24
25

---

Page 157

1        SIGNATURE OF WITNESS
2    I, JOHN COGGIN, hereby certify that I have
3  read the transcript of my deposition consisting of
4  pages 4 through 155, and except for the corrections
5  listed below, certify that it is a true and correct
6  transcription.
7
8    _____
9        JOHN COGGIN
10  SWORN TO AND SUBSCRIBED before me
    this _____ day of _____, 2007.
11
12
    _____
13  NOTARY PUBLIC
14   * * * * * * * * * *
15  Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25