IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN COGGIN,                   )
                                    )
       PLAINTIFF,         )
                                      )
V.                               )     2:05-CV-1214-MEF
                                      )
UNITED STATES OF AMERICA,   )
                                      )
       DEFENDANT.       )

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

    **COMES NOW** the Plaintiff in the above-styled cause and in opposition to Government's Motion for Summary Judgment files the following Brief in Opposition and shows as follows:

## FACTS

I.    **RESPONSE TO MOVANT'S STATEMENT OF UNDISPUTED FACTS, INCLUDING ADDITIONAL UNDISPUTED FACTS.**

    The Health Services Unit ("HSU") of FPC Maxwell ("Maxwell") is a clinic that provides medical care services to inmates incarcerated at Maxwell. Dr. Orenzio Garcia-Brenes ("Dr. Garcia") is the clinical director over all of the PA's[1], nurses, pharmacists and

---

[1] Physician's assistant.

1

nurse practitioners. (Garcia deposition at 62 [Plaintiff's Exhibit A]).  Dr. Garcia participates in the hiring of the non-physician health care professionals and has the final interview with these individuals before they are employed by the HSU. (*Id*. at 63).  The clinic administers medical care to inmates under a scheme of regulations that applies to all medical facilities in the Federal System. (*Id*.)  These regulations are available to the medical staff, and the staff is trained to know these requirements for circumstances as they present to the HSU. (Garcia deposition at 64).  Dr. Garcia is intimately aware of the regulations, policies and procedures for the system. (*Id*.)  The staff is familiar with these protocols and discuss them monthly for two hours.  (Rodriguez deposition at 61 [Plaintiff's Exhibit B]).  The clinic is staffed from 6:00 a.m. to 6:00 p.m. Monday through Friday and from 8:00 a.m. to 6:00 p.m. on weekends and holidays by physician assistants, nurses or nurse practitioners. (Garcia deposition at 67).  Dr. Garcia, the sole physician who works at the HSU, works Monday through Friday, 8:00 a.m. to 4:30 p.m. (*Id*. at 68).  After hours no health care provider is physically present to provide health care, but in 2001 a health care provider was available by phone for consultation. (Garcia deposition at 69).  If an emergency arises, all of the correctional officers ("guards") know to send the patient out and call the medical staff later. (Garcia deposition at 70).  They are trained to contact Dr. Garcia to inform him of the emergency transfer to another facility. (*Id.*).

The guards have some medical training, such as CPR, and they are to use their judgment to determine that the symptoms an inmate exhibits should require sending out to Emergency Room. (Garcia deposition at 71-72).  The guards are the first responders and primary care givers who have all been trained by the health care staff to assess the

inmate and thereafter contact a mid-level health care providers. (Rodriguez deposition at 65-66). Inmates cannot demand to go to an Emergency Room after hours, they must ask a guard, who in turn takes the inmate to the lieutenant's office and then contacts Dr. Garcia or the health care provider on call who makes the decision. (Garcia deposition at 73; Christopher Thomas deposition at 9 [Plaintiff's Exhibit C]). The on-call personnel will either speak to the inmate directly over the phone or the guard will ask the inmate questions as prompted by that health care provider. (Garcia deposition at 74-75).

During regular clinic hours, inmates must fill out a "cop out" form to request medical care. (Garcia deposition at 77). The HSU staff reviews this request and assigns appointments for the inmate to be seen based upon their judgment as to what the condition warrants. (Garcia deposition at 78). Inmates can also come to sick call between 6:00 a.m. and 6:20 a.m. and the staff will determine whether they are seen that day or have them use the "cop out" assignment system. (Garcia deposition at 79). If a patient is seen without a scheduled appointment, it may mean that another Maxwell staff member has called the clinic to have the patient seen. (Rodriguez deposition at 147).

Dr. Garcia is required to monitor the care that is ordered and provided by the PA's and nurses to the inmates. (Garcia deposition at 84).

John Coggin was not allowed to record his descriptions of his symptoms and complaints in his medical chart. (Affidavit of John Coggin, paragraph 6 [Plaintiff's Exhibit E]). He was not allowed to review the notes for content or accuracy. (*Id.*) He was not allowed to record the content of conversations with health care providers, record the questions posed, his responses, or their responses, nor was he allowed to record the recommendations of the health care providers. (*Id.*)

3

The medical chart notes under Section "S" are only the health care providers interpretation of what the inmate said and not the inmate's words. (Rodriguez deposition at 84-85).

On July 24, 2001, plaintiff Coggin went to the Emergency Sick Call at 6:00 a.m. and gave Mike, the x-ray technician, a "cop out" form. (Coggin deposition at 82 [Defendant's Exhibit 7]). He was told to wait to see PA Rodriguez. When he did see Rodriguez, he told Rodriguez that he was suffering from severe abdominal pain. (Coggin deposition at 83). PA Rodriguez did not examine him and told him he would place Coggin on the Call Out list for an appointment. (*Id*.). Coggin checked later that night to see if he was on the computer call out sheets for an appointment and discovered that he was not. (*Id*.).

On July 25, 2001, Coggin went to the Emergency Sick Call again at 6:00 a.m. He filled out a second "cop out" request. (*Id*.; BOP Medical Records at 165 [Defendant's Exhibit 3]). On that form Coggin recorded the following:

> "Second emergency sick call request. I request to see Dr. Garcia today. Severe intense pain in my abdomen, three days duration. Tylenol for pain completely ineffective."

(BOP Medical Records at 165).

Thereafter he was examined by Rodriguez but not Garcia (Rodriguez deposition at 98). Rodriguez does not record plaintiff's description of severe pain but does prescribe, with Dr. Garcia's approval, a shot of pain medication, Toradol, as well as a prescription of Tylenol #3 with Codeine. (BOP Medical Records at 17). Labs were drawn at that time that indicated that plaintiff's hemoglobin was 15 g/dL, hematocrit was 42.8%, and a white blood cell count of 10.53. (BOP Medical Records at 43, 44). At that time both Dr. Garcia and PA Rodriguez's working diagnosis was gall bladder problems and no tests were done

4

to rule out peptic ulcer disease. (Garcia deposition at 172; Rodriguez deposition at102, 111).

On July 26, 2001, Coggin was seen again by PA Rodriguez, who noted that his symptoms had not abated and that the Tylenol #3 was upsetting Coggin's stomach. (Rodriguez deposition at 105; BOP Medical Records at 18). Rodriguez prescribed Motrin, 800 milligrams, 3 times a day, for thirty days, with one refill. (BOP Medical Records at 18).

