PLAINTIFF'S EXHIBIT A

DEPOSITION
OF
DR. ORENICIO GARCIA-BRENES

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF ALABAMA
 3                 NORTHERN DIVISION
 4
 5
 6
    JOHN COGGIN,                  )
 7                               )
              PLAINTIFF,          )
 8                               )
    VS.                          )    CIVIL ACTION NO.:
 9                               )    2:05-cv-1214-MEF
                                 )
10  UNITED STATES OF AMERICA,)
                                 )
11            DEFENDANT.         )
12
13      DEPOSITION OF O. GARCIA-BRENES, M.D.
14
15          The Deposition of O. GARCIA-BRENES,
16  M.D., was taken before Kathy Colburn, CSR.,
17  on Friday, February 23, 2007, at the Office
18  of U.S. Attorney, One Court Square, Suite
19  201, Montgomery, Alabama, commencing at 9:15
20  a.m., pursuant to the stipulations set forth
21  herein:
22
23
24
25
```

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFF:
    PATE & COCHRUN, L.L.P.
    BY: Ms. Julia T. Cochrun
    400 Title Building
    Birmingham, Alabama 35203

APPEARING FOR THE DEFENDANT:
    U.S. DEPARTMENT OF JUSTICE
    BY: Mr. Stephen Michael Doyle
        and
        Mr. James J. DuBois
    Assistant U.S. Attorneys
    One Court Square
    Suite 201
    Montgomery, Alabama 36104

        AND

    FEDERAL BUREAU OF PRISONS
    BY: Ms. Terry Collins, Senior
        Counsel
    3800 Camp Creek Parkway
    Building 2000
    Atlanta, Georgia 30301

Reported By:

    Kathy Colburn,
    Certified Shorthand Reporter

---

Page 3

INDEX

EXAMINATION OF O. GARCIA-BRENES, M.D.

EXAMINATION BY:            PAGE NUMBER:
Ms. Cochrun . . . . . . . . . . .  5 - 238
                        239 - 240

Mr. Doyle . . . . . . . . . . . 238 - 239

EXHIBITS:

Plaintiff's Exhibit No. 1 . . . . .   41
Plaintiff's Exhibit No. 2 . . . . .  240

CERTIFICATE OF REPORTER        241

---

Page 4

STIPULATIONS

1
2
3       IT IS STIPULATED AND AGREED by and
4   between the parties through their respective
5   counsel, that the deposition of O.
6   Garcia-Brenes, M.D., be taken before Kathy
7   Colburn, Certified Shorthand Reporter, and
8   Notary Public, State of Alabama at Large, at
9   the Office of U.S. Attorney, One Court
10  Square, Suite 201, Montgomery, Alabama, on
11  Friday, February 23, 2007.
12      IT IS FURTHER STIPULATED AND AGREED
13  that it shall not be necessary for any
14  objections to be made by counsel to any
15  questions, except as to the form or leading
16  questions, and that counsel for the parties
17  may make objections and assign grounds at the
18  time of trial, or at the time said deposition
19  is offered in evidence, or prior thereto.
20      IT IS FURTHER STIPULATED AND AGREED
21  that notice of filing of the deposition by
22  the Commissioner is waived.
23
24
25          *    *    *    *    *

---

Page 5

DEPOSITION

1
2       O. GARCIA-BRENES, M.D.
3   after having been duly sworn under oath, was
4   examined and testified as follows:
5
6
7       COURT REPORTER:  Usual stipulations?
8       MR. DOYLE:  We'll read and sign.
9
10  EXAMINATION BY MS. COCHRUN:
11  Q       Can you state your full name and
12  your address for the record, please, sir?
13  A       Of course.  Orencio, O-r-e-n-c-i-o,
14  Garcia-Brenes, G-a-r-c-i-a hyphen
15  B-r-e-n-e-s.  Address is 104 Natchez Court,
16  Montgomery, Alabama  36107.
17  Q       Okay.  And who is your employer,
18  Doctor?
19  A       The Bureau of Prisons.
20  Q       All right.  And how long have you
21  worked for the Bureau of Prisons?
22  A       Since '92.
23  Q       Okay.  I'm going to back up a little
24  bit and try to get through your education and
25  clinical training up to the point.

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 6

1    A    Sure.
2    Q    So -- Well, let me ask you this:
3    Where were you born?
4    A    Havana, Cuba.
5    Q    All right.  And when did you come to
6    this country?
7    A    1959.
8    Q    All right.  And where did you settle
9    upon getting here to the United States?
10    A    Miami, Florida.
11    Q    And how long did you stay in Miami?
12    A    Until I came to Montgomery in '98.
13    Q    Okay.  So you were down there for
14    basically most of --
15    A    I was raised there.  Yes, ma'am.
16    Q    Raised there.  All right.  And where
17    did you attend medical school?
18    A    Autonomous University, Guadalajara.
19    Q    Guadalajara?
20    A    Yes, ma'am.
21    Q    And what years were you in that
22    medical school?
23    A    1973 to 1979.
24    Q    All right.  Where did you graduate
25    high school?

Page 7

1    A    Hialeah High School.
2    Q    Pardon?
3    A    Hialeah.
4    Q    Hialeah.  In what year?
5    A    '63.
6    Q    And what did you do for the ten
7    years between '63 and '73?
8    A    I studied part-time and worked most
9    of the time full time.
10    Q    All right.
11    A    I studied in Miami, Dade Community
12    College.
13    Q    Okay.
14    A    Part-time.  And then I studied at
15    the University of Miami from 1970 to '73.
16    Q    All right.  Did you graduate from
17    Miami?
18    A    No.  I did not.
19    Q    All right.
20    A    I was studying pre-med there.
21    Q    You were in pre-med there?
22    A    Uh-huh (in the affirmative).
23    Q    So am I correct that you did some
24    pre-med at Miami Dade and Miami?
25    A    I did some pre-med -- I did pre-med

Page 8

1    at University of Miami.
2    Q    All right.  And then --
3    A    I was studying -- I had an Associate
4    in Arts from Miami Dade Community College.
5    Q    All right, sir.  And you started
6    medical school in Guadalajara?
7    A    Yes, ma'am.
8    Q    In 1973?
9    A    Correct.
10    Q    In order to gain entrance to that
11    medical school, do you have to have a four
12    year undergraduate degree?
13    A    You have to have the MCAT with a
14    bachelor's core.  You have to have certain
15    requirements of pre-med courses.  You do not
16    have to be completely accredited from a
17    pre-med.
18    Q    Four year school?
19    A    No.
20    Q    All right, sir.  And the medical
21    school at Guadalajara, how long is that
22    program normally?
23        I mean, when you start, how many
24    years do they have an expectation you will
25    be there?

Page 9

1    A    It's four years medical school, one
2    year internship, one year social service.
3    That's how come it's six years.
4    Q    All right.  And did you do your
5    internship there in Guadalajara?
6    A    No.  I did not.
7    Q    Where did you do your internship?
8    A    I did -- for Mexico it's considered
9    an internship; for here it's considered an
10    externship.
11    Q    All right.
12    A    So I did an externship in Internal
13    Medicine Department at the VA Hospital in
14    Miami, Florida and South Miami Hospital I did
15    some of it.  And what used to be called
16    Children's Hospital which is now Miami
17    Children's Hospital, I did the other
18    rotation.
19    Q    So you did a year of kind of
20    rotating internship through those facilities?
21    A    Yes, ma'am.
22    Q    And did you in coming back to this
23    country to begin that externship/internship,
24    did you have to undergo any kind of licensure
25    or test in order to come back to the United

3 (Pages 6 to 9)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 10

1  States to begin your medical training, your
2  internship? And did you have to take any
3  kind of exam?
4  A    I do not understand what you ask.
5  Q    Did you have to take any boards or
6  anything? I know you did four years in
7  Mexico, right?
8  A    Yes, ma'am.
9  Q    And then you came back to Miami?
10 A    Yes, ma'am.
11 Q    Did you have to do any testing or
12 any --
13 A    I started working as a surgical
14 assistant at South Miami Hospital.
15 Q    All right. So you were not in a
16 formal internship program --
17 A    No.
18 Q    -- in Miami, you were working as an
19 SA, surgical assistant?
20 A    Surgical assistant; that is correct.
21 Q    All right. And were you assigned to
22 a specific physician or was this actually a
23 program that Guadalajara placed you in?
24 A    This had nothing to do with
25 Guadalajara. It was a job.

Page 11

1  Q    Oh, a job. Okay. Now, when you
2  finished the first four years in Guadalajara,
3  are you considered graduated from medical
4  school there?
5  A    Yes, ma'am.
6  Q    Okay. So you were considered a
7  medical doctor at that point?
8  A    In Mexico I was considered a medical
9  doctor at that time, yes.
10 Q    Okay. However, to come to this
11 country, are there other requirements above
12 and beyond what you accomplished in Mexico in
13 order to become a medical doctor?
14 A    Yes, there are.
15 Q    Tell me what all -- well, let's just
16 try to do chronological, that will be easier.
17 A    Sure.
18 Q    So you came back and worked as an SA
19 for one year rotating through?
20 A    No. I worked as a surgical
21 assistant from 1979, the latter part of 1979
22 until approximately 1988.
23 Q    All right. Then I guess I need to
24 back up.
25     The one year that you did -- I

Page 12

1  thought you told me six years in Guadalajara,
2  four years straight medical school, then one
3  year of internship/externship, that was in
4  Miami?
5  A    The year that I did have
6  internship/externship in South Miami Hospital
7  was an OB/GYN. At that time they did have a
8  program for an externship. It was not a job,
9  it was not paid, it was a teaching position.
10 Q    Okay. And that was --
11 A    In between 1978 and 1979.
12 Q    All right, sir. And then did you go
13 back to Guadalajara after that?
14 A    I went back to Guadalajara to the
15 social service and you have to serve the
16 government, basically, in whatever position
17 they assign you.
18     So I was assigned as an instructor
19 in the Department of Infectious Diseases at
20 our university.
21 Q    Okay.
22 A    You know, Guadalajara.
23 Q    The medical school there?
24 A    Yeah.
25 Q    All right, sir. Then when you

Page 13

1  accomplished that in '79, you came back
2  stateside?
3  A    Yes, ma'am.
4  Q    And began a position as a surgical
5  assistant, a real job, so to speak, not
6  training?
7  A    Uh-huh (in the affirmative).
8  Q    Okay. And where or whom did you
9  work for as the surgical assistant? I mean,
10 is that -- were you working for a hospital
11 or were you working for a doctor?
12 A    I was working for a hospital.
13 Q    What hospital was that?
14 A    South Miami Hospital.
15 Q    Upon your completion of the six
16 years in Guadalajara, would you be eligible
17 to come to this country and begin working as
18 a physician?
19 A    Provided I pass examinations, yes.
20 Q    Okay. And those examinations, what
21 would they be?
22 A    Well, actually, it's more than that.
23 You have to pass -- you had at the time to
24 pass what it was called the ECFMG. And then
25 you had to do more training as an intern and

4 (Pages 10 to 13)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 14

1   then you would be able to gain your licensure
2   and work as a physician.
3   Q        All right, sir. Did you undertake
4   to do any of those steps?
5   A        Yes. The tests?
6   Q        Yes.
7   A        That's what your driving at? Yes.
8   Q        Well, I'm just trying to get how you
9   got from point A to point B. I mean, when
10  you came to this country, you obviously had
11  to accomplish some things to become a
12  licensed physician in this country. I just
13  need to kind of get through those steps,
14  okay?
15  A        Okay.
16  Q        So you came back in '79. Why don't
17  you just walk me through what you did?
18  A        Easily.
19  Q        Okay.
20  A        After I finished working at South
21  Miami Hospital, although I did take a test,
22  I did not pass it. I give up on it. I
23  worked from '88 to '89, I think, or '90,
24  maybe, as a pharmaceutical representative for
25  Hoechst Russell.

Page 15

1   Q        For who?
2   A        H-o-e-c-h-s-t, I believe.
3   Q        Okay.
4   A        Hyphen, R-u-s-s-e-l or l-l.
5   Q        All right. And did you, when you
6   were working as a pharmacy rep, was there a
7   specific drug line or a medication line that
8   you worked?
9   A        Yeah.
10  Q        What was that?
11  A        One of them was Claforan, which was
12  an injectable antibiotic. And one was Lasix
13  which is a diuretic. The other one Dulcolax,
14  sodium. I believe those were our forte.
15  Q        All right. So you worked for a
16  pharmacy rep for a while, and then what?
17  A        I missed patients, patient contact,
18  so I went back and sought employment as a
19  house physician at Hialeah Hospital.
20  Q        A house physician at Hialeah?
21  A        Yeah.
22  Q        All right. And to do that, did you
23  have to interim take any more testing or do
24  any more training?
25  A        No. I was working under the

Page 16

1   licensure of another physician and the
2   hospital requires that the State of Florida
3   gives you a temporary licensure to work
4   within the hospital.
