ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 118

1  that way, but it may be administered in a
2  little bit different fashion?
3  A    Right.
4  Q    Okay.  All right.  The next drug we
5  have is Lisinopril?
6  A    Uh-huh (in the affirmative).
7  Q    And that is for --
8  A    Lisinopril.
9  Q    Pardon?
10 A    Lisinopril.
11 Q    Lisinpril.  Okay.  And that drug is
12 for?
13 A    Hypertension.
14 Q    Hypertension.  And then that was
15 also prescribed on that day?
16 A    Apparently he felt that he didn't
17 have enough or the patient may have mentioned
18 that he needed medication.  I don't know the
19 instance.
20 Q    Okay.
21 A    And he was prescribed at that same
22 time.
23 Q    He may have got a refill for his
24 blood pressure medication?
25 A    Right.

Page 119

1  Q    All right.  And then the next one in
2  the top corner, the 7/26, it looks like
3  Ibuprofen 800 milligrams?
4  A    Uh-huh (in the affirmative).
5  Q    One tab TID after meals?
6  A    Uh-huh (in the affirmative).
7  Q    And then the next prescription we
8  have --
9  A    But the way, every time one
10 medication -- let me clarify something for
11 you.
12 Q    Okay.
13 A    Even though it says here after
14 meals, every time a medication is given to
15 a patient, not only do we verbally say it or
16 sometimes we put it or not, the pharmacists,
17 all the pharmacists that we have had there,
18 and all the pharmacists that I have known in
19 the BOP, give the patients with the
20 medication, even if they have taken the
21 medication one hundred times, information on
22 that medication.
23 Q    All right.  They get an info sheet?
24 A    Uh-huh (in the affirmative).
25 Q    All right.  And it looks like there

Page 120

1  is one refill on that?
2  A    Uh-huh (in the affirmative).
3  Q    How many doses, I mean, that's
4  something he could keep in his room, I mean,
5  in his cell, right?
6  A    Uh-huh (in the affirmative).
7  Q    So how many doses, is that number --
8  A    He didn't have a cell, he had a
9  cube.
10 Q    A cube.  Well, and I don't mean a
11 cell with bars.  I'm talking --
12 A    They are cells with bars, but --
13 Q    Right.  Right.  Still not a fun
14 place one way or the other, right?
15 A    No.
16 Q    When it says, this number here, the
17 pound sign with 45, that means how many pills
18 were dispensed, correct?
19 A    Yes, ma'am.
20 Q    Okay.  So 45 with that first filling
21 and then he would have another refill for an
22 additional 45?
23 A    Yes, ma'am.
24 Q    Without having to come get another
25 script from you?

Page 121

1  A    Right.
2  Q    Okay.  Then we drop down and we've
3  got another blood pressure, Lisinopril,
4  thirty pills on 8/8.  And then 8/23 it looks
5  like we have nalbuphine?
6  A    8/8?  I saw it there.  Okay.
7  Q    Why would --
8  A    No.  The pharmacist should not have
9  given this to him twice.
10 Q    All right.  And then it looks like
11 he had an injectable on 8/22/01 of
12 nalbuphine.
13 A    Uh-huh (in the affirmative).
14 Q    And that's also known as --
15 A    Nubain.
16 Q    Nubain.  Okay.  I wanted to make
17 sure we're on the same sheet.  Okay.
18       And then the next prescription is
19 8/23.  It looks like Naprosyn or Naproxen?
20 A    Uh-huh (in the affirmative).
21 Q    28 tabs, no refills.  That was
22 ordered by D. Little, one of the CRNPs?
23 A    Uh-huh (in the affirmative).
24 Q    And then it looks like there is a
25 Sulindac prescription?

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 122

1   A      Right.
2   Q      Can you tell --
3   A      Sulindac.
4   Q      Sulindac.  Can you tell when that
5   was prescribed?
6   A      Yes, I can.
7   Q      Okay.
8   A      If you turn to the progress notes on
9   8/27, it was prescribed by me.
10  Q      Okay.  All right.  And if we look up
11  the middle, it looks like --
12  A      Although it was filled on the 28th,
13  I think.  I don't know.
14  Q      Yeah.  It looks like it was
15  prescribed -- it was filled on the 28th.  I
16  mean, that shows you when it actually got
17  filled?
18  A      Right.
19  Q      Okay.  Got you.  If you write a new
20  prescription like on Friday, may it take
21  until the next Monday for it to actually get
22  filled or sent over to the pharmacy?
23  A      Unless it's -- okay.  If it's given
24  before a certain time, it usually gets filled
25  that day.

Page 123

1   Q      Okay.
2   A      If it's after that certain time, we
3   feel it necessary that it needs to be filled,
4   we go directly to the pharmacist with the
5   chart in hand and, please fill up for the
6   patient, the patient needs it.
7   Q      Okay.  If it's a routine script,
8   though, and it's Friday afternoon, it might
9   be Monday?
10  A      Probably Monday, especially
11  something like this.
12  Q      All right.  And that's -- I'm never
13  going to be able to say that drug right?
14  Sulindac?
15  A      Sulindac.  Yes.
16  Q      What kind of medicine is that?
17  A      It's an NSAID.
18  Q      NSAID.  Okay.
19  A      Yes, ma'am.
20  Q      And that would be considered not an
21  emergent drug, I guess.  I mean, that would
22  be one that might go from Friday to Monday?
23  A      Right.
24  Q      Okay.  And then we're looking --
25  A      By the way, he never picked that one

Page 124

1   up.
2   Q      Okay.  And how can you tell he never
3   picked it up?
4   A      I checked with the pharmacy.
5   Q      All right.  It looks like the
6   pharmacist added it into the system on the
7   28th --
8   A      Let me go back here a second.
9   Q      Okay.
10  A      Note on 9/4 at the very bottom,
11  check it out.  It says, "It was noted that
12  the patient did not pick up Sulindac ordered
13  on 8/27/01."
14  Q      Okay.  Somebody checked that out at
15  some point?
16  A      I did.
17  Q      Okay.  And that was your --
18  A      I charted it.
19  Q      Okay.  Good.  Then we've got one
20  from 9/18.  These look like the prescriptions
21  that were recommended when he was coming out
22  of the hospital, down the middle there, when
23  he got out?
24  A      Yes, ma'am.
25  Q      These are the scripts that Dr.

Page 125

1   Kreher had written, said, can you continue
2   over at the facility, correct?
3   A      Correct.
4   Q      All right.  Now, how is it that --
5   I'm going to switch gears now and go back to
6   that visit of the 25th.
7          How was it that Mr. Coggin came to
8   be seen on the 25th?
9   A      I don't know.
10  Q      All right.
11  A      He was seen at 7:05.  I imagine he
12  came to sick call.
13  Q      All right.
14  A      I do not know.
15  Q      Do you have a cop out that matches
16  up to that?
17  A      I don't know.  Yes, I do.
18  Q      All right.  Let me make sure you and
19  I are on the same page.  Are we matching?
20  A      Yep.
21  Q      Okay.  We're matching.  And that
22  page at the top in handwriting it says,
23  "Second emergency sick call request"?
24  A      Yep.  Patients do that a lot.
25  Q      Okay.

32 (Pages 122 to 125)

Page 126

1   A    To try to get -- they never present
2 a first request. And in this particular
3 case, I don't recall seeing a first request
4 because I checked. I said, what the heck is
5 the first request.
6       This is some little things that the
7 patients usually do, usually. Sometimes they
8 do it to try to get more of immediate
9 attention. And he did.
10   Q    All right. Let me ask you this --
11   A    But I do not know if there was a
12 first request.
13   Q    Okay.
14   A    The only thing I can say, it's not
15 here. If it's not here, it didn't happen.
16   Q    Well --
17   A    It didn't happen.
18   Q    If there is -- is there any other
19 place -- when they do a cop out and it gets
20 put in the box, I guess at this time Oscar
21 Rodriguez was his assigned health care
22 provider, I mean, if we were in that new
23 system?
24   A    Probably. I honestly do not
25 remember. Probably he was. I do not

Page 127

1 remember.
2   Q    All right. Well, assuming he was,
3 I mean, at least Mr. Coggin believed he was,
4 okay?
5   A    Okay. More than likely he was. I
6 really don't know.
7   Q    Okay. If indeed that's who his
8 assigned person was --
9   A    Yes, ma'am.
10   Q    -- who would transport that cop out
11 from the box, I guess, to -- I mean, where
12 would it go next so that he could get put on
13 the sheet?
14   A    Ms. Robinson.
15   Q    Okay. And she is the receptionist
16 there?
17   A    No. She is the medical records
18 person.
19   Q    Okay.
20   A    She picks out the -- all the cop
21 outs. All the requests to see medical
22 personnel. And then distributes them to a
23 medical personnel. Either puts them in a box
24 with the name of the medical personnel or
25 gives them directly to the person.

Page 128

1   Q    If a patient was to come in, not for
2 like a routine cop out, but felt they were in
3 extremis or needed to be seen rather
4 immediately, and what I'm calling -- you
5 called it earlier, you still have emergency
6 sick call?
7   A    Yes.
8   Q    If someone wants to come in and
9 bring a cop out form, might they hand it
10 directly to someone at the clinic that
11 morning?
12   A    Yes.
13   Q    All right. For example, could they
14 necessarily hand it to someone like Mike, the
15 x-ray tech?
16   A    Maybe at that time that's the way it
17 was done before the box. I honestly do not
18 remember.
19   Q    Okay.
20   A    Now, at that time that may have been
21 the procedure.
22   Q    All right. If an emergency cop out
23 form -- I know it's not an emergency cop out
24 form, but if a patient came and felt like
25 they really needed to be seen that day, would

Page 129

1 they be asked to wait to see someone or would
2 they be returned to the general population?
3   A    They usually are asked to wait and
4 see a provider.
5   Q    If the cop out sheet would come in
6 in that manner, not through Ms. Robinson,
7 would it at that time be attached to the
8 chart, or how would that go?
9       I mean, I know you all have your
10 regulations. I mean, is there a possibility
11 that a cop out sheet could have been handed
12 in and it somehow didn't make its way to this
13 sheet?
14   A    I don't think so.
15   Q    You wouldn't want it to happen that
16 way?
17   A    No.
18   Q    Okay. But --
19   A    She is incredibly efficient. We
20 do not misplace -- we do not -- this is the
21 first that we know of it.
22   Q    All right. And I understand Ms.
23 Robinson may be incredibly efficient. I'm
24 just wondering if --
25   A    She is. But I don't remember,

33 (Pages 126 to 129)

Page 130

1  honestly, going back, I don't remember if at
2  that time --
3  Q      She was the efficient one?
4  A      No. She was using -- we were using
5  the box or this was being given --
6  Q      To whomever?
7  A      Whoever was there. That may have
8  been the case in those days.
9  Q      All right. Did you get Ms. Robinson
10 and the box and the equation to try to make
11 that a more efficient process, where the cop
12 out forms were going through one set of
13 hands?
14 A      Yes. When the whole process got
15 instituted, then we put the box in there.
16 Whether it was -- the box was instituted at
17 that time or not, I honestly do not remember.
18 Q      All right. The reason why I ask is:
19 Mr. Coggin recalls giving initially on the
20 24th, the day before this, a cop out form to
21 Mike, the x-ray tech, and being asked to wait
22 to see Rodriguez.
23        So I guess a determination could be
24 made whether he needed to be seen immediately
25 or the next day in the regular process?

Page 131

1  A      However, what is a cop out?
2  Q      Right. That's my question. I'm
3  trying to find out if there's, you know, I
4  guess --
5  A      Mike would have given it to us.
6  Q      All right. If he would have given
7  it to Rodriguez, then Rodriguez would have
8  been under a duty to put it in the chart?
9  A      No. Rodriguez's duty is to leave
10 it -- well, leave it in the chart, not file
11 it.
12 Q      Just leave it in there?
13 A      Yes.
14 Q      All right. If a patient was to come
15 in and be complaining of severe abdominal
16 pain, would that be something that
17 necessarily would require to be seen that day
18 as opposed to put on the call out for the
19 next day? I mean, exam, you know, evaluate?
20 A      He should evaluate that, yes.
21 Q      Okay. Now, I'm looking at the
22 document you and I were talking about. And
23 in here it says, "Second emergency sick call
24 request."
25        And then there's some handwriting

Page 132

1  that says, "Patient requests to see Dr.
2  Garcia today." Do you know whose writing
3  that is?
4  A      Nope.
5  Q      Okay. But is this the form that the
6  inmates would have available to them?
7  A      Yes.
8  Q      Okay.
9  A      There are two forms that they use at
10 that time. This is one of them, which is
11 just what I was telling you before, request
12 to see the patient. And this is what is a
13 cop out form.
14 Q      Like if he wanted to go to a
15 different department even in medical?
16 A      Yeah.
17 Q      Okay. All right. And this form
18 would be available to the patients where?
19 A      In the reception room.
20 Q      At the clinic?
21 A      Ma'am?
22 Q      At the clinic?
23 A      At the clinic.
24 Q      All right. And this one, Mr. Coggin
25 appears to say, "Severe intense pain in my

Page 133

1  abdomen of three days duration."
2        And then he lists that he was taking
3  blood pressure, Tylenol for pain, completely
4  ineffective. And then he signs this off; is
5  that correct?
6  A      Yes.
7  Q      And then at the bottom it says,
8  "Seen 7/25/01." And is that Oscar's
9  initials, if you know?
10 A      I don't think so. I'm not sure, to
11 be honest.
12 Q      Okay.
13 A      That does not look like Oscar's
14 handwriting.
15 Q      All right. Well, Doctor, let me ask
16 you this: If indeed the day prior to this,
17 on the 24th, Mr. Coggin had come to the
18 emergency sick call at 6:00 a.m., handed in a
19 cop out requesting immediate attention for
20 severe abdominal pain, and he was seen by PA
21 Rodriguez, if his complaint was indeed severe
22 abdominal pain, in your estimation, under the
23 regs and protocols for your facility, would
24 Mr. Rodriguez be under an obligation to
25 perform at least an initial physical exam to

34 (Pages 130 to 133)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 134

1  evaluate that condition?
2  A    You're talking prior to this?
3  Q    Yes.
4  A    Yes, ma'am.
5  Q    I'm just saying hypothetically, the
6  day before he did hand in a cop out form to
7  Mike, and he was seen by Mr. Rodriguez with
8  a complaint of severe abdominal pain.  In
9  your opinion as a physician and director of
10 the clinic, would your expectation be that
11 Mr. Rodriguez would see to him and examine
12 him?
13 A    Yes, but --
14 Q    I mean, if that happened, you would
15 expect Rodriguez to see him?
16 A    Right.  But there's no record --
17 Q    Okay.
18 A    -- of him requesting or of him being
19 seen.
20 Q    All right.  The 25th, was this --
21 was Mr. Coggin seen that day as opposed to
22 being put on the call out sheet because of
23 what was reflected --
24 A    Yes, ma'am.
25 Q    -- in that sheet?  Okay.

