# PLAINTIFF'S EXHIBIT B

## DEPOSITION
## OF
## OSCAR RODRIGUEZ

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOHN COGGIN,                )
                           )
            PLAINTIFF,     )
                           )
VS.                        )   CIVIL ACTION NO.:
                           )   2:05-cv-1214-MEF
                           )
UNITED STATES OF AMERICA,  )
                           )
            DEFENDANT.     )


DEPOSITION OF OSCAR RODRIGUEZ, PA


        The Deposition of OSCAR RODRIGUEZ,
PA, was taken before Kathy Colburn, CSR., on
Friday, July 20, 2007, at the Office of U. S.
Attorney, 131 Clayton Street, Montgomery,
Alabama, commencing at 10:20 a.m., pursuant
to the stipulations set forth herein:

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 2

APPEARANCES

APPEARING FOR THE PLAINTIFF:
PATE & COCHRUN, L.L.P.
BY: Ms. Julia T. Cochrun
400 Title Building
Birmingham, Alabama 35203

APPEARING FOR THE DEFENDANT:
OFFICE OF U.S. ATTORNEY
BY: Mr. Stephen Michael Doyle
Assistant U. S. Attorney
131 Clayton Street
Montgomery, Alabama 36104

Reported By:

Kathy Colburn,
Certified Shorthand Reporter

Page 4

STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the deposition of OSCAR RODRIGUEZ, PA, be taken before Kathy Colburn, Certified Shorthand Reporter, and Notary Public, State of Alabama at Large, at the Office of U. S. Attorney, 131 Clayton Street, Montgomery, Alabama, on Friday, July 20, 2007.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to the form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that notice of filing of the deposition by the Commissioner is waived.

* * * * *

Page 3

INDEX

EXAMINATION OF OSCAR RODRIGUEZ, PA

EXAMINATION BY:          PAGE NUMBER:
Ms. Cochrun . . . . . . . . . .  5 - 170

EXHIBITS:
Plaintiff's Exhibit No. 1 . . . . .   45

CERTIFICATE OF REPORTER       171

Page 5

DEPOSITION

OSCAR RODRIGUEZ, PA
after having been duly sworn under oath, was examined and testified as follows:

COURT REPORTER: Usual stipulations?
MR. DOYLE: He would like to read and sign.

EXAMINATION BY MS. COCHRUN:
Q    Can you please state your name for the record, sir?
A    My name is Oscar Rodriguez.
Q    And where do you live, Mr. Rodriguez?
A    I live in Prattville.
Q    All right. And how long have you lived in the Montgomery area?
A    Seven years now.
Q    Did you move here from -- I mean, have you always been in Alabama like for the last twenty or thirty years, or that was a new move when you came to Montgomery?
A    No. I lived in Louisiana eight

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 6

1    years prior.
2    Q    Okay. Let's do this: You are a
3    physician's assistant?
4    A    Uh-huh (in the affirmative).
5    Q    Is that a yes?
6    A    Yes. I'm sorry.
7    Q    And tell me what your educational
8    background is.
9    A    I have a doctor's degree in
10   medicine.
11   Q    From what facility?
12   A    I'm a graduate of the University of
13   the Dominican Republic. It has a Spanish
14   name.
15   Q    Okay. What's the name of it, if you
16   can spell it?
17   A    It's called Pontificia Universidad
18   Catolica Madre Y Maestra. Translation is
19   Catholic University of Mother and Teacher and
20   has the pontific. And that's the highest
21   recognition that the Vatican can give a
22   Catholic -- when you become a pontifex
23   you're --
24   Q    You're at the top?
25   A    Yeah.

Page 7

1    Q    Okay. Got you.
2         What year did you graduate from that
3    facility?
4    A    1991.
5    Q    How many years did attend there?
6    A    Six years.
7    Q    All right. Prior to attending that
8    facility, where were you doing your
9    schooling?
10   A    I studied in New York. I went to a
11   high school, Thomas Alva Edison Vocational
12   and Technical High School in Jamaica, Queens.
13   Q    All right. Why don't we do this:
14   Where were you born, Mr. Rodriguez?
15   A    I was born in Santiago, Dominican
16   Republic.
17   Q    Okay. Where did you grow up?
18   A    I grew up in Queens, New York.
19   Q    How old were you when you got in the
20   United States?
21   A    I got here, I was six months old.
22   Q    All right. So did you graduate, I
23   mean, go through the New York school system,
24   graduate high school from Edison?
25   A    Yes.

Page 8

1    Q    And did you immediately go down to
2    the Dominican Republic or did you work for
3    some period of time?
4    A    No. I went straight to the
5    Dominican Republic.
6    Q    All right. Did you apply for any
7    medical schools stateside?
8    A    No.
9    Q    Okay. So you went directly down
10   there. And it's a six year program; is that
11   correct?
12   A    Yes.
13   Q    Unlike here in the United States
14   where you do four years and then you go to
15   medical school, it's just a six year
16   circumstance?
17   A    Yes.
18   Q    And is it for a medical doctor or
19   are there other things you're studying?
20   A    It's for medical doctors.
21   Q    Okay.
22   A    It's a Harvard program.
23   Q    A Harvard program. Tell me what you
24   mean by that.
25   A    I don't know.

Page 9

1    Q    Okay.
2    A    It's a curriculum. It was a
3    curriculum that Harvard implemented to do,
4    and it was a way of -- it was an approach to
5    teaching medicine. And then Harvard did it
6    and so did the Dominican Republic.
7    Q    So at some point somebody came up
8    with the idea of a six year medical school
9    instead of four and four?
10   A    Right.
11   Q    You think it came from Harvard, they
12   had some kind of program where they tried
13   that?
14   A    Yeah. We had Harvard teachers come
15   in.
16   Q    All right. And this facility kept
17   that six year program going; is that correct?
18   A    Yes.
19   Q    All right. And you graduated in
20   1991?
21   A    '91.
22   Q    All right. And did you go through
23   six years straight?
24   A    Yes.
25   Q    Okay. And do you hold a medical

3 (Pages 6 to 9)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 10

1  license from any authority?
2  A    I have a license in the Dominican
3  Republic.
4  Q    So you could go there today and
5  practice medicine in the Dominican Republic?
6  A    Yes.
7  Q    All right. You didn't have to get
8  re-licensed or anything since '91?
9  A    No.
10 Q    Did you have to take any kind of
11 boards in the Dominican Republic, you know
12 what I'm saying, any board exams?
13 A    Yeah. No, you don't.
14 Q    You just can graduate from medical
15 school and begin practicing down in the
16 Dominican Republic; is that correct?
17 A    Yes.
18 Q    All right.
19 A    If you can graduate.
20 Q    If you can graduate.
21       You understand here, during medical
22 school and even during residency, there's a
23 series of boards in this country that you
24 have to take in order to even get a
25 physician's license?

Page 11

1  A    True.
2  Q    Is that correct?
3  A    Yes.
4  Q    All right. But down there that's
5  not a requirement?
6  A    No.
7  Q    Okay. Have you taken any exams of
8  that sort like we do in the United States, to
9  be boarded here in this country?
10 A    No.
11 Q    Okay. So you've taken no medical
12 boards at all?
13 A    No.
14 Q    Okay. Do you hold any license to
15 practice medicine in the United States or any
16 of its territories?
17 A    No.
18 Q    Do you hold any sort of physician's
19 assistant's license?
20 A    No.
21 Q    Have you ever taken any kind of exam
22 or applied to have a physician's assistant's
23 license outside the prison system?
24 A    No.
25 Q    Why not?

Page 12

1  A    Not necessary.
2  Q    Have you ever worked in any kind of
3  health profession position outside of the
4  prison system?
5  A    No.
6  Q    If you decided to depart from the
7  federal prison system, could you practice as
8  a PA in the State of Alabama?
9  A    Can you repeat the question?
10 Q    Sure. If you decided to leave the
11 federal prison system, could you practice as
12 a PA in the State of Alabama?
13 A    No.
14 Q    Why not?
15 A    The State of Alabama doesn't
16 recognize our -- you would have to pass the
17 PA board.
18 Q    Okay. You would have to go on and
19 take their exams, correct?
20 A    Yes, ma'am.
21 Q    All right. With the degree you
22 receive from the facility in the Dominican
23 Republic, were you eligible to take any of
24 the medical boards to be licensed in the
25 United States?

Page 13

1  A    Yes.
2  Q    All right. Did you?
3  A    No.
4  Q    Why not?
5  A    I got a good offer from the
6  government.
7  Q    Okay. If you decided to use your
8  medical degree here in the United States,
9  what would you have to undertake to do?
10 A    I just have to board.
11 Q    Have to do the three boards?
12 A    The three boards.
13 Q    Would you have to, at this point in
14 your career, do any additional training or do
15 any additional clinical circumstances in
16 order to take the boards?
17 A    No.
18 Q    Okay. When you graduated from the
19 facility in the Dominican Republic, did you
20 have a general medical degree or did you
21 specialize in anything?
22 A    No.
23 Q    Just general?
24 A    (Witness indicated by nodding head
25 affirmatively.)

4 (Pages 10 to 13)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 14

1  Q    Am I correct that you hold no
2  medical licenses, be it PA, nursing, or
3  physician, in the United States?
4  A    Correct.
5  Q    Did you do any form of internship or
6  residency at all?
7  A    I did an internship, one year.
8  Q    Where was that?
9  A    In the Dominican Republic.
10 Q    Was that after your six years of
11 curricular studies?
12 A    It's part of -- it's your sixth
13 year.
14 Q    Okay. So five years book work, one
15 year internship?
16 A    Right.
17 Q    And what kind of internship did you
18 do and where?
19 A    I did it -- well, at the hospital.
20 Q    Okay.
21 A    Would you like the name of the
22 hospital?
23 Q    Sure. Well, that's okay. But it
24 was a facility associated with the Catholic
25 university down there?

Page 15

1  A    Right. It was the regional hospital
2  for the whole country.
3  Q    All right. So the Dominican
4  Republic is not that big, but --
5  A    No.
6  Q    But, I mean, it was the medical
7  center there, right?
8  A    Yes.
9  Q    Okay. And it was the medical center
10 affiliated with that university?
11 A    Right.
12 Q    Okay. And did you just work on the
13 wards the whole time or did you have book
14 learning that same year?
15 A    The system that we use for training
16 is a system where you do theory and practice
17 at the same time.
18 Q    Okay.
19 A    That's why it's different than the
20 traditional system where you train a doctor
21 by feeding him pounds of books, and then one
22 day five years later you show him a patient.
23       We say this is a cup, we treat
24 a cup. When we work on the eyes, we're
25 already seeing patients with eyes.

Page 16

1  Q    Okay. Did you -- but are you
2  required to do any course work like hard
3  science, you know, such as biology, and
4  physiology, and chemistry, and those things,
5  in that college?
6  A    Yes.
7  Q    But it's integrated in the first
8  year?
9  A    It's all integrated.
10 Q    Okay. So as of '91, you stayed down
11 there for the six years for the training; is
12 that correct?
13 A    Yes, ma'am.
14 Q    All right. You came back to this
15 country in '91?
16 A    I came back in -- yeah, '91.
17 Q    All right. Tell me what you did
18 after that.
19 A    That summer I came -- well, I got to
20 New York. And I went to work at the North
21 Central Bronx Hospital. I was doing
22 lobotomy.
23 Q    Drawing blood?
24 A    Yes.
25 Q    So you worked as a lab tech?

Page 17

1  A    Yeah.
2  Q    Okay. How long did you do that?
3  A    For about seven or eight -- I think
4  nine or ten months while I was waiting for
5  the government to process my paperwork.
6  Q    All right. Had you already been
7  hired by BOP?
8  A    They were already talking to me. I
9  was getting my credentials evaluated and so I
10 had them done in some place in Milwaukee, I
11 believe.
12       And they presented -- they evaluated
13 my credentials and stated that they were the
14 same as any doctor in America, and that I was
15 eligible to board. And then the bureau takes
16 that and puts you to work.
17 Q    All right. Well, let me ask you
18 this: Who said that you had the same
19 training as any other doctor in this country?
20 A    It's a company that does credential
21 evaluations.
22 Q    Do you pay them to get your
23 credentials in order for the government?
24 A    Yeah. You pay like $30.00 and they
25 will -- you submit all of your paperwork and

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 18

1  then they look at a curriculum of another, I
2  guess, university here and put it together.
3      And they say, well, he's got all the
4  credits. It's the same. And his degree is
5  authentic, and my school is accredited by the
6  AMA.
7  Q    Your school is accredited by AMA?
8  A    Yes.
9  Q    Okay.
10 A    If it wasn't accredited, you
11 couldn't board.
12 Q    Okay. And they put all that
13 together with you. Had you already applied
14 to the Bureau of Prisons at that point?
15 A    The moment I left, I was already
16 putting paperwork --
17 Q    Okay. So your intention when you
18 came back from the Dominican Republic, was to
19 try to get on with the BOP; is that correct?
20 A    Right.
21 Q    Is that something you had planned
22 when you headed off to medical school?
23 A    No.
24 Q    Okay.
25 A    I planned on staying in the country.

Page 19

1  Q    Staying in the Dominican?
2  A    Right.
3  Q    Okay. What made you want to come
4  back here?
5  A    The American Embassy. They told me,
6  you're an American citizen --
7  Q    Go home?
8  A    -- you have a lot of knowledge, you
9  need to go up there and work for us.
10 Q    All right. So the embassy asked --
11 the American Embassy asked you to come back
12 to the United States?
13 A    Yes. They told me, you're a
14 citizen, you're young, you're a doctor, you
15 need to go back and help us out.
16 Q    So they weren't willing to let you
17 stay, get a work visa and stay in the
18 Dominican Republic; is that right?
19 A    It wasn't necessary because I'm
20 Dominican.
21 Q    So if you're Dominican, why were
22 they saying you were a United States citizen
23 and go up there?
24 A    The moment you become an American
25 citizen, then you leave your past

Page 20

1  citizenship --
2  Q    Right.
3  A    But my country has double
4  nationality --
5  Q    Dual?
6  A    Dual. So I retained both.
7  Q    Okay.
8  A    And I was there, and it seemed to be
9  better, you know, hey, if you're going to pay
10 me good money, hey, I'll go. I'll go back.
11 Q    So even before you left the
12 Dominican Republic, you were thinking that
13 you would go to work for BOP?
14 A    Yes.
15 Q    Okay. I'm just trying to get a
16 sense of whether you came back here and were
17 going to go on and try to take the boards up
18 here and go out into private practice and do
19 a residency and all that; or if when you left
20 the Dominican Republic, you kind of had in
21 your mind, I'm going to try to work for the
22 BOP, I'm going to get this credentialing
23 company get my stuff together. Was it more
24 like the latter?
25 A    Yeah. You know, I was looking for

Page 21

1  a better life. If you work in a third world
2  country, you know, the humanitarian thing --
3  Q    Right.
4  A    -- it was good, you know, you really
5  want to help, but --
6  Q    But you wanted to go back and make
7  some money? There's nothing wrong with that.
8  A    No. Making money is good, but
9  there's a point where you say, how much can I
10 help. If you notice, you could help all you
11 want, it's not going to change much, you help
12 people. So I figured I needed to get a
13 retirement system, I need to get something
14 going.
15 Q    Right. Take care of you and your
16 family?
17 A    Right.
18 Q    Okay. Fair enough. I'm not
19 criticizing that. I was just trying to get
20 a sense of whether your intention in leaving
21 the Dominican Republic was to come back and
22 do a residency and to go into private
23 practice as a physician?
24 A    No.
25 Q    Or if you were just going to get

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 22

1  into the government system from the get-go?
2  A    Right.  No.  My intent was to get
3  in and then now as I progress, and the age
4  a little bit, I'm preparing for my boards.
5  Q    Okay.
6  A    So I will be taking my boards and
7  then come back as a clinical director for the
8  Department of Justice.
9  Q    All right.  You are preparing to
10 take your boards now so you can get your MD
11 license?
12 A    Right.
13 Q    What are you doing to do that?  Is
14 there a course or something?
15 A    No.  Just study.  Study all the
16 books.
17 Q    All right.  And you have to take all
18 three sections, right?
19 A    I believe so.  I don't know if I
20 have to take the third, but I might have to
21 because I know English.
22 Q    Okay.  So you would be getting EFMG
23 or whatever that foreign medical graduate,
24 you have to go through that process; is that
25 correct?

