PLAINTIFF'S EXHIBIT J

DEPOSITION OF DAVID FOLMAR

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOHN COGGIN,

      Plaintiff,

vs.                              CASE NO. 2:05-cv-1214-F

UNITED STATES
OF AMERICA,

      Defendant.


* * * * * * * * * *


      DEPOSITION OF DAVID FOLMAR, taken pursuant to
stipulation and agreement before Heather Barnett,
Certified Court Reporter and Commissioner for the
State of Alabama at Large, at the Offices of the
United States Attorney, 131 Clayton Street,
Montgomery, Alabama, on Tuesday, November 6, 2007,
commencing at approximately 9:50 a.m.


* * * * * * * * * *

JOHN COGGIN v. UNITED STATES OF AMERICA                                11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 2

```
 1              APPEARANCES
 2  FOR THE PLAINTIFF:
 3   Ms. Julia Truesdell Cochrun
     PATE, LLOYD & COCHRUN, LLP
 4   Attorneys at Law
     400 Title Building
 5   300 North 21st Street
     Birmingham, Alabama 35203
 6
     FOR THE DEFENDANT:
 7
     Mr. Stephen M. Doyle
 8   Assistant United States Attorney
     OFFICE OF THE UNITED STATES ATTORNEY
 9   FOR THE MIDDLE DISTRICT OF ALABAMA
     131 Clayton Street
10   Montgomery, Alabama 36104
11           * * * * * * * * * *
12         EXAMINATION INDEX
13  DAVID FOLMAR
        DIRECT BY MR. DOYLE          4
14      CROSS BY MS. COCHRUN        16
        REDIRECT BY MR. DOYLE       83
15      RECROSS BY MS. COCHRUN      84
16
17           EXHIBIT INDEX
18  PLAINTIFF'S EXHIBIT NO.:
19   1  List of days for July 2001     56
20  DEFENDANT'S EXHIBIT NO.:
21   1  List of prescriptions        8-10,22,40
                                     46,62,83
22
     2  Patient drug education       10-11,27
23
     3  Chronological record         11-12
24      of medical care
25           * * * * * * * * * *
```

---

Page 3

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of DAVID FOLMAR is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Heather Barnett, Certified Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced at the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

* * * * * * * * * *

COURT REPORTER: Usual stipulations?

MR. DOYLE: Yeah. We're taking this deposition for trial testimony.

COURT REPORTER: How about read and sign?

MR. DOYLE: He doesn't need to. He's in

---

Page 4

Japan.

DAVID FOLMAR

The witness, having first been sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. DOYLE:

Q.  Please state and spell your name for the record.

A.  My name is David, D-A-V-I-D, Folmar, F-O-L-M-A-R.

Q.  And what is your current address?

A.  Current address is PSC 78, Box 428, APOAP 96326.

Q.  What is your profession?

A.  I'm a military pharmacist.

Q.  And where are you currently employed?

A.  I work for the Air Force in Japan.

Q.  Are you a commissioned officer?

A.  I am.

Q.  What is your current rank?

A.  Captain.

Q.  And how long have you been in the Air Force?

A.  Since March of 2004.

Q.  Where are you currently?

---

Page 5

A.  Yokota, Y-O-K-O-T-A, Air Base, Japan.

Q.  And how long have you been stationed in Japan?

A.  Since June of 2006.

Q.  When will your tour in Japan end?

A.  June 2009.

Q.  Briefly, what are your duties and responsibilities in Japan?

A.  I'm the element leader of the pharmacy department.

Q.  And what brings you here to the United States in November of 2007?

A.  I attended a pharmacy conference in California.

Q.  And are you here in the United States Attorney's Office at my request?

A.  Yes, sir.

Q.  Where will you be the week of February 4th, 2008?

A.  Tokyo, Japan.

Q.  Briefly, will you please describe your education?

A.  I have a Bachelor of Arts in human relations from Golden Gate University, 1993.  I have a Bachelor of Science in pharmacy from Auburn University 1997.

---

76988476-61d7-4609-9c9f-84c9f48976ca

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

Page 6

1  And I'm an MBA candidate from Troy University distance
2  learning currently.
3      Q.  Are you a licensed pharmacist?
4      A.  I am.
5      Q.  And where are you licensed?
6      A.  In the state of Alabama.
7      Q.  What is the procedure for becoming a licensed
8  pharmacist?
9      A.  One must graduate pharmacy school, do an
10 internship, and pass the state boards.
11     Q.  And where did you take the state boards?
12     A.  In Alabama.
13     Q.  Turning your attention to July of 2001, where
14 did you work then?
15     A.  I was a commissioned officer in the United
16 States Public Health Service; and I was detailed to
17 the FPC Montgomery, Federal Prison Camp, Montgomery.
18     Q.  How long were you a public health service
19 officer?
20     A.  I joined the Public Health in October of
21 2000, and I stayed with them until I joined the Air
22 Force in March of 2004.
23     Q.  And how long were you stationed at the
24 Federal Prison Camp at Maxwell?
25     A.  I was there the entire tour.

Page 7

1      Q.  What were your duties and responsibilities at
2  the prison camp at Maxwell?
3      A.  I was the chief pharmacist for the prison
4  camp.
5      Q.  Were you responsible for all pharmacy
6  operations?
7      A.  I was.
8      Q.  In general, how did you dispense medications
9  at the Federal Prison Camp at Maxwell?
10     A.  In general, the physicians, or PAs, nurse
11 practitioners, would write orders in the chart; and I
12 would fill prescriptions from the chart.
13     Q.  And how did the inmates pick up their
14 medications?
15     A.  There was three pill lines a day.  They had
16 their choice of whether to come to the morning, noon,
17 or evening pill lines.
18     Q.  And who worked the pill lines?
19     A.  We all did.
20     Q.  When you say we all?
21     A.  I, as the pharmacist, worked some.  The
22 doctor worked some.  Physician assistants and nurse
23 practitioners worked some.  And the nurses worked
24 some.
25     Q.  Did you counsel inmates on their medications?

Page 8

1      A.  I did.
2      Q.  Okay.  And how was that done?
3      A.  Two ways.  Written information was given, and
4  I verbally counseled inmates.
5      Q.  How was the written information generated?
6      A.  When I filled a prescription, it came out on
7  the printer, standard labels with written information.
8      Q.  Okay.  Do you know which company's
9  information you utilized at Maxwell?
10     A.  Yes, sir.  We used Kalos.
11     Q.  And after you printed the label and the
12 patient education information, what did you do with
13 them?
14     A.  I filled the prescriptions; and the written
15 information, I folded up and I put it in the bag with
16 the prescriptions for pick up.
17     Q.  Did you make chart entries when you dispensed
18 medications?
19     A.  Yes, sir.  When I filled them, I made chart
20 entries.
21     Q.  And what did you put in the chart?
22     A.  I would, of course, have my name.  And I
23 would put how many prescriptions were written.  For
24 example, if there were two, I would put two
25 prescriptions filled.

Page 9

1      Q.  I'm going to show you what's been marked --
2  did you put the drug labels into the chart?
3      A.  Yes, sir, I did.
4      Q.  Okay.  I'm going to show you what's been
5  marked Defendant's Exhibit #1, which is Bates number
6  64 in the chart.  It's the -- can you tell me what
7  that is?  It's a one-page exhibit, Bates number 64.
8      A.  Yes, sir.  This appears to be the labels that
9  I put in the chart showing the prescriptions that I
10 filled.
11     Q.  And how would they physically go into the
12 chart?
13     A.  The labels?
14     Q.  Yeah.
15     A.  The -- the pharmacy labels that are generated
16 on the printer had additional labels.  One went on the
17 bottle and one was on a sheet -- a continuity sheet of
18 prescriptions.
19     Q.  I want to invite your attention to the
20 right-hand side at the top, and I just want you to go
21 through.  I'm going to pick the prescription that says
22 ibuprofen 800 milligrams and just ask you to describe
23 certain information on there.  Do you see over on the
24 right where it says number 45?
25     A.  Yes, sir.

JOHN COGGIN v. UNITED STATES OF AMERICA    11/6/2007

# DEPOSITION OF DAVID FOLMAR

Page 10

1    Q.    What does that mean?
2    A.    It means that I dispensed 45 tablets.
3    Q.    Okay.  And where it says over on the left one
4    refill, what does that mean?
5    A.    It mean that I -- it means that I gave the
6    inmate one refill on the Motrin.
7    Q.    Okay.  And on the -- there's a block to
8    the -- the date, I take -- what is that date
9    indicative of, the first date, 7/26/2001?
10    A.    That is the date that I entered it into the
11    computer, 7/26/01.
12    Q.    Okay.  And then it says RX expiration, EXP
13    8/24/01.  What does that mean?
14    A.    It's the expiration date of the prescription.
15    Q.    What other information is in that label?
16    A.    Well, it shows the name of the pharmacy up
17    top, FPC Montgomery Pharmacy.  It shows Maxwell Air
18    Force Base, Rodriguez -- Oscar Rodriguez is the
19    prescriber.  There's a prescription number to the
20    left, which you can barely see.  There's a smudge
21    out.  John Coggin is the name.  One tablet three times
22    a day after meals is the directions.  It also shows my
23    initials in the middle, DAF, as the dispensing
24    pharmacist.
25    Q.    Direct your attention to what's been marked

Page 11

1    as Defendant's Exhibit #2, which is a three-page
2    exhibit that says at the top, patient drug education,
3    monograph date 27 June '01, and a generic name
4    ibuprofen.  Can you take a moment to look at that?
5    MS. COCHRUN:  I have one question, Steve.
6    Has this ever been produced to the plaintiff pursuant
7    to any of the discovery set out so far?
8    MR. DOYLE:  I don't believe so.
9    MS. COCHRUN:  Is there some reason why we
10    don't have that until today?
11    MR. DOYLE:  We can discuss that off the
12    record.  I don't think you've ever requested it.
13    MS. COCHRUN:  Okay.
14    Q.    Captain Folmar, can you tell me what this
15    is?
16    A.    Exhibit #2, sir, is the patient drug
17    education sheet for ibuprofen.
18    Q.    And can you tell me how that's organized?
19    A.    This patient drug education sheet is
20    organized by generic name, common uses, how to use the
21    medication, a caution section, possible side effects
22    section, before using this medicine section, overdose,
23    additional information, copyright stuff.
24    Q.    And is this the patient education information
25    you would have placed in the prescription for

Page 12

1    ibuprofen?
2    A.    Yes, sir.
3    Q.    I'm going to invite your attention to what's
4    been marked as Defendant's Exhibit #3, which are some
5    entries in the chart that I pulled out that are Bates
6    13 through 17, and ask you to take a look at those.
7    And they're in reverse chronological order, so we'll
8    start at the last page.
9    Do you see at the bottom where there's a label
10    seven -- it's indicated 7/25/01; and it says,
11    administrative note, pharmacy chart review for
12    prescriptions filled, Lieutenant D. Folmar, RPH?
13    A.    Yes, sir.
14    Q.    Okay.  Is that your signature next to that?
15    A.    It is.
16    Q.    And when would you make chart entries?
17    A.    Whenever I filled a prescription, I would
18    make a chart entry.
19    Q.    Okay.  How did you go about filling the
20    prescriptions?
21    A.    The charts were provided to me.  I would
22    review them and look for any medications on the
23    orders.  If there were, I typed them in and filled the
24    prescriptions for the inmates.
25    Q.    For instance, on this one, the 7/25/01, what