Motrin is a Nonsteroidal Anti-Inflammatory ("NSAID") that, especially at higher doses like this dose and when given for a prolonged period of time, can cause gastric tissue erosion and bleeding. NSAIDS include Anaprox and Sulindac, which are other medications prescribed by HSU personnel for Coggin. (Affidavit of Dr. Joseph Paris, paragraph 4 [Plaintiff's Exhibit D]). The PDR and MedScape Drug profiles, which are recognized resources utilized by medical practitioners nationally, indicate that Motrin is not recommended for undiagnosed abdominal pain and the fact that it can have an adverse impact, including erosions and bleeding, on the gastrointestinal tract is recognized, especially at the higher doses. (*Id.*). A dosing scheme of 800 mgs. T.I.D. (three times a day) (2400 mgs. daily) is just under 800 mgs. Q.I.D. (four times a day) (3200 mgs. daily), which is the maximum dose as recommended by the manufacturer. (*Id.*). Gastrointestinal problems are dose related and it is expected that a patient will have more GI problems from the higher dose. (*Id.*). Patients on long term NSAID therapy can develop serious adverse effects such as bleeding and ulceration. (*Id.*). This can occur at any time and not all patients are symptomatic, so the clinician must remain alert to this possibility in any patient receiving such drugs. (*Id.*). Mr. Coggin would be such a patient in light of the prescriptions of high dose Motrin, Anaprox and Sulindac he received from the

5

health care providers at Maxwell. (*Id.*). Second only to *H. Pylori* (a bacteria), NSAID use is the most prevalent and recognized cause of GI bleeding. (David Folmar Deposition at 74 [Plaintiff's Exhibit J]). Patients can suffer erosion and bleeding at a dose of 800 mgs. t.i.d., 600 mgs. t.i.d., 400 mgs. t.i.d., or 200 mgs. t.i.d., so the daily dose does not have to exceed 800 mgs. t.i.d. in order for this to occur. (*Id.* at 79-81).

On July 30, 2001, Coggin was sent out for an abdominal ultrasound. (BOP Medical Records at 51). No chart note or indication of a meeting with clinical staff occurred between July 28, 2001 and August 6, 2001. (BOP Medical Records at 18). At the August 6, 2001 visit, no physical exam was performed and Rodriguez states that Coggin had nothing to "say". (Rodriguez deposition at 128). However, by August 6, 2001, the staff at the HSU knew about his studies and would tell him "what he had" when they bumped into him. (Rodriguez deposition at 129).

Thereafter a number of incidents occurred that are in dispute as to the treatment or response that Coggin received or lack thereof from the staff of FPC Maxwell. *See Disputed Facts Summary.* However, Garcia does recall that Lt. Snyder did call him about Coggin complaining about pain after hours. (Garcia deposition at 188-89).

On August 22, 2001 at 4:35 p.m. Coggin was given a shot of Nubain and instructed to return to the clinic on August 23, 2001 at 10:00 a.m. for further evaluation by Nurse Little, CRNP. (BOP Medical Records at 16). On August 23, 2001, at 10:10 a.m. he is seen again by Nurse Little who records that he had continuing right upper quadrant pain, nausea and vomiting through the night, a tender abdomen, and she planned for a referral to a surgeon through Dr. Garcia. (*Id.*). She ordered another NSAID medication, Anaprox, 550 milligrams, twice a day, PO with food. (*Id.*). The Motrin was not discontinued. (*Id.*).

6

The next recorded note in the chart is on August 23rd, where the pharmacist records the Nubain injection and that the Anaprox prescription is filled for Coggin. (BOP Medical Records at 13).

The next note is for Monday, August 27, 2001, at 9:30 from Dr. Garcia. (*Id.*). Dr. Garcia records and "quotes" the following information from Mr. Coggin:

> approximately for the last three weeks I have had this pain which comes and goes. The pain is in the right upper front of abdomen, sometimes it radiates the upper quadrant, not to my back nor anywhere else. I sometimes get nausea associated with it, not this last weekend, but Wednesday and Thursday night I had some vomiting, have problems eating because I don't feel like it and then when I eat something like a plain turkey sandwich, I get pain, I think I lost about 15 pounds in the last three weeks.

(BOP Medical Records at 13).

Dr. Garcia prescribed Sulindac[2] for pain, 200 milligrams, one tablet twice daily with food. (*Id.* at 14). Garcia also ordered blood laboratory studies which reflected a increase in the white count of 11.28 from 10.53 on July 25, 2001. (BOP Medical Records at 41, 43). It also reflected a decrease in the red blood cell count from 5.12 on July 25, 2001 to 4.58 on August 27, 2001. (BOP Medical Records at 44, 41). It further reflected a decrease in the hemoglobin from 15.0 on July 25, 2001 to 13.1 on August 27, 2001. (*Id.*). It also reflected a decrease in his hematocrit from 42.8 on July 25, 2001 to 38.5 on August 27, 2001. (*Id.*). Dr. Garcia also ordered a gastroenterology consult on that date. (BOP Medical Records at 78).

On August 28, 2001, a second consult sheet was filled out by Nurse Essex, CRNP,

---

[2]Sulindac (Clinoril) is a nonsteroidal anti-inflammatory drug. It too, like all other NSAIDs, can cause gastrointestinal problems including stomach ulceration and bleeding. (Affidavit of Dr. Paris, paragraph 6)

for an evaluation by Dr. Antonio Williams, a private surgeon who practiced outside the

clinic.  (BOP Medical Records at 77).    Nurse Essex records in her note of August 28,

2001:

> that she spoke with the surgeon with regards the abdominal ultrasound
> report; states that he will need to examine the patient; states that patient
> does not need a gastroenterologist at this time unless he may have problems
> with the common bile duct or PUD (peptic ulcer disease), etc.;  Informed Dr.
> Garcia; Will hold gastro consult and schedule for surgeon.

(BOP Medical Records at 14).  Dr. Garcia cancelled the gastroenterology consult. (BOP

Medical Records at 78).

On Wednesday August 29, 2001, Mr. Coggin was taken to Dr. Williams' office

outside the prison for an office visit.[3]   His medical chart was not sent with him and only

some labs and diagnostic studies were sent. (Garcia deposition at 188).  The abbreviated

documentation that came back to the prison with Mr. Coggin indicated a that a full consult

was dictated, and that William's impression was "biliary colic, questionable polyp vs.

cholelithiasis with a plan for a laparscopic cholecystectomy".  This was not signed off by

Dr. Garcia until September 4, 2001 days after Coggin's transfer to Baptist for the GI bleed.

(BOP Medical Records at 77).  The full dictated note from Dr. Williams was not faxed to

the Bureau of Prison until February 25, 2003, where it was thereafter reviewed by Dr.