5   Q        What physician did you work under?
6   A        Dr. Geraldo Carreras.
7   Q        And how long did you work as a house
8   physician?
9   A        One year.
10  Q        All right. And then what did you
11  do?
12  A        I started working for the bureau.
13  Q        All right. And were you working at
14  a facility in Miami?
15  A        In Miami.
16  Q        Which one was that?
17  A        At the time it was called MCC Miami.
18  Q        All right. And you were working as
19  a physician's assistant?
20  A        No, ma'am. I started as a PA,
21  physician's assistant.
22  Q        All right. And how long did you
23  work in that position?
24  A        Until '96.
25  Q        All right. And then what did you

Page 17

1   do?
2   A        '96 I went to Puerto Rico. Took
3   examinations of the American Board of Medical
4   Examiners, passed it, sought an internship,
5   finished an accredited internship, and got a
6   licensure in the Commonwealth of Puerto Rico
7   to work as a physician.
8   Q        Where did you do your internship?
9   A        Where?
10  Q        Yeah. In Puerto Rico?
11  A        Yeah. Central.
12  Q        A hospital there. All right.
13  A        A teaching hospital, yes.
14  Q        Okay. So that allowed you -- I
15  guess you became licensed in Puerto Rico?
16  A        Yes, ma'am.
17  Q        By virtue of that license, you could
18  come to this country as a physician then or
19  did you still have to do more testing?
20  A        I can work within the bureau, the
21  Federal system, as a physician. Yes. Not
22  otherwise.
23  Q        All right.
24  A        In certain areas of need. It
25  doesn't have to be federal, it could be

5 (Pages 14 to 17)

Page 18

1    state.
2    Q      They have programs, I guess?
3    A      Exactly.
4    Q      Okay. So you couldn't hang your
5    shingle out and practice here in Montgomery
6    as a private physician?
7    A      No, ma'am.
8    Q      All right. So by virtue of the
9    nature of your licensure, you need to stay
10   in the BOP system or something similar to
11   that with the state?
12   A      In Health Services, Bureau of
13   Prisons, federal or state, some local
14   community services as well in different
15   states.
16   Q      All right. Are you board certified?
17   A      At one time I believe you could do
18   it at the VA Hospital. I'm not sure now.
19   Q      Do you have a specialty, sir?
20   A      No, I do not. I'm a GP.
21   Q      Are you board certified in anything?
22   A      No, ma'am, I am not.
23   Q      Would you be board eligible for any
24   of the board tests even for family practice
25   or internal medicine or anything?

Page 19

1    A      No, ma'am.
2    Q      Okay. When you finished your -- was
3    it a year in Puerto Rico you were down there?
4    A      Yes, ma'am.
5    Q      And when you came back stateside,
6    what did you do then?
7    A      I worked for approximately a year,
8    close to a year, as a PA, waiting for a
9    physician's position to open.
10   Q      Still at Miami?
11   A      Still at Miami, same place.
12   Q      All right, sir. And then did one
13   become available?
14   A      Yes.
15   Q      And what year was that that you
16   started?
17   A      '98.
18   Q      1998. That's when you went up in
19   grade and became a physician within the
20   system?
21   A      That's right.
22   Q      All right. And have you stayed in
23   that grade or a higher grade since then?
24   A      I'm sorry?
25   Q      My understanding is all of those

Page 20

1    positions are a grade within the federal
2    system?
3    A      Yes, ma'am.
4    Q      My question is: Once you moved from
5    the PA grade to the physician grade, have you
6    stayed in a physician grade from that point
7    forward?
8    A      Yes. But for a different grade, I
9    went up in grade.
10   Q      Right. Over time --
11   A      Uh-huh (in the affirmative).
12   Q      -- you can move up?
13   A      Exactly.
14   Q      Within grade?
15   A      No, above grade.
16   Q      Above grade. But, I mean, you're
17   still in the physician track?
18   A      Yes, ma'am.
19   Q      You have never gone back to PA or
20   anything like that?
21   A      No, I have not.
22   Q      Okay. And still in Miami in '98
23   when you moved up?
24   A      Yeah.
25   Q      Okay. And where did you -- how long

Page 21

1    did you stay down there?
2    A      In Miami?
3    Q      Yeah.
4    A      Until I came here in October of '98.
5    Q      All right. And have you been out at
6    Maxwell this whole time?
7    A      All the time.
8    Q      All right. How was it you decided
9    to come to Montgomery from Miami?
10   A      It was a position open. I spoke
11   with the HSA that was here at the time. I
12   liked what I heard about the place. And
13   decided to come and take a look and see if
14   it would fit. Came, took a look, liked it,
15   stayed.
16   Q      Okay. Have you undertaken to take
17   any more training or tests in order to become
18   a private physician in this country?
19   A      No.
20   Q      Am I correct you do not hold an
21   Alabama medical license?
22   A      You're correct.
23   Q      Or any other state?
24   A      You're correct.
25   Q      Okay. Prior to your deposition

6 (Pages 18 to 21)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 22

1  today, sir, have you reviewed any documents?
2  A    You're talking about this document
3  with the -- with regards to this case?
4  Q    Yes.
5  A    Yes, I have.
6  Q    Have you reviewed any textbooks or
7  articles or anything like that?
8  A    No.
9  Q    Okay. Have you reviewed any
10  statements or testimony taken from anyone
11  involved with this circumstance prior to
12  today?
13  A    Yes, I have.
14  Q    Tell me about that.
15  A    I've read some testimony from the --
16  Mr. Coggin, or whatever he put down on paper.
17  Q    Okay. Anything else?
18  A    There was somebody else, another
19  inmate that I did not recall him at all.
20  Q    Statements or affidavits or
21  something of that sort?
22  A    Something of that sort.
23  Q    All right, sir. Have you ever been
24  a party to any lawsuit?
25  A    Yes, I have.

Page 23

1  Q    All right. How many times?
2  MR. DOYLE: Just for clarification,
3  can you define party, please?
4  Q    Have you ever sued anyone?
5  A    Have I ever sued anyone?
6  Q    Anyone. Yes.
7  A    Never.
8  Q    Has anyone ever sued you?
9  A    Yes.
10  Q    All right. How many times?
11  A    Actually, I'm not sure if it was me
12  or the government.
13  MR. DOYLE: That's what I was --
14  MS. COCHRUN: I see what you're
15  saying.
16  Q    Let me ask you this: Have you ever
17  been involved in any other lawsuits stemming
18  out of your job at Maxwell?
19  A    Yes.
20  Q    All right. How many others?
21  A    With this one, maybe four; three,
22  four.
23  Q    All right.
24  A    And one at least that I recall was
25  prior to me getting here and they just wanted

Page 24

1  me to examine a case to start off.
2  Q    All right, sir.
3  A    I had treated the patient
4  afterwards.
5  Q    Okay. And are any of those still
6  ongoing?
7  A    Not that I know of.
8  Q    All right. Do you recall in what
9  years those were?
10  A    No.
11  Q    Okay. Do you recall the nature of
12  the allegations in those cases, you know,
13  what they were complaining of?
14  A    Very vaguely.
15  Q    All right. Did they have to do with
16  your care and treatment? I mean, they were
17  all inmate cases, right?
18  A    Yes.
19  Q    That I think we can kind of --
20  A    Yes.
21  Q    Okay. Do you know just generally
22  what kind of problem the inmate was claiming
23  he suffered as a result of the medical
24  treatment?
25  A    Okay. It was not a result of

Page 25

1  medical treatment. It was a result of a
2  medical condition. The one case that comes
3  into mind was a patient that had -- by the
4  time he was sent to me, he had an already
5  deteriorated knee joint and he wanted knee
6  replacement. And I took it from there.
7  Q    Okay. Any other cases that dealt
8  with gastrointestinal conditions in patients,
9  GI?
10  A    The case that I told you was before
11  me.
12  Q    Yes, sir.
13  A    Was a gastrointestinal case but it
14  was not mine.
15  Q    All right. And what was the problem
16  with the inmate, what was the GI problem?
17  A    I do not remember exactly. Okay.
18  It was a young man that ended up with a
19  permanent colostomy. I believe it had to do
20  with some cancer. And, like I say, it was
21  before my time.
22  Q    All of it had transpired?
23  A    All that happened before me.
24  Q    You just were a subsequent treating
25  doctor?

301 Title Building/300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 26

1   A      Yeah. After the fact.
2   Q      Okay. Any other that come to mind?
3   A      Those are the only two.
4   Q      All right.
5   A      Well, one guy had nothing to do with
6   gastrointestinal. He was opening a door, a
7   golf cart came by, and said that he was hit
8   by the door. We did all the studies on this
9   guy, we found nothing. We sent him to a
10  specialist, and the whole nine yards. That
11  was it.
12  Q      All right, sir. Have you given any
13  other depositions prior to today in cases?
14  A      I do not remember, to be honest. I
15  do not remember.
16  Q      All right. Have you ever had
17  privileges at any facility outside of a BOP
18  facility?
19  A      In Puerto Rico.
20  Q      Puerto Rico. Okay. Have you
21  ever --
22  A      In Puerto Rico, I used to work in
23  emergency rooms.
24  Q      Okay. Within the BOP system, have
25  you ever been disciplined or demoted?

Page 27

1   A      Not that I recall.
2   Q      Have you, while in the BOP system,
3   ever been required to undergo training or
4   retraining as part of a work evaluation -- I
5   know -- well, I don't know that you have to
6   do continuing education. Let me ask you that
7   in a minute.
8          Have you ever as a part of any kind
9   of evaluation of your performance, been
10  required to undergo any additional training
11  or schooling?
12  A      Absolutely not.
13  Q      Okay. I know physicians who are
14  licensed in the private sector have to
15  maintain so much continuing medical education
16  every year. Is there any requirement like
17  that in your position?
18  A      The same.
19  Q      You have to do how much per year?
20  A      In a period of three years, I need
21  to maintain 60, at least 60 CMEs.
22  Q      60 CMEs. Okay. And does the
23  government provide the CMEs for you in a
24  program or do you have to get those outside
25  the system, so to speak?

Page 28

1   A      Some are provided to me by the BOP.
2   And most of them I take on the outside.
3   Q      All right. Do you keep track of --
4   well, I guess, do you get reimbursed by the
5   government if you do outside ones?
6   A      Yes, ma'am.
7   Q      Okay. So is there, do you think,
8   a system by which you can kind of track what
9   kind of CMEs you have in a period of time, do
10  you keep up with what courses you have
11  accomplished?
12  A      Yes. I have to prove to my
13  licensure board so I can have my license
14  renewed, the credits that I have taken.
15  Q      All right, sir. This licensure
16  board, is that a board within the BOP?
17  A      No, ma'am. It's the board of Puerto
18  Rico.
19  Q      Okay. So you're saying your CME
20  requirements are for Puerto Rico?
21  A      Yes, ma'am.
22  Q      Okay. Not for BOP?
23  A      No.
24  Q      Okay. Does the BOP have any
25  requirement of you in terms of continuing

Page 29

1   education credits?
2   A      Yes, ma'am.
3   Q      Tell me about those.
4   A      We are required to take some CMEs
5   and to maintain them on a multi basis which
6   we do in-house most of the time.
7   Q      All right. And who provides that
8   training for you?
9   A      We do it ourselves. I assign the
10  PAs to have sometimes the -- some lectures.
11  We haven't done it in the past few months.
12  We have been very busy, but we have done it.
13  Q      Are there any -- well, when I say
14  physicians, I mean people who are in the
15  grade of physician --
16  A      Right.
17  Q      -- out at Maxwell working, I mean,
18  I guess, working in the years 2000 through
19  2002, I mean, were there any other physicians
20  or were you the sole --
21  A      At the institution?
22  Q      Yes, sir.
23  A      I was a sole physician.
24  Q      Are you still the sole physician?
25  A      I'm still the sole physician.

8 (Pages 26 to 29)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 30

1  Q    And how long has that been that way?
2  A    Since '98.
3  Q    Okay. So you've been it?
4  A    I'm it.
5  Q    Okay. And you've had PAs and nurse
6  practitioners and nurses --
7  A    Yes.
8  Q    -- within the facility working with
9  you?
10 A    Yes. And I train techs and dentists
11 and --
12 Q    And eye doctors, optometrists?
13 A    Yes.
14 Q    The whole nine yards?
15 A    Exactly.
16 Q    All right. Who handles the record
17 management, you know, the medical records for
18 each of the inmates, was there a system in
19 place when you got there or have you had
20 anything to do with how the records are
21 generated and kept?
22 A    I do not understand your question.
23 Q    Okay. I meant to say that earlier.
24 That's a good point. If I ask something that
25 doesn't make sense, please tell me, and I'll

Page 31

1  try to --
2  A    That doesn't make sense.
3  Q    Good. All right. The manner in
4  which medical records are kept for inmates,
5  and what documents would be, I guess, in the
6  yellow folder that we're looking at right
7  here, that's Mr. Coggin's; is it not?