Page 135

1      Do you have any recollection of how
2  Mr. Coggin, or do you know how Mr. Coggin
3  ended up getting in the clinic that day,
4  whether he was there at 6:00 and stayed or
5  he got called back later or whatever?
6  A    No, ma'am.
7  Q    Okay.  Can the inmates request to
8  see you as opposed to the PA?
9  A    They can request to see me.  The
10 usual procedure is to see the PA three times
11 and then they can request to see me.
12     Now, if the PA doesn't feel
13 comfortable with seeing the patient, I do
14 have an open door policy in which he or she
15 can consult me at any particular time.  And I
16 believe this was the case in this particular
17 case.  He did consult with me that day, the
18 25th.
19 Q    ...All right.  Do you think you
20 actually performed any kind of physical exam
21 on the 25th, or was that after John was seen
22 you just consulted with Mr. Rodriguez?
23 A    Honestly, I do not remember me
24 laying hands on the patient.
25 Q    Okay.

Page 136

1  A    I could have or perhaps not.  I do
2  not know.
3  Q    Okay.
4  A    I do remember being consulted about
5  it.
6  Q    If a patient requests emergency
7  treatment, should that come to your
8  attention -- I mean, like if they ask to go
9  to the ER because they, from their
10 perspective, feel like they are ill enough to
11 go to the ER, can a PA, without consulting
12 you, make a determination that that's not
13 necessary?
14 A    That -- yes and no.
15 Q    Okay.
16 A    If a patient tells the PA that he's
17 got a lot of pain in his toe and wants to go
18 to the ER, which has happened, the PA can
19 say, forget it.
20 Q    Okay.
21 A    If the patient can say that he's
22 having different pains and we think we can
23 treat the patient in house, we treat it.
24 Q    Okay.
25 A    If we think we need to send them to

Page 137

1  the ER, he goes to the ER.
2  Q    Acute abdominal pain, in your
3  opinion, can that be treated adequately
4  in the clinical facility there?
5  A    Sometimes it can.
6  Q    Can you do ultrasound there at the
7  clinic?
8  A    No, ma'am.
9  Q    Can you do upper GI testing?
10 A    No, ma'am.
11 Q    Can you do lower GI testing?
12 A    No, ma'am.
13 Q    Can you do anything other than just
14 flat x-rays or plain films?
15 A    Yeah.  We can do uprights.
16 Q    Plain films?
17 A    Plain films.
18 Q    All right.  And do you actually read
19 the films or do you have a radiologist come
20 in and read them?
21 A    We have a radiologist that reads
22 them.  Sometimes I do make a wet reading, but
23 I am not a radiologist.
24 Q    Okay.  I'm looking at that note from
25 7/25 at 7:05.  This note was available to you

35 (Pages 134 to 137)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 138

1  when you consulted with Mr. Rodriguez about
2  Mr. Coggin?
3  A      Yes, ma'am.
4  Q      All right. Since the injectables
5  that we were talking about, it looks like
6  they were actually prescribed by you, do you
7  think that at the time he got the shots and
8  all that, that you were actually present for
9  that?
10  A      Maybe not. The prescription was
11  there. The PAs can give the injections.
12  Q      Okay. The reason I'm asking is some
13  medications the PAs can just order without
14  you co-signing them at the time, correct?
15  A      Yes, ma'am.
16  Q      Would Rocephin be one of those?
17  A      No.
18  Q      Okay. And the Tordol, I mean,
19  that needs you in the equation, correct?
20  A      Yes, ma'am.
21  Q      What I'm trying to get a sense of,
22  Coggin said that he was called back in later
23  and you actually laid hands on him?
24  A      Could have been. I don't remember.
25  Q      But would it be fair to say that at

Page 139

1  least from the 25th, the only written note
2  appears to be from Mr. Rodriguez?
3  A      Right. Well, hold on. Rodriguez,
4  he saw him the next day also. Yeah,
5  apparently he saw him the next day.
6  Q      Pardon?
7  A      Apparently he saw him on the next
8  day, the 26th.
9  Q      All right. And that note -- let me
10  .make sure.
11  A      He was complaining that the Tylenol
12  Number 3 is causing him GI discomfort.
13  Q      I don't think in all of my copies I
14  have that note, but let me just double check.
15  No, I don't. Let me take another look.
16          I just want to get so we can look at
17  the same pages.
18          Nope. In all my sets, I don't have
19  that page. Can he get that one? We'll get a
20  copy of that page.
21
22          (Off the record discussion.)
23
24  Q      But on 7/25, if we can go back to
25  that note and we'll get the other part in a

Page 140

1  minute. It looks like it indicates that
2  right upper quadrant pain for four days
3  radiating to his back, decreases?
4  A      Bowel sounds decreased.
5  Q      Excuse me?
6  A      Bowel sounds decreased.
7  Q      Oh, I see, down further. I'm
8  talking -- it decreases essentially --
9  Up here at the top (indicating).
10  A      Where are you reading?
11  Q      Up here at the top (indicating).
12  A      Okay.
13  Q      Okay. I'm trying to --
14  A      I think it says increases.
15  Q      Increases?
16  A      Uh-huh (in the affirmative).
17  Q      Essentially after I eat?
18  A      Especially if you -- there is
19  another note by Rodriguez later on that says
20  that, or by me, increases. I would have to
21  review it.
22  Q      Okay.
23  A      Hold on a second. It was done by
24  Rodriguez. This was by Ms. Little an 8/22.
25  Where it says, "Aggravated by food."

Page 141

1  Q      Okay.
2  A      So I tend to believe that knowing
3  his handwriting, that is a little bit --
4  Q      That it's more increasing with
5  foods?
6  A      Increases with food.
7  Q      Okay.
8  A      In which -- yeah.
9  Q      All right. Let me ask you this:
10  If someone who has ulcer disease, food can
11  increase their discomfort or their pain?
12  A      It can increase or decrease.
13  Q      Sure. That can happen with
14  gallbladder disease as well?
15  A      It can happen with gallbladder
16  disease as well.
17  Q      But that complaint, that symptom,
18  could be consistent with both?
19  A      At the time with everything we had
20  in our hand, I still believe that this is
21  more adequate for a gallbladder. And we did
22  extensive studies.
23          And if you look at the specialist
24  that we sent him on the outside, he uses the
25  word increases with fatty food.

36 (Pages 138 to 141)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 142

1  Q    All right.
2  A    Do you want to go over that one?
3  Q    No. Okay. We'll get there. But
4  what I'm trying to get a sense of is, when
5  you see someone and they are complaining of
6  abdominal pain and right upper quadrant pain,
7  there are a number of things that come to
8  mind that could be going on with the patient.
9        And my question simply is: That
10 kind of complaint could be consistent both
11 with ulcer disease as well as gallbladder
12 disease?
13 A    Yeah. And we were thinking
14 inclusive trying to discard pancreatitis,
15 which you haven't mentioned.
16 Q    There are a number of things.
17 A    Yeah, exactly. Many things that can
18 cause it.
19 Q    Right.
20 A    Diverticulitis can give it to you.
21 Q    All right, sir. So you were looking
22 basically for any of the things that could
23 give rise to pain with this kind of
24 presentation in the abdomen?
25 A    Right.

Page 143

1  Q    It looks like there's a note here,
2  "History of gallstones, diagnosis by
3  ultrasound"?
4  A    Yes.
5  Q    Now, does that refer to the
6  ultrasound that was later done or was that --
7  A    I believe it has to reflect the
8  ultrasound that was either done -- and he may
9  have put that note to himself as a reminder.
10 Q    Okay.
11 A    Because it doesn't make sense to me.
12 Q    Okay. It's probably referencing
13 that ultrasound --
14 A    Yeah. He was trying to figure out,
15 okay, does he have it or going to have it,
16 and then apparently he put the note after we
17 got the ultrasound, in my opinion. I don't
18 really know, but I think that's what
19 happened.
20 Q    Well, I can ask him. We'll get to
21 that.
22        Decreased bowel sounds, the right
23 upper quadrant, extremely tender to the
24 touch. And the pain is radiating to the
25 scapular region?

Page 144

1  A    That's more like gallbladder.
2  Q    Sounds like gallbladder. But you
3  would have to agree with me, it also could be
4  an ulcer?
5  A    You have to agree with me that it
6  sounds more like gallbladder.
7  Q    Okay. But can we have a truce that
8  it also could be that problem?
9  A    It could be many things.
10 Q    Right. But, I mean, it's consistent
11 with that?
12 A    It can be many things.
13 Q    All right. I just want to make sure
14 that kind of finding, you're not telling me
15 today absolutely couldn't have been an ulcer?
16 A    No. No. No.
17 Q    Got you. All right. We're on the
18 same sheet. Okay. So he analyzes it and
19 says he thinks it's cholelithiasis or
20 chololithiasis, meaning inflammation of his
21 gallbladder or infections?
22 A    Cholelithiasis by definition is a
23 stone.
24 Q    Stone. Okay. Do you think he could
25 make that diagnosis before he got the

Page 145

1  ultrasound, stone and gallbladder diagnosis
2  before he got the ultrasound?
3  A    From the description of the
4  symptomatology, I would tend to agree with
5  him. In fact, I remember I agreed with him
6  when I co-signed all this.
7        In fact, had I laid hands on the
8  patient myself, I do not remember. I may
9  have or may have not. But I agree with him
10 in that the symptomatology more gears towards
11 a problem, any problem in the gallbladder
12 than any problem in the stomach.
13 Q    Okay. What I'm trying to get a
14 sense of is because, like you said, there are
15 some things in here that while this note is
16 timed 7:05 --
17 A    Yes, ma'am.
18 Q    -- there are some things in here
19 that appear to have come later in the day
20 after some testing was done and so on?
21 A    Yes, ma'am.
22 Q    When we see 7:05, that doesn't
23 necessarily mean this note was written at
24 7:05?
25 A    It may have been started at 7:05.

37 (Pages 142 to 145)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 146

1  Q      I got you.
2  A      The case may have been an ongoing
3  case and later when we had certain things,
4  it closed the door.
5  Q      Okay. That's all I'm trying to get
6  to.
7  A      More than likely that's what
8  happened.
9  Q      Right.
10  A      Because it says x-ray done, it shows
11  the x-ray was not done at 7:05. Nothing
12  happens at exactly one moment.
13  Q      Okay. It looks like he was given
14  Rocephin and the Tordol, and a script for
15  Tylenol Number 3. And then you all did an
16  x-ray and it showed a stone on the left side,
17  a renal stone?
18  A      Yes, ma'am.
19  Q      All right. The renal stone on the
20  left side wouldn't necessarily be consistent
21  with the pain complaints he had on the right
22  upper quadrant, correct?
23  A      No.
24  Q      So you all were not thinking, he's
25  trying to pass a kidney stone at this point,

Page 147

1  were you?
2  A      Not necessarily, no. But on x-ray
3  if he does have a kidney stone on the left
4  side, there may be the possibility that he
5  does have a kidney stone on the right that
6  is not showing due to the fecal matter
7  because he was not appropriately prepped.
8  Q      All right.
9  A      I believe that's why an IVP was done
10  later on him.
11  Q      Okay. So the idea was we'll do some
12  more follow-up radiological studies if things
13  don't abate and look at his labs. And it
14  looks like they gave him some information
15  about gallstones, about diet and all of that
16  in that first visit; is that correct?
17  A      Yes, ma'am.
18  Q      All right. And it looks like you
19  all gave him an Idle sheet, I-d-l-e, on that
20  date so he could be off work until the 29th?
21  A      Yes, ma'am.
22  Q      Okay. And it also appears that on
23  that day there was an abdominal film, AP and
24  lateral done that reflected that
25  calcification on the upper pole on the left

Page 148

1  kidney?
2  A      I got it.
3  Q      All right. Looking at that document
4  which says abdomen AP and lateral on the exam
5  requested. And the request was for right
6  upper quadrant abdominal discomfort, radiates
7  to right scapular region. And it looks like
8  Rodriguez requested it. And it was requested
9  on the 25th.
10  A      And done on the 25th.
11  Q      And done on the 25th, because where
12  it says exam in the typed part lower, that
13  tells us when the film was actually done,
14  correct, down here (indicating)?
15  A      Yes, ma'am.
16  Q      Okay. When I read that, Ms.
17  Vining's evaluation, she's talking about an
18  ultrasound from July 30th, okay, in that
19  note, in that dictated note. And I'm trying
20  to guess how she had ESP on that moment. Do
21  you see what I'm saying?
22  A      Yeah.
23  Q      It looks like this was over read
24  sometime after July 30th when she had the
25  ultrasound?

Page 149

1  A      She may have done that -- you're
2  right on that. She may have done that and
3  referred to the abdominal ultrasound.
4  Q      All right.
5  A      And whether he was -- usually we get
6  a reading, and if we ask to have it referred
7  or the radiologist deems it necessary to have
8  it referred to another study, they usually
9  put an addendum. Why she did not put an
10  addendum, referred to something that was done
11  at a later date, I do not know whether it was
12  the transcriber, the doctor itself, I do not
13  know. That wasn't typed by us.
14  Q      Okay. Do you think you did a wet
15  read on that film that day?
16  A      That we did a wet reading?
17  Q      Right.
18  A      Probably.
19  Q      Okay. And it looks like a KUB --
20  well, no, that's the next day. I'm getting
21  ahead of myself. Okay. All right. But it
22  looks like at least her report is generated
23  somewhere down the path after some other
24  studies have been done?
25  A      Yes, ma'am.