Page 23

1  A    Right.
2  Q    Are they going to make you do any
3  more schooling or internship or anything
4  since you, you know, have not been doing
5  clinical -- formal clinical training since
6  '91?
7  A    No.  What I'm doing now qualifies
8  as clinical experience.
9  Q    Okay.
10 A    But it's not a requirement for them
11 anyway.  They do not require that.
12 Q    Right.  Not at BOP, they don't?
13 A    No.  Not even the national
14 accreditation, you don't have to.
15 Q    Okay.  So you're going to try to get
16 through all the sections of the board?
17 A    Right.
18 Q    And then you will, if you accomplish
19 that, have an MD license in this country?
20 A    Yes.
21 Q    All right.  Will you be able to go
22 out and practice, get a license in any state,
23 or are you still going to be having to do an
24 internship and residency?
25 A    It depends on what the committee is

Page 24

1  requiring at the time.
2  Q    Okay.
3  A    Because it changes every year.
4  Q    Right.  I mean, I know normally if
5  you do four years of medical school here, you
6  take part one and two of your boards, and
7  then you've got to take -- you've got to do a
8  year of internship in this country, and then
9  sometimes it's two, but at least one year.
10 And then you can take your final parts of
11 your boards; is that correct?
12 A    Yes.
13 Q    Okay.  So you don't know exactly
14 what the committee is going to require you to
15 do after you get the first parts of your
16 boards accomplished?
17 A    Right.
18 Q    Okay.  You might have to end up
19 doing an internship or residency?
20 A    I may.  I may.
21 Q    All right.  You won't have to do
22 that if you stay in the Bureau of Prison
23 System, is that correct, to have your
24 clinical director position?
25 A    I'll have to do whatever the board

Page 25

1  says to come back.
2  Q    All right.  Okay.  The board you're
3  talking about is the Board of Prisons?
4  A    No.  No.  The National Board of
5  Doctors.
6  Q    The National Board.  Okay.  We're on
7  the same sheet.  Okay.  All right.
8      As clinical director position you're
9  talking about, where is that facility?
10 A    It's everywhere I work.  Dr. Garcia
11 is the clinical director.
12 Q    All right.  So that's back to the
13 Bureau of Prisons?
14 A    Right.
15 Q    To be a clinical director at the
16 BOP, what do you have to have in terms of
17 licensure and residency and all that?
18 A    You need to have a license somewhere
19 in America and then you're considered an MD.
20 Q    Okay.
21 A    Within the system.
22 Q    And you can work in the system?
23 A    Yes.
24 Q    Okay.  When you came back in '91 and
25 went through the process in order to work for

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX   (205) 251-4224

Page 26

1    BOP --
2    A    Right.
3    Q    -- where did you begin working?
4    A    They offered me a job in Louisiana;
5    Oakdale, Louisiana.
6    Q    Okay.  And you worked as a PA?
7    A    A PA.
8    Q    All right.  And how many years were
9    you in Oakdale?
10   A    Eight years.
11   Q    All right.  And then where did you
12   go?
13   A    And then I moved here to Alabama.  I
14   was transferred here to Maxwell Air Force
15   Base.
16   Q    Okay.  And how is it that you got
17   transferred?  Did you request it or --
18   A    I put my name, you know, you ask for
19   a transfer and then they select the place for
20   you.
21   Q    Why did you want to transfer?
22   A    I really don't know that.  I just
23   did.  You know, I got tired of the place.
24   Q    Okay.
25   A    Maybe the environment, maybe a new

Page 27

1    thing.
2    Q    Pardon?
3    A    I wanted to try a new thing.
4    Q    Are you married?
5    A    Yes.
6    Q    And do you have children?
7    A    Yes.
8    Q    How old are your kids?
9    A    I have a twelve year old and a seven
10   year old.  Girls.
11   Q    What year did you start then here at
12   Maxwell?
13   A    '99.  Actually, November of 1999.
14   Q    Okay.  And have you held the
15   position of PA the whole time you've been at
16   Maxwell?
17   A    Yes, ma'am.
18   Q    Still there, right?
19   A    Yes.
20   Q    Okay.  When you get the clinical
21   director circumstance, you get your boards
22   done and all that, will you stay at Maxwell
23   or will you probably be transferred out?
24   A    I really don't know.
25   Q    Okay.  Have you worked in any health

Page 28

1    care position at all since coming back to the
2    United States outside the Bureau of Prisons
3    system?
4    A    No.
5    Q    Okay.  Always been in BOP from day
6    one?
7    A    Right.
8    Q    Okay.  Other than that little stint
9    lobotomizing people up in New York?
10   A    For a year, right.
11   Q    Okay.  Have you had any change
12   in grade or position while you've been at
13   Maxwell?
14   A    No.
15   Q    How many PAs do they have out at
16   Maxwell?
17   A    There is one.
18   Q    One slot?
19   A    How many positions?
20   Q    Yes.
21   A    Three.
22   Q    Three.  And is that three full time
23   PAs?
24   A    Yes.
25   Q    All right.  And back in 2001, was

Page 29

1    that the case, did you have three?
2    A    There might have been five.
3    Q    How many nurse practitioners do you
4    have?
5    A    Well, let me clarify one thing.
6    We're not considered PAs, or nurse
7    practitioners.  When you come into the
8    bureau, you become -- since last year they
9    changed the name to mid level practitioner.
10   Q    Okay.
11   A    So we are called now MLPs.  And
12   that's to save face for the PAs that don't
13   recognize us or the nurse practitioners that
14   don't recognize us.  They were all MLPs.
15   Q    All right.  So it kind of levels the
16   playing field?
17   A    Right.
18   Q    So people can reduce their
19   territoriality; is that fair?
20   A    Yeah.
21   Q    Okay.  Because sometimes nurse
22   practitioners think PAs don't have as much
23   training that they do, and there are PAs who
24   think that the NPs are just nurses?
25   A    Yes.

8 (Pages 26 to 29)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 30

1  Q    Okay.  So you've been in an MLP
2  position from the get-go and have stayed
3  there?
4  A    Yes.
5  Q    And tell me generally what your
6  duties are as an MLP at Maxwell and if they
7  have changed since like -- I mean, I'm most
8  interested in 2001, that period of time, and
9  if they have changed, let me know that.
10       But let's just say 2001 when Mr.
11 Coggin would have been out there, what were
12 your duties on a day-to-day basis for
13 Maxwell?
14 A    Right.  Back in 2001, my
15 responsibility is to treat, to take care of
16 any of our inmates' health care problems.
17 And whenever they show up, at that time we
18 were applying what we used to call sick call
19 on demand, which is if you come to the
20 clinic, if you come in at 6:00 in the
21 morning, we see you that day.
22       So you didn't have to wait for
23 another day unless we deem the problem
24 something that can wait, well, then we would
25 schedule you for another time.

Page 31

1  Q    All right.  So back in 2001, if
2  you showed up for sick call at 6:00 in the
3  morning, you would be seen that day by
4  somebody?
5  A    Triaged at that time, at a minimum.
6  Triaged by a PA.
7  Q    And if the PA or the -- well, we'll
8  just say the MLP.  If the MLP decided that it
9  was -- you could be seen in the next day or
10 two, they would schedule an appointment or
11 they would see you that day if they felt it
12 warranted?
13 A    Yes.
14 Q    Okay.  And how is it that the
15 determination would be made that whatever the
16 condition was warranted, you know, being seen
17 that day as opposed to being given an
18 appointment to come back?
19 A    You base it on severity, how acute
20 the patient is.  Because at that time we had
21 a population of about 900 inmates.  And it
22 was very typical to have about fifty to
23 seventy inmates show up at six o'clock in the
24 morning.  So they would all be sitting in a
25 room.

Page 32

1       And like a good triage nurse, if you
2  look around, you have to start with who is
3  the sickest and move on.
4  Q    Okay.  How many people would be, you
5  know, quote, "at sick call" to make those
6  evaluations?
7  A    There -- at 6:00 there's always
8  one -- there's only one mid level provider
9  to start.  And then at that time when we had
10 more coverage, we would have another person
11 coming in at 7:30, another person was coming
12 in at 8:00, another person was coming in at
13 9:00.  So we would have like our full
14 complement of staff by ten o'clock.
15       So like if all fifty were acute and
16 needed treatment, they would have been
17 filtered down in the day.  Those that were
18 severely wounded or terminally ill, or
19 acutely ill, if we deemed they had to go to
20 the hospital, we would send them by ambulance
21 out or treat them in house.
22 Q    All right.  In terms of physicians,
23 how many physicians, what I would call, I
24 guess, someone like Dr. Garcia, he's
25 considered a what level provider?

Page 33

1  A    He's the MD.
2  Q    MD.  Okay.  How many MDs would you
3  have available to you in that circumstance?
4  A    Well, there's always one.  He's
5  available twenty-four hours a day.
6  Q    Did you, in 2001, what shift did you
7  typically work?
8  A    I can't recall.
9  Q    Okay.  Did you work Monday through
10 Friday, did you work weekends?
11 A    It could have been a variety because
12 we covered, back then we covered twenty-four
13 hours, seven days a week.  I take that back.
14 No.  We've had different time slots.
15       I believe in 2001 we were covering
16 until nine o'clock.  At that time we had
17 already changed to nine o'clock.  But we were
18 Monday through Sunday.
19 Q    All right.  Actually showing up to
20 the facility as opposed to being on call, how
21 many days a week would you work?
22 A    Back then, four days.
23 Q    Four days?
24 A    We all worked on compressed
25 schedules.

9 (Pages 30 to 33)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX   (205) 251-4224

Page 34

1  Q      Pardon?
2  A      We work compressed schedules.  The
3  middle providers work ten hour shifts four
4  days a week.
5  Q      All right.  And how often would you
6  have to be on call?
7  A      Every night.
8  Q      Did you carry a beeper, or how would
9  they get a hold of you?
10  A      We have a call back system by
11  telephone.
12  Q      Tell me what that's like.  How did
13  they get ahold of you?
14  A      The control will call us on the
15  phone, you know, hey, Dr. Rodriguez, Dr.
16  Garcia --
17  Q      Would they call a specific person or
18  was there a person designated to take those
19  kinds of calls on the off hours?
20  A      Yes.  The physician takes the calls
21  twenty-four hours a day.
22  Q      Okay.  I don't think my question was
23  clear then.
24        Every time control would call, and
25  what I'm saying is, after hours?

Page 35

1  A      They first call the MD.
2  Q      They would call the MD first?
3  A      Right.
4  Q      Every time?
5  A      Yes.
6  Q      How would it be that a mid level
7  provider would get called then?
8  A      It's not normal for a mid level
9  provider to be called.
10  Q      All right.  Have you ever been
11  called?
12  A      Maybe four times in seven years.
13  Q      Okay.  So it is always the physician
14  that is called?
15  A      Yes.
16  Q      If it's after hours?
17  A      Yes.
18  Q      All right.  If you were working ten
19  hour shifts, how late are you there in the
20  evening?
21  A      I stayed -- presently, I'm there to
22  6:30.
23  Q      Okay.  But --
24  A      Back then if I had a shift, I was
25  10:00 to 8:00, then I would have been there

Page 36

1  until 8:00.
2  Q      8:00 p.m.  So let me ask you this:
3  If you were there until 8:00 p.m. and
4  somebody, one of the correctional officers,
5  wanted to call medical, if you were still
6  there in the facility, would you be called
7  before actually Dr. Garcia would be called?
8  A      Yes.
9  Q      Okay.  That's what I'm just trying
10  to get.  If you're there and the
11  circumstance --
12  A      I was trying to remember.  Yeah.
13  Q      If it's ongoing and you're still in
14  the facility, they will call you?
15  A      Yes.
16  Q      Okay.  Or someone over in the
17  clinic?
18  A      Right.
19  Q      Is the clinic open like until 8:00
20  at night or 9:00 at night?
21  A      Back then I'm thinking we used to
22  close at 6:30.  So 6:30 was the latest that
23  there was a provider there.
24  Q      So in 2001, there wouldn't be anyone
25  there passed 6:30?

Page 37

1  A      No.
2  Q      All right.  So if anyone had to call
3  to get information about an inmate after
4  6:30, it would always be Garcia?
5  A      Yes.
6  Q      You said that you recalled
7  sometimes, though, you actually got called?
8  A      Sometimes they will call me.
9  Q      How often do you think you have been
10  called after hours?
11  A      Direct call?
12  Q      Yes.
13  A      Very minimal.  I'm thinking maybe
14  four times, what I can remember.
15  Q      Any of those times involve Mr.
16  Coggin?
17  A      Not at night.
18  Q      Did you get calls about Mr. Coggin
19  during the day?
20  A      When we were working?
21  Q      Yes.
22  A      I can't recall.
23  Q      But it's possible?
24  A      That they call?
25  Q      Yeah.

10 (Pages 34 to 37)

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 38

1  A    I'm not sure.
2  Q    Okay. But it's your recollection
3  that you never were called at home or when
4  you were away from the prison on Coggin at
5  all?
6  A    I don't remember.
7  Q    Okay. I mean, is it possible and
8  you just don't remember it?
9  A    I just can't recollect because it's
10  not -- it's not the norm.
11  Q    Okay. Do you have any recollection
12  of whether you were ever called about him
13  while you were actually still at the
14  facility?
15  A    I don't remember that.
16  Q    Is it possible that you were and you
17  just don't remember it?
18  A    Really, I don't.
19  Q    If you were called at home about an
20  inmate, do you record that anywhere in their
21  records, be it either the medical record or
22  elsewhere?
23  A    If one of us is called, if anybody
24  is called, there would be a note in the
25  chart.

Page 39

1  Q    So for example, the evening that Mr.
2  Coggin was taken to the emergency room for
3  his bleed, do you recall whether or not you
4  were called about that?
5  A    No.
6  Q    You weren't?
7  A    No.
8  Q    But the medical records should have
9  a note from whatever caretaker, be it Dr.
10  Garcia, or any other person on the outside,
11  so to speak, indicating that they were called
12  and what transpired?
13  A    Yes. The next day.
14  Q    Okay. That's standard procedure?
15  A    That's standard procedure.
16  Q    So if anybody was called on the
17  outside be it doctor or MLP, and it's not
18  recorded in the chart, that would be a
19  violation of the procedure and how it's set
20  up?
21  A    That's correct.
22  Q    All right. Have you ever been
23  asked by anyone to go ahead and make a note
24  because you failed to make a note in a
25  situation like that?

Page 40

1  A    No.
2  Q    Can anyone be transferred away from
3  Maxwell to an emergency room without one of
4  the -- either the MLPs or Dr. Garcia being
5  called?
6  A    No.
7  Q    Okay. So am I correct that if that
8  indeed occurred, there should be a note in
9  the chart from either that physician or MLP
10  about the circumstances of the permission to
11  transfer the patient out of Maxwell?
12  A    Not permission.
13  Q    Well, not permission but, I mean --
14  A    Acknowledge.
15  Q    Acknowledging, yes, let him go in
16  the ambulance and get out to the hospital?
17  A    Well, not let him go. Any
18  situation -- in any situation there's a 9-1-1
19  emergency, you don't really need a doctor to
20  tell you if this guy is -- and that's
21  happened in the institution.
22         If a guy is cut, his arm is broke,
23  they'll alert us but he's getting on an
24  ambulance and there will be an officer
25  escorting that guy out.

Page 41

1  Q    All right.
2  A    But the next day there will be an
3  entry in the record by one of us.
4  Q    As to the circumstances?
5  A    Yeah. This guy left because we need
6  something chronological and we follow up on a
7  daily basis, you know, where he's at.
8  Q    And the person who got the 9-1-1
9  alerting, meaning the person, I guess, off
10  site that was told, we've got to get this guy
11  to the hospital, is that the person who would
12  make the note, the person who had been
13  notified of the situation?
14  A    Not necessarily. It would be
15  whoever is in charge of the -- whoever is in
16  the clinic the next day.
17  Q    How would they go about getting the
18  information about what transpired?
19  A    As soon as you walk in, there's a
20  duty log that will tell you, or the
21  lieutenant will tell you, we have an inmate
22  out. He went out last night for such and
23  such. So whoever is the first person in,
24  they start, you know.
25  Q    They see in the duty log that

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 42

1 somebody went out to the hospital the night
2 before?
3 A      Yeah. Or the lieutenant would
4 be -- the guy running the institution, when
5 you walk in he says, last night we had one
6 guy went out, or we had a fight.
7      And so that morning whoever walked
8 in will start the ball rolling.
9 Q      All right. What happens, I mean, I
10 imagine even as an employee of the BOP, that
11 Dr. Garcia gets a vacation now and then,
12 doesn't he?
13 A      Yes.
14 Q      Who takes over to take those calls
15 at night when he's gone on vacation?
16 A      A licensed MD on the street.
17 Q      They contract out?
18 A      Yes.
19 Q      And would he come back in and make
20 notes, I mean, they just kind of get a
21 fill-in doc; is that correct?
22 A      Yeah. But they have to come in --
23 Q      And do all the regular routine
24 duties?
25 A      Yes.

Page 43

1 Q      Okay. Did there come a time out at
2 Maxwell where the sick call procedure was
3 changed in a way where you actually had an
4 assigned caregiver where an inmate basically
5 would be like your patient or some other
6 MLP's patient on a regular basis?
7 A      Yes.
8 Q      All right. If it had been suggested
9 to me in the Spring of 2001, this idea of
10 being assigned to a health care provider for
11 continuity of care came about about that
12 time, would that be about right in your
13 recollection?
14 A      I don't think it was that early. I
15 believe it was a little bit later on.
16 Q      But some time in 2001 that started?
17 A      I would say more like 2003 or 2002.
18 Q      All right. So in 2001, you think
19 that the idea of managed care or a sick call
20 being abolished and you being assigned to a
21 specific doctor or nurse practitioner, that
22 wasn't in place then?
23      MR. DOYLE:  Objection. There's been
24 no testimony about sick call being abolished.
25 Q      I don't mean abolished but, I mean,

Page 44

1 I know there's still sick call.
2      But, I mean, in the sense where you
3 have a caregiver assigned to you that if you
4 have a problem, that's who you'll see on a
5 regular basis, you think that didn't come
6 into place until 2003?
7 A      I'm not sure, so I don't want to
8 tell you when did it start.
9 Q      Okay. Were you ever assigned Mr.
10 Coggin as one of your patients?
11 A      Let me look in the file.
12 Q      Okay. And is there some document
13 that will indicate that you're assigned to
14 him, so to speak?
15 A      Well, if I'm the one who's always
16 seeing him, then I think it would be me.
17 Q      Okay.
18 A      I really can't -- not yet. I can't
19 determine when did it -- when did he might
20 have start. His number, though, is not in my
21 range of what I see.
22 Q      Okay. And the number you're
23 referring to is up here in the far right
24 corner of the yellow folder?
25 A      Yes.

Page 45

1 Q      I have a copy of your chart here.
2 A      Okay.
3 Q      And we'll make it Exhibit 1 to your
4 deposition, okay?
5 A      Okay.
6 Q      But we also have it as Exhibit 2 to
7 Dr. Garcia's, but we'll use it.
8
9      (Whereupon, Plaintiff's
10      Exhibit Number 1 was
11      marked for identification and
12      was retained by counsel.)
13
14 Q      And you're talking about this number
15 20237-001?
16 A      Right. The numbers are divided.
17 I see 00 through 33. So it's kind of
18 complicated. But from the first five
19 numbers, the second two -- the last two.
20 Q      The last two?
21 A      Yes. So that 37, if it's between
22 00 and 33, it belongs to me.
23 Q      Okay.
24 A      From 34 through 66 belongs to
25 another provider.