Page 13

1    medications did you fill that day?
2    A.    Prescriptions were written for Motrin,
3    Toradol.
4    Q.    I'm sorry?
5    A.    Sir?
6    Q.    Where do you see Motrin on there?
7    A.    I'm sorry.  Rocephin.  Rocephin, Toradol
8    Tylenol No. 3, Lisinopril.
9    Q.    Okay.  And those are the -- that's where you
10    put for -- and that's a stamp you used, I take it?
11    A.    It is a stamp.
12    Q.    Okay.  And what are you indicating there,
13    written information given?
14    A.    It means that the information that came with
15    the prescriptions were put in the bag to give to the
16    inmate.
17    Q.    And do you know whether you had personally
18    handed the inmate the medication in the pill line?
19    A.    I do not.
20    Q.    Turning to the next page, that's the next
21    note you that I see on 7/26/01 at 1620.  Do you see
22    that?
23    A.    I do.
24    Q.    And what does that indicate?
25    A.    PA Rodriguez had written another order on

JOHN COGGIN v. UNITED STATES OF AMERICA                                11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 14

1  7/26, so I reviewed it.  And his orders were to stop
2  Tylenol No. 3 and Motrin 800 one TID, which is three
3  times a day, times 30 days was written.  So I
4  discontinued T-3 in my note and Motrin was filled.
5      Q.  And is that the Motrin -- the ibuprofen label
6  that we just looked at?
7      A.  Yes, sir.
8      Q.  Okay.  Now, at the top of the chart there, it
9  says S chart reviewed and complained of Tylenol No. 3
10 as causing GI discomfort.  In your experience as a
11 pharmacist, is that common?
12     A.  T-3 is another name for Tylenol No. 3, and it
13 has two ingredients.  One is Tylenol; the second
14 ingredient is codeine.  Codeine very commonly causes
15 GI upset.
16     Q.  In your experience and training as a
17 pharmacist, is ibuprofen an unusual prescription?
18         MS. COCHRUN:  Object to form.
19     A.  No, sir.
20     Q.  Is it a very common prescription --
21     A.  It is.
22     Q.  -- in your experience?  And in your training
23 and experience as a pharmacist, is 800 milligrams
24 three times a day a high dose of ibuprofen?
25         MS. COCHRUN:  Object to form.

Page 15

1      Q.  You can answer the question.
2      A.  In my experience, Motrin 800 three times a
3  day is very commonly written.  The maximum dose of
4  Motrin is 3200 milligrams a day.  It's well within the
5  range.
6      Q.  And in your training and experience as a
7  pharmacist, is 30 days a particularly long regimen of
8  ibuprofen?
9          MS. COCHRUN:  Object to form.
10     A.  No, sir.
11     Q.  Let's continue through to the page 16.
12 There's a note by you dated 8/8/01.  Do you see that?
13     A.  Yes, sir.
14     Q.  And can you tell me what that note indicates?
15     A.  One prescription was filled -- let me get my
16 bearings.
17     Q.  Sure.  I know it's --
18     A.  These are out of order.
19     Q.  Yes.
20     A.  8/8/01.  Okay.  Oscar Rodriguez had a chronic
21 care clinic note written on 8/8/01 at 1030.  It's in
22 reference to that -- that order.
23     Q.  And is that the Lisinopril that appears in
24 that chronic care note?
25     A.  It is.

Page 16

1      Q.  And what is Lisinopril?
2      A.  Lisinopril is a medication commonly used for
3  treatment of high blood pressure.
4      Q.  And the next time I see a note from you is at
5  the very top of the first page, page number 13.  And
6  do you see that?  It says 8/23/01 at 1400?
7      A.  Yes, sir.
8      Q.  And what is that note indicating?
9      A.  There should be an order written that day.
10 Let me find it.
11     Okay.  The 8/23/01 at 1400, if I look back on
12 8/22/01 and 8/23/01, there were two entries by
13 Ms. Doris Little.  The first one was for Nubain 10
14 milligrams IM now, and the second one was for Anaprox
15 550 milligrams twice a day with food.
16     Q.  And did you always make a chart entry when
17 you filled a prescription?
18     A.  I did.
19         MR. DOYLE:  I tender the witness.
20         MS. COCHRUN:  All right.
21             CROSS-EXAMINATION
22 BY MS. COCHRUN:
23     Q.  Mr. Folmar, you are a pharmacist, and you
24 continue to work for the U.S. Government; is that
25 correct?

Page 17

1      A.  Yes, ma'am.
2      Q.  How many times have you met or spoken with
3  the U.S. Attorney, Mr. Doyle, before today?
4      A.  We had some e-mail correspondence.
5      Q.  Have you brought that with you today?
6      A.  No, ma'am.
7      Q.  All right.  Well, when did you first -- when
8  were you first contacted by the U.S. Attorney?
9      A.  About two weeks --
10         MR. DOYLE:  I object on attorney-client as
11 well.
12     Q.  Well --
13     A.  Approximately two weeks ago.
14     Q.  Approximately two weeks ago.  You have not
15 talked to anyone about this case prior to that time?
16     A.  I -- I don't understand the question.
17     Q.  Do you know why we're here today?
18     A.  I do.
19     Q.  Do you know what the case is about?
20     A.  Yes, ma'am.
21     Q.  All right.  You know the allegations of the
22 case?
23     A.  Yes, ma'am.
24     Q.  All right.  Have you talked to -- I'm not
25 limiting this just to Mr. Doyle, but have you talked

76988476-61d7-4609-9c9f-84c9f48976ca

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 18

1  to anyone about your care and prescription treatment
2  that you provided to Mr. Coggin prior to today?
3      A.  I told my wife I was coming here.  I haven't
4  talked about the case, no, ma'am.
5      Q.  All right.  Maybe my question isn't clear.
6  Okay.  When is the first time you knew about
7  Mr. Coggin's case?
8      A.  The first time?
9      Q.  Yes, sir.
10     A.  About two weeks ago in an e-mail.
11     Q.  All right.  Prior to that time, did you talk
12 to Dr. Garcia or Mr. Rodriguez or Mrs. Essex or Nurse
13 Little or any of the caregivers that were involved
14 with Mr. Coggin's care in and about, you know, his GI
15 bleed that he developed?  And I mean even all the way
16 back when he was a patient.
17     A.  I don't remember when he was patient.  I have
18 not spoken to any of these people since I found out I
19 was coming here.
20     Q.  Okay.  Prior to finding out you were coming
21 here, did you have any opportunity or any circumstance
22 wherein, after it was determined Mr. Coggin had a GI
23 bleed, wherein you discussed his care or treatment
24 leading up to his transfer over to the Baptist
25 Hospital?

---

Page 19

1      A.  My understanding, he was transferred to
2  Baptist from the prison side.  I had no -- no
3  knowledge he had an ulcer until after he was
4  transferred.
5      Q.  All right.  But after everybody realized what
6  was going on --
7          MR. DOYLE:  Just to make it clear, I'm
8  objecting on anything you learned from me in
9  discussing the case in the last few days.
10         MS. COCHRUN:  Right.  I'm talking about --
11         MR. DOYLE:  I'm talking about what you
12 learned from me, the lawyer.
13     Q.  What I want to know is do you have any idea
14 what John Coggin looks like?  Do you remember John
15 Coggin in any way?
16     A.  I don't remember Mr. Coggin from the prison.
17     Q.  Do you think, based on your review of the
18 records or your recollection, that you ever had a
19 counseling session of any type about any medication
20 that you may have signed off on as the pharmacist?
21     A.  I don't know if I ever counseled him given
22 the structure of the pill line situation.
23     Q.  Okay.  It would have been extraordinarily
24 unlikely that you would have sat down and had some
25 kind of counseling session about ibuprofen, Anaprox,

---

Page 20

1  even his Lisinopril?
2      A.  I wouldn't say that.  I usually ran two out
3  of three pill lines a day, so the probability is in my
4  favor that he did speak to me.
5      Q.  My question is not did he speak to you.  I
6  mean, I assume he has to ask for the medication and
7  give -- identify himself.  I'm talking about do you
8  have any recollection that you ever counseled
9  Mr. Coggin at any time about ibuprofen?
10     A.  I have no recollection of him in particular.
11     Q.  And if we look at the chart, it does not
12 indicate you had a specific counseling session, does
13 it?
14     A.  No, ma'am.
15     Q.  It indicates in some places you actually gave
16 him written information; is that correct?
17     A.  In all places.
18     Q.  All right.  But sometimes that would just be
19 put in the sack and you wouldn't even be the person
20 handing the medication to the patient, would you?
21     A.  Yes, ma'am.
22     Q.  So you can't come before this federal judge
23 and tell him, at any time where John Coggin received
24 pharmacy care from you, that you ever once counseled
25 him about ibuprofen?

---

Page 21

1      A.  Not verbally.
2      Q.  All right.  Can you be sure that he was given
3  the written information each and every time?
4      A.  Each and every time, the written information
5  was placed in the bag.
6      Q.  But you can't tell us that you actually
7  handed the bag with that information to this gentleman
8  and it actually got in his hands, can you?
9      A.  I can't tell you that I handed it to him, but
10 the bag was given to the inmate with the written
11 information inside.
12     Q.  I mean, you have to trust that whoever passed
13 it to him made sure that it was in there?
14     A.  Unless they pulled it out of the bag and
15 shredded it, yes.
16     Q.  I'm not saying someone did.  I'm just saying
17 you have no personal knowledge once it left your hand
18 whether it ever came to be in Mr. Coggin's possession.
19     A.  It was -- it was given to him in the bag.
20     Q.  If it was still there, correct?
21     A.  Assuming no one pulled it out of the bag,
22 that's correct.
23     Q.  Sure.  I guess you're not understanding what
24 I'm saying.  I'm not saying that anyone did it.  I'm
25 just saying that oftentimes, you might set the drug up

---

6 (Pages 18 to 21)

JOHN COGGIN v. UNITED STATES OF AMERICA                          11/6/2007
DEPOSITION OF DAVID FOLMAR

| Page 22 | Page 24 |
|---|---|
| 1 and put the information in the bag, but you wouldn't<br>2 be the person who would hand it to the inmate.<br>3     A. No, ma'am. I don't know if I handed it to<br>4 him.<br>5     Q. Okay. So you don't have personal knowledge<br>6 that it actually went into his hand?<br>7     A. No.<br>8     Q. Okay. That's all. That's fine. Let's look<br>9 at Defendant's Exhibit #1, the prescription.<br>10     A. Yes, ma'am.<br>11     Q. Page. And you were asked about a number of<br>12 these prescriptions. Let's talk about the<br>13 Lisinopril. Now, as a pharmacist, you're familiar<br>14 with what that drug is, correct?<br>15     A. Yes, ma'am.<br>16     Q. And it is an ACE inhibitor, blood pressure<br>17 medicine; is that correct?<br>18     A. Yes.<br>19     Q. And it works on the angiotensin system in the<br>20 body; is that correct?<br>21     A. Yes.<br>22     Q. It binds a certain site, and it -- and the<br>23 hoped effect of that drug is it can lower the blood<br>24 pressure by virtue of vasoconstriction -- it binds the<br>25 site where vasoconstriction happens; is that correct? | 1 as a pharmacist, you must be cognizant of that in your<br>2 filling of that prescription in conjunction with the<br>3 healthcare provider?<br>4     A. Yes, ma'am.<br>5     Q. All right. Do you give any special<br>6 counseling to the patient when they are on chronic<br>7 Lisinopril and one of the healthcare providers there<br>8 at Maxwell starts a prescription of ibuprofen that<br>9 will last for at least a month?<br>10     A. Written information is provided. Blood<br>11 pressure is followed by the prescribers.<br>12     Q. That's not my question. Do you give the<br>13 patient themselves any counseling about the fact that<br>14 prescribing ibuprofen -- and let's talk about<br>15 Mr. Coggin. You would agree with me that 800<br>16 milligrams TID is certainly a dose that may well<br>17 have --<br>18     A. May increase the blood pressure.<br>19     Q. It may increase his blood pressure. And that<br>20 may happen immediately or as the drug is given over a<br>21 period of time, correct?<br>22     A. Yes.<br>23     Q. All right. So when a patient who is<br>24 hypertensive by diagnosis, who has been on an ongoing<br>25 Lisinopril prescription, ACE inhibitor, for the |