Garcia and signed off on that date.  (BOP Medical Records at 73A, 74A [Plaintiff's Exhibit

I]).  Upon return to Maxwell from the office visit with Dr. Williams, Mr. Coggin delivered the

paperwork to the HSU.  (Coggin deposition at 98).  He ran into Dr. Garcia who told him he

would discuss the situation with Dr. Williams and get the surgery set up but that it may take

---

[3]The discussions that ensued at this appointment and the nature of the
examination are in dispute but not material to this summary judgment motion.

weeks to accomplish this. (*Id.*).

On August 30, 2001, plaintiff Coggin filled out an "Inmate Request to Staff Member" form addressed to Warden DeRosa wherein he requested Emergency Medical Furlough. (BOP Medical Records at 156). In the form he stated that he had been suffering from excruciating pain in his upper abdomen for over a month. (*Id*). He stated he had been examined by the local surgeon who recommended immediate surgery to remove the gall bladder, and requested an emergency medical furlough to go to the Kirklin Clinic in Birmingham to have the surgery done right away. (*Id.*) He offered to use his personal medical insurance to save the BOP and the Camp costs. (*Id.*) He also wrote "I cannot stand this pain much longer, I humbly beseech you to grant my request." (BOP Medical Records at 157). Coggin made this request based on the representation by Dr. Garcia that it might be weeks or months before they could get the surgery scheduled. (Coggin deposition at 100). Coggin became aware of a provision under the Program Statements of the BOP that he could actually request a medical furlough and go to his own doctors, at his own expense. (Coggin deposition at 101). He did not feel confident about Surgeon Williams and he did not feel like he could wait because of the pain being so great. (*Id.*). Mr. Hudson, his work supervisor, suggested that he write up the request to the Warden, so he filled it out and Mr. Hudson delivered it. (*Id.*)

On Sunday, September 2, 2001, Coggin passed out after vomiting. Another inmate called a guard officer to the scene. Coggin came to and was in a pool of vomit with reddish stuff in it. (*Id.* at 30, 32). He was transported by ambulance to the Baptist Medical Center thereafter. (*Id.* at 34).

At the time of his admission to Baptist Medical Center, his laboratory values were

9

aberrant.  His white blood count was up to 17.6.  His red blood count had dropped to 2.37.

His hemoglobin had dropped to 6.8.  (BOP Medical Records at 122-123).  His hematocrit

had dropped to 19.9. (*Id.*).  Dr. Peter Lutz, who evaluated Mr. Coggin at the time of his

admission, determined that he was suffering from a GI bleed, likely due to the NSAID use,

and recommended transfusion of blood.  (Baptist Medical Center Record at 198 [Plaintiff's

Exhibit F]).  He also determined that he had normocytic anemia and would need at least

three units of blood. (*Id.*).  He diagnosed him with an increased white blood count, likely

secondary to stress, increased BUN secondary to his GI bleed, deceased total protein and

albumin, probably due to poor nutrition, that would need to be evaluated after he recovered

from his GI bleed. (*Id.*).  He also diagnosed  metabolic alkalosis secondary to the nausea

and vomiting which would be treated with symptom control as well as orthostatic

hypotension secondary to volume loss due to the GI bleed.  (*Id.*).  At the time of surgery,

Dr. Alex Kreher determined that Mr. Coggin had a contained perforation of the duodenum.

He had a posterior penetrating duodenal ulcer that had caused bleeding from the gastro

duodenal artery.  The purpose of the operation was to try and ligate that vessel and control

hemorrhage and to address the ulcer.  (BOP Medical Records at 93).  This surgery was

performed because of the findings in the endoscopy performed by Dr. White which

reflected this large posterior ulcer with a visible vessel.  This was a large pulsating vessel

with a clot in it and Mr. Coggin was at extremely high risk for re-bleeding in the near future.

(BOP Medical Records at 94).  The gall bladder was not removed at the time of surgery.

(BOP Medical Records at 93).  Dr. Kreher attributed the bleed to the high doses of Motrin

Coggin was taking. (BOP Medical Records at 92).  Coggin's gall bladder has not been

removed yet and he has not had any other treatment or surgery suggested for it. (Coggin

10

deposition at 154).

In the week prior to the hospitalization, Coggin experienced tarry stools. (Coggin deposition at 57). He did not know at the time that this may be significant and attributed it to not eating much. He learned later that this can mean blood. (*Id.*). No employee of Maxwell had ever inquired about his stools prior to his transport to Baptist in September. (Coggin deposition at 147). No one ever tested his stool prior to the Baptist Hospital admission. (*Id.*).

Coggin did purchase aspirin, Tylenol and ibuprofen on July 24, 2001. He took 2-3 Tylenol prior to his first visit with Rodriguez on July 25, 2001. (Coggin deposition at 75). When he got the prescription for the high dose Motrin from Rodriguez, he took it as prescribed and did not take any of the purchased ibuprofen. (*Id.*). He purchased one additional bottle of Tylenol and ibuprofen on August 14, 2001 because Rodriguez told him that he had sludge in his gall bladder that would require surgery, but that it would be better to wait to have surgery after his release. (*Id.*). Realizing that his pain medicine prescription was only for 30 days, Coggin bought more to store up for that time since the commissary was not always accessible to inmates. (*Id.* at 79-80).

He did not take any Motrin beyond the prescribed amount of 800 milligrams per day. (*Id.*).

## II. CLAIMANT'S DISPUTED FACTS

On the evening of August 18, 2001, Coggin's pain worsened, he vomited and may have even vomited blood. (Coggin deposition at 54-56). He was found by a guard who he told of his symptoms and asked to be taken to the emergency room at a hospital. (*Id.*

at 55).  He was taken to Lieutanant Snyder's office who in turn called Rodriguez who spoke to Coggin on the phone. (*Id*. at 56).  Rodriguez told Coggin that he was suffering from gall bladder disease, that he was going to have problems and needed to have it out and to take the Motrin for the pain. (*Id*.).  This interaction is not reflected in the chart. (Garcia deposition at 170).

The night of August 21, 2001, Coggin vomited two to three times.  (Coggin deposition at 50).  The vomit looked to contain coffee grounds. (*Id*. at p. 51).  The morning of August 22, 2001, Coggin went to the emergency sick call and told the nurse that he wanted to see Garcia or Rodriguez because of vomiting blood and extreme pain. (*Id*. at 51).  The nurse told him he would be called to come to the clinic but he was not called back by 11:00 a.m. (Coggin deposition at 52).   He went to work and his supervisor, Charlie Hudson, called the clinic. (*Id*.).  He also saw Ms. Beasley, his case manager, and she called Garcia. (*Id*. at 53). He was sent over to see Rodriguez around 1:30 p.m. and waited to see him until 3:30 p.m. to 3:45 p.m. (*Id*.).  When Rodriguez came out he began yelling at Coggin.  He accused him of "pulling something" and inquired as to why he was insisting on seeing a "doctor". (*Id*.).   He informed him that he, Rodriguez, was the most qualified PA in the whole BOP. (*Id*.).   Rodriguez also told him that he would not send Coggin to a hospital and that he would no longer treat him.   (*Id*.).    Rodriguez told him to quit complaining to outside staff. (*Id*. at 54).