8  A    Uh-huh (in the affirmative).
9  Q    Did you have any input as to what
10 documents would be kept, how the notes would
11 be taken, what kind of things are recorded,
12 or is that generally a system in place when
13 you come to the facility? You see what I'm
14 saying? I mean, I know you're --
15 A    I'm not sure what you're driving at,
16 but let me explain to you how it works.
17 Q    Okay.
18 A    The records are kept by the medical
19 records personnel. As far as what goes
20 inside of the record, which is, I think, what
21 you're trying to say; is that correct?
22 Q    Yes.
23 A    Okay. Each provider makes the entry
24 in our 600 Form. Okay. Each consultant
25 sends their consultations and it's put on

Page 32

1  the record. Everything that happens with a
2  patient slash inmate, whether he's healthy
3  or not healthy, it's put on the record.
4  Okay.
5        Now, that includes the doctors, the
6  doctor in this case, the providers which is
7  the MLP, the PA, or the nurse practitioner,
8  the nurse. Okay.
9  Q    Okay.
10 A    Those are the guys, the people that
11 make entries in here off whatever patient
12 encounter there are. There are also some
13 times that there is a chart review that I do
14 from time to time. I'm not sure that this
15 one has one or not. That is done without a
16 patient encounter.
17 Q    Without a patient encounter?
18 A    Without a patient encounter. For
19 example, I think -- let me study the chart
20 and see how many medications are appropriate.
21 Q    All right, sir.
22 A    Or something has been done that
23 should be done different, that can be
24 happening.
25 Q    Are the cop out forms kept in the

Page 33

1  medical chart?
2  A    Yes, ma'am.
3  Q    Okay. Every patient encounter, be
4  it from getting a pill administered to, I
5  guess, any physical encounter with that
6  patient should be recorded in the chart?
7  A    Yes, ma'am.
8  Q    All right. If the patient is
9  actually not seen that day, comes to clinic,
10 brings a cop out, whatever, but is not seen
11 until the next day, will there be any
12 recording of the encounter that day?
13       I mean, if you're not actually going
14 to examine, things are going to happen the
15 next day?
16 A    A cop out is a request to see a
17 provider.
18 Q    Yes, sir.
19 A    Or any type of request.
20 Q    Sure.
21 A    So that is not sometimes put in
22 the -- in anything.
23 Q    Okay.
24 A    Okay. Patient may come to pill
25 line, and even though it was not a patient

9 (Pages 30 to 33)

301 Title Building/300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 34

1  encounter, that he was examined, but
2  something was said, it may be put in there.
3  Q    All right. But not necessarily, I
4  mean, what I'm trying to get a sense of is --
5  I'll give you an example.
6  A    Please.
7  Q    Patient comes to pill line, sees the
8  nurse, says I have a very bad headache, very
9  very bad headache, and I want to see someone
10  or I want to turn in a cop out form for a
11  request to see someone. Would that encounter
12  necessarily be -- I mean, is there a rule
13  that it would have to be written down?
14  A    The cop outs are not usually given
15  to us. They are put in a box.
16  Q    Okay.
17  A    Okay. And then the box is picked up
18  and then distributed to the providers on a
19  daily basis.
20  Q    Okay.
21  A    If the patient or an inmate comes to
22  the window or comes to us, sometimes it's not
23  written. Sometimes they come and they say, I
24  need some arch support. We don't have any.
25  We don't put it there.

Page 35

1  Q    All right. Sometimes it might be
2  that the encounter might be charted,
3  sometimes not?
4  A    If it's important, it's charted.
5  Q    Okay.
6  A    If you're talking about arch
7  supports, it may not be charted.
8  Q    I'm just trying to get to a sense
9  of, there's not like a rule or regulation
10  that every time a patient approaches a health
11  care provider in your facility --
12  A    Now you're talking different.
13  Q    Okay.
14  A    If at any time a patient approaches
15  a health provider with regards to something
16  of importance, that should be recorded in the
17  patient's chart.
18  Q    All right. Prior to your deposition
19  today, sir, did you have an opportunity or
20  have you discussed the situation with Mr.
21  Coggin's claim with any of the other health
22  care providers out at Maxwell?
23  A    Yes, I have.
24  Q    All right. Tell me who you've
25  talked to about it.

Page 36

1  A    I spoke with Rodriguez. That's it.
2  Q    That's it. Okay. Have you had any
3  discussions with any of the health care
4  providers outside of the BOP system?
5  A    No.
6  Q    Okay.
7  A    By that, you mean --
8  Q    Any other doctors or nurses?
9  A    No.
10  Q    Okay. As part of your deposition --
11  A    You're talking after the fact,
12  right? You're not talking --
13  Q    I'm not talking about --
14  A    -- during the case, during the
15  problem that was going on?
16  Q    No. I'm talking about -- we'll get
17  to that. I'm talking about after, water
18  under the bridge.
19  A    No. No. No.
20  Q    Okay. All right. Did you contact
21  anyone else once you knew of Mr. Coggin's
22  complaint? Did you contact any other health
23  care providers or anyone, for that matter,
24  about it?
25  A    After?

Page 37

1  Q    Yes.
2  A    No.
3  Q    As part of the deposition process,
4  we sent a notice to you and asked you to
5  bring certain things with you today.
6      One of them is the chart, and am I
7  right what I'm looking at in the yellow
8  folder is the original complete medical chart
9  of Mr. Coggin?
10  A    This is a copy of the original.
11  Q    Copy. All right. Where is the
12  original?
13  A    Should be at the institution. I
14  don't have it.
15      MS. COCHRUN: Is this your copy,
16  Stephen, or is it one that can be, quote,
17  "attached to the deposition" or will Kathy
18  need to make a copy?
19      MR. DOYLE: We'll need to make a
20  copy. Yes.
21      MS. COCHRUN: All right. But that's
22  responsive, I guess, to Number 1 on the
23  request?
24      MR. DOYLE: Yes.
25      MS. COCHRUN: Okay. Good.

10 (Pages 34 to 37)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 38

1    Q    The second request is any and all
2    records or documents, any kind of paper,
3    basically, that you have recorded information
4    regarding Mr. Coggin during his
5    incarceration.
6          And that would mean -- I know
7    there's tons of other papers on Mr. Coggin
8    in the system, but ones where you would have
9    recorded any kind of medical information, or
10   requests for anything, or would they all be
11   housed in there?
12   A    Everything should be in here.
13   Q    If you touched it, it ought to be in
14   there?
15   A    Yeah.
16   Q    Okay. Good. The third request was
17   about a CV, and I think we've talked through
18   your training?
19   A    Yes.
20   Q    And am I correct, you have not
21   brought any articles that you have written
22   or any studies or anything you've done?
23   A    No.
24   Q    Am I correct that you have not done
25   any, that's why you have not brought them?

Page 39

1    A    Correct.
2    Q    Okay. Good. The fourth request
3    is any article, treatise, other written
4    documentation supporting your contentions
5    that you met the standard of care in Mr.
6    Coggin's treatment?
7    A    I do not understand what you just
8    said.
9          MR. DOYLE: And I'm objecting to
10   that request to the doctor. That's our legal
11   defense.
12   Q    Okay. Well, the purpose of that
13   request was to ask you if there were any
14   articles in the medical literature or any
15   textbooks or anything that you believe
16   supports the idea that the standard of care
17   was given to John Coggin.
18         Are there any texts or books or
19   anything that you relied on or utilized in
20   your treatment of him in this circumstance?
21   A    Only the articles that I have read
22   throughout my lifetime as a physician and as
23   a PA.
24   Q    Nothing specific?
25   A    No.

Page 40

1    Q    Okay. Is there any specific
2    textbook that you utilized in your position
3    as a physician?
4          I mean, I know over the years
5    there's been lots. But let me kind of limit
6    it to a period of time, maybe 2000 to 2002.
7          Any specific internal medicine
8    textbooks, or general medicine,
9    gastroenterological textbooks that you
10   utilize in your practice?
11   A    I use a lot of reference books
12   because I read a lot of journals. Harrison's
13   Internal Medicine is one of them. Karin's D
14   iagnosis and Treatment is another one. Washi
15   ngton Manual is another one.
16   Q    All right, sir. You said that you
17   read a lot of the journals. Are there
18   specific ones that you subscribe to?
19   A    Yeah. I receive quite of bit of
20   journals, depending on the article that I'm
21   interested in I read them. I do not read
22   them all.
23   Q    Okay. Fair enough. Is there any
24   specific area of medicine that you are, I
25   guess, focused on or interested in?

Page 41

1    A    As a general practitioner I read
2    sometimes cardiovascular, sometimes I read
3    diabetic hypertensive surgery, it all
4    depends.
5          MS. COCHRUN: I'm going to mark the
6    deposition notice as 1.
7
8          (Whereupon, Plaintiff's Exhibit
9          Number 1 was marked for
10         identification.)
11
12   Q    Also, this next series of questions
13   I'm just going to ask you about are different
14   folks and what your understanding is of the
15   information they may have in regards to Mr.
16   Coggin.
17   A    Different folks?
18   Q    People.
19   A    Okay.
20   Q    Sorry.
21   A    No problem.
22   Q    Okay. Because they have been listed
23   as people who may have information about the
24   defense of this claim. And so I want to get
25   a sense of what you know and what you know

11 (Pages 38 to 41)

ASSOCIATED COURT REPORTERS. LLC
(205) 251-4227 / FAX (205) 251-4224

Page 42

1    they may have in terms of that defense.
2    Okay?
3         Cathy Adams is a nurse at Baptist
4    Medical Center when Mr. Coggin was inpatient.
5    A    Okay.
6    Q    Do you have any idea who she is?
7    A    None.
8    Q    Okay. Rosetta Bailey, and she was a
9    case manager at the federal prison camp
10   during his incarceration?
11   A    Yes.
12   Q    Do you have any information about
13   what Ms. Bailey may have to offer in terms of
14   a defense of this claim?
15   A    None.
16   Q    All right. Danny Brown, counselor
17   at Maxwell?
18   A    I know him. I do not know.
19   Q    How about we'll do this: I'll give
20   a name, if you know of something they may
21   have to offer in terms of a defense of this
22   claim, you let me know and maybe we'll get
23   through this quick, okay?
24   A    Okay.
25   Q    Steve Burns, correctional officer?

Page 43

1    A    No.
2    Q    Okay. Louie Cummings at Kirklin,
3    he's one of his subsequent treating doctors.
4    I imagine not, right?
5    A    Nothing.
6    Q    Okay. Carla Davis, a nurse at
7    Baptist?
8    A    Nothing.
9    Q    Okay. Freddie Davis, a correctional
10   officer at the facility?
11   A    I know the guy. That's it.
12   Q    Okay. C. J. DeRosa, who was the
13   warden during his --
14   A    Yes. Well, I know him, but that's
15   it.
16   Q    Okay. Do you recall any interaction
17   with the warden about Mr. Coggin or his
18   circumstance, stemming out of this episode?
19   A    No.
20   Q    You don't recall having any
21   conversations with the warden about Mr.
22   Coggin?
23   A    I don't remember any conversations
24   about him.
25   Q    Okay. Have you had any

Page 44

1    conversations with him since then?
2    A    No.
3    Q    Do you know where Mr. DeRosa is now?
4    A    The last I've heard, he was going to
5    Phoenix. But I don't know anything more,
6    just --
7    Q    Okay. Within the system but
8    transferring?
9    A    I'm not sure if it's in the system
10   or outside the system.
11   Q    Okay. Beverly Downs, who is a
12   nurse?
13   A    Yes.
14   Q    Do you know of anything she has to
15   offer in terms of information about this
16   claim or the defense of this claim?
17   A    No, ma'am.
18   Q    Okay. Darryl Drew, the associate
19   warden?
20   A    No, ma'am.
21   Q    Did you have any conversations with
22   him at all at the time of Mr. Coggin's
23   incarceration regarding his medical care?
24   A    If I did, I do not remember.
25   Q    Okay. Daphne Essex, a nurse

Page 45

1    practitioner?
2    A    Yes, ma'am.
3    Q    Do you know if she has anything
4    to offer in terms of information about the
5    defense of this claim?
6    A    She was -- she made the appointment
7    with the specialist so the specialist could
8    see him upon review of the case, that I can
9    recall, for the appointment to see the
10   outside specialist when it -- and she also
11   talked to the specialist as to what the
12   specialist on the outside had planned to do
13   with Mr. Coggin.
14   Q    All right. I'm going to try to pull
15   those people back in chronologically as we go
16   through the facts. But as far as a one on
17   one conversation with Ms. Essex or any
18   specific involvement with Ms. Essex, are you
19   relying on what you have seen in the chart --
20   A    Yes, ma'am.
21   Q    -- in terms of that recollection?
22   A    Yes, ma'am.
23   Q    You don't remember, she and I sat
24   down and had a conversation about this?