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

Page 150

1  Q      Okay. Then I'm looking at the labs
2  from 725, and it looks like they were
3  collected at 9:54 in the morning, you with
4  me?
5  A      Yep.
6  Q      Okay. Anything about his labs that
7  gave you more information that indeed this
8  was a gallbladder circumstance as opposed to
9  some other kind of abdominal process?
10  A      He gave me no information as to
11  anything.
12  Q      One way or the other?
13  A      Uh-huh (in the affirmative).
14  Q      You didn't see any problems with the
15  Amylase?
16  A      Unh-unh (in the negative).
17  Q      And would you have expected to have
18  seen, if indeed he was having issues with a
19  gallstone, wouldn't you have expected to see
20  something with his Amylase or maybe his liver
21  function studies?
22  A      Not necessarily.
23  Q      Okay.
24  A      Maybe if he had a pancreatic
25  problem, yes. But not necessarily with a

Page 151

1  gallbladder.
2  Q      All right. How about his liver
3  function studies, would you expect it --
4  A      Not necessarily.
5  Q      All right. But in an acute stone
6  circumstance in the gallbladder that's
7  actually giving rise to pain, wouldn't you
8  expect to see some aberration in his labs
9  that are --
10  A      Maybe, maybe not. I have seen them
11  without it.
12  Q      Okay. The only thing that looks
13  like is off is his Anion gap. What did you
14  attribute that to?
15  A      The Anion gap was basically two over
16  normal. So I didn't give any importance to
17  that.
18  Q      Okay. Then he got his prescriptions
19  filled and then he returned the next morning
20  on the 26th?
21  A      Yep.
22  Q      Okay. If you don't mind, I'm going
23  to look over your shoulder.
24  A      Not at all.
25  Q      All right. It looks like at about

Page 152

1  10:00, he's back in seeing Rodriguez?
2  A      Uh-huh (in the affirmative).
3  Q      And they are reviewing his chart and
4  complains Tylenol Number 3 is causing --
5  A      GI discomfort.
6  Q      GI discomfort. Okay.
7  A      I have never heard of that one by
8  the way.
9  Q      Okay. So you wouldn't have expected
10  Tylenol 3 to cause anybody's belly to hurt?
11  A      Neither -- with neither of the
12  presumptive things that you have mentioned
13  before, I have heard any GI discomfort with
14  it.
15  Q      Okay. The Tylenol 3. So if he's
16  got GI discomfort, it may be not necessarily
17  from the Tylenol Number 3?
18  A      Right.
19  Q      Okay. No changes in his physical
20  exam, or no objective changes, I guess?
21  A      Exactly.
22  Q      All right. Now we have
23  cholelithiasis, and --
24  A      Nephrolithiasis.
25  Q      Nephrolithiasis, that's the kidney

Page 153

1  stone. That's two things, because he's now
2  got the film showing a stone on one side,
3  correct?
4  A      Yes, ma'am.
5  Q      All right. And then an ultrasound
6  is ordered right away?
7  A      Uh-huh (in the affirmative).
8  Q      And going to follow-up after the
9  ultrasound, IVP, that order process starts --
10  that's not something that's going to happen
11  just, boom, you've got to get them NPO over
12  night?
13  A      Yes. And you have to usually clean
14  the person.
15  Q      Right. Okay. And stopping the
16  Tylenol Number 3. And at that point Motrin
17  800 milligrams TID is ordered for this
18  gentleman by Rodriguez?
19  A      Uh-huh (in the affirmative).
20  Q      And then he gives a pamphlet on
21  kidney stones?
22  A      Yes.
23  Q      Then it looks like the pharmacist
24  shows Tylenol 3 DC'd. Motrin filled.
25  Written information given. That's Mr.

39 (Pages 150 to 153)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 154

```
 1   Fulmar.
 2   A      Right.
 3   Q      And then the next note we have in
 4   the actual chart is on 7/28, but clearly some
 5   things went on between the note of the 26th
 6   and the 28th, in terms of radiological
 7   studies, is that correct, because I'm looking
 8   at KUB was done on 7/26?
 9   A      Yes.
10   Q      Okay.  And that one again notes the
11   calcification in the left kidney upper pole?
12   A      Yes, ma'am.
13   Q      It doesn't really give us any
14   information on the right side whatsoever?
15   A      Right.
16   Q      Okay.  Does it reflect the next time
17   there's any note is the 7/28.  And that, I
18   believe, is -- July 27th is a Friday so then
19   there's a note there for the 28th; is that
20   correct?
21   A      Yes, ma'am.
22   Q      Is that -- who makes that note to
23   the chart?
24   A      Nurse Lake.
25   Q      Pardon?
```

Page 155

```
 1   A      Nurse Lake.
 2   Q      Lake?
 3   A      Uh-huh (in the affirmative).
 4   Q      And she reflects that he comes to
 5   the pill line.  At pill window stating he was
 6   on call out to clinic in the morning and
 7   wanted to know why.  And instructed to be NPO
 8   after midnight Sunday and voiced
 9   understanding; is that correct?  And that was
10   about 11:30 on Sunday?
11   A      Yes.
12   Q      So you all had the IVP set up for
13   Monday?
14   A      Apparently so.
15   Q      Does your record reflect any call
16   from the Lieutenant's office made to
17   Rodriguez on Sunday night?
18   A      7/29?
19   Q      Yes.  7/29.
20   A      No.
21   Q      If a call is made to Rodriguez at
22   home about Mr. Coggin, would there
23   necessarily be charting about that?
24   A      Sometimes it is charted, sometimes
25   it is not.
```

Page 156

```
 1   Q      All right.  If indeed this patient
 2   had the Lieutenant's office call because he
 3   was having severe abdominal pain and
 4   Rodriguez was called thereafter, would it
 5   have been acceptable to you to advise him to
 6   return to his bunk and take his Motrin and
 7   wait until he gets his follow-up exam on
 8   Monday?
 9   A      Would you please repeat that?
10   Q      Sure.  If he came to the
11   Lieutenant's office complaining of severe
12   pain in his abdomen, and they called
13   Rodriguez, would Rodriguez necessarily call
14   you or would he handle it?
15   A      He could have handled it.
16   Q      Okay.  If, with a complaint of
17   extremely severe pain, would it have been
18   prudent for Rodriguez to advise this patient
19   to go back to his bunk and take more Motrin
20   for the pain and wait until the morning when
21   they were going to get the rest of the tests
22   done?
23   A      If he was thinking of a gallbladder
24   and he was familiarized with the patient, and
25   he knew more or less the intensity, it
```

Page 157

```
 1   depends on what they spoke.  It may have been
 2   prudent to say, yes, go back to your bunk or
 3   not.
 4   Q      Okay.  All right.  It looks like on
 5   the 30th, he was sent out to Medical Imaging
 6   Associates for the ultrasound?
 7   A      Yes, ma'am.
 8   Q      And he was also given a 24 hour
 9   urine collection kit to do; is that correct?
10   A      Yes, ma'am.
11   Q      Is there any recording in the chart
12   of his physical condition on the 30th, how he
13   was doing, how he was feeling, what his pain
14   level was?
15   A      No.
16   Q      All right.  It looks like I'm
17   looking at, from the 30th, a medical
18   restriction where he's put off on Idle until
19   the 31st by Beverly --
20   A      Downs.
21   Q      -- Downs, the LPN?
22   A      Uh-huh (in the affirmative).
23   Q      All right.  And then it's --
24   A      It's co-signed by me.
25   Q      Co-signed by you in August.  Does
```

40 (Pages 154 to 157)

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 158

1  she, the LPN, have the ability to put them
2  off work if --
3  A      Yeah.
4  Q      -- she feels it's necessary?
5  A      Yeah.
6  Q      All right.
7  A      Sometimes we give them a break
8  whether they need it or not so they can rest.
9  Q      All right.
10  A      Especially in somebody that we're
11  doing studies and things of that nature.
12  Q      Is she one of the blood drawing
13  nurses?
14  A      No.
15  Q      Okay. How would John have gone
16  about getting such a form signed by this
17  nurse?
18  A      Sometimes she would have been at the
19  place of the x-ray tech. And she would do
20  some screenings, and the screening would
21  consist mainly, okay, let me give you some
22  time off. And they come back and see later
23  the PA, or come back tomorrow if you are not
24  that bad off, whatever.
25  Q      All right. I note that there is an

Page 159

1  Advanced Medical Imaging Center, Diagnostic
2  Study Report from the abdominal ultrasound of
3  7/30/01?
4  A      Yes, ma'am.
5  Q      And it looks like Vining was the
6  radiologist?
7  A      Uh-huh (in the affirmative).
8  Q      And it looks like it's stamped by
9  you for 8/10/01?
10  A      Uh-huh (in the affirmative).
11  Q      And stamped by Rodriguez and
12  initialed as well 8/1/01; is that correct?
13  A      Yeah.
14  Q      All right. Does Dr. Vining work at
15  Advanced Medical Imaging Center or was that
16  test actually done at clinic?
17  A      No. She works at Advanced Imaging
18  Center.
19  Q      All right.
20  A      Or used to. I'm not sure if she's
21  there anymore.
22  Q      All right. But he was sent out,
23  done the test, when you stamp this and
24  initial it, does that indicate that you have
25  actually seen the report?

Page 160

1  A      That's when I saw the report. Yes,
2  ma'am.
3  Q      All right. And does this ultrasound
4  give you any indication as to what is going
5  on with this patient?
6  A      Absolutely.
7  Q      Tell me what it tells you.
8  A      It tells me that the second line,
9  that this may represent a poorly calcified
10  stone, polyp, or small area of impacted
11  sludge.
12  Q      All right. Obviously a poorly
13  calcified gallstone would mean he has a
14  gallstone that may be giving him problems?
15  A      Uh-huh (in the affirmative).
16  Q      Right?
17  A      Or the sludge or a polyp.
18  Q      Now, a polyp in the gallbladder
19  would be indicative of what?
20  A      More than likely cancer.
21  Q      All right. Sludge indicative of
22  anything specific?
23  A      Sludge, not indicative of specifics,
24  but do you remember that you asked me when I
25  used to be a surgical assistant, in the olden

Page 161

1  days we didn't have the laparoscopic type of
2  thing.
3  Q      Right.
4  A      Many a gallbladder that were taken
5  out did not show any gallstones.
6  Q      Just sludge?
7  A      Or polyps. And when we opened it
8  up, it was sludge. It looked like mud.
9  Q      Okay. All right.
10  A      And that's what it says here.
11  Q      All right. This study was reviewed,
12  I mean, it looks like it was on the chart by
13  8/1/01, at least, because that's when
14  Rodriguez signs off. But the first time you
15  actually saw the study itself was 8/10/01?
16  A      Yes, ma'am. Apparently so.
17  Q      All right. He also had labs done on
18  7/31. It looks like the creatinine clearance
19  on the 24 hour urine --
20  A      Kidney function test.
21  Q      Right. It looks like those are all
22  within normal limits?
23  A      Uh-huh (in the affirmative).
24  Q      And probably less problems with the
25  kidney stone maybe if that all looks pristine

41 (Pages 158 to 161)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 162

1  as it does?
2  A     Yes, ma'am.
3  Q     Okay. Would it be fair to say that
4  the idea that there was a kidney stone at
5  that point, at least after the 24 hour urine
6  and radiological studies were much lower down
7  on your differential?
8  A     They were.
9  Q     All right. Especially since the
10 pain was the opposite side of the stone?
11 A     Yep.
12 Q     Okay. Then it looks like the IVP
13 got set up for 8/1. And there were no visits
14 with --
15 A     8/6.
16 Q     8/6 is the next visit. So 8/1 he
17 goes back after being prepped for his IVP?
18 A     Uh-huh (in the affirmative).
19 Q     And it looks like you signed off on
20 that on 8/10 as well?
21 A     Yes.
22 Q     Okay. And it looks like you got a
23 1.5 stone in the upper pole of the left
24 kidney?
25 A     Uh-huh (in the affirmative).

Page 163

1  Q     And doesn't look like it's giving
2  him any trouble?
3  A     No.
4  Q     Everything else looks fine?
5  A     Yeah.
6  Q     Nothing on the right?
7  A     Yeah.
8  Q     It looks like also on 8/1 he had a
9  stat creatinine/BUN, and that was done prior
10 to the IVP being given to make sure he was
11 okay to give it?
12 A     Before you get an IVP, you should
13 get a creatinine, yes.
14 Q     He looked fine for that?
15 A     Uh-huh (in the affirmative).
16 Q     All right. The next note is 8/6?
17 A     Uh-huh (in the affirmative).
18 Q     I'll come back over there.
19        1500, it says follow-up by
20 Rodriguez. No pain. Gallstones slash kidney
21 stones. And then --
22 A     24 hour urine, creatinine.
23 Q     He's ordering the 24 hour urine at
24 that point?
25 A     Yeah.