12 (Pages 42 to 45)

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 46

1  Q    Who would that be?
2  A    At that time it would have been Ms.
3  Essex.
4  Q    Essex?
5  A    Yeah.
6  Q    Nurse Practitioner Essex?
7  A    Yes.
8  Q    Okay.
9  A    But at this time, I really don't
10 feel that we were the PCPT that we were
11 talking about.  I don't believe it was yet
12 installed.
13 Q    Okay.  I don't think Essex was
14 actually working there.  She came -- didn't
15 she come in kind of the Summer of 2001?
16 A    She's in there because she's in the
17 file somewhere.
18 Q    Okay.  Yeah.  But, I mean --
19 A    Maybe mid summer.
20 Q    Yeah.  She was newer then, wasn't
21 she?
22 A    Yes.  Yes, she was.  She came in and
23 then Ms. Little came in a little bit after.
24 Q    All right.
25 A    That's why I don't feel that this

Page 47

1  system was in place yet because for it to be
2  working, all of us have to -- there have to
3  be three providers.
4  Q    All right.  Do you think you were
5  kind of easing into the idea of having a
6  specific provider in -- for example:  My
7  allergies are acting up, I'm an inmate, it's
8  not a medical emergency, I just need to get
9  in to see somebody to get some Claritin, or
10 whatever?
11 A    Right.
12 Q    And rather than come to sick call
13 and just wait in line I guess until somebody
14 got to me, if I had you as my MLP, would I
15 come in and sign a cop out form and asked to
16 be seen by you at some point for that?
17 A    Yes.  If at any time you feel like
18 you have a medical problem -- with the PCPT,
19 it's kind of like -- there's good things
20 about both systems.
21 Q    Okay.
22 A    The PCPT will allow you, if you're
23 sick -- if you feel you're sick, you can do
24 two things.  You can either tell your
25 supervisor that you don't feel well and your

Page 48

1  supervisor will call me, me directly, on my
2  line, and then I would talk to you about your
3  problem and see, well, can I see you, if I
4  can work you in.
5       If not, there are guidelines that
6  put you in a timetable for me to bring you
7  back.
8  Q    Okay.
9  A    And the other way is just to walk
10 into the lobby because the front door is
11 always open, grab this inmate request.  We
12 don't call it a cop out.  We call it an
13 inmate request for medical appointment.
14      And that sheet, he fills it out,
15 puts it in our mailbox.  That day by noon our
16 medical records person picks up all that mail
17 and puts them in my -- for my review that
18 afternoon.
19 Q    Okay.
20 A    So it's a quick avenue.  In the time
21 that Mr. Coggin was seeking sick call, I
22 would say that was even the best way of a
23 system which, if you're sick, you just come
24 in and you would be seen that day.
25 Q    All right.  And that would have to

Page 49

1  be during the sick call period?
2  A    He would need to come in at six
3  o'clock.
4  Q    All right.  And that sick call was
5  held from 6:00 a.m. until when?
6  A    Until about 6:30.
7  Q    6:20?  I had just seen a form
8  that --
9  A    I believe the sign in, it was from
10 6:00 to 6:20; that's correct.
11 Q    I saw something in one of your --
12 because this is dated February 2002 that was
13 provided by the government.  It says, "Sick
14 call is conducted Monday, Tuesday, Thursday,
15 and Friday between 6:00 a.m. and 6:20" and
16 they are given an appointment or will be seen
17 on the same day.  And it's for urgent or
18 emergent care; is that correct?
19 A    Yeah.
20 Q    All right.  So between 6:00 and
21 6:20, you would be expected to see fifty
22 to seventy folks and make a decision as to
23 whether they need to be seen that day or
24 come back for an appointment?
25 A    Pretty much.

13 (Pages 46 to 49)

Page 50

```
 1   Q    Okay.  What happens on Wednesdays?
 2   A    Wednesdays, the only way -- the way
 3  to come in is to alert the supervisor.
 4   Q    Okay.
 5   A    Because inmates have that avenue.
 6  Any time they need to speak to somebody, if
 7  they feel ill, they can approach any staff
 8  member at any time, and the staff member will
 9  call us.
10   Q    All right.  And this clinic where
11  you say the door is always open, I've been
12  told, and I think even Dr. Garcia said that
13  the doors are locked at the clinic, there's
14  a box on the outside where they can put those
15  forms, correct?
16   A    Yes.  There's like a foyer or
17  there's two doors to get into the clinic.
18  The first door is left open because that's
19  where they come in to the pill line also, the
20  pharmacy window is in this room.
21       But on this wall, on the far wall,
22  there's cop outs and inmate requests for
23  sick, and the boxes are right there so they
24  have access to it.
25   Q    Okay.  They can just walk right up
```

Page 51

```
 1  and fill it out?
 2   A    What they can't pass is the door to
 3  the lobby of the hospital because that's a
 4  security problem.
 5   Q    Right.  So are you sitting out there
 6  by the box or they just come in between 6:00
 7  and 6:20 and fill out either a cop out or
 8  that --
 9   A    No.  At six o'clock we open all the
10  doors.  We're there.  And then they will come
11  in through the lobby, sign up, and then a
12  provider will be waiting in our urgent care
13  room.  And we'll see them one by one.
14       Really, it's not to make a decision
15  between twenty minutes.  It's twenty minutes
16  for you to get there.
17   Q    Okay.
18   A    Because, you know, there's another
19  accountability problem for the institution
20  if you're not where you're supposed to be.
21   Q    Right.  You can't just be hanging
22  out over there?
23   A    Yes, ma'am.
24   Q    Okay.  Do you recall whether there
25  was a sign put up that said, quote, "Do not
```

Page 52

```
 1  knock on door except in case of medical
 2  emergency," on that locked set of doors?
 3   A    I don't recall that.
 4   Q    Okay.  Other than that twenty minute
 5  window, that anteroom that we're talking
 6  about would be unmanned, you all would be
 7  behind the locked closed doors of the
 8  hospital after that, right?
 9   A    Before 6:00 in the morning, but
10  the other door is open until 6:30 at night.
11   Q    The outside doors?
12   A    The inside doors.  The hospital is
13  open during working hours.
14   Q    All right.
15   A    But after 6:30 we have to lock it.
16   Q    Okay.  6:30 at night?
17   A    6:30 at night.
18   Q    So if I came in at 6:15 and wanted
19  to fill something out, you or one of the
20  nurse practitioners would be there near the
21  box area?
22   A    Of the night or the morning?
23   Q    Morning.
24   A    Morning, yeah, I'll be there.  I'm
25  there.
```

Page 53

```
 1   Q    All right.  If Mr. Coggin recalls
 2  that he was assigned you as his primary care
 3  person at some point, you know, in the mid
 4  2001 period, could that be possible that you
 5  were, I mean, at that point you were actually
 6  assigned to him?
 7   A    I don't think so.
 8   Q    Okay.  Was there any way to, on the
 9  chart where indication of who was the
10  primary, was kept other than the numbers?
11   A    No, not yet because at that point we
12  still hadn't instituted that.  At that point
13  all patients are -- all patients are
14  everybody's.
15   Q    All right.  At that time was the
16  medical director Barbara McCrory?
17   A    The administrator of the hospital?
18   Q    Yes.
19   A    Yes, ma'am.
20   Q    All right.  And Dr. Garcia was the
21  clinical director?
22   A    Yes.
23   Q    And you and -- is it Mr. Patchel?
24   A    Patchel.
25   Q    Were the PAs?
```

14 (Pages 50 to 53)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 54

1  A    Yes.
2  Q    And then Ms. Essex and Ms. Little
3  became nurse -- they were nurse practitioners
4  in that system about that time?
5  A    Yeah. Later on in the year they
6  came. I believe Mr. Patchel left that
7  summer.
8  Q    Okay. So was there a period of time
9  where you were the only PA?
10 A    I believe so.
11 Q    Okay. What documents have you
12 reviewed, sir, in order to prepare for today?
13 A    This record.
14 Q    The record. Okay. Do you have any
15 other notations that you make on inmates on
16 any other kind of logs or records that are
17 kept, not necessarily for the individual
18 inmate but just, you know, for general
19 population outside of the medical records?
20 A    No, I don't -- only what we're
21 doing.
22 Q    Okay. Anything that PA Rodriguez
23 would have done for Mr. Coggin on any level
24 from prescriptions to visits to anything
25 would be written in this chart; is that

Page 55

1  correct?
2  A    Yes.
3  Q    All right. And have you had an
4  opportunity to review the chart to determine
5  that everything that you recall doing for
6  this gentleman is recorded here?
7  A    I believe so.
8  Q    Okay. Have you talked with any
9  of the other health care providers out at
10 Maxwell about Mr. Coggin and this lawsuit?
11 A    I spoke to Dr. Garcia about it.
12 Q    All right. When was that?
13 A    About two or three months ago. The
14 last time he was here for a deposition.
15 Q    Okay. Have you read his deposition?
16 A    No.
17 Q    What did Dr. Garcia tell you about
18 the deposition -- was it before the depo or
19 after?
20 A    After, because I was waiting in the
21 other room.
22 Q    Right. What did you discuss?
23 A    He said it was long.
24 Q    I don't know if that was me or him.
25 He's pretty long winded himself. But I've

Page 56

1  heard that it's better than having Ms. Estep,
2  the correctional officer, because she never
3  is quiet or at least that's what was
4  represented to me today. All right.
5      Have you ever been called in to
6  either the warden or Dr. Garcia's office to
7  discuss the care of Mr. Coggin at any time
8  even back when he was an inmate?
9  A    I can't recall that.
10 Q    Do you recall whether or not you
11 had any conversations with the warden or
12 the assistant warden around the time of Mr.
13 Coggin's hospitalization?
14 A    No. I don't recall.
15 Q    Could you have had?
16 A    I could have -- if I didn't make --
17 let me look in the chart because if I didn't
18 make an entry, I didn't talk to him about it.
19 Q    Okay. If you were --
20 A    Yes, I did. I did talk to him
21 because I saw him on September -- I called
22 the hospital on September 8th -- September 8
23 of 2001. And I report to them of his status,
24 you know.
25 Q    All right. On that day, you

Page 57

1  actually did report to --
2  A    I would have to tell them how he's
3  doing.
4  Q    And if somebody is out in the
5  hospital, is that one of your routine jobs to
6  check in on them?
7  A    Yes.
8  Q    That's protocol, isn't it?
9  A    Yes. We check on them.
10 Q    Okay. And then you get an update
11 and then do you report it to the warden or
12 the assistant warden?
13 A    I normally will tell everybody who's
14 involved in the chain, but I will try to tell
15 the AW, the associate warden.
16 Q    Okay. And those conversations are
17 noted --
18 A    Well, that I talked to the AW, no.
19 But I can tell you that I told them what I
20 wrote, you know.
21 Q    I see. If there's a notation that
22 you made a call at the hospital for an
23 update, your assumption is, it would be your
24 job to call at least the AW and let him know
25 what the deal was?

15 (Pages 54 to 57)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 58

1   A    Yeah.  Because every time that we
2   have a person out of the institution,
3   everybody is worried about the person.
4   Q    And it's protocol for, I mean,
5   irrespective of whether you're worried or
6   not, you have to call every day and check
7   on the inmate, correct?
8   A    Yes.
9   Q    Okay.  And it has to be reported up
10  the chain?
11  A    Yes.
12  Q    Okay.  Have you ever been counseled
13  during your tenure with BOP for failure to do
14  your job duties?
15  A    No.
16  Q    Were you counseled regarding the
17  Coggin situation?
18  A    No.
19  Q    If you're indeed counseled for your
20  performance, I mean, do you get an annual
21  review or how often are you reviewed?
22  A    Quarterly.
23  Q    Quarterly.  And who does your
24  review?
25  A    The clinical director and the

Page 59

1   hospital administrator.
2   Q    So it would be Dr. Garcia and --
3   A    Beth McCrory back then.
4   Q    And have you ever had any quarterly
5   evaluations where you were given less than
6   acceptable ratings?
7   A    Never.
8   Q    Okay.  Do you remember the inmate,
9   Jim Johnson?
10  A    No.
11  Q    Do you remember Mr. Coggin?
12  A    Vaguely.
13  Q    Okay.  Have you seen a picture of
14  him to try to refresh your memory?
15  A    Not recent.
16  Q    Okay.  At some point have you seen
17  a picture of him?
18  A    Well, actually, there's no picture
19  in the chart.
20  Q    No.  No.  But, I mean, at some
21  point -- I mean, I would imagine if you're
22  called into a circumstance like this, you try
23  to figure out who the inmate is?
24  A    I remember treating a guy.
25  Q    Okay.

Page 60

1   A    But I don't know his face.  I think
2   he was of low stature.
3   Q    Short guy?
4   A    That is all I can recall.
5   Q    Okay.  If an inmate was to fill out
6   a request to the warden for medical care,
7   would that come back to you?
8   A    No.
9   Q    That would go to Garcia?
10  A    I don't know.  I've never seen one
11  of those.
12  Q    Okay.
13
14       (Off the record discussion.)
15
16  Q    As part of your employment with the
17  BOP, do you have to go through a training
18  program so you can familiarize yourself with
19  the manner and method which they expect you
20  to provide medical care?
21  A    No.
22  Q    Okay.  Are you familiar with the,
23  quote, "program statements" they have or, you
24  know, outlining what, you know, principles
25  are supposed to be used or how you're

Page 61

1   supposed to handle medical emergencies or --
2   A    You mean protocols?
3   Q    Protocols, yeah.
4   A    Yeah.
5   Q    Okay.  Where are those protocols
6   located?  I mean, can you put your hands on
7   them on a day-to-day basis or how do you
8   become familiar with them?
9   A    You got -- there's a set in the
10  administrator's office and there's some in
11  the emergency room.
12  Q    In the emergency area?
13  A    Yeah.
14  Q    Okay.  And do you go through any
15  kind of continuing education or training
16  course where you've got to know what those
17  program statements or protocols say?
18  A    Well, we do -- we discuss cases and
19  protocols once a month for about two hours.
20  Q    Okay.  But, I mean, in terms of when
21  you came to work for BOP, did they give you
22  some kind of orientation where they say,
23  here's what you're going to have to do, here
24  are the rules, here's, you know, if an inmate
25  comes and this is the circumstance, this is

16  (Pages 58 to 61)

Page 62

1  how it's supposed to be handled. I mean, how
2  do you learn kind of the ropes?
3  A      Pretty much your training, you know,
4  you've got to know your stuff.
5  Q      Right. But, I mean, practicing
6  medicine in the Dominican Republic versus
7  in a federal prison setting is a little bit
8  different, wouldn't you agree?
9  A      A little.
10  Q      Okay. But, I mean, there's rules
11  and regulations because of the fact it's a
12  prison that you have to adhere to as well,
13  correct?
14  A      Yeah, there are.
15  Q      Right. I mean, you can't just say
16  to an inmate who came in looking kind of
17  poorly to you in the morning, hey, you know,
18  check back in with me this afternoon or later
19  in the evening, you know, or give me a call
20  when you're feeling out of sorts if it's
21  still bothering you later.
22         I mean, you don't have that ability
23  to manage the care that way, right?
24  A      No. It's not going to be treated --
25  we treat everybody the same way a person on

Page 63

1  the street would be treated. We say that we
2  give community standards.
3  Q      All right. So if I'm an inmate, I
4  can call you from wherever I am in the prison
5  at any time, just like I would my regular
6  doctor on the outside, and ask you to call me
7  back and see what's going on that day?
8  A      In a sort of way.
9  Q      Okay. It's not quite the same, I
10  wouldn't imagine?
11  A      No. There are avenues because they
12  are inmates.
13  Q      Right.
14  A      You have to ask your supervisor,
15  your supervisor will open the communication
16  between me and the inmate, and then I would
17  tell them, this is what's happening, you
18  know, we'll have a dialogue. If his problem
19  deems coming to the clinic, I will have them
20  brought in.
21  Q      All right. But you make the
22  decision of whether they get actually to the
23  clinic after you sort out the situation?
24  A      Right.
25  Q      Okay. What's the difference between

Page 64

1  medically mandatory and presently medically
2  necessary in terms of figuring out what kind
3  of care you're going to give to someone?
4  A      Well, if it's a life-threatening
5  problem, that means you've got to go. If
6  it's not, if it's a chronic problem, then
7  you have a little bit more time.
8  Q      All right. And if somebody is
9  considered presently medically necessary,
10  that is -- well, let me ask you this: Do you
11  know the difference between mandatory and
12  necessary? I mean, those two designations,
13  do you know how those are supposed to be
14  handled? I mean, I know --
15  A      No. I don't. I don't handle that
16  part. I do patient care.
17  Q      Okay. Have you ever had any other
18  claims levied against you or involving you
19  stemming out of the care and treatment that
20  you provided to any inmate?
21  A      No.
22  Q      Okay. Have you ever been named as a
23  party in any lawsuit?
24  A      No.
25  Q      Have you ever given your deposition

Page 65

1  before, sir?
2  A      For patient care?
3  Q      Yes.
4  A      No.
5  Q      How about non patient care?
6  A      Well, bureau related staff issues is
7  something else.
8  Q      You mean like given a deposition in
9  a staff --
10  A      For like talking about another staff
11  member or something like that, a union issue.
12  Q      Okay. Employment stuff?
13  A      Yeah.
14  Q      Okay. If an inmate faints, what's
15  supposed to happen for them in terms of
16  medical care?
17  A      If an inmate faints somewhere on the
18  compound, wherever he goes down, the first
19  staff member that's around him is deemed
20  the -- whatever staff member is close, he'll
21  be the primary care giver at that -- he'll be
22  the first responder. They will initiate CPR
23  if they have to.
24         They have all been trained. We
25  train them on a yearly basis everybody.

17 (Pages 62 to 65)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX   (205) 251-4224

Page 66

1  Everybody on our staff is CPR certified so
2  that they can assess the inmate. And then
3  they will pick up their radio and call
4  medical. And we normally get through within
5  less than four minutes.
6  Q    And then what does medical do at
7  that point?
8  A    At that point, one of us, a mid
9  level provider, will be the ones out there,
10 we'll assess the situation.
11 Q    Okay.
12 A    If the patient is transportable, we
13 will put them on our hospital cart, transport
14 them to the clinic, and take them to our
15 urgency care room and initiate whatever
16 treatment is necessary.
17 Q    All right. What if it happens after
18 hours when you all are not in the clinic?
19 A    After 6:30?
20 Q    Yes.
21 A    The first responder will contact the
22 operation center. The operation center will
23 call 9-1-1.
24 Q    If someone faints?
25 A    Yes.