| Page 23 | Page 25 |
|---|---|
| 1     A. It's an angiotensin converting enzyme site,<br>2 yes, an inhibitor of angio -- consists of converting<br>3 enzyme, yes.<br>4     Q. And some drugs interfere with an ACE<br>5 inhibitor's ability to do that, do they not?<br>6     A. Yes.<br>7     Q. And one of those drugs would be ibuprofen,<br>8 would it not?<br>9     A. Yes.<br>10     Q. And when a patient or an inmate, in this<br>11 circumstance -- and if I call him patient, you<br>12 understand I'll be talking about the inmate in this<br>13 situation; but they're still patients, are they not?<br>14     A. Absolutely.<br>15     Q. Okay. When a patient is on chronic<br>16 Lisinopril, an ACE inhibitor, to try to manage their<br>17 blood pressure, can the ability of that drug to manage<br>18 the blood pressure be impacted by a prescription of<br>19 ibuprofen?<br>20     A. Yes.<br>21     Q. Or Anaprox?<br>22     A. Yes.<br>23     Q. Or Clinoril?<br>24     A. Yes.<br>25     Q. All right. And would it be fair to say that, | 1 protection of his system from the hypertension --<br>2     A. Yes.<br>3     Q. -- when he is then given a new prescription<br>4 of ibuprofen, do you undertake to do any counseling of<br>5 that individual to give him some warning about the<br>6 idea his blood pressure may increase because of the<br>7 known interference of ibuprofen on his blood pressure<br>8 medicine?<br>9     A. I don't remember doing anything special at<br>10 the prison regarding that counseling. The written<br>11 information was provided, yes.<br>12     Q. All right. And does that written information<br>13 warn someone like John Coggin, who is taking<br>14 Lisinopril and then is given 800 milligrams of<br>15 ibuprofen three times a day for a month as a<br>16 prescription? Point to me in Exhibit #2 where that<br>17 written warning is given to this gentleman --<br>18     MR. DOYLE: Objection.<br>19     Q. -- about that circumstance.<br>20     MR. DOYLE: You can go ahead and answer.<br>21     THE WITNESS: Answer the question?<br>22     MR. DOYLE: Yeah.<br>23     A. Let me actually read these. These written<br>24 information sheets change frequently.<br>25     (Brief pause) |

7 (Pages 22 to 25)

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 26

1    A.  No, ma'am.  I don't see anything specific
2  about that.
3    Q.  All right.  So you would agree with me, as
4  far as Mr. Coggin was concerned, at the time that he
5  was prescribed the ibuprofen, it does not reflect
6  either in the chart or in this warning insert or this,
7  I guess, drug education insert -- he was given no
8  indication that that ibuprofen could impact his
9  hypertension in a negative fashion?
10    MR. DOYLE:  Objection.  You can answer the
11  question.
12    A.  Not -- not from me.
13    Q.  All right, sir.  You've looked at the chart
14  the U.S. Attorney has provided to you.  Did you see
15  anywhere in there where PA Rodriguez counseled this
16  gentleman about that potential negative interaction
17  between these two medications?
18    MR. DOYLE:  Objection.  You can answer the
19  question.
20    A.  I haven't read their entries.
21    Q.  You haven't reviewed the medical chart?
22    A.  I haven't read PA Rodriguez's entries.
23    Q.  All right.  Well, then, let's look at the
24  7/25 note that's on page 17 that you looked at
25  earlier.  It's right above your 7/25 note.  You told

---

Page 27

1  the Court earlier that you filled four prescriptions
2  on that date.  Lisinopril was one of them, correct?
3    A.  Yes, ma'am.
4    Q.  So you were cognizant of the fact this
5  gentleman was on Lisinopril throughout the time you
6  prescribed -- or you filled prescriptions for him,
7  were you not?
8    A.  Yes, ma'am.  He is on Lisinopril.
9    Q.  And, in fact, he continued on Lisinopril even
10  through August 8th, '01, when, indeed, you refilled
11  that prescription?  That's on the top of page 16.
12    A.  Yes, ma'am.
13    Q.  All right.  And if you will look on the top
14  of page 18, that's Mr. Rodriguez's 7/26 note, correct?
15    A.  Yes.
16    Q.  And in that note, he says stop Tylenol No. 3.
17    A.  Yes, ma'am.
18    Q.  And then Motrin 800 milligrams, one TID times
19  30 days; is that correct?
20    A.  Yes, ma'am.
21    Q.  And, thereafter, you filled that
22  prescription, discontinued the Tylenol No. 3.  And I
23  don't see where you gave any verbal counseling about
24  the interaction between the ibuprofen and his
25  Lisinopril and the potential for an adverse impact on

---

Page 28

1  his hypertension.  Am I correct?
2    A.  I did not write verbal information here.
3    Q.  And I think we've identified that if indeed
4  he was given the printout which has been marked as
5  Defendant's Exhibit #2, would it be fair to say that
6  from your perspective, no information was provided to
7  this inmate of that danger?
8    A.  I did not verbally counsel him.  I can't --
9    Q.  And it doesn't reflect there was any verbal
10  counseling or written counseling given by Rodriguez at
11  the time of that prescription; is that correct?
12    A.  On 7/25, I don't see any indication of that.
13    Q.  Have you had an opportunity to review the
14  deposition of Rodriguez about his prescription of
15  Motrin?
16    A.  No, ma'am.
17    Q.  Let me ask you just some basic questions
18  about Motrin.  You're familiar with it and you've
19  probably dispensed it thousands of times, correct?
20    A.  Yes.  Yes.
21    Q.  And would it be fair to say that it is a
22  medication that, while it has many positive aspects,
23  also has some recognized negative impacts upon a
24  patient's well-being?
25    A.  All medications have side effects.

---

Page 29

1    Q.  It's just something you've got to kind of
2  sort them out and, when you're prescribing them, make
3  sure you don't combine drugs that can have a negative
4  impact or combine drugs that can undo the positive
5  impacts of another drug.  Would that be fair?
6    A.  You have to treat the patient.
7    Q.  Yes, sir.
8    A.  Anytime you add two medicines together, some
9  effects may affect other things you're trying to do.
10    Q.  Sure.  So what you're doing as a pharmacist
11  in conjunction with the healthcare providers is, I
12  would suppose, first and foremost, to make sure that
13  it's the right drug for the patient in light of their
14  totality of circumstances?
15    MR. DOYLE:  Objection.  You can answer the
16  question.
17    A.  I make sure the medications written fit the
18  picture of the patient that I see.
19    Q.  All right, sir.  And as a pharmacist, you're
20  just not a robot that hands out pills because the
21  doctor writes it; but you have an independent
22  education, training, and clinical experience that
23  allows you to work in conjunction with the healthcare
24  providers to bring your knowledge to bear in a
25  patient's care or circumstance, do you not?

---

76988476-61d7-4609-9c9f-84c9f48976ca

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 30

1    A.  Yes.
2    Q.  All right.  If simply pushing a button and a
3  pill fell out, there would be no reason for
4  pharmacists.  Fair enough?
5    A.  I agree.
6    Q.  All right.  And, I mean, you went through a
7  lot of education to get to the point where you
8  understand these drugs, their interactions, their
9  contraindications, their adverse effects, and so on,
10 so you can, in conjunction with the healthcare team,
11 provide medications that will be, hopefully, of a
12 benefit to your patients.
13   A.  Yes.
14   Q.  All right.  At the point that Rodriguez
15 prescribed this ibuprofen in the face of a chronic
16 Lisinopril prescription, did you approach him about
17 the potential problem that exists from a
18 pharmaceutical standpoint?
19   A.  I don't remember.
20   Q.  If you had, would you have charted it?
21   A.  Not necessarily.
22   Q.  Why not?
23   A.  I guess given the fact that I talk with
24 physicians and PAs all day long, everything that I do
25 can't feasibly make it into the chart.

Page 31

1    Q.  But you would agree with me that this is a
2  potential drug interaction that could be dangerous to
3  a hypertensive patient?
4    A.  I consider this a minor drug interaction.
5    Q.  A minor drug interaction.  Do you -- but the
6  interaction wherein the ACE inhibitors aren't going to
7  work and his blood pressure goes up, wouldn't that --
8    A.  It may increase his blood pressure.  It may
9  increase his blood pressure.
10   Q.  All right.  But that's something you have to
11 be cognizant of, correct?
12   A.  It's something that pharmacists know.
13   Q.  Okay.  You can't ignore it.
14   A.  No.  You follow his blood pressure.
15   Q.  Whether it's minor or major, it's not to be
16 ignored.
17   A.  No.
18   Q.  Okay.
19   A.  But the pharmacist does different things
20 depending upon whether it's major or minor.
21   Q.  All right.  So do you think this kind of
22 interaction -- this interaction, I'm talking about
23 Coggin.  Lisinopril chronically for hypertension of
24 longstanding duration.  He is now given a dose of
25 ibuprofen or a prescription of ibuprofen.  Do you

Page 32

1  believe you discussed that potential interaction with
2  Rodriguez at the time of the initial prescription?
3    A.  I have no documentation I did.
4    Q.  Do you think you may have?  Based on your
5  pharmacy knowledge, would this have been a situation
6  that would have prompted you, even if you didn't chart
7  it, to say something to Rodriguez?
8    A.  I don't remember in this case.  It's a minor
9  interaction.  If we were speaking about other things,
10 I might have; but it's not one that the pharmacist
11 picks up the phone and calls a provider routinely.
12   Q.  All right.  Well, let me ask you this.  Do
13 you consider the potential for gastrointestinal damage
14 from ibuprofen to be either a minor or major problem
15 with that drug?
16   A.  I consider it a risk.
17   Q.  A risk.  All right.  Is it something that
18 you, as a pharmacist, are cognizant of and when you
19 are filling such a prescription, you look to see if
20 this patient's picture presents one where that risk
21 could come to bear?
22   A.  If he has chronic conditions that suggest you
23 shouldn't prescribe Motrin, yes, I know.
24   Q.  All right.  What would those chronic
25 conditions be?