The weekend of August 25-26, 2001, Coggin had more vomiting and increased pain. (Coggin deposition at 44).   The night of the 26th after a bout of vomiting he was found on the floor of his cube by a guard whom he told that he was experiencing excruciating pain and had vomited reddish brown liquid. (*Id*. at 45).  He asked to go the emergency room

12

so she called the Lieutenant's office. (*Id* at 46).   He was transported to the office via golf cart with another inmate's assistance. (*Id.* at 47; Affidavit of Jim Johnson paragraph 6 [Plaintiff's Exhibit G]).   After telling Lieutenant Snyder of his condition, Snyder called Rodriguez in Mr. Coggin's presence, who in turn said to call Garcia. (*Id.*).   Garcia was called and Coggin spoke to him about the situation. (*Id.* at 48).   Garcia told Coggin that he had sludge in his gall bladder which will necessitate surgery and to come to the HSU in the morning to get it set up. (*Id.* at 49).   Coggin did and a surgical consult was ordered thereafter. (BOP Medical Records at 14).

On Saturday September 1, 2001, at about the time of the 10:00 p.m. count, Coggin became very sick, nauseated and went to the C wing bathroom where he vomited repetitively. (Coggin deposition at 35-36; Affidavit of Ronald Rankin at paragraph 6 [Plaintiff's Exhibit H]).   Guard Thomas came in and he, along with another inmate, took Coggin to the Lieutenant's Office. (*Id.* at 37; Affidavit of Jim Johnson at paragraph 7). Thereafter Lieutenant Snyder came in and Mr. Coggin told him he had been throwing up blood and was in extreme agony and asked to go to the Emergency Room. (*Id.* at 38; Affidavit of Johnson at paragraph 8).   Snyder told him he would not send him to the Emergency Room and that he would call Garcia.   Snyder did not make the call in the presence of Coggin. (*Id.* at 38).   Mr. Coggin was left to sit there until after the count was concluded and then another guard, who was a captain, came in and Coggin told him about what had been going on. (*Id.* at 39).   Shortly after that Lieutenant Snyder came into the room and sent Coggin back to the dorm. (*Id.*).   Coggin returned to the dorm and went to take a shower to remove the vomit from his person. As he left the shower, he passed out. (*Id.* at 40.).   Another inmate alerted a guard who radioed Lieutenant Snyder to tell him of

13

what had transpired. (*Id.* at 40). The guard told Coggin that Snyder had said to put him to bed in his bunk. (*Id.* at 41; Affidavit of Jim Johnson at paragraph 9; Affidavit of Ronald Rankin at paragraph 7).

No one at Maxwell ever told Coggin not to take Tylenol, ibuprofen or aspirin while taking the Motrin. (*Id.* at 152-153).

Dr. Joseph Paris, is a licensed physician with a speciality in correctional medicine and who is familiar with the national standard of care, has opined that based upon the information he has reviewed as listed in his Rule 26 Expert submission and the deposition of the plaintiff, and  the declarations of Garcia and Williams, it is his opinion that in and about the care and treatment of John Coggin, the FPC Maxwell staff, including Dr. Ornecio Garcia-Brenes, fell below the national standard of care for the treatment of a patient such as John Coggin who presented with the signs and symptoms and condition that Mr. Coggin exhibited beginning in July 2001. (Affidavit of Dr. Joseph Paris, paragraphs 4, 5 and 7). The standard was not met when Mr. Coggin's abdominal pain was not properly worked up and evaluated. (*Id.* at paragraph 5).  An appropriate differential diagnosis was not formulated and considered so as to rule in or rule out diagnoses to avoid disastrous consequences if not treated promptly and properly. (*Id.*).  Further the use of pain relievers for abdominal pain when a diagnosis is not certain is below the standard and may mask the patients's true symptoms making the diagnosis more difficult and increase the risk to the patient. (*Id.*).  Further, the choice of the prescribed pain relievers in this case was a series of NSAIDs, including Toradol, high dose Motrin (ibuprofen), Anaprox (Naproxen) and Clinoril (Sulindac).  (*Id.*).   NSAIDs are drugs that can cause ulcerative disease in the gastrointestinal ("GI") tract of patients and can cause erosion of the tissues and bleeding.

14

The prolonged use of NSAIDs in Mr. Coggin's case was below the standard of care. (*Id.*).

Additionally, failure to undertake other diagnostic studies to evaluate the ongoing signs and

symptoms that Mr. Coggin exhibited after the initial evaluation, and, simply ordering tests

that would confirm the initial working diagnosis without ruling out other sources for his

condition was below the standard of care and delayed the diagnosis of his gastrointestinal

erosion and bleeding. (*Id.*).

Further, Dr. Paris states that Dr. Garcia, as the supervising physician, cosigned and

approved the actions and care provided by the midlevel providers such as PA Rodriguez,

NP Little, NP Essex as well as provided direct care himself for this patient. (*Id.*). He states

that sending this patient to the surgeon for evaluation does not relieve the referring

physician of their independent obligation to meet the standard of care. (*Id.*).  Prior to this

referral, the records and depositions reflect that at Dr. Garcia's request,  NP Essex

contacted the surgeon Dr. Antonio Williams and discussed the ultrasound report. In

response, the surgeon instructed her that he would need to examine the patient and that

a gastroenterology consult would not be needed unless "he may have problems with the

common bile duct, peptic ulcer disease, etc, etc". (BOP Medical Records at 14).  Dr. Garcia

thereafter ordered the gastroenterology consult cancelled.  (BOP Medical Records at 78).

Based upon the medical records and other information in the depositions, no adequate

evaluation had been accomplished by Dr. Garcia or the other  medical providers to rule out

either common bile duct problems or peptic ulcer disease as diagnosis. (Affidavit of Dr.