25   A    No.

12 (Pages 42 to 45)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 46

1   Q      So your understanding is --
2   A      And I do remember answering
3   something for the warden, but I don't
4   remember the warden telling me anything about
5   it.
6   Q      Okay. We'll go through the
7   documents. Okay. And I'm trying to look for
8   kind of what you've gleaned from the chart
9   and if there's some independent thing of, you
10  know, this person and I sat down and talked
11  about this or we had this conversation, you
12  know, anything like that. My job today is to
13  try to get as many facts as I can. Okay.
14  A      No problem.
15  Q      Then we have Tiffany Estep?
16  A      Yes.
17  Q      She is a corrections officer, or was
18  at the time?
19  A      Was a corrections officer.
20  Q      Any understanding of what she may
21  have to offer in this regard?
22  A      No.
23  Q      Okay. Andre Farley, corrections
24  officer?
25  A      I believe he was a captain, but no.

Page 47

1   Q      Okay. D. Fulmar, who was a
2   pharmacist at the facility, do you even
3   know --
4   A      I know who you're talking about. I
5   know the people that you're talking about but
6   not that they have anything to do with it.
7   Q      Is it a Mr. or Mrs. Fulmar, male or
8   female?
9   A      Mr. David Fulmar, I believe.
10  Q      And is he still out at the facility?
11  A      No, ma'am.
12  Q      All right. When did he leave?
13  A      Since then we had a -- we have our
14  present pharmacist, so three years ago, four
15  years ago, maybe five. Between three and
16  five.
17  Q      Okay. Did he leave on good terms?
18  A      Yes.
19  Q      Okay. Good. We have Officer Frost
20  who is a corrections officer?
21  A      Vaguely remember him.
22  Q      But nothing that connects to this?
23  A      No.
24  Q      Okay. John Hendricks who was over
25  at Baptist, did you even have any

Page 48

1   conversations with that physician?
2   A      Not that I recall.
3   Q      All right. Charlie Hudson, who used
4   to be in the education department?
5   A      Yes.
6   Q      Do you recall having any
7   conversation or interaction with Mr. Hudson?
8   A      No.
9   Q      Not about Mr. Coggin?
10  A      No.
11  Q      Do you know what he has to offer in
12  terms of information in this case?
13  A      Not really.
14  Q      Okay. Jim Johnson, he was an inmate
15  during the time Mr. Coggin -- this situation
16  was evolving, do you recall him?
17  A      I don't recall him and I don't
18  recall the statement that he made.
19  Q      Okay. So you've had a chance to
20  look at that and --
21  A      Uh-huh (in the affirmative).
22  Q      Okay. Alex Kreher, he was the
23  surgeon over at Baptist that did the repair.
24  Okay. Ramona Lake --
25  A      Yes.

Page 49

1   Q      -- she's a nurse practitioner. Tell
2   me -- she's no longer at the facility?
3   A      No.
4   Q      Did she leave on good terms?
5   A      Yes.
6   Q      Okay. Good. What, if anything,
7   does she have to offer about this
8   circumstance?
9   A      I don't think anything.
10  Q      Okay.
11  A      To be honest.
12  Q      Doris Little, nurse practitioner?
13  A      She was one of our nurse
14  practitioners and she saw him on a couple of
15  occasions at least.
16  Q      Okay. Any conversations with Doris
17  or any specific information outside of the
18  chart that you're aware of?
19  A      No.
20  Q      Do you have any recollection of her
21  coming to you at any time and inquiring about
22  Mr. Coggin or having any concerns about Mr.
23  Coggin?
24  A      I don't recall, but all of my staff,
25  I have an open door policy with them, and

13 (Pages 46 to 49)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 50

1  they can come and consult with me at any
2  particular time, how is somebody doing, what
3  have you, but I don't recall.
4  Q    All right.
5  A    It could have happened. I don't
6  recall.
7  Q    All right. A Walter Martin who is a
8  PA?
9  A    Yes, ma'am.
10  Q    And where is Walter now?
11  A    I have no idea.
12  Q    Did he leave on good terms?
13  A    Yes, ma'am.
14  Q    All right. Do you know what he has
15  to offer in terms of this circumstance?
16  A    Not from what I read in there.
17  Q    I didn't see his name either.
18      You don't recall any independent
19  conversations about Mr. Coggin's health
20  stemming out of this circumstance?
21  A    With Walter Martin?
22  Q    Yes, sir.
23  A    No.
24  Q    All right. Ivan Maya? And he is an
25  internist or do you know?

Page 51

1  A    He's an internist, yes.
2  Q    All right. And he was at Baptist?
3  A    Uh-huh (in the affirmative).
4  Q    Did you have any conversations with
5  him regarding Mr. Coggin?
6  A    I remember talking to him on the
7  phone about the patient, that the patient was
8  in whatever condition it was, what was the
9  consistency, what did we talk about, I don't
10  recall. I think it was specifically just
11  telling me how the patient was, but honestly
12  I do not recall.
13  Q    And that was after he was admitted?
14  A    That was after he was admitted,
15  absolutely.
16  Q    Do you know Dr. Maya outside of your
17  work, I mean, do you know him socially or
18  professionally outside of work?
19  A    Yes.
20  Q    All right, sir.
21  A    But not as a friend, I just knew
22  him.
23  Q    All right. Knew him to see and
24  speak?
25  A    To see and speak, yes. He was --

Page 52

1  Dr. Maya, so that you know how I know him,
2  Mr. Maya used to be, before they had clinical
3  director there, he used to be the contract
4  clinical director. So that's how come I know
5  him.
6  Q    All right. So he was the facility
7  physician before you came?
8  A    Yes.
9  Q    All right. Was he doing the
10  training of you or teaching you the ropes,
11  so to speak, when you got here?
12  A    Not at all.
13  Q    All right. Did you have to work
14  with him on any level initially or since?
15  A    Not at all.
16  Q    Okay. Got a Nurse McCall at
17  Baptist?
18  A    Does not ring a bell.
19  Q    All right. Clarence Morris is a
20  unit manager?
21  A    Yes, ma'am.
22  Q    Obviously he's still there?
23  A    Yes.
24  Q    And you know him?
25  A    Yes.

Page 53

1  Q    All right. Do you know anything
2  that he has to offer in terms of information
3  or evidence in this case?
4  A    No, ma'am.
5  Q    Okay. Dereck Mosley who was an
6  inmate?
7  A    Doesn't ring a bell.
8  Q    Okay. Joseph Murale, who was a
9  Unicort employee working at the facility
10  during Mr. Coggin's incarceration?
11  A    It doesn't ring a bell.
12  Q    And what is a Unicort employee?
13  A    A Unicort is a separate facility and
14  it's part of the bureau. And in this
15  particular town, what they do is, they wash
16  the clothes and sheets and what have you, and
17  our inmates work at Unicort. It's a separate
18  facility within the base outside of our camp.
19  Q    It's like the laundry work center?
20  A    Basically, yes.
21  Q    Okay. And you have no idea what he
22  has to offer in this regard?
23  A    None.
24  Q    Okay. Nelda, L-n-u, who is a nurse
25  at Baptist?

14 (Pages 50 to 53)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 54

| | | |
|---|---|---|
| 1 | A | Neither. |
| 2 | Q | Okay. Geraldo Ottero? |
| 3 | A | Yes, ma'am. |
| 4 | Q | And he's a PA? |
| 5 | A | He was a PA. |
| 6 | Q | Okay. |
| 7 | A | He works in another department now. |
| 8 | Q | What is he doing now? |
| 9 | A | He works in drug addiction program |
| 10 | | there. |
| 11 | Q | Do you know what he has to offer in |
| 12 | | regards to this circumstance? |
| 13 | A | I don't know. I don't think |
| 14 | | anything. |
| 15 | Q | Okay. Mac Pachell? |
| 16 | A | Pachell. |
| 17 | Q | He was PA at the time? |
| 18 | A | Yes, he was. |
| 19 | Q | And where is he now? |
| 20 | A | Living somewhere -- he's retired. |
| 21 | | Lives somewhere around here. I don't know |
| 22 | | where. |
| 23 | Q | But he's retired from there? |
| 24 | A | Yes, ma'am. |
| 25 | Q | Was he a true PA in the sense that |

Page 55

| | | |
|---|---|---|
| 1 | | he was a trained PA? |
| 2 | A | PAC. |
| 3 | Q | PAC. Okay. What we typically hear |
| 4 | | of PAs as opposed to someone with other |
| 5 | | training that was working in that slot? |
| 6 | A | Uh-huh (in the affirmative). |
| 7 | Q | Okay. Do you know what he has to |
| 8 | | offer in this regard? |
| 9 | A | I don't know, but I don't think |
| 10 | | anything. |
| 11 | Q | Okay. Anita Ramadue, who is a case |
| 12 | | manager, do you know what she has to offer? |
| 13 | A | No. |
| 14 | Q | Okay. Ronald Rankin, who was an |
| 15 | | inmate? |
| 16 | A | He rings a bell. I don't think |
| 17 | | anything. |
| 18 | Q | Okay. Cherry -- is it Rape or -- |
| 19 | | R-a-p-e, she was a social worker? |
| 20 | A | Who? Again, please. |
| 21 | Q | Let me show you. I want to make |
| 22 | | sure. |
| 23 | A | Does not ring a bell. |
| 24 | Q | Okay. And it's spelled C-h-e-r-r-y, |
| 25 | | Cherry Rape. Okay. |

Page 56

| | | |
|---|---|---|
| 1 | | Sandra Reese, nurse at Baptist? |
| 2 | A | No. |
| 3 | Q | Charles Reed, physician at Baptist, |
| 4 | | do you recall any interactions with him? |
| 5 | A | No, not with him. No. |
| 6 | Q | Okay. Oscar Rodriguez? |
| 7 | A | Yes. |
| 8 | Q | He was a PA at the time? |
| 9 | A | He still is. |
| 10 | Q | All right. And he is still at the |
| 11 | | facility? |
| 12 | A | Yes, ma'am. |
| 13 | Q | Working directly under you now? |
| 14 | A | Yes, ma'am. |
| 15 | Q | And I will get into -- I mean, Oscar |
| 16 | | was more involved in this circumstance, |
| 17 | | correct? |
| 18 | A | Yes, ma'am. |
| 19 | Q | All right. We'll go about what you |
| 20 | | know and what he knows and all of that in a |
| 21 | | few moments. |
| 22 | | Pam Zeigler, nurse at Baptist? |
| 23 | A | No. |
| 24 | Q | Okay. There's a nurse Shay at |
| 25 | | Baptist? |

Page 57

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Thomas Sinwell, who was the |
| 3 | | pharmacist at Baptist? |
| 4 | A | No. |
| 5 | Q | I mean, I'm sorry, that's -- |
| 6 | A | I forgot. Thomas Sinwell, that's |
| 7 | | the one that was there when I got there. |
| 8 | Q | Thomas Sinwell was the pharmacist? |
| 9 | A | Yeah. He was the pharmacist. |
| 10 | Q | Do you know of anything that he has |
| 11 | | to offer? |
| 12 | A | I don't think so, but I don't know. |
| 13 | Q | I have a Dr. Phil D. Smith at |
| 14 | | Baptist? |
| 15 | A | Doesn't ring a bell. |
| 16 | Q | Okay. Lieutenant Snyder, Brittain |
| 17 | | Snyder, corrections officer at Maxwell? |
| 18 | A | I know who he is. |
| 19 | Q | Do you know what he has to offer in |
| 20 | | regards to this circumstance? |
| 21 | A | No. |
| 22 | Q | Do you recall any conversations with |
| 23 | | Snyder during the times surrounding this |
| 24 | | circumstance? |
| 25 | A | I do not recall any conversations |

15 (Pages 54 to 57)

301 Title Building/300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 58

1  with -- any specific conversations with him.
2  I may have spoken with him, yes, but I don't
3  recall in specific.
4  Q    All right. A. P. Vining?
5  A    Who?
6  Q    A. P. Vining, Dr. Vining?
7  A    She was a radiologist. I don't
8  recall. I may have spoken to her but I don't
9  know.
10  Q    Okay. She read films?
11  A    Yeah. I used to talk to her all the
12  time on the films that I wanted her to read
13  or re-read or what have you. But I don't
14  recall in this case in particular that I have
15  spoken to Dr. Vining in regards to this
16  patient at all.
17  Q    Okay. Then there is a Thomas West,
18  corrections officer?
19  A    I know him very slightly.
20  Q    Okay. Nothing comes to mind from
21  this?
22  A    No.
23  Q    Okay. Dr. Pam White over at
24  Baptist?
25  A    No.

Page 59

1  Q    Antonio Williams, a physician
2  who examined Mr. Coggin in August of 2001?
3  A    Yes.
4  Q    Did you know Dr. Williams prior to
5  Mr. Coggin's interaction with him?
6  A    Yes. We send them patients.
7  Q    All right. How is it that you would
8  choose, for example, if you wanted him to see
9  a GI specialist or a surgeon or whatever, an
10  inmate, how is it that you choose the
11  consultant physician for an inmate?