Page 164

1  Q     That note is dated 8/6, but it looks
2  like the 24 hour urine had already long been
3  done. I mean, it was done five days earlier.
4        Do you have any explanation for why
5  Rodriguez is not making a note until five
6  days later?
7  A     No.
8  Q     All right. Would that be something
9  you would have expected him to do or should
10 have known --
11 A     No. It should have happened the
12 same day that he was seen.
13 Q     All right. Mr. Coggin recalls that
14 he saw Rodriguez on the 3rd, that Friday
15 after he had had all the tests and was told
16 that he had a kidney stone, sludge in his
17 gallbladder, no gallstones, told to modify
18 his diet and --
19 A     Which day was that now?
20 Q     Friday, August 3rd. But there's no
21 note in there reflecting that, is there?
22 A     Right.
23 Q     Okay. Would that be standard
24 procedure to see a patient, evaluate a
25 patient, and --

Page 165

1  A     No.
2  Q     -- consult with a patient and not
3  make a note?
4  A     No. Most of the time, although
5  we're not perfect, most of the time that
6  there is a patient encounter, especially
7  if we tell them something, we record it on
8  the chart.
9  Q     All right. The next -- well, when
10 we had the 8/6 note but there doesn't -- that
11 doesn't seem to -- if he was seen on the
12 3rd -- if he does not recall being seen -- we
13 just have a discrepancy there, the 6th and
14 the 3rd.
15 A     I understand. Sometimes we do tell
16 a patient, you know, if this is of no
17 importance, you didn't have any real problems
18 in your kidneys, and it's not recorded.
19 Q     Okay.
20 A     Sometimes that happens. We're
21 human, you know.
22 Q     All right. It looks like the
23 next --
24 A     It should have been recorded.
25 Q     It should have. All right.

42 (Pages 162 to 165)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 166

1    A    I agree.
2    Q    All right. The next note we see is
3    8/10/01, the typed up --
4    A    8/8.
5    Q    Yeah, 8/8. I'm sorry.
6         And that's the Chronic Care Clinic,
7    hypertension. Is that different than a, you
8    know, like a cop out visit or a follow-up
9    visit?
10   A    Yes, ma'am.
11   Q    All right. He's a blood pressure
12   patient. You all have protocols to follow up
13   on those folks regularly?
14   A    Yes, ma'am.
15   Q    Okay. It says here, "Patient to
16   clinic this date for chronic care assessment
17   due to recent finding of hypertension."
18   Well, that's just not true, is it?
19   A    No.
20   Q    Okay. No somatic complaints.
21   Denies shortness of breath, chest pains or
22   dyspnea.
23        Does it look like at this visit
24   he was being evaluated in any way for his
25   abdominal complaints?

Page 167

1    A    Well, if you look down where it says
2    abdomen, functional bowel sounds, no
3    tenderness -- it was not addressed, but he
4    was checked.
5    Q    All right. Well, the reason why I
6    ask is when I look at this note, there are
7    things that don't --
8    A    And two days before it says no pain.
9    So you have two days that have no pain.
10   Q    Okay.
11   A    Which can happen in both
12   gallbladder --
13   Q    And peptic ulcer disease?
14   A    Uh-huh (in the affirmative). And
15   diverticulitis, if you want to bring more.
16   Q    I don't mean to be critical, but I'm
17   looking at this note, and this looks like the
18   note you would write on just about everybody
19   in the world in a chronic clinic for
20   hypertension because like the first line
21   doesn't even have anything to do with John.
22        And my concern was the handwritten
23   note down here at the bottom says -- well,
24   EKG, chest x-ray, micro albumen, do you know
25   what those other things are, is that a lab?

Page 168

1    A    Yeah. CP24. CP24 is a
2    comprehensive which would give you
3    electrolytes, glucose, kidney function test,
4    liver function test.
5    Q    But it looks like on that day his
6    blood pressure was up to 162 over 89?
7    A    Yes, ma'am.
8    Q    Okay. Under the comments it says --
9    A    And he gave them a card for to keep
10   the blood pressure record. And the blood
11   pressure to be checked at least three times a
12   week.
13   Q    Okay. And then this one here, do
14   you know what this -- is this a
15   recommendation to decrease weight or is
16   this --
17   A    No. That is a wrong entry there
18   because in those comments, what we usually do
19   is educate a patient as to weight, and/or
20   exercise, or something else. Well, he
21   probably was. He probably was given
22   recommendations to decrease weight because he
23   may have been overweight. I don't know.
24   Q    Okay.
25   A    I really don't know. Maybe he did

Page 169

1    tell the patient to lose weight. What date
2    is that?
3    Q    8/8, this date.
4    A    Yeah. Patient is educated to the
5    importance of diet and exercise. Use of
6    prescribed medication, blah, blah, blah.
7         So more than likely he was telling
8    him to lose some weight, that he was fat --
9    that he was overweight.
10   Q    All right. And then labs were done
11   that day and it looks like the creatinine in
12   his urine and his creatinine clearance was
13   low as well as the specific gravity of his
14   urine. Here, I'll make it easier.
15        Does that have any clinical
16   significance to you as the physician in this
17   clinic?
18   A    If the creatinine would be high, the
19   kidneys are not functioning well. I'm
20   honestly lost with the lower creatinine in
21   this case.
22   Q    All right. And then when is the
23   next time that you show an interaction with
24   Mr. Coggin in your clinic?
25   A    Mine?

43 (Pages 166 to 169)

301 Title Building/300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 170

1  Q    Yes.
2  A    The 27th.
3  Q    The 27th?
4  A    Uh-huh (in the affirmative).  8/27.
5  He was seen before by Ms. Little.  And Ms.
6  Little consulted with me.
7  Q    All right.  I'm looking and I see a
8  note from 8/8 and then there's an 8/22 note?
9  A    Yeah.  It's still from 8/8 is the
10 pharmacist.  8/22 is from Ms. Little.  And so
11 is this one.  And she did consult with me in
12 both cases.  I do remember that.
13 Q    All right.  Do you show any
14 interaction with any of your staff for the
15 weekend of August 18th and 19th?
16 A    Not on the record, no.
17 Q    All right.  If the patient came to
18 the correctional staff and complained of
19 being in extreme pain and needing to go to
20 the emergency room, it's not reflected
21 anywhere in this chart, is it?
22 A    It is not, no.
23 Q    If Officer Davis had called the
24 Lieutenant's office and was told to bring him
25 down there so they could size him up, that's

Page 171

1  not reflected anywhere in that chart?
2  A    No, it isn't.
3  Q    Would it be reflected elsewhere in
4  his, not chart, but his file, for the general
5  prison circumstance, not, you know, for the
6  correctional officers if an inmate is brought
7  to them like to the Lieutenant's office and
8  there's any kind of interaction or
9  intervention there, is that housed in a
10 different document?
11 A    Yes.
12 Q    All right.  So there may be
13 recording of that episode elsewhere?
14 A    It would be recorded somewhere in a
15 different log.
16 Q    Okay.  Great.  If Snyder, after
17 talking with Mr. Coggin that Saturday night
18 the 18th, had said or decided to call
19 Rodriguez at home at 2:30 in the morning that
20 Sunday morning, and told him he was in
21 extreme abdominal pain, would you have
22 expected Rodriguez to note that or contact
23 you?
24 A    I would have expected him either to
25 evaluate him and make a decision whether to

Page 172

1  send him up or not and/or contact me if he
2  did send him out.
3  Q    Okay.  At that point, had you formed
4  any opinion that this was indeed gallbladder,
5  and that would have been 8/19?
6  A    I'm sorry?
7  Q    On August 19th, had you already in
8  your mind determined that --
9  A    I don't have an August 19th.  I
10 don't have a record here.
11 Q    No.  No.  No.  I'm just saying by
12 the 19th of August, had you in your mind come
13 to a decision or a diagnosis that this
14 gentleman had a gallbladder problem, was that
15 the working diagnosis?
16 A    The working diagnosis had been, from
17 the beginning, gallbladder problem.  We had a
18 sonogram to back it up and the whole nine
19 yards.  This was to me a gallbladder.
20 Q    All right.  Had you done any test to
21 rule out peptic ulcer disease at that point?
22 A    No, ma'am.
23 Q    What kind of tests are done to rule
24 out peptic ulcer disease?
25 A    The most accurate one would be an

Page 173

1  EGD.
2  Q    Could you have ordered a hemoculture
3  of the stool to test for occult bleeding?
4  A    Of course.
5  Q    But that was never ordered?
6  A    It was never ordered and it was
7  never suspected, otherwise it would have been
8  ordered.
9  Q    Do you see any of the notes up until
10 this point where anyone made an inquiry as to
11 the nature and character of the stools?
12 A    Not that I recall.
13 Q    Okay.
14 A    I don't see it even with Ms. Little.
15 She's the one I'm reading right now.
16 Q    All right.  With the working
17 diagnosis of gallbladder disease -- let me
18 withdraw that one.
19      At this point in time, I guess up to
20 the 20th of August, was this gentleman still
21 under prescription for Motrin to treat the
22 pain for the right upper quadrant pain?
23 A    What date?
24 Q    The 19th, 20th.
25 A    I mean, no medication had been

44 (Pages 170 to 173)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 174

1 changed. Prescription went from thirty days,
2 from the 25th he received the medication
3 until the 26th of August.
4 Q       Okay.
5 A       So, yes. The date you're asking me,
6 he was still on the one pill three times a
7 day as needed.
8 Q       All right.
9 A       August 22nd.
10 Q      August 22nd. The first note is from
11 the nurse?
12 A       Yes, ma'am. Nurse Practitioner
13 Little.
14 Q       Little. And she indicates he's
15 complaining of right upper abdominal pain
16 and nausea and vomiting since the night
17 preceding, correct?
18 A       Uh-huh (in the affirmative).
19 Q       And unable to eat for three days?
20 A       Uh-huh (in the affirmative). Pain
21 aggravated by food.
22 Q       Okay. Nothing seems to relieve it.
23 No identifiable alleviating factors, correct?
24 A       Uh-huh (in the affirmative).
25 Q       And she gets vital signs on him,

Page 175

1 listens to his belly, and hears bowel sounds
2 all four quadrants, but does determine that
3 he has guarding and right upper quadrant
4 tenderness on palpation, correct?
5 A       Uh-huh (in the affirmative).
6 Q       And she checks for his liver as
7 well?
8 A       Uh-huh (in the affirmative).
9 Q       He is given a shot of Nubain which
10 is a pain medication?
11 A       Yes, ma'am.
12 Q       Now, does the nurse have the ability
13 to go on and give a pain shot like that
14 without calling you first?
15 A       No. Only under my direction.
16 Q       Under your direction. So you think
17 that on the 22nd, she in some way, form or
18 fashion, had contacted you or do you think
19 you actually saw the patient?
20 A       Her office was right next to mine.
21 Q       Okay.
22 A       So in both instances, she called me
23 over, what do you think, Doctor, should I
24 give him some Nubain? I looked at the
25 patient. I did not examine him. I think,

Page 176

1 yes, I agree with that.
2 Q       So his pain at that point at least,
3 seemed to be of the character and quality
4 that would justify giving him an injectable
5 pain indication such as Nubain?
6 A       Yes, ma'am.
7 Q       All right. Do you know if you
8 actually did a physical exam on him on that
9 day?
10 A       No. I do not remember.
11 Q       All right. If you had done one, do
12 you believe you would have charted in his
13 chart your findings?
14 A       Maybe, maybe not since the nurse
15 practitioner was doing it.
16 Q       But if you found something --
17 A       If I found something different.
18 Q       You would have noted it?
19 A       Yes. Absolutely.
20 Q       All right. At that point, could you
21 rule out with these symptoms as described on
22 8/22, peptic ulcer disease in this man?
23 A       Again, with everything we had up to
24 8/22 and even 8/23, we were all thinking of a
25 gallbladder problem. And I agreed with it.

Page 177

1 Sometimes I put I concur, and in this
2 particular case I did not -- in this
3 particular chart, I did not use that word.
4 Sometimes I do put that.
5 But the signature for the Nubain was
6 not only for the Nubain, but it kind of like
7 concurring with whatever Nurse Practitioner
8 Little examined and found on this patient.
9 Q       All right. And they ran a UA and it
10 looked like it was within normal limits?
11 A       Uh-huh (in the affirmative).
12 Q       Correct?
13 A       Yep. Correct. I'm sorry.
14 Q       And it looks like some labs -- well,
15 no labs were done on that day, he just got
16 the Nubain shot and thereafter it was
17 returned to the population?
18 A       Uh-huh (in the affirmative). And
19 she planned to see him the next day at 10:00
20 a.m. for further evaluation.
21 Q       All right.
22 A       Which she did.
23 Q       Do you see a cop out form for that
24 visit?
25 A       No.

45 (Pages 174 to 177)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 178

1  Q     All right.  Should there have been a
2  form filled out for, I mean, he obviously
3  didn't have a scheduled appointment for that
4  date?
5  A     The 22nd?
6  Q     Yes.
7  A     No.  The 23rd he did, but the 22nd
8  did he not.
9  Q     So how is it that he is seen that
10  day without a cop out?
11  A     He either presented himself to sick
12  call in the morning, early in the morning.
13  He was told to hold until later or given an
14  appointment for later that day, or somebody
15  on the staff sent him.  I do not know.
16  Q     Do you recall on that day if Charlie
17  Hudson called over to the clinic because of
18  his concerns about Mr. Coggin's condition?
19  A     (Witness indicated by nodding head
20  negatively).
21  Q     You don't have any recollection of
22  that?
23  A     (Witness indicated by nodding head
24  negatively).
25          MR. DOYLE:  Doctor, you have to give

Page 179

1  a verbal response.
2  A     No, I do not recall Mr. Hudson
3  calling.
4  Q     All right.  Do you recall if Ms.
5  Beasley, the case manager, called and talked
6  to you at that point or, I mean, I don't know
7  if you remember it that day, but at some
8  point do you remember Beasley calling you?
9  A     With regard to -- let me state
10  something here now.
11  Q     Okay.
12  A     I get many calls from the unit
13  managers, Mr. Charlie Hudson, Mr. Hal Johnson
14  in food service, the operations lieutenant,
15  whoever.  You're asking me specific if I
16  recall Charlie Hudson or Ms. Beasley calling
17  me about Mr. Coggin.  I do not remember them
18  calling me about Mr. Coggin.
19  Q     Okay.  Fair enough.  Now he is
20  complaining of vomiting.  Does that have any
21  impact in terms of your differential
22  diagnosis?
23  A     Yeah.
24  Q     Tell me about that.
25  A     He's got nausea and vomiting, which

Page 180

1  is consistent with gallbladder.
2  Q     Is it also consistent with ulcer
3  disease?
4  A     Yes.  Absolutely, but in a
5  different -- but it would pose a little
6  different type of quality vomitus.
7  Q     And when you say quality of vomitus,
8  what do you mean?
9  A     It would mean that more than likely
10  it could be either regular vomitus or it
11  could be wine colored vomiting, or vomiting
12  with a different type of coloration, dark
13  brown, something.
14          If it was, A, vomiting that had that
15  coloration, it would have been recorded by
16  Nurse Little.  And she did not.
17  Q     Did she ever see the vomitus?
18  A     We record what the patient tells us.
19  Q     All right.
20  A     If the patient did not say that he
21  vomited in a certain color, we don't put it.
22  Q     All right.  So it is up to the
23  patient to describe his vomitus to you in
24  order for that to be evaluated?
25  A     Yes.  Sometimes we ask the patient

Page 181

1  and sometimes not.
2  Q     Any testing done or any instruction
3  that you were aware of, at that point in time
4  as to keeping some vomit -- if he vomits
5  again, we want to see it, or we want to test
6  it, anything like that?
7  A     No.  I don't recall that we run the
8  test of quality of vomitus.  We were geared
9  toward gallbladder, cholecystitis, or --
10  Q     All right.  Well, if he had
11  cholecystitis what would that --
12  A     Which is an inflammation of the
13  gallbladder.  This is for the record.
14  Q     Right.
15  A     I'm going to tell you this because
16  the surgeon that did the procedure, the
17  ultimate procedure, found that the
18  gallbladder was chronically inflamed.
19  Q     Okay.  And with a diagnosis of
20  cholecystitis, the inflammation, would that
21  necessarily be something that would be
22  treated with an antibiotic or some other kind
23  of medication?
24  A     He was given antibiotics in the
25  Rocephin.