Page 67

1  Q    Okay. What if someone is suffering
2  with -- with vomiting, what happens in that
3  situation? And let's do during the day and
4  then let's do after 6:30, okay?
5  A    If they are vomiting, they are going
6  to be treated the same way that we talked
7  about in the beginning.
8        If it's after dark, if the guy is
9  conscious, if he can walk, they are going to
10 be brought towards the operation center. And
11 then they are going to call the MD.
12 Q    All right. If an inmate vomits
13 blood, what should occur, first during the
14 day and then let's talk about afterwards?
15 A    If he vomits blood, you're going to
16 go out there, check his vital signs, make
17 sure he's okay, transport him to the clinic,
18 stabilize him, and call 9-1-1.
19 Q    If an inmate was to complain that he
20 had vomited blood but you didn't actually see
21 the vomitus, what would happen?
22 A    If an inmate vomited blood in the
23 institution, you have to be able to see it
24 somewhere. You just can't say, I vomited
25 blood. Somewhere you have to put it -- there

Page 68

1  should be remnants somewhere.
2  Q    Okay.
3  A    Normally if a guy vomits blood,
4  he's going to have a towel or something,
5  he's going to show you blood.
6  Q    All right. If the vomitus itself
7  has bloody streaks or whatever and it's in
8  the commode, are they told that they have to
9  leave it there until you come back?
10 A    No. No.
11 Q    Well, if an inmate was to say to
12 you, came to you in clinic and said, hey,
13 last night I think I vomited blood, what
14 would you do?
15 A    If he came to the clinic in the
16 morning?
17 Q    Yeah.
18 A    At 6:00?
19 Q    Yeah.
20 A    We're going to check him out.
21 Q    Doing what?
22 A    We'd have to bring him into the
23 urgency care room. We'll check his vitals.
24 We'll do blood work to see how he's doing.
25 We'll do a complete neurological exam. Check

Page 69

1  for shortness of breath. See if he's dizzy.
2  Q    What else?
3  A    If he said he vomited blood, then we
4  will place an NG tube up his nose into his
5  stomach and try to put some saline in there
6  and pull it out and see if there's blood, if
7  it's coming from the upper gastric area.
8        And then we would ask him if he's
9  having a stool -- blood in his stool. And
10 ask him if he did, and if he's not sure, we
11 would put a glove on and do a DRE, a digital
12 rectal exam.
13        If it's positive for bleeding above,
14 he gets an immediate 9-1-1.
15 Q    Okay. When is the first time that
16 you cared for Mr. Coggin?
17 A    Let me -- are you referring to the
18 vomiting or before?
19 Q    Before.
20 A    Our first intervention?
21 Q    Right.
22 A    It appears on April 13 of the year
23 2000, he had come in complaining of nasal
24 discomfort and needing wound care. I saw him
25 at eleven o'clock that day.

18 (Pages 66 to 69)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 70

1   Q    All right, sir.  What's the next
2   time?
3   A    The next time after that it's going
4   to be above that (indicating).
5   Q    All right.
6   A    The next time I saw him was when he
7   presented himself to our sick call on 7/25/01
8   at seven o'clock.
9   Q    Okay.  Do you recall whether you
10  actually may have triaged him the day before
11  and assigned him to come in that next day?
12  A    No.  There is no -- no, not at all.
13  He came in on the 25th.
14  Q    And you're looking at the sheets --
15  your log?
16  A    Under that sheet.
17  Q    Under the sheet, the thing to the
18  warden, you're looking at -- what are these
19  sheets called?
20  A    That's a HIV consent form.
21  Q    No.  No.  I know what that is.  I'm
22  talking about under that section, this back
23  section, what's housed on those?
24  A    We call this section Section 6.  And
25  we normally put a cop out.  Any time an

Page 71

1   inmate tries to talk to us through paper,
2   that's where it goes.
3   Q    All right.
4   A    And anything he writes will get put
5   in here.  And there should be a
6   chronological -- whatever he writes there
7   will be something in the 600 because we
8   assess everything that they put in.
9   Q    So there are no cop out forms for
10  July 24th?
11  A    I don't see any.
12  Q    Okay.  Is there a cop out form for
13  July 25th?
14  A    Yes.
15  Q    All right.  And who puts the cop out
16  forms on there?
17  A    The cop out form is placed in this
18  part by the medical records person.
19  Q    Taking the little forms out of the
20  box in the front?
21  A    Yeah.  After we've seen them that
22  morning, we give them to them and they go
23  back into the file and they put everything
24  where it goes.
25  Q    And this is his original file; is

Page 72

1   that correct?
2   A    Yes.
3   Q    All right.  But are those Xerox
4   copies or are those the originals, the cop
5   out forms that you're looking at, the inmate
6   request forms?
7   A    These are copies of the originals.
8   Q    Where are the originals?
9   A    Probably back at the institution.
10  Q    They are not kept in the medical
11  chart, the medical request forms are not --
12      MR. DOYLE:  This is a copy.
13  Q    Oh, that's a copy.  Okay.  Those
14  look like copies, too.
15      So on the original chart, the
16  originals -- does it have -- is it like a
17  three or four page document like, you know,
18  makes copies all the way down or is it just
19  one copy?
20  A    I don't understand the question.
21  Q    Is there just an original in the
22  chart or when the inmate fills one of these
23  out, is it like --
24  A    I believe he gets a copy, too.
25  Q    Okay.  The inmate gets a copy, too?

Page 73

1   A    Yes.  He gets a copy of exactly
2   what's written on the front and we mail it
3   back to them.
4   Q    Okay.
5   A    With our interjection on the bottom.
6   Q    So your recollection is that you
7   have -- I'm looking at this form, and it is
8   dated 7/25/01.
9   A    Right.
10  Q    And at the top it says, "Second
11  Emergency Sick Call Request.  I request to
12  see Dr. Garcia today."  And there's not --
13  you would agree with me that there's not
14  another cop out form or sick call request
15  form in here in his chart?
16  A    I don't see any other ones.
17  Q    Okay.  And you have no recollection
18  of seeing him the day before?
19  A    No.  What day is that?  The 25th is
20  what day of the week?
21  Q    That would be -- well, the 24th was
22  Tuesday, Wednesday was the 25th.  So that
23  would have been on Tuesday -- well, I don't
24  know.  It just says emergency.  This is my
25  second emergency sick call request.

19  (Pages 70 to 73)

Page 74

1　A　　Okay.
2　Q　　Where else would there be a form of
3　that sort?
4　A　　It wouldn't be kept anywhere else
5　but there. And if there was a sheet there,
6　there would be a note over here on the 600.
7　Q　　Okay. But you agree with me that
8　at the top of the sheet in your file, it does
9　say, "Second Emergency Sick Call Request. I
10　request to see Dr. Garcia today"?
11　A　　On my copy it appears, yeah. The
12　only weird thing I want to say is, he wrote
13　it one way on one form and then there's
14　another kind of writing on top. I really
15　don't understand why.
16　Q　　Well, this is your form. I mean,
17　Mr. Coggin hasn't got access to this but
18　outside in that little anteroom from the
19　period of time until he hands it over to you,
20　right?
21　A　　Yeah. That's okay, though. In his
22　opinion, if he says he's made a second
23　appointment --
24　Q　　He may well have?
25　A　　I can't attest to that. I can tell

Page 75

1　you that the day he came, he was seen really
2　really fast. And that's better than the
3　street.
4　Q　　Okay. If he had come to emergency
5　sick call the day before and handed in a cop
6　out form, you just don't have any record of
7　it there in his medical record?
8　A　　I assume it didn't happen.
9　Q　　Now, the inmates can check the
10　computer to see if they have an appointment
11　the next day, can they not?
12　A　　If he would have had an appointment
13　the next day, he would have been on what we
14　call a call out.
15　Q　　But he can look. So I just want you
16　to assume for purposes of my question that he
17　did actually come in on the 24th and give a
18　cop out form to Mike, the X-ray technician,
19　that day.
20　　　He could, if that cop out form had
21　been turned in to the system, check that
22　night on the computer to see if he had an
23　appointment the next day?
24　A　　I'm going to have to say no, because
25　Mike is not supposed to be accepting any

Page 76

1　paperwork. Mike is an X-ray tech.
2　Q　　Right. What I'm saying is, if that
3　cop out form got into the system, in theory,
4　he would be given an appointment to be seen
5　the next day; is that correct?
6　A　　No. Only I can do that.
7　Q　　Okay. So --
8　A　　Only a provider can triage.
9　Q　　Okay.
10　A　　Not an X-ray tech. X-ray techs have
11　no medical training.
12　Q　　And it's your testimony that on the
13　24th, the day before this first note, you did
14　not see Mr. Coggin at sick call and indicated
15　to him that you would put him on the list to
16　be seen?
17　A　　On the 24th, I did not see Mr.
18　Coggin and I did not tell him that I was
19　going to see him the next day. On the 25th I
20　saw him quite exhaustively.
21　Q　　Okay. So it's your recollection you
22　had no interaction whatsoever with him on
23　Tuesday the 24th?
24　A　　No, ma'am.
25　Q　　All right. How is it that Mr.

Page 77

1　Coggin came to be under your care that day,
2　the 25th? Tell me what you recall about
3　that.
4　A　　I'll be honest. I don't remember
5　how he got -- I manage each case because
6　we're very good at documenting what we do.
7　　　If I opened a chart and I see that
8　he came that morning at 6:00, and I saw him
9　at 7:00, it must have meant that when I
10　walked in, and I saw the list of people, I
11　got to him because he was only complaining of
12　right upper quadrant pain.
13　　　When we write our S, our subjective,
14　the patient has the ability to tell us
15　anything he wants, and we're going to write
16　it. We even write down the vulgarity that
17　they use, whatever they are feeling. If they
18　say, you know, I'll put it the way he says
19　it.
20　Q　　Well, my question was: Do you have
21　any recollection about how it is that he was
22　seen, I mean, you have 7:05 here, you saw him
23　at 7:05?
24　A　　At 7:05.
25　Q　　On the 25th?

20 (Pages 74 to 77)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 78

1   A      On the 25th.  That's the first thing
2   I write, date and time.  And then I start
3   with my S.
4   Q      Do you have any recollection whether
5   Mr. Coggin asked to see Dr. Garcia instead of
6   you?
7   A      I have no recollection of that.  And
8   if he wanted to, he only had to write a cop
9   out.
10  Q      Well, he did write a cop out that
11  said he wants to see Garcia, but did he see
12  Garcia that day?
13  A      I haven't seen that cop out.
14  Q      We were just looking at it.
15  A      That's not a cop out.
16  Q      Okay.
17  A      A cop out is the form you have in
18  front of you right there.
19  Q      The front like this?
20  A      Yeah.  He addressed that one to the
21  warden, I believe, right there.
22  Q      All right.  But you would agree with
23  me that it's dated 7/25/01.  And Mr. Coggin
24  says on that day, "Severe intense pain in my
25  abdomen three days duration."  And he wrote,

Page 79

1   "I request to see Dr. Garcia today" with an
2   exclamation point right below the part where
3   it says, "Second Emergency Sick Call
4   Request"; is that correct?
5   A      I don't even know which is his
6   handwriting because there's one handwriting
7   in the body and then there's another kind of
8   handwriting on top.  Here he is formally
9   requesting to be seen by us.
10         And when seen at 7:05, here he tells
11  us that all he has is right upper quadrant
12  pain for four days.  And that the pain
13  radiates to the back and increases especially
14  after he eats.
15  Q      Let me ask you this because this --
16  did he come to you just spontaneously or did
17  he come to you as a result of filing this
18  form that's dated 7/25/01 which is in what
19  you call Section G?
20  A      Section 6.
21  Q      Section 6 of your medical record,
22  entitled FPC Montgomery, Health Services
23  Unit, Medical Inmate Sick Call Sign Up Sheet.
24  And it has instructions to fill it out.
25  A      Right.

Page 80

1   Q      And it would appear that it is
2   filled out?
3   A      Yes.
4   Q      And are you telling me that you did
5   not have this form that prompted Mr. Coggin
6   getting in to see you?
7   A      I might have just looked, as a
8   provider, I just looked at the body, the
9   complaint, and I look at how many days really
10  quick.  I've got the patient in front of me.
11  This is the way to get in, I mean, you're in
12  my office.
13  Q      He doesn't get in to see you until
14  he gets something like this filled out?
15  A      He fills out that form and then
16  amongst the group, when I say, okay, Mr.
17  Coggin, come on in, at 7:05, I look at him
18  and I tell him, Mr. Coggin, tell me what is
19  your problem?  And he says just what's
20  written on this form, on the 600.  But he can
21  elaborate on this.  Most of the time when --
22  and I will make this record -- they will
23  write whatever they want in here to get in
24  the door.
25         MR. DOYLE:  Can we just clarify

Page 81

1   something?
2          MS. COCHRUN:  Yeah.
3          MR. DOYLE:  Is that form something
4   the patient fills out in sick call?
5          MS. COCHRUN:  Right.
6   A      Yes.
7          MR. DOYLE:  And that's different
8   than a cop out?
9   A      Right.
10         MR. DOYLE:  He's sitting in the
11  clinic when he fills that out?
12  A      Right.
13         MS. COCHRUN:  Right.
14  Q      So you have this in your hand,
15  though, before he can come see you?
16  A      Yes.
17  Q      Okay.  That's what I'm trying to
18  establish.
19  A      Okay.
20  Q      So this form is filled out.  He
21  doesn't give it back afterwards and carried
22  around all day to add stuff to it?
23  A      No.
24  Q      All right.  So you would agree with
25  me that the form that he fills out in order

21 (Pages 78 to 81)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 82

1  to even get in the door to see you, says, "He
2  is complaining of three days with this
3  problem. And the complaint is severe intense
4  pain in my abdomen." At the top it says,
5  "Second Emergency Sick Call Request. I
6  request to see Dr. Garcia today."
7       That's all on this form that you
8  have before he gets in to see you?
9  A    It's written on the form.
10 Q    All right. And then at the bottom I
11 have something that says, seen 7/25/01, and
12 do you know whose initials those are?
13 A    Yes. That's the records person.
14 Q    All right. Who is that?
15 A    Ms. Anita Roberts.
16 Q    All right. So you have this
17 information available to you as well as the
18 patient in front of you?
19 A    Right.
20 Q    Okay. So you would agree with me
21 that's what Mr. Coggin wrote, and that's his
22 description of his complaints?
23 A    Yes.
24 Q    What is in your chart at 7:05 is
25 what you wrote, and he had absolutely no

Page 83

1  ability to make you write any single word
2  on that form?
3  A    He can't make me write it. But
4  whatever he says is what I write. And I even
5  upped him one because I gave him four days of
6  pain where he said four.
7  Q    So in the entire time that you were
8  in there talking to him about his condition,
9  he said these words, "Complain discomfort
10 right upper quadrant since four days. Pain
11 radiates straight back, it decreases" --
12 A    "Especially after I eat."
13 Q    "Increases especially after I eat."
14 That's all he said to you, period?
15 A    Right.
16 Q    No other words, no other
17 description?
18 A    Nothing else, otherwise I would have
19 put it.
20 Q    And he just said "discomfort"?
21 A    Right.
22 Q    Did you inquire of him about his
23 description of it being severe and intense
24 for three days as he himself wrote on the
25 medical request form?

Page 84

1  A    Can you repeat that question?
2  Q    Sure. He wrote, "Severe and intense
3  for three days." And you have, "Complained
4  of discomfort right upper quadrant since four
5  days."
6       I mean, did you inquire of him and
7  say, is it better now today and it was just
8  severe for three days and today it's better,
9  or what conversation did you have in that
10 regard?
11 A    Well, that's part of the story
12 taking -- well, I started to examine him and
13 once I started to examine him, there are
14 certain things I start to look at. The first
15 thing I listened to is his lungs.
16 Q    That is not my question.
17 A    Okay.
18 Q    I'm trying to get down to the fact,
19 you're not going to tell the federal judge in
20 this case that the only words that passed
21 from John Coggin's mouth to you when you were
22 taking a history from him, is that which is
23 under the Section S in your SOAP note?
24 A    No. I'm going -- what I'm going to
25 tell him is that under the S, the patient has

Page 85

1  the ability to tell me everything he wants
2  about his problem. And all he told me was
3  what was stated.
4  Q    Those words?
5  A    Some of them are my words, some are
6  his words. But, in essence, that's what he
7  told me. Not in any way are we trying to
8  diminish his problem, we want to get the
9  story.
10 Q    I'm not saying you're diminishing
11 what I'm saying, sir.
12      Is it fair to say that what you have
13 written there is your interpretation of
14 whatever Mr. Coggin said because unlike the
15 form he filled out, those are your words
16 based on your interpretation of what he's
17 saying, not his words?
18 A    I'll agree to that. It is my
19 interpretation of what he said, that and only
20 that.
21 Q    Okay. Did you inquire of Mr. Coggin
22 in terms of quantifying how much pain, be it
23 severe, moderate, you know, on a scale of one
24 to ten, or anything of that sort, did you
25 make an inquiry about that?

22  (Pages 82 to 85)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 86

1  A    I don't recall.
2  Q    All right.  If you had made an
3  inquiry, and he had provided you that
4  information, do you believe you would have
5  recorded that in your chart?
6  A    If I would have -- yeah.  If I would
7  have asked him the intensity of it --
8  Q    Yes, sir.
9  A    -- I would have written it.
10  Q    Okay.
11  A    But in this case, I don't think it
12  would have changed the outcome in any way.
13  Q    That's not my question, sir.  You'll
14  have an opportunity at some point to try to
15  handle that situation for yourself.  I've got
16  to try to get the facts, okay?
17  A    Yes.
18  Q    All right.  Did you inquire of him
19  whether he had been having any blood in his
20  stool?
21  A    Yes.
22  Q    And where did you record that?
23  A    In a SOAP note.  You only put your
24  positive findings, not what was not there.
25  So if -- in this case, if he says he has

Page 87

1  nausea, it would be in there.  If he doesn't
2  have nausea, I'm not going to put no nausea.
3  Q    Okay.  How about vomiting, would you
4  have recorded that one way or the other?
5  A    If he was vomiting, I would have put
6  it in there.
7  Q    All right.  If he had said he had
8  some, historically he had had some vomiting,
9  would you have recorded that?
10  A    I would have recorded it if he would
11  have said it.
12  Q    Okay.  What if a patient said to
13  you, or an inmate said to you, I don't want
14  to see you, I want to see to see the doctor,
15  I feel like I'm sick enough I actually need
16  to see Dr. Garcia, what would happen at that
17  point?
18  A    At that point, he would be advised
19  that he has that right.  He has to write a
20  cop out to the doctor and specially request
21  that.  And the doctor will see him when he
22  can.
23  Q    All right.  And that would be that
24  other form as opposed to the medical form, it
25  would just be this (indicating)?