Page 33

1    A.  Well, given that we're here, if someone had
2  GI perforation or ulcers, prescribing them Motrin
3  wouldn't be appropriate.
4    Q.  Because if they do have that kind of a
5  problem, ibuprofen most certainly is going to be --
6    A.  The risk-to-benefit ratio changes.
7    Q.  Right.  It would, in all likelihood, be
8  contraindicated --
9    A.  Yes.
10   Q.  -- unless there's some extraordinary reason
11 to give it?
12   A.  Yes.
13   Q.  It would not be given for routine pain?
14   A.  Someone who has GI problems, it would not be
15 given routinely.
16   Q.  Okay.  When you discontinued the Tylenol
17 No. 3 on the 26th --
18   A.  Yes, ma'am.
19   Q.  -- this gentleman had been complaining of GI
20 problems for about a week at that time, had he not?
21      MR. DOYLE:  Objection.
22   Q.  And maybe I'm confused.  My understanding is
23 you're writing on these charts.
24   A.  Yes.
25   Q.  And you're stamping and putting your

9  (Pages 30 to 33)

JOHN COGGIN v. UNITED STATES OF AMERICA                     11/6/2007
DEPOSITION OF DAVID FOLMAR

Page 34

1  signature as a licensed pharmacist on here, correct?
2      A. Yes.
3      Q. And you're part of the team that delivers
4  care to the inmates at this facility, correct?
5      A. Yes.
6      Q. And you have access, I mean, to this chart
7  because you're writing on it --
8      A. Yes.
9      Q. -- on a daily basis, correct? So you have
10 every opportunity to review their clinical condition
11 leading up to that prescription, do you not?
12     A. Yes.
13     Q. All right. So I'm not trying to ask you
14 about something that you don't have access to. So
15 let's -- let's look at this -- the note on 17, page
16 17, where Mr. Coggin has the first visit with
17 Rodriguez. And would you agree with me that it says,
18 Complains of discomfort right upper quadrant since
19 four days?
20     A. Yes, he wrote that.
21     Q. So that was on the chart at the point you got
22 involved with the prescriptions?
23     A. Yes.
24     Q. All right. Likewise, the chronic Lisinopril
25 circumstance was on the chart at that same point in

Page 35

1  time as well, correct?
2      A. Yes.
3      Q. All right. So this gentleman, at least if
4  you read Rodriguez's initial note, was extremely
5  tender, was complaining of abdominal pain, decreased
6  bowel sounds, and would appear to have some form of
7  abdominal pain. Would that be fair?
8      A. Yes.
9      Q. And as a pharmacist, you could look at that
10 and note that. That's part of your training, correct?
11     A. Yes.
12     Q. All right. Tell me if I step outside
13 something that you've been trained about but --
14 pharmacists are -- they go through pathophysiology,
15 anatomy and physiology, and all of those things as
16 well in order to be able to get licensed to prescribe
17 medication, correct?
18     A. Yes.
19     Q. Okay. If I step outside your bailiwick, you
20 let me know. Okay?
21     A. Yes, ma'am.
22     Q. All right. So as a pharmacist, on the 25th,
23 when you filled the Tylenol No. 3 and the Lisinopril
24 and the Toradol, you knew at that point this gentleman
25 had at least had four days of abdominal pain; is that

Page 36

1  correct?
2      A. I knew he had a diagnosis of cholelithiasis.
3      Q. Well, my question is, did you know he had
4  those symptoms?
5      A. I knew he spoke those symptoms to the PA, and
6  the PA diagnosed him with cholelithiasis.
7      Q. But you also know that the PA recorded these
8  symptoms as well; is that correct?
9      A. Yes, ma'am.
10     Q. All right. So when you prescribed the
11 Tylenol No. 3 on that day, did you have any hesitation
12 in terms of a potential GI distress problem?
13     A. No, ma'am.
14     Q. Okay. However, he was given the Tylenol
15 No. 3, correct?
16     A. Yes.
17     Q. Now, it caused him further GI distress, did
18 it not?
19         MR. DOYLE: Objection. You can answer.
20     A. On 7/6, PA Rodriguez said, Complains T-3 is
21 causing GI discomfort, yes.
22     Q. All right. So it doesn't look like, under O,
23 where it says no changes, he had any relief of the
24 other circumstances that he presented with on the
25 25th, does it?

Page 37

1      A. None that I can -- none that were documented
2  that I can see.
3      Q. All right. So he was still -- based on this
4  chart that you had available to you, still having
5  right upper quadrant pain, decreased bowel sounds, and
6  extremely tender to touch on his abdominal exam. And
7  now, in addition, he thought that the medication, the
8  Tylenol No. 3, was causing him additional GI
9  discomfort; is that correct?
10         MR. DOYLE: Objection. You can answer.
11     A. Looking at the chart entry, all I see is T-3
12 is causing GI discomfort; so he discontinued it.
13     Q. All right. So then it was changed to Motrin
14 800 milligrams TID; is that correct?
15     A. Yes, ma'am.
16     Q. And would you agree with me that patients who
17 have undiagnosed abdominal pain, that Motrin would be
18 contraindicated --
19         MR. DOYLE: Objection.
20     Q. -- in that circumstance?
21         MR. DOYLE: You can answer the question.
22     Q. From a pharmacy perspective.
23     A. You said undiagnosed of abdominal pain?
24     Q. Yes, sir.
25     A. I thought he a diagnosis of abdominal pain.

10 (Pages 34 to 37)

JOHN COGGIN v. UNITED STATES OF AMERICA                          11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 38

1    Q.  I'm not asking you about Mr. Coggin.  I'm
2  asking you as a registered pharmacist, a licensed
3  pharmacist --
4    A.  Yes.
5    Q.  -- a patient with undiagnosed abdominal pain,
6  would it -- would ibuprofen 800 milligrams TID be
7  indicated or contraindicated?
8    A.  What's causing the abdominal pain?  Is it
9  referred pain, or is it an ulcer?  The question is
10 askew to me.
11   Q.  Right.  You need to get to the bottom of
12 what's causing the abdominal pain; is that correct?
13   A.  It needs to be worked up by a provider.
14   Q.  Right.  So before the ibuprofen is given,
15 they ought to have a diagnosis that they feel fairly
16 confident about; because if they are not confident
17 about the source of that abdominal pain, the ibuprofen
18 may well be contraindicated; is that correct?
19       MR. DOYLE:  Objection.  You can answer the
20 question.
21   A.  If someone has an ulcer and no one knows
22 about it, Motrin would be a very bad idea, yes.
23   Q.  If someone had an ulcer, could codeine upset
24 their stomach?
25   A.  It's a different mechanism.  Codeine can

---

Page 39

1  cause stomach upset, yes.
2    Q.  But, I mean, somebody who had GI ulcer,
3  peptic ulcer disease, could Codeine upset it?
4    A.  Independently, codeine causes stomach upset.
5  If you give it to someone who already has stomach
6  upset, you have two different mechanisms that can
7  cause stomach upset, yes.
8    Q.  So at the point that the ibuprofen was
9  prescribed, we know two things about Mr. Coggin.
10 Let's go back to Mr. Coggin.  Okay?
11   A.  Yes.
12   Q.  We know that he had right upper quadrant pain
13 for at least four days, that his abdomen was extremely
14 tender to the touch.  He had decreased bowel sounds.
15 He had some referred pains.  And then once given
16 Tylenol No. 3 --
17       MR. DOYLE:  Objection.
18   Q.  -- he returned to the clinic complaining that
19 it was causing him GI discomfort.  And when Rodriguez
20 saw him, he charted that there had been no changes in
21 his condition and went on and prescribed a different
22 pain medication; is that correct?  Is that how he kind
23 of ends up in front of you when you filled that
24 prescription on the 26th?  Is that the information,
25 basically, you know about him from a --

---

Page 40

1       MR. DOYLE:  Objection.  You can answer the
2  question.
3    Q.  -- GI perspective?
4    A.  On the 26th, T-3 is discontinued and Motrin
5  is started.  So, yes.
6    Q.  So that information was available to you at
7  that time?
8    A.  Yes.
9    Q.  If a patient -- so he was prescribed the
10 Motrin and you filled it, as reflected on page 64,
11 which is your #1 over there; is that correct?
12   A.  You said 7/26, the Motrin?  Is that what
13 you're talking about?
14   Q.  Right.
15   A.  Yes, ma'am, I filled Motrin on that date.
16   Q.  And it looks like you only gave him 15 pills
17 the first go -- I mean -- excuse me -- 15 days worth
18 the first go-round.
19   A.  Yes, ma'am.
20   Q.  And why is that?
21   A.  As a pharmacist, I didn't -- didn't want to
22 waste medications.  If the doctor gave them 30-day
23 supply, customarily, I or another pharmacist will give
24 a 15-day supply with one refill.  They're not short of
25 their medication.  In case they choose not to take the

---

Page 41

1  medicine or if the medicine is discontinued, there's
2  less wastage.  That's my thinking.
3    Q.  So he had a 30-day prescription.
4    A.  Of which he picked up 15 days.
5    Q.  Okay.  So he had to have come back and had
6  this refilled somewhere in the interim; is that
7  correct?
8    A.  Yes.  If he wants to take it 30 days, yes.
9    Q.  All right.  And did that get refilled?
10   A.  I don't know.
11   Q.  Okay.  When you discontinue a medication,
12 where is that charted?
13   A.  In the case of T-3 discontinuing, I did it on
14 7/26.
15   Q.  But if you discontinue another medication,
16 such as a non narcotic, where is that -- where is that
17 discontinued medication recorded in the chart?
18   A.  It's not recorded in the chart.
19   Q.  Why not?
20   A.  Because I wasn't trained that way.
21   Q.  Okay.  Is that the training you got over at
22 Maxwell, or is that just general?
23   A.  As a pharmacist.
24   Q.  Okay.
25   A.  Very few pharmacists write in the chart.

---

11 (Pages 38 to 41)

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 42

1    Q.  All right.  But at Maxwell, you have to at
2  least, every time something is filled, chart; is that
3  correct?  Whenever you fill a prescription, you've got
4  to chart it?
5    A.  I put it in the chart, yes, at Maxwell.
6    Q.  All right.  At Maxwell.  But if it's
7  discontinued, you don't necessarily place it in the
8  chart?
9    A.  If a medicine is discontinued, I don't write
10  a chart entry, no, ma'am.
11    Q.  Do you get the rest of the medication back
12  from the inmate?
13    A.  Not routinely.
14    Q.  Do you confiscate it to throw it away?
15    A.  No, ma'am.
16    Q.  Does anyone do that?
17    A.  Not to my knowledge.
18    Q.  Now, on 8/8, his Lisinopril was filled again;
19  is that correct?
20    A.  Yes.
21    Q.  And at this point, he had been on the
22  ibuprofen for a couple of weeks; is that fair?
23        MR. DOYLE:  Objection.  You can answer the
24  question.
25    A.  It was filled 7/26 and this is 8/8, so

---

Page 43

1  roughly a couple of weeks.
2    Q.  All right.  When you filled the Lisinopril
3  and gave written information --
4    A.  Yes.
5    Q.  -- do you know whether or not you cautioned
6  Mr. Coggin about the potential interaction with the
7  ibuprofen and the Lisinopril?
8        MR. DOYLE:  Objection.  We've asked and
9  answered this about 30 times, but you can go ahead and
10  answer it.
11    A.  Of interest to me -- I have the Motrin one
12  here, but what -- the Lisinopril one, I'd be
13  interested to see that because, currently, the
14  Lisinopril prescriptions caution you about
15  nonsteroidals in the written information.
16    Q.  Currently, they do.  You don't know if --
17    A.  I have no knowledge if I verbally counseled
18  him, no, ma'am.
19    Q.  All right.  Look at the 8/8 clinical note
20  that Rodriguez put on the chart.
21    A.  Yes.
22    Q.  Are you with me?
23    A.  I'm with you.
24    Q.  What's his blood pressure at that point?
25    A.  Elevated.

---

Page 44

1    Q.  As a pharmacist --
2    A.  He's in pain.
3    Q.  Oh, he's in pain?
4    A.  He may be in pain.
5    Q.  Okay.
6    A.  As a pharmacist, I know, if you're in pain,
7  your blood pressure goes up.
8    Q.  All right.  Do you think Mr. Coggin was in
9  pain on 8/8/0?
10    A.  Actually, looking at the note, I can't --
11  can't say that he is.
12    Q.  All right.  So it would appear from
13  Mr. Rodriguez's charting on that day that he had no
14  complaints of pain at that time, correct?
15    A.  Reading his note, I see no evidence of pain.
16    Q.  All right.  And it would appear that his
17  blood pressure was 162/89; is that correct?
18    A.  It is.
19    Q.  And his pulse was 55, and his respirations
20  were 20; is that correct?
21    A.  That's what's charted.
22    Q.  All right.  In light of this evaluation by
23  Mr. Rodriguez, would it appear that this gentleman is
24  hypertensive on this date?
25    A.  His blood pressure is elevated, yes.