Joseph Paris, paragraph 5).  The events surrounding the referral occurred on August 27th

and 28th of 2001, after a month of unrelieved and worsening symptoms in this patient. (*Id.*;

BOP Medical Records at 13-18).    The nearly 2 gram drop in Mr. Coggin's blood

15

hemoglobin over the month just prior to this consult (7/25/01 and 8/27/01) was not explored. (Affidavit of Dr. Joseph Paris, paragraph 5). This decrease was not commented upon in the Maxwell medical records nor was it commented on by the surgeon who performed the referral in either the short form consult that was sent back with Mr. Coggin to the prison nor the dictated consultation later faxed to the prison on February 25, 2003. (*Id.*; BOP Medical Records, 74A and 75A [Plaintiff's Exhibit I])[4]. Under these circumstances, it would be reasonable for this surgeon to believe that the appropriate work up to eliminate common bile duct problems or peptic ulcer disease conditions had been accomplished prior to the referral. The surgical consultation record does not record anything about Mr. Coggin's laboratory results or changes at all. (BOP Medical Records at 73-74). Dr. Paris opines that the work up to evaluate for these conditions had not been done by the Maxwell staff prior to the consult, and based upon the condition that Mr. Coggin was found in at the Baptist Hospital days later, that those tests, such as a rectal exam with testing for blood, if done prior to the referral would have been diagnostic for the GI bleeding and the appropriate care could have been instituted immediately, including a gastroenterology consult as recommended by the surgeon. (Affidavit of Dr. Joseph Paris, paragraph 5). The amount and duration of the NSAID medications prescribed by the staff of FPC Maxwell was never provided to the surgeon by the medical staff at the time of the referral. (Garcia deposition at 88). Dr. Paris opines that the standard of care was not met by Dr. Garcia nor the other care givers at Maxwell and as a result Mr. Coggin underwent

---

[4]These are copies of the documents identified in Defendant's Exhibit 3, however, these documents have the 'fax information' on the top as reflected in the original BOP Medical records.

prolonged pain, weight loss, a life threatening GI bleed that required surgical intervention and transfusion, that led to a lengthy convalescence. (Affidavit of Dr. Joseph Paris, paragraph 5).

In late October 2001, John Coggin met with his counselor, Rosetta Beasley, to discuss his impending release from Maxwell on November 13, 2001. (Affidavit of John Coggin, paragraph 4). He was to be released to the Birmingham Community Center, which is a half-way house facility. (*Id.*). His sentence was to be up the first week of April in 2002. (*Id.*). He was informed that per BOP procedure inmates were to be released to a half-way house three to six months prior to expiration of their sentence, however, inmates could be released to home confinement at the 10% date (the period where you only have 10% left on sentence). (*Id.*).  In the pre-release meetings with Ms. Beasley, the question of whether he could physically tolerate working at the half-way house was discussed. (*Id.* at paragraph 5). At this time, Coggin was still on convalescent status at Maxwell. (*Id.*). Ms. Beasley suggested calling Mr. Larry Spencer, who is in charge of the half-way houses for the BOP in the Southeast. (*Id.* at paragraph 6). In a discussion with Mr. Spencer, it was agreed that due to Coggin's medical condition, he would be given home confinement status immediately upon his 10% date of January 1, 2002. It was agreed that he would reside at the Birmingham Community Center from November 13, 2001 to December 31, 2001 and be permitted to work out of his home during that period. (*Id.*). Mr. Spencer indicated that the half-way house did not want to be in any way responsible for Coggin's medical expenses. (*Id.* at paragraph 7). As a result of these discussions, it was agreed that Coggin would work out of his home due to this medical condition and thereafter be placed on home confinement on January 1, 2002. As part of this arrangement, he would be

17

responsible for medical expenses while at the half-way house and while on home confinement. (*Id.* at paragraph 8).

There was absolutely no discussion about releasing the BOP or the government from any tort claim in any of these conversations. (*Id.* at paragraph 9). There was no discussion about or intent to release BOP from any future economic damages stemming from the circumstance surrounding his health condition. Coggin understood that he would be responsible for his medical expenses and home confinement expenses while at the half-way house and while on home confinement. (*Id.*). This agreement was signed in Ms. Beasley's office. Despite the letter's statement that Coggin be given home confinement status immediately upon his 10% date of January 1, 2002, this did not occur. He was not placed on home confinement until days after January 1, 2002. (*Id.* at paragraph 10).


## **ARGUMENT**

### **INTRODUCTION**

The first two prongs of the government's argument are premised on an incomplete reading of the Alabama Medical Liabilities Act ("AMLA"). The government argues that the doctor, physician's assistant and guards are not "healthcare providers" covered by the AMLA, because they do not satisfy the state specific licensure requirements under the AMLA definitions of "medical practitioners" or "physicians." The government completely neglects to observe that "medical institutions," such as the BOP Health Services Unit, are also "healthcare providers" independently covered under the AMLA. When the BOP Health Services Unit itself is a "healthcare provider" covered by the AMLA, there is no need

18

to parse definitions trying to fit each and every person employed by the BOP Health Services Unit under a separate definition.  The medical institution itself is a healthcare provider covered in its entirety under the AMLA.

Furthermore, the government ignores longstanding precedent in this circuit and others in arguing that the doctor and physician's assistant do not fall under the AMLA simply because they are not licensed in Alabama.  The applicable case law shows that courts have consistently held that under the Federal Tort Claims Act ("FTCA"), state malpractice statutes apply to unlicenced federal system doctors, even when the state-statute purports to only apply to state-licensed physicians.  The government acknowledges that Alabama malpractice law applies, but then attempts to use hypersensitive state-specific licensure technicalities to make the application of Alabama law impossible.  This tactic stands contrary to both the language of the FTCA and longstanding interpretation of the FTCA by this circuit and others.

The government further argues that Alabama law imposes no duty on guards with respect to prisoners' medical care, and therefore the only possible cause of action against the guards would be an Eight Amendment claim.  This claim is entirely without merit. Under Alabama law the guards are liable for: 1) negligence under the AMLA to the extent that the guards were employed by a healthcare provider, 2) simple negligence, and 3) negligence *per se* due to violation of Alabama statute.  The guards were employed in providing medical care to prisoners by the BOP Health Services Unit, which is a medical institution covered as a healthcare provider under the AMLA.  In the capacity that the guards were employed by the BOP Health Services Unit, the guards are liable under the AMLA.  In addition to liability under the AMLA, the guards are also liable for simple

19

negligence under Alabama law.  Under a simple negligence claim in Alabama, the guards' standard of care is that of a reasonable person.  In failing to provide medical attention to a prisoner, the guards breached that standard of care, and proximately caused injury to plaintiff.  The claim of simple negligence does not apply to the guards' failure to directly provide medical care as employed by the BOP Health Services Unit, which would be covered under the AMLA, but a claim of simple negligence does apply to the guards' failure to *obtain* medical care for a prisoner in need.  Further, under Alabama law, liability for conduct of this nature by  correctional guards, for negligence in failing to obtain medical care for inmates, is both statutory and supported by case law interpreting the application of that statutory duty.  The Alabama legislature has created a statutory duty for guards to aid prisoners in case of sickness and to provide medical attention to prisoners.  This statutory duty does not limit a claimant to claims under *Bivens*, but gives rise to a cause of action for negligence *per se* independent of constitutional grounds.  The guards are liable for negligence *per se* under Alabama law because the guards violated Alabama statutes enacted to protect prisoners from injury resulting from the failure of guards to provide either medical aid or medical attention to a prisoner.