12  A    From the community we have learned
13  that some physicians agree to see inmates.
14  And some physicians do not. We try to choose
15  from the good physicians in town who want to
16  see our inmates, and we make a habit of
17  sending our inmates to those that we know
18  that would be seen as soon as possible rather
19  than --
20  Q    So you kind of have a list by virtue
21  of historically who is accessible and who
22  isn't as accessible?
23  A    Exactly.
24  Q    Okay. Has Dr. Williams been on your
25  list for some time?

Page 60

1  A    Dr. Williams sees our patients on a
2  regular basis.
3  Q    Okay. Any other surgeons that you
4  use on a regular basis other than Williams?
5  A    Not for urology, neurological
6  surgeries or procedures, any other physicians
7  in town that would take our patients.
8  Q    All right. Ruth Yancey?
9  A    She was a warden there.
10  Q    Do you know what she has to offer in
11  this regard?
12  A    I don't know. None. I don't think
13  so.
14  Q    All right. We have a Ray Heaton,
15  he's a Baptist nurse.
16  A    No.
17  Q    Okay. And Mario Canizares --
18  A    No.
19  A    I'll let you look at that and see.
20  A    Mario Canizares. It should be
21  Canizares --
22  A    With an A in there?
23  A    With an A in there. Right. But I
24  have no idea who that person is.
25  Q    Okay. All right. Do you know a

Page 61

1  case manager at the camp whose name is Ms.
2  Beasley?
3  A    Rings a bell. I do not believe that
4  Ms. Beasley is there any more.
5  Q    Okay. One of the guards whose name
6  is Ramadue, maybe that's the same person as
7  Ramado?
8  A    Could be. I know her, yes.
9  Q    All right.
10  A    And it's misspelled.
11  Q    The setup of the medical facility at
12  Maxwell, can you kind of give me the outline
13  of, I mean, do you have a direct superior
14  over you?
15  A    Yes. Everybody has.
16  Q    Who is that?
17  A    I have several.
18  Q    All right, sir.
19  A    One is the assistant warden.
20  Q    All right.
21  A    Two is the warden. And three, like
22  I told one of my patients yesterday, I
23  consider all 1,100 inmates there are my
24  superiors. They are my bosses because I have
25  to respond to them.

16 (Pages 58 to 61)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 62

1   Q      All right. Are you the clinical
2   director of the facility?
3   A      Yes, ma'am.
4   Q      Is there a medical administrator?
5   A      No, ma'am. There's a clinical
6   administrator.
7   Q      Clinical administrator. And who is
8   that?
9   A      At this time?
10  Q      Yes, sir.
11  A      Mr. Barry -- James Barry Metoyer,
12  and it's spelled, M-e-t-o-y-e-r, I believe.
13  Q      And what is a clinical
14  administrator's job duty or what are they
15  administering?
16  A      The administration part of the
17  clinic. In other words, paying bills, how is
18  the clinic run, a sense of do we have enough
19  personnel that they are making the
20  scheduling, things of that nature.
21  Q      All right. But am I correct that
22  you as clinical director, are over all the
23  PAs, the nurses, pharmacists, and nurse
24  practitioners?
25  A      Yes, ma'am.

Page 63

1   Q      All right. Do you have a part in
2   the hiring of these individuals to work?
3   A      A part, yes.
4   Q      I mean, they have to go through this
5   system, but --
6   A      Not only that, they have to be
7   interviewed by several people.
8   Q      All right. Who else would have to
9   interview them?
10  A      Typically it would be the Health
11  Services Administrator, the warden, or
12  assistant warden, the psychologist, and
13  myself.
14  Q      Okay.
15  A      That's the final interview, by the
16  way.
17  Q      Okay. All right. Now, my
18  understanding is that the clinic and the
19  medical care that is administered to the
20  inmates at the facility is, I mean, operates
21  under regulations that would apply to all
22  medical facilities in the federal system?
23  A      Yes.
24  Q      Okay. I mean, there are rules and
25  regulations that you must go by in processing

Page 64

1   the inmates through the medical clinic; is
2   that correct?
3   A      Yes, ma'am.
4   Q      All right. And the requirements of
5   the medical staff in terms of what they are
6   required to do under those regulations, are
7   those distributed to them and are they
8   trained so that they know what the
9   requirements are for certain circumstances
10  as they presented in the medical facility?
11  A      Yes, ma'am.
12  Q      All right. Are those regulations
13  available to your staff so if they have a
14  question about how they should handle certain
15  circumstances as they present within the
16  health care, they can refer to them so they
17  have got guidelines?
18  A      Yes, ma'am.
19  Q      And I would imagine as director, you
20  have to be intimately aware of what those
21  regs, procedures, policies involve so that
22  you can also guide them in administering
23  those?
24  A      Yes, ma'am.
25  Q      All right. In 2001, the Spring of

Page 65

1   2001, did the manner and method by which
2   inmates could obtain medical care change
3   somewhat from the prior system?
4         And let me tell you what I
5   understand the prior system was. Prior to
6   the Spring of 2001, there was a sick call
7   between 6:00 a.m. and 6:20 every day except
8   Wednesdays where people with medical problems
9   could report and then would be assigned to
10  someone to see them.
11        Do you recall that being the way it
12  was run?
13  A      Yes.
14  Q      And it would be everything from a
15  cold, the flu, sinus, whatever, all the way
16  up to medical emergencies, from 6:00 to 6:20,
17  basically, you could come to the medical
18  clinic and voice your need and have care
19  assigned to you accordingly?
20  A      Yes, ma'am.
21  Q      All right.
22  A      I still do.
23  Q      All right. Now, back in that period
24  of time, would the medical clinic waiting
25  room, that's where inmates would come, I

17 (Pages 62 to 65)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 66

1  guess, to interface with you all, they
2  couldn't just come straight back into the
3  clinic, correct. I mean, without being let
4  in, it was a locked unit?
5  A      Basically, yes.
6  Q      Okay. But prior to the Spring of
7  2001, would there be a staff person in the
8  waiting room or that initial area twenty-four
9  hours a day or was it just manned during the
10  sick call time?
11  A      In the reception area?
12  Q      Yes.
13  A      Just during those hours.
14  Q      All right. Now, in terms of
15  staffing and I'm going to ask in 2001, how
16  many people, I guess, in a twenty-four hour
17  period, how did you staff the clinic or the
18  medical care?
19  A      Yeah. We still have the same
20  schedule, 6:00 to 6:00. 6:00 in the morning
21  until 6:00 in the afternoon. Actually, 6:30
22  in the afternoon Monday through Friday.
23  Weekends and holidays, 8:00 to 6:00. Now,
24  6:30.
25  Q      All right. And what -- let's talk

Page 67

1  like a weekday, in the 6:00 to 6:30 window,
2  who all would be available to see patients?
3  A      The PAs.
4  Q      Would both -- you have two PAs?
5  A      At that time I had, I believe, three
6  PAs, and a nurse practitioner, I believe.
7  And then nurse practitioners, I think I have
8  like about four.
9  Q      On a typical shift you would have --
10  A      Two or three.
11  Q      Two or three?
12  A      At least.
13  Q      All right. People would rotate
14  through -- would they work the weekends, too,
15  or would you have a separate weekend staff?
16  A      At the time we had a nurse to cover
17  weekends.
18  Q      Not a nurse practitioner but a
19  nurse?
20  A      No. RN.
21  Q      RN. All right. So from 6:00 to
22  6:30, would you be there every day Monday
23  through Friday?
24  A      No.
25  Q      Okay. Tell me about your schedule.

Page 68

1  A      My schedule is 8:00 to 4:30, which
2  I never get out of there until at 4:30. It's
3  always around 6:00.
4  Q      I know that feeling.
5  Would you be there Monday through
6  Friday, though?
7  A      Yes, ma'am.
8  Q      All right. And the PAs and nurse
9  practitioners would be there from 6:00 to
10  6:30 or did you have another shift or --
11  A      Some come at 6:00 and leave at 4:30.
12  The other ones come at 8:00 and leave at
13  6:00.
14  Q      Got you.
15  A      So we can cover a twelve hour
16  period.
17  Q      All right. And then on the weekends
18  and holidays, you would have an RN available?
19  A      RN.
20  Q      Okay. After 6:30 and until 6:00
21  a.m. the next morning, what medical providers
22  would be -- I'm going to ask it two ways.
23  What medical providers would actually be at
24  Maxwell during that time?
25  A      Physically?

Page 69

1  Q      Physically.
2  A      Unless we're called in, nobody.
3  Q      And did you have an on-call system?
4  A      Yes, we do. We did and we do.
5  Q      All right.
6  A      Basically, I am the person that they
7  call first. And if I'm not available, they
8  call one of the PAs.
9  Q      All right. Do you carry a beeper
10  or do they just call you at home, or how does
11  that work?
12  A      Right now I'm carrying a pager. I
13  used to carry a telephone, cell phone.
14  Q      Okay. Back during the time that Mr.
15  Coggin was being treated, I guess 2001, were
16  you utilizing the phone?
17  A      I believe so, but I'm not sure.
18  Q      So would you be on call twenty-four
19  hours a day, essentially, seven days a week?
20  A      Yes, ma'am.
21  Q      Did the government compensate you
22  for that time?
23  A      I think they do.
24  Q      Okay. All right. Let me ask you
25  this: Were you required to have your phone

18 (Pages 66 to 69)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 70

1   on and be absolutely available 24/7 seven
2   days a week?
3   A       Yes, ma'am.
4   Q       Okay. The reason I ask is you said
5   if they couldn't get you, then they would
6   call the PA?
7   A       Right.
8   Q       So if they called the phone --
9   A       In case there is a phone failure,
10  I'm out of --
11  Q       You're in the shower?
12  A       I'm in the shower, exactly.
13  Q       Okay.
14  A       And there is an emergency, then they
15  call the PA. If it is a true emergency,
16  however, all the officers there know enough
17  to send the patient out and then tell us
18  afterwards, which has happened on many
19  occasions.
20  Q       Okay.
21  A       If there's a true emergency, they
22  don't call me.
23  Q       Okay.
24  A       He goes out, or she if it was in
25  another facility.

Page 71

1   Q       All right.
2   A       And then the next day or that same
3   night, Doc, I had to send so and so out.
4   Q       And that's probably in their
5   training and their procedure that if they
6   have to send somebody over emergently, they
7   either get ahold of you or at some point get
8   in touch with you and let you know you have
9   an inmate out in an outlying facility?
10  A       Yes.
11  Q       Is there a specific hospital that
12  Maxwell contracts with for emergent care?
13  A       We don't have a contract.
14  Q       Or that you all use?
15  A       We don't have a contract, a formal
16  contract, but we use Baptist South for most
17  of our cases, emergency cases.
18  Q       What kind of training do the
19  officers have in terms of evaluating what is
20  emergent or serious enough to warrant a call
21  to you or the PAs?
22  A       They do know CPR. They do have
23  the -- they didn't have the EMS at the time.
24  They do have it now, though. It's basically
25  based on common sense. If you see somebody

Page 72

1   that is bleeding or somebody that is having
2   problems breathing, or somebody is having
3   chest pains, that constitutes something that
4   needs to be attended.
5           There are instances basically the
6   same as you would treat your child, your
7   mother, your father, your husband, in a
8   particular case. They have something they
9   think they should send them to the emergency
10  room, hey, Doc, this guy is going out.
11  Q       Okay.
12  A       Or, hey, Doc, do you think this guy
13  should go out?
14  Q       The inmates themselves, though,
15  cannot demand to be carried to the emergency
16  room, I mean, if I was an inmate there, and I
17  said something like, you know, I feel so ill
18  I believe I need to be seen in the
19  emergency -- like if I was out in the private
20  sector, I was not incarcerated, because you
21  were using the example, use common sense, if
22  you take your kid in, your husband in.
23          But I want to get a sense of an
24  inmate who might, using their own common
25  sense, and decide they want to get to an

Page 73

1   emergency room because they feel so ill they
2   feel like they need emergent care, how do
3   they go about getting that to occur?
4   A       They would have to contact the
5   officer, and the officer, if it's something
6   like -- I have seen patients that say, I have
7   such a bad cold, I want to go to the
8   emergency room. I'm sorry, you're not going
9   to go to the emergency room for a bad cold.
10          If you're an asthmatic that is
11  having trouble breathing and has a cold
12  because of that, that is different, and that
13  patient goes out to the emergency room.
14  Q       So the officers -- and I'm talking
15  after hours.
16  A       Right.
17  Q       After hours, the officers had to
18  make that call to --
19  A       Officers inform me, and I have to
20  make that call.
21  Q       I guess that's my question.
22  A       Or the PA.
23  Q       If the inmate said, I want to go to
24  the ER, I feel so ill, and --
25  A       What is it that you feel?

19 (Pages 70 to 73)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 74

1   Q      Right. How do you feel. And he
2   says, I just have a very bad stomach ache
3   and I'm vomiting, would that --
4   A      What color is your vomitus.
5   Q      Okay. And so what I'm trying to
6   get to is, are these officers trained to ask
7   those series of questions?