46 (Pages 178 to 181)

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 182

1  Q    That was a month before?
2  A    Yes, ma'am.
3  Q    All right. When the 23rd rolls
4  around and I see Nurse Little says,
5  cholelithiasis versus cholecystitis, no
6  antibiotics were given?
7  A    No, because she wanted to see him
8  the next day without anything in order for
9  her to do something and what she did was
10  refer him to the surgeon for me.
11  Q    All right.
12  A    Or to a specialist. That's more
13  than likely why she did not.
14  Q    Okay. Do you think you saw him on
15  that day, the 23rd?
16  A    I do believe I saw him on one or
17  both occasions. I'm not sure. More than
18  likely I told her, I do not remember exactly,
19  but more than likely I was there, since her
20  office was right next to me. And more than
21  likely I said to her, let's refer this guy to
22  a surgeon for, you know, a solution of the
23  situation.
24  Q    All right, sir. Do you recall any
25  conversations with Rodriguez where he seemed

Page 183

1  to be upset that Mr. Coggin was seeking your
2  care over his care, you know, asking him to
3  see a doctor instead of being satisfied with
4  a PA?
5  A    No. It is possible because
6  sometimes the patients want to see me instead
7  of the PA. But in this particular case,
8  again, I do not recall that Coggin
9  specifically said, no, I don't like or want
10  Rodriguez.      _
11  Q    All right. Rodriguez has gone to
12  medical school?
13  A    Rodriguez has -- yes. He has gone
14  to medical school.
15  Q    All right. Do you recall at any
16  point where Rodriguez asked to not be
17  involved with this gentleman's care any
18  longer?
19  A    No.
20  Q    Okay. If he had done so, would he
21  have been allowed to transfer him to another
22  caregiver?
23  A    Usually not.
24  Q    All right. Does it look like he
25  ever did see this patient again or chart at

Page 184

1  least on this patient again?
2  A    I don't know. I would have to look
3  through that. No, because after that we had
4  planned to send him to a specialist on the
5  outside.
6  Q    All right.
7  A    And after that, the unfortunate
8  incident happened where he was sent out.
9  Q    All right.
10  A    And I don't think we saw him ever
11  again after that.
12  Q    If Rodriguez told this inmate that
13  he would never see him again or deal with him
14  again because he was -- did not like his
15  attitude because he felt somehow Mr.
16  Coggin did not respect his qualifications
17  because he kept asking to see you instead of
18  Rodriguez, would that be inappropriate for
19  the PA to do that in that circumstance?
20  A    Nope.
21  Q    It would be okay for him to do that?
22  A    No.
23  Q    It would be inappropriate?
24  A    Inappropriate completely. The PAs,
25  see, they have their inmates work load and I

Page 185

1  do not allow transference and I tell them
2  specifically, if you have any problems with
3  the translation, if you have any problems
4  with the particular patient, I do not mind at
5  all that you call me in to see him, see the
6  patient, while you're in there and be with
7  you, but this is your work load.
8  Q    All right. Okay.
9  A    So if he did ask, which he did not,
10  I would have said no.
11  Q    Okay. On the 23rd when he comes
12  back to see Ms. Little, the nurse
13  practitioner, is that when she began to
14  attempt to get him seen with the surgeon
15  through you?
16  A    I'm sorry. You said something, the
17  nurse practitioner and the surgeon.
18  Q    Yeah. On the 23rd, that's when the
19  referral process started?
20  A    I think so.
21  Q    How does that happen? How do you
22  get him in to see Antonio Williams?
23  A    On the 23rd, we were going to refer
24  him to a surgeon, who worked, I believe,
25  thinking surgeon, thinking a gastro, and I

47 (Pages 182 to 185)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 186

1  did do a consult to see the gastro person on
2  the 27th.
3  Q    All right.
4  A    The gastro person would not have an
5  opening. And if you see your paper, on the
6  9/6, this is a consultation.
7  Q    Okay. I'll catch up to you.
8  A    We couldn't get anything earlier
9  than that.
10  Q    Okay. And that's the form that says
11  consultation sheet, there's a 9/6 at the top?
12  A    Right. We sent him to a surgeon, a
13  gastro. Okay. Let's send him to a gastro
14  first for him to evaluate and possible treat.
15  Q    All right.
16  A    It happens that the earliest we
17  could get was 9/6. I said that's too long of
18  a period of time.
19  Q    Okay.
20  A    And then, it was generated that Ms.
21  Essex who apparently knew somebody in that
22  office, the office of Dr. Williams, okay, and
23  could push a little bit more, called on the
24  28th, the next day that I made this consult.
25  And she spoke to whoever in that office and

Page 187

1  asked to see if they could see the guy, the
2  patient.
3      He was seen the next day by Dr.
4  Williams. Thank God then we had that, and we
5  have a full consultation that was dictated.
6  And you should have a copy of that as well.
7  Q    Okay.
8  A    And his impression at that time was
9  biliary colic versus a polyp. We sent him
10  all the things that we had at that time
11  versus cholelithiasis and planned a
12  laparoscopic cholecystectomy possible
13  intraoperative cholecystectomy. He was also
14  thinking about the same thing that we're
15  doing.
16      If you observe on mine, I put
17  cholecystectomy, gallbladder, which he made
18  the referral to Dr. Williams. She said
19  abdominal pain. She didn't even guide him.
20  She said abdominal pain. And it's not the
21  guide, my thoughts were still into the
22  gallbladder.
23  Q    All right. In the consultation
24  form that you sent to him, did you send his
25  chart with the kind of day by day that had

Page 188

1  been going on?
2  A    No. No. Not his chart. The
3  studies. The chart is not sent.
4  Q    All right.
5  A    So the studies where I meant the
6  ultrasound, the labs, possibly the x-rays,
7  the studies that we had on this patient.
8  Q    All right. If on Sunday, August
9  26th, Mr. Coggin again is brought to the
10  Lieutenant's office for excruciating
11  abdominal pain, in fact, has to even be taken
12  on a golf cart to that office, would that be
13  something that you would expect them to go on
14  and call whoever is on call, Rodriguez, or
15  you, or whoever?
16  A    Yes, ma'am.
17  Q    All right. And if indeed Rodriguez
18  was called, and is asked if this patient
19  could be carried to the emergency room, would
20  the decision to carry him to the emergency
21  room, I mean, could it be referred to you at
22  that point?
23  A    Yes, it could be referred to me.
24  Q    All right. Do you recall Snyder
25  calling you about Mr. Coggin on the 26th,

Page 189

1  that would have been right before this note?
2  A    Snyder called, I don't remember if
3  it was that day or not.
4  Q    Okay.
5  A    It could have been that day,
6  honestly, I don't remember the dates.
7  Q    Tell me what you recall occurring in
8  that -- the episode you do recall.
9  A    I remember him calling me about Mr.
10  Coggin having some pain and that was it.
11  Q    Okay. You recall making any
12  recommendations?
13  A    To see me the next day, which I did,
14  on the 27th.
15  Q    And that's your note starting at
16  9:30?
17  A    Uh-huh (in the affirmative).
18  Q    Do you recall if you actually talked
19  to Mr. Coggin over the phone?
20  A    I could have, but I don't remember.
21  Q    All right.
22  A    Sometimes, like I say, I talked to
23  the patient; sometimes I talked to the
24  lieutenant or one of the officers. I don't
25  remember either way in this case.

48 (Pages 186 to 189)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 190

1   Q      And at that point, would you have
2   recommended that he continue to take his pain
3   medication if he's having pain and see you in
4   the clinic in the morning?
5   A      More than likely not. Honestly, I
6   don't remember. More than likely I did not.
7   I would have said, why don't you see me the
8   next day, if you can hold off until then,
9   which is my usual.
10  Q      All right. And you would tell him
11  to forego taking any of his pain medication?
12  A      I don't recall either way, to take
13  or not take.
14  Q      All right. Well, then, let's look
15  at your note from 8/27, okay?
16  A      Yes, ma'am.
17  Q      And will you correct me if I'm
18  reading this wrong?
19  A      Okay.
20  Q      "Approximately for the last three
21  weeks I've had this pain, which comes and
22  goes. The pain is in the right upper front
23  of the abdomen. Sometimes it radiates to the
24  right upper quadrant, not to my back nor
25  anywhere else. I sometimes get nausea

Page 191

1   associated with it. Not this last weekend,
2   but Wednesday and Thursday night, I had some
3   vomiting. Had problems eating because I
4   don't feel like it. And then when I eat
5   something like a plain turkey" --
6   A      And I repeated turkey.
7   Q      "Turkey turkey sandwich, I get pain.
8   I think I lost about 15 pounds in the last
9   three weeks." And that's what Mr. Coggin is
10  telling you, correct?
11  A      Yes, ma'am.
12  Q      All right. And then you have 53
13  year old white male. No known allergies.
14  You sort out his vital signs, 150 over 88,
15  pulse is 76. He's afebrile. Weight of
16  160 --
17  A      2.
18  Q      2?
19  A      Uh-huh (in the affirmative).
20  Q      And you evaluate his lungs?
21  A      Uh-huh (in the affirmative).
22  Q      And under his abdominal exam, you
23  have positive bowel signs --
24  A      Bowel sounds present.
25  Q      In right upper quadrant to

Page 192

1   palpation. No rebound. Extremities no
2   problem. And then over to the left, is this
3   all the information from your IVP and
4   ultrasound?
5   A      IVP and ultrasound.
6   Q      Okay. Do you know whether you had
7   reviewed all those films prior to that?
8   Well, I guess some of them you did because
9   you dated them the 10th of August, I think?
10  A      This is August '01.
11  Q      Right?
12  A      The 27th. Should have.
13  Q      Okay. And then your note goes on,
14  continued on the next page, hypertension.
15  History of renal calculi. Cholelithiasis
16  with a question mark slash sludge.
17  A      Because at that time I was not sure
18  we were talking about a stone or basically
19  sludge.
20  Q      All right. Then you prescribe the
21  Sulindac?
22  A      Sulindac.
23  Q      And why was that prescribed?
24  A      He told me that the Motrin was not
25  working for him so I discontinued Motrin and

Page 193

1   the Anaprox. And then put him on Lyrica
2   until seen by the surgeon, which is -- until
3   the gastroenterologist consult was done,
4   which I was hoping it would be very fast.
5   Q      Okay.
6   A      And that gave him some sort of pain
7   relief. And I thought that perhaps the
8   Sulindac would help him with his pain.
9   Q      All right. And I'm hoping -- my
10  note kind of cuts off here, well, yours does
11  as well. Can you tell me what that says up
12  in that corner?
13  A      "DC Motrin and Anaprox." Then I
14  explained to the patient, not to take the
15  Sulindac because that note responds to that
16  one.
17  Q      Okay.
18  A      Although it's unclear -- not to take
19  unless as directed for pain, PRN as needed
20  for pain.
21  Q      Okay.
22  A      As directed, as needed for pain.
23  Q      All right.
24  A      Will follow after consult.
25  Q      And then we looked at that Sulindac

49 (Pages 190 to 193)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 194

1  prescription and there seems to be something
2  in there where it's not filled for a number
3  of days, correct?
4  A      Right. He never picked it up.
5  Q      And you don't have any idea whether
6  it never got set up or what was the delay in
7  getting that set up?
8  A      I don't remember. It was filled
9  late, you say?
10 Q      It looks like it was not filled
11 until 8/28.
12 A      Where are you?
13 Q      Well, that would be one day. Okay.
14 A      Next day.
15 Q      All right. The 27th, some labs were
16 done, correct?
17 A      I'm not there yet. 27th, labs.
18 Yes.
19 Q      I'm looking at the labs from that
20 section. And I've got, it looks like, three
21 sets of documentation of the same set of
22 labs. Do you have that, too?
23 A      I do not. I have only one.
24 Q      Okay.
25 A      Hold on a second. Hold on a second.

Page 195

1  I do, too.
2  Q      Okay. I just wanted to make sure.
3  A      Yeah. I have three pages. One page
4  is a repeat page. I don't know why it may
5  have been sent because the signature is on
6  the same date but it's different. So we may
7  have received two copies.
8  Q      All right. Off his laboratory
9  studies, were there any aberrations there?
10 A      Yes, ma'am.
11 Q      And what were those?
12 A      You have got a higher than normal
13 white blood cell count which can indicate
14 either an infection or stress. And you had a
15 slightly lower than normal red blood cell and
16 hemoglobin level with a normal hematocrit.
17 Q      How did this hematocrit and
18 hemoglobin compare to any that you had
19 performed previously?
20 A      I believe he was normal before. I
21 don't remember exactly the numbers. We can
22 check.
23 Q      All right. Well, did it reflect an
24 upward or downward trend?
25 A      Downward trend. 7/25.