Page 88

1  A    It would be that cop out form right
2  there.
3  Q    All right.  Like the one he did to
4  the warden?
5  A    Right.
6  Q    If an inmate requested to be sent to
7  the emergency room, what would occur?
8  A    He's an inmate.  He doesn't make
9  that request.  He's not afforded that desire.
10  Q    All right, sir.  So he can't request
11  to go to an emergency room?
12  A    No.  He's a federal inmate.
13  Q    Okay.  If an inmate is requesting
14  to go to an emergency room, he's got to go
15  through the medical process in the clinic
16  over there and that determination is made in
17  that process?
18  A    By me.
19  Q    Okay.  At that point in time and at
20  this visit, did you undertake to do any kind
21  of physical exam?
22  A    Yes.
23  Q    Okay.  What did you do?
24  A    I listened to the lungs.  I listened
25  to the heart.  And then I went to the

Page 89

1  abdomen.  And when I looked at the abdomen,
2  in that region, which is the right upper
3  quadrant of the abdomen, I note, not on a
4  pain scale, but I put that he is extremely
5  tender to the touch.  That the bowel sounds
6  are diminished, they are low, and that the
7  pain radiates to the scapular region.
8  Q    All right.  And then that says left
9  side, and what is that passed there?
10  A    I don't know why I put that.
11  Q    You have a sentence that says, "Pain
12  radiates to scapular region."
13  A    That the right side is the only
14  positive.  The left side is zero.  I didn't
15  find anything positive on the left side.
16  Q    All right.  And at that point, what
17  did you decide was going on?
18  A    At that point I was -- pretty much
19  textbook case.  I decided that he had a
20  cholelithiasis, but I was ruling out other
21  causes.  Suggesting that he might have an
22  infection in that area, we started him with
23  a shot of Rocephin.  We gave him something
24  for pain, intramuscularly, a shot of Toradol.
25  We put him on Tylenol 3.

23  (Pages 86 to 89)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 90

1   And because I had taken his blood
2   pressure and noted it was high, 153 over 97,
3   I made sure that he had some kind of
4   antihypertensive medication, so that he
5   doesn't evolve into a more potentially
6   dangerous problem, cardiac risk.
7       I also ordered all kinds of -- I
8   ordered an X-ray, and the X-ray had showed a
9   stone on the left side. That was available
10  that day. And I ordered more labs. I order
11  a complete chemistry profile, urinary exam, a
12  CBC, and I also ordered lipase and Amylase to
13  rule out a problem with the pancreas. And we
14  did that right away.
15  Q    All right. Let me ask you this: On
16  the X-ray designation, you had -- first you
17  had a KUB ordered, and then you crossed that
18  out and put AP lateral. Tell me, what was
19  the reason for that.
20  A    It wasn't on that visit. It was
21  somewhere else. Where did you see that?
22  Q    (Indicating).
23  A    Oh, KUB. First I put a KUB because
24  I was thinking, could it be a kidney stone
25  because a KUB is the kidney, ureter, and

Page 91

1   bladder. And I said, no, let's check the
2   abdomen first, looking for that gallstone.
3   Gallstones don't pretty much show on X-rays.
4   You really pretty much have got to go with
5   an ultrasound.
6       So I was chancing it, but when I --
7   we did an AP and a lat, and a lateral, and
8   that's what yielded the stone on the left
9   side.
10  Q    All right. And it looks like you
11  ordered him some Tylenol Number 3; is that
12  correct?
13  A    That's correct.
14  Q    And that's a narcotic?
15  A    That's a narcotic.
16  Q    All right. So did you feel his pain
17  was sufficient to warrant that?
18  A    Yes. I noted that he was extremely
19  tender to the touch.
20  Q    All right. And you got the labs
21  drawn?
22  A    And got the labs drawn that day.
23  Q    All right. And did you review those
24  before Mr. Coggin was sent out or did the
25  labs come back later?

Page 92

1   A    Latter.
2       MR. DOYLE: Whatever is a good time
3   to take a break.
4       MS. COCHRUN: I just want to get
5   through this visit and then we can take a
6   break.
7   A    The labs came back 7/26.
8   Q    All right. It looks like the labs
9   are actually collected at 9:54. Why did it
10  take two hours for him to actually get blood
11  work drawn? I mean, you were in the clinic,
12  weren't you?
13  A    Yeah. But the clinic -- the clinic
14  is a unit. It's not a hospital. It's a
15  health services unit so we have modified
16  stuff.
17      So to get a patient from point A to
18  point B, it takes a little bit longer because
19  we're not set up like an emergency room
20  nor -- it's pretty much like if you're on the
21  street, a field unit.
22  Q    Okay.
23  A    That's how we run.
24  Q    So how far does he have to go in the
25  unit to go from you at 7:00, 7:30, being

Page 93

1   evaluated, to getting blood work done just
2   before 10:00, I mean, is he just in line
3   waiting?
4   A    No, not in line. He's probably at
5   7:05 going through all these exams. It
6   probably took me a good forty-five minutes to
7   get down halfway through the note and talking
8   to the patient. So we're looking at 8:00'ish
9   and then trying to stabilize his pain, and
10  giving him some pain medication and all that
11  first before we start drawing blood.
12  Q    I thought you wrote him a
13  prescription, he didn't get it until the pill
14  line?
15  A    We did the X-ray first, so we wasted
16  time doing the X-ray.
17  Q    Okay.
18  A    And then the X-ray was the first
19  thing we did, and then the Rocephin shot,
20  then the Toradol, in that chronological
21  order.
22  Q    So it would take a couple of hours
23  or three hours to get him to the lab part?
24  A    Yeah. In that case, less than two.
25  Q    Okay. So do you think that you

24 (Pages 90 to 93)

301 Title Building/ 300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 94

1    actually --
2    A    Yes.  The labs weren't emergency.
3    Q    No.  I'm not saying that.
4    A    Okay.
5    Q    So you think the order of what we
6    see here is the order of what you ordered
7    and it was done in that order?
8    A    Right.
9    Q    Okay.  All right.  So I'm looking at
10   the X-ray from that day.  And you feel like
11   you had the film back?
12   A    Well, the report isn't back, but
13   I've got the film in my hand.
14   Q    All right.  So you're reading the
15   film yourself?
16   A    Yes.
17   Q    You're not having a radiologist
18   reading it at the same time?
19   A    It's called a wet read.
20   Q    Okay.  I'm just trying to get a
21   sense of chronologically what you're doing,
22   okay?
23   A    All right.
24   Q    Tell me, sir, what was in your
25   differential diagnosis.  You're familiar with

Page 95

1    that term, right?
2    A    Yes.
3    Q    What was in your differential
4    diagnosis for Mr. Coggin, I guess even before
5    you started ordering tests?
6    A    Well, right upper quadrant pain
7    normally could be colitis, a colic, it could
8    be some problem with the liver.  It could be
9    a problem with the pancreas.  But pretty much
10   just that.
11   Q    What about peptic ulcer disease?
12   A    Highly unlikely.
13   Q    Why would that be?
14   A    Peptic ulcer disease, normally that
15   discomfort is epigastric.  It doesn't hurt
16   all the way into the right side and radiate
17   to the upper scapula the way this one did.
18   Q    So it's your testimony that with a
19   complaint of right upper quadrant pain, that
20   just could not be peptic ulcer disease?
21   A    No.
22   Q    That is your training that leads you
23   to that belief?
24   A    By symptom and sign, yes.
25   Q    Could a complaint of severe intense

Page 96

1    pain in the abdomen be indicative of peptic
2    ulcer disease?
3    A    That's too general.  The abdomen is
4    divided into four quadrants with the area
5    above the umbilicus deemed the epigastric,
6    so when you're palpating these areas, you're
7    looking for specific stuff in that area.
8    At that time he did not have a --
9    that PUD wasn't -- there wasn't any symptoms
10   of it.
11   Q    All right.  Decreased bowel sounds,
12   that's gallbladder?
13   A    Petechia bowel sounds pretty much
14   doesn't have a lot to do with that upper
15   quadrant.  And because it's in pain, the
16   intestines sometimes quiet that area or it
17   can increase it because it's trying to move
18   stuff.
19   So if it's going fast, it will tell
20   you problems of the intestine.  But if it's
21   not, that means that something exogenous
22   through the intestine, so they are all
23   thinking, this must be his gallstone.
24   Q    All right.  Did you do a rectal exam
25   on this gentleman?

Page 97

1    A    No.  He did not get an DRE that day.
2    Q    Why not?
3    A    I didn't deem it necessary.
4    Q    Why not?
5    A    He doesn't have signs of -- if his
6    problem would have been left lower quadrant,
7    I would have been worried.  I would have been
8    thinking diverticulosis, diverticulitis,
9    volvulus, irritable bowel, but nothing of the
10   sort.
11   And he didn't describe any problems
12   with bowel movement.  He didn't say he had
13   nausea.  He didn't say he had vomiting.  He
14   didn't say he was belching.  He didn't say he
15   had acid reflux.  He didn't say anything of
16   the type.  He didn't say -- he didn't even
17   mention burning sensation.
18   Q    All right.  So it's your testimony
19   that with the complaint of abdomen pain that
20   Mr. Coggin had on that day, peptic ulcer
21   disease was not in your differential?
22   A    I was not thinking about it, no.
23   Q    And with that complaint, you did not
24   feel it incumbent upon yourself to perform a
25   rectal exam and test stool --

25  (Pages 94 to 97)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 98

1    A    No.
2    Q    All right.
3    A    Now, I did state at the bottom that
4  I was going to post my results, and I would
5  re-evaluate everything as they would come in,
6  you know, as soon as I can.
7        And he was instructed if he had any
8  other problems, to immediately come back to
9  the HSU.
10   Q    Did Dr. Garcia come in that day at
11  all to look him over?
12   A    I don't think so. I can't recall.
13   Q    All right.
14   A    But he did review the note.
15   Q    Okay. That's the stamp to the side,
16  is what you're indicating?
17   A    Right.
18   Q    What symptoms do you think would
19  have to be present in order for you to
20  consider peptic ulcer disease in your
21  differential?
22   A    Well, let me ask a question: Is
23  this -- am I being asked about my medical
24  knowledge or is this about the case, because
25  how I manage the guy, it's written here. I

Page 99

1  really don't, you know, asking me my
2  knowledge is really -- to me, doesn't have
3  anything to do with this. I mean, unless you
4  really --
5        MR. DOYLE: Just listen to the
6  question and answer it.
7    Q    Sir, what, in your opinion, what
8  symptoms would have to be present in order
9  for you to consider peptic ulcer disease in
10  your differential?
11   A    Okay. If he would have had -- for
12  peptic ulcer disease, he would have been
13  talking about mid chest, retro sternal
14  burning sensation. He would have said, hey,
15  I'm bloated, I have a lot of gas, I belch a
16  lot. I feel a burning sensation in the back
17  of my throat. At night I cough. Whole sorts
18  of stuff that he -- all he was telling us was
19  that he would describe it, I have pain right
20  here (indicating).
21   Q    Okay.
22   A    And if you have pain right there
23  (indicating) --
24        MR. DOYLE: Can you describe what
25  area?

Page 100

1    A    I'm pointing to the area under my
2  right pectoral, the rib cage.
3    Q    All right. So he got the
4  medication, and what time did he get the
5  Rocephin shot?
6    A    I don't know what time he got it.
7  He got it soon after.
8    Q    Do you record in the chart what time
9  you give the medications to these inmates?
10   A    No. Some medications, yes.
11   Q    But not an antibiotic shot?
12   A    No. It just says STAT which means
13  kind of quick.
14   Q    All right. Do you record or is
15  there any recording of when the actual film
16  is done?
17   A    The film, there might be a time
18  stamped on the --
19   Q    And do you all have the actual films
20  there?
21   A    Yes.
22   Q    And you have Mr. Coggin's films
23  still there, right?
24   A    Yes.
25   Q    Okay. And so basically have you

Page 101

1  told me everything that occurred during that
2  first visit?
3    A    I believe so.
4    Q    Okay. Did you put him on idle by
5  any chance that day or not?
6    A    I don't think so.
7    Q    Okay. All right. And it looks
8  like at about 10:35, four prescriptions were
9  filled by the pharmacist?
10   A    10:25?
11   Q    At 10:35 on the 25th.
12   A    Yeah. He got the Tylenol, the
13  Lisinopril --
14   Q    Who would have given him the shots?
15   A    I would have.
16   Q    Okay. So do you have to get that
17  medication from the pharmacy?
18   A    Yes.
19   Q    And this administrative note, is
20  that just, I mean, how does that get on
21  there? Is that when the prescriptions are
22  picked up or what?
23   A    When he writes the medication, he
24  provides -- he writes all that stuff and then
25  he puts his entry, and then he walks over,

26 (Pages 98 to 101)

Page 102

1   and in this case, if he gave them to the
2   patient at that moment, the Lisinopril, or
3   the other medications, we would talk to him
4   about it upon request.
5   Q      All right. I note in your problem
6   list on 7/25/01, you give a diagnosis of
7   cholelithiasis?
8   A      Right.
9   Q      Is that the diagnosis you made on
10  that day?
11  A      That day I was still sticking to
12  cholelithiasis.
13  Q      All right. Did that ever change?
14  A      When I reviewed the case the next
15  day, I added that he had a kidney stone, and
16  I put the chart reviewed, and also the
17  patient said that the Tylenol 3 was causing
18  him stomach discomfort.
19  Q      Okay. Well, I know we're trying to
20  take a break, but you've told me everything
21  about the 25th that you recall?
22  A      Yeah.
23         MS. COCHRUN: All right. Then why
24  don't we take a break now and then we can
25  come back and start with the 26th? Does that

Page 103

1   work for you, Steve?
2          MR. DOYLE: Yes.
3
4          (Whereupon, a lunch break was
5          taken at 12:15 p.m. until 1:25
6          p.m. when the deposition was
7          resumed as follows:)
8
9   Q      (BY MS. COCHRUN) Mr. Rodriguez, we
10  were finishing up the 7/25 circumstance. And
11  I think you had gotten started telling me
12  about the 7/26 circumstance. And I guess at
13  the top, it's at the top of that, are you
14  with me?
15  A      Yeah.
16  Q      Okay. The 10:00 a.m. note. Is Mr.
17  Coggin actually there with you when you were
18  making this note, or is this your
19  follow-up note from, you know, checking the
20  labs and all that from the day before?
21  A      I had to have seen him because he
22  was complaining that his stomach was
23  bothering him.
24  Q      Okay. So you think there should
25  have been -- he didn't have a regularly

Page 104

1   scheduled appointment to come back?
2   A      No. He probably hit the pill line
3   and talked to the pharmacist and told them
4   that the Tylenol 3 that he took was giving
5   him discomfort and that's normal in older
6   gentlemen, the Tylenol 3 will cause
7   constipation.
8   Q      All right. But he only had it a
9   day. You don't think he was like constipated
10  overnight, do you?
11  A      It will go to work pretty quick.
12  Most guys that don't like it, they will take
13  it and they will tell you right away, this
14  stuff hit me heavy.
15  Q      All right. But he's not saying
16  he's constipated, he's saying he had GI --
17  A      Discomfort.
18  Q      Discomfort. Okay. And those are
19  your interpretations of what he came in and
20  told you?
21  A      Right.
22  Q      All right. Did he tell you -- he
23  didn't come in and say the Tylenol Number 3
24  is giving me GI discomfort?
25  A      No. He said the T3. That's how I

Page 105

1   wrote it. When I put it in quotations --
2   Q      He called it the T3. Okay. So he
3   told you he thought it was the medicine?
4   A      Yeah.
5   Q      Okay. Did you perform an entire new
6   physical and all of that?
7   A      Not a complete physical, but I
8   looked him over for the same problems that he
9   had.
10  Q      Okay.
11  A      And he had no changes.
12  Q      All right. Had the epigastric pain
13  subsided or was it still there in that there
14  had been no changes from the day before?
15         MR. DOYLE: Objection. I don't know
16  that there's been any testimony about
17  epigastric pain.
18  Q      I'm sorry. Right upper quadrant
19  pain.
20  A      Right.
21  Q      It was still present?
22  A      Yes.
23  Q      All right. Was it still tender to
24  palpation?
25  A      Yes.

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 106

```
 1   Q     And now it looks like in your
 2   analysis you've got both cholelithiasis and
 3   nephrolithiasis, correct?
 4   A     Correct.
 5   Q     What was that based upon, sir?
 6   A     The X-ray review of the kidney
 7   stone.  And I believe it was on the right
 8   side.
 9   Q     All right.  I notice that you've got
10   O. Rodriguez and O. Rodriguez, two places
11   here on that note?
12   A     Right.
13   Q     Did you just -- what's the reason
14   why you have it signed twice on that note?
15   A     I was going to probably stop with
16   the -- when I wrote the ultrasound, but then
17   I got some more ideas so I continued to
18   write.  And then I signed it under my last
19   entry.
20   Q     All right.  Do you think that Dr.
21   Garcia had not been present in that visit the
22   day before?
23   A     No.  He wasn't present.
24   Q     Who prescribed the Lisinopril?
25   A     The Lisinopril?
```

Page 107

```
 1   Q     Lisinopril, yes.
 2   A     I did, the day before.
 3   Q     All right.  And we can tell that
 4   how?  I'm looking at his med sheet, will it
 5   tell us?
 6   A     That I prescribed it or that he
 7   received it?
 8   Q     Yeah.  Does it indicate, you know,
 9   on the pharmacy?
10   A     Yes.  On the first page of it, of
11   your pharmacy list.
12   Q     Okay.  Let me get there.
13   A     This right here (indicating).  Lift
14   that up.  It's the third page.
15   Q     All right.
16   A     Right there, bottom left
17   (indicating).
18   Q     Okay.  I see it.  7/25.  It's got
19   Rodriguez so we know you prescribed it,
20   correct?
21   A     Right.
22   Q     All right.  Now, I see 7/25/01 for
23   the Tylenol Number 3.  And it has Dr.
24   Garcia's name there as being the prescribing
25   physician?
```

Page 108

```
 1   A     Normally, Tylenol Number 3 is a
 2   physician 1, he has to prescribe it, or
 3   couldn't send for it.  So I could request it,
 4   but he has to somewhere in the note approve
 5   it.
 6   Q     All right.  So was he in the loop
 7   that day, because obviously the man got the
 8   medicine that day, how did that approval
 9   occur from Dr. Garcia?  I mean, was he there?
10   A     At some point in the day when I
11   present him the case, he saw it and said,
12   yeah, give him Tylenol 3.  And then he signed
13   for it.
14   Q     Are you sure he actually didn't come
15   in and see John Coggin, I mean, is it
16   possible that he came in and looked him over?
17   A     No.
18   Q     Not possible.  Okay.  Well, then,
19   I see right above that, the Rocephin, that's
20   the Ceftriaxone, right?
21   A     Correct.
22   Q     And it's 250 milligrams i.m. one
23   dose, and it has Dr. Garcia's name there as
24   well.  How is -- I mean, you can prescribe
25   antibiotics, can't you?
```

Page 109

```
 1   A     I can.  But that one is also a
 2   physician only.
 3   Q     All right.  And would you have to
 4   get permission for him to administer that
 5   medication to this patient?
 6   A     Yes.
 7   Q     So do you believe that prior to the
 8   injection of that drug by you that day as
 9   you've said, that you did consult with Dr.
10   Garcia to get his approval of that
11   medication?
12   A     Yes.
13   Q     All right.  Then it looks like above
14   that we have the Ketorolac?
15   A     Ketorolac.
16   Q     Ketrolac.  That, too, has Dr.
17   Garcia's name.  What is it about the nature
18   of that drug that would require him to
19   prescribe it?
20   A     All the injectables, we always
21   consult a physician to make sure that he's --
22   we work together.
23   Q     All right.  So I want to be sure.
24   This man came in with the complaints of pain.
25   You worked him up.  You made a determination
```

28 (Pages 106 to 109)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 110

1 that you thought an antibiotic injection, a
2 narcotic pain medication, as well as an
3 injectable, that's Toradol, basically, isn't
4 it?
5 A    Yeah.
6 Q    But those three drugs you in and of
7 your own position, cannot prescribe,
8 administer without a co-signature or an
9 approval of Dr. Garcia?
10 A    It needs approval by him.
11 Q    All right. So do you believe --
12 well, let me ask you this way: Is it your
13 testimony prior to administering the two
14 injectables that we're describing, and seeing
15 that the Tylenol Number 3 prescription was
16 filled, you consulted with Dr. Garcia,
17 presented the patient to him and what was
18 going on, and got approval based on what you
19 related to him for the injection of these
20 drugs?
21 A    Yes.
22 Q    All right. So he knew what was
23 going on with John Coggin before you
24 administered those medications on the 25th?
25 A    Yes.