---

Page 45

1    Q.  All right.  And you had this note available
2  to you when you filled the Lisinopril prescription?
3    A.  Yes.
4    Q.  And let's see.  Rodriguez saw him at 1030,
5  and you filled it at 1610?
6    A.  Yes, ma'am.
7    Q.  All right.  So this whole typed up note would
8  have already been on the chart?
9    A.  It would have.
10    Q.  At that point -- and, of course, he was
11  diagnosed hypertension, correct?
12    A.  That is the diagnosis.
13    Q.  All right.  Did you have any counseling with
14  Mr. Coggin about the ibuprofen-Lisinopril interaction
15  potential in the face of his increased blood pressure
16  at that time?
17        MR. DOYLE:  Objection.  You can answer the
18  question.
19    A.  I don't have any recollection of verbally
20  speaking to Mr. Coggin about that.
21    Q.  Do you know whether or not you went to
22  Rodriguez and talked to him about that potential?
23    A.  No way of remembering.
24    Q.  Do you have an opinion as to whether or not
25  that would have been a prudent thing to do, for either

---

76988476-61d7-4609-9c9f-84c9f48976ca

JOHN COGGIN v. UNITED STATES OF AMERICA                                11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 46

1  you or Rodriguez to sort out that issue in light of
2  his increased blood pleasure?
3      MR. DOYLE:  Objection.  You can answer the
4  question.
5      A.  The blood pressure is a number that he took
6  in his office.  He has the option of treating it
7  however he chooses to.  He gave Lisinopril 10
8  milligrams.  I didn't see anything wrong with giving a
9  blood pressure medicine to someone with elevated blood
10  pressure medicine.
11      Q.  Did you see anything wrong with not pointing
12  out to the healthcare provider that the ibuprofen that
13  he had prescribed might be preventing that ACE
14  inhibitor from doing the work it should have been
15  doing?
16      MR. DOYLE:  Objection.  You can answer the
17  question.
18      A.  People are commonly on both Lisinopril and
19  Motrin.  You treat the blood pressure, so he could
20  have the increased blood pressure medicine at that
21  time if he chose to.
22      Q.  But he didn't, did he?
23      A.  I don't see -- he did not.
24      Q.  All right.  If we can go back to Exhibit #1.
25  That was the page 64.  The next prescription it looks

---

Page 47

1  like you were involved with is the Nubain, or the
2  nalbuphine, that was injectable given by the nurse; is
3  that correct?
4      A.  On 8/23, yes.
5      Q.  Okay.  And that prescription was actually
6  given the day before, on the 22nd, was it not?
7      A.  According to the chart, yes.
8      Q.  And why does this slip get printed out on the
9  23rd of that day?
10      A.  The next -- the next day that I'm there, the
11  business day, is when I review the chart.  It was
12  placed in the pharmacy inbox.  I don't know if this
13  was a weekend, given the dates.  So the next day that
14  I come in, inmates were seen over the weekends; so
15  that's the first opportunity I had to review the
16  chart.
17      Q.  All right.  So you go ahead and look back at
18  the chart.  Is there a stack of folks that got
19  medications since you last were there sitting there
20  for you to review, or how do you know to go to
21  Coggin's chart and know he got --
22      A.  There's a pharmacy inbox that was in the
23  medical records station.  So, assuming this is a
24  weekend-- I don't know looking at the dates.  If they
25  saw someone on Saturday or Sunday, they gave them a

---

Page 48

1  treatment, they would put it in the pharmacy inbox for
2  Monday.  When I came in, I would put it in the
3  patient's profile.
4      Q.  All right.  And the Naproxen that was filled
5  on that day, that's the Anaprox?
6      A.  Yes, ma'am.
7      Q.  And that's an NSAID like ibuprofen, is it
8  not?
9      A.  Yes.
10      Q.  It has all the same risks and potential
11  problems, at least from a GI bleed perspective, as
12  ibuprofen would?
13      A.  Very similar.
14      Q.  All right.  And have you seen it given for
15  undiagnosed abdominal pain in your practice?
16      MR. DOYLE:  Objection.  You can answer the
17  question.
18      A.  Anaprox, 550 milligrams twice a day, written
19  on the 23rd of August, diagnosis of cholelithiasis
20  versus cholecystitis.
21      Q.  That's not my question, sir.  I asked you in
22  your practice as a pharmacist, have you ever seen
23  Anaprox given for undiagnosed abdominal pain?
24      A.  Someone who doesn't know they have pain or
25  they --

---

Page 49

1      Q.  Someone who does not -- someone who has not
2  had a clear diagnosis of the source of their abdominal
3  pain.  You know what undiagnosed is the term for,
4  don't you?
5      A.  They're having pain in their abdominal area,
6  which could be many things.
7      Q.  Right.  Have you seen, in your practice --
8      A.  Sure.  I've seen it given for abdominal pain,
9  yes, for kidney stones or other things.
10      Q.  Well, now, that would be diagnosed abdominal
11  pain.  I'm talking about abdominal pain where the
12  various things that could cause it had not been ruled
13  out.
14      A.  If they've been seen by a physician, they
15  should have a diagnosis, yes.
16      Q.  So those things should be ruled out before
17  the Anaprox is given?
18      A.  That's their job.
19      Q.  Okay.  And that would be true for Motrin,
20  too?  I mean, you've got to rule out things that would
21  contraindicate --
22      A.  They're clinicians.  They -- they come up
23  with the diagnosis.
24      Q.  All right.  So on the 23rd, is that the day
25  you actually filled the Anaprox?

---

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

Page 50

1    A.  On the 23rd, yes, ma'am.
2    Q.  All right.  And it looks like written
3  information was given?
4    A.  Yes.
5    Q.  And do you know if there is a written
6  information sheet just like this ibuprofen one for
7  Anaprox?
8    A.  I haven't seen one here.
9    Yes, all -- they have written information sheets
10  were given to the inmate.
11    Q.  And, in fairness, would it be similar to this
12  ibuprofen one in terms of its description as --
13    A.  It should be similar.  I have not seen it, so
14  I don't know the exact verbiage, but it should be
15  similar as well.
16    Q.  Okay.  At the time of filling that
17  prescription, did you have any counseling with
18  Mr. Coggin verbally?
19    A.  Not that I can recall.
20    Q.  Did you tell him to discontinue the ibuprofen
21  that he was currently on?
22    A.  I have no idea of whether or not I talked to
23  him, but I will say the Motrin was for 30 days.  This
24  was 30 days later.  So as a pharmacist, I wasn't
25  concerned with him taking both of them necessarily.

Page 51

1    Q.  So he began the prescription of ibuprofen on
2  7/26.  So when you filled it on 8/23, is it your
3  testimony that he should have been out of the Motrin?
4    A.  My testimony is as a pharmacist filling that
5  prescription, it seemed reasonable.
6    Q.  That's not the question.
7    A.  That's not your question?
8    Q.  Nope.  You got to do math on this one.  You
9  know he was prescribed 30 days' worth of ibuprofen.
10    A.  He got 15 days worth, yes, with a refill.
11    Q.  With a refill?
12    A.  Yes, ma'am.
13    Q.  So that means how many pills would he have
14  been dispensed beginning 7/26 of the ibuprofen?
15    A.  He should have received 90 total if he picked
16  his refill up.
17    Q.  90 total.  And if he would have taken them
18  three times a day beginning on 7/26 -- looks like you
19  filled it at four in the afternoon, at 4:20 in the
20  afternoon.  Would you have expected him to take all
21  three of those 800s that day?
22    A.  I would not have expected him to be taking
23  both.
24    Q.  All right.  So maybe he got two doses on the
25  first day?

Page 52

1    MR. DOYLE:  Objection.  I think he didn't
2  hear the question.
3    Q.  Well, you refilled it about 4:20 in the
4  afternoon on the 26th, correct?
5    A.  The Anaprox?
6    Q.  No.  I'm back on Motrin.
7    A.  Back on Motrin.  Yes.
8    Q.  All right.  When you filled it at 4:20, would
9  you tell him he needed to take all three of those
10  pills the first day?
11    MR. DOYLE:  Objection.  You can answer.
12    A.  Again, I don't know if I talked to him, but
13  no.
14    Q.  You would --
15    A.  I would not advise someone to take a full
16  day's course of Motrin in six hours.
17    Q.  All right.  So --
18    A.  Eight hours.
19    Q.  When they're taking this TID, do you tell
20  them what time of day to take it TID?
21    A.  I have no recollection of Mr. Coggin; but as
22  a pharmacist, I counsel three times a day, you know,
23  breakfast, lunch and dinner, is okay kind of time
24  frame; or you can space it out, take a snack in the
25  afternoon, and do towards bedtime.  So three times a

Page 53

1  day spaced out as much as possible.
2    Q.  That would be about every eight hours if you
3  can manage it.
4    A.  Exactly.
5    Q.  So do you feel like -- I know you don't
6  remember Mr. Coggin.
7    A.  Yes, ma'am.
8    Q.  But do you feel like when he would have
9  gotten his prescription initially, somebody in the
10  system, in handing him that medication, would have
11  suggested to him to take it with food?
12    MR. DOYLE:  Objection.  You can answer.
13    A.  Yes.  Yes.  The auxiliary label should have
14  printed as well on Motrin, but the one on the bottle
15  said take with food or milk.
16    Q.  All right.  The bottle that y'all would have
17  handed him likely would have said that?
18    A.  Oh, yes.  Take with food or milk.
19    Q.  And it actually says three times a day after
20  meals, correct?
21    A.  Yes.
22    Q.  All right.  So after 4 p.m. at Maxwell, do
23  you know how many meals they have after 4 p.m.?
24    A.  I do not.
25    Q.  All right.  But, in fairness, I wouldn't

JOHN COGGIN v. UNITED STATES OF AMERICA
11/6/2007
DEPOSITION OF DAVID FOLMAR

## Page 54

1  imagine they would have five or six more meals that
2  day.
3      A.  I don't know the chow hall schedule, but I do
4  know they had food in the dormitories.
5      Q.  All right.  But if Mr. Coggin took it after
6  meals, then, if he got a dose on the 26th, that would
7  be 89 pills to split up three times a day with meals.
8      A.  Okay.
9      Q.  All right.  And you're a pharmacist and you
10 can't pills a lot.  Tell me when you would have
11 expected that prescription to have run out?
12     MR. DOYLE:  Objection.  Do you need a
13 calendar?
14     A.  Well, 30 days later.  Do you want me to
15 count it out?
16     Q.  Well, don't -- you had indicated to me
17 earlier with your testimony that it was already over.
18     A.  I said it -- I said it was approximately 30
19 days prior.  So I do not expect him to have a bunch of
20 Motrin laying around.
21     Q.  All right.  My question is this.  If he took
22 one on the 26th after his evening meal --
23     A.  Yes, ma'am.
24     Q.  -- then you should be taking three a day.
25     A.  Yes, as prescribed.