Plaintiff does not dispute the government's claim that the specialist, Dr. Antonio Williams, is not employed by the government.  Dr. Williams is not a party in this case.  No allegation has been pled or made by plaintiff against Dr. Williams. The government argues, citing to Dr. Williams' deposition, that a duty of care is satisfied and absolved by referring a patient to a specialist.  No case law is cited in support of this proposition.  In the instant case, Dr. Garcia had already breached his duty of care before he referred plaintiff to a specialist.  Under the AMLA, a surgeon, Dr. Williams, may not testify as to a non-surgeon,

20

such as Dr. Garcia's duty under the standard of care. He is not similarly situated. Further, his declaration does not even state that he is familiar with the standard of care that would be applicable to a medical physician such as Dr. Garcia under these circumstances. More importantly, plaintiff has offered in this submission the affidavit of Dr. Joseph Paris, a similarly situated medical doctor with experience in a correctional setting, who opines that Dr. Garcia did not meet the applicable standard of care. Dr. Paris also opines that the surgical referral did not absolve Dr. Garcia of his independent duty to meet the standard of care.

The government also argues that plaintiff waived any claim by entering into a written agreement with the government. The agreement cited by the government is taken out of context. The agreement does not refer to any claim or cause of action relating to this case.

Plaintiff's arguments will address each of these unfounded assertions hereinbelow in more detail.

I.      **The BOP Health Services Unit is a Health Care Provider Under the AMLA.**

Under the Alabama Medical Liability Act ("AMLA"), the medical malpractice standard of care "is that level of such reasonable care, skill, and diligence as other similarly situated *health care providers* in the same general line of practice, ordinarily have and exercise in like cases." Ala. Code § 6-5-542(2) (1975) (emphasis added). The AMLA defines "health care provider" as "[a] medical practitioner, dental practitioner, *medical institution*, physician, dentist, hospital, or other health care provider as those terms are defined in Section 6-5-481." *Id.* § 6-5-542(1) (emphasis added). The AMLA defines "medical institution" as, *inter*

21

alia, a "clinic containing facilities for the examination, diagnosis, treatment, or care of human illnesses." Id. § 6-5-481(3).

The BOP Health Services Unit is a "clinic containing facilities for the examination, treatment and diagnosis of illnesses," and is therefore a "medical institution," which is a "healthcare provider" covered under the AMLA. See id. §§ 6-5-481(3), 6-5-542(1). As a healthcare provider, the BOP Health Services Unit breached its duty to comply with the requisite standard of care under the AMLA. See id. § 6-5-542(2).

The BOP Health Services Unit is itself a healthcare provider under the AMLA, which puts all individuals employed[5] by the BOP Health Services Unit in providing that care also under the AMLA as a matter of logical necessity. A medical institution can only conduct itself and provide care by and through those individuals it chooses to utilize in the provision of that care. Here it did. The HSU utilized a range of individuals from physicians, to PAs, to nurse practitioners, nurses, pharmacists, and even in after-hour circumstances, the correctional officers or guards. The stream of care flowed from this medical institution to inmates such as John Coggin through these various individuals. Because it is a health care provider as contemplated in the clear language of the statute, it and the conduct of those it utilizes is subject to the AMLA and must meet the applicable standard of care. In

---

[5]In the context of the AMLA, the Supreme Court of Alabama has denied assertions that "the term 'employed' as used in § 6-5-481 should be strictly defined and limited to situations where there is some kind of employment or contractual relationship between the physician and the individual involved in the 'delivery of health care services.'" Cackowski v. Wal-Mart Stores, Inc., 767 So. 2d 319, 324 (Ala. 2000). The Court held that "the term 'employ' means 'to make use of,' as well as 'to use advantageously,' 'to devote or direct [one's time or energies, for example] toward a particular activity or person,' 'to use or engage the services of,' or 'to provide with a job that pays wages or a salary.'" Id. (citing Merriam Webster's Collegiate Dictionary 379 (10th ed.1997)).

order for the government to prevail on summary judgment, there must be no issue of material fact as to whether or not the care provided to John Coggin met the standard of care. There is evidence before the Court that the care did not meet the standard as set out in the affidavit and attached report of Dr. Joseph Paris. Thus, summary judgment would not be proper. However, we will additionally argue that the doctor, physician's assistant and guards are also independently healthcare providers in their own right under the AMLA.

## II. The Doctor Who Treated Plaintiff is a Healthcare Provider Under the AMLA.

Under the FTCA, the government "shall be liable . . . in the same manner and to the same extent as a private individual under the circumstances . . . ." 28 U.S.C. § 2674 (1982). Liability is determined "in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1).

The government has not disputed that plaintiff's claim is governed by Alabama law. However, the government has argued that the doctor who treated plaintiff does not satisfy the definition of "healthcare provider" under Alabama law, Ala. Code § 6-5-542(1) (1975), because the doctor is not licensed to practice medicine in the State of Alabama. Both "medical practitioners" and "physicians" are considered "healthcare providers" under the AMLA. *Id.* § 6-5-542(1). The AMLA defines "medical practitioner" as "Anyone licensed to practice medicine or osteopathy in the State of Alabama . . . ." *Id.* § 6-5-481(1). Likewise, the AMLA defines "physician" as "Any person licensed to practice medicine in Alabama." *Id.* § 6-5-481(5).

The Eleventh Circuit has previously held that under the FTCA, state malpractice law applies to federal system doctors who are not licensed in that state, even when the state-statute purports to apply to only state-licensed physicians. *See Scheib v. Flo. Sanitarium and Benev. Ass'n*, 759 F.2d 859, 863-64 (11th Cir. 1985) (reasoning that "under the Federal Tort Claims Act, 28 U.S.C. 2674 (1982), the government may be held liable only 'to the same extent as a private individual under like circumstances ...', and that in [a case where the federal doctor is unlicensed], for the purpose of measuring the government's liability, the most analogous private individual would be a licensed physician practicing family medicine in the State of Florida."); *see also Lucas v. United States*, 807 F.2d 414, 417 (5th Cir. 1986) (holding that if the Texas medical malpractice statute applies to hospitals licensed in Texas, the Texas medical malpractice statute would also apply to an unlicensed federal hospital under the FTCA); *Taylor v. United States*, 821 F.2d 1428, 1431-32 (9th Cir. 1987) (noting that "[t]o hold that [the state medical malpractice statute] does not apply to the United States because the United States is exempt from state licensing requirements would contravene Congress' directive that the United States 'shall be liable ... in the same manner and to the same extent as a private individual under like circumstances....' 28 U.S.C. § 2674."). "[The FTCA] is given broad interpretation to effectuate the legislative aim of putting citizen and national sovereign in tort claim suits on a footing of equality as between private parties within that state. Nice pieces of casuistry and hypersensitive legalisms are avoided." *Owen v. United States*, 935 F.2d 734, 737 (5th Cir. 1991).