8   A      This is not the officer who's
9   answering these questions. It is me or the
10  PA. I send these questions to the officer,
11  to ask the inmate, and for the inmate talking
12  to the PA or me on the phone directly.
13  Q      So your understanding of how this
14  should work is, if a patient or an inmate
15  comes to an officer after hours and says, I
16  am very ill and I really feel like I need
17  emergent care, I mean, the first step is to
18  find out what the problem is generally. And
19  then he is to call either you, meaning the
20  officer, or whoever is on call, the PA, and
21  either -- I mean, let him talk to the patient
22  over the phone, or he asks questions as
23  prompted by the medical person, to get to the
24  bottom of it to make a decision as to whether
25  indeed go to the ER or it can be handled the

Page 75

1   next day?
2   A      Correct.
3   Q      Okay. Have you, during the time you
4   have been the medical director there,
5   discovered circumstances where inmates ask
6   for care from an officer but you were not
7   called, and then the next day or whenever,
8   you do get into the situation, in retrospect,
9   I wish they had called me in, if they were
10  ill enough, they really should have called me
11  about that?
12  A      Would you please repeat that?
13  Q      Sure. In the time you've been the
14  medical director there, have you ever had any
15  circumstances where you felt that the
16  corrections officers did not call you when
17  they should have called you when an innate
18  was complaining?
19  A      Not that I recall.
20  Q      Okay. In the Spring of 2001, did
21  the method by which inmates were followed
22  in the clinic change somewhat to a more --
23  I don't want to say managed care, but as
24  opposed to me getting a random assignment of
25  an inmate whoever -- whatever day he showed

Page 76

1   up with a problem, instead as an inmate I
2   would have a specific PA, nurse practitioner,
3   who would be my clinical health care
4   provider, I guess, for my staff?
5   A      I'm not sure when it changed but,
6   yes, it did change. It could have been
7   around that time.
8   Q      All right. And the reason I ask
9   is Mr. Coggin was there from '99 until after
10  this in 2001, but his recollection is that
11  when he first got there, it was pot luck.
12         You got whoever, you sign your form,
13  whatever, it could be -- you could see every
14  single person in the system over your time
15  there?
16  A      You still can if the provider is not
17  available.
18  Q      Right. But, I mean --
19  A      But it became more organized.
20  Q      Right. And he had had --
21  A      But I don't know when it happened.
22  It may have happened in his time.
23  Q      Right. He just recalls that he had
24  high blood pressure, he tended to see after
25  the Spring of 2001, he was assigned to

Page 77

1   Rodriguez pretty much but for, like you said,
2   somebody being unavailable, Rodriguez was his
3   assigned person?
4   A      Probably.
5   Q      Is that your recollection of how the
6   system kind of changed up at some point where
7   there was more continuity in terms of the
8   same provider?
9   A      Yes. When did it change, I do not
10  remember, but basically --
11  Q      All right. And would the inmate
12  then, after it switched to that kind of
13  system, would you actually have to sign a
14  cop out to see Rodriguez, or a cop out to
15  see Little, as opposed to just signing a
16  general cop out?
17  A      Basically, the inmate sometimes did
18  not even request to see somebody. They just
19  stated the problem in the cop out, they
20  wanted to see a medical provider. And if it
21  was at the time that we had changed already
22  to an assigned provider, he went to the
23  provider.
24  Q      Okay.
25  A      If there was not the provider

20 (Pages 74 to 77)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 78

1   available, somebody else took the load.
2   Q      All right.
3   A      And depending on what the patient
4   put on that cop out or that request, then he
5   will be seen on prioritization just like on
6   the outside.
7   Q      All right.  Was there also, when you
8   would fill out a cop out, would there usually
9   be a twenty-four hour, if you filled out the
10  cop out today -- well, not Friday, but during
11  the week, would you see that provider the
12  next day, your appointment would be assigned
13  the next day by and large?
14  A      Not necessarily.
15  Q      Okay.
16  A      When the provider sees -- reads the
17  cop out, and feels that the patient should be
18  seen today, he may be called over the loud
19  speakers.
20         If from what the patient puts down,
21  it's not something that -- if it's low back
22  pain that he has had for three months, and
23  the patient states so, well, that is not a
24  true emergency.  And he can be seen the next
25  day or whenever there's an opening.

Page 79

1   Q      Okay.  I heard there's a computer
2   sheet --
3   A      Let me clarify something.
4   Q      Okay.
5   A      We still do have what we call sick
6   call, which is from 6:00 to 6:20.  And if
7   they need or feel they need immediate
8   attention, they can go at that time to be
9   evaluated.
10  Q      All right.
11  A      And then, at that time, he is
12  assessed and determined whether he will
13  be seen on that date or the following date.
14  Q      Okay.
15  A      Besides the cop out.
16  Q      So you can still go from 6:00 to
17  6:20?
18  A      Yes, ma'am.
19  Q      And somebody will see you or hear
20  your complaint, and if they said, no, the cop
21  out will work, you will get on the call out
22  sheet when it comes out or, no, come back
23  here, we need to see you now?
24  A      Yes, ma'am.
25  Q      And that call out sheet is a

Page 80

1   computer printout that tells them when
2   they need to show up the next day to see
3   the health care provider?
4   A      Do what?
5   Q      A computer printout, they call it --
6   A      What did you call it?
7   Q      A call out sheet?
8   A      Oh, yeah.  What the inmates get.
9   Q      Right.  It's posted and it says,
10  come at 9:20 to see the doctor, and their
11  name is --
12  A      No.  The name of the inmate is there
13  and the provider's number is there.  It might
14  be one, it might be two, it might be three.
15  Q      Okay.
16  A      Now, I don't know what system they
17  used then.  That's what we use now.
18  Q      Okay.  But basically, I do my cop
19  out, if it's determined I can be seen the
20  next day, there's a sheet that's printed up
21  at some point in the afternoon and the inmate
22  knows, tomorrow I will see so and so at such
23  and such a time?
24  A      Yes, ma'am.
25  Q      Okay.  How is it determined what is

Page 81

1   an immediate or urgent or emergency
2   circumstance?
3         I mean, do you have guidelines for
4   that or is it basically the call of the
5   health care provider evaluating the patient?
6   A      It's basically clinical judgment.
7   Q      Okay.
8   A      I mean, there are certain guidelines
9   written there.  Okay.  But there's a clinical
10  judgment involved.
11  Q      Okay.  Do you have a sign on the
12  door there that says, Do Not Knock On Door
13  Except For Medical Emergency, or did you?
14  A      I do not recall.  We may have had
15  one at one time.
16  Q      All right.  And do you know who put
17  it up?
18  A      No.  It was there when I got there.
19  Q      Did you ever cause it to be taken
20  down?
21  A      No.  I did not put it up.  I didn't
22  put it down.  I don't recall it being there.
23  Q      Oh, you don't recall it, period?
24  A      No.
25  Q      Okay.

21 (Pages 78 to 81)

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 82

1  A      Now, the way to do it after, and the
2  patients know, and if they don't know, they
3  are told, after 6:20 they can also see us but
4  they will have to have a staff member.  If
5  it's an emergency, it throws all the rules
6  out the window.  Okay.
7         If they call me, and they can knock,
8  I don't care, they can knock the door down,
9  but otherwise they should speak to a staff
10 member, and a staff member calls us, somebody
11 is on the phone, whoever is the provider, or
12 me, or whatever, and says, okay, what's going
13 on.
14 Q      So some other staff member can call
15 you directly in the clinic and say, I've got
16 this inmate here in the laundry working and
17 he does not look good, and I would like to
18 send him over.  And then you attempt to
19 facilitate that?
20 A      Yes, ma'am.
21 Q      All right.  If another staff member
22 calls, does that automatically mean that that
23 inmate is going to be seen at that time, or
24 is an evaluation done over the phone as to
25 whether it can be done then or through the

Page 83

1  regular next day procedure?
2  A      An evaluation is done over the phone
3  and the evaluation is done as soon as the
4  patient arrives.
5  Q      All right.  Do you have, of your PAs
6  and nurse practitioners, is there someone
7  even during the regular working hours, the
8  6:00 a.m. to the 6:30 p.m., who's considered
9  the on call emergency PA or NP?
10 A      Not at this institution.
11 Q      Okay.  At Miami, did they have
12 someone like that?
13 A      Yes, we did.
14 Q      Was that a bigger facility?
15 A      Larger.
16 Q      How many inmates do you or have
17 medical care for at Maxwell?
18 A      Right now?
19 Q      On average.
20 A      Right now it's a little over a
21 thousand.  At the time it was approximately
22 seven to eight hundred.
23 Q      Okay.  All of the care that is
24 rendered by your PAs and your nurse
25 practitioners, do you sign off on each of

Page 84

1  their notes?
2         I mean, you know, if someone, for
3  example, for blood pressure follow up, if
4  Rodriguez was seeing Mr. Coggin, you know,
5  routinely to monitor his pressure and make
6  sure his meds are in line with that, do you
7  oversee that or, you know, sign off on his
8  notes or his progress notes in regards to
9  something like that?
10 A      Okay.  Let me explain to you.  I am
11 required and do revise a certain amount of
12 charts on a daily basis from each of my
13 practitioners.
14        If there is something that should
15 be followed up or they tell me, my nurse
16 practitioner tells me, can you check this
17 out, I'll check it out.
18        When the lab work comes in, I check
19 all the amounts.  Sometimes I put a little
20 sticky note, this patient should be followed.
21 Q      Okay.
22 A      Any patient that is being seen after
23 hours, I have got to check that out.  And I
24 do.  Every patient that is seen on what we
25 call an incident report, I check what has

Page 85

1  happened.
2         In other words, after hours or
3  during hours if it was an accident, a guy
4  fell on his back, what was done, I check it
5  out.
6  Q      All right.  What prompts an incident
7  report, an injury in the facility, or a fight
8  or, you know, something like that?
9  A      Exactly.  A fight, an incident, a
10 fall, something that happened, an accident.
11 Q      If an inmate is found passed out,
12 unconscious, would that necessarily generate
13 an incident report?
14 A      More than likely that would generate
15 a 600 entry.  If the inmate is found passed
16 out?
17 Q      Yes, sir.
18 A      That would generate an incident
19 report and more than like a 600 entry for
20 more follow up.
21 Q      When you're saying a 600 entry,
22 you're talking about in the medical chart?
23 A      In the medical chart, yes, ma'am.
24 Q      If a patient is found bleeding, for
25 example, vomiting blood, would that generate

22 (Pages 82 to 85)

Page 86

1  an incident report?
2  A    Absolutely.
3  Q    And a 600?
4  A    And a 600 for follow-up.
5  Q    Okay. All right. If I could, can
6  I go ahead and -- I don't usually just grab
7  stuff, but --
8  A    Sure.
9  Q    I mean, I have a set. I just want
10  to make sure, I've numbered some things and
11  this helps me to look at the real thing.
12  A    Okay.
13  Q    In the chart some things have
14  highlighter on them?
15  A    Yes, ma'am.
16  Q    Are those marks that you put on the
17  chart?
18  A    I did not.
19  Q    Okay. Are those marks -- what I
20  want to get a sense of is, if this is a color
21  copy of his original chart or this is -- they
22  have been yellowed and highlighted since
23  then?
24      MR. DOYLE: They have been
25  highlighted since then.

Page 87

1  Q    Not by you?
2  A    No.
3  Q    Okay. Good. Then I won't ask you.
4  Okay.
5      I'm going through this just to kind
6  of see how your chart is set up.
7  A    No problem.
8  Q    What I'm trying to get a sense of is
9  how your charts are set up so that if a
10  health care provider is coming in wanting to
11  look at a patient, and figure out what's
12  going on with them, obviously there are tabs
13  in here that I didn't have in the set that
14  was provided by the bureau.
15      So it looks like I have all the same
16  documents. I just now know why they are in
17  kind of a helter-skelter order. They are
18  not. They are actually in an order with
19  tabs.
20  A    Very organized.
21  Q    Right. So the first section you
22  have here, it looks like you have a problem
23  list.
24  A    That's the second section. That's
25  your first section (indicating).

Page 88

1  Q    All right.
2      MR. DOYLE: Why don't you ask him
3  how it's organized?
4      MS. COCHRUN: All right.
5  Q    How about we'll do this: When we
6  look through this chart, and we're looking at
7  Mr. Coggin's and the number is 20237-001?
8  A    I don't remember his number.
9  Q    It's there.
10  A    Okay.
11  Q    No trick questions. Okay.
12      All right. When I open this up to
13  the first section, on the left side it looks
14  like the progress notes or what you would
15  typically call Progress Notes and Care; is
16  that correct?