Page 196

1  Q      It looks like we're looking at the
2  same thing. So he had gone from a hematocrit
3  of 42.8, he's now down to 38.5?
4  A      Yes.
5  Q      And he had gone from a hemoglobin of
6  15 to a hemoglobin of 13.1?
7  A      Uh-huh (in the affirmative).
8  Q      Did that have any clinical
9  significance to you?
10 A      Yes. This patient is abnormal.
11 What is happening at this time, I -- at this
12 time I did not know because this time I was
13 referring him to the gastro.
14 Q      All right. But based on your own
15 clinical --
16 A      And also I saw this on the 28th.
17 And on the 28th was when we spoke with Dr.
18 Williams.
19 Q      All right. My point is, from your
20 own clinical perspective, I mean, you didn't
21 send this H & H to Dr. Williams, did you? I
22 mean, the one from the 27th or the one from
23 the 28th?
24 A      I don't know if this was sent to him
25 or not since he saw him on the 28th. If I

Page 197

1  saw him early enough in the morning, these he
2  may have received.
3  Q      All right.
4  A      But I do not know.
5  Q      But his -- did you have any
6  discussion with him on the 28th about the
7  difference in a month in the hematocrit and
8  hemoglobin?
9  A      It was not discussed by him or by
10 me.
11 Q      Okay.
12 A      That I recall.
13 Q      All right. These lab value
14 differences within the month, in light of
15 the totality of the process that this man had
16 undergone under your care as his physician,
17 did it assure you that he did not have any
18 ulcer disease?
19 A      No.
20 Q      All right. Could this indeed be
21 reflective of a bleeding process abdominally?
22 A      Yes.
23 Q      And what, if anything, did you do in
24 response to these labs to rule out a bleeding
25 circumstance, be it abdominal or otherwise?

50 (Pages 194 to 197)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 198

1  A    At that point he was being sent out
2  to a specialist so we proceeded to set him up
3  with a specialist for treatment of whatever
4  type was necessary.
5  Q    All right. When you sent -- I'm
6  looking at the consultation sheet to Dr.
7  Williams?
8  A    Yes, ma'am.
9  Q    It says abdominal pain right upper
10  quadrant, see the ultrasound, and attached
11  labs? Do you think that he indeed had
12  those -- all of these labs including the
13  H & H?
14  A    He could have. I honestly don't
15  know.
16  Q    Did he in his consultation report
17  to you, indicate that he had ruled out any
18  abdominal bleeding potential?
19  A    Let me check it because I'm not
20  sure. He does not make a differential
21  diagnosis at this time. He is the same way
22  I am, he's geared towards the gallbladder.
23  He's concerned about a polyp which is
24  precancerous.
25  Q    Let me ask you this, sir: I'm

Page 199

1  looking at this consult, and that is a
2  handwritten one that comes back with the MA;
3  is that correct?
4  A    Yes, ma'am.
5  Q    On there he indicates biliary colic,
6  question polyp versus cholelithiasis, plan is
7  what?
8  A    Cholecystectomy. Possible
9  intraoperative cholecystectomy.
10  Q    All right, sir. He thinks based on
11  the evaluations he did on the 28th, this man
12  needed an operation; is that correct?
13  A    That is correct.
14  Q    What did you do to facilitate that
15  occurring?
16  A    We scheduled the surgery. At that
17  time we have the review committee to put it
18  forward or not. More than likely that was
19  scheduled because it was already sent out.
20  That was scheduled. I don't know when, but
21  that was scheduled.
22  Q    Pardon?
23  A    I do not know for when, but that was
24  scheduled. If the consulting physician would
25  have thought that that needed immediate -- an

Page 200

1  immediate procedure, he would have called me
2  and say, hey, I'm taking this patient to
3  surgery; or, hey, this guy needs to be going
4  tomorrow to surgery. Clean him up. Or, I'm
5  going to keep him, I'm going to send him to
6  the hospital, he would have acted upon it.
7  Q    All right.
8  A    Yet he did not. He did a consult,
9  dated a consult, set his plans, and this more
10  than likely was scheduled, I do not know for
11  when. I should have checked on that but, I
12  mean, before coming over here for you. I do
13  not know.
14  Q    Whose job is it to schedule the
15  surgery?
16  A    Ms. Downs.
17  Q    Pardon?
18  A    Ms. Downs.
19  Q    Ms. Downs. All right.
20  A    Beverly Downs.
21  Q    All right. She is one of the
22  nurses?
23  A    She's the LPN but her job there is
24  Image Systems Coordinator. So actually her
25  job encompasses different things including

Page 201

1  the scheduling of patients to see outside
2  consultants, follow ups, things of that
3  nature.
4  Q    All right. But don't you have to
5  sign off on a surgery before she can schedule
6  it or can she simply schedule it based on
7  this consultant form?
8  A    With that consultant form,
9  all she needs is a verbal order, you know.
10  Q    All right.
11  A    Usually -- you're right, it's a
12  consult that is done for the procedure.
13  Q    All right. And it looks like this
14  typed consultant form -- when did you receive
15  this?
16  A    The what?
17  Q    I see that you --
18  A    The full dictated consult?
19  Q    Right.
20  A    Usually it's received later.
21  Q    All right. I see 2/25/03 you have
22  signed off on it. And it actually looks like
23  it -- with a fax notation at the top of this
24  page, it looks like it was fax'd to you on
25  February 25th of '03?

51 (Pages 198 to 201)

301 Title Building/300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 202

1  A    Uh-huh (in the affirmative).
2  Q    All right.
3  A    Go back to the consultation, and you
4  go to the bottom.
5  Q    Right.
6  A    Dr. Williams' signature, his own
7  handwriting, it says 8/29.
8  Q    All right.
9  A    Okay. The consultation was done
10 on 8/28. He was seen the next day on 8/29.
11    Now, go back over here to the
12 progress sheets and you will see 8/29 at
13 three o'clock in the afternoon. It says,
14 "Spoke with Dr. Williams. Patient in the
15 office. He set a three o'clock, more than
16 likely for lab work."
17 Q    All right.
18 A    Okay. Recommends gallbladder
19 removal. Dr. Garcia informed. Consultation
20 completed for surgery. She did do a
21 consultation and probably handed it over.
22 Q    My question to you, sir, is that is
23 it a fair reading of these documents that you
24 never saw the complete dictated consultation
25 on your patient, John Coggin, by the surgeon

Page 203

1  until February 25th, 2003, I mean, he wasn't
2  even an inmate any longer?
3  A    Right.
4  Q    Tell me why you did not attempt or
5  inquire as to the full dictated consultation
6  of this specialist prior to that time?
7  A    I had a consultation that told me
8  what the specialist had an impression of, and
9  what were his plans.
10 Q    And this additional information was
11 not necessary to you to continue to care for
12 this man, the information that is in the full
13 consultation?
14 A    I do not understand your question.
15 Q    My question is this then: You did
16 not rely in any way, shape, or form, on one
17 bit of information in this typed consultation
18 in your care and treatment of John Coggin at
19 any time?
20 A    I did not have that, so I couldn't
21 do it. I had this one, which told me what I
22 needed to know.
23 Q    All right.
24 A    I did communicate with Dr. Williams,
25 by the way.

Page 204

1  Q    You did talk to him, when?
2  A    It's not recorded, but I remember
3  talking to him.
4  Q    When was that conversation?
5  A    I don't know.
6  Q    Before his perforation or after?
7  A    No. I may have talked to him before
8  his perforation. Probably the day that -- I
9  don't remember if it was the same day or the
10 day after.
11 Q    When he was in the hospital?
12 A    Ma'am?
13 Q    When he was in the hospital?
14 A    No. Before he was in the hospital.
15 I have the recollection that I may have
16 talked to him. Now, when, I don't remember.
17 Q    All right.
18 A    But it was before the perforation.
19 Q    All right. But to be sure, nothing
20 contained in this typed up formal
21 consultation was utilized by you in your care
22 and treatment while this man was a patient?
23    MR. DOYLE: Objection to the extent
24 that it is not contained -- some of the
25 information may be the same.

Page 205

1     MS. COCHRUN: Right.
2  Q    But, I mean, nothing -- if there's
3  any additional information in the typed form
4  that is not reflected on this handwritten
5  consultation form, that was not utilized by
6  you in your treatment plan while he was still
7  a patient?
8     MR. DOYLE: Again, I'm going to
9  object. He's testified that he didn't have
10 that sheet.
11    MS. COCHRUN: Right. I know he
12 didn't. And I'm not trying to -- this is not
13 a tricky question.
14 Q    You didn't have it so you couldn't
15 rely on it?
16 A    But I did have the consultation --
17 Q    Okay.
18 A    -- that told me what his impression
19 was or what his plans were.
20 Q    That's all I'm asking. I just want
21 to make sure that these forms when they --
22 A    My opinion that what that proves is
23 that his gallbladder problem that we already
24 thought from the beginning was reflected by
25 the outside consultant.

52 (Pages 202 to 205)

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 206

1  Q    All right.  Do you have any
2  recollection after the visit to Dr. Williams,
3  if Mr. Coggin asked you if he could be
4  examined by his own physicians at his own
5  expense utilizing his own health insurance
6  or --
7  A    I think he did.
8  Q    Okay.  And do you recall what your
9  reply to that inquiry was?
10  A    More likely the standard reply
11  is that, no, patients cannot be seen by
12  outside physicians.  They are the ward of the
13  state and we take care of them.
14  Q    All right.  So are you telling me in
15  the federal prison system that if a patient
16  asks to be seen by his own physician or an
17  outside physician, he is not allowed to do
18  that while an inmate?
19  A    Well, an inmate -- an inmate has got
20  to follow the community standards of whatever
21  doctors are out there.  But, no, they are not
22  to be followed by their own physician on the
23  outside.
24  Q    Okay.
25  A    While they are incarcerated.

Page 207

1  Q    All right.  And I want to make sure.
2  I'm not asking like if his blood pressure
3  doctor, he wanted to keep him through the
4  time he was in, but if an acute situation
5  presents, can an inmate request to be seen
6  not by a BOP physician, but rather a private
7  physician of his own choosing if he is
8  willing to pay for it for evaluation?
9  A    You may be referring to 8/30, and
10  this was directed to Warden DeRosa.  And I
11  have explained to Warden DeRosa that the
12  patient had been evaluated by a local surgeon
13  whose impression was the patient had biliary
14  colic by a polyp of cholelithiasis.  The
15  surgeon had planned a cholecystectomy and I
16  explained what it was, removal of gallbladder
17  through a small hole using camera and TV
18  monitor, or intraoperative cholecystectomy,
19  which means a gallbladder removal.  Patient
20  had been scheduled for surgery which was
21  dated 9/4.
22  Q    All right.  My question is:  Is it
23  impossible, not allowed, not ever can happen,
24  that if a patient asks to be seen on the
25  outside by a physician and even offers to pay

Page 208

1  for the hospital care and visit himself, they
2  are just not allowed to do that if they are
3  incarcerated at Maxwell?
4  A    At Maxwell or any other place?
5  Q    Any other place?
6  MR. DOYLE:  Just answer the
7  question.
8  Q    Can they or can't they?
9  A    No.
10  Q    Period, end of story?
11  A    No.
12  Q    You can ask, but it ain't ever going
13  to happen?
14  A    No.
15  Q    Okay.
16  A    Never is the wrong word.  If there
17  are no other physicians available, yes.
18
19    (Off the record discussion.)
20
21  Q    Is there such a thing as a medical
22  furlough?
23  A    Yes.
24  Q    All right.
25  A    He did have a medical furlough.  A

Page 209

1  medical furlough to Dr. Williams.
2  Q    All right.  Can you have a medical
3  furlough to seek treatment outside the
4  system?
5  A    No.
6  Q    Okay.  How long, ordinarily, should
7  it take if there's a recommendation for
8  surgery for it to actually be set up within
9  your system?
10  A    It depends on the case.
11  Q    For this man, for this gallbladder
12  surgery?
13  A    I don't know what transpired between
14  Ms. Downs and the office of Dr. Williams.
15  Dr. Williams did not make any indication on
16  his original answer as to how fast he wanted
17  it.  And if he wanted it fast, like I said
18  before, he would have told us, A, hey, this
19  guy is going right now.  This guy should be
20  going tomorrow.  This guy, I'm taking him to
21  the hospital myself.  He makes no reference
22  whatsoever as to time.
23  So in that case, what we do is we
24  call the office of Dr. Williams and say, when
25  does Dr. Williams have an opening or when

53 (Pages 206 to 209)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 210

1  does he want to do the procedure.
2  Q      And do you have recordation of
3  somebody accomplishing that?
4  A      No, ma'am.
5  Q      All right.  Do you know or did you
6  follow up yourself personally to make sure
7  your staff did accomplish that?
8  A      I may have, which I usually do ask,
9  has somebody been scheduled.  I don't
10 remember if I did or not.
11 Q      All right.
12 A      I do that.
13 Q      So based on your chart or your
14 recollection, you don't have any idea of when
15 he may have been able to do this surgery or
16 recommended this surgery to be done?
17 A      No, ma'am.
18 Q      All right.  One of his concerns that
19 we at least see in his note from that time
20 was he wanted to make sure this gentleman did
21 not have cancer --
22 A      Uh-huh (in the affirmative).
23 Q      -- of the gallbladder because of the
24 polyp.  In your medical opinion, is that
25 something that needs to be addressed quite