Page 111

1 Q    Okay. Do you recall if he asked you
2 any questions about, you know, what kind of
3 belly pain, how long, duration, all of those
4 things?
5 A    He might have. I don't recall.
6 Q    Okay. There's no recording of any
7 conversation?
8 A    No.
9 Q    All right. And Dr. Garcia does not
10 make his separate note from that visit?
11 A    No.
12 Q    All right. And he -- do you recall
13 if he made any suggestions prior to the
14 injection of those medications for any other
15 tests or any other kind of follow-up or
16 inquiry?
17 A    No. Only what's written.
18 Q    Okay. So would it be fair to say
19 that the note from the 25th reflects both
20 your interpretation and evaluation and
21 concurrence in Dr. Garcia's part in that?
22 A    Yes.
23 Q    All right. If he had given you some
24 other plan or additional things to add to the
25 circumstance, do you feel certain you would

Page 112

1 have listed that in the chart, too?
2 A    Yes.
3 Q    Okay. Did he at any point suggest
4 to you getting or doing -- performing a
5 rectal exam and checking for blood?
6 A    No. I didn't have any order for
7 that.
8 Q    All right. Do you think that --
9 let me ask you this: In terms of when the
10 medications were given, do you know kind of
11 in the scheme of things, were they before or
12 after the X-rays?
13 A    I would say they would happen after
14 the X-rays.
15 Q    Okay. The reason why I'm asking is,
16 you know, before we had kind of said they
17 were in the order of how they happened?
18 A    Yeah.
19 Q    And it looks like those things were
20 done, and then it says, "X-ray done, now
21 shows a stone."
22    So I'm trying to get a sense of if
23 you knew there was a stone or not before you
24 consulted with Dr. Garcia?
25 A    After the injections, then they

Page 113

1 showed me the film because he's being
2 injected, they bring him back out, I bring
3 him back.
4 Q    So it's your recollection that he
5 would have been medicated with the pain
6 medication antibiotic prior to getting the
7 film back?
8 A    I didn't get that. What?
9 Q    It's your recollection looking at
10 this, that you got the film back after he got
11 the prescriptions done?
12 A    Yes.
13 Q    Okay. So when you talked to Dr.
14 Garcia, you would not have had the results of
15 that wet read of the film?
16 A    No.
17 Q    Okay. All right. Kind of back
18 to -- I think we kind of got through, you had
19 done your physical exam, follow-up physical
20 exam, Mr. Coggin had complained to you that
21 the Tylenol Number 3 medication was causing
22 him GI discomfort, correct?
23 A    Right.
24 Q    What makes Tylenol Number 3 cause GI
25 discomfort?

29 (Pages 110 to 113)

301 Title Building/ 300 21st Street North
Birmingham, Alabama 35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 114

1  A    I really don't know.
2  Q    Okay.  Did you discuss it with Dr.
3  Garcia?
4  A    That day?
5  Q    Yes, sir.
6  A    Probably.
7  Q    All right.  Did he make any
8  recommendations in terms of that
9  prescription?
10  A    No.
11  Q    All right.  If Mr. Coggin had
12  complained of constipation symptoms, do
13  you believe you would have noted that in
14  the chart?
15  A    If it was constipation, I would have
16  said constipation.
17  Q    Okay.  So GI discomfort, what do you
18  mean by that, sir?
19  A    His stomach is bothering him when he
20  takes the pill.
21  Q    Okay.  All right.  Now you have the
22  film that shows a stone and you plan for an
23  ultrasound, it says -- is that "ultrasound
24  ordered right away"?
25  A    "Ultrasound ordered right away."

Page 115

1  Q    All right.  And who is going to
2  perform that ultrasound?
3  A    That would be done outside at
4  another place.
5  Q    Okay.  And number two it says, "Will
6  follow-up post ultrasound"?
7  A    Right.
8  Q    Number three is, "IVP also ordered"?
9  A    Right.
10  Q    And five is Motrin 800 milligrams,
11  one 800 tab TID times thirty days; is that
12  correct?
13  A    Correct.
14  Q    And then that squiggle out to the
15  side is 90 pills?
16  A    Number 90.
17  Q    Okay.  What is Motrin?
18  A    Motrin is Ibuprofen.
19  Q    All right.  Is that a non steroidal
20  anti-inflammatory drug?
21  A    It is.
22  Q    And can it, too, give GI distress?
23  A    Motrin can cause discomfort.
24  Q    All right.  Can it cause GI
25  bleeding?

Page 116

1  A    If taken excessively, yes.
2  Q    And what would be excessively?
3  A    Taking more than the prescribed by
4  your provider.
5  Q    Is it your testimony that 800
6  milligrams TID for thirty days would not
7  cause GI distress?
8  A    If taken the way he was supposed
9  to take it, it should not.
10  Q    It should not.  Is it your testimony
11  that 800 milligrams of Motrin TID would not
12  cause or promote ulceration in the GI tract
13  in his stomach?
14  A    Not if taken as ordered by
15  prescription.
16  Q    All right.  So you're simply giving
17  2400 milligrams three times a day, I mean,
18  800, 800, 800 --
19  A    Right.
20  Q    -- TID.  Then it should not cause
21  any erosion or any problems whatsoever in
22  the GI tract?
23  A    It should not if you take it as
24  indicated.
25  Q    And as indicated, what would that

Page 117

1  be?
2  A    In the first thirty days.
3  Q    What would that be?
4  A    That would be to take it by mouth
5  with food and report to us any problems that
6  you feel as you take it.
7  Q    All right.  And tell me what
8  conversation, if any -- do you recall any
9  conversation with this inmate at this time?
10  A    Conversation with the inmate?
11  Q    Yeah.  About that medicine.
12  A    Yeah.  When we write patient
13  education, we are talking to the inmate about
14  how to take the medication, everything that
15  has to pertain to -- relative to the
16  medication, the treatment, the activity, the
17  diet, the sub care.
18  Q    Okay.
19  A    He's fully explained what to do when
20  taking that drug.  He's told, make sure that
21  you eat before you take that pill.
22  Q    Okay.
23  A    Because it is strong on your
24  stomach.  And he also received, when he
25  received that medication, a handout a page

30  (Pages 114 to 117)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 118

1  long from the pharmacy that indicates that,
2  too.
3  Q     But it's your testimony if he was
4  taking 800, one tablet three times a day with
5  food, he should have absolutely no problem
6  with this medication?
7  A     No.
8  Q     Okay. Is that correct?
9  A     Yes.
10  Q     Okay. Then I see at 4:20 this
11  afternoon, Tylenol 3 DC'd. Motrin filled.
12  Written information given. And then the
13  pharmacist signs off; is that correct?
14  A     Right.
15  Q     Do you have a standard Motrin
16  printout that these fellows get?
17  A     Yes.
18  Q     The pharmacy does?
19  A     Yes.
20  Q     Okay. Do you recall any other
21  interventions or interactions you had with
22  Mr. Coggin at all that day?
23  A     No. No more intervention.
24  Q     All right. Was another X-ray taken
25  on that day?

Page 119

1  A     On the 26th?
2  Q     Yes.
3  A     I would have to look. The KUB was
4  done the next day.
5  Q     All right. And why did you repeat
6  the film of the abdomen on the second day?
7  A     Well, that -- because we had the
8  first, the AP and the lat, and it showed a
9  calcification. We decided to go more precise
10  with a KUB and try to identify exactly what,
11  you know, how big the stone was, just get a
12  better view of it because now he's got two
13  problems.
14  Q     And those problems are?
15  A     He's got gallstones and he has a
16  kidney stone.
17  Q     All right. And what definitive
18  study did you do that identified a gallstone?
19  A     The gallstone is a clinical finding
20  from the symptoms that he has.
21  Q     And you would not see that on a flat
22  and upright?
23  A     Unh-unh (in the negative). You
24  can't.
25  Q     You have to answer out.

Page 120

1  A     No.
2  Q     So that was your clinical
3  determination based on his symptoms?
4  A     Right.
5  Q     Okay.
6  A     Although sometimes you can.
7  Q     Okay. Was his pain as he described
8  it, consistent with a kidney stone
9  circumstance?
10  A     Actually, the kidney stone
11  discomfort was very vague. His kidney stone
12  was on the left side.
13  Q     Okay. He wasn't complaining of any
14  pain on the left side?
15  A     He had nothing on the left side,
16  no.
17  Q     Okay.
18  A     That stone was either asymptomatic,
19  but the truth of the matter was, he had a 1.5
20  centimeter stone, I believe.
21  Q     But he had no symptoms of it at the
22  time?
23  A     But he had no symptoms of it. No
24  symptoms of it.
25  Q     All right. And it hadn't moved any

Page 121

1  between the day before and the next day, that
2  you could tell?
3  A     Well, you can't tell if it moved
4  because the KUB shows the kidney, the ureter,
5  and the bladder. They don't tell you exactly
6  where they are seeing it, but 1.5 centimeters
7  is almost as big as your finger.
8  Q     Right. It's a big one?
9  A     It's a big one.
10  Q     If it had moved on the wet film, and
11  you could on the wet film see a movement, I
12  mean --
13  A     Probably.
14  Q     -- you would have noted it?
15  A     That it moved, yes.
16  Q     Okay. Because you're comparing both
17  films, right?
18  A     Right.
19  Q     And you're doing that, not a
20  radiologist, at this point?
21  A     At this point it's still me.
22  Q     All right. So he was given
23  education and instructions on kidney stones
24  that day, too?
25  A     Kidney stones.

31 (Pages 118 to 121)

301 Title Building/ 300 21st Street North
Birmingham, Alabama 35203

Page 122

1  Q    Okay. The IVP and the ultrasound,
2  that was going to be done off campus, right?
3  A    Yes.
4  Q    How did you go about getting that
5  arranged?
6  A    I don't arrange, I just order.
7  Q    Okay.
8  A    There's a system in place where
9  they -- somebody in the hospital, I believe
10 it's the infectious control nurse, she's the
11 one that coordinates and gets all the
12 approvals to get to move an inmate outside.
13 Q    All right. And while we're just
14 talking about it, it looks like the
15 ultrasound was done on the 30th of July?
16 A    On the 30th.
17 Q    Yeah. And the IVP was done on
18 August 1st?
19 A    Yes.
20 Q    All right.
21 A    That's pretty good.
22 Q    Yeah. Within four days you got your
23 ultrasound and five days you got your IVP, so
24 at the point on the 26th, you were working
25 with your clinical diagnosis of flat X-ray

Page 123

1  but no invasive study, so to speak, for
2  confirmatory until later?
3  A    Right.
4  Q    All right. Then it looks like on
5  7/28/01 at 11:30 R. Lake, RN, now who is
6  that?
7  A    Ramona Lake. She's the weekend
8  registered nurse.
9  Q    All right. And it says there, "At
10 pill window stating he was on call out to
11 clinic in the a.m. wanted to know why.
12 Instructed to be NPO after midnight and
13 voiced understanding."
14       He was set for his ultrasound on the
15 next day, correct?
16 A    Right.
17 Q    So they were just -- somehow
18 somebody notified Mr. Coggin, guess what,
19 tomorrow morning --
20 A    You're going out.
21 Q    Well, he was told what he was
22 supposed to do, he just went to figure out
23 why; is that fair?
24 A    Yeah.
25 Q    All right. And then it looks like

Page 124

1  the next note is by you?
2  A    Yes.
3  Q    And do you think you had any
4  intervention or any conversations with Mr.
5  Coggin between the 26th and August the 6th?
6  A    No. I hadn't seen him at all.
7  Q    Okay. In and about the diagnosis
8  you made of cholelithiasis, did you advise
9  him about what to eat, what not to eat, you
10 know, restricting fats, and all that kind of
11 stuff, with gallbladder?
12 A    Yes.
13 Q    Okay. Did you receive any calls
14 from the lieutenant's office in that period
15 of time about continuing abdominal pain with
16 Mr. Coggin?
17 A    No.
18 Q    Okay. Do you work on the weekends?
19 A    No.
20 Q    Okay. So if you got called on the
21 weekend, it would have to be for -- it would
22 either be Garcia or -- I mean, does anybody
23 ever call you from over there, the
24 lieutenant's office?
25 A    They are not supposed to. It's a

Page 125

1  union problem.
2  Q    But have they done it?
3  A    Very very unlikely. I would say I
4  might have been called four times in seven
5  years.
6  Q    Okay. Fair enough.
7       How about MPL to MPL like Ramona, if
8  she's working, would she call you necessarily
9  if she's on and you're off. Are there any
10 nurses or anything in there on the weekends?
11 A    She's the nurse.
12 Q    Okay. So she's the weekend nurse?
13 A    Yeah.
14 Q    Would she, by any chance, call you
15 to check in and say, hey, look, Coggin is on
16 call out for tomorrow, do you know what's up
17 with that?
18 A    No.
19 Q    She wouldn't?
20 A    And I wouldn't know either.
21 Q    Okay. Because that all gets sent
22 out?
23 A    Yeah.
24 Q    Okay. On the dates he had the
25 studies, do you recall, I mean, would he come

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 126

```
1   back to the clinic after being sent out for
2   the study or would he have to come to the
3   clinic in order to be sent out for the
4   studies?
5   A     No. He would be -- because then
6   he's treated like a federal prisoner in
7   transit.
8         Whenever an inmate is going to be
9   moved outside the institution, there are a
10  lot of steps that have to be taken. He has
11  to dress a certain way. They cuff him in a
12  certain way. An officer would be escorting
13  him, you know, depending on his level, and
14  then he would get to the place. A lot of
15  security things have to be in place.
16  Q     Okay.
17  A     And I have nothing to do with that.
18  Q     All right. Did you do any urine
19  testing on Mr. Coggin when this kidney stone
20  became an issue?
21  A     I started it on August 6th when I
22  saw him again.
23  Q     So prior to that --
24  A     Prior to that, no. I ordered it --
25  I believe a UA was ordered on my first
```

Page 127

```
1   evaluation. Yes, I did. On the 25th, I
2   ordered a UA.
3   Q     All right. And it was negative?
4   A     I believe it was negative.
5   Q     I've got it. The only thing on
6   there, he's got .2 urobilinogen. That's
7   still within the normal range so it looks
8   like everything is negative, and he's got a
9   good specific graft.
10        So did you really think he was
11  having issues with a kidney stone with a
12  clean urine and, you know, what you found
13  on the film and his symptoms?
14  A     I don't think -- the stone was
15  there. And it was going to start a problem
16  soon, but it wasn't definitely his primary
17  diagnosis at this point. He was still riding
18  with cholelithiasis.
19  Q     Okay. All right. So on the 6th,
20  you see him?
21  A     Right.
22  Q     And S, which is the subjective part,
23  it says FU, that means follow-up, right?
24  A     Right.
25  Q     Any complaints, any concerns, any
```

Page 128

```
1   conversation you had with the patient
2   whatsoever?
3   A     Normally when I brought him back to
4   talk to him to see how he was doing, he had
5   nothing to tell me. He was okay. So I put
6   just follow up.
7         Then when I looked at him, he had no
8   pain, well, this guy is doing good.
9   Q     All right. Did he indicate to you
10  he had any alterations in his diet or that
11  the medication that you had prescribed for
12  him was working, or anything like that? Did
13  you have any conversation like that?
14  A     He said he was all good.
15  Q     All right. No physical exam at that
16  time?
17  A     No.
18  Q     Did he discuss the findings of both
19  the films at that time, I mean, the
20  ultrasound and IVP?
21  A     No. At this point he already knew
22  what he had.
23  Q     How would that be?
24  A     Because I talked to him on 7/26. He
25  had got off for the ultrasound. Everybody is
```

Page 129

```
1   telling him what he has. He knows.
2   Q     And who would everybody be, sir?
3   A     Me, and Ramona, Dr. Garcia, you
4   know, people who he bumps into.
5   Q     All right. Between 7/26 and 8/6,
6   you feel like the medical staff of this
7   facility had had conversations with Mr.
8   Coggin that are not reflected in this chart,
9   but whereupon he was told --
10  A     No. No.
11        MR. DOYLE: Objection. That's not
12  what he testified to.
13  Q     All right. Well, who's telling him
14  and when, because I don't see any notes. He
15  didn't have these tests until after 7/28 and
16  the next note is 8/6?
17  A     I gave him a handout for kidney
18  stones when I told him he had them. And I
19  gave him a handout for gallstones, and I told
20  him he had them back then.
21  Q     All right.
22  A     This guy is fairly intelligent. I
23  mean, I gave him the stuff.
24  Q     All right. My question is: Were
25  there any gallstones in any of these studies?
```

33 (Pages 126 to 129)

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 130

1  A    Not yet.  Not conclusive by film.
2  Q    By 8/6 --
3  A    But my ultrasound, I was waiting on
4  that one.
5  Q    All right.  But by 8/6 you had that
6  ultrasound, right?
7  A    On 8/6.  Let me see.  The ultrasound
8  came back on -- I saw him on 8/1.  And it
9  said that there was calcified gallstone.
10 That's on the second line, first two
11 letters -- first two words.
12 Q    Well, actually, what it says, "This
13 may represent," and this is a radiologist
14 reading it?
15 A    Right.
16 Q    It says, "This may represent a
17 poorly calcified gallstone, polyp, or a
18 small area of tumefactive sludge"; isn't
19 that correct?
20 A    Correct.
21 Q    So there's not a definitive
22 diagnosis by a radiologist licensed in the
23 State of Alabama that says there's a
24 gallstone?
25 A    No.  But I think he's saying that

Page 131

1  there's an obstruction, which is exactly what
2  we're talking about.
3      Something is there, whether it's
4  hardened or still soft, it's plugging the
5  bile duct.  And if that little bile duct
6  can't let out what it has inside, it's going
7  to hurt.
8  Q    It says it's in the gallbladder,
9  doesn't it, it doesn't say it's in the bile
10 duct?
11 A    He says somewhere around the
12 gallbladder.
13 Q    Did you see, I mean, did you talk to
14 Dr. Vining about this?
15 A    No.
16 Q    A polyp, that wouldn't be a
17 gallstone, correct?
18 A    No.  A polyp is not a gallstone.
19 Q    What could a polyp be?
20 A    A polyp is some kind of tumor,
21 growth.
22 Q    It could be a tumor?
23 A    It could be a growth, tumor, benign,
24 malignant, but it's still in the way.
25 Q    He does talk about the common bile

Page 132

1  duct, and he doesn't reflect anything being
2  obstructed about the common bile duct and
3  it's diameter and all is completely normal;
4  isn't that correct?
5  A    I wouldn't say completely normal.
6  The bile duct measures .31 centimeters and
7  it's normal.
8  Q    Do you know if that's normal or
9  is --
10 A    No.  I don't know the correct
11 dimensions of the bile duct.
12 Q    Okay.  Would it be fair to say that
13 really all this ultrasound shows is that
14 there was a hyperech area .5 centimeters seen
15 in the gallbladder?
16     MR. DOYLE:  Objection.  That report
17 speaks for itself.
18 A    I would say no.  I would say
19 something is there.
20 Q    Okay.  Did you have any conversation
21 with Dr. Garcia about that report?
22 A    Dr. Garcia, not -- no.  I didn't
23 discuss it with him.  He saw it himself and
24 signed it.
25 Q    On August 10th?