## Page 55

1      Q.  So what -- July has 31 days, does it not?
2      A.  I've always been bad at that.  If you say so.
3      MR. DOYLE:  Don't -- if you need a calendar,
4  we'll get you a calendar.
5      MS. COCHRUN:  Right.  We can do that.
6      Q.  But he has 30 days worth of prescription.
7  And if he starts on 7/26 and takes it three times a
8  day with meals, he should be still taking Motrin on
9  August 23rd when the Naproxen was filled, correct?
10     A.  Theoretically.
11     Q.  Theoretically.  In fact, he should have -- if
12 he only got one dose on the 26th and he starts on the
13 27th, he has three to four more days of that
14 prescription left if he is taking it as directed in
15 the prescription; is that correct?
16     MR. DOYLE:  Objection.
17     A.  I haven't done the math, but he should.
18     Q.  Well, I don't want you to guess, so I'm going
19 to ask you to do this.  You're a pharmacist.  You
20 figure out when these people are supposed to have
21 their medications.  He's taking it three times a day.
22 Here's a pen and a piece of paper.  I want you to
23 figure it out.
24     MR. DOYLE:  Do you need a calendar from '01?
25 You want to take a break and we'll -- I'll get one off

## Page 56

1  the Internet?
2      MS. COCHRUN:  Oh, wait a minute.  I think I
3  have --
4      (Brief recess)
5      Q.  I'm going to show you what I'm going to mark
6  as Plaintiff's Exhibit #1.  We were talking about the
7  ibuprofen that was ordered by Rodriguez starting on
8  the 26th, correct?  And we know that you filled it at
9  1620; is that correct?
10     A.  Yes.
11     Q.  All right.  And it was ordered to be given
12 one tablet three times a day after meals, correct?
13     A.  Yes.
14     Q.  And unless we find out lunch is quite late at
15 Maxwell, I'm going to ask you to assume that he took
16 one pill after dinner the night of the 26th.  Okay.
17     A.  One or two.
18     Q.  One or two.
19     A.  If he picked it up at five o'clock, he could
20 sneak one in before bedtime.
21     Q.  He could?
22     A.  He could.
23     Q.  I mean, the pharmacist might have -- whoever
24 filled it --
25     A.  Or Rodriguez or somebody might have said, I

## Page 57

1  want you take one in pill line and one at bedtime.
2      Q.  All right.  So at least -- at least one,
3  maybe two.
4      A.  Yes.
5      Q.  All right.  I'll put question mark, maybe
6  two.
7      A.  Yes.
8      Q.  All right.  And then thereafter, if he takes
9  it as prescribed, he --
10     A.  As prescribed.
11     Q.  As prescribed, he would be taking 800
12 milligrams three times a day.
13     A.  Yes, ma'am.
14     Q.  All right.  And so beginning the 27th, he
15 should have three pills taken on that day, 28th, 29th,
16 30, 31.
17     A.  Okay.
18     Q.  And then the 1st through the 22nd, he should
19 have three on each of those days if he is taking it as
20 prescribed; is that correct?
21     A.  I agree.
22     Q.  Then on the 23rd, we have the nurse ordering
23 Anaprox at about ten in the morning; is that correct?
24     A.  Yes, ma'am.
25     Q.  And it gets filled by you at two in the

JOHN COGGIN v. UNITED STATES OF AMERICA                          11/6/2007
DEPOSITION OF DAVID FOLMAR

---

**Page 58**

1  afternoon; is that correct?
2      A.  23rd.  Okay.  Thank you.  Yes.
3      Q.  All right.
4      A.  Two o'clock in the afternoon.
5      Q.  All right.  So he may well -- well, at least
6  on the 23rd, he may well have had his breakfast dose
7  by the time he sees her.
8      A.  Sure.
9      Q.  And he -- by the time you can get him the
10  Anaprox, he may well have taken his lunch dose.
11      A.  Yes.  At two in the afternoon when I filled
12  it, he could not have picked this up until after
13  dinner.
14      Q.  After --
15      A.  Five o'clock was the next pill line that he
16  could potentially get this prescription at that time.
17      Q.  All right.  So he may well have taken all
18  three doses --
19      A.  Very likely.
20      Q.  -- of the ibuprofen --
21      A.  Yes.
22      Q.  -- on the 23rd.
23      A.  Yes.
24      MR. DOYLE:  Objection.  You can answer.
25      Q.  Okay.  I'm going to let you help me here; but

**Page 59**

1  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,
2  17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28.  If he
3  was given 90 pills, he would have at least a couple
4  more days worth of ibuprofen, would he not?  I'll let
5  you look at it.
6      MR. DOYLE:  Objection.  You can answer.
7      Q.  You can kind of give me the most he could
8  have and the least he could have, if you would, sir,
9  if it was being taken as prescribed.
10      A.  So we counted 28 days, yes?
11      Q.  Yes, sir.
12      A.  So according to my calculator, that's 84 plus
13  the two potentially on the day.  It's 86 tablets.
14      Q.  All right.  And he had 90 prescribed to him;
15  is that correct?
16      A.  He had 45 with one refill, total of 90.
17      Q.  So how many days remaining prescription would
18  he have?
19      A.  He would have had four tablets.
20      Q.  Four tablets?
21      A.  Which is one day and one dose.
22      Q.  And if he didn't get started until late on
23  that first day, he may actually have a little bit
24  more?
25      A.  And if he didn't pick his prescription up, he

**Page 60**

1  could have completely ran out.  There's no way of
2  knowing he picked it up on that day or two days later
3  or the next day.  I don't know.
4      Q.  Okay.  But at the time of the Anaprox
5  prescription, would it be fair to say, based on at
6  least the number of tablets that he was prescribed, he
7  would have had a couple more days' worth of
8  prescription?
9      MR. DOYLE:  Objection.  It mischaracterizes
10  his testimony, but he can answer.
11      A.  We concluded he had four tablets.
12      Q.  All right.
13      A.  If he picked the prescription up when it was
14  written that afternoon.
15      Q.  All right.  And if he took his whole day on
16  the --
17      A.  As prescribed.  He could have took more,
18  could have took less.  I don't know.
19      Q.  Okay.  But at least if he was following the
20  way the healthcare providers had prescribed --
21      A.  Four tablets.
22      Q.  -- he should have four tablets remaining?
23  And then he got the Anaprox filled on that date; is
24  that correct?
25      A.  The Anaprox was filled by me, yes.

**Page 61**

1      Q.  Okay.  Did you see any order on the chart to
2  discontinue the ibuprofen?
3      A.  None written by Ms. Little, no.
4      Q.  Would it be advisable for Mr. Coggin to
5  receive 800 milligrams of ibuprofen at the same time
6  he is receiving 550 milligrams of Anaprox?
7      MR. DOYLE:  Objection.  You can answer the
8  question.
9      A.  I would not advise Mr. Coggin to take both of
10  those at the same time nor anyone else.
11      Q.  And why would that be, sir?
12      A.  It's a duplication of therapy.
13      Q.  And what risks are attendant therewith?
14      A.  You're basically taking double the dose, so
15  increased drowsiness; in this case, increased
16  potential stomach pain, increased risk for ulcers,
17  potentially.
18      Q.  Now, the Anaprox that was prescribed, 550
19  milligrams BID, as a pharmacist, would you
20  characterize that as a high dose or a low dose of
21  Anaprox?
22      A.  As a pharmacist, I would characterize that as
23  an average dose that I see daily.
24      Q.  For abdominal pain or for arthritic
25  conditions?

JOHN COGGIN v. UNITED STATES OF AMERICA
DEPOSITION OF DAVID FOLMAR

11/6/2007

---

Page 62

1    MR. DOYLE: Objection. You can answer.
2    A. As a pharmacist, normally, you don't see the
3 diagnosis. I just see the order. So in a range, in
4 my profession, I would not question that at Wal-Mart
5 or a hospital or anyplace else I would work.
6    Q. But how about at the prison? Have you seen
7 Anaprox 550 milligrams BID given for abdominal pain?
8    MR. DOYLE: Objection. You can answer.
9    A. Yes. Someone with abdominal pain, I would.
10   Q. Defendant's Exhibit #1, under that Naproxen
11 prescription, there's another sticker, is there not?
12   A. Yes.
13   Q. Do you know what that is?
14   A. On 8/21 is the one you're talking about?
15 It's a prescription for Sulindac.
16   Q. On 8/21? It looks like that's written on
17 8/20. What does your copy say?
18   A. Oh, I'm sorry. Are you talking about this
19 one here (indicating)?
20   Q. Yeah. What date does that look like that was
21 prescribed?
22   A. That's the order date.
23   Q. All right. Is that 8/21 or 8/28?
24   A. 8/28. I'm sorry.
25   Q. Okay. I just -- all right.

---

Page 63

1    A. It's 2001. Forgive me. I'm jetlagged.
2    Q. I'm sorry. And I don't mean to be pushing
3 you, but we've got to get this stuff straight while
4 you're here.
5    A. It is right, 8/28/01.
6    Q. All right. And can you tell who prescribed
7 that?
8    A. Well, as you can see, most of the sticker is
9 covered, but it looks like Garcia at the bottom.
10   Q. Okay. Kind of at the --
11   A. You see where it's cut off by the other
12 sticker.
13   Q. Sure.
14   A. It looks like -- it looks like Garcia.
15   Q. All right. Can you tell who filled it?
16   A. According to this sticker, it doesn't have
17 the pharmacist's initials on it. This is the smaller
18 sticker.
19   Q. What does that mean to you in terms of
20 whether this gentleman got the medication?
21   MR. DOYLE: Objection.
22   A. 8/28. So this is all the chart?
23   Q. No, it's not. Here's some more. I'm going
24 to let you look at Bates stamped chart. And I want
25 you to show me where any pharmacist filled the

---

Page 64

1 Clinoril prescription. Okay? And I'm giving you
2 pages 01 through -- I think you've already got through
3 17 over there, don't you? My question is I'm trying
4 to determine whether the Clinoril prescription did get
5 filled based on this record from Maxwell.
6    A. That's 8/28. So the last thing I
7 see here is an 8/29/01. So the next time the chart
8 entry is 10/18. No. These are in reverse order. I'm
9 sorry.
10   I'm sorry. You're asking me -- for to me to do
11 what here?
12   Q. We see the sticker down on the prescription.
13 Does it look like that prescription was ever filled?
14   A. If the sticker is in the chart, it means that
15 a label was generated and I put it in there, which
16 means I put the Sulindac in a bottle, yes.
17   Q. All right. Does it reflect that the
18 medication was ever given to the patient?
19   A. In all these cases, I have no idea if the
20 inmate picked these up based upon -- this just means I
21 filled them.
22   Q. All right. But it doesn't -- like these
23 other stickers, it doesn't have your initials or any
24 of the other information. And so my question is do
25 you know that it was filled -- I mean, that it was

---

Page 65

1 actually dispensed to the patient?
2    A. I do not know if it was dispensed to the
3 patient.
4    Q. All right. Unlike these other medications
5 we've talked to heretofore --
6    A. Yes, ma'am.
7    Q. -- there's no record that any written
8 information was given to this inmate, was there?
9    A. On the Sulindac?
10   Q. Yeah.
11   A. I did not see my chart entries for this.
12   Q. Or any other pharmacist.
13   A. Or anybody else's. I'm the only -- I was the
14 only pharmacist.
15   Q. Okay. So --
16   A. Prescriptions could have been filled by some
17 of the other providers there. They had access to my
18 programs. So if they filled it, written information
19 came with the drug. It just means I didn't do it.
20 Because I was very anal about putting my information
21 stuff in there.
22   Q. All right. And I can tell that. So if that
23 occurred, if it actually did get filled, it got filled
24 outside your normal routine for you as the pharmacist?
25   A. Yes.