When the state legislatures exclude Federal institutions and physicians from state malpractice statutes, the state legislatures are merely acknowledging the limits of their

24

power. *See Lucas*, 807 F.2d at 417. It is a crime to practice medicine in Alabama without a license, Ala. Code § 34-24-51 (1975), therefore the AMLA includes all physicians legally practicing medicine in Alabama under the definitions of "medical practitioner" and "physician." *See* Ala. Code § 6-5-481(1), (5) (1975). In order to hold the government liable "in the same manner and to the same extent as a private individual under the circumstances . . . ," 28 U.S.C. § 2674 (1982), a federally licensed doctor must be held to the same standard as a doctor licensed to practice medicine in Alabama. The government's argument that Alabama licensure is required for the AMLA to apply under the FTCA is without merit, and contrary to precedent in this circuit and others.

Thus the AMLA does apply and in order for the government to prevail on summary judgment, there must be no issue of material fact as to whether or not the care provided to John Coggin met the standard of care. There is evidence before the court that the care did not meet the standard as set out in the affidavit of Dr. Joseph Paris. Thus, summary judgment would not be proper.

### III.    The Physician's Assistant and Guards who Treated Plaintiff are Healthcare Providers under the AMLA.

The AMLA defines "health care provider" as "[a] medical practitioner, dental practitioner, medical institution, physician, dentist, hospital, or *other health care provider* as those terms are defined in Section 6-5-481." *Id.* § 6-5-542(1) (emphasis added). The AMLA defines "other health care provider" as "any person employed by physicians . . . who are directly involved in the delivery of health care services." *Id.* § 6-5-481(8). In the instant case, the medical institution physician employed the physician's assistant to directly deliver

25

health care services, therefore, the physician's assistant is an "other health care provider" under the AMLA. *See id.* § 6-5-481(8); Garcia deposition at 67. Likewise, the medical institution physician employed the guards in observing and reporting the patients' condition to directly deliver health care services; therefore, the guards are also, in that capacity, "other health care providers" under the AMLA. *See id.* § 6-5-481(8); Garcia deposition at 69-72, 74-75; Rodriguez deposition at 65-66. These individuals are subject to the AMLA and their failure to execute their duties within the standard of care will incur liability when it injures a patient. In order for the government to prevail on summary judgment, there must be no issue of material fact as to whether or not the care provided to John Coggin met the standard of care. There is evidence before the court that the care did not meet the standard as set out in the affidavit of Dr. Joseph Paris. Thus, summary judgment would not be proper.

## IV. The Guards who Withheld Medical Aid from Plaintiff are Liable for Negligence and Negligence Per Se Under Alabama Law.

As hereinbefore, under the FTCA, the government "shall be liable . . . in the same manner and to the same extent as a private individual under the circumstances . . . ." 28 U.S.C. § 2674 (1982). Liability is determined "in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1). The standard of care by which the conduct of the guards is judged is clear under Alabama law.

Jail and prison guards under Alabama law are subject to statutes that set out the standard or duty to which they are held in dealing with inmates, including inmate health care provision. Ala. Code §§ 14-6-19, 14-6-105 (1975). Thus, the guards' conduct in this

26

case must meet this duty. And while this conduct might also rise to the level of a constitutional Eighth Amendment violation, plaintiff does not have to bring a *Bivens* claim in addition to the breach of this standard in order to proceed. The evidence before the court is sufficient to support a finding that these guards did indeed violate the statute that sets the standard for conduct in securing medical care for John Coggin. Multiple events where this inmate sought care only to have it ignored, dismissed, or minimized are before the court in the record. These events as described by Coggin ring true when read with the medical records from the BOP and Baptist Hospital which reflect that John Coggin indeed had been suffering from GI bleeding for a period of time. His hemoglobin and hematocrit were dropping over the month between first complaint and the surgical consult. (BOP Medical Records at 41, 43-44.) Upon admission to the Baptist Hospital, these labs values were so decreased as to be life threatening and require multiple transfusions. (BOP Medical Records at 121-22.) He was not actively bleeding upon admission to Baptist indicating that this drop in values represented bleeding that was ongoing while at Maxwell. (BOP Medical Records 93-94.) Thus, issues of material fact exist as to the guards' liability under the law and the government is not entitled to summary judgment as a matter of law.

"The doctrine of negligence per se . . . arises from the premise that the legislature may enact a statute that replaces the common-law standard of the reasonably prudent person with an absolute, required standard of care. . . . Proof of a violation of the statute is proof of negligence." *Parker Bldg. Services Co., Inc. v. Lightsey*, 925 So. 2d 927, 930-31 (Ala. 2005) (citations omitted).

The Alabama legislature has created a statutory duty for a jailer to provide medical attention:

> Necessary clothing and bedding must be furnished by the sheriff or jailer, at the expense of the county, to those prisoners who are unable to provide them for themselves, and also necessary medicines and medical attention to those who are sick or injured, when they are unable to provide them for themselves.

Ala. Code § 14-6-19 (1975).  Additionally, the Alabama legislature has created a duty for guards to aid sick prisoners, even at night:

> Prisoners shall not be confined in any jail or prison in this state when such jail or prison is not provided with a deputy, watchman or attendant, whose duty it shall be to watch the jail or prison at night for the prevention of escapes and fire and to aid in case of sickness among the prisoners, and who shall have access to the jail or prison and to the prisoners.

*Id.* § 14-6-105.  Plaintiff alleges that the guards violated these Alabama statutes and are liable for negligence per se.

> [F]our elements are required for violation of a statute to constitute negligence per se: (1) The statute must have been enacted to protect a class of persons, of which the plaintiff is a member; (2) the injury must be of the type contemplated by the statute; (3) the defendant must have violated the statute; and (4) the defendant's statutory violation must have proximately caused the injury.

*Lightsey*, 925 So. 2d at 931 (*citing Fox v. Bartholf*, 374 So. 2d 294, 295 (Ala. 1979).  In the instant case all four of these factors are met: 1) both Section 14-6-19 and Section 14-6-105 were enacted to protect prisoners, 2) both statutes contemplate injury to prisoners resulting from the failure of guards to provide either medical aid or medical attention to a prisoner, 3) the guards violated the statutes by failing to provide medical aid or attention, 4) the guards' failure to provide aid or attention was the proximate cause of injury to plaintiff.