17  A    Yes. Correct.
18  Q    And they are front and back?
19  A    Front and back.
20  Q    Okay. Then below that is a tab
21  section called Laboratory Reports?
22  A    Yes, ma'am.
23  Q    And that will be all your blood work
24  studies that are sent off to the lab,
25  correct?

Page 89

1  A    Yes, ma'am.
2  Q    Then you have a section after that
3  that says X-ray Diagnostic Reports. Those
4  will be films, studies, ultrasounds --
5  A    EKGs.
6  Q    -- those kinds of things. Okay.
7      Then we have a section called
8  Medication and Treatment. And that looks
9  typically like an MAR or a medical
10  administration record like you would see in
11  a hospital almost?
12  A    Yes, ma'am.
13  Q    And it gives you drug profile of the
14  medication on the left and then the dates and
15  times when it was administered with --
16  A    Yes, ma'am.
17  Q    -- with indication for the dosages?
18  A    Yes, ma'am. That would be for the
19  medications that are given at pill line only.
20  Q    These are the pill line?
21  A    Or from medications that came from
22  another institution. They are put there.
23  Not the current ones.
24  Q    Okay.
25  A    Current pill line medications that

23 (Pages 86 to 89)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 90

1  have been already --
2  Q      Given?
3  A      Given.
4  Q      In the chart?
5  A      And from other institutions.
6  Q      All right.  For example, if Mr.
7  Coggin was currently incarcerated, these
8  sheets, once the drugs had been given and he
9  was no longer on them, would be in the chart.
10         Is there a place where the current
11  day in day out medications that they are
12  being administered in pill line, are those
13  housed in a separate place?
14  A      Yes, ma'am.
15  Q      All right.  Now, his regular
16  medicines like blood pressure medicines and
17  all of those, now that he's out and no longer
18  a patient, where is the recordation of those
19  drugs administered, housed?
20  A      In the same place where they would
21  be originally because they are from our
22  institution and they were not pill line
23  medications.
24  Q      Okay.  So if he was ordered
25  hydrochlorothiazide or something like that

Page 91

1  coming in --
2  A      Yes.
3  Q      They would be on a separate set of
4  documents?
5  A      I'm sorry?
6  Q      They would be on a separate pill
7  line document from this?
8  A      Hydrochlorothiazide is not a pill
9  line item.
10  Q      That's an outside medication?
11  A      I don't follow.
12  Q      What is a pill line medication?
13  A      A pill line medication is something
14  that even though on the outside it is given
15  to the patient, we restrict it to pill line.
16  Okay.
17         Something like, for example, we do
18  not have hydrocodone, but if we did, it would
19  be a pill line.
20  Q      Right.  Because you don't want that
21  being passed around in the prison?
22  A      Exactly.
23  Q      Okay.
24  A      If you're giving somebody pain
25  medication like, for example, I believe

Page 92

1  Tylenol Number 3 may be there, which is
2  Tylenol acetaminophen with codeine, that will
3  be there because he's got to pick it up at
4  the pill line.
5  Q      But the routine meds that don't
6  really have an abuse potential or some other
7  thing to them that could present a problem?
8  A      For example, high blood pressure
9  medication, the patient takes with them, will
10  go to another section.  If he comes from
11  another institution, after he's come from
12  another institution, he goes into that
13  section.  If the patient goes into the street
14  and we are the licensed institution, he
15  remains in the other section.
16  Q      All right.  So based on your review
17  of the records, other than the ones that are
18  under this little medication treatment
19  section, did Mr. Coggin have any pill line
20  medications or are all his pill lines in
21  there?
22  A      I would say that they are there.  I
23  would have to review that particular chart.
24  Q      All right.  Well, we'll look at that
25  in a minute.

Page 93

1  A      No problem.
2  Q      I just want to get a sense of if
3  he's on regular blood pressure medicines, he
4  has his pills with him and he can take them
5  as he should?
6  A      Yes.
7  Q      All right.
8  A      Unless I am checking out the patient
9  to make sure he's taking his medication, I
10  put it on pill line until I have it regulated
11  because some patients are not compliant.  And
12  I want to make sure that this patient is
13  completely controlled.
14  Q      Okay.  PRN medicines such as
15  Tylenol, Motrin, I guess antacids like
16  Mylanta or something like that, how are those
17  medications handled for the inmates?
18  A      Handled?
19  Q      I mean, how can -- does it require
20  a prescription -- if I want to have Tylenol,
21  do I have to have a prescription for Tylenol
22  or do --
23  A      Anything that we give, even over the
24  counter medication is written as a
25  prescription.

24 (Pages 90 to 93)

ASSOCIATED COURT REPORTERS. LLC
(205) 251-4227 / FAX (205) 251-4224

Page 94

1  Q     Okay.
2  A     Okay.  They can purchase certain
3  medications at commissary.  But the
4  medications that we give, even acetaminophen,
5  which is over the counter medication, is a
6  prescription and given for a certain amount
7  of time and how to give it and how to take it
8  and how to --
9  Q     All that's in place?
10 A     Yeah.
11 Q     Okay.  But if they just want to buy
12 a Tylenol, a bottle of Tylenol for themselves
13 for an occasional headache or something, they
14 can buy that at the commissary, too?
15 A     Yes.
16 Q     All right.  Now, I'm moving to the
17 next section.
18 A     Okay.
19 Q     And the first thing I see is
20 something that's called a Patient Problem
21 List.  And it looks like there are dates
22 noted when that problem is an issue, what
23 the significant diagnosis is, and any
24 invasive procedures or operations or
25 whatever.

Page 95

1        And then this date to the right on
2  the Problem List, what is to be recorded
3  there?
4  A     Usually that's when it happened.
5  Q     All right.  Or when it started, the
6  problem?
7  A     No.  When it happened.
8  Q     Okay.
9  A     In this case, you're reading history
10 of rhinoplasty.  It happened in 1965.
11 Q     Okay.  And in reviewing this, Mr.
12 Coggin started his incarceration there the
13 end of August '99.
14       And it looks like early on, I mean,
15 pretty much at the time of his intake, the
16 medical department determined one of his
17 problems that needs to be monitored, I
18 suppose, during his incarceration, was
19 hypertension?
20 A     Yes.
21 Q     And historically he had a
22 rhinoplasty?
23 A     Yes.
24 Q     And it looks like history of renal
25 calculi in 1997?

Page 96

1  A     Apparently so.
2  Q     All right.  And that means kidney
3  stones a couple of years before he came in?
4  A     Uh-huh (in the affirmative).
5  Q     And then it looks like no new
6  problems added to the list except for, or up
7  until April of 2000.  And it looks like
8  allergic rhinitis and --
9  A     I can't see from this angle.
10 Q     You're going to have to help me with
11 that handwriting.
12 A     Looks like minor wound.  I'm not
13 sure.
14 Q     Okay.  Minor wound.  Okay.  All
15 right.  Thanks for the translation.
16       All right.  And then on 7/25/01, it
17 looks like cholelithiasis?
18 A     Uh-huh (in the affirmative).
19 Q     And then 9/7/01, exploratory lap,
20 perforated duodenal ulcer is listed for his
21 problem?
22 A     Yes.
23 Q     All right.  Shows no known allergies
24 to medications as well, correct?
25 A     Yeah.

Page 97

1  Q     And then behind that, there is
2  a series of documents which appear to be
3  medications actually prescribed by BOP
4  physicians, or PAs, or whatever, while
5  incarcerated; is that correct?
6  A     Our institution.
7  Q     Okay.  And then beyond that you've
8  got your tetanus and tuberculin test,
9  immunizations, so to speak.  And then beyond
10 that there's a hypertension flow sheet that,
11 I guess, has different things that you're
12 going to follow in a hypertensive inmate; is
13 that correct?
14 A     That was something that was started
15 around that time.  And, yeah, we have
16 different flow sheets for a quick viewing of
17 what you can very easily see in the 600
18 entries as well.
19 Q     All right.  Kind of a -- it kind of
20 gives you kind of quick access to certain
21 flows?
22 A     Yeah.
23 Q     Okay.  And it looks like it started
24 in August of '01; is that correct?
25 A     I don't know.  You're the one that

25 (Pages 94 to 97)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 98

1  has the papers.
2  Q     I just notice that prior to August
3  of '01, there was never any big fancy typed
4  up hypertension note in Mr. Coggin's chart
5  even though he had been there a couple of
6  years.
7         And then all of a sudden now we have
8  this very nice typed up note that says,
9  chronic care clinic hypertension, and that's
10 the same time this started.
11        Do you have any idea how come this
12 note would be typed and all the rest of them
13 are basically handwritten?
14 A     Because some of the PAs at this
15 institution, and other institutions, like to
16 type out their notes sometimes. Sometimes
17 they write them out. It's a preference of
18 what they want to do that day, how they want
19 to follow it.
20 Q     All right. They are not dictating
21 it, they are actually typing it themselves?
22 A     No. They are typing it.
23 Q     All right. Then the next section is
24 a History and Physical. And that looks like
25 the intake H & P that was done when the

Page 99

1  inmate is brought into the system?
2  A     Yes. And then if their stay is long
3  enough, there's a periodic sometimes.
4  Q     Okay.
5  A     And the statement of the -- he made
6  as they come into the system.
7  Q     All right. And so Mr. Coggin, when
8  he came in, it looks like this examination
9  date is 8/26/99 at the time of intake, and --
10 A     His signature and date should be
11 right there somewhere.
12 Q     Right. I found that. And part of
13 this is to determine medical clearance for
14 work duties; is that correct?
15 A     And medical treatment.
16 Q     Okay. And it looks like --
17 A     It's more for us, for medical
18 treatment, than for duty assignment.
19 Q     Okay. And this sheet that's
20 entitled Medical History Report, is this
21 actually filled out by the patient?
22 A     Yes, ma'am.
23 Q     All right. And he goes through and
24 says, what conditions they have and haven't
25 had and so on?

Page 100

1  A     Yes, ma'am.
2  Q     And it looks like Mr. Coggin says he
3  does have high blood pressure?
4  A     I can't see from here.
5  Q     I'm sorry.
6  A     No problem.
7  Q     It looks like high blood pressure?
8  A     Uh-huh (in the affirmative).
9  Q     It says he has --
10 A     Frequent and painful urination.
11 Q     Okay. And he's had a kidney stone
12 or blood in his urine?
13 A     Yes.
14 Q     There's some numbers next to that,
15 2 and 3, does that refer to --
16 A     This consists of a second page.
17 Q     Oh, there's a back to this one.
18 A     A back to this. And then 1, 2, and
19 3 would be written out and explained why.
20 Q     It's a history. Okay.
21 A     You may have it. I don't know.
22        MR. DOYLE: Would this be a good
23 time to take a break?
24        MS. COCHRUN: Let's finish up this
25 document and then we can go.

Page 101

1  Q     And then let's just look at the back
2  sheet of that page. Still filled out from
3  the patient?
4  A     This is up to here filled out by the
5  patient (indicating).
6  Q     Okay. And then it looks like he
7  says, yes, he's had some operations or
8  advised to have operations in the past. Has
9  had an inpatient stay at some point.
10        And then he explains with operation
11 on nose. Operation on nose, infection of
12 cyst. And then he signs off. And then you
13 all come in and review this with him, I
14 guess?
15 A     Yes.
16 Q     And here's where our 1, 2, and 3 is,
17 history of hypertension, history of renal
18 calculi in 1997. And nocturia or night urine
19 times 2 daily. And PSA and DRE normal. And
20 that's based on historical --
21 A     Historical. That is not a physical.
22 Q     Okay. And it just says no work
23 until meds assigned. And it says here,
24 review and substitution of anti-hypertension
25 meds before --

26 (Pages 98 to 101)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 102

1  A     By C. B. Garcia.
2  Q     By C. B. Garcia.  That's you?
3  A     Yes.
4  Q     Okay.  So you look at what he has,
5  as part of his intake, you're going to
6  evaluate what he's going to get, what he can
7  get while he's in there?
8  A     More than likely when he gets there,
9  I do not remember in his particular case, but
10 when he gets there, he gets some immediate
11 medication from the PAs.  And then I review
12 if it's okay, the patient is -- agreeing with
13 the patient, sometimes we have to change the
14 medication, we don't know if it's agreeing
15 with the patient.
16 Q     All right.
17 A     We try to approximate the same
18 medication the patient is taking on the
19 outside, whatever that might be.
20 Q     All right.  Is a physical exam
21 actually done at that intake portion?
22 A     The what?
23 Q     At the intake portion of his
24 evaluation, is there actually a physical
25 exam done along with the history?

Page 103

1  A     Is it the same date?
2  Q     It looks like 9/1, the next day, it
3  looks like somebody has done -- it looks like
4  one of the PAs.
5  A     9/1 --
6  Q     About a week later.  He came in on
7  8/26 and then --
8  A     Usually that's not done on the first
9  visit.
10 Q     Okay.  Then the next section of the
11 chart are consultations.  And are these
12 consultations from outlying facilities?