Page 211

1  quickly to rule out the cancer?
2  A      Yes, of course.
3  Q      All right.  How long do you think it
4  would be reasonable to allow this gentleman
5  to go without having the gallbladder surgery
6  for that evaluation?
7  A      This probably would have been
8  scheduled within a week or two, tops.
9  Q      Okay.  And that would be reasonable
10 in terms of addressing the cancer?
11 A      The cancer, yes.
12 Q      All right.
13 A      Probably some more studies would
14 have had to be done.
15 Q      In looking at the cop out form that
16 was addressed to Warden DeRosa by Mr. Coggin.
17 Would it be fair to say that, at least by his
18 own description, he said he was in severe
19 pain?
20 A      Uh-huh (in the affirmative).  What
21 is your question?
22 Q      Would it be fair to say that it
23 looks like, I mean, he's saying, "I cannot
24 stand this pain much longer, I humbly beseech
25 you to grant my request," does that sound

Page 212

1  like someone who is in extremis?
2  A      That sounds like somebody who wants
3  to have something done, yes.
4  Q      All right.  Were you ever made aware
5  of a vomiting episode on September 1st or the
6  evening of Saturday, September 1st, where Mr.
7  Coggin was vomiting blood?
8  A      Never, that I recall, was I told
9  that Mr. Coggin was vomiting blood.
10 Q      All right.
11 A      Nor by Mr. Coggin either.
12 Q      All right.  Well, did you ever see
13 him again after -- when is last time you laid
14 eyes on this man?
15 A      I'm sorry, ma'am?
16 Q      When is last time you laid eyes on
17 this gentleman or treated him?
18 A      The last time was on 11/1/01.
19 Q      Pardon?
20 A      November 1, '01.
21 Q      Prior to his admission to the
22 hospital, when is the last time you saw this
23 man to evaluate him?
24 A      8/27.
25 Q      All right.  Did you receive any call

Page 213

1  from Lieutenant Snyder on Saturday, September
2  1st, wherein you were told that Mr. Coggin
3  was vomiting, vomiting blood, and having
4  severe abdominal pain?
5  A      Wasn't that the same question you
6  asked me before or was it a different date
7  that you're asking me now?
8  Q      I'm asking on September 1st, that
9  night, Saturday night, do you remember
10 getting a call from Snyder?
11 A      I told you I remember getting a call
12 from Snyder, now you're asking about vomiting
13 blood?
14 Q      Yes, sir.
15 A      No.
16 Q      Do you ever remember a call where
17 the words vomiting and blood were told to you
18 by any of the officers at the facility?
19 A      Vomiting, yes; blood, no.
20 Q      If you had been told there was blood
21 in the vomitus, what would you have done?
22 A      Send him out.
23 Q      To the hospital immediately?
24 A      To the hospital immediately.
25 Q      If that information had been

54 (Pages 210 to 213)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 214

1  withheld from you, would that have been
2  inappropriate in your mind?
3  A    Yes.
4  Q    All right. It would have impacted
5  what might have been recommended by you?
6  A    Yes.
7  Q    All right. If an inmate -- well,
8  let me just say, if John Coggin had passed
9  out on the heels of this -- of a complaint
10 of vomiting, severe vomiting, and bloody
11 vomitus, if he had passed out, what would you
12 have expected the staff of the facility to do
13 in response to that information?
14 A    Would you please repeat the
15 question?
16 Q    Sure.
17 A    Yes.
18 Q    If after being told he was vomiting
19 violently, and that there was blood in the
20 vomitus --
21     MR. DOYLE: Objection to form. I
22 don't know what he -- who he is that you're
23 referring to.
24 Q    Oh, well -- if any of the staff, the
25 correctional staff had been informed that Mr.

Page 215

1  Coggin had vomited, vomited blood, and
2  thereafter passed out, what should their
3  response have been to that information?
4  A    Send him out.
5  Q    Okay. Were you ever called and told
6  that this gentleman had passed out?
7  A    I don't recall.
8  Q    All right.
9  A    I don't think so, but I don't
10 recall.
11 Q    Is it your testimony, Doctor, that
12 the BOP program statements do not allow for
13 an inmate to get medical furlough to see his
14 own doctors and pay for it himself if it is
15 approved by the warden and the medical
16 director?
17 A    I think you're right.
18 Q    So if you approved it and the warden
19 approved it, John Coggin --
20 A    No. No. Medical director.
21 Q    All right. And who is the medical
22 director?
23 A    I am the clinical director. Medical
24 director is Dr. Newton Kendig, K-e-n-d-i-g.
25 Q    And is he at Maxwell?

Page 216

1  A    He is in Washington.
2  Q    All right. So how would it get in
3  front of him for such an approval or request?
4  A    Probably be sent by the warden. I
5  really don't know. I've never been under
6  that position.
7  Q    All right. Would it start with the
8  request like Mr. Coggin had done on the 30th
9  to the warden?
10 A    Yes, ma'am.
11 Q    That would be the first step,
12 correct?
13 A    Yes, ma'am.
14 Q    And then it looks like down here on
15 9/4/01, you filled out your recommendations
16 to the warden; is that correct?
17 A    Yes, ma'am.
18 Q    It was done on that date, 9/4?
19 A    9/4.
20 Q    And would it require your
21 recommendation for it to go up to Washington
22 for review by the medical director?
23 A    Honestly, I don't know, but I guess
24 it would.
25 Q    What was your reason for not

Page 217

1  recommending that process?
2  A    Because, as I stated there, he was
3  being taken care of locally.
4  Q    What harm would it be for him to go
5  see his own doctor, if he was willing to pay
6  for it through that process?
7  A    There's -- it's just not the way
8  that we do it. There's no reason. There's
9  no reason for him to go see any physician of
10 his own, spend his own money when he's a ward
11 of the state. We have sent him already to a
12 local specialist. The local specialist has a
13 program to do it, come do it. What's the
14 harm in that?
15 Q    Well, if he has his own money and
16 his own insurance, what's the harm in letting
17 him do it?
18 A    What's the harm in us taking care of
19 him?
20     MR. DOYLE: I'm going to object.
21 Q    You've got to answer. I get to ask
22 the questions today.
23     My question is: What harm is there,
24 what harm at all is there to allow him to do
25 that?

55 (Pages 214 to 217)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 218

1   A    None.
2   Q    Okay. And, of course, your
3   recommendations were made two days after he
4   was taken to the emergency room for this
5   condition, correct?
6   A    Apparently so, yes. I don't
7   remember when his procedure was done, but
8   I think it was done after that.
9   Q    All right. Did you have any
10  conversations with the warden, the assistant
11  warden himself on this?
12  A    That was with the warden.
13  Q    Did you talk to him?
14  A    I don't think so. I think it was
15  sent to me and I just answered it.
16  Q    Okay. When is the first time you
17  knew of the situation that prompted transfer
18  to the emergency room at Baptist?
19  A    I have to be very honest. I do not
20  remember if I was called that night or I
21  learned from Nurse Lake the next day.
22  Q    All right. What is your
23  recollection of what you were told, whenever
24  you found out about it, what were you told?
25  A    That inmate Coggin was found with

Page 219

1   blood around him. That was the first time I
2   heard about it. And I'm not sure if he was
3   conscious or not, but he was on the floor.
4   Q    When is the first time that you had
5   any interaction with any of the physicians
6   who were caring for this patient?
7       MR. DOYLE: Just clarify. The
8   physicians at Baptist?
9       MS. COCHRUN: Oh, at Baptist, yeah.
10  A    9/5 when I spoke with Dr. Meyer.
11  And he told me the patient was stable. And
12  he was going to observe him until tomorrow.
13  And if he was still stable, he may discharge
14  him to the camp.
15  Q    All right. It looks like on 9/4 at
16  1615, you actually called over and talked to
17  one of the nurses?
18  A    But not a doctor. You said a
19  doctor.
20  Q    I'm going on to another thing.
21  A    Oh, I'm sorry.
22  Q    All right. And you talked to Cathy
23  Adams?
24  A    Uh-huh (in the affirmative).
25  Q    And she told you that his H & H at

Page 220

1   noon was 10 and 28.2?
2   A    Uh-huh (in the affirmative).
3   Q    Did you have any indication of what
4   you thought might be going on with the fellow
5   at that time?
6   A    No, ma'am.
7   Q    I see that there's another note
8   right before your signature on there, "Upon",
9   and there's an initial, and it says, "It was
10  noted that patient did not pick the Sulindac
11  ordered 8/27." Is that what you were
12  referring to earlier?
13  A    Where are you at? Yeah. Yeah.
14  Yeah.
15  Q    Okay.
16  A    Yeah. I added that after I was --
17  Q    When did you add that note?
18  A    The same day.
19  Q    The same day?
20  A    Yeah.
21  Q    What significance did that have for
22  you?
23  A    To make sure that he wasn't bleeding
24  from -- at that time an ulcer did come to
25  mind because if he was taking -- if he had

Page 221

1   taken the Sulindac and he had not
2   discontinued the Motrin, maybe he was taking
3   too much.
4       But that would have been thinking
5   backwards respectively, only four days that
6   he would have been taking that.
7   Q    All right. The Sulindac, how would
8   that be any less corrosive, I guess, is the
9   word to --
10  A    It is not.
11  Q    It's not?
12  A    Just a different type of --
13  different patients -- it's a different NSAID.
14  Different patients respond differently.
15  Q    All right.
16  A    If you were talking about something
17  like Salsalate, yeah.
18  Q    All right. But can that drug cause
19  bleeding?
20  A    Sulindac?
21  Q    Yes. Gastrointestinal bleeding?
22  A    If you don't take it as indicated,
23  yes.
24  Q    All right. The Motrin 800
25  milligrams, can that also cause gastric

56 (Pages 218 to 221)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 222

1  bleeding?
2  A      It can if you don't take it as
3  indicated.  In susceptible patients, yes.
4  Q      All right.  He had been on it for
5  about a month.
6  A      Less than a month.  Yeah, about a
7  month.  You're absolutely right.  I'm sorry.
8  Yes.  You're absolutely right.  Right.
9  Q      All right.  And could the Motrin
10  indeed at the prescribed dose, cause bleeding
11  of an ulcer?
12  A      Again, in susceptible patients when
13  taken as indicated -- in patients who have
14  taken as indicated, it doesn't.  In
15  susceptible patients, yes, it can.
16  Q      Do you have any evidence that the
17  Motrin was taken in excess of the prescribed
18  amount?
19  A      By the way, that this chart --
20      MR. DOYLE:  Can you clarify the time
21  frame that you're talking about?
22      MS. COCHRUN:  Well, I mean --
23      MR. DOYLE:  I mean, he's become
24  aware of that today.
25  Q      Well, I'm just asking point blank:

Page 223

1  Do you know of any way that you know that he
2  took more than the prescribed amount?
3  A      Nope.
4  Q      Not from the chart?
5  A      Not from the chart.
6  Q      Do you know now he did?
7  A      Yes, I do.
8  Q      How do you know?  I mean, what
9  evidence do you have that he took more than
10  the prescribed amount?
11  A      May I consult with my lawyer
12  outside?
13      MR. DOYLE:  Just answer the
14  question.  Just answer the question.  If
15  it's something I told you --
16  A      After the fact.
17  Q      Yes, sir.
18  A      After the fact of everything that
19  happened which was totally unbelievable to
20  us that this patient would have bled, we were
21  searching for something and we knew that we
22  were giving the medications as indicated.  We
23  were searching for some way that this guy
24  would have been doing something else other
25  than what we had ordered.

Page 224

1      It was found that he had blood -- an
2  excessive amount of Motrin and aspirin at the
3  commissary.  And he had been apparently over
4  medicating himself.  And that could have
5  caused the bleeding of the ulcer and masked
6  the real cause, which was the gallbladder.
7  That is my personal opinion.
8  Q      All right.  And what evidence do you
9  have that he took any of the aspirin that he
10  bought at the commissary?
11  A      None.  Except why would you buy it
12  otherwise.
13  Q      What evidence do you have --
14  A      And that he mentioned -- excuse me a
15  second.  And that he mentioned to the --
16  several places to the emergency room
17  physician, to several of the physicians, I
18  believe to Dr. Williams himself, that he had
19  been taking a lot of Motrin.
20  Q      Well, 800 milligrams TID is a lot of
21  Motrin.  That's about the maximum dose?
22  A      That is maximum dose.
23  Q      So you had already prescribed the
24  maximum dose?
25  A      Yes, ma'am.

Page 225

1  Q      And on top of that, he was getting
2  Naprosyn, too, right?
3  A      He only took -- he only got Naprosyn
4  for four days after that, at the very end,
5  extra.
6  Q      All right.  And those are both drugs
7  that can cause GI bleeding?
8  A      Yes, ma'am.
9  Q      And those were both prescribed by
10  your clinic?
11  A      Yes, ma'am.
12  Q      You said that the excessive amount
13  of Motrin and aspirin would have masked --
14  A      Masked the true symptoms of
15  gallbladder disease, which they did find when
16  they opened him up and found the gallbladder
17  to be chronically inflamed.
18      He may have caused his own bleeding
19  by taking the extra Motrin and aspirin which
20  he may have been -- which he did buy at the
21  commissary, and he may or may not have taken
22  it himself.
23  Q      I'm trying to understand how you
24  feel like he was masking his gallbladder
25  disease.  I mean, that's what you thought he

57 (Pages 222 to 225)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 226

1 had, you weren't masked by that, I mean, you
2 were not misled from thinking he had
3 gallbladder disease, were you?
4 A      No.  I was thinking he had
5 gallbladder.
6 Q      Okay.
7 A      And to this day I still think he had
8 a gallbladder problem.
9 Q      If he was prescribed both the
10 Naprosyn and the Motrin concomitantly, would
11 be inappropriate?
12 A      That would have been inappropriate.
13 Q      Initially, after they transfused
14 him, they thought that with conservative
15 treatment they may be able to get him passed
16 this bleed?
17 A      Apparently so.
18 Q      All right.  But that obviously did
19 not work out that way?
20 A      Apparently not.
21 Q      It says on 9/5 at 1645 you went to
22 the hospital?
23 A      Uh-huh (in the affirmative).
24 Q      And visited the patient?
25 A      Yeah.