Page 133

1  A    Yes.
2  Q    Okay.  Back to where you had said to
3  me that somebody had told him what his
4  problems were all along.
5      Are you saying -- and you had said
6  something, you know, he sees us, you know,
7  casually or whatever.  I'm just trying to get
8  a sense of, other than these moments in time
9  that are reflected on this chart, like the
10 26th at 10:00, and the 26th at -- well, I
11 don't think the pharmacist would really be
12 describing that to him, do you?
13 A    He would.
14 Q    The diagnosis?
15 A    Yes.
16 Q    Okay.  All right.  So 4:20 on that
17 date, and then 7/28 at 11:30, other than
18 those specific time periods, do you know if
19 anyone was describing to him in specific the
20 fact that a diagnosis had been made of
21 cholelithiasis?
22 A    Let me clear the casual thing that
23 you're talking about.  There's no casual
24 visits in a prison.  You move when authorized
25 to.

34  (Pages 130 to 133)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 134

1  Q     Okay.
2  A     So if you're not on the call out,
3  and you didn't come approved, then it's not
4  in the record, it didn't happen.
5  Q     Okay.  So there were no passing
6  conversations with any medical person?
7  A     If he was in the hospital when he's
8  supposed to be in his dorm, he's out of
9  bounds.
10 Q     Okay.  On the visit of the 6th at
11 3:00 p.m., you ordered a twenty-four hour
12 urine and a creatinine clearance?
13 A     Yes.
14 Q     And what was the purpose of that,
15 sir?
16 A     Since he has a stone that's very
17 big, we need to also make sure that the
18 kidneys are working, that they are
19 functioning.  So there's a kidney function
20 test to make sure those are working, too.
21 Q     Okay.  Did you talk to him at all
22 about your findings or the findings that were
23 forwarded to you on the IVP and the
24 ultrasound?
25 A     More than likely.

Page 135

1  Q     All right.  Did you talk to him
2  about what, you know, in terms of surgery, he
3  may have to have surgery or not have surgery,
4  or any discussion of surgery at that visit?
5  A     No.  I don't discuss that because
6  I'm not qualified to make that decision.
7  Q     All right.  Based on the findings,
8  did you talk with Dr. Garcia to determine
9  whether he thought this gentleman might need
10 to be considered for surgery with those
11 gallbladder findings?
12 A     No, I wouldn't.  No.  I haven't had
13 any further discussion with Dr. Garcia.
14 Q     Okay.  Do you know whether -- well,
15 I guess he signed off on those studies on
16 August 10th, so at least by August 6th, his
17 opinion about what should be done or not
18 done, doesn't look like it's reflected in any
19 note that you have, right?
20 A     No.
21 Q     Okay.  Did you stop any medication
22 for this gentleman or was he to continue on
23 with what you had prescribed to date?
24 A     He was currently on Motrin from 7/26
25 through 8/26.

Page 136

1  Q     All right.  And I see on 8/6 -- 8/8
2  at 1610, there is a refill of a prescription.
3  Can you tell which one that was?
4  A     Lisinopril, but that was on 8/8,
5  that wasn't 8/6.
6  Q     No.  I said 8/8.
7  A     8/8?
8  Q     Yeah.  So he got his blood pressure
9  medicine refilled on that date?
10 A     Yes.
11 Q     Okay.  And the next visit, it looks
12 like 8/22 at 1635, and that's when Ms.
13 Little, the nurse practitioner, sees him?
14 A     Yeah.
15 Q     All right.  And he was complaining
16 of right upper abdominal pain with nausea and
17 vomiting since the night before.  Not able to
18 eat for three days.  Nothing seems to
19 alleviate it.  And she mashes around on his
20 belly and sees that he's tender in his right
21 upper quadrant and guarded; is that fair?
22 A     That's what she wrote.
23 Q     Okay.  And, of course, she's saying
24 possible gallstone, cholelithiasis, and that
25 would be stone or inflammation of the

Page 137

1  gallbladder?
2  A     Stone.
3  Q     Okay.  And he gets a shot of Nubain;
4  is that correct?
5  A     Yeah.
6  Q     And would she have to coordinate
7  that with Dr. Garcia in order to get that
8  injectable drug?
9  A     Yes.
10 Q     So you feel confident if things were
11 going as per protocol, Dr. Garcia has been
12 made aware on August 22nd that this gentleman
13 is again having pain, now nausea and
14 vomiting, and the practitioner is inquiring
15 for pain medication that, I guess, is greater
16 than --
17       MR. DOYLE:  Objection.  Does this
18 have anything to do with this witness, or are
19 you asking about something Nurse Little did?
20 I mean, he can read the note.
21 Q     Under the protocol, she can't give
22 this medication unless she gets the doctor to
23 okay it?
24 A     Yes.
25 Q     And if she's following the protocol,

35 (Pages 134 to 137)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 138

1  she would give the signs and symptoms as
2  reflected in this note to the physician, if
3  she's following the protocol?
4  A    She would have had to have told him
5  that that's what he signed.
6  Q    And then again on the 23rd, he's
7  still continuing to complain of pain, nausea
8  and vomiting with any food intake. And he is
9  now put on Anaprox, 550 BID with food; is
10  that correct?
11  A    Yes. That's what she wrote.
12  Q    Does it appear that the Motrin was
13  discontinued?
14  A    Any time a new medication is
15  started, the pharmacist stops the previous
16  one. The patient is advised not to continue
17  the other medications and discard it, and
18  continue with the new drug that's been
19  issued.
20  Q    All right. And why, I mean, was his
21  Lisinopril discontinued?
22  A    No.
23  Q    Why not?
24  A    Because it's a hypertensive
25  medication.

Page 139

1  Q    So are you saying because Anaprox is
2  another NSAID, that they would discontinue
3  the other NSAID?
4  A    Yes. It's contraindicated.
5  Q    Do you have any understanding of why
6  Anaprox had been substituted with the Motrin?
7        MR. DOYLE: Objection. Calls for
8  speculation. Go ahead and answer.
9  Q    Based on your medical judgment, do
10  you have any understanding why Anaprox would
11  have been substituted for the Motrin?
12  A    If he's complaining of pain, she
13  decided to switch the medication because
14  Anaprox has a different type of formulation.
15  And sometimes being a sodium, it tends to go
16  in a little quicker and help sometimes a
17  little more.
18  Q    All right.
19  A    So it's twice a day with food, she
20  went ahead and put it in her note to make
21  sure he was taking it. So the good thing
22  about this medication is that taking it twice
23  a day, he's taking less medication a day and
24  taking it with food. And it's a different
25  kind of medication, different preparation.

Page 140

1  It should have been helping a little more.
2  Q    All right. Now, the Motrin that you
3  had prescribed, would he be given that bottle
4  of Motrin?
5  A    He had the original bottle in his
6  hands. But it should have been almost, since
7  I wrote it on the --
8  Q    25th.
9  A    -- on the 25th, he should have been
10  almost out of it on the 23rd, because that's
11  almost thirty days.
12  Q    Did they confiscate it in the
13  prison, like if you stopped the blood
14  pressure medicine, will you take it away from
15  the patient, you know, I don't mean meanly
16  but, I mean, take the medication back and you
17  substitute it with a new one?
18  A    No.
19  Q    They get to keep the leftover pills?
20  A    The patient is told to discard it or
21  bring it to the pharmacy. But that would be
22  the pharmacist who would have, you know --
23  Q    Would do that?
24  A    Yeah.
25  Q    Okay. I mean, he wouldn't be in

Page 141

1  trouble if he had kept a couple?
2  A    In this case he would be because we
3  check the lockers almost every day.
4  Q    Okay.
5  A    And the medication that he had had
6  an expiration of 8/25. So it would have
7  expired.
8  Q    In two days?
9  A    In two days. So then they would
10  have taken it.
11  Q    Okay. It would have been pulled
12  from the locker?
13  A    Yes.
14  Q    Okay.
15  A    And Motrin had an expiration date of
16  8/24, so one day shy.
17  Q    All right. We missed -- I'm sorry,
18  we missed your note of 8/8.
19  A    Okay.
20  Q    Your typed note. How come this one
21  gets to be typed and all the other ones are
22  handwritten?
23  A    On the day that I do a chronic care
24  visit, because it's very extensive, I take --
25  where I see these guys on a SOAP entry

36 (Pages 138 to 141)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 142

1 fifteen, twenty minutes on a chronic care
2 visit, I almost stay an hour with them and I
3 go through a lot.
4 Q    Okay.
5 A    It's almost like doing an annual
6 physical. In these cases when a guy is
7 chronic care, we do it every ninety days.
8 Q    Okay. And it looks like on that
9 day his abdomen had no tenderness, masses,
10 or palpable organomegaly?
11 A    Right.
12 Q    Let me ask you, this typed note, do
13 you type all of this in on every one of those
14 guys when they are chronic?
15 A    Just about.
16 Q    Okay. Is there any part that's kind
17 of an automatic that reprints, or are you
18 having to type all of this?
19 A    No. I type all of that. I type
20 pretty good.
21 Q    Okay.
22 A    And we're going to electronic file.
23 Q    Okay.
24 A    So it's going to be all typed.
25 We're getting ready for it.

Page 143

1 Q    Okay. And at the bottom it looks
2 like more labs were ordered?
3 A    Yes. That day I ordered another
4 chemistry profile. I ordered a phonoscopy.
5 I ordered an EKG. I ordered a chest X-ray
6 again. And I ordered a microalbumen.
7 Q    No hematocrit or hemoglobin done
8 that day?
9 A    No.
10 Q    The CP 24, is that what that is?
11 A    Yes.
12 Q    The chem profile, it doesn't have --
13 A    It doesn't have a CBC in it.
14 Q    Okay.
15 A    It's your basic chemistry.
16 Q    All right. And the next time this
17 gentleman is seen by anyone in your clinic,
18 it would appear to be on 8/23, two
19 prescriptions are filled with the pharmacist
20 at 2:00 p.m. And those prescriptions were
21 for --
22 A    Sulindac.
23 Q    Okay. What kind of drug is that?
24 A    That's a new -- that's another type
25 of NSAID.

Page 144

1 Q    Not Anaprox?
2 A    Not Anaprox.
3 Q    Okay. And when was that ordered?
4 A    8/27/01.
5 Q    No. I'm looking at 8/23/01 at the
6 top.
7 A    Oh, you're up here (indicating).
8 Q    Yes. It says two prescriptions
9 filled. And I'm looking over here and it
10 looks like --
11 A    8/23 they gave him the --
12 Q    Nubain?
13 A    The Nubain. That's the note from
14 Ms. Little.
15 Q    Okay.
16 A    That's just a pharmacist filling the
17 Nubain, I guess, and the Naprosyn.
18 Q    That was given the day before,
19 right?
20 A    Yeah. She probably gave it to him
21 and then the pharmacist got it the next day.
22 Q    All right. So you guys had the
23 medicines for like the injectables there, it
24 isn't going over to get it from the pharmacy?
25 A    Sometimes he'll give it to you.

Page 145

1 He's the one inside the pharmacy.
2 Q    Okay.
3 A    And he'll give it to you and then he
4 will process the order later.
5 Q    All right. And on the shot it looks
6 like Garcia; on the Nubain, Garcia --
7 A    Let me explain why.
8 Q    Okay.
9 A    On 8/22 when she ordered the Nubain,
10 it was already 4:35. The pharmacist leaves
11 like at four o'clock.
12 Q    Okay.
13 A    So by that time he was already
14 leaving so he probably figured, I'll get it
15 the next day. So that's why the note -- the
16 note that was filled was showing --
17 Q    A day later?
18 A    A day later.
19 Q    So when we see this administrative
20 note of 8/23 at 2:00 p.m. --
21 A    Right.
22 Q    -- that doesn't mean that's when he
23 got -- I mean, that's just when he got it
24 charted?
25 A    Charted. Right.

37 (Pages 142 to 145)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 146

1  Q    Because we know that this nurse
2  charted the time and location of that
3  injection as being on the 22nd?
4  A    Right.
5  Q    Okay.  And Dr. Garcia, though, would
6  have been called on the 22nd before she gave
7  that shot?
8  A    Right.
9  Q    All right.  And then the next visit
10 is 8/27 and that is Dr. Garcia's note; is
11 that correct?
12 A    Yes.
13 Q    Did you see the patient that day?
14 A    No.
15 Q    Do you recall any time before that
16 getting any calls whatsoever from Snyder
17 about Mr. -- Lieutenant Snyder about Mr.
18 Coggin?
19 A    No, not at all.
20 Q    Do you recall ever having a phone
21 conversation with Mr. Coggin telling him
22 about your diagnosis and if he's having
23 epigastric pain, whatever it may be related
24 to?
25 A    No.

Page 147

1  Q    Is there anything in the records
2  showing that in the week of the 22nd, I guess
3  any time before that that there were any more
4  cop outs or sick calls?
5  A    I don't see one.  The week of the
6  22nd you say?
7  Q    Yes.
8  A    No.  After he saw Ms. Little and he
9  saw Dr. Garcia, and then that was it.
10 Q    All right.  In order to see her on
11 the 22nd, that wasn't a regularly scheduled
12 appointment, though, right?
13 A    No.
14 Q    So he would have had to do
15 something, either cop out or a sick call in
16 order to get in back there to get a shot from
17 her, right?
18 A    Yes.
19 Q    So where is the document reflecting
20 how he got through your system and into the
21 clinic?
22 A    That was the way -- what we had
23 discussed earlier.  At this point he probably
24 contacted a staff member which is an avenue.
25 He told the staff member, I'm not feeling

Page 148

1  well, can you please call the clinic.
2  And then whoever is there, in this
3  case, 4:35, she was still working, so she
4  took his case.  She took him at that point.
5  Q    All right.  And like the visit --
6  A    That's the first time he ever
7  mentioned nausea and vomiting.
8  Q    Okay.
9  A    He goes on record and says that,
10 "Since last night", so it was -- on the 22nd,
11 the first time he's had nausea and vomiting,
12 and this was on the 22nd.  And he's only had
13 it since the night before.
14 Q    Is that significant to you?
15 A    Well, it's significant to the case
16 because here, had he mentioned nausea and
17 vomiting from the beginning, you look at it
18 differently.
19 Q    How would that make a difference to
20 you?
21 A    Well, it's all about the symptoms
22 and signs when you put it all together.
23 Q    All right.  Let's add that to the
24 mix, okay?  What direction would that have
25 pointed you into in terms of his diagnosis or

Page 149

1  evaluation?
2  A    I don't want to comment on that.
3  Q    Well, I'm asking you so you get to.
4  If nausea and vomiting were symptoms
5  that the patient complained of, what --
6  A    Well, then we would have asked him,
7  what kind of nausea do you have, what kind of
8  vomiting are you experiencing?
9  Q    And if he said I have nausea and
10 vomiting periodically or, you know, I mean,
11 what kind of other things would come into
12 your differential?
13 MR. DOYLE:  Objection.  This calls
14 for speculation.  He's here to testify about
15 what he did, what he saw, not hypothetical
16 medical questions.
17 Q    What kind of things, if the patient
18 had told you nausea and vomiting, what would
19 you have done?
20 A    I would have -- if he would have
21 told me he had nausea and vomiting, I would
22 have stuck a nasogastric tube.
23 Q    You would have put an NG tube down?
24 A    Yes, ma'am.
25 Q    And done what?

38 (Pages 146 to 149)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 150

1  A      Aspirated him, see what was going
2  on.
3  Q      And you would have tested it for
4  what?
5  A      Gas.
6  Q      All right.  Because that nausea and
7  vomiting, what about that would prompt you to
8  want to check his gastric contents for blood
9  in light of his whole picture?
10  A      All right.  Can you repeat the
11  question?
12  Q      Sure.  You just told me that if he
13  had complained to you of nausea and vomiting
14  in this sequence of events, that you would
15  have put an NG tube down him and aspirated
16  and checked for blood.
17        What about those symptoms would
18  cause you to want to test for gastric
19  contents?
20  A      I would have wanted to look a little
21  bit further into another possibility.
22  Q      Okay.
23  A      But he still has gallstones, in my
24  book, clinically, and he still has kidney
25  stones.