---

17 (Pages 62 to 65)

JOHN COGGIN v. UNITED STATES OF AMERICA                                    11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 66

1    Q.  All right.  And looking at that sticker, can
2  you tell, just based on reviewing the chart, whether
3  anyone else filled that prescription?
4    A.  I did not see any chart entries like mine
5  that I put in there.
6    Q.  All right.
7    A.  But the label doesn't show the initials of
8  who did it, because it's a smaller sticker.
9    Q.  All right.  Does it show that any written
10 instructions were given?
11   A.  There's no chart entry, so -- but written
12 information prints off with every prescription filled,
13 so there was written information with the Sulindac
14 when the label was generated.
15   Q.  Whether it ever got to Mr. Coggin, you have
16 no way of knowing that?
17   A.  I have no way of knowing.
18   Q.  Okay.  You don't even know if he got this
19 prescription based on the chart?
20   A.  I don't know if I filled it or someone else
21 did.
22   Q.  Okay.  Do you know that it was filled,
23 though?
24   A.  I do not.
25   Q.  Okay.  What would be the circumstance wherein

---

Page 67

1  someone, other than you as the pharmacist, would be
2  filling an oral medication such as the Sulindac?
3    A.  There was an RN there who acted as a pharmacy
4  tech in my absence.  She would fill the prescriptions,
5  and then a physician would check her work.
6    Q.  All right.  And you would -- who -- and then
7  she would or a physician would give the medication to
8  the inmate?
9        MR. DOYLE:  Objection.  You can answer.
10   A.  It would be filled normally.  And, you know,
11 with a bottle full of medication, you know, it would
12 be placed in the bin to be handed to the inmate.  If
13 it's after hours, I don't know if the doctor handed it
14 to him directly.  I wasn't involved with the process.
15 But if it was filled, it was put in a bottle and
16 written information would have been generated with the
17 prescription.
18   Q.  Okay.  And Sulindac, that is also known as
19 Clinopril?
20   A.  Yes, ma'am.
21   Q.  And that is also an NSAID?
22   A.  It is.
23   Q.  And it would have, in terms of GI problems,
24 the same impact on the GI tract as the other NSAIDs?
25   A.  Very similar, yes.

---

Page 68

1    Q.  How many prescriptions back in 2001 would you
2  be filling on a daily basis when you were working,
3  Mr. Folmar?
4    A.  It's hard to know.  Maybe 80 prescriptions a
5  day on average.  I don't know what the day -- this
6  particular day's -- on these days what they were.
7    Q.  But you --
8    A.  Somewhere between 50 and 80.  You know, it's
9  hard to say.
10   Q.  Those would be new prescriptions, correct, or
11 refills?
12   A.  Both.
13   Q.  Okay.  How many inmates did you provide, in
14 terms of number, pharmacy services for?  Do you know
15 how many, back when you were working there, that you
16 covered?
17   A.  I want to say around 800.
18   Q.  Would you agree that NSAIDs, including
19 Motrin, Anaprox and Sulindac, can cause serious
20 gastrointestinal adverse events, including
21 inflammation, bleeding, ulceration, perforation, and
22 can be fatal -- which can be fatal?
23       MR. DOYLE:  Objection.  You can answer.
24   A.  I know as a pharmacist there is a risk when
25 taking those medications, yes.

---

Page 69

1    Q.  And with these NSAID type drugs, these
2  serious adverse events can occur at any time during
3  the prescription of the drug?
4    A.  Yes.
5    Q.  Doesn't matter if it's the first day or 20
6  days out, they can happen at any point in the
7  spectrum?
8        MR. DOYLE:  Objection.  You can answer.
9    A.  That's what the literature suggests, yes.
10   Q.  And that's what you know as a trained
11 pharmacist?
12   A.  Yes.
13   Q.  These aren't trick questions.  I'm just
14 asking you about what you know about this drug.
15 Okay?
16   A.  I'm sorry.  It's my first time.
17   Q.  Okay.  That's okay.  Everyone always thinks
18 we're going to ask trick questions.  I know.  Okay.
19 All right.  So it can happen at any point in the
20 course of the actual prescription of the NSAID?
21       MR. DOYLE:  Objection.  You can answer.
22   Q.  These GI events.
23   A.  It's a risk, yes.
24   Q.  All right.  Would you agree with me that only
25 one in five patients who develop serious upper GI

---

18  (Pages 66 to 69)

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

Page 70

1  adverse events on NSAID therapy is symptomatic?
2       MR. DOYLE: Objection. You can answer.
3    Q. The literature reflects that?
4       MR. DOYLE: If you know.
5    A. One more time, please.
6    Q. Sure. Only one in five of the patients who
7  develop serious upper GI events while on NSAID therapy
8  is symptomatic?
9    A. As a pharmacist, I know that some are
10 symptomatic; some are not. I did not know the ratio.
11   Q. Okay. But if the literature reflects that,
12 you wouldn't --
13   A. If the literature reflects that and it's from
14 a reasonable source, I wouldn't disagree with it.
15   Q. All right. Would you agree that the risk of
16 the potential for an adverse GI event, the longer
17 you're on the medication, that that risk may increase
18 with the duration?
19      MR. DOYLE: Objection. If you know.
20   A. I have no concrete data to say yes or no on
21 that. Logically, as a pharmacist, I would think the
22 longer you took it, it may increase it; but I have no
23 data to support that.
24   Q. In layman's terms, if you were taking it for
25 a week, you, as a pharmacist, might not expect as much

Page 71

1  of a GI ulceration or impact as somebody who was
2  taking it for a month or two?
3       MR. DOYLE: Objection. You can answer if you
4  know.
5    A. I've seen people take Motrin for years. So,
6  you know, some people have adverse reactions; some
7  don't. If you had to pin me down, I would say the
8  risks may increase with time.
9    Q. All right.
10   A. But I can't prove it.
11   Q. But somebody could take it just for a week
12 and still have a bad event --
13   A. Yes.
14   Q. -- GI wise, correct?
15   A. Yes, sir.
16   Q. So, as a pharmacist, you have to be cognizant
17 of that whole spectrum; is that correct?
18   A. As a pharmacist, I know that it is a risk.
19   Q. All right, sir. Would you agree with me to
20 minimize the potential risk for an adverse GI event in
21 patients treated with an NSAID, the lowest effective
22 dose should be used for the shortest possible
23 duration?
24      MR. DOYLE: Objection. If you know.
25   A. Yes.

Page 72

1    Q. And that's reflected in the literature as
2  well as the information provided by the manufacturer
3  of these kind of drugs?
4    A. That's for all drugs. Less is best.
5    Q. Based on your education and training and
6  clinical experience, do you agree with this statement,
7  sir, that patients and physicians should remain alert
8  for signs and symptoms of GI ulcerations and bleeding
9  during NSAID therapy and promptly initiate additional
10 evaluation and treatment if a serious GI event is
11 suspected?
12   A. Yes.
13   Q. This should include discontinuation of the
14 NSAID until a serious GI adverse event is ruled out?
15      MR. DOYLE: Objection. If you know and if
16 you understand the question.
17   Q. Based on your same education and training.
18   A. I agree that they should be worked up by a
19 physician or licensed provider.
20   Q. And should the NSAID be discontinued while
21 that is being worked up?
22   A. That's a clinical decision by the prescriber.
23   Q. Well, from a pharmacy standpoint, is that
24 your understanding the recommendation is by the
25 manufacturer and the clinical understanding of this

Page 73

1  drug?
2       MR. DOYLE: Objection. If you know.
3    A. I don't know if we're talking about
4  Mr. Coggin or in general. In general, there's --
5    Q. In general.
6    A. In general, there's a diagnosis of something
7  else. I, as a pharmacist, would not question stomach
8  abdominal pain and Motrin, as I have a diagnosis in
9  the chart of something else.
10   Q. That's not my question. My question is this,
11 sir. Do you agree, as a licensed registered
12 pharmacist, with this statement: Patients and
13 physicians should remain alert to signs and symptoms
14 of GI ulcerations and bleeding during NSAID therapy
15 and promptly initiate additional evaluation and
16 treatment if a serious GI event is suspected.
17 Further, this should continue -- excuse me -- this
18 should include discontinuation of the NSAID until a
19 serious GI adverse event is ruled out.
20      MR. DOYLE: Objection. There was nothing --
21   Q. Do you agree with --
22      MR. DOYLE: -- in the statement relating to
23 pharmacists. You can answer if you know.
24   Q. Do you agree or disagree, as a licensed
25 registered pharmacist, with that statement?

19 (Pages 70 to 73)

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

---

Page 74

1    A.  It's not really in the scope of practice of
2  pharmacy.  I agree with it up until the end.  The
3  risk, you should be on the lookout for, yes.  Should
4  it be discontinued while the patient has been worked
5  up by a trained professional?  I -- that's their
6  professional call at that point.  So yes to most of
7  that.
8    Q.  Have you had training or in your training,
9  have you learned about the potential side effects of
10 these NSAIDs, such as Motrin?
11   A.  Yes.
12   Q.  And are you aware that second only to
13 H-pylori, NSAID use is the most prevalent and
14 recognized cause of GI bleeding?
15   A.  Yes.
16   Q.  Okay.  And because of that, clinicians should
17 be alert to the potential for GI bleeding whenever
18 NSAIDs are prescribed to be given over a period of
19 time?
20   A.  Yes.
21        MR. DOYLE:  Objection.  Captain Folmar is a
22 pharmacist, and you're talking about clinicians.
23   Q.  I want to be really clear with you, Captain
24 Folmar.  You have undertaken to educate yourself to be
25 a registered licensed pharmacist; is that correct?

---

Page 75

1    A.  Yes.
2    Q.  And that license allows you to participate in
3  the dispensing of medications to patients; is that
4  correct?
5    A.  Yes.
6    Q.  And in terms of knowledge about drugs, would
7  it be fair to say while you don't prescribe them, part
8  of your education, training, and clinical experience
9  is to be aware of the nature of that drug and the use
10 of that drug in human beings?
11   A.  Yes.
12   Q.  And --
13        (Brief interruption)
14   Q.  And while physicians may prescribe
15 medication, do you leave your education and clinical
16 training and responsibilities that you hold as a
17 licensed pharmacist at the door when you are
18 dispensing these medications to patients?
19   A.  Do I leave my license at the door?  Is that
20 what you're saying?
21   Q.  No, sir.  Do you just ignore what you know
22 from your education, training, and clinical
23 experience?
24   A.  Of course not.
25   Q.  Even if a doctor prescribes something, you

---

Page 76

1  also have a part to play in that scheme of making sure
2  that that drug matches up with what it needs be given
3  for and how it might potentially impact that patient?
4        MR. DOYLE:  Objection.  You can answer if you
5  understand it.
6    A.  My job is to match the drug with the
7  diagnosis, yes.
8    Q.  And so all these questions I've been asking
9  you about these medications, I mean, that's part of
10 your training and education and clinical experience.
11 I mean, you know about these drugs; is that correct?
12   A.  Hopefully.
13   Q.  Hopefully?
14   A.  That's yes.
15   Q.  I've had pharmacists tell me that they really
16 actually know more about these drugs than the
17 physicians on a good day.
18        MR. DOYLE:  Objection.
19   Q.  Well, at least about the pharmacokinetics and
20 the pharmacology that are the basis of the drugs.  Do
21 you think that's fair?
22        MR. DOYLE:  Objection.
23   A.  I think it's fair to say I was trained in
24 medications, yes.
25   Q.  A dose of 800 milligrams TID, would you

---

Page 77

1  characterize that as a high or low dose of ibuprofen?
2    A.  I would characterize it as an average dose.
3  That's not your question, though.
4    Q.  No, it isn't.
5    A.  I know that 3200 milligrams a day is the
6  maximum, so I -- when I see a prescription for Motrin
7  800 milligrams three times a day, I've seen it a
8  thousand times or more, 10,000 times.  I'm not
9  concerned with it.  It doesn't prompt me to call a
10 physician, no.
11   Q.  No.  And I don't mean that.  It's a
12 recognized prescribing regimen, right?
13   A.  Right.
14   Q.  Okay.  But I'm just trying to ask you about
15 in terms of the dose of Motrin that can be given, it
16 ranges anywhere from, what, 200 Q6 in an adult all the
17 way up to 3200 as a maximum daily dose; is that
18 correct?
19   A.  200 or four, six, yes.
20   Q.  Okay.  Would you characterize 800 milligrams
21 TID to be at the higher end of that spectrum?
22        MR. DOYLE:  Objection.  He's already
23 explained it.  You --
24        MS. COCHRUN:  Do you have an objection to the
25 form of my question, sir?