Thus, under the facts in evidence before this court, issues of material fact exist as to the guards' liability under the law and the government is not entitled to summary

judgment as a matter of law.

**V.    No Allegation has been Pled or Made by Plaintiff against Doctor Williams.**

The government also asserts that is entitled to summary judgment because Dr. Williams is not a government employee. Plaintiff does not dispute the fact that Dr. Williams is not a government employee. No allegation has been pled or made by the plaintiff against Dr. Williams. This is not fatal to the claims plaintiff brings against the BOP. As acknowledged by the government, under the FTCA the government is subject to liability in the same manner and extent it would be under Alabama law. Alabama has joint and several liability among tortfeasors. *Butler v. Olshan*, 191 So. 2d 7, 17 (Ala. 1966). The plaintiff is not required to bring a claim against all tortfeasors who may have caused or contributed to cause an injury. *Id.*

**VI.    A Genuine Issue of Material Fact Exists as to Whether Doctor Garcia Breached the Standard of Care.**

The government's attempt to use Williams' testimony regarding the standard of care violates the AMLA, which precludes a surgeon from testifying as to the standard of care for a non-surgeon. *See* Ala. Code § 6-5-548(e) (1975). The Alabama Supreme Court has held that a surgeon may not even testify to the standard of care of another surgeon in the same specialty who is licensed by another board. *Johnson v. Price*, 743 So. 2d 436, 438 (Ala. 1999).

Further, it is absurd to think that Dr. Garcia's duty to treat Mr. Coggin was extinguished by the consult on August 29th. Mr. Coggin was not left in  Dr. Williams'

custody at that time. He was returned to the prison and placed back under the care of Dr.

Garcia to set up surgery albeit this was likely to take some time. To accept this assertion

by the government is to accept that irrespective of Coggin's condition he can be allowed

to go untreated and ignored until this arguably unnecessary surgery was executed.[6]

Under the standard of care proposed by Dr. Williams, an inmate's medical condition could

be ignored with impunity. Further, the court has before it evidence in the form of testimony

of Dr. Paris, a similarly situated correctional medical provider, who had testified that he is

familiar with the applicable standard of care. Dr. Paris opines that the surgical consult

does not relieve Dr. Garcia of his duty to provide care that meets the standard either before

or after that consult. This raises an issue of material fact and thus summary judgment is

inappropriate.


### VII.    Plaintiff did not waive any Claims Relating to this Case.

Under the FTCA, a plaintiff must accept an award, compromise or settlement to

effectively release a claim. *Macy v. United States*, 557 F.2d 391, 394 (3rd Cir. 1977) (citing

28 U.S.C. § 2672). In the instant case, the plaintiff did not accept any award, compromise

or settlement. The government argues that a letter from plaintiff to his caseworker

regarding the plaintiff's responsibilities for the remainder of his incarceration is a release.

However, there has been no award, and the letter does not contain any compromise or

settlement or even refer to any claim, FTCA or otherwise. The government does not offer

any compromise or settlement to the plaintiff in the letter. This letter is not a valid release

---

[6]Coggin has never undergone gallbladder surgery or any subsequent gallbladder treatment.

because it does not meet the statutory requirements for a release of claims under § 2672. Furthermore, the caseworker who signed this letter lacked the authority to bind the government to a release. "The United States cannot be bound to a settlement agreement where the agent of the United States who signed the agreement lacked the authority to enter into the agreement." *Turner v. United States*, 875 F. Supp. 1430, 1436 (D. Nev. 1995).

Even if FTCA release requirements were satisfied, this letter does not qualify as a release under Alabama law. A release is a type of contract that is controlled by contract law. *Gess v. United States*, 909 F. Supp. 1426, 1446 n.26 (M.D. Ala. 1995). Under Alabama law, the requisite elements of a valid contract are: "an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Hunter v. Wilshire Credit Corp.*, 927 So. 2d 810, 813 (Ala. 2005). In the instant case, the document put forward by the government is a letter memorializing a telephone conversation regarding responsibilities of the plaintiff during the remainder of his sentence. The government makes no offer in this document. The details of the plaintiff's remaining sentence are discussed, but no offer is made, and no offer is accepted. Further, there is no consideration. There is nothing given up by the government or gained by the plaintiff. There was no mutual assent to the essential terms if the government now claims this letter is a release of liability for damages under a FTCA claim. Plaintiff understood this letter to be an acknowledgment of his personal responsibilities during the remainder of his sentence. Affidavit of John Coggin, paragraph 9. Furthermore, the letter does not purport to be a release, and there is no mention in the letter of any FTCA claim. Defendant Exhibit 5, BOP Central File at Bates No. 00637, Letter dated October 30, 2001. Even if this letter

31

was considered a contract, it is not an effective release. The letter speaks only to the time that the plaintiff was serving his sentence, which expired April 2002. The letter sent by plaintiff to Rosetta Beasley, plaintiff's caseworker, is not a valid release under Alabama law.[7]

Thus, under the facts in evidence before this court, issues of material fact exist as to this issue and therefore the government is not entitled to summary judgment as a matter of law.

## CONCLUSION

Plaintiff submits based upon the forgoing, he has established sufficient and substantial evidence of material fact as well as set out the complete applicable law that would apply in this case so as to defeat the government's arguments on the issues heretofore raised. Plaintiff moves this Court to deny the government's motion in its entirety.

Respectfully submitted,

JULIA T. COCHRUN
Attorney for Plaintiff

---

[7]The government notes that the Alabama Supreme Court held the Section 6-5-544 cap on non-economic damages to be invalid under the Alabama Constitution. *See Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156, 171 (Ala. 1991). The Alabama Supreme Court subsequently held that the Alabama Legislature explicitly superseded Section 6-5-544 by enacting a new non-economic damage cap in Section 6-11-21. *Mobile Infirmary Ass'n v. Tyler*, 2007 WL 2687321, *23 (Ala. 2007). Under Alabama law, the applicable cap on non-economic damage in the instant case is $1,500,000. *See* Ala. Code § 6-11-21(d) (1975).

OF COUNSEL:
PATE & COCHRUN, LLP
P. O. Box 10448
Birmingham, AL 35202-0448
Telephone: (205) 323-3900
Fax: (205) 323-3906
e-mail: filings@plc-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the _____ day of November, 2007, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, the CM/ECF system will send notification of such filing to the following:

Stephen M. Doyle, Esq.
Assistant U.S. Attorney
P. O. Box 197
Montgomery, AL 36101-0197

and I hereby certified that I have mailed the foregoing document by U.S. Mail, postage prepaid, to the following:

None

_____
OF COUNSEL