13 A     Yes.
14 Q     All right.  Or requests made to
15 those?
16 A     From outside consultants, you will
17 find there also the consultations of the
18 optometrist who goes to our institution.
19 Q     All right, sir.
20 A     He is an outside consultant.
21 Q     All right.  And then passed that
22 section there's a purple section for
23 psychology?
24 A     Uh-huh (in the affirmative).
25 Q     And in Mr. Coggin's circumstance,

Page 104

1  that's empty?
2  A     Uh-huh (in the affirmative).
3  Q     And then we have outpatient surgery.
4  There's not anything behind that?
5  A     No.
6  Q     And then we flip it over, it looks
7  like the dental record on the left side?
8  A     Yes, ma'am.
9  Q     And then on the right side, what are
10 these documents ordinarily?
11 A     Inpatient records.
12 Q     Inpatient.  Okay.
13 A     Not outpatient.
14 Q     Okay.
15 A     While -- inpatient records while
16 under our care because that's another section
17 for inpatient or outpatient records from the
18 outside before our care.
19 Q     And it has prescriptions, EKGs,
20 whatever, you've been provided by an outlying
21 facility pursuant to the care of an inmate?
22 A     Uh-huh (in the affirmative).
23 Q     Okay.  And then we flip over and we
24 have a section that doesn't really have a tab
25 in front of it.  What is this section?

Page 105

1  A     That section is, it's in the back
2  portion you will find any incident or injury
3  reports.
4        On the front you will find -- we
5  give the inmate or the patient some
6  restrictions, or some medical items which
7  say, go home, you know, stay quiet, what have
8  you.  Whatever instructions we may want to
9  give them are written in there.
10 Q     Okay.
11 A     I say restrictions so they don't
12 make them work.
13 Q     All right.  So those are some of
14 the things that you were discussing with me
15 before, for example, he twisted his knee and
16 that got written up.  There's recordation in
17 the 600 and there's recordation in the
18 incident report?
19 A     Uh-huh (in the affirmative).
20 Q     And then this last section, what is
21 housed on, I guess, this last section on the
22 back, what kind of things are put here?
23 A     The cop outs that the patients
24 actually write to us.  And the HIV results, I
25 think, are there -- not the HIV results, the

27 (Pages 102 to 105)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 106

1   HIV explanation. The results go in the labs.
2   Q    Okay.
3   A    The disposition of when the patient
4   is going to be released, what medications the
5   patient is on, what have you. That sort of
6   thing. I'm not sure what else.
7   Q    All right. So all cop outs for Mr.
8   Coggin should be in this section?
9   A    Uh-huh (in the affirmative).
10  Q    And how do they -- how do the cop
11  outs end up coming to you? You told me there
12  was just a main place for them and --
13  A    There's a box.
14  Q    A box. And then they get
15  distributed?
16  A    And then they pick it up and
17  distribute it.
18       MS. COCHRUN: Okay. Why don't we
19  take a break now?
20
21       (Brief recess.)
22
23  Q    Doctor, what we did was, we tried --
24  I tried to get my chart in a chronological
25  order. And, of course, you've got it in the

Page 107

1   setup that is used at the clinic.
2        What we're going to do is mark a
3   copy of that copy which Ms. Colburn will get
4   from Mr. Doyle at some point, as Plaintiff's
5   Exhibit 2.
6        MR. DOYLE: That's fine.
7   Q    But what I'm doing, so I'll give you
8   time so, you know, don't -- I'm not trying to
9   rush you, but I may ask you about a document
10  and I have it in a chronological order, or at
11  least I've tried to, and you may have it in
12  the different sections. So I will wait for
13  to you catch up if we need to do that. All
14  right.
15       The first thing I'm going to ask you
16  about is on the commitment exam. We've
17  talked about that. And do you actually, on
18  the second page, you know, this H & P, does a
19  physician sign off on that?
20  A    The H & P?
21  Q    Yeah, the H & P.
22  A    Okay. That's the intake screening.
23  Q    Oh, that's the intake screening.
24  Okay. Does the physician sign off on that
25  when they get in?

Page 108

1   A    No.
2   Q    Okay.
3   A    Not unless it's -- No.
4   Q    Okay. But this is -- but a
5   physician's assistant or a nurse practitioner
6   participates in the obtaining of that
7   information?
8   A    A physician assistant, yes.
9   Exactly.
10  Q    Okay.
11  A    This is not co-signed.
12  Q    Okay. That one is not?
13  A    This one is not.
14  Q    Okay. I just saw a second signature
15  Pichell or Pachell's signature on the other
16  side of that. Is that just his signature?
17  A    May I see what you have?
18  Q    I'm sorry.
19  A    That would be his signature, yes.
20  Q    All right. At the time that Mr.
21  Coggin was first incarcerated, how would you
22  characterize his health?
23       I mean, in terms of he did have
24  hypertension, but was he in relatively good
25  health for a man his age?

Page 109

1   A    At the time of my first encounter
2   with him, I have written here, "I have no
3   physical complaints at this time. I feel
4   fine. Right wrist hurt about a week ago.
5   Fracture is getting better. I have blood
6   pressure."
7        His blood pressure taken that day
8   was under control. I made a note here he was
9   taking medication at this time.
10  Q    All right. The first time you
11  actually had to have any kind of interaction
12  with him was when?
13  A    9/27.
14  Q    All right. So he was actually in
15  for a month before he required any
16  interaction with you?
17  A    Yes.
18  Q    And up until the Summer of 2001,
19  after reviewing the chart, do you have any
20  recollection of any serious medical problems
21  that Mr. Coggin was having other than
22  managing his chronic hypertension or was it
23  basically routine colds, you know, twist
24  ankle here, those kind of things?
25  A    It depends on what you call summer.

28 (Pages 106 to 109)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 110

1   Q      Okay.  Well, how about --
2   A      Qualify summer.
3   Q      All right.  June of 2001 passed that
4   point.
5   A      There you go.
6   Q      Okay.  Other than that, nothing out
7   of the ordinary as far as his care medically
8   as far as you and your clinic were concerned?
9   A      No.
10  Q      Things would come up, they would be
11  handled, he would get them taken care of?
12  A      Right.
13  Q      Do you actually even have any real
14  recollection of dealing with Mr. Coggin
15  before this episode in the Summer and Fall of
16  2001?
17  A      Not until I saw his records again.
18  Q      Okay.  I mean, he didn't stick out
19  as a patient that was a pain in the butt or
20  anything like that to you?
21  A      No.
22  Q      So just routine, whatever he needed
23  got handled, you followed his blood pressure
24  as necessary.  And he was just one more
25  inmate kind of in the scheme of patients you

Page 111

1   would need to see?
2   A      Yes.
3   Q      Okay.  Tell me when you first were
4   aware that there might be some issue with his
5   health after June of 2001.
6          When is the first time you were
7   aware that there was anything going on with
8   Mr. Coggin that was requiring out of the
9   ordinary medical intervention or monitoring?
10  A      I believe on 7/25, Rodriguez
11  consulted, when he was first seen by
12  Rodriguez, he consulted me with this patient.
13  And we both agreed to do studies on him and
14  that sort of thing.
15  Q      All right.  So 7/25 is really your
16  first interaction with this circumstance with
17  his -- which ultimately ended up being the
18  peptic ulcer disease; is that correct?
19  A      With this last thing that he had,
20  yes.
21  Q      Right.  If I could, can you look
22  at -- you know your medication sheets for the
23  prescribed drugs in house, I want to make
24  sure I understand when I see this sheet and
25  you and I are both looking at -- I'm looking

Page 112

1   at the one that starts with the prescription,
2   the first prescription on the left looks like
3   for -- well, we don't know what it's for, but
4   it's -- maybe for the Bacitracin?
5   A      Bacitracin.
6   Q      Okay.  From May 11th of '01.  Are we
7   on the same page?
8   A      Yes, we are.
9   Q      Okay.  Good.  When I look at that
10  and see -- are these stickers that are put on
11  the --
12  A      Yes, they are stickers.
13  Q      Okay.  Good.  And when I see this,
14  basically, the date in the top, that's the
15  date it's prescribed like 5/11/01?
16  A      Yes, ma'am.
17  Q      And then O. Rodriguez.  That would
18  be Oscar Rodriguez, the PA, had prescribed
19  it?
20  A      Yes, ma'am.
21  Q      Okay.  Then it gives me the drug
22  and the directions, and would that be a
23  medication that necessarily would be handed
24  to the patient or would that be administered?
25  A      This one in particular was given to

Page 113

1   the patient.
2   Q      All right.  Depending on the
3   medication, it might be handed to the patient
4   or not?
5   A      Exactly.
6   Q      All right.  Obviously, stuff with
7   narcotics you're going to do the pill line
8   circumstance, correct?
9   A      Uh-huh (in the affirmative).
10  Q      All right.  So it looks like, what,
11  I'm trying to figure out -- I don't know if
12  your sheet is better than mine -- no.
13         I'm trying to figure out, that looks
14  like it's for the ointment?
15  A      Yes.
16  Q      Is this a --
17  A      That's another medication.
18  Q      Another medication starting down
19  here.  So where this starts with Montgomery,
20  FPC Montgomery to here, that's like one
21  sticker?
22  A      Right.
23  Q      Okay.  It's hard on yours.  It may
24  be a little easier, mine I'm having to kind
25  of guess as we go.  Because I think sometimes

29 (Pages 110 to 113)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 114

1 the stickers are over the top, you know what
2 I'm saying, there's no consistency?
3 A    It could be.
4 Q    All right.
5 A    Because this area right here which
6 makes no difference, it's covered.
7 Q    But hopefully I can look at a
8 sticker and kind of get a clue of who
9 actually prescribed it?
10 A    Uh-huh (in the affirmative).
11 Q    Okay. And if we can kind of knock
12 these sheets out, I would like to go on and
13 do that.
14 A    No problem.
15 Q    Okay. It looks like on 7/25/01,
16 you, sir, prescribed Ketorolac?
17 A    Ketorolac. It's Tordol. It's a
18 generic name.
19 Q    All right. K-e-t-o-r-o-l-a-c.
20 Tordol. All right. And that was an
21 injectable?
22 A    Yes, ma'am.
23 Q    All right. And then there's also a
24 prescription from that day with your name on
25 it that is for Ceftriaxone, 500 milligrams

Page 115

1 antibiotic?
2 A    Uh-huh (in the affirmative).
3 Q    And what's the legend name for that
4 not the generic?
5 A    Rocephin.
6 Q    Okay. Rocephin.
7 A    And he was given 250 milligram dose.
8 Q    Okay. 250.
9 A    Because it comes in 500.
10 Q    So you're going to break it in half?
11 A    They don't break it in half, they
12 draw 250.
13 Q    Oh, okay. Even though it says take
14 one tablet by mouth three times daily on pill
15 line --
16 A    Hold on a second. You're going
17 somewhere else now.
18 Q    You're still talking about the
19 Tordol?
20 A    Yeah.
21 Q    See where I am down here
22 (indicating)?
23 A    Right.
24 Q    He was getting also an oral dose of
25 antibiotic prescribed that day?

Page 116

1 A    Where are you?
2 Q    Here's the Tordol (indicating).
3 A    Yes.
4 Q    And there's the one IM dose?
5 A    One time. Okay.
6 Q    And then the next drug, the
7 Ceftriaxone, that is also known as --
8 A    Rocephin.
9 Q    Rocephin.
10 A    This is Tylenol Number 3.
11 Q    Okay. These stickers are -- you see
12 how the stickers may be --
13 A    Yes.
14 Q    Okay.
15 A    Is acetaminophen with codeine, 300.
16 300 acetaminophen --
17 Q    Like a Tylenol Number 3?
18 A    Tylenol Number 3.
19 Q    All right. What I'm trying to
20 figure out is this, take one to two tablets
21 by mouth three times daily times three days
22 on pill line. Is that for the Tylenol Number
23 3, or is that for --
24 A    For the Tylenol Number 3.
25 Q    Okay. Do you see how the sticker --

Page 117

1 A    Yes, ma'am. I understand.
2 Q    All right. Now you know why I'm
3 confused, okay?
4 A    No problem.
5 Q    All right. So we don't see a whole
6 lot about the Rocephin injection, but you
7 know it was a Rocephin injection that he got?
8 A    Yes, ma'am.
9 Q    Okay. Then we've got the Tylenol
10 Number 3 and it was one to two tabs by mouth, .
11 three times daily times three days on the
12 pill line. And then the next prescription --
13 A    Let me tell you something.
14 Q    Okay.
15 A    Even though it's not written here,
16 this is a PRN type of medication. In other
17 words, it's up to the choice of the patient
18 to take it or not take it.
19 Q    Okay. And he's limited by he's only
20 going to get one to two tabs TID every eight
21 hours, so to speak?
22 A    Right.
23 Q    Over that three day period?
24 A    Absolutely. Right.
25 Q    I understand you have to dose it

30 (Pages 114 to 117)