Page 227

1 Q      I guess on 9/4 you actually had a
2 visit --
3 A      I don't remember when I visited him,
4 but -- yeah.  9/4 -- hold on a second.
5 Q      Well, the note on 9/5 just says,
6 "Yesterday I saw him."
7 A      Yeah.  That was a late entry so we
8 visited on the 4th.
9 Q      All right.  Tell me if I'm reading
10 this wrong, "Visited patient at bedside,
11 Baptist South Room 458 yesterday late
12 afternoon.  Patient expressed gratitude at
13 his being taken care of and for what our" --
14 A      He did.  He was very thankful.
15 Q      Can I finish, sir?
16 A      I'm sorry.
17 Q      "What our medical staff had done for
18 him.  Patient expressed concern about not
19 being discharged from hospital before he
20 would be stable."
21          Tell me, what about that note is in
22 any way --
23 A      I'm just putting down what I spoke
24 with the patient, period.
25 Q      This has nothing to do with his

Page 228

1 treatment, though?
2 A      Nope.  Not at all.  I'm just -- this
3 is my conversation with a patient and if I
4 recall correctly, his wife was present there.
5 Q      All right.  And this is your --
6 reflecting your --
7 A      That's just expressing the
8 conversation with the patient.  It has
9 nothing to do with the treatment at all.
10 Q      All right.
11 A      It states I was there at the
12 hospital.  I checked with him.  His concerns
13 were not to be taken -- to be discharged.  I
14 told him, no, I would do my very best not to
15 have him discharged until everything was
16 resolved.
17          And that I also explained that I was
18 not the physician, and his chart would not be
19 my decision but whoever was the new
20 physician.  But I would do my best for him to
21 be there.
22 Q      All right.  Did you, when you
23 visited him, did he tell you how he had had
24 the bloody vomitus episode and Snyder said
25 that he had called you, Dr. Garcia, and told

Page 229

1 you about it?
2 A      You know, I don't remember.  And I
3 don't know if I wrote it or not.
4 Q      Did he tell --
5 A      He may have, but I honestly don't
6 remember.
7 Q      All right.  Do you remember him
8 telling you that he himself had told you
9 personally that he had thrown up blood?
10 A      No, I don't.
11 Q      Now, Dr. Kreher didn't take out this
12 gentleman's gallbladder, did he?
13 A      No.
14 Q      And he was actually in there looking
15 at it, wasn't he?
16 A      Yes.
17 Q      And can sludge be caused by the
18 ulcerative process that he was undergoing?
19 A      I doubt it.
20 Q      Okay.
21 A      If you're finished with that, I
22 would like to add something.
23 Q      Yes, sir.
24 A      In a procedure of, as I recall
25 reading from Dr. Kreher --

58 (Pages 226 to 229)

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 230

1    Q      Alex Kreher.
2    A      Kreher?
3    Q      Yes.
4    A      From Dr. Kreher's description of the
5    procedure, he had a heck of a time and had a
6    heck of a problem with a vessel that was
7    bleeding, and had a problem to try to control
8    it.
9          When you have a procedure that is as
10   difficult as this apparently was, you do not
11   want to complicate a procedure more by adding
12   something else. If he just sees the
13   gallbladder that is distended or even --
14   Q      Inflamed?
15   A      Yeah. Chronically inflamed, you
16   leave it alone. You don't want to add more
17   complications to an already difficult
18   procedure which can get complications and
19   then deal with the gallbladder later on.
20   Q      After he got this surgery, did you
21   have to treat him anymore for gallbladder
22   disease?
23   A      No, ma'am.
24   Q      He didn't even have any symptoms of
25   gallbladder disease after this, did he?

Page 231

1    A      No, ma'am.
2    Q      If he had, do you think you would
3    have noted it in your chart throughout the
4    balance of his stay at Maxwell?
5    A      If he had protested about it, yes.
6    Gallbladder, as I see it now, can come and
7    go. I mean the symptoms.
8    Q      Do you have any evidence he's ever
9    been treated for gallbladder disease, period?
10   A      I lost contact with the patient.
11   Q      Okay. Well, even since then, have
12   you been shown any records or any medical
13   information wherein this gentleman has had to
14   undergo treatment for gallbladder disease?
15   A      No, ma'am.
16   Q      If his gallbladder was so severely
17   diseased, would you expect it to have had a
18   spontaneous cure with the treatment for the
19   peptic ulcer disease?
20   A      Peptic ulcer disease was not treated
21   for the gallbladder, but yet the gallbladder
22   could have ceased to have bothered this
23   gentleman.
24   Q      And what would have promoted a cure
25   of his chronically inflamed gallbladder if

Page 232

1    that indeed was what he had?
2    A      Perhaps the antibiotics that were
3    given at the hospital or perhaps the passing
4    of the sludge after the procedure. I don't
5    know. I'm just speculating.
6    Q      All right, sir. After he was
7    discharged from the hospital, did he
8    convalesce for some period of time there at
9    Maxwell?
10   A      I believe he did.
11   Q      And do you know whether or not he
12   was released early from his anticipated
13   incarceration because of his medical status?
14   A      Not that I know of.
15   Q      All right. Did you ever tell Mr.
16   Coggin's wife that you thought he was faking?
17   A      Are you kidding? I don't think so,
18   no.
19   Q      All right. If an inmate has
20   symptoms of peptic ulcer disease or bleeding,
21   what would be the normal treatment that you
22   would offer to them?
23   A      Would you please repeat the
24   question?
25   Q      Sure. If you have some evidence of

Page 233

1    gastrointestinal bleeding either through
2    bloody vomitus or coag the stool or hemocult
3    the stool, what normally would you prescribe
4    for that patient thereafter, if it was a
5    positive finding?
6    A      If it's a positive finding or a
7    suspected finding, and the patient is stable,
8    I probably would have done a Helicobacter
9    pylori and H. pylori test on the blood, and
10   do a CBC with differential. Start helibacter
11   treatment for Helicobacter Pylori. Follow
12   him up to see how he's doing.
13         Depending if he's dehydrated with
14   his electrolytes, give him some fluids, and
15   follow him very closely.
16   Q      Do you have an opinion as to whether
17   Mr. Coggin may have had an ulcer that was
18   adversely impacted by the NSAIDs or whether
19   the ulcer was caused by the NSAIDs?
20   A      If I understand correctly your
21   question, you're asking me what my opinion
22   is what caused the ulcer?
23   Q      Yes.
24   A      I think he caused the ulcer himself
25   by over treating himself with the NSAIDs.

59 (Pages 230 to 233)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 234

1    And that still he had the gallbladder
2    problem. We have no reason to believe that
3    he had a peptic ulcer disease before.
4    Q      Did you ever tell Mr. Coggin's wife
5    that you should have sent him to the
6    emergency room when he had requested it?
7    A      I don't recall. I don't recall.
8    Q      Did you ever --
9    A      In fact, anything back,
10   retrospectively, I do not think I said it.
11   Q      All right. Did you ever talk to Dr.
12   Kreher, the surgeon, about this patient?
13   A      I believe I did.
14   Q      Can you tell me about that
15   conversation?
16   A      He basically -- I vaguely remember
17   he basically describing what he had found
18   which is the same thing that it says in
19   there. That was it.
20   Q      All right. Dr. Garcia, in your
21   evaluation of this patient from the
22   beginning, actually, of this episode or of
23   the complaints of the right upper quadrant
24   pain, do you think that part of your
25   differential would be to rule out peptic

Page 235

1    ulcer disease?
2    A      I don't know how many ways I can
3    say it. At the time, it is very easy now to
4    think retrospectively, but at the time we're
5    looking at this patient, everything that he
6    showed, everything that he told us, every
7    study that we did, it pointed towards
8    gallbladder, not peptic ulcer disease.
9    Q      I understand that. But my question
10   to you is: When he presents with those
11   symptoms initially, peptic ulcer disease
12   should have been in your differential
13   diagnosis, should it not, if you were acting
14   within the standard of care, that is one of
15   the things that ought to be in there?
16   A      If he presented with the same
17   symptoms again today, it is a differential
18   diagnosis, and it's very low at the list.
19   Q      All right. But before you prescribe
20   him 800 milligrams of Motrin three times a
21   day for a month, do you think it would have
22   been prudent and within the standard of care
23   to determine that you did not have any peptic
24   ulcer disease ongoing before you prescribed
25   NSAIDs to him?

Page 236

1    A      If I had thought that he had peptic
2    ulcer, yes. But I don't think he had peptic
3    ulcer. I think he created his own peptic
4    ulcer. He didn't have any symptoms prior to
5    that.
6    Q      Are you aware of what Mr. Coggin's
7    H & H was when he actually got to Baptist via
8    ambulance?
9    A      I don't remember right off the bat
10   but it was very low.
11   Q      6.8 and 19.9?
12   A      Something like that. I know it was
13   6 something.
14   Q      And he hadn't perf'd at that point,
15   right?
16          MR. DOYLE: Objection. If you know.
17   Q      If you know. You don't think he
18   had -- I mean, they did the EGD and it didn't
19   appear that he had perf'd, correct?
20   A      Right.
21   Q      With those levels, would that
22   indicate to you that he had been bleeding for
23   some period of time?
24   A      Apparently so.
25   Q      And with levels that low, that would

Page 237

1    be consistent with his continuing complaints
2    of extraordinary abdominal pain, weakness,
3    illness, and vomiting?
4    A      Thinking backwards retrospectively,
5    yes.
6    Q      This Motrin prescription that
7    occurred beginning in July, you had
8    prescribed Motrin, or your staff had
9    prescribed Motrin, back in May of that year
10   as well; isn't that true?
11   A      I think it was prescribed Motrin.
12   Q      May 3rd of '01?
13   A      Not '01. Yes.
14   Q      Okay. And then --
15   A      It was given for ten days.
16   Q      All right.
17   A      As needed for pain.
18   Q      And then it was also prescribed
19   again July 1st of '01?
20   A      July 1st?
21   Q      July 21st. I'm sorry.
22   A      I don't have a note for July 21st.
23   Q      It may be in the pharmacy, the
24   prescription. I withdraw that question. I
25   can't find my note. All right.

60 (Pages 234 to 237)

301 Title Building/300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS. LLC
(205) 251-4227 / FAX (205) 251-4224

Page 238

1    MS. COCHRUN:  I think that's all I
2  have, Doctor.  Thank you.
3    MR. DOYLE:  I want to clarify a
4  couple of things.
5    MS. COCHRUN:  Okay.
6
7  EXAMINATION BY MR. DOYLE:
8  Q    Dr. Garcia, did John Coggin ever
9  report to you that he was throwing up blood?
10  A    Never.
11  Q    Did he have an opportunity to do so?
12  A    All the time, and to three different
13  providers.
14  Q    Did he ever report to any of your
15  staff in the clinic that he was throwing up
16  blood?
17  A    No.  Not at all.
18  Q    Did he have an opportunity to do so?
19  A    Of course.
20  Q    Did any staff member outside of the
21  clinic in the prison camp ever report to you
22  that inmate Coggin was throwing up blood?
23  A    None.
24  Q    Did they have an opportunity to do
25  so?

Page 239

1  A    Every single time.
2
3    (Off the record discussion.)
4
5  Q    You were asked a question about the
6  scheduling of the surgery with Dr. Antonio
7  Williams.  I'm going to ask you to take a
8  look, and I'll show it to you, the
9  consultation sheet, and if you look at the
10  top of the sheet where the 9/6 appears, what
11  is that?
12  A    That means to say the date that the
13  person that schedules the appointments was
14  able to get an appointment with the
15  specialist.  And that's a date that they gave
16  us, 9/6.
17  Q    And would that have been the date
18  for the surgery?
19  A    No.  That would have been the date
20  for this specialist to see the patient.
21    MR. DOYLE:  Okay.
22
23  RE-EXAMINATION BY MS. COCHRUN:
24  Q    And that specialist would have been?
25  A    The gastroenterologist.

Page 240

1  Q    The GI --
2  A    The GI man.
3  Q    So that was not a surgery date?
4  A    No.  That was not a surgery date.
5    MS. COCHRUN:  Okay.
6    MR. DOYLE:  Thank you.  That's all.
7
8    (Whereupon, Plaintiff's Exhibit
9    Number 2 was marked for
10    identification.)
11
12
13    (Whereupon, the preceding
14    deposition was concluded at
15    2:15 p.n.)
16
17
18
19
20
21
22
23
24
25

Page 241

1    REPORTER'S CERTIFICATE
2  STATE OF ALABAMA )
   JEFFERSON COUNTY )
3
4
5    I hereby certify that the above and
6  foregoing deposition was taken down by me in
7  stenotype, and the questions and answers
8  thereto were transcribed by means of
9  computer-aided transcription, and that the
10  foregoing represents a true and correct
11  transcript of the testimony given by said
12  witness upon said hearing, to the best of my
13  ability and understanding,
14    I further certify that I am neither
15  of counsel, nor of kin to the parties to the
16  action, nor am I in anywise interested in
17  the result of said cause.
18
19
20    Kathy Colburn, CSR,
     Notary Public, State
21    of Alabama at Large
22
   My Commission Expires:
23  7-24-08
24
25

61 (Pages 238 to 241)

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 242

1
ERRATA SHEET
2
3    PLEASE LIST ANY CORRECTIONS BELOW
4    PLEASE DO NOT WRITE ON THE
     TRANSCRIPT
5
6
     PAGE NO.    LINE NO.    CORRECTION
7
8
9        1.
         2.
         3.
10       4.
         5.
11       6.
         7.
12       8.
         9.
13       10.
         11.
14
         12.
15       13.
         14.
16       15.
         16.
17       17.
         18.
18
         19.
19       20.
         21.
20
         22.
21       23.
22       24.
         25.
23       26.
         27.
24       28.
         29.
25       30.

Page 243

1
2
3
     DEPONENT'S CERTIFICATE
4
5        I, O. GARCIA-BRENES, M.D., the
6    witness herein, have read the transcript of
7    my testimony and the same is true and
8    correct, to the best of my knowledge.  Any
9    corrections and/or additions, if any, are
10   listed separately.
11
12
13
14
15
16            O. Garcia-Brenes, M.D.
17
18
19
20
21
22   Dated:
23
24
25

62 (Pages 242 to 243)

301 Title Building/300 21st Street North
Birmingham, Alabama  35203