Page 151

1  Q      Okay.  Well, people can have a GI
2  bleed and gallstones, right, at the same
3  time?
4  A      But you have to have symptoms.
5  Q      No.  But, I mean, I'm just asking
6  you, they can have both, can they not?
7  A      I say you can have both with
8  symptoms.  You just can't be bleeding and not
9  show it.  You have to be pale.
10  Q      And one of those symptoms might be
11  nausea and vomiting?
12  A      Blood.
13  Q      Okay.  And one of those symptoms
14  could be rectal bleeding or not even rectal
15  bleeding, you could do a stool sample from a
16  rectal exam and find blood?
17  A      Yes.
18  Q      Okay.
19  A      But you also have to tell the
20  provider.  We're not wizards.  If you don't
21  tell us, we cannot imagine it.  And this
22  individual had more than ample opportunity
23  to convey what he says and never delivered
24  that to us.
25  Q      All right.  So he would have needed

Page 152

1  to tell you, I have stool in my rectum that
2  is positive even though I can't see the
3  blood?
4  A      All he has to do is say, I went to
5  the bathroom and saw something weird.  I saw
6  black stool, that's not normal.  I saw purple
7  stool, that's not normal.  I see green stool.
8  Everybody knows the color of their stool.
9        Because he wasn't experiencing --
10  and on two other occasions when I called him
11  in, I asked him, how are you doing, he told
12  me he's fine.  So I don't see where this is
13  going.
14  Q      Did he tell you at every one of
15  those visits that his stools were totally
16  normal?
17  A      He didn't mention -- it wasn't a
18  finding for him, so it has to be normal.
19  Q      My question is:  Did he tell you
20  that his stools were normal?
21  A      He never said they were black.
22  Q      Okay.  Did you ever ask?
23  A      Maybe, maybe not.
24  Q      Okay.  Do you know that Mr. -- do
25  you know whether or not Mr. Coggin has any

Page 153

1  medical training?
2  A      No.
3  Q      You can't assume that he did, could
4  you?
5  A      No, I can't assume that.
6  Q      Could you assume that he would know
7  that a change in his stools might be
8  reflective of a problem?
9  A      I think he would know that.
10  Q      Okay.  You assume that?
11  A      I assume that.
12  Q      All right.  On the visit of the
13  27th, my understanding is you were not
14  involved in that visit?
15  A      No.  After that date, I had nothing
16  to do with the patient.
17  Q      All right.  If Charlie Hudson called
18  over to the clinic like you were talking,
19  would that be his supervisor?
20  A      Yes.
21  Q      Okay.  So if Charlie Hudson called
22  over on the 22nd, and said, Mr. Coggin is
23  ill, then he would be able to get through
24  the system without a cop out or the medical
25  request form, right?

39 (Pages 150 to 153)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 154

1    A    Right.
2    Q    How about Ms. Beasley, the case
3  manager, if he complained to her about
4  feeling ill, would she be able to facilitate
5  getting him in to see somebody in the clinic?
6    A    Yes.
7    Q    Okay.  Based on the chart, does it
8  look like you never undertook to evaluate or
9  treat this gentleman after the 8th --
10    A    Right.
11    Q    -- of August?
12        At least in the chart it doesn't
13  reflect any visits to you specifically,
14  correct?
15    A    Correct.
16    Q    All right.  Did he get an EKG done
17  on August 24th?
18    A    I don't know.  Let's look.
19    Q    Okay.
20    A    No.
21    Q    All right.  On August 26th, that
22  would have been a Sunday, do you have any
23  recollection whether or not Snyder called,
24  Lieutenant Snyder called you about Mr.
25  Coggin?

Page 155

1    A    I have no recollection of any calls.
2    Q    If he did call you with complaints
3  about Mr. -- or with concerns about Mr.
4  Coggin's condition, would you have referred
5  him to Dr. Garcia?
6    A    If he would have called me, which
7  never happens, I would have told him to call
8  Dr. Garcia.
9    Q    Okay.  When is the next time you're
10  aware of anything after your August 8th visit
11  going on with Mr. Coggin medically?
12    A    There's one last time on September
13  8th at four o'clock in the afternoon.
14    Q    Yes, sir.
15    A    When I called Baptist South.
16    Q    And you got the update on him?
17    A    Right.
18    Q    And you called the AW and relayed
19  that information?
20    A    Right.
21    Q    All right.  Do you know if BOP
22  allows patients or inmates to get medical
23  furloughs to go to their own doctors?
24    A    No.
25    Q    They don't?

Page 156

1    A    (Witness indicated by nodding head
2  negatively).
3    Q    How do you know that?  I mean, did
4  that come in your training, or is that any
5  kind of rule that you're aware of?
6    A    It's a rule.
7    Q    Where does that rule come from?
8    A    It's a written rule.  It's in our
9  policy that once you become a ward of the
10  government, you can only do what the
11  government says.
12    Q    All right.  A patient cannot get a
13  furlough to go out and see his own doctors?
14    A    No.
15    Q    Okay.
16    A    It's free.
17    Q    No.  No.  I realize you may get free
18  care, but my point is, you know of no way
19  that an inmate can request that or ask for
20  that and have a furlough to go out, I mean,
21  granted, they don't just let them walk out
22  the door and do it, but under circumstances
23  where they can go to their own physician?
24    A    It sounds like a nice thing to make
25  people pay for their own stuff, but when

Page 157

1  you're a federal prisoner, you have to do
2  what the government says.
3    Q    All right.
4    A    And it's, you know, it's a security
5  thing.
6    Q    When the incident occurred that Mr.
7  Coggin was sent out to the emergency room
8  and admitted to Baptist --
9    A    Right.
10    Q    -- were you made aware of that
11  situation?
12    A    No, I wasn't.
13    Q    When is the first time you knew Mr.
14  Coggin was over there?
15    A    On September -- the day that I made
16  the note.
17    Q    Okay.  Were you off during that
18  time, on vacation or something?
19    A    No.  I was taking care of the other
20  960 inmates that also have all kinds of
21  problems from cancer to, you name it, we have
22  it.
23        So everybody -- I'm focused on who's
24  in front of me today and what problems they
25  pose that day and that time.

40 (Pages 154 to 157)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 158

1  Q    All right.  You don't recall any
2  discussion about that episode?
3  A    No, ma'am.
4  Q    How did you know to call on that day
5  to check on him?
6  A    That day I was the attending
7  provider for the day.  So there I look on the
8  wall and they tell you, this guy is in the
9  hospital.
10       And I say, oh, Coggin is in the
11  hospital.  I'm supposed to make an entry in
12  the chart for that day, so I called.
13  Q    You have the chart with you, though,
14  and you can look back and see why he ended up
15  there, right?
16  A    Yeah.  The chart is in an area, I
17  just pull it.
18  Q    Because you would have to kind of
19  have some idea why he's over there before you
20  can ask the nurses, I guess, a question that
21  would even make sense, right?
22  A    Right.  Remember that the lieutenant
23  will tell you, too.  Any time an inmate is
24  out of the institution, you have got 960 in
25  the institution and one in a public hospital.

Page 159

1       So there's a safety concern that
2  that inmate is on the street.
3  Q    Okay.  Do you ever recall having a
4  conversation with Mr. Coggin about asking him
5  why he was, quote, "being a pain in the ass"
6  and asking to see a doctor all the time?
7  A    No.  I don't have that recollection.
8  Q    Do you ever recall telling him that
9  you had as much training as any PA in the
10  entire BOP?
11  A    I don't recall telling him that
12  either.
13  Q    Do you?
14  A    Pretty much.
15  Q    Okay.  Would it be fair to say that
16  no medication comes to any inmate from
17  outside the prison, everything they have has
18  to be purchased, obtained, or provided by the
19  prison?
20  A    Right.
21  Q    Okay.  Would that include
22  over-the-counter medication?
23  A    Yes.
24  Q    All right.  So what kind of
25  over-the-counter medication can be purchased

Page 160

1  by an inmate without a prescription?
2  A    Pretty much your general OTC
3  spectrum.
4  Q    Tylenol?
5  A    Tylenol, Advil, allergy tablets,
6  Vicks, fungus creams.
7  Q    Tinactin kind of stuff?
8  A    Your mild steroids, topical, no more
9  than one percent.
10  Q    All right.  Who keeps track of what
11  they get?
12  A    If they purchase it?
13  Q    Yes.
14  A    The commissary.  They use like a
15  credit card form.  Every time they swipe it,
16  they would know exactly what they got.
17  Q    Have you seen any records reflecting
18  commissary purchases by Mr. Coggin?
19  A    I haven't seen any.
20  Q    Are you aware of any commissary
21  purchases of any over-the-counter medications
22  that Mr. Coggin may have purchased between
23  July and September?
24  A    No, I'm not aware.
25  Q    You had indicated earlier in your

Page 161

1  testimony that you believe that Mr. Coggin
2  did not take his Motrin in the way it was
3  prescribed?
4  A    He must have taken a lot of Motrin.
5  Q    That's in excess of the 800 TID?
6  A    Yes.
7  Q    How do you know that?
8  A    Well, to end up the way he did,
9  because I'm looking at the end diagnosis
10  which says that the ulcer was caused by NSAID
11  abuse.  He didn't get that from us.
12       So as an inmate, he either purchased
13  it, had it smuggled in, I don't know.  He
14  took it.  But it was more than what we gave
15  him.
16  Q    Because did the same person who made
17  that diagnosis, I mean, I don't think the
18  word abuse was used, was it?
19  A    I believe so.  I think in the record
20  it says peptic ulcer by NSAID abuse.  I think
21  that's what I read.
22  Q    I think you're referring to the
23  10/9/01 note, is that it, or is there another
24  one?  Was it Dr. Garcia who made that
25  diagnosis or was Dr. Kreher, the surgeon on

41  (Pages 158 to 161)

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX  (205) 251-4224

Page 162

1  the outside?
2  A      I don't know where it is. I think
3  I -- I mean, there's entries everywhere.
4  Q      Right. I would like you to point me
5  to where you see any physician licensed in
6  the State of Alabama who indicated that this
7  man's problem was related to NSAID abuse?
8  A      Well, right here. Dr. Maya states
9  right here, "Mr. Coggin also tells me that he
10 takes a lot of Ibuprofen on a daily basis."
11 Q      Where does it say there's an abuse?
12 A      You taking a lot of Motrin, that's
13 abuse. Because whenever you take more than
14 a prescription, the dose that's given to you
15 by a provider, you're abusing it.
16 Q      Sir, let me ask you this: Please
17 tell me where any licensed physician
18 diagnosed this gentleman as abusing
19 Ibuprofen.
20 A      It's in here somewhere. I read it.
21 Q      I want to be, you know, we're trying
22 to stick to what the records say. And I want
23 to make sure if you found a declaration where
24 a licensed physician --
25 A      It may not -- I don't remember. I

Page 163

1  can't see it now, and I'm not going to go
2  through the whole file now because I have
3  nothing to do with it.
4       But it states by doctors in the
5  hospital that seen him, he has gone on record
6  telling them that he took more than what he
7  was supposed to. It's in his history. Look
8  at it. Pow, pow, everywhere.
9  Q      That he took more than what was
10 prescribed?
11 A      Let me see. A significant -- look
12 at that generalized statement. "Coggin also
13 tells me that he takes a lot of Ibuprofen on
14 a daily basis."
15      Would you like me to read every
16 entry by every physician?
17 Q      No, sir. I would like you to show
18 me when you characterize --
19 A      Because I'll have to read the whole
20 file.
21 Q      What I would like you to do, you
22 just testified that the doctor -- he had a
23 diagnosis of abusing NSAIDs. I want to see
24 what you base that upon. That's all I'm
25 asking.

Page 164

1           Is that your interpretation or is
2  that a diagnosis from a physician?
3  A      That's my interpretation.
4  Q      Okay. Good. I just want to make
5  the record clear, okay?
6  A      Sure.
7  Q      I think the statement, in fact,
8  says, "Mr. Coggin also tells me he takes a
9  lot of Ibuprofen on a daily basis." Okay?
10 A      Right.
11 Q      And that was when he was admitted to
12 the hospital, correct?
13      MR. DOYLE: Object. He's just
14 reading from a note there. He said he has
15 nothing to do with it.
16 Q      All right. But I'm just asking you,
17 if that's really what that says, it doesn't
18 say anything about abuse?
19      MR. DOYLE: The document speaks for
20 itself.
21 Q      All right. Let me refer you then to
22 another board certified licensed physician in
23 the State of Alabama who is a surgeon who
24 actually went into this man's belly and
25 repaired the problem.

Page 165

1  A      Right
2  Q      His note of 10/9/01.
3  A      10/9/01, where is that?
4  Q      It's right there in front of you.
5  A      This is the one?
6  Q      Yes.
7  A      Okay.
8  Q      And in there he says, "I think this
9  probably originated from the high doses of
10 Motrin he was taking," correct?
11 A      Yes.
12 Q      All right. Would it be fair to
13 characterize 800 milligrams three times a day
14 as a high dose of Motrin?
15 A      No. That's a -- that's a dose.
16 That's the way it's written. That's the way
17 it's told to be given.
18 Q      All right.
19 A      TID, 800.
20 Q      So 2400 milligrams, would you
21 consider that, I mean, Motrin can be given in
22 a number of dosages, correct?
23      MR. DOYLE: Object to this whole
24 line. Wasn't the testimony earlier that the
25 Motrin had been discontinued before he went

42 (Pages 162 to 165)

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 166

1  to Baptist?
2  A    Yeah.
3        MS. COCHRUN:  Do you have an
4  objection to the form of the question?
5        MR. DOYLE:  Yeah.  I object to the
6  form of the question.
7  Q    My question is this:  This Motrin
8  was prescribed by you, correct?
9  A    Uh-huh (in the affirmative).
10  Q    You did not have to have Dr. Garcia
11  sign off on that, correct?
12  A    The Motrin?  Well, yes, he has to
13  sign on my note.
14  Q    But you could prescribe that without
15  him first signing off before it's prescribed;
16  is that correct?
17  A    Yeah.
18  Q    So you better know about Motrin in
19  the 800 milligram dose or in any dose,
20  correct?
21  A    And I do.
22  Q    All right.  My question is:  Motrin
23  can be prescribed 200 milligrams every six
24  hours or every eight hours, can it not?
25  A    Right.

Page 167

1  Q    400 milligrams of Q six to eight
2  hours, correct?
3  A    It can.
4  Q    600 milligrams if appropriate?
5  A    600.
6  Q    All right.
7  A    TID.
8  Q    All right.  Or 800?
9  A    Or 800 TID.
10  Q    Anything prescribed over 800 TID or
11  2400 milligrams in a twenty-four hour period,
12  would you consider that to be more than ought
13  to be prescribed?
14  A    More than 800 three times a day is
15  more.
16  Q    All right.  Would 800 three times a
17  day be the maximum you would prescribe for
18  anyone?
19  A    That would be the maximum I would
20  prescribe.
21  Q    All right.  So would that be
22  considered a high dose of Motrin, or a low
23  dose of Motrin?
24  A    For this patient, that would have
25  been correct.

Page 168

1  Q    My question was high or low?
2  A    It's the right dose.
3  Q    So you can't qualify it as a high or
4  low dose?
5  A    No.  High dose is if I go above
6  that, which a doctor can go off label
7  whenever he feels like doing it, or if he
8  thinks it's warranted.  But he didn't get
9  that indication from none of us to take more
10  than what he's supposed to.
11  Q    And it's your opinion that 800
12  milligrams TID could not cause any kind of
13  gastric mucosal erosion?
14  A    That it can't cause?
15  Q    Cannot.
16  A    It may.  It may.  But that's why the
17  patient is told to let us know how he's doing
18  with the medications.  He has that window.
19  He can communicate with us at any time, the
20  same way he came back within a couple of
21  hours and said, Doc, the T3 is not working
22  for me.  He came right away to tell us that.
23        So if the Motrin was bugging him, he
24  just had to come back and say, doc, this
25  ain't working for me.

Page 169

1  Q    What kind of symptoms would you have
2  expected if the Motrin was bugging him, as
3  you put it?
4  A    He would have said, I'm getting acid
5  reflux.  I'm getting burning sensation.  I'm
6  getting a heaviness.  Something right here,
7  up here, where it's bothering him.  He told
8  me at his chronic care visit, he had no pain.
9  Q    What is the 600 form for?
10  A    A 600 is a progress note, and it's
11  right here in Section 2.
12  Q    Okay.  Is your plan, sir, to stay in
13  the prison system after you get your boards
14  done?
15  A    Possibly.
16  Q    If you do get through the boarding
17  process, will you be required to do an
18  internship, or a residency, or will you be
19  able to go out and just practice?
20  A    If I pass the test, I should be able
21  to go out on the street and practice.
22  Q    Okay.  I think I'm almost done.
23        Is Nurse Essex still there?
24  A    No.  She's left.
25  Q    Nurse Little?

43 (Pages 166 to 169)

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 170

```
1   A    No.  She also is not.
2   Q    Do you know where either of those
3   ladies are now?
4   A    Excuse me?
5   Q    Do you know where either of those
6   ladies are now?
7   A    No.  I have no idea where they are.
8        MS. COCHRUN:  I think that is all I
9   have.
10       MR. DOYLE:  I don't have any
11  questions.
12
13       (Whereupon, the preceding
14       deposition was concluded at
15       2:45 p.m)
16
17
18
19
20
21
22
23
24
25
```

Page 172

ERRATA SHEET

PLEASE LIST ANY CORRECTIONS BELOW
PLEASE DO NOT WRITE ON THE
TRANSCRIPT

PAGE NO.    LINE NO.    CORRECTION

```
1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.

12.
13.
14.
15.
16.
17.
18.

19.
20.
21.

22.
23.
24.
25.
26.
27.
28.
29.
30.
```

Page 171

```
1        REPORTER'S CERTIFICATE
2   STATE OF ALABAMA )
    JEFFERSON COUNTY )
3
4
5        I hereby certify that the above and
6   foregoing deposition was taken down by me in
7   stenotype, and the questions and answers
8   thereto were transcribed by means of
9   computer-aided transcription, and that the
10  foregoing represents a true and correct
11  transcript of the testimony given by said
12  witness upon said hearing, to the best of my
13  ability and understanding,
14       I further certify that I am neither
15  of counsel, nor of kin to the parties to the
16  action, nor am I in anywise interested in
17  the result of said cause.
18
19
20       Kathy Colburn, CSR,
         Notary Public, State
         of Alabama at Large
21
22
    My Commission Expires:
23  7-28-08
24
25
```

Page 173

```
1
2
3        DEPONENT'S CERTIFICATE
4
5        I, OSCAR RODRIGUEZ, PA, the witness
6   herein, have read the transcript of my
7   testimony and the same is true and correct,
8   to the best of my knowledge.  Any corrections
9   and/or additions, if any, are listed
10  separately.
11
12
13
14
15
16       Oscar Rodriguez, PA
17
18
19
20
21
22  Dated:
23
24
25
```

44 (Pages 170 to 173)