JOHN COGGIN v. UNITED STATES OF AMERICA                          11/6/2007
DEPOSITION OF DAVID FOLMAR

Page 78

1    MR. DOYLE: I do.
2    MS. COCHRUN: So noted.
3    Q. You can answer.
4    A. All right. 200 every four hours is 1200 a
5 day. So 1200 to 3600, I'd calculate it dead smack in
6 the middle, right?
7    Q. Right.
8    A. An average, a median dose.
9    Q. Would you expect that with 800 milligrams
10 three times a day, that you might see more GI distress
11 than you would at a lower dose?
12    MR. DOYLE: Objection. If you know.
13    A. I haven't seen any data; but, theoretically,
14 a higher milligram dosage of Motrin could potentially
15 cause more; but I have seen no data to back that up.
16    Q. Based on what you know about ibuprofen, sir,
17 is it possible that someone taking 800 TID, even with
18 meals, might experience GI distress?
19    A. It's possible.
20    Q. At 800 milligrams TID, would that dose be a
21 dose that someone could actually suffer one of the
22 adverse GI events we've described, such as erosion or
23 bleeding of the stomach?
24    MR. DOYLE: Objection. It mischaracterizes
25 his prior testimony. You can answer.

Page 79

1    A. At any dose.
2    Q. At any dose?
3    A. Yes.
4    Q. So if someone was to say that it's impossible
5 for Motrin to cause these adverse GI events at 800
6 milligrams TID, they would be wrong?
7    MR. DOYLE: Objection. You can answer.
8    A. In my opinion, there is a risk.
9    Q. Or they may just not understand about this
10 drug if they were to hold fast to that belief?
11    A. I don't know.
12    Q. Okay. It wouldn't be correct, based on your
13 education, training, and clinical experience as a
14 pharmacist, though?
15    A. As a pharmacist, I -- the dose could cause
16 that.
17    Q. In fact, a dose of 600 milligrams TID could
18 cause it?
19    A. In my opinion, yes.
20    Q. A dose of 400 milligrams TID could cause it?
21    A. In my opinion, yes.
22    Q. A dose of 200 milligrams TID could cause it?
23    A. Yes.
24    Q. So it does not need a dose in excess of 800
25 milligrams a day to cause it, does it?

Page 80

1    A. It doesn't need a dose higher than that?
2    Q. Uh-huh.
3    A. For causing of ulcers?
4    Q. Yeah.
5    A. Any doses of Motrin could theoretically cause
6 GI upset, GI perforations, ulcers, in the right
7 individual, the right circumstances, yes.
8    Q. Okay. So it's not some magic over 800
9 milligrams TID that suddenly causes these GI
10 problems. It can be caused even at much lower doses?
11    A. In my opinion, yes. I've never seen a chart
12 that shows any ratio tied to the dosage. If it
13 exists, I don't know.
14    Q. All right. So my question is -- and I may
15 not have been clear. As a pharmacist, is it your
16 testimony that you can have these adverse GI events
17 that we've been discussing at the low dose as well as
18 at the high dose or the higher doses of this
19 prescription?
20    A. My opinion is yes.
21    Q. Okay. And --
22    A. But I don't know the prevalence.
23    Q. Okay. But it can happen?
24    A. Yes, I think so.
25    Q. Okay. I guess my question is that if

Page 81

1 somebody experiences a GI bleed, that doesn't mean
2 they had exceeded 800 milligrams of Motrin per day,
3 does it?
4    MR. DOYLE: Objection. If you know.
5    A. You can have a GI bleed without taking
6 Motrin. I'm not sure I'm following you.
7    Q. I'm going to try to make it real clear.
8 Let's see if I can -- I know you're a little jetlaged,
9 so I'm going to try to. John Coggin.
10    A. Uh-huh.
11    Q. We know he's had a GI bleed, correct? I
12 mean, do you know that?
13    A. Looks like he went to Baptist with a GI
14 bleed, yes.
15    Q. I want you to assume that he had a GI
16 bleed. Okay? Because I know in the records -- you
17 haven't really reviewed the chart. Okay?
18    All right. Fair enough. Based on what you know
19 about this drug, did he have to exceed 800 milligrams
20 of Motrin per day taken with meals in order to get a
21 GI bleed, or could he have developed it at that very
22 dose?
23    A. I guess I'm -- the point is -- are you saying
24 800 TID or 800 total daily dose? That's what I
25 want --

JOHN COGGIN v. UNITED STATES OF AMERICA                          11/6/2007
DEPOSITION OF DAVID FOLMAR

Page 82

1    Q.  No.  800 TID.
2    A.  800 TID?
3    Q.  Uh-huh.
4    A.  You can develop a GI bleed at 800 TID, yes,
5  and lower dose, yes.
6    Q.  He doesn't have to exceed 800 TID?
7    A.  You can develop a GI bleed, in my opinion, at
8  800 TID, yes.
9    Q.  Or even lower?
10   A.  Yes.
11   Q.  All right.  What do you think the risk to
12  Mr. Coggin developing the GI bleed would be if he was
13  continuing to take the Motrin and then was taking the
14  Anaprox on top of it for those three or four days?
15       MR. DOYLE:  Objection.  If you know.
16   A.  Those four tablets we concluded perhaps.  But
17  if you're taking two nonsteroidals, theoretically, the
18  risk increases.  There's no way to quantify the risk,
19  in my opinion.
20   Q.  But it would be higher; you just can't
21  quantify it.
22   A.  I would think so.
23       MS. COCHRUN:  That's all I have.
24
25

Page 83

1        REDIRECT EXAMINATION
2  BY MR. DOYLE:
3    Q.  Captain Folmar, I want to invite your
4  attention to Nurse Little's encounter with John Coggin
5  on 8/22 and 8/23.  Do you know whether or not Nurse
6  Little told Mr. Coggin anything with respect to his
7  Motrin on either of those days?
8    A.  No, sir.  According to the notes, I don't see
9  anything about it.
10   Q.  So you would have no idea whether she did or
11  not?
12   A.  I have idea.
13   Q.  And inviting your attention to what's been
14  marked as Defendant's Exhibit #1.
15   A.  Yes, sir.
16   Q.  At the bottom of Bates number 64, where that
17  Sulindac --
18   A.  Yes, sir.
19   Q.  -- sticker appears, you don't know whether or
20  not John Coggin ever received Sulindac, do you?
21   A.  I have no way of knowing.
22   Q.  And are you an expert on the current
23  literature on the risks associated with ibuprofen
24  related to the patient, dosage, length of regimen, or
25  do you hold -- or any other factors?  Do you hold

Page 84

1  yourself out as an expert in any of those fields?
2       MS. COCHRUN:  Object to form and --
3       MR. DOYLE:  You can go ahead and answer.
4       MS. COCHRUN:  -- and as to the
5  characterization of holding himself out as an expert
6  one way or the other.
7    Q.  Oh, you're --
8    A.  I consider myself a pharmacist, just a
9  regular pharmacist.
10   Q.  All right.  And the same question with
11  respect to the literature on the risks of ibuprofen as
12  it existed in 2001.  Your knowledge is that of an
13  ordinary pharmacist?
14   A.  Of a pharmacist, yes.
15       MR. DOYLE:  That's all I have.
16       RECROSS-EXAMINATION
17  BY MS. COCHRUN:
18   Q.  Can we look at page 14 of the chart?
19   A.  Page 14.
20   Q.  See the little numbers at the bottom?
21   A.  Yes.  Yes.  Thank you.
22   Q.  I think you've testified heretofore that you
23  don't know what Nurse Little told John Coggin one way
24  or the other on the 23rd; is that correct?
25   A.  I wasn't privy to their conversation, right.

Page 85

1    Q.  And it doesn't reflect that she, in the
2  chart, discontinued the Motrin at that time; is that
3  correct?
4    A.  On page 14, there's nothing with Ms. Little
5  here.
6    Q.  Oh, I'm sorry.  On page 16.
7    A.  Okay.  No, ma'am.  Reading these two entries
8  by Nurse Little, I do not see anything related to
9  ibuprofen.
10   Q.  All right.  On the 27th, is there anything
11  that reflects a discontinuation of the Motrin and the
12  Anaprox at that time?
13   A.  On 8/27, Dr. Garcia wrote Sulindac, 200
14  milligrams.  And then he wrote DC Motrin, Anaprox,
15  explained not to take unless directed.
16   Q.  Do you know whether that drug was
17  discontinued on the 27th?  I mean, you never saw this
18  chart, I guess, after that fill of Sulindac; is that
19  correct?
20   A.  Do I know if Sulindac was filled?  What was
21  the question?
22   Q.  Right.  Was the Sulindac filled?  I think
23  we've established that you don't know.
24   A.  Well, there's a sticker in the chart, so --
25  but it doesn't have my initials on it.  And I was

22  (Pages 82 to 85)

JOHN COGGIN v. UNITED STATES OF AMERICA                    11/6/2007
DEPOSITION OF DAVID FOLMAR

Page 86

1  pretty anal, again, about stamping things.  So --
2      Q.  Okay.  All right.
3      A.  I don't know if he got it.
4      Q.  And this chart reflects DC Motrin and
5  Anaprox, explained not to take unless directed PRN for
6  pain?
7      A.  Yes.
8      Q.  Is that the first time that you see any
9  reflection in the chart that the Anaprox and Motrin
10 were discontinued?
11     A.  That's the first time I see a DC Motrin
12 prescription, yes.  And also there's an Anaprox on the
13 23rd, Anaprox BID; 27th, stop Anaprox -- or DC
14 Anaprox.  Yes.
15     MS. COCHRUN:  That's all I have.  Thank you.
16     MR. DOYLE:  We're done.
17         (The deposition concluded at
18         11:43 a.m.)
19     * * * * * * * * * *
20     FURTHER DEPONENT SAITH NOT
21     * * * * * * * * * *
22
23
24
25

Page 87

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  AUTAUGA COUNTY
4      I, Heather Barnett, Certified Court Reporter and
5  Commissioner for the State of Alabama at Large, hereby
6  certify that on Tuesday, November 6, 2007, I reported
7  the deposition of DAVID FOLMAR, who was first duly
8  sworn or affirmed to speak the truth in the matter of
9  the foregoing cause, and that pages 4 through 86
10 contain a true and accurate transcription of the
11 examination of said witness by counsel for the parties
12 set out herein.
13     I further certify that I am neither of kin nor of
14 counsel to any of the parties to said cause, nor in
15 any manner interested in the results thereof.
16     This 9th day of November, 2007.
17
18
19     _____
       HEATHER BARNETT, CCR
20     Commissioner for the
       State of Alabama at Large
21     Alabama License No. 436
22     MY COMMISSION EXPIRES: 3/30/11
23
24
25

76988476-61d7-4609-9c9f-84c9f48976ca