JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOHN COGGIN,

        Plaintiff,

vs.                                CASE NO. 2:05-cv-1214-F

UNITED STATES
OF AMERICA,

        Defendant.




            * * * * * * * * * * *


        DEPOSITION OF PHILLIP DOYLE SMITH, M.D.,
taken pursuant to stipulation and agreement before Dee
Coker, Registered Professional Reporter and
Commissioner for the State of Alabama at Large, in the
Law Offices of Pate, Lloyd, Fuston & Cochrun, 400
Title Building, 300 North 21st Street, Birmingham,
Alabama, on Thursday, December 13, 2007, commencing at
approximately 1:06 p.m.


            * * * * * * * * * * *

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

2 (Pages 2 to 5)

---

Page 2

1              APPEARANCES
2   FOR THE PLAINTIFF:
3   Ms. Julia Truesdell Cochrun
    PATE, LLOYD, FUSTON & COCHRUN, LLP
4   Attorneys at Law
    Post Office Box 10448
5   Birmingham, Alabama 35202-0448
6   FOR THE DEFENDANT:
7   Mr. Stephen M. Doyle
    Assistant United States Attorney
8   OFFICE OF THE UNITED STATES ATTORNEY
    FOR THE MIDDLE DISTRICT OF ALABAMA
9   131 Clayton Street
    Montgomery, Alabama 36104
10
11          * * * * * * * * * * *
12          EXAMINATION INDEX
13  PHILLIP DOYLE SMITH, M.D.
        BY MR. DOYLE          4
14      BY MS. COCHRUN       127
15          EXHIBIT INDEX
16  DEFENDANT'S EXHIBIT NO.:
17  1  CV for Phillip          5
        Doyle Smith, M.D.
18
    2  8/29/07 opinion of Dr. Smith   108,128
19
    3  10/4/07 Expert Witness Report   114,122
20     of Patrick I. Okolo, III, MD
21  4  Dr. Smith's hourly rate for    123
       participation in legal review
22     and testimony in Coggin vs. US
23          * * * * * * * * *
24          STIPULATIONS
25      It is hereby stipulated and agreed by and

---

Page 3

1   between counsel representing the parties that the
2   deposition of PHILLIP DOYLE SMITH, M.D., is taken
3   pursuant to stipulation and agreement; that all
4   formalities with respect to procedural requirements
5   are waived; that said deposition may be taken before
6   Dee Coker, Registered Professional Reporter and
7   Commissioner for the State of Alabama at Large,
8   without the formality of a commission; that objections
9   to questions other than objections as to the form of
10  the questions need not be made at this time but may be
11  reserved for a ruling at such time as the deposition
12  may be offered in evidence or used for any other
13  purpose as provided for by the Alabama Rules of Civil
14  Procedure.
15      It is further stipulated and agreed by and
16  between counsel representing the parties that the
17  filing of the deposition is hereby waived and that the
18  deposition may be introduced at the trial of this case
19  or used in any manner by either party hereto provided
20  for by the Statute.
21          * * * * * * * * * *
22      PHILLIP DOYLE SMITH, M.D.
23      The witness, having first been sworn to speak
24  the truth, the whole truth, and nothing but the truth,
25  testified as follows:

---

Page 4

1              EXAMINATION
2   BY MR. DOYLE:
3       Q.  Could you please state your full name for the
4   record.
5       A.  Phillip Doyle Smith.
6       Q.  And give me your address, please.
7       A.  942 Conroy Road, Birmingham.
8       Q.  Dr. Smith, have you had your deposition taken
9   before?
10      A.  Once before.
11      Q.  And when was that?
12      A.  It must have been about three years ago.
13      Q.  Okay.  What was the nature of that
14  deposition?
15      A.  It was a case dealing with a woman who died
16  following eating at a fast food restaurant.  And the
17  family claimed that she died of gastrointestinal
18  infection, which is one of my specialties.
19      Q.  Okay.  And were you an expert witness in that
20  case?
21      A.  Yes.
22      Q.  I'm just going to explain the procedure here
23  since you've only been deposed once.
24      A.  Sure.
25      Q.  This is a court proceeding.  Your testimony

---

Page 5

1   is under oath just as if you were in court, although
2   no judge is present.  Do you understand that?
3       A.  Yes.
4       Q.  When I ask a question, I ask that you please
5   listen to the question and answer when I'm finished.
6   The court reporter is going to be taking a verbatim
7   transcript, and the worst thing for taking a
8   transcript is when people are talking at the same
9   time, so if you'll let me finish.  And we'll speak one
10  at the time.  Is that okay?
11      A.  Yes.
12      Q.  And if you don't understand my question,
13  please just let me know; and I'll be happy to rephrase
14  it.  If you need to take a break at any time, just let
15  me know; and we'll be happy to do that.  If there is a
16  question pending, I'd ask that you answer it before we
17  take a break.  Okay?
18      Do you have any questions about the procedure
19  today?
20      A.  No.
21      Q.  Okay.  I'm going to -- Doctor, I'm going to
22  show you an exhibit that I'm going to have marked as
23  Defendant's Exhibit #1.  It's a multi-page -- it's
24  your CV.  It's a multi-page exhibit.  It starts at
25  page number 750 and goes through 775.

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

3 (Pages 6 to 9)

Page 6

1    Do you recognize that?
2    A.  Yes, I do.
3    Q.  Please feel free to -- this should just help
4  us get through the background a little faster.  Can
5  you take a quick look at that and make sure that
6  that's your current CV?
7    A.  It's not my current CV.
8    Q.  Okay.  Do you have a more updated one?
9    A.  Not with me.
10     MS. COCHRUN:  Did you add two more articles
11  or something?
12     THE WITNESS:  One article on peptic ulcer
13  disease.  There's an article that's not included in
14  here that's been accepted and will be published in the
15  February issue of Gastroenterology on peptic ulcer
16  disease.
17    Q.  Okay.  And what's the -- the broad topic is
18  peptic ulcer disease?
19    A.  Yes.
20    Q.  Does it have a specific topic?
21    A.  It's comparing peptic ulcer disease in
22  children and adults and the underlying differences in
23  the pathophysiology of ulcer disease in children
24  versus adults.
25    Q.  And when will that be published?

Page 7

1    A.  In February.
2    Q.  Other than that, is this CV current?
3    A.  Several recent presentations are not
4  included.
5    Q.  Can you just briefly tell me what those are?
6    A.  Yes.  I gave a talk -- two talks in France in
7  November, and I gave a talk in Stockholm in November.
8    Q.  And what was the topic?  We'll start with the
9  ones in France.
10    A.  The first talk in France was on mucosal
11  immunology and HIV vaccine development.
12    Q.  And the second?
13    A.  The second talk, at the end of the last
14  month, was on macrophage function in the
15  gastrointestinal mucosa in patients with HIV infection
16  and in vitro studies related to that topic.
17    Q.  And what was the topic of the presentation in
18  Stockholm?
19    A.  The topic there was the mechanism by which
20  cytomegalovirus induces inflammation and ulceration in
21  the gastrointestinal tract mucosa.
22    Q.  Okay.  Other than that, is your resume --
23  your CV current?
24    A.  I think it probably is, although there seems
25  to be some blank pages there.

Page 8

1    Q.  That's probably my copy machine.  If they
2  don't have a Bates number on them, it's my copy
3  machine that screwed up.
4    A.  So it doesn't mean that I published less
5  papers than I thought I had?
6    Q.  No.  Can you run through your education for
7  me, briefly?
8    A.  I -- beginning with grammar school?  High
9  school?
10    Q.  No.  With your undergraduate education would
11  be fine.
12    A.  I attended and graduated from the University
13  of California at Berkeley, after which I went to
14  medical school at the University of Rochester in New
15  York.  I took a year out of medical school on
16  fellowship to do research on RNA polymerase, yeast RNA
17  polymerase.  I had a fellowship to take a year out of
18  medical school to study that at the University of
19  Vienna in Austria.
20    I then did my house staff training internship and
21  general residency at Vanderbilt.  Let's see.  I
22  then -- after Vanderbilt, I went to the University of
23  Colorado, where I did a fellowship in
24  gastroenterology.  Part of that fellowship included
25  training in infectious diseases, specifically,

Page 9

1  parasitic diseases at the University of Natal in
2  Durban, South Africa.
3    After that, I went to NIH.  And I was at NIH for
4  nine years and eventually becoming a tenured senior
5  scientist at NIH.
6    Q.  And I'm going to want to follow up on that in
7  a second, Doctor.
8    A.  Sure.
9    Q.  Can you describe in general how your
10  internship and residency -- what did that consist of?
11    A.  Well, internship was in internal medicine --
12  you do one year -- at Vanderbilt.  In those days, so
13  to speak, you're on call for 36 hours and you have 12
14  hours off for about 10 months out of the year.  And
15  it's all types of internal medicine problems.  You
16  rotate through the intensive care unit.
17    Q.  And how long does the internship period last?
18    A.  That's one year.  And then two years of
19  residency.  That's the same still today, although we
20  worked a lot harder and learned a lot more back then
21  because nowadays there's all --
22    Q.  Okay.  And what -- can you describe in
23  general what your residency consisted of?
24    A.  It was really an extension of internship;
25  only after internship, you become a resident and you

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

4 (Pages 10 to 13)

Page 10

1  have interns that you're responsible for.  So you take
2  care of patients on the wards, predominantly, and you
3  also have a clinic during residency.  Usually we don't
4  have a clinic as an intern.  In those days, it was
5  mostly hospital care.  As an intern, as a resident,
6  it's a lot of supervision of interns and you have a
7  clinic.
8      Q.  And what is the -- can you describe what the
9  clinic means?
10     A.  Oh, you take care of internal medicine
11 patients.  Any patient with an internal medicine
12 problem could come to your clinic.
13     Q.  Okay.  And when did you complete your
14 residency?
15     A.  In 1976.
16     Q.  Okay.  Is that when you sat for the board in
17 internal medicine?
18     A.  Yes.
19     Q.  Okay.  And what did you do after that?
20     A.  I did a fellowship in gastroenterology.
21     Q.  And what does that consist of?
22     A.  It was three years of focusing on
23 gastroenterology.  You see patients with the entire
24 spectrum of gastrointestinal diseases that occur in
25 the United States, at least.  I did take three months

Page 11

1  of my fellowship, with university approval -- because
2  I was particularly interested in gastrointestinal
3  infections, and so I studied and saw patients and
4  treated patients in Durban, South Africa,
5  predominantly patients with infectious
6  gastrointestinal problems.
7      Q.  Where did you do your gastroenterology
8  fellowship?
9      A.  It was at the University of Colorado and the
10 medical schools in Denver.
11     Q.  Okay.  And at some point, did you become
12 board certified in gastroenterology?
13     A.  Yeah, after I took my -- after fellowship.
14     Q.  Okay.  And what does the board certification
15 consist of?
16     A.  Well, it's a two-day exam.  They just ask you
17 lots of questions on cases.
18     Q.  And is that a specialty board of the internal
19 medicine board?
20     A.  Yes.
21     Q.  Do you hold any other board certifications?
22     A.  No.  Just internal medicine and
23 gastroenterology.
24     Q.  Now, you had mentioned that -- is it
25 following your -- the fellowship that you went to NIH?

Page 12

1      A.  Yes.
2      Q.  And what were your -- how long did you stay
3  at NIH?
4      A.  I was there for nine years.
5      Q.  Okay.  Which years were those?  Feel free to
6  look at your CV as well.  That's why it's there.
7      A.  Let's see.  I came here in 1992, so I guess
8  it was 1983 to 1980 -- 1983 to 1992.
9      Q.  Okay.  I'm going to invite your attention to
10 number 751 on your CV.  When I refer to a Bates
11 number, I mean those little numbers on the lower
12 corner.
13         MS. COCHRUN:  That's what he's talking about,
14 that number.
15         THE WITNESS:  Okay.
16     Q.  And about the middle of that page, it's got
17 the NIH, your period of employment there; is that
18 right?
19     A.  Yes.  So it was 1980 -- yes, 1983 to 1992.
20     Q.  Can you explain -- you've broken it into two
21 different periods.  You've got --
22     A.  Sure.  I went there as a guest investigator,
23 and I liked what I was doing, and they liked what I
24 was doing, and so they asked me to stay.  So I stayed
25 on, then as a senior what's called a staff fellow.

Page 13

1  And I liked doing that, and the research went very
2  well, so then they asked me to stay on indefinitely.
3  So I became a senior investigator, which means you
4  have tenure.  And that means that you have a position
5  for the rest of your life there.
6      Q.  Tell me about when you were -- when you
7  started as a guest investigator.  What sort of
8  research were you working on?
9      A.  I was working on a parasite, Giardia
10 lamblia.  G-I-A-R-D-I-A lamblia.  That's capital G and
11 then small L-A-M-B-I-A.
12     Q.  And what was the nature of your research on
13 Giardia?
14     A.  Well, we studied the mechanism by which it
15 causes malabsorption and diarrhea.  We were the first
16 people to actually culture the organism.  And,
17 following that, it was passed around the world and
18 people used what we cultured to study the biochemistry
19 and the physiology in the organism.
20     Q.  And was that primarily laboratory work?
21     A.  Yes.  The first two years, yes.
22     Q.  And did you see patients during those two
23 years?
24     A.  No.  Well, to be honest with you, I didn't
25 see -- I will always be honest with you.

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

5 (Pages 14 to 17)

---

Page 14

1    MS. COCHRUN: He said he will always be
2 honest, in a manner of speaking.
3    A. I didn't see patients at NIH, but Washington
4 was pretty expensive, so I did some moonlighting.
5 Well, I did a lot of moonlighting at that time.
6    Q. Where did you moonlight?
7    A. In West Virginia emergency rooms, a couple of
8 places around Washington, but mostly in West Virginia
9 because you get --
10    Q. And just to jump ahead, would that be true of
11 your entire tenure at NIH from '80 to '92?
12    A. Well, after I became a senior staff fellow,
13 then I started seeing patients at NIH. I continued to
14 moonlight. I did all of the gastrointestinal
15 evaluations for the HIV-infected patients. So for
16 nearly eight years, I basically -- I was the only
17 person. I did all of the evaluations for HIV-infected
18 people, people with AIDS, at NIH. And so that
19 included seeing them, diagnosing, and also doing the
20 procedures, upper and lower gastrointestinal
21 endoscopy.
22    Q. Again, I'm just trying to follow your CV.
23 You go from the guest investigator position, and then
24 it says senior staff fellow and senior investigator.
25 And then you've got what appear to be two different

---

Page 15

1 sections of NIH, the Laboratory of Immunology and the
2 National Institute of Dental and Craniofacial
3 Research. Is that -- am I interpreting that
4 correctly?
5    A. Correct. So the Laboratory of Immunology was
6 a laboratory in which I was working. It was in the
7 NIDCR. I worked in that laboratory because that
8 laboratory had as its director a world-renowned
9 scientist who studied macrophages, and I was
10 interested in this cell in particular. It plays an
11 important role in host defense. And she's one of the
12 leading figures in the world. And so I worked in her
13 lab and eventually --
14    Q. What were your duties and responsibilities
15 there in the Laboratory of Immunology?
16    A. To do basic research on macrophages. And I,
17 because of my background in gastroenterology, sort of
18 carved out an area in which we focused on macrophages
19 in the gastrointestinal tract mucosa. So at NIH, I
20 developed a technique by which we can isolate and
21 purify mucosal macrophages. So we were the first
22 people in the world to be able to do that. And that's
23 an important component of my research here at UAB.
24    Q. And is it fair that your work in the
25 Laboratory of Immunology was not clinical work? Is

---

Page 16

1 that correct?
2    A. Well, it was -- much of -- so the patients
3 that I saw had infections. They were HIV-infected
4 patients, and I saw them predominantly for their
5 gastrointestinal infections. And so we would obtain
6 tissues or the organisms that they were infected with,
7 and then we would study them in the laboratory. So it
8 was directly related to the work that I was doing in
9 seeing the patients.
10    So for me it was a fabulous opportunity, because
11 nobody else wanted to touch these patients, and so I
12 could see them and study their infections both
13 clinically. So we published a number of papers on
14 clinical manifestations -- that is, the
15 gastrointestinal manifestations of HIV infection --
16 and then also on the basic pathophysiology of the
17 infections with which they were infected.
18    Q. Now, if you can give me the percentages of
19 how you divided your time between laboratory work and
20 clinical work seeing patients.
21    A. It was probably -- during my working time at
22 NIH, it was probably 25 or 30 percent.
23    Q. 25 or 30 percent with patients?
24    A. Yes. Of course, on weekends, the shifts were
25 often 16 hours. So on the weekend, I saw more than

---

Page 17

1 enough patients to --
2    MS. COCHRUN: To make up for the difference?
3    Q. Is it fair to say that 25 to 30 percent were
4 with patients; 70 percent or 75 percent was in the
5 laboratory?
6    A. Correct.
7    Q. And what years would that cover, the
8 Laboratory of Immunology?
9    A. It would have been '80 -- the end of '82 to
10 '89 -- I'm sorry -- to '92. So all --
11    Q. I'm sorry. I -- the Laboratory of Immunology
12 I guess I'm confusing with the National Institute of
13 Dental and Craniofacial Research.
14    A. It's the same thing.
15    Q. Same thing. Okay.
16    A. That institute has multiple different
17 laboratories like any institute at NIH has.
18    Q. Is it -- I guess it's really sort of out of
19 curiosity, frankly. Is it misnamed, Dental and
20 Craniofacial Research?
21    A. No. It does it all.
22    Q. It doesn't seem to -- okay. So that would
23 encompass the GI tract?
24    A. Oh, definitely.
25    Q. Does dental and craniofacial research

JOHN COGGIN v. UNITED STATES OF AMERICA                                12/13/2007
Deposition of Phillip Smith, M.D.

6 (Pages 18 to 21)

Page 18

1  encompass the GI tract?
2      A.  Well, it certainly encompasses the beginning
3  of the gastrointestinal tract, but they were
4  interested in what I was doing because I brought in a
5  new focus; namely, the study of HIV infection in the
6  mucosa and, in particular, the interaction between the
7  pathogens that HIV-infected people acquire because
8  they're immunosuppressed and cells in the mucosa, in
9  particular macrophages.
10     So while I was learning monocyte macrophage
11 immunobiology from the laboratory chiefs, so to speak,
12 I extended that to the mucosa.  Because the cells in
13 the mucosa are different than the cells in the blood.
14     Q.  And is that research area, HIV infection in
15 the mucosa, still your primary area of research?
16     A.  It's one of the areas of research.
17     Q.  Doctor, can you describe for me your
18 moonlighting activities while you were at NIH?
19     A.  In what sense?
20     Q.  That's not entered on your CV; is that right?
21     A.  Correct.  Because you weren't supposed to do
22 it, so I was a little reticent to --
23     Q.  Well, if you can just tell me --
24     A.  I worked in the emergency room because I like
25 taking care of patients and in the emergency room, you

Page 19

1  see lots of patients.
2      Q.  And approximately how many days a month did
3  you do this?
4      A.  Oh, several.  At least every other weekend.
5  So -- and the shifts would usually start -- well, they
6  were usually 16-hour shifts.  It depends on when I
7  would start.  But if I started at midnight on a Friday
8  night, I'd finish at four o'clock on Saturday.
9      Q.  And what years did you do that?
10     A.  All the years.
11     Q.  All the years at NIH?
12     A.  Yeah.
13         MS. COCHRUN:  The government doesn't pay very
14 well.
15     Q.  And why did you -- when did you leave NIH?
16     A.  Let's see.  I left on Friday, November 13th,
17 and flew to Birmingham.  My wife --
18     Q.  That's November of '92?
19     A.  Yes.  And started work on November 16th,
20 1992.
21     Q.  And why did you decide to leave NIH?
22     A.  Two reasons.  One, I wanted to see if I could
23 make it on my own.  At NIH, there's always -- you
24 know, from the outside, you often have to wonder --
25 one does wonder in academia, if this person were at a

Page 20

1  university, could this person be successful.  And so
2  that was one reason.  I wanted to see if I could do it
3  on my own.
4      Another reason is I wanted to experience the sort
5  of esprit de corps again of an academic center at a
6  university.  And that was another reason.
7      A third reason was there's very little mucosal
8  immunology at NIH.  And UAB at the time, probably
9  still, is the most renowned, has the most renowned
10 group in mucosal immunology in the world.  And I
11 wanted to be a part of that team.  And they recruited
12 me here, wanted me to be a part of that team.
13     I guess another reason is my wife's family lives
14 in Washington, and she didn't want to be near her
15 family.  And I didn't either.
16     Q.  Can you just tell me very briefly --
17     A.  She won't have access to these records, will
18 she?
19     Q.  That's up to you, Doctor.
20     Very briefly, can you tell me what mucosal
21 immunology encompasses?
22     A.  It's the study of the cells and -- the immune
23 cells and the immune reactions of those cells that are
24 in the mucosa.  The mucosa is -- are the body surfaces
25 that line the gastrointestinal tract, the genital

Page 21

1  tract, the respiratory tract, even the eyes.  Those
2  are all mucosal surfaces.
3      Q.  And would you agree with me that mucosal
4  immunology is not involved in this case?
5      A.  No, I would not.  This gentleman had an ulcer
6  involving the mucosa of his stomach.
7      Q.  And would the immune cells be involved in
8  that process?
9      A.  Certainly.
10     Q.  I'm looking at your CV, and you've got
11 several different positions listed at UAB.  I'm just
12 going to ask you to describe what the duties and
13 responsibilities of each of those are, starting with
14 the first where you have professor of medicine and
15 microbiology.
16     A.  Well, I'm a professor of medicine at UAB.  It
17 means that you have -- it means different things to
18 different faculty.  And for me, I have three sets of
19 responsibilities.  One is to teach, so we all teach.
20 We teach medical students and house staff, house staff
21 being interns and residents, and then fellows.  In my
22 case, it would be fellows in gastroenterology.  So
23 teaching is a mission of UAB.
24     Q.  And what percentage of your time is devoted
25 to teaching?

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

Page 22

1    A.  It depends on what time of year.  I'm -- the
2  time of year.  For example, two months out of the
3  year, I'm the attending on the university wards in
4  gastroenterology and/or consult service.  So
5  that's a six-day-a-week job, and you're responsible
6  for all the patients on the wards or all the
7  consults.  So it's a hugely demanding job.  And
8  sometimes you're seeing patients from eight in the
9  morning until four o'clock at nighttime, four in the
10  afternoon.
11    Q.  And what two months do you do that?
12    A.  It varies, but usually in the winter time.
13    Q.  Okay.  And where are --
14    A.  Teaching also involves giving lectures to the
15  interns and residents or medical students.  It also
16  involves supervising students or Ph.D.'s.  For
17  example, I have students in my laboratory in the
18  summertime.  We have a student who's going to spend a
19  year with us.
20    We also teach post-docs, people who have finished
21  their Ph.D. and are in a transition phase to their own
22  job.  So we teach medical students, and we teach all
23  the young doctors and Ph.D.'s.
24    Q.  What are some of your other duties in
25  addition to teaching?

Page 23

1    A.  I see patients.  So as an attending
2  physician, I'm responsible for those patients on the
3  wards or the consult service.
4    And I have a clinic, a clinic once a week; so I
5  see gastroenterology patients that are referred to the
6  university to the Kirklin Clinic.  And I see them one
7  morning a week and return patients as well.  And then
8  in the afternoon of that day, I will do the procedures
9  that are generated from their problems.
10    Q.  Is that all throughout the year?
11    A.  Yes.  And then every Wednesday, I supervise
12  fellows doing procedures at the VA Medical Center.
13    Q.  Which VA Medical Center?
14    A.  The only one in town.
15    Q.  Here in Birmingham?
16    A.  Yes.
17    Q.  We've got two in Central Alabama.
18    A.  The one in Tuscaloosa, you mean?
19    Q.  Tuskegee.  I'm from Montgomery.
20    A.  Oh.  I think the one here is the only one in
21  town.
22    Q.  And when do you work at the VA?
23    A.  That's Wednesday.  Wednesday.
24    Q.  Has this schedule been fairly consistent
25  throughout your time at UAB?

Page 24

1    A.  Yes.  Well, I used to do more.  There was a
2  time when I was doing three or four months of
3  attending.  And it's just not consistent with someone
4  who also does research; so it's been cut down to, at
5  my insistence, two months a year.
6    And then we are on call.  So every -- probably
7  about every sixth weekend, I'm on call.  And we are
8  responsible for all the new admissions or consults in
9  gastroenterology.
10    Q.  And how many professors are there in the
11  gastroenterology division?
12    A.  How many faculty or full professors?
13    Q.  Well, do both for me.
14    A.  I think there's about 18 in the division of
15  gastroenterology, and there's probably about six or
16  seven are professors.  I'd have to go through them.
17    Q.  That's roughly.  And what other duties and
18  responsibilities do you have?
19    A.  Well, I have administrative responsibilities.
20  I'm the director of a center at UAB.
21    Q.  And what does that mean?
22    A.  Well, we applied to NIH in one funding for
23  five years, and we just got renewed for another five
24  years.  It's the Mucosal HIV and Immunobiology Center,
25  so we -- we study -- we sort of pool resources and

Page 25

1  talent to study an array of diseases, three categories
2  of diseases, I would say.
3    One is H. pylori, the bacteria that causes
4  gastric ulcers.  We study HIV infection, which is also
5  a mucosal infection.  And we study inflammatory bowel
6  disease.  That's Crohn's disease and ulcerative
7  colitis.  So there are about 25 of us in the center.
8  And those three foci of academic interests unite us
9  together.
10    Q.  The other entry covering the same dates says
11  senior scientist, Center for AIDS Research at UAB.
12    A.  Yes.  So while I'm the director of our
13  center, there are about 24 other members.  So they
14  would be like a scientist in our center, just as I'm a
15  scientist in these centers.
16    Q.  And you could briefly tell me what your
17  duties and responsibilities are with the Center for
18  AIDS Research.
19    A.  These centers, both the Center for AIDS
20  Research and the Comprehensive Cancer Center, it's
21  research oriented; that is, I collaborate with other
22  investigators.  So I pool our -- my laboratory's
23  interests or I organize my laboratory's interests and
24  expertise and interact with people in these centers on
25  various research projects.

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

8 (Pages 26 to 29)

Page 26

1    Q.  And can you describe for me the type of
2  research you perform?
3    A.  My laboratory focuses on mucosal immunology
4  and, in particular, the pathogenesis of
5  gastrointestinal infections.  The three infections
6  that we study are HIV infection, cytomegalovirus
7  infection --
8    Q.  You need to spell that, I'm sure.
9    A.  Okay.
10      MS. COCHRUN:  CMV.
11    A.  You can say CMV.  C-Y-T-O-M-E-G-A-L-O-
12  V-I-R-U-S.  And capital H, period, pylori,
13  P-Y-L-O-R-I, H. pylori.  We study these three
14  infections from the perspective of the mucosa, what do
15  these organisms do to immune cells in the mucosa and,
16  vice versa, what do immune cells in the mucosa do to
17  these cells.
18    In addition, we study the basic immunobiology of
19  cells in the mucosa, such as macrophages, epithelial
20  cells and lymphocytes and, more recently, dendritic
21  cells, the four major types of immune cells in the
22  mucosa; because we uniquely are able to isolate and
23  purify these cells with techniques that I developed
24  while I was at NIH and have refined here.
25    then the other thing that we study, of course,

Page 27

1  is the pure immunobiology of these cells, I-M-M-U-N-O
2  biology, of these cells, what makes them unique, how
3  is a macrophage in the mucosa different from a
4  macrophage in the spleen, the liver, or even a
5  monocyte to the blood.
6    And then, finally, we study inflammatory bowel
7  disease, Crohn's disease.  So someone in my lab heads
8  up our studies on Crohn's disease.  And then more
9  recently, we have a grant to look at Celiac -- the
10  immunobiology of Celiac disease as well.
11      MS. COCHRUN:  C-E-L-I-A-C.
12      THE WITNESS:  The study of Celiac disease.
13    Q.  Doctor, what percentage of your time is
14  devoted to laboratory research?
15    A.  Again, it depends on the month.  So during
16  January and February, for example, it might be, I'm
17  embarrassed to say, 10 percent.  During May, when
18  we're getting ready for meetings and abstracts, it
19  might be 80 percent.  So it does vary.  Overall,
20  probably 60 percent of my time.
21    Q.  And would that include your writing would be
22  included in that percentage?
23    A.  Probably not.  Most of my writing I do at
24  home at nighttime.
25    Q.  What percentage, if you could give me the

Page 28

1  same type of analysis, of your time is devoted to
2  teaching duties?
3    A.  Well, certainly, sometimes it's difficult to
4  differentiate research and teaching because we have so
5  many people in the lab there; but in terms of -- I
6  guess I would say 5 percent.
7    Q.  And what percentage is devoted to
8  administrative duties?
9    A.  I try to minimize it by having a very, very
10  effective administrator; so I would say maybe 2
11  percent.
12    Q.  And what percentage is devoted to seeing
13  patients?
14    A.  35 to 40 percent.
15    Q.  I just want to continue.  I see in 2000 to
16  2001, you were on sabbatical; is that right?
17    A.  Yes.
18    Q.  Can you describe that sabbatical for me?
19    A.  I spent a year studying epithelial cells and
20  working on epithelial cells at the Institut Cochin in
21  Paris.
22    Q.  And how did you come to do that?
23    A.  Well, the first cell the HIV, for example,
24  interacts with is an epithelial cell.  And we
25  published a paper in 2002 in Nature Medicine on the

Page 29

1  interaction between HIV and epithelial cells and how
2  these cells select the type of HIV that everyone in
3  the world gets infected with initially.  So we -- so I
4  studied sort of basic biology of these cells in Paris
5  to be better able to extend our work here in
6  Birmingham.
7    Q.  And how did you get selected for that
8  fellowship?
9    A.  Well, it wasn't exactly getting -- part of it
10  was getting selected in the fact that I got -- I
11  received a fellowship from the French government as
12  well.  But I was entitled to a sabbatical because I
13  had been at UAB for six years.  And although my work
14  was funded, so anyone -- not anyone; but if you're
15  tenured, you're entitled to a sabbatical every seventh
16  year.  And if you convince the chairman of medicine
17  and the dean that you can support yourself during that
18  year, they will pay your salary for six months.
19    In my case, because -- frankly, because I had --
20  because all of my support, except for my clinical
21  revenue, was from NIH, it was no loss to the
22  university in terms of revenue because my grants would
23  still run the lab.  So they let me take a full year
24  sabbatical.
25    Q.  And during your sabbatical with INSERM, did

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

9 (Pages 30 to 33)

Page 30

1  you see patients?
2      A. No. But I paid a heavy price for that in
3  that when I came back, they made sure I made up for
4  the missed months of attending.
5      Q. Do you speak French?
6      A. A little.
7      Q. I'm going to invite your attention to page
8  Bates number 753. And you have a long list of
9  academic committees, and I'm not going to go through
10 each one. I'm just going to ask you, what is the
11 significance of being on an academic committee?
12     A. Well, it depends on the committee.
13     Q. Okay. I guess we'll start with what is an
14 academic committee?
15     A. Well, I see also that it doesn't -- the
16 committee -- well, for example, if you're on an NIH
17 study section, that, to be immodest, is an honor
18 because NIH views your input in the evaluation of
19 grants. So three times a year, we review grants from
20 other clinicians or scientists and evaluate them for
21 NIH, for the government, whether or not they're worthy
22 of being funded.
23     I see that -- also, I was recently elected to the
24 Board of Counselors for the Society for Mucosal
25 Immunology. So that's not on there. And that

Page 31

1  involves advising the president and vice president of
2  the committee -- basically, the counselors advise the
3  president and vice president and help run the
4  International Society for Mucosal Immunology.
5      Q. You have a section on research funding. It
6  starts at the bottom of page 758. Do you see
7  that?
8      A. Yes.
9      Q. I just want to ask you if you can invite or
10 direct my attention. Are any of your studies directly
11 related to the subject matter of this lawsuit?
12     A. Yes.
13     Q. And if you can point that out to me.
14     A. Let's look at, for example, on page 00760, at
15 the bottom, the Immunobiology and Prevention of
16 Helicobacter Pylori Gastritis. So that's the most
17 common cause of mucosal ulceration in the stomach and
18 duodenum worldwide and in the United States as well.
19     So that's what I -- that's directly related to
20 this case. The other -- that's the one that's
21 directly related to the case, I would say.
22     Q. And I want to ask the same question with
23 respect to your very impressive bibliography. If you
24 could, rather than going through each one, if you
25 could direct my -- and it begins at the -- at Bates

Page 32

1  number 762.
2      A. Okay.
3      Q. And if you -- could you direct my attention
4  to any of your publications that you feel are directly
5  related to the subject matter of this lawsuit?
6      A. Well, would it be possible to begin at the --
7  from the back and work our --
8      Q. Of course.
9      A. It might be easier to --
10     Q. I want to know which ones I need to read. I
11 don't want to keep you here for days and have you
12 describe them all to me.
13     A. Well, for example, 133, that one is the
14 publication that we're very happy about that's being
15 published in the February issue of Gastroenterology.
16 That's on the pathogenesis of ulcer disease in
17 children versus adults.
18     Q. Okay. Anything else that you think is
19 directly related to the subject matter of this
20 lawsuit?
21     A. Again, the word "direct." Everything is
22 ultimately related. We are working on a vaccine
23 against this bacteria that causes ulcer disease.
24     For example, reference number 123 is a study
25 that's been published on the vaccine. The cells that

Page 33

1  are involved in responding and mediating ulcer disease
2  of the stomach are described and referenced in 122.
3      There are a number of papers -- further papers on
4  H. pylori infection. And we can look at those.
5      Q. Yes. It's very helpful to me if you could
6  call them out by number.
7      A. Okay. For example, number 110, that looked
8  at Zollinger-Ellison syndrome, which causes -- it's a
9  neuroendocrine tumor that secretes gastrin that causes
10 gastric ulcer disease. And we looked at that in
11 relationship to H. pylori infection.
12     Let's see. There are -- number 102, that's
13 H. Pylori infection. Number 100, again H. pylori
14 infection. Number 99, H. pylori infection. 98,
15 H. Pylori infection.
16     Let's see. I think there are a couple -- number
17 84 is a chapter on a book on H. pylori infection.
18 Number 87, H. pylori infection. Number 80. Number
19 78.
20     Q. And those both involve H. pylori; is that
21 right?
22     A. Yes. There were a couple of others that
23 are -- frankly, I'm -- let's see. Number 54, again,
24 H. pylori infection. Number 55, H. pylori infection.
25     Let's see. And then number -- also number 59 is

Case 2:05-cv-01214-MEF-SRW     Document 50-5     Filed 01/04/2008     Page 10 of 36

JOHN COGGIN v. UNITED STATES OF AMERICA                          12/13/2007
Deposition of Phillip Smith, M.D.

10 (Pages 34 to 37)

Page 34

1 H. pylori infection. That's a -- try 59. That will
2 put you to sleep.
3      Let's see. I think those are the main ones that
4 are directly relevant.
5      Q. Doctor, have you done any research on
6 nonsteroidal anti-inflammatory drugs as the cause of
7 ulcers?
8      A. No.
9      Q. Can you tell me what the terms "primary,"
10 "secondary," "tertiary" and "quaternary care mean in
11 the healthcare field?
12      A. Well, I guess primary care would refer to the
13 setting in which patients first see a primary care
14 physician, that being a family physician or an
15 internist. They may refer patients that are
16 complicated or with whom they feel -- a physician
17 feels uncomfortable to a secondary referral center,
18 such as, you know, Brookwood or St. Vincent's
19 Hospital.
20      And a tertiary setting would be like UAB, the
21 university, where we specialize and focus on certain
22 diseases.
23      Q. And where does your practice with patients
24 fit into that?
25      A. It's certainly tertiary referral. We get

Page 35

1 patients that are complicated in the sense that I'm
2 referred patients with resistant H. pyloric infection,
3 persistent gastric ulcer disease, patients that have
4 chronic diarrhea, for example, and the physician is
5 worried about an unusual pathogen causing -- an
6 infectious organism causing that diarrhea.
7      At the same time, anyone in the city can call up
8 the Kirklin Clinic and ask to see a patient -- asked
9 to be seen as a patient. And so I see all comers in
10 that sense as well; but if you were to look up in the
11 UAB web site, it would say that my area of interest is
12 infectious problems of the gastrointestinal tract. So
13 we would get referrals from the Southeast, people with
14 infectious causes of gastrointestinal problems; but as
15 I said, we also see Mrs. Johnson's mother-in-law.
16      Q. Have you ever worked as a primary care
17 physician?
18      A. It depends on your definition of primary
19 care. At West Virginia, emergency rooms serve as
20 primary care for a lot of people. And so in that
21 sense, you know, I took care of everything, even
22 deliveries on Christmas eve, children, infants,
23 delivering babies, and adults.
24      Q. And that goes back to what years that you
25 worked in the emergency room?

Page 36

1      A. Up through the month that I came to UAB, I
2 was still working in the emergency room.
3      Q. Other than that, have you ever worked in
4 anything that you would consider primary care?
5      A. Not -- no.
6      Q. And is it fair to say that you're a tertiary
7 care gastroenterologist?
8           MS. COCHRUN: Object to form.
9      A. No, I don't think so. As I said earlier, I
10 see all comers. So if you develop some abdominal
11 pain, you can call up UAB. And I would be one of the
12 gastroenterologists at the Kirklin Clinic that
13 would -- that you could see.
14      Q. And what percentage of your patients would
15 fall into that category?
16      A. Probably -- probably two-thirds to
17 three-fourths.
18      Q. And the others would have --
19      A. The others would be referred for suspected
20 chronic or infectious diarrhea, abdominal pain. So we
21 get a lot of abdominal pains and a lot of diarrhea,
22 for example.
23      Q. What is the relationship between a primary
24 care physician and a specialist providing secondary or
25 tertiary care?

Page 37

1      A. Well, a primary care physician would see a
2 patient, evaluate the patient and the patient's
3 problems. And he would refer the patient if he was
4 unable to make that diagnosis or needed some help
5 endoscopically, for example, or a special procedure to
6 make the diagnosis or if he needed special help in
7 treating the patient.
8      Q. And do you get patients on referral from
9 primary care physicians?
10      A. Sure.
11      Q. When you do, do you typically have a
12 continuing dialogue with them? How does that
13 relationship work?
14      A. Yes. So, often I establish sort of a
15 personal relationship with the referring physician.
16 Even though I rarely actually see them, we talk on the
17 phone. I always send them a note. They always get a
18 note when I see a patient. So they will see my note,
19 but I often will also call them and talk to them on
20 the telephone about the patient.
21      Q. Would you expect them to have the same level
22 of expertise in gastroenterology that you do?
23      A. Well, no, primary care physicians wouldn't;
24 but sometimes we get patients from
25 gastroenterologists.

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

11 (Pages 38 to 41)

Page 38

1    Q.  Would you agree with me that your job as an
2  endowed professor at UAB is quite different from that
3  as a primary care physician?
4       MS. COCHRUN: Object to form.
5    A.  No.  I think that Friday morning and Friday
6  afternoon -- so what is that, 20 percent of my time --
7  and every sixth weekend, I'm seeing all comers.
8  Someone can, as I said, make an appointment at the
9  Kirklin Clinic and see any one of the
10  gastroenterologists.  And so in that sense, I'm seeing
11  primary care people.
12    And certainly, because of the new hospital at
13  UAB, we often get, on GI wards, someone with
14  hypertension or someone with -- you know, recovering
15  from an acute MI or renal disease.  We get all comers
16  on the GI wards because of the -- well, because of the
17  way that the university is set up now.  So in that
18  sense, I'm like a primary care physician who also
19  admits patients to his local hospital.
20    Q.  Do you use the term "acute abdomen" in your
21  practice?
22    A.  Not in my practice.  I use it when I'm in the
23  hospital predominantly.  If someone comes in with an
24  acute abdomen, I admit them to the hospital.  So I
25  wouldn't say, you know --

Page 39

1    Q.  In other words, is it a term that you're
2  familiar with?
3    A.  Yes.
4    Q.  Is it a term that you use?
5    A.  Yes.
6    Q.  Okay.  Tell me what it means to you.
7    A.  It means that someone is having an acute
8  problem in their gastrointestinal tract system,
9  predominantly, that could lead to a life-threatening
10  situation or a situation that clearly would
11  necessitate hospitalization.
12    Q.  Do you -- are you familiar with the term
13  "nonspecific abdominal pain"?
14    A.  Yes.
15    Q.  Is that a term that you use?
16    A.  Almost never, because I try to make a
17  diagnosis.  No, I'm not trying to be flippant.
18  Because, you know, that's what we like to do as
19  internists.  We're not surgeons.  What we think we do
20  better than surgeons is make the diagnosis.  And so
21  I --
22    Q.  Can you describe for me what that term,
23  "nonspecific abdominal pain," means?
24    A.  Yes.  It would be probably pain that a
25  physician doesn't know what the cause of is, for which

Page 40

1  the physician does not know the cause.  Sorry.
2    Q.  Can you tell me the most common symptoms of
3  peptic ulcer disease?
4    A.  Probably, abdominal discomfort, pain.  The
5  patient may have nausea, generalized malaise, would
6  not be interested in eating.  So there's a --
7    Q.  Would dyspepsia be a common characteristic?
8    A.  No.
9    Q.  Where would the pain associated with peptic
10  ulcer disease usually present?
11    A.  In the abdomen.
12    Q.  Okay.  More specific than just in the
13  abdomen?  Is there a specific region?
14    A.  Oh, it could be in the epigastrium.
15    Q.  And what is that?
16    A.  That's sort of the high central part, upper
17  central part of the abdomen, and the right upper
18  quadrant.  The stomach is going to loop around a
19  little bit, so it would be the right upper quadrant.
20  You could even have pain in the left upper quadrant.
21  So it generally would be the upper portion of the
22  abdomen:  left upper quadrant, right upper quadrant,
23  epigastrium.
24    Q.  Is bloating associated with peptic ulcer
25  disease as an --

Page 41

1    A.  No.
2    Q.  No.  How about a feeling of fullness?
3    A.  Generally, no, unless, of course, the stomach
4  is full of blood.
5    Q.  And have you had occasion to diagnose
6  gallbladder disease?
7    A.  Certainly.  I'm a gastroenterologist.
8    Q.  And what are the most common presenting
9  symptoms of gallbladder disease?
10    A.  Abdominal discomfort.  And an interesting but
11  important feature of it is it's often what we call
12  colicky.  So there will be a fluctuation in the
13  intensity of the pain as opposed to the constant type
14  of pain that one experiences in peptic ulcer disease.
15    Q.  And can a patient experience nausea and
16  vomiting with biliary colic?
17    A.  Yes.
18    Q.  Doctor, does biliary colic usually appear
19  after eating?
20    A.  It frequently does.
21    Q.  And peptic ulcer disease, does it -- is the
22  pain frequently diminished by eating?
23    A.  It can be diminished or increased by eating.
24  Some people have written that 25 percent of people
25  with peptic ulcer disease will experience increased

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

12 (Pages 42 to 45)

---

Page 42

1  pain with eating.
2      Q.  And what's the generally accepted diagnostic
3  test for gallbladder disease?
4      A.  Well, you know, for each of the various
5  problems of the gastrointestinal tract, there are an
6  array of tests that we use.  So there's no one common
7  test.  And for most of the problems, to really be
8  conclusive, one would use more than one test.
9      So tests to look at the gallbladder and its
10 function would include, but not exclusively, things
11 such as a liver function test, an ultrasound of the
12 abdomen, and eventually what's called an ERCP.
13     Q.  Anything else?
14     A.  Those are the things that would come to mind
15 most commonly.  I mean, there are other more refined
16 tests.  A HIDA scan will tell you if the gallbladder
17 is malfunctioning.
18     Q.  Have you had occasion to review the records
19 in this case?
20     A.  Yes.
21     Q.  And have you formed an opinion?
22     A.  Yes.
23     Q.  Okay.  Can you tell me what you've reviewed
24 in arriving at your opinion?
25     A.  I reviewed everything that I was provided.

---

Page 43

1  And I --
2      Q.  And what I'd like you to do for me, Doctor,
3  is if you could tell me the ones that you found
4  significant in forming your opinion.
5      A.  The -- the notes from the clinic or physician
6  and the physician assistant that took care of the
7  patient I thought were helpful.  I saw -- I read so
8  much of this stuff, it's just all a real big blur
9  right now.  If you could be more specific.
10     Q.  Well, that's what I'm asking.
11         MS. COCHRUN:  Was everything significant or
12 not?
13         THE WITNESS:  No, I didn't think everything
14 was significant.
15     A.  You know, there was -- those little short
16 documents that I saw I didn't think were significant.
17 I can't really remember which ones they were.
18     Q.  And that's what I'm asking you, Doctor.
19 We're going to go through your opinion, but what
20 stands out in your mind as the things that were
21 significant in arriving at that opinion?
22     A.  The affidavits, the clinic notes.
23     Q.  And those are the clinic notes from the
24 prison that you --
25     A.  Correct.

---

Page 44

1      Q.  Anything else?
2      A.  What else did I look at?  I looked at it all.
3         MS. COCHRUN:  It's all here if you want to --
4      Q.  Yeah.  I'm just looking for what sticks in
5  your mind as being highly significant.
6      A.  The clinic notes stick in my mind.
7      Q.  And which affidavits?
8      A.  Well, I remember one by another inmate who
9  witnessed the patient vomiting up blood.
10     Q.  Anything else?
11     A.  Just the depositions, the depositions.
12     Q.  Any of those in particular that stand out as
13 being significant?
14     A.  Significant or insignificant?
15     Q.  Give me both.
16     A.  Sorry.  I thought Dr. Paris's comments were
17 quite accurate.  I thought the pharmacist's comments
18 were moderately helpful.  I did not find the comments
19 by somebody named Okono, Okolo.  He's an endoscopist
20 from Hopkins.  I didn't find those comments
21 particularly helpful.
22     Q.  Anything else?
23     A.  No.  Those were --
24     Q.  Before we discuss your opinion, we're going
25 to be using the term "standard of care."  Can you tell

---

Page 45

1  me what that means?
2      A.  It means based upon the general level of
3  education, training, and experience, one physician or
4  group of physicians is accepted by other physicians as
5  how a patient's problems should be approached, be
6  diagnosed, treated, and seen in follow-up I think at a
7  national level.
8      So I think that in the United States today, the
9  standard of care in Alabama is the same as the
10 standard of care in Boston, as in Seattle, in San
11 Francisco, or Fargo, North Carolina.
12     Q.  And is the -- when we use the term "standard
13 of care," I want to be on the same page.  That's the
14 minimally acceptable care that must be given; is that
15 right?
16     A.  I would -- I guess that's a fair way of
17 approaching it, looking at it, yeah.
18     Q.  In other words, it's not that every test that
19 could possibly be done is required; it's the minimum
20 that is required.  Is that right?
21     A.  An appropriate number of tests to arrive at a
22 diagnosis, yes.
23         MS. COCHRUN:  I don't mean to interrupt you.
24 I need to get rid of this out of my system.
25         MR. DOYLE:  Sure.  You want to take a moment?

JOHN COGGIN v. UNITED STATES OF AMERICA                          12/13/2007
Deposition of Phillip Smith, M.D.

13 (Pages 46 to 49)

Page 46

1          (Brief recess)
2     Q.  Dr. Smith, in your opinion, did the medical
3  treatment that Mr. Coggin received at the Federal
4  Prison Camp at Maxwell meet the standard of care?
5     A.  No, it did not.
6     Q.  And please give me the basis for your
7  opinion.
8     A.  Well, I summarized it in one of the things
9  that I --
10    Q.  Yeah.  We'll go through the report, but can
11 you just tell me?
12    A.  I think that his evaluation was not of an
13 appropriate standard of care for several reasons.
14    First of all, the person who evaluated him did
15 not include an appropriate differential diagnosis;
16 that is, other causes of his pain were not considered.
17 So if you don't consider the possibility that a person
18 has something, you're not going to order the
19 appropriate tests or pursue that in terms of history
20 of the patient.  So if you don't consider the
21 possibility of peptic ulcer disease, you're not going
22 to evaluate him for peptic ulcer disease.  So that's
23 the initial, I think, problem with the evaluation of
24 this patient.
25    I think that the history was incomplete.  There

Page 47

1  are certain symptoms that one always asks patients
2  when they come in with abdominal pain like this or
3  when they present with abdominal pain:  what causes
4  the pain, what causes the pain to diminish, does the
5  pain increase in intensity, does it fluctuate in
6  intensity, as examples of things that were not
7  considered at the time.
8     So I think that this patient did not have a full
9  differential considered as the cause of his pain.
10    Secondly, he was not evaluated at the prison
11 appropriately.  For example, when a patient with a
12 gastrointestinal problem presents, one of the things
13 that is incumbent upon the examining physician,
14 physician assistant, is to perform a rectal
15 examination to determine whether or not the patient is
16 bleeding or to determine if the patient has a rectal
17 problem that could be contributing to his symptoms.
18    Q.  And why don't we -- have you got a copy of
19 the prison health care record with you, Doctor?  I
20 brought one if you don't.
21    MS. COCHRUN:  That's probably easier for
22 you.  What I was doing, I tried to pull the records
23 for this period of time, Steve, if that will help
24 some.  That's what I was just putting in order.  He
25 has a set of those specific things.

Page 48

1     MR. DOYLE:  I'm not going to attach the
2  entire record to his deposition.
3     Q.  We've used it multiple times, Doctor.  I did
4  bring you an extra copy.  If you want to refer to
5  that, I'm going to ask you some specific questions.
6  And I'm going to invite your attention to the -- I'll
7  be referring to these numbers that I'll call Bates
8  numbers that are on the bottom of the pages.
9     A.  Okay.
10    Q.  So you just testified about the evaluation.
11 Are you referring to the evaluation that was performed
12 when the patient first presented?
13    A.  Well, he -- according to the records that I
14 saw, I believe he didn't have a rectal exam during any
15 of his evaluations at the prison.  So when I see new
16 patients in the clinic, at the Kirklin Clinic, if you
17 come to me as a new patient with a gastrointestinal
18 problem, I'm going to do a rectal exam on you.  So I
19 would say it's just -- it's consistent with the level
20 of care that we provide people in contemporary
21 gastrointestinal clinics.
22    Q.  Doctor, I'm going to invite your attention to
23 page 17 of the BOP health record.
24    MS. COCHRUN:  This may be easier.  Like I
25 said, I tried to pull them out.  We can flip through

Page 49

1  it.  But there we go.
2     THE WITNESS:  Okay.
3     Q.  You reviewed this document; is that correct?
4     A.  I did.
5     Q.  Okay.  And when Mr. Coggin presented on July
6  25th of '01, is that the first presentation in this
7  case, so we're on the same sheet of music?
8     A.  Is that -- that's page 17, yes.
9     Q.  Okay.  Did Mr. Coggin have an acute abdomen
10 at that time?
11    A.  Well, that's a little difficult to say.  I
12 didn't see the patient myself, and so I'm not going
13 to --
14    Q.  In your opinion, Doctor, did he or did he
15 not?
16    A.  Let's see.  I believe this is the note where
17 he had severe abdominal pain and, yes, extreme
18 tenderness to touch.  And the arrow means marked,
19 presumably -- to most people, it would be marked --
20 decrease in bowel sounds.  So that, to me, would be
21 close to what I would describe as an acute abdomen.
22    Q.  And you've discussed a rectal exam.  What
23 would you expect a rectal exam to have shown on this
24 patient on that day?
25    A.  If the patient were bleeding, you could

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

14 (Pages 50 to 53)

---

Page 50

1  detect blood in the stool. If the patient had -- if
2  the cause of the patient's pain were appendicitis, for
3  example, you could elicit an exacerbation of his pain
4  during a rectal examination. Certainly, those are two
5  important things that could have been learned had a
6  rectal exam been performed.
7      Q.  Anything else?
8      A.  Well, you certainly would have learned
9  whether or not he had perirectal disease, perirectal
10 inflammation, perirectal abscess, a perirectal
11 fistula, perirectal infection. All of those would be
12 pieces of information you would acquire from a rectal
13 examination.
14     Q.  And in this case, we have the benefit of
15 hindsight. What would a rectal exam have shown on
16 this day on this patient, if anything?
17         MS. COCHRUN: Object to form.
18     A.  Well, there's no way -- short of -- again,
19 there's no way of knowing, not having been there or
20 done the exam myself; but blood could have been
21 detected in the stool at the time of the rectal
22 examination.
23     Q.  In your opinion, was the patient bleeding
24 when he first presented on July 25th?
25     A.  There's no way for me to know that; but

---

Page 51

1  because of that, I would have been motivated to
2  examine his stool and exclude rectal -- exclude
3  bleeding with a rectal examination.
4      Q.  With respect to the history and physical, do
5  you take issue with how that note is done?
6      A.  Well, yes. As I said, I think there's
7  certain features of the history that are important to
8  ask the patient about and, therefore, to document:
9  What's the quality of the pain? What's the intensity
10 of the pain? Does it come and go? Is it associated
11 with meals? Is it diminished by meals? Is there
12 accompanying vomiting? Has he had any recent
13 diarrhea? Has he vomited any blood recently? Is
14 there a past history? All of these things should have
15 been incorporated into the history.
16     Q.  Anything else that you feel is deficient
17 about that history?
18     A.  Well, I certainly would not be as cursory in
19 writing up my abdominal examination. I think the
20 abdominal examination should include a mention of
21 whether or not -- particularly if someone has
22 abdominal pain.
23     And excuse me, but you're asking a
24 gastroenterologist. You know, there's something wrong
25 with that. It's like when I tell the students and the

---

Page 52

1  residents on rounds. You know, you're on rounds with
2  a gastroenterologist on gastroenterology service. You
3  better be giving me a thorough gastroenterology
4  examination if you're going to tell me about that.
5  It's the same when you're on neurology rounds.
6      So I would want to know whether or not the
7  patient had any palpable splenomegaly, if you could
8  feel the patient's liver; could you feel the patient's
9  spleen; could you feel a mass; did the patient have
10 decreased bowel sounds, for example, or decreased
11 bowel sounds at the beginning or the end of the
12 examination.
13     I would want to know if there was -- the quality
14 of the bowel sounds is, of course, very important. If
15 there's a partial obstruction, the bowel sounds are
16 high pitched. So all of these things are put in. And
17 the abdominal examination is never complete without
18 description of the rectal examination.
19     I would also -- I mean in all my notes, you know,
20 and in, I'm sure, most of my colleagues', you want to
21 note whether or not the patient had guarding,
22 G-U-A-R-D-I-N-G, or rebound, abdominal rebound.
23 They're clues as to the process going on in the
24 abdomen. And I always mention that. And certainly,
25 when appropriate, if someone comes in with abdominal

---

Page 53

1  pain, you want to know if you can detect fluid in the
2  abdomen. That's known as ascites, A-S-C-I-T-E-S.
3      And there's no mention of guarding, rebound,
4  enlarged liver, enlarged spleen, tender liver.
5  There's no mention of what's called a Murphy's sign,
6  was a Murphy's sign present. So, in my opinion, the
7  abdominal examination is incomplete. And if I were to
8  be audited at UAB, having written this, the auditor
9  would say I didn't do a complete examination because I
10 didn't write it down. So the standard of care today
11 in the United States is to write down what you do and
12 what you ask.
13     Q.  And with respect to the differential
14 diagnosis, was cholelithiasis a reasonable
15 differential diagnosis?
16     A.  I can't say that it's reasonable. It's in
17 the -- it's clearly in the differential. I mean, the
18 man had right upper quadrant pain; and so that is the
19 location of the gallbladder; so stones could be
20 causing his symptoms. I would think it's in the
21 differential.
22     Q.  And the plan that the PA -- the tests that he
23 ordered, is that reasonable?
24     A.  Well, in my opinion, it's not.
25     Q.  Okay. And please tell me why not.

JOHN COGGIN v. UNITED STATES OF AMERICA                                    12/13/2007
Deposition of Phillip Smith, M.D.

Page 54

1    A. Well, if someone has such severe pain that an
2  acute abdomen is under consideration, you would want
3  to know if a patient is bleeding. And it's pretty
4  easy to put down an NG tube. It takes you about 30
5  seconds. And you'll know whether or not the patient
6  is bleeding in his upper gastrointestinal tract.
7    I think the x-ray is reasonable. All that is
8  going to tell you basically is if there's something
9  very, very obvious, grossly obvious, such as free air
10  in the abdomen. Had he perforated at this point of
11  time, you could see that on an x-ray.
12    I think that from it's -- I don't think. I know
13  it's not advisable to treat someone with abdominal
14  pain with an analgesic when you don't know what the
15  cause of the pain is. And he was given Toradol, a
16  nonsteroidal anti-inflammatory agent, as well as
17  codeine.
18    And so the problem with prescribing these
19  medications at this point in time are, first, that the
20  codeine could mask the natural history of his pain and
21  you would potentially miss the diagnosis. And the
22  Toradol could exacerbate the underlying problem or
23  induce a problem. So we don't prescribe medicines
24  like this when someone comes in with abdominal pain
25  when we don't know the diagnosis.

Page 55

1    Q. And please continue to go through the tests
2  that he ordered.
3    A. Let's see.
4    MS. COCHRUN: Rocephin.
5    A. Okay. So it looks like he gave some -- an
6  lisinopril. He used some lisinopril. Oh, labs.
7    Do you know what that is right there? I don't
8  know what the first -- labs ordered. I can't read the
9  first word, but he got a urinalysis and a CBC and a --
10    Q. This looks like CB-24.
11    A. Okay. And then the U -- a urinalysis is
12  reasonable. A CBC is reasonable. I think that's -- I
13  don't know what this word is, but Amylase. So those
14  are all appropriate. So I do see x-ray tomorrow,
15  although it up here it says x-ray arrow at -- AP?
16  Honestly, I don't know why he said in number seven,
17  x-ray tomorrow; but number one, x-ray arrow. I'm not
18  quite sure what that means.
19    Q. I'm looking for your opinion, Doctor. That's
20  all. If you don't know, that's fine.
21    A. Okay. Sorry.
22    Q. But you used this note as the basis for
23  forming your opinion?
24    A. Well, one of the notes, yes.
25    Q. And do you want to look at those labs and

Page 56

1  show me -- looking --
2    MS. COCHRUN: At page 43.
3    A. Okay. So I guess these are just --
4    MS. COCHRUN: And 44. I'm going to give you
5  those, and then I'll pull out the x-ray and all that
6  jazz.
7    A. So I mean, as I said, I think these were
8  reasonable. And if I saw these, I would conclude
9  that -- did I see in the first note that he had a --
10  may have had a stone in his left collecting system, a
11  renal stone? But with the normal --
12    Let's see. Yes. Okay. So we'll do the liver
13  function tests first. So I would assume that he's not
14  vomiting and he doesn't have diarrhea. Those are
15  causes of metabolic changes. And his electrolytes,
16  they appear to be normal. I would conclude that he's
17  not hypoglycemic. I would conclude that he's not
18  dehydrated with a normal BUN. And his renal function
19  is certainly normal. It's well within the normal.
20  And his liver function tests are all normal.
21    So that would cause me to think something else is
22  going on. Certainly, with stones in the gallbladder
23  and obstruction severe enough to cause what appears to
24  be his symptoms, I would expect some changes in his
25  liver function tests. You know, for example, one

Page 57

1  sees, in obstructive cholelithiasis, an elevated
2  alkaline phosphatase and an elevated bilirubin.
3  They're normal. So they would direct my attention to
4  a potential other problem.
5    I should mention his amylase and lipase were also
6  normal. So those being normal, I would be much less
7  concerned about a pancreatic problem. I would be less
8  concerned about a biliary tract problem. I would --
9  since he was afebrile apparently. He had no fever, as
10  far as I know; but if he had a fever, it would have
11  been mentioned.
12    But in the absence of fever, in the absence of
13  elevated liver function tests, in the absence of
14  jaundice, in the absence of what looks like a
15  normal -- relatively normal white count, that would be
16  strong evidence against cholecystitis.
17    So the lab tests here help me conclude that it's
18  much less likely that this man has a gallbladder
19  problem. He probably doesn't have stones. He didn't
20  see them on the film. He doesn't have any secondary
21  liver function test elevation. He doesn't have
22  secondary cholecystitis; namely, he's not jaundiced.
23  He's not febrile. He doesn't have a Murphy's sign on
24  physical examination. And he doesn't have any
25  liver -- elevated liver function tests in terms of his

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

16 (Pages 58 to 61)

Page 58

1  enzymes, all of which could be increased in the
2  setting of cholecystitis secondary to cholelithiasis.
3      Q.  Is there anything -- have you reviewed his
4  blood work as well, Doctor?  It starts at 44.
5      MS. COCHRUN:  That's what he was --
6      A.  Yes.  Part of this is part of that.  And the
7  urinalysis.  Moreover, the fact that he doesn't have
8  any blood in his urine and the stone is on the left
9  side -- he didn't mention in the physical examination
10 of whether or not he had what's called CVA
11 tenderness.  He didn't have tenderness in the left
12 flank area -- well, it's not mentioned, and the
13 patient didn't describe it.  So his symptoms on
14 physical examination and the normal urinalysis are
15 strong evidence against a urinary tract problem such
16 as a stone.
17     Q.  Is there any -- does the blood work tell you
18 anything about whether he was bleeding or not at that
19 time?
20     A.  At that time, no, it doesn't.  He could still
21 be bleeding at that time.  It takes some time for you
22 to equilibrate so that you would see a drop in the
23 hematocrit.  So he could certainly be bleeding at this
24 time; he just hasn't dropped his hematocrit or his
25 hemoglobin yet.

Page 59

1      Q.  Is there any evidence to argue that he was
2  bleeding at that time?
3      A.  Well, there's no mention of it; but, again,
4  the examination was incomplete without a rectal exam
5  and an NG tube.  So the absence of proof is not
6  necessarily the proof of absence.
7      Q.  And, Doctor, just so I have your testimony
8  correct, is it your testimony that in every
9  presentation of abdominal pain, that a rectal exam is
10 required?
11     A.  Certainly, when someone comes in with
12 abdominal pain, you would have to convince me that
13 there is a reason not to do it as opposed to a reason
14 to do it.
15     Q.  Okay.  And is it your testimony that a
16 nasogastric tube should be inserted every time a
17 patient presents with abdominal pain?
18     A.  No.
19     Q.  When is it required?
20     A.  When you suspect a patient has peptic ulcer
21 disease, acute severe peptic ulcer disease.
22     Q.  And is there anything in the record from --
23 I'm just talking about from that first day, July 25th,
24 '01 -- that indicates to you that the patient had
25 peptic ulcer disease?

Page 60

1      A.  Well, the severity of his pain is very
2  impressive.  And the absence of most everything else
3  in the initial evaluation, suggesting another problem,
4  causes me to suspect that that would be a possibility,
5  a high possibility, if not the number one -- well, the
6  number one possibility.
7      Q.  What else leads you, if anything, to that
8  conclusion?
9      A.  Well, I think that the findings at this point
10 in time are against gallbladder disease as being a
11 primary cause of his symptoms.  I think that the
12 symptoms and the physical examination are against
13 this -- and the laboratory tests are against this
14 being pancreatitis.  So that would lead me to believe
15 that his problems could well be related to gastric
16 disease.
17     Q.  Doctor, do you have an opinion whether or not
18 Mr. Coggin had peptic ulcers when he presented on
19 7/25?
20     A.  I guess you're asking -- a different way of
21 asking the same question.  I think it's certainly --
22 on this day, that would be very, very high in the
23 differential diagnosis of his problem.
24     Q.  And taking the entire record into account, if
25 he had an ulcer on that date, what, in your opinion,

Page 61

1  caused it?
2      MS. COCHRUN:  I object to form.  When you say
3  the entire record, you mean this whole course?
4      MR. DOYLE:  Everything he's reviewed, yes.
5      MS. COCHRUN:  Okay.  The whole course meaning
6  now, looking back at all his laboratories and
7  everything else that's occurred?
8      MR. DOYLE:  Right.
9      MS. COCHRUN:  Okay.
10     A.  Well, I think -- your question again was --
11     Q.  What do you think would have caused an ulcer
12 when he presented on 7/25?
13     MS. COCHRUN:  That's a different question, so
14 I'm going to object.
15     MR. DOYLE:  You can read back the -- she can
16 read back the question.
17         (The court reporter read from the
18         record as requested.)
19     A.  Well, certainly, one possibility would be
20 H. pylori infection.
21     Q.  Anything else?
22     A.  That would be the leading cause of peptic
23 ulcer disease.  Another, less common, cause of peptic
24 ulcer disease is what's called Zollinger-Ellison
25 syndrome.  Z-O-L-L-I-N-G-E-R, E-L-L-I-S-O-N syndrome.

JOHN COGGIN v. UNITED STATES OF AMERICA
Deposition of Phillip Smith, M.D.

12/13/2007

17 (Pages 62 to 65)

Page 62

1  And that's a remote possibility. But clearly
2  worldwide and in the United States, H. pylori
3  infection is the leading cause overall of peptic ulcer
4  disease.
5      Q.  If it wasn't peptic ulcer disease on 7/25/01,
6  what else would have been in the differential?
7      A.  Well, in the right upper quadrant, things
8  that can cause pain would be peptic ulcer disease,
9  gastritis, gallbladder disease, cholelithiasis --
10  that's stones -- cholecystitis -- that's
11  inflammation -- in the gallbladder. We talked about
12  pancreatitis. Those are certainly high in the
13  differential.
14      In view of the history, though, there's no
15  history to suggest Crohn's disease or ulcerative
16  colitis. They are more intestinal diseases. Ischemic
17  disease is certainly a possibility, but there's
18  nothing in the record to suggest that he had vascular
19  insufficiency or vascular disease. That would
20  certainly be a source of mesenteric ischemia, but that
21  would be in the differential. In fact, that would be
22  another reason to do a rectal examination. Because
23  patients will often have blood in their stools with
24  mesenteric insufficiency.
25      Q.  I'm going to invite your attention to the

Page 63

1  next -- the patient came back the next day; is that
2  right?
3      A.  I think he did.
4      MS. COCHRUN: You're on page 18?
5      MR. DOYLE: Yeah, I am.
6      MS. COCHRUN: Okay. I'm trying to keep us
7  in --
8      MR. DOYLE: Sure. And if it helps, we're
9  looking at the same thing.
10      MS. COCHRUN: I tried to pull -- just because
11  we have to keep flipping back and forth, Steve, I just
12  thought it might be easier after the last go-round and
13  we were doing the flip back and forth, to try to do
14  this. So we're on 18?
15      MR. DOYLE: Yes.
16      Q.  Would you agree that the patient was seen
17  again the next day?
18      A.  According to the record.
19      Q.  Okay. And is that prompt follow-up, in your
20  mind?
21      A.  Well, you know, if someone has an acute
22  abdomen -- if someone has an acute abdomen, they
23  should be admitted and observed. So, in that sense,
24  this would not be considered, in my opinion,
25  appropriate.

Page 64

1      Q.  Are you now testifying that your opinion is
2  that this patient had an acute abdomen when he
3  presented on 7/25/01?
4      A.  As we discussed earlier, he had symptoms that
5  are consistent with it. He had extreme tenderness and
6  reduced bowel sounds. And as the initial laboratory
7  tests showed, I think they spoke against gallbladder
8  disease, pancreatic disease. So that would certainly
9  be high in my differential, an acute abdomen related
10  to his peptic -- related to a peptic ulcer. That is
11  certainly a possibility.
12      So whatever could be causing an acute abdomen --
13  again, the differential of acute abdomen is very
14  extensive -- he should, in my opinion, be observed.
15      Q.  The plan on the second day, an ultrasound was
16  ordered?
17      A.  Yes.
18      Q.  Is that appropriate?
19      A.  Well, that probably should have been done on
20  the first day. It should have been done on the first
21  day to find out if he's got a stone obstructing his
22  common bile duct. And if so, you would admit him; and
23  the next day you would do a special test to remove
24  that stone and open up the common bile duct. So the
25  ultrasound is, in a sense, 24 hours late.

Page 65

1      Q.  Apart from the time, is it the right test to
2  order?
3      A.  It is the right test to order.
4      Q.  Okay. How about the other tests that are
5  ordered there?
6      A.  An IVP. I think that is very unlikely the
7  cause of his problem, so I would not have ordered an
8  IVP at this point in time. I think that's farther
9  down the list in terms of tests that should have been
10  done.
11      Q.  And is your opinion concerning the IVP based
12  on the pain being located in the right upper quadrant?
13      A.  Well, he also -- that and the fact that he
14  had a normal urinalysis.
15      Q.  And was it appropriate to discontinue the
16  Tylenol Number 3 upon the patient's complaint that it
17  was causing discomfort?
18      A.  Yes. I mean codeine can actually exacerbate
19  symptoms, so that was appropriate. And as we
20  discussed earlier, you really don't want to order that
21  type of medication when someone has pain for which you
22  don't have a diagnosis.
23      Q.  And then they prescribed Motrin 800
24  milligrams t.i.d. Do you see that?
25      A.  Yes.

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

18 (Pages 66 to 69)

Page 66

1    Q.  Do you know what the maximum recommended dose
2  of ibuprofen is?
3    A.  Yes.
4    Q.  And what is that?
5    A.  3200 milligrams.
6    Q.  Okay.  Was this within the acceptable dose
7  limits of ibuprofen?
8    A.  Acceptable in what sense?
9    Q.  Is it a recommended dose for pain?
10   A.  It is within the recommended range of
11 medication for pain; but anyone taking care of someone
12 with an acute abdomen, most people -- most physicians,
13 certainly gastroenterologists and I think general
14 internists, primary care physicians, would not order a
15 nonsteroidal anti-inflammatory agent for someone who
16 has severe abdominal pain.
17   Q.  Doctor, are NSAIDs appropriate analgesics for
18 biliary colic?
19   A.  We usually don't use that for biliary colic
20 either.
21   Q.  Is that universally accepted, in your
22 experience?
23   A.  Well, it's not universally accepted because
24 they suspected that this patient had biliary colic and
25 they gave him Motrin; but in general, we wouldn't use

Page 67

1  it.
2    Q.  And why is that?
3    A.  Well, in someone who has abdominal pain, if
4  you're ordering a medication that can induce ulcer
5  disease, you could complicate the underlying
6  evaluation and, ultimately, management of the patient.
7    Q.  And how common are prescriptions for NSAIDs?
8    A.  They're pretty common.
9    Q.  Okay.  Probably, the most prescribed class of
10 drugs out there?
11   A.  If you have some evidence that that's the
12 case, I guess it is.  It's very common.
13   Q.  And NSAIDs increase the risk of ulcers; isn't
14 that right?
15   A.  That's correct.
16   Q.  And NSAIDs increase the risk of
17 gastrointestinal bleeding; isn't that right?
18   A.  That's correct.
19   Q.  And NSAIDs increase the risk of GI
20 perforation; isn't that right?
21   A.  They certainly increase the risk of
22 complications of peptic ulcers.  There's no doubt
23 about that.
24   Q.  And that's a well known side effect of
25 NSAIDs, isn't it?

Page 68

1    A.  Those are well known side effects, yes.
2    Q.  And a certain number of patients take --
3  ibuprofen, so that our record is clear, is an NSAID;
4  isn't that right?
5    A.  Correct.
6    Q.  Probably the most commonly used NSAID?
7    A.  Probably.
8    Q.  And a certain number of patients taking
9  ibuprofen will develop peptic ulcers, won't they?
10   A.  Well.  In fact, the data shows that
11 among people who take NSAIDs, about 6 to 12 percent of
12 them, after eight weeks, will develop a gastric ulcer
13 measuring anywhere from three to five millimeters; and
14 4 to 8 percent of them will develop a duodenal ulcer
15 measuring three to five millimeters.  So definitely,
16 yes.
17   Q.  And a certain number of those patients will
18 develop GI bleeding; isn't that right?
19   A.  Complications, including bleeding, can occur.
20   Q.  Now, it's not malpractice to prescribe
21 ibuprofen within the recommended dosages, is it?
22     MS. COCHRUN:  Object to form.
23   A.  It depends on the circumstances.  In this, in
24 my opinion, it is inappropriate.  Now, someone
25 might --

Page 69

1    Q.  And why is that, Doctor?
2    A.  Well, because if peptic ulcer disease is in
3  the differential and you prescribe NSAIDs, you can
4  exacerbate the peptic ulcer disease; because NSAIDs,
5  they increase acid secretion and they decrease the
6  protective mechanism by which we defend ourselves
7  against ulcer disease.
8      For example, NSAIDs decrease bicarbonate
9  production; they decrease mucous secretion; they
10 decrease epithelial cell proliferation -- that's how
11 we regenerate the mucosal lining -- and they decrease
12 phospholipids in the epithelial lining, all of which
13 are important in defense against peptic ulcer
14 disease.  So you don't want to prescribe a medication
15 that's going to reduce our natural protective
16 mechanisms against peptic ulcer disease.
17   Q.  There are certain risk factors that increase
18 the risk of GI complications from taking ibuprofen,
19 aren't there?
20   A.  Yes.
21   Q.  And can you tell me what some of those are?
22   A.  If you're older than 60, you increase the
23 risk.  If you have other co-morbid problems, such as
24 renal disease, you increase the risk of having
25 complications.  If you have a coagulopathy -- that is,

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

Page 70

1   if you don't clot -- if you don't stop bleeding
2   normally, if there's some sort of problem that causes
3   that, they're, quote, contraindicated.
4       If you're already taking an NSAID, then you don't
5   want to prescribe an NSAID, although steroids
6   themselves do not cause ulcer disease.  If someone is
7   taking a steroid, prednisone, and then you add an
8   NSAID, you increase the risk of ulcer disease.
9       Q.   Anything else you can think of?
10      A.   Those are the main reasons.  There probably
11  are, but --
12      Q.   Alcohol use?
13      A.   To my knowledge, that's not -- that's -- I
14  don't think so.
15      Q.   Mr. Coggin didn't have any of the risk
16  factors you just described, did he?
17      A.   He certainly had the possibility of having
18  peptic ulcer disease.  So if that's a possibility,
19  then they would be contraindicated in this person, in
20  him.
21      Q.   And would you agree with me that a patient
22  could develop GI bleeding simply from taking
23  ibuprofen?
24      A.   I would agree with you.
25      Q.   And that could be the case with Mr. Coggin,

Page 71

1   couldn't it?
2       A.   It could be.
3       Q.   With no underlying peptic ulcer disease;
4   isn't that right?
5       A.   The NSAIDs themselves can induce ulcerations
6   that bleed, definitely.
7       Q.   And that's just an unfortunate complication
8   of NSAIDs; isn't that right?
9       MS. COCHRUN:  Object to form.
10      A.   Well, whenever you do something that
11  complicates a patient's problem, I think that's
12  unfortunate.
13      MS. COCHRUN:  That's the objection.
14      Q.   But in other words, that's a well known
15  complication of ibuprofen?
16      A.   Bleeding ulceration?
17      Q.   Yes.
18      A.   That's correct.
19      Q.   And that does not necessarily mean that
20  there's malpractice; isn't that right;
21      MS. COCHRUN:  Object to form.
22      A.   You know, probably in general, that is
23  probably true; but I don't think that's true in the
24  case of Mr. Coggin.
25      Q.   And why is that?

Page 72

1       A.   Well, because, as I said, very high in the
2   differential of this man, and ultimately turned out to
3   be the case, is peptic ulcer disease.  And prescribing
4   NSAIDs in peptic -- patients with peptic ulcer disease
5   is not advisable.  The medical literature, the
6   textbooks say they should be prescribed only under --
7   with extreme caution; in other words, they're
8   contraindicated.
9       Q.   And, Doctor, do we have -- do we have a
10  chicken-and-egg issue here, which is Mr. Coggin may
11  have presented without peptic ulcer disease.  Would
12  you agree with me?
13      A.   That's certainly possible.
14      Q.   And we know that he was prescribed NSAIDs;
15  isn't that right?
16      A.   Correct.
17      Q.   And those NSAIDs could have caused an ulcer.
18  Would you agree with that?
19      A.   They could have caused an ulcer, or they
20  could have exacerbated an ulcer that was already
21  present.
22      Q.   And we can't know what the case is, can we?
23      A.   Hindsight in this case, it would be difficult
24  to interpret.
25      Q.   And if he didn't have peptic ulcer disease

Page 73

1   when he presented, NSAIDs would not be
2   contraindicated, would they?
3       A.   They would be contraindicated because you
4   didn't know what the cause of his pain was.  You don't
5   give NSAIDs when you don't know what the cause of the
6   pain is.  You don't give analgesic if you don't know
7   what the cause of the pain was, yes.
8       Q.   And in your opinion, that's true in every
9   case?
10      A.   Well, you know, we never say never and we
11  never say always, but that certainly is appropriate
12  standard of care today in the United States.
13      Q.   I want to invite your attention to the
14  abdominal ultrasound that was done on the patient.
15  And that's at Bates 51.
16      MS. COCHRUN:  I'm there.  Okay.
17      Q.   Doctor, just let me know when you've had a
18  chance to look at that.
19      A.   Okay.
20      Q.   I believe you testified that abdominal
21  ultrasound is the appropriate test for diagnosis of
22  gallbladder disease.
23      A.   It's one of the important tests, correct.
24      Q.   And in medicine in the United States today,
25  is a general practitioner able to rely on a report

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

20 (Pages 74 to 77)

Page 74

1  from a radiologist?
2      A.  It all depends on the radiologist.
3      Q.  Okay.  Explain what you mean by that.
4      A.  Well, some radiologists, you know, like
5  lawyers, are good and some aren't.
6      Q.  Okay.  Do you know anything about the
7  radiologist that wrote this report?
8      A.  No, I don't.
9      Q.  Okay.  Assume that this radiologist is a
10  board-certified diagnostic radiologist.  Does that
11  inform your judgment any?
12      A.  It doesn't.  It's something that I would take
13  into consideration if I'm going to evaluate someone;
14  but there are lots of board-certified radiologists,
15  physicians, and there are lots of -- what are you
16  guys -- licensed lawyers, or whatever you are, you
17  know, that aren't very good.  And so what would be
18  more important is if he doesn't have a license or a
19  board certification.  Then, that would make me feel a
20  little uncomfortable.
21      MS. COCHRUN:  Well, he has the films, too,
22  Steve.  I mean he -- I'm sorry.  I didn't mean to
23  interrupt you.  I'm just saying he's got the films,
24  too.
25      Q.  Doctor, does this ultrasound report indicate

Page 75

1  an abnormal gallbladder?
2      A.  Well, he has some finding there that the
3  radiologist cannot define.  So is that an abnormal
4  gallbladder?  We see lots of things we can't define
5  and the organ that's being investigated is indeed
6  normal.  So there's a wide range of what's normal or
7  abnormal.  It would be hard -- I'd be hard pressed.
8      When someone says may represent a poorly
9  something or other, then it means that the radiologist
10  or the person who's interpreting the film is trying to
11  be very cautious and cover the possibilities that he
12  might, in fact, be wrong or right.  And so I'm not --
13  I mean, obviously, I can read this.  He sees --
14  there's a finding in the gallbladder that he describes
15  as a calcified gallstone, a polyp, or a small tumefact
16  of sludge.
17      Q.  And would that be consistent with gallbladder
18  disease?
19      A.  It depends on your definition of disease.  It
20  certainly is not consistent with cholecystitis or
21  inflammation.  You know, it's -- does he comment --
22  you know, there's no inflammation reflected in the
23  normal thickness of the mucosa of the gallbladder.
24  And his liver function tests were normal.
25      So those findings are consistent with a normal

Page 76

1  gallbladder.  There's no inflammation and there's no
2  obstruction.  And that's reflected in the diameter of
3  the bowel, the 0.3 centimeters.  You know, the upper
4  limit of normal is between eight and ten millimeters
5  or one centimeter.  So if this were a gallstone or a
6  sludge that's causing the patient's problems, then
7  what happens is it enters the common bowel duct trying
8  to leave the gallbladder and obstructs and so you get
9  intermittent peristaltic activity in the gallbladder
10  induced by that obstruction trying to force whatever
11  is blocking it through.  And there's no evidence on
12  this film, as interpreted by this radiologist, that
13  the patient has obstructive gallbladder disease, if
14  you want to use that word.
15      Q.  And with respect to -- I'm going to invite
16  your attention to the page before that, the IVP.
17      MS. COCHRUN:  Page 50.
18      Q.  It's at Bates number 50.
19      A.  Yes.  He's got a stone at diverticulitis.  He
20  has a calculus, C-A-L-C-U-L-U-S, in a caliceal,
21  C-A-L-I-C-E-A-L, diverticulum.  So we get
22  diverticulums in the stomach, esophagus, in the small
23  intestine, the colon in particular; and they're
24  inconsequential.  So I think that's -- that would
25  not -- also, he doesn't have any hydronephrosis.

Page 77

1  So it's the same sort of pathophysiology.  If
2  that stone had dropped down into the ureter or into
3  the -- into the ureter, then you would -- you would
4  have an obstruction; then, eventually, the kidney
5  couldn't expand because of difficulty moving urine
6  through, just like in a gallstone.  You would get --
7  So I'm not bothered by this at all.  I mean, in
8  fact, it confirms the fact that he doesn't have any
9  renal disease as a cause of his right upper quadrant
10  pain.
11      Q.  And the next clinical encounter is on August
12  6th, '01.  Do you see that?  That's at the bottom of
13  that -- I'm sorry -- of the page we were just on,
14  which is page 18, Bates number 18.  And does that
15  indicate that they were --
16      MS. COCHRUN:  Well, for the record, let me
17  make this clear.  I believe Mr. Rodriquez did not
18  indicate that he had really, truly a clinical
19  encounter in terms of history, exam, and treatment at
20  that time.  That was just a follow-up note.  I think
21  that's what the evidence is.  But with that in the
22  record -- I mean, the record will speak for itself;
23  but I just object to the form, characterizing it as a
24  follow-up clinical interaction with patient and
25  doctor.

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

Page 78

1    Q.  Doctor, do you see the note that I'm
2  referring to at 8/6/01?
3    A.  Yes.
4    Q.  And that's written in the SOAP format?
5    A.  Yes.
6    Q.  And do you see where, in the objective
7  portion of the note, it says no pain?
8    A.  Yes.
9    Q.  And would that be consistent with biliary
10 colic?
11   A.  Well, technically, no, because biliary colic
12 means pain.  And he says no pain here, so it's
13 inconsistent with biliary colic.
14   Q.  So is biliary colic something that comes and
15 goes?
16   A.  By definition.  So you get this intermittent
17 peristaltic activity trying to move bile or a stone,
18 whatever it might be, through the common bile duct.
19   Q.  And can it be quiescent for days, weeks,
20 months?
21   A.  Possibly.  In fact, he doesn't -- whoever
22 wrote this note doesn't even say how long he was
23 without pain.  So he could have been without pain for
24 five minutes, five hours, or five days; and that would
25 be consistent with biliary colic or a biliary problem.

Page 79

1    Q.  And if you look at the timing between the
2  7/26 visit and the 8/6, is that an appropriate length
3  for follow-up?
4    A.  Well, as I said earlier, I would have
5  approached this differently, trying to adhere to how
6  we practice gastroenterology or medicine at UAB, for
7  example.  I would have pushed harder to make a
8  diagnosis in the beginning.  So in the absence of a
9  diagnosis, I find waiting a week plus whatever that is
10 inappropriate when I was considering, at the outset,
11 an acute abdomen.
12   Q.  Would an absence of pain be consistent with
13 your suspicion or a suspicion of peptic ulcer?
14   A.  It sure could be.  Sure.
15   Q.  Is it reasonable that when a patient doesn't
16 have any current painful symptoms, to take a
17 monitoring approach?
18   A.  It depends on the circumstances.  It depends
19 on the patient.  I think in this case, if I'm not
20 mistaken, he was taking some pain medication.  So I
21 think that clouds the issue.  I think he was taking
22 Motrin, if I'm not mistaken.  So that -- because it's
23 an analgesic, it could be suppressing the symptoms
24 from an underlying problem.
25   Q.  The tests that were ordered on 8/6, were they

Page 80

1  appropriate?
2    A.  Well, I don't think so.  I wouldn't have
3  ordered them, because you had a normal urinalysis and
4  a normal creatinine.  So in view of the totality of
5  this patient's presentation, I would not have gone
6  there, particularly the stones in the diverticulum.
7  It's irrelevant.  He doesn't have any kidney disease.
8  So I wouldn't have ordered a clearance.  He's got a
9  normal creatinine.
10   Q.  In light of the IVP, you wouldn't have run
11 those tests?
12   A.  You know, it's not just the IVP, but he had a
13 normal urinalysis as well.  So I wouldn't have.
14   Q.  And then there is the -- two days later,
15 he's -- and I'm at Bates number 15 -- he's seen in
16 the -- again by PA Rodriquez.  Do you see that?
17   A.  Yes.
18   Q.  And that's for his hypertension, chronic
19 care?
20   A.  Okay.
21   Q.  And in the subjective portion of the note,
22 the physician's assistant writes, No somatic
23 complaints.  And do you take issue with him seeing the
24 patient here, anything he did here?
25   A.  No.  If someone comes in with -- that's in

Page 81

1  acute pain, I wouldn't take issue with seeing him.  I
2  would want you to see him.
3    Q.  But, again, with the patient having no
4  somatic complaints, would it be reasonable to continue
5  to follow the patient?
6    A.  Certainly.
7    Q.  Now, on 8/8 -- I'm going to jump to 8/21, I
8  believe is the next time he was seen.  I'm sorry.
9  It's 8/22.  And that's on Bates number 16.
10         MS. COCHRUN:  We're with you.  Okay.
11   Q.  And what, if anything, does that note do to
12 inform your opinion, Doctor?
13   A.  Well, he has the same -- or at least a
14 recurrence of the same pain.  I guess I'd have to go
15 back and look again and see on 8/6 if he had -- 7/25
16 or 26, if he had nausea and vomiting.  He certainly
17 has nausea and vomiting now.
18   So he's got a recurrence of his right upper
19 quadrant pain.  It's exacerbated by food.  So, once
20 again, the differential includes peptic ulcer disease,
21 gallbladder disease, certainly mesenteric ischemia.
22 You know, when you eat, it increases the oxygen demand
23 of the musculature of the gastrointestinal tract.  And
24 if the blood supply is inadequate and you develop
25 pain, it's analogous to coronary artery disease and

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

22 (Pages 82 to 85)

Page 82

1   the pain you get with that. So that would be in the
2   differential.
3       So this causes me to once again be concerned.
4   He's had this pain now for three weeks, I guess. So
5   I'm very concerned.
6       Q.  And he comes back the next day; is that
7   right?
8       A.  According to the notes.
9       Q.  Is there anything on 8/22 or 8/23 that
10  indicates to you that Mr. Coggin was bleeding?
11      A.  No. But, once again, the absence of proof is
12  not the proof of absence; so he could still have
13  peptic ulcer disease. He could, in fact, be bleeding.
14      Q.  But there's no indication that he is,
15  there, evidence of that?
16      A.  Well, but the diagnostic evaluation is
17  incomplete, so it would be difficult for me to answer
18  your question. I would say there is no evidence of
19  bleeding if an evaluation -- if an appropriate
20  evaluation had been completed and all those studies
21  were negative; but since the appropriate diagnostic
22  tests were not performed, it's difficult to say
23  whether or not he was bleeding.
24      Q.  And what, in your opinion, were the
25  appropriate diagnostic tests at this point, 8/22 and

Page 83

1   8/23?
2       A.  Well, this is a man with now recurring
3   abdominal pain. Certainly, at some point in time, you
4   want to do a rectal exam. If you're concerned about
5   peptic ulcer disease, you would want to stop his
6   NSAIDs and maybe -- I think he's taking Motrin at this
7   point in time. So maybe his pain would get better if
8   we stop it.
9       You know, sometimes we start a medication or we
10  stop a medication, and that helps us in our
11  diagnosis. As I said earlier, I wouldn't have even
12  placed him on an NSAID. Does that help?
13      Q.  I'm going to invite your attention to the
14  8/23 note --
15      A.  Yes.
16      Q.  -- where in the plan, there's one referral to
17  surgeon through Dr. Garcia. Is that appropriate, to
18  send him for an expert consult at that point?
19      A.  In my opinion, it's not.
20      Q.  And why not?
21      A.  Well, a surgeon in general is not in the
22  business of making a diagnosis. He's in the business
23  of operating. So to send someone to a surgeon, his
24  bias is to operate, not to do an extensive, thorough
25  evaluation. Now, surgeons at UAB send their patients

Page 84

1   to us to do that evaluation. So in that sense, the
2   patient hasn't been fully or thoroughly or
3   appropriately evaluated at this point in time to refer
4   him to a surgeon.
5       If he's referring the patient to a surgeon for
6   the diagnosis of cholelithiasis versus cholecystitis,
7   that's not correct, because the patient doesn't have
8   cholecystitis based on all the evidence thus far, no
9   gallbladder thickening on the ultrasound, no elevated
10  liver function tests, no fever, no jaundice, no
11  Murphy's sign, no Charcot's triad. So, you know,
12  sending someone to a surgeon is like asking your
13  barber to give you a haircut.
14      Q.  And I'll just read the note. It says
15  referral to surgeon, in parentheses, through
16  Dr. Garcia. And then do you see the next note is
17  7/25/01? I'm sorry. I misspoke. The next note is
18  8/23/01, the next day.
19      A.  Yes.
20      Q.  And that's Dr. Garcia's note?
21          MS. COCHRUN: No, it's not 8/23. It's 8/27.
22      Q.  I'm sorry. 8/27. I read the top of the
23  page. I'm sorry. It's 8/27.
24      A.  Okay.
25      Q.  And if you want to take a moment and take a

Page 85

1   look at that, Doctor.
2       A.  "Past three weeks, I've had this pain which
3   comes and goes. The pain is in the right quadrant.
4   Sometimes it radiates to the back. Sometimes nausea.
5   Not this last weekend, but Wednesday, Thursday --"
6       Yes. So he's vomiting, pain. Okay. He's lost
7   15 pounds. That's pretty serious pain.
8       Q.  And is that an appropriate subjective portion
9   of the note?
10      A.  The question is, is it appropriate?
11      Q.  Yes, as an S entry in the note.
12      A.  No, it's not.
13      Q.  Why not?
14      A.  If someone has abdominal pain that's
15  vomiting, the next question you want to ask is are you
16  vomiting blood, are you passing blood in your stool.
17  If the patient doesn't know how to determine whether
18  he has blood in his stool, you want to ask him. Most
19  patients, even educated patients, need to be coached
20  along that line. That is, do you have black, tarry
21  stools? Your stool consistency, has it changed? Does
22  it smell like old blood, so to speak?
23      So those would be important features that I would
24  really want to know about. In helping you make the
25  differential diagnosis, if somebody comes in with

Case 2:05-cv-01214-MEF-SRW    Document 50-5    Filed 01/04/2008    Page 23 of 36

JOHN COGGIN v. UNITED STATES OF AMERICA                     12/13/2007
Deposition of Phillip Smith, M.D.

23 (Pages 86 to 89)

Page 86

1  abdominal pain and a 15-pound weight loss, the next
2  question is, well, does your pain associate with
3  eating? Is there certain meal induced pain? And is
4  the weight loss due to food phobia from that?
5      So the differential there would be mesenteric
6  ischemia and/or peptic ulcer disease, but you'll
7  notice that he's afebrile, so that's just -- he's
8  not -- doesn't have a fever. Of course, he's taking a
9  whopping dose of nonsteroidals. If I'm not mistaken,
10 he's on Motrin. I think a few days before, he was put
11 on Anaprox. So he may well be on two nonsteroidals at
12 this point in time, which could reduce his
13 temperature. Anyway.
14     Q. And with his assessment, can you tell me how
15 that informs your opinion? It's on the next page of
16 that. That's Bates number 14.
17     A. Well, I think the assessment is totally
18 accurate. He has hypertension, at least a history of
19 hypertension. He does have a left -- he does have a
20 renal stone. Cholelithiasis with a question mark
21 is -- you could put down a lot of things with a
22 question mark. So that's -- nothing wrong with that.
23 And sludge was in the radiographic differential of
24 that echogenic focus in his gallbladder.
25     Q. And do you see the note where it says

Page 87

1  discontinue Motrin and Anaprox?
2      A. Yeah.
3      Q. Is that appropriate?
4      A. Definitely.
5      Q. And with respect to the rest of his plan, it
6  says, gastroenterology consult done, will follow up
7  after consult results available or as needed. Is that
8  appropriate?
9      A. Well, if you're asking me if the rest of his
10 plan is appropriate, I would say no, because you're
11 replacing two nonsteroidals with yet another
12 nonsteroidal, Sulindac. I think that's not
13 appropriate.
14     Q. And do you know whether the patient ever took
15 that medication?
16     A. Well, I don't know whether he took any of his
17 medications, for that matter; but it's in the record
18 that it was prescribed.
19     Q. And I want to invite your attention to his --
20 under the consult section.
21     MS. COCHRUN: You're on page 78.
22     MR. DOYLE: Yeah. I'm going to go to --
23     Q. Yeah, it's on 78.
24     A. Okay.
25     Q. Have you had a chance to take a look at that?

Page 88

1      A. Yes.
2      Q. And is that an appropriate ordering of a GI
3  consult?
4      A. Well, I think it's appropriate to send him,
5  but he's -- poorly calcified gallstone. I'm not
6  convinced that he did have a poorly calcified
7  gallstone. He had an echogenic focus in his
8  gallbladder. They don't know what that is. Polyps
9  are certainly in the differential. I'm sorry. Oh, he
10 does have a polyp here or sludge.
11     Is this appropriate? Yes, it's appropriate.
12     Q. And then I'm going to ask you to assume that
13 the gastroenterologist was not available until the 6th
14 of September. And is that too long to wait?
15     A. Yes.
16     Q. Okay. And was it appropriate to make a
17 referral to another specialist sooner?
18     A. To another gastroenterologist, sure.
19     Q. Okay. Well, how about to a surgeon at that
20 point?
21     A. Well, I think it's sort of -- going back to
22 what we said before, I think -- we help the surgeons.
23 And they appreciate our help. We provide them with
24 patients for whom we have made a diagnosis. And this
25 patient is -- has not been appropriately evaluated, so

Page 89

1  that there is not a diagnosis. So I don't think at
2  this point in time he should be sent to a surgeon. He
3  should have been sent to a gastroenterologist.
4      Maybe Dr. Rodriquez -- maybe Dr. Rodriquez has
5  some difficulty doing rectal exams, but you could send
6  him to a gastroenterologist to do a rectal exam and to
7  do endoscopy. That would be the typical and
8  appropriate care at this point in time.
9      Q. Was it reasonable for Dr. Garcia to want him
10 to be seen by an outside specialist?
11     A. I mean it depends on the specialist, what
12 kind of specialist it is. Sure. Well, excuse me.
13 You know, I think that I would have been embarrassed
14 if I were Dr. Rodriquez.
15     MS. COCHRUN: Garcia. You're changing the
16 name.
17     A. Rodriquez or Garcia. I would have been
18 embarrassed, as a member of a team taking care of this
19 man, to send him out without having been appropriately
20 evaluated. Most physicians pride themselves on
21 sending a patient to another doctor who has been fully
22 evaluated so that the doctor who's doing the consult
23 can take the data and interpret it instead of attain
24 the appropriate data himself in terms of basic things.
25     Q. Now, I'm going to invite your attention to

JOHN COGGIN v. UNITED STATES OF AMERICA                12/13/2007
Deposition of Phillip Smith, M.D.

24 (Pages 90 to 93)

---

Page 90

1  page number Bates 77. That's the consult form for
2  Dr. Williams.
3     A.  Okay.
4     Q.  And is it your testimony that you disagree
5  with sending him to a surgeon at that point?
6     A.  I do, yes.
7     Q.  Do you think that's a violation of the
8  standard of care?
9     A.  I wouldn't say it's a -- I wouldn't use the
10 word "violation." That's a bit harsh or
11 inflammatory. I think I would use the word it's not
12 appropriate at this point in time. I would want to
13 know what the cause of his pain is. And I would ask
14 someone who's skilled in diagnostic evaluation to help
15 me; namely, a gastroenterologist.
16    Q.  And was it appropriate to ask Dr. Williams to
17 please evaluate and treat accordingly?
18       MS. COCHRUN:  Object to form.
19    A.  So is he not the surgeon?
20    Q.  He is.
21    A.  Well, as I -- I'm not --
22       MS. COCHRUN:  No, you're right. You're
23 right.
24    A.  I'm not trying to be difficult. I just --
25    Q.  So you think that whole consult is

---

Page 91

1  inappropriate?
2     A.  I do. I think that, you know, the man has
3  not even had a rectal exam yet. They're sending him
4  to a surgeon. It's, you know --
5     Q.  And I want to invite your attention, Doctor,
6  to Dr. Williams' dictated consult, which begins at
7  page number 73 and continues to 74. Take a look at
8  that, and I'll ask you some questions.
9     A.  Okay.
10       (Brief pause)
11    A.  Okay.
12    Q.  Is there any evidence when Dr. Williams
13 evaluated the patient on August 29th, '01, that he was
14 bleeding at that point?
15    A.  Well, again, with all due respect, Mr. Doyle,
16 I would have to, you know, once again refer to the
17 admonition that the absence of proof is not proof of
18 absence. He certainly could be bleeding. We just
19 don't have any evidence one way or the other. So I
20 couldn't say he's not or even probably is not.
21    Q.  And can you know whether or not he had a
22 perforation when Dr. Williams examined him?
23    A.  You know, I think that most surgeons who are
24 educated and trained in the United States can provide
25 a high level of suspicion as to whether a patient has

---

Page 92

1  a perforation, based on physical examination. So I
2  would agree with that.
3     Q.  Would Dr. Williams, who is a board-certified
4  surgeon, be in a position to judge whether Mr. Coggin
5  had an acute abdomen at that point?
6     A.  Based on, I presume, his education and his
7  training and experience, I would presume so.
8     Q.  And would he be in a better position to make
9  that determination than anyone simply looking at the
10 records years after the fact?
11       MS. COCHRUN:  Object to form.
12    A.  I'm not quite sure what you're asking.
13    Q.  A board-certified surgeon that examined this
14 man in his office --
15    A.  Yes.
16    Q.  -- would he be in a better position to make a
17 determination whether he had an acute abdomen at this
18 point than any of us reviewing the records years after
19 the fact?
20       MS. COCHRUN:  Object to form.
21    A.  Well, possibly, yes.
22    Q.  And would Dr. Williams be in a position to
23 determine whether the patient had GI bleeding at that
24 point?
25    A.  Would he be in a position to? Yes, he would

---

Page 93

1  be in a position to. But did he? Let's see. I mean,
2  this is a question. Once again, he hasn't done a
3  rectal exam on the man, so I find that disconcerting.
4  But would he be in a position? He is in a position as
5  a surgeon in Montgomery, Alabama, in the year 2001.
6     Q.  And his plan was to perform a laparoscopic
7  cholecystectomy; is that right?
8     A.  It looks like -- is that what he says he's
9  going to do? Yes, that's what he recommends.
10    Q.  Was it reasonable for Dr. Garcia, the general
11 practitioner, to follow the plan for the surgery?
12    A.  You know, if you disagree with the surgeon, I
13 think it would not be reasonable. And I disagree with
14 this surgeon.
15    Q.  Okay. If a general practitioner agreed with
16 the surgeon?
17    A.  Then they could both be wrong. And if -- go
18 ahead. I'm sorry.
19    Q.  In your opinion, did Dr. Williams violate the
20 standard of care here?
21    A.  The standard of care for this problem, the
22 patient would have undergone endoscopy and they would
23 have evaluated his stomach, his esophagus, stomach and
24 duodenum.
25    Q.  And at what point --

JOHN COGGIN v. UNITED STATES OF AMERICA                          12/13/2007
Deposition of Phillip Smith, M.D.

Page 94

1    A.  And it's quite likely you would have done an
2  ultrasound at the time of endoscopy and conclusively
3  make the diagnosis of whether this is a stone or a
4  polyp.
5    Q.  Doctor, at what point do you feel that the
6  standard of care required endoscopy?
7    A.  Back at the beginning when he first
8  presented.
9    Q.  On the first day?
10   A.  Yes.
11   Q.  So your testimony is that endoscopy was
12 required on July 25th?
13   A.  That he should have been observed.  And,
14 certainly, he should have had a rectal exam
15 performed.  And if the rectal exam showed any form of
16 blood or if there was any, then he should have had an
17 endoscopy done at that time.  It should have been
18 considered at that point in time.  That is, you know,
19 I think it should have been strongly considered back
20 then or somewhere along the line.
21   The man has never had a rectal exam.  He's never
22 had endoscopy.  He's never had endoscopic ultrasound.
23 If this were indeed a gallbladder problem, he -- if
24 this is sludge, he's never had the opportunity of
25 having a non-invasive procedure such as ERCP.  He's

Page 95

1  gone from an inadequate evaluation to being prepared
2  for or having surgery advised.
3    So those are the things that could have been
4  done:  rectal exam, endoscopy, endoscopic ultrasound.
5    Q.  Now, we know, with the benefit of hindsight,
6  that on September 2nd, the patient went to Baptist
7  Medical Center and had GI bleeding; is that -- can we
8  agree with that?
9    A.  I think that's correct, yes.
10   Q.  Do you want to look at the document?
11       MS. COCHRUN:  No, no.  If you were going to
12 go over it, I was just going to pull it out of this
13 stack here.
14   Q.  And, Doctor, at this point -- I should have
15 done this earlier.  I have an '01 blank calendar that
16 may help us follow some dates.  Would that be helpful
17 to you?  If it's okay, we can look at this.  If not,
18 it helps me.
19   A.  Sure.  Well, I remember what -- this is 2001?
20   Q.  Yeah.  These are just '01 blank pages.
21   A.  I remember what day?  September 11th?
22   Q.  Yes.  And the patient was transported from
23 the prison to Baptist on September 2nd?
24   A.  Okay.  I believe you.
25   Q.  Okay.  And we know he was -- had GI bleeding

Page 96

1  at that point.  Would you agree with me?
2    A.  You know, I'd have to --
3    Q.  Please look at the record.  And I can invite
4  your attention to specific points.  To establish the
5  date, I'm just going to invite your attention to page
6  178.  Do you see that, that ER record?
7    A.  I see it.
8    Q.  And it's September 2nd?
9    A.  Okay.
10   Q.  And we've got a --
11       MS. COCHRUN:  What page are you on?
12   Q.  Okay.  On page 182, if you read the nurses'
13 notes.  I'll invite your attention -- it's about the
14 middle, where we're talking about an NG tube placed.
15   A.  I see black -- is it before or after black
16 stools?
17   Q.  It's after that.
18   A.  NG tube inserted.  Okay.  So they placed it.
19       MS. COCHRUN:  Are you at lavage?  Is that
20 where you are, Steve?
21       MR. DOYLE:  Yeah.  Yeah.  400 cc's.
22   A.  Okay.
23   Q.  So would you agree that on the 2nd, he
24 had upper GI bleeding?
25   A.  I would.

Page 97

1    Q.  Okay.  Can you determine when that upper GI
2  bleeding started?
3    A.  No.
4    Q.  Okay.  And it could have started that day,
5  isn't that right, September 2nd?
6        MS. COCHRUN:  Object to form.
7    A.  It could have started that day.
8    Q.  And GI bleeding can develop suddenly with
9  NSAID use; isn't that correct?
10   A.  Let me just take one more look.
11   Q.  Look at any of those records you like,
12 Doctor.
13   A.  No.  It could not have started that day.
14   Q.  I'm sorry?
15   A.  It could not have started that day --
16   Q.  Okay.  When --
17   A.  -- because he had black stools.  So that's
18 going to take several days for the blood to become
19 oxidized as it travels through the gastrointestinal
20 tract.  He has melaena, so his bleeding started before
21 then.
22   Q.  Can you tell when?
23   A.  No.
24   Q.  Would you agree that GI bleeding can develop
25 suddenly with NSAID use?

Case 2:05-cv-01214-MEF-SRW     Document 50-5     Filed 01/04/2008     Page 26 of 36

JOHN COGGIN v. UNITED STATES OF AMERICA                           12/13/2007
Deposition of Phillip Smith, M.D.

26 (Pages 98 to 101)

**Page 98**

1   A. Yes.
2   Q. Should an ulcer start to heal -- should an
3   NSAID-induced ulcer start to heal when the NSAIDs are
4   stopped?
5   A. It depends on how deep and extensive the
6   ulcer is. So if you've got an ulcer that is caused by
7   a nonsteroidal anti-inflammatory agent, if you stop
8   that agent and that ulcer is deep and bleeding, it can
9   continue to bleed. You could stop that NSAID. If the
10  ulcer has passed through the mucosa such that a
11  perforation has occurred, that perforation would still
12  be there.
13      So, again, it depends on the severity of
14  complication from the NSAIDs. I don't know whether
15  just stopping them would resolve that problem.
16  Q. In general, a major cause of ulcers is
17  NSAIDs; is that correct?
18  A. Correct.
19  Q. And if the NSAIDs are stopped, does the
20  healing process begin?
21  A. Well, again, it depends on how severe it is.
22  If the patient is bleeding from an NSAID-induced ulcer
23  and you stop the NSAID, it's -- it depends on whether
24  it's an arterial bleed that's caused by the ulcer --
25  he'll continue to bleed. You have to do something to

**Page 99**

1   stop that bleed. If the ulcer has penetrated, if it's
2   in the duodenum or the posterior wall of the duodenum
3   and it's penetrated into the pancreas, stopping the
4   NSAID is not going to stop the problem.
5   Q. How about if it hasn't, if it's not bleeding?
6   A. Well, I guess it would depend on if -- you
7   could have a penetrating perforation that's not
8   bleeding. And stopping the NSAIDs is not going to
9   solve the perforation problem and possible
10  peritonitis.
11  Q. What if you don't have a perforation?
12  A. So I think what you're --
13  Q. Let's say you have a moderate --
14  A. A small erosion? Yes, that will start to
15  heal.
16  Q. At what level would it not start to heal upon
17  cessation of the NSAIDs?
18  A. Well, I just said if it's a penetrating
19  ulcer, if it's a bleeding ulcer, particularly, if it's
20  an arterial bleed, if it's in the duodenum, in the
21  posterior wall and communicating with the pancreas,
22  stopping the NSAIDs will not solve the person's
23  problem -- or may not solve the person's problem,
24  likely wouldn't.
25  Q. Have you -- in forming your opinion, did you

**Page 100**

1   review the records from Baptist Medical Center?
2   A. Well, I reviewed everything.
3   Q. You've seen those records before?
4   A. Yes.
5   Q. Because I'm going to ask a couple of
6   questions about them, but I don't want to --
7   A. Okay.
8   Q. If you haven't studied them, I don't want to
9   belabor.
10  A. Well, there's a difference between reviewing
11  them and studying them.
12      MS. COCHRUN: He has not committed them to
13  memory, as neither of us have either, I don't think.
14  Q. Did Mr. Coggin get appropriate treatment at
15  Baptist Medical Center, in your opinion?
16  A. I really would have to go back and look at
17  the details. He had a bleeding ulcer, and it needed
18  to be taken care of surgically because it was a
19  life-threatening bleed. It's dropped his hematocrit
20  from over 40 to 19. So in someone that's 53 years old
21  that dropped their hematocrit by 50 percent, maybe
22  even more, because they were probably hydrating him --
23  so I think he needed surgery. I would agree with the
24  need for surgery. It sounds like he had a
25  life-threatening bleed.

**Page 101**

1   Q. And do you know when the surgery was actually
2   performed?
3   A. I think, if I'm not mistaken, it was
4   performed like on the 3rd of September. Is that when
5   it was?
6   Q. Well, it was performed the 6th, Doctor.
7       MS. COCHRUN: He was admitted on the 3rd.
8   A. Well, the 6th, then.
9   Q. And do you want to see -- I'll invite your
10  attention to -- the surgical note is --
11      MS. COCHRUN: 93. We're there.
12  A. Okay.
13      MR. DOYLE: It's 195, I believe.
14      MS. COCHRUN: Pardon?
15      MR. DOYLE: The surgical note I believe is
16  195.
17      MS. COCHRUN: Okay. I just pulled it out of
18  the other thing because it was quicker --
19      MR. DOYLE: That's fine.
20      MS. COCHRUN: -- because it was easier to
21  pull out than 195 pages worth of junk.
22  Q. I'm just establishing the date, Doctor.
23  Would you agree with me that the surgery was performed
24  on the 6th?
25  A. I would agree with you.

JOHN COGGIN v. UNITED STATES OF AMERICA                12/13/2007
Deposition of Phillip Smith, M.D.

Page 102

1    Q.  With that in mind, would it have made -- and
2  the patient was taken to the hospital on the 2nd.
3  Would you agree with that?
4    A.  Or was it the 3rd?  Well, he was admitted on
5  the 3rd, so I presume he was taken on the 3rd.
6    Q.  Well, he was taken there on the 2nd.
7    MS. COCHRUN:  In the middle of the night sort
8  of thing.
9    A.  Well, I guess the clock struck midnight.  So
10  I guess I would have to agree with you.
11    Q.  Would it, in your opinion, have made any
12  difference if he was taken to the hospital on the
13  31st?
14    A.  It might have.
15    Q.  In what way?
16    A.  He, we may not have been bleeding then.  He
17  may not have had as severe a problem involving the
18  gastroduodenal artery.  I think that you could have
19  possibly, if not probably, prevented this ultimate
20  sequelae if he had been treated appropriately weeks
21  before.
22    Q.  Okay.  I'm not talking about weeks.  You
23  agree with me he was taken to the emergency room on
24  the 2nd?
25    A.  Yes, I do.

Page 103

1    Q.  Okay.  If he was taken on the 1st, would that
2  have made any difference?
3    A.  Probably not on the 1st.
4    Q.  Okay.  If he was taken on the 31st, would
5  that have made any difference?
6    A.  I don't know.
7    Q.  Okay.  How about on the 30th?
8    A.  If I don't know on the 31st, then I don't
9  know on the 30th.
10    Q.  And on the 29th, the day that he saw Antonio
11  Williams?
12    A.  You know, I just don't know.  It might have.
13  I think the farther you go back in the delivery of
14  care to this man, the more likely the possibility that
15  something could have been done to intervene and
16  prevent what happened.
17    Q.  You can't say that to any reasonable degree
18  of medical certainty, can you?
19    MS. COCHRUN:  I object to the form of the
20  question.
21    A.  I can say it with a strong likelihood that
22  that would have been the case.
23    Q.  On the 29th, it would have been --
24    A.  I said early, as you go farther back.
25    Q.  I'm only talking about on the 29th.

Page 104

1    A.  I can't say whether the 29th was the magical
2  day that he turned the corner and he had to go to
3  surgery.
4    Q.  I'm going to show you -- have you seen his
5  prison commissary purchase records?
6    A.  The commissary?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Then I won't attach them, but I'll show you a
10  copy.  That's Bates number 397.  Let me know when
11  you're there.
12    A.  I'm there.
13    Q.  And do you see the receipt that's in the
14  center of the page --
15    A.  Yes.
16    Q.  -- dated 7/24/01?
17    A.  I do.
18    Q.  And do you see that he purchased two boxes of
19  ibuprofen tablets that day?
20    A.  I see the receipt for it, correct.
21    Q.  Okay.  And you see two bottles of aspirin?
22    A.  I do.
23    Q.  And two boxes of non-aspirin pain reliever?
24    A.  Yes.
25    Q.  If Mr. Coggin took any of these

Page 105

1  over-the-counter medications, would it have
2  contributed to his risk of ulcer?
3    A.  I think he was already predisposed to ulcer,
4  having been prescribed the Motrin.  And he started off
5  with an injectable nonsteroidal, and he was given
6  Motrin and Anaprox, and he was given Sulindac.  So
7  whether or not he took additional nonsteroidals, I
8  think was almost inconsequential.  I think the errors
9  that were made were way back in the beginning.
10    Q.  And I invite your attention to the next Bates
11  number 398.  Again, the receipt in the center of the
12  page that shows the purchase of additional ibuprofen.
13  Do you see that?
14    A.  Yes, I see that.
15    Q.  And that's on August 14th, '01.  Do you see
16  the date?
17    A.  Yes.
18    Q.  And I'm going to ask you the same question.
19  In your opinion, if he took this ibuprofen, would it
20  have contributed to his risk of ulcer?
21    A.  Well, if his risk of ulcer was already
22  established when he was prescribed more than one
23  nonsteroidal anti-inflammatory agent, specific data is
24  that when someone is taking one steriodal, their risk
25  increases.  It increases substantially when you add

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

28 (Pages 106 to 109)

---

### Page 106

1  another nonsteroidal anti-inflammatory agent. He had
2  already been prescribed at least three, if not four,
3  by this point in time.
4      Q. And I'd like to invite your attention to that
5  page back before 397. And it's cut off, but I have a
6  better one. I don't think it's important. I'm
7  looking at the -- why don't we look at all three.
8      Do you see these purchases of Pepsi? Do you see
9  the purchases of Pepsi?
10     A. I do.
11     Q. And assume that the evidence will show for
12 purposes of my question that each one Pepsi is a
13 six-pack of Pepsi, not an individual can.
14     Would heavy drinking of Pepsi contribute to the
15 risk of an ulcer?
16     A. Not that I know of. Not that I know of.
17     Q. Okay. Are there any dietary factors
18 associated with ulcers?
19     A. In terms of food or in terms of beverage?
20     Q. Let's start with beverage.
21     MS. COCHRUN: And when you say in terms of,
22 are you saying causing ulcer?
23     MR. DOYLE: Causing, exacerbating,
24 contributing.
25     A. Well, you know, a drink or a couple of

---

### Page 107

1  drinks, certainly, I don't think would influence his
2  underlying process. However, it's well known and has
3  been well studied -- and I can remember a paper in
4  1996 in I think The American Journal of
5  Gastroenterology -- the first author was Wilcox -- in
6  which it was shown that the leading cause of upper GI
7  bleed among chronic alcoholics -- in a population of
8  over 700 individuals seen at Emory, the leading cause
9  was peptic ulcer disease, not alcohol-induced
10 gastrotrophy.
11     So alcohol-induced gastritis with bleeding -- is
12 that what you're talking about? Are we talking
13 about -- did you ask me about alcohol?
14     MS. COCHRUN: He asked you about beverages.
15     Q. But, in fact, Doctor, we don't think that
16 there's alcohol in prison.
17     MS. COCHRUN: Well, you were answering the
18 beverage question. He hadn't gotten to the food yet.
19 And so is the only beverage -- are you saying is
20 alcohol?
21     THE WITNESS: Alcohol does not cause upper GI
22 bleed unless there's an ulcer. It doesn't cause
23 gastritis. And only in chronic -- chronic alcohol
24 consumption.
25     Q. Any literature on decaffeinated beverages?

---

### Page 108

1      A. Not that I know of.
2      Q. Okay. Any literature on acidic beverages?
3      A. Not that I know of.
4      MR. DOYLE: You want to take a break?
5      THE WITNESS: I want to finish.
6          (Brief recess)
7      Q. Doctor, I'm going to show you a copy of your
8  report and ask that it be marked as Defendant's
9  Exhibit #2.
10     A. Okay.
11     Q. Have you updated or changed your opinion
12 since writing this report?
13     A. Have I updated? I don't -- I don't think
14 I -- do I still believe what I wrote here?
15     Q. Yes.
16     A. Yes.
17     Q. Has your opinion changed in any way?
18     A. Well, yes, it has.
19     Q. And in what way is that?
20     A. Well, my opinion has been strengthened after
21 reviewing the record again and after reviewing I think
22 Dr. -- the doctor from Hopkins and the doctor from the
23 prison system. Their -- what do you call them --
24 depositions strengthened my opinion. The pharmacist
25 as well. His deposition also convinces me more that

---

### Page 109

1  my interpretation is correct.
2      Q. And, Doctor, I'm going to invite you to the
3  second page of your report.
4      A. Okay.
5      Q. And you have it looks like nine points, in
6  parentheses.
7      A. Okay.
8      Q. And I just want to go through them.
9      A. Sure.
10     Q. The first, you state, The patient was not
11 properly questioned as to symptoms of upper
12 gastrointestinal bleeding. As noted in the
13 affidavits, others observed the patient vomit blood;
14 but the patient was not adequately questioned about
15 his symptoms by the care providers.
16     Assume that the patient never vomited blood.
17 Would that change your opinion?
18     A. Probably not, because he dropped his
19 hemoglobin during this time.
20     Q. Okay. And when did that occur?
21     A. I'd have to go back and check the days, but
22 he dropped his hemoglobin from something over 15 to 13
23 during this August -- late July to mid August. So he
24 lost a significant amount of hemoglobin. That
25 suggests, you know, he's bleeding.

JOHN COGGIN v. UNITED STATES OF AMERICA                     12/13/2007
Deposition of Phillip Smith, M.D.

29 (Pages 110 to 113)

Page 110

1    Q.  What might be the other causes of losing
2  hemoglobin?
3    A.  Well, if you had a certain type of anemia
4  called thalassaemia, minor or major; if you had
5  metastatic disease to your bone marrow and you're
6  losing the capacity to produce red blood cells; if you
7  had leukemia.  Certain toxic agents can cause aplastic
8  anemia, so you become anemic.
9    Q.  And if you could go through the -- each point
10  for me.
11    A.  Okay.  Sure.  So he was not properly
12  questioned.  I think the point that I made earlier is
13  that if you don't look for something, you're not going
14  to find it.  So he wasn't questioned about it because
15  the physician didn't look for it, look for it with a
16  rectal examination and putting down an NG tube at some
17  point in time.
18    You know, the second point there, that an NG tube
19  was not placed to look for blood, a digital
20  examination was not performed.
21    Point number three --
22    Q.  And on point two, Doctor, at critical points
23  in the patient history, could you just tell me where
24  you feel that an NG tube should have been inserted?
25    A.  Well, you know, there was an affidavit by

Page 111

1  another inmate that he had vomited blood.  He
2  witnessed the patient vomit blood.  Well, boy, you
3  need to confirm that.  And so at that point, he
4  certainly should have had an NG tube placed.
5    Q.  Okay.  With respect to three?
6    A.  Peptic ulcer disease should have been in the
7  differential when he first presented on July 26th or
8  5th.
9    Q.  And have we covered four?
10    A.  Well, I think we have.
11    Q.  And I do want to ask could the patient, when
12  he presented, not have had peptic ulcer disease?
13    MS. COCHRUN:  I object to form.
14    A.  Well, I think that in view of the symptoms
15  with which he presented and the negative findings with
16  respect to his gallbladder and his urinary tract, that
17  peptic ulcer disease was the most likely diagnosis.
18    Q.  All right.  On number five, can you explain
19  that to me, please?
20    A.  Well, he had -- the renal stone was on the
21  left side, and he had a normal urinalysis, so it was
22  not necessary to do the IVP.  In a normal urinalysis,
23  normal creatinine, no blood in his urine, I think that
24  the evaluation was distracted.
25    Q.  Does that show that Oscar Rodriquez was

Page 112

1  looking for the cause of the pain?
2    MS. COCHRUN:  Object to form.
3    A.  I can't speak for Mr. Rodriquez or why he
4  ordered that.  I guess he ordered it because his
5  initial evaluation included a flat plate of the
6  abdomen and a stone was observed in the left renal
7  system.
8    Q.  And number six?
9    A.  Well, you know, I think it's
10  self-explanatory.
11    Q.  That's what I was -- do you have anything to
12  add to number six?
13    A.  I don't.
14    Q.  And do you have anything to add to number
15  seven?
16    A.  I don't.
17    Q.  Number eight, do you have any -- is that
18  speaking of the Tylenol Number 3?
19    A.  Correct.
20    Q.  And in your opinion, did that have any effect
21  on the outcome for this patient?
22    A.  Well, it delayed the workup.
23    Q.  And number nine, I'm going to ask you to
24  pinpoint when you think endoscopy was required by the
25  standard of care.

Page 113

1    A.  Well, if this patient had been referred to me
2  with an acute abdomen, I would have hospitalized him.
3  I would have observed him overnight.  I would have
4  done -- well, I would have done a rectal examination
5  at the time of admission.  In view of the severity of
6  his symptoms, even in the absence of overt vomiting of
7  blood, I would have likely put down an NG tube.  When
8  I had all of his liver function tests back and his
9  ultrasound back, I would have, probably the next day,
10  considered doing an EGD.
11    Q.  Anything else you would like to add to your
12  report, Doctor?
13    MS. COCHRUN:  And let me object to the form
14  of that.  I mean, this report -- he's given you a
15  deposition for now hours and given you plenty of
16  fleshing out of this.  I don't want there to be any
17  question in the form of your question that somehow
18  this is it as opposed to everything that went with it.
19  We've been doing this for the last four hours.
20    Q.  Doctor, re-reading your report now, is there
21  anything you would want to add with respect to your opinion?
22    MS. COCHRUN:  Same objection.
23    A.  At this very moment, there's nothing that I
24  would add.  That doesn't preclude that in 15 minutes
25  or an hour, I'll think of something that I might want

JOHN COGGIN v. UNITED STATES OF AMERICA                          12/13/2007
Deposition of Phillip Smith, M.D.

30 (Pages 114 to 117)

Page 114

1    to add.
2        Q.  And if you do, would you please inform me?
3        MS. COCHRUN:  And we will let you know.
4        A.  I'd be pleased to.
5        Q.  I want to ask you to take a look at
6    Dr. Okolo's report.  I'm going to ask that it be
7    marked as Defendant's Exhibit #3.  And I've got a copy
8    for you.
9        A.  Okay.
10       Q.  Have you reviewed this previously?
11       A.  Yes.
12       Q.  Do you disagree with anything in Dr. Okolo's
13   report?
14       A.  I disagree with some of his conclusions.
15       Q.  And please tell me what you disagree with.
16       A.  Oh, boy.  I guess I would have to -- well,
17   the signs on page -- well, it's not page numbered.
18       Q.  I'm sorry.  Nor is mine.
19       MS. COCHRUN:  Here.  We can do numbers on
20   this.  You want to do that?  There's 10 pages.
21           (Off-the-record discussion)
22           (The court reporter read from the
23           record.)
24       A.  So I disagree with the conclusion that the
25   signs and symptoms of this patient point to

Page 115

1    gallbladder disease within the limits of the highest
2    degree of certainty possible from a clinical
3    encounter.
4        I would -- if I interpret his sentence
5    correctly -- and there is some difficulty in
6    interpreting what he has written here, but he's saying
7    he's -- there's a -- the highest degree of certainty
8    that this is gallbladder disease.  I disagree with
9    that.  I think my disagreement is appropriate based on
10   all the things that I have said and the fact that he
11   turned out to have peptic ulcer disease.
12       Q.  Is there anything else in Dr. Okolo's report
13   you disagree with?
14       A.  You know, a diagnosis -- in the same
15   paragraph, "a diagnosis of the cause of abdominal pain
16   and the statistical likelihood of these signs and
17   symptoms occurring simply by happenstance," I tell
18   residents and interns when someone has a
19   gastrointestinal problem such as an ulcer, there is a
20   reason for it.  So I -- this is difficult for me to
21   accept.  Things don't happen by happenstance.  There's
22   a reason for them.
23       So if he is suggesting that -- I don't know.
24   That doesn't make sense to me.  I strongly disagree
25   with the interpretation that there are no symptoms or

Page 116

1    signs pointing to peptic ulcer disease.  That simply
2    is wrong.
3        Q.  And why is that?
4        A.  Because abdominal pain and his other eventual
5    symptoms, including nausea and vomiting, are
6    consistent with peptic ulcer disease.  It's not to say
7    that other diseases or processes should not be in the
8    differential, but certainly peptic ulcer disease
9    should not be excluded.  It wasn't excluded.  Well,
10   no, let's say that it wasn't, that it wasn't excluded,
11   because it wasn't even considered.  His signs and
12   symptoms do not exclude peptic ulcer disease.
13       "A digital rectal examination for the purpose
14   of fecal occult blood testing is not considered
15   standard of care in the evaluation of a patients with
16   upper abdominal pain."
17       Well, most people who graduate from American
18   medical schools know the importance of doing a rectal
19   examination as part of a thorough evaluation of the
20   gastrointestinal tract.  A major symptom of the
21   gastrointestinal tract is abdominal pain.  So if
22   someone comes to me in my clinic, almost regardless of
23   their symptoms, I do a rectal examination for the sake
24   of thoroughness and to be complete.
25       Q.  Is there anything else in the report you

Page 117

1    disagree with?
2        A.  You know, he -- there is some disregard for
3    upper endoscopy and should be dictated by clinical
4    presentation.  Well, I guess there we disagree.  And
5    as I stated earlier, it should have been done sooner.
6    And when someone presents with these kind of
7    symptoms -- extreme abdominal pain, extreme tenderness
8    to touch, reduced bowel sounds -- they should be
9    observed and, at UAB, would be observed overnight and
10   the next day, endoscopy, if the patient's symptoms
11   persisted.  And they did in this case, so endoscopy
12   would be considered.
13       The patient had no indication of a perforation,
14   so there was not a contraindication to doing upper GI
15   endoscopy.  And if it had been done, it very probably
16   would have altered the clinical course of this
17   patient's care and subsequent events.
18       I, in the strongest of terms, disagree with the
19   interpretation that ibuprofen was appropriate.  This
20   was a man who had abdominal pain and we did not know
21   the cause of his abdominal pain.  It is inappropriate
22   to prescribe NSAIDs in that circumstance.
23       Q.  Do you disagree with anything else in the
24   report, Doctor?
25       A.  Let's see.  You know, if someone comes in

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

31 (Pages 118 to 121)

Page 118

1  with the possibility of an acute abdomen and that's in
2  my differential, then I would want a
3  gastroenterologist and a surgeon to see that patient
4  certainly within 24 hours.  So with all due respect, I
5  think that the patient should have been seen by a
6  gastroenterologist sooner than he was.
7      Q.  Do you disagree with anything else in the
8  report, Doctor?
9      A.  Well, yes.  If a patient has biliary colic --
10 he says that, "Mr. Coggin's clinical picture was
11 consistent with biliary colic and a decision to
12 proceed with cholecystectomy was both well reasoned
13 and appropriately made by board."
14     Well, it wasn't appropriately and it wasn't well
15 reasoned because you could have made the diagnosis,
16 without sending the patient to surgery, with upper GI
17 endoscopy.  You, first of all, would have seen he had
18 a bleeding ulcer.  Had he not a bleeding ulcer, had
19 his problem been due to sludge or a stone or a polyp,
20 ultrasonography done at the time of endoscopy would
21 have, without a doubt, made the diagnosis.  So that
22 could have, if not should have, been done.
23     Q.  Anything else in the report you disagree
24 with?
25     A.  Well, "he was not at baseline at a high risk

Page 119

1  for the use of nonsteroidals."  Without having
2  performed an endoscopy to know whether or not he had
3  ulcer disease, this statement cannot be made.  Had the
4  patient had no peptic ulcer disease, then the
5  statement is accurate.  If the patient had ulcer
6  disease, which he turned out to have, the statement is
7  not correct; because nonsteroidals have a higher -- a
8  much higher risk of complications in the setting of
9  ongoing peptic ulcer disease.
10     Q.  Do you disagree with anything else in the
11 report?
12     A.  I did not -- I have no evidence with which to
13 evaluate as to whether or not he added to his
14 prescriptions of Motrin and Anaprox and, ultimately,
15 Sulindac, if he added over-the-counter nonsteroidal
16 agents.  The ibuprofen that he purchased, if I'm not
17 mistaken, I think something about -- I read somewhere
18 that the boxes were not opened.
19     Q.  Doctor, if he did take them, would you agree
20 with Dr. Okolo's statement?
21     A.  Well, no, I don't because -- "he was on
22 therapeutic doses of ibuprofen but added additional
23 doses of ibuprofen exceeding ordinarily allowable
24 doses."  Well, without knowing how much he added, if
25 he did add any, you couldn't say whether or not he had

Page 120

1  exceeded the recommended dosage.
2      And so in conclusion, I do not believe that
3  Mr. Coggin received appropriate care -- he received
4  appropriate care at referral.  Sorry.  I agree that he
5  received appropriate care at Baptist Hospital, Baptist
6  Medical Center.  Well, yes, I think he did because at
7  that point, he had a bleeding posterior-wall duodenal
8  ulcer and needed surgery.
9      Q.  Doctor, could Mr. Coggin have had biliary
10 colic when he first presented?
11     A.  Could he have?  It's within the possibility.
12 Because, as I said, it's in the differential.
13 Gallbladder disease is within the differential of
14 right upper quadrant pain, so he could have.
15     Q.  And his ulcer could be NSAID induced?
16     A.  Correct.
17     Q.  So could he have had both biliary colic and
18 then developed an ulcer as a complication of NSAID
19 use?
20     A.  He could have had transient biliary colic,
21 but I think it is unlikely without any other evidence,
22 that he had obstruction; namely, as we've talked, a
23 dilated common bile duct or elevated liver function
24 tests.
25     Q.  Can sludge cause biliary colic?

Page 121

1      A.  Yes.
2      Q.  And can that spontaneously result?
3      A.  It can.
4      Q.  Did you take a look at Dr. Okolo's CV?
5      A.  I did.
6      Q.  And please give me your opinion on
7  Dr. Okolo's qualifications.
8      MS. COCHRUN:  I guess I'm going to object to
9  form.  Opinion as to does he have them or does he not
10 have them or --
11     A.  I'm not --
12     Q.  Evaluate his qualifications for me.
13     A.  I don't know what medical school in Nigeria
14 is like; but having spent a substantial amount of time
15 in South Africa, I know what medical education in
16 Africa at a good medical school is like.  So I think
17 that his education at Nigeria is probably not
18 equivalent to the education that someone would receive
19 at a medical school in the United States.  I think
20 that his bibliography is not distinguished.
21     Q.  And what's the basis for that opinion,
22 Doctor?
23     A.  Well, he has very, very few publications.  He
24 has a few -- I mean many of what he lists as
25 publications are actually abstracts.  Without knowing

JOHN COGGIN v. UNITED STATES OF AMERICA                                    12/13/2007
Deposition of Phillip Smith, M.D.

32 (Pages 122 to 125)

Page 122

1  the volume and the page numbers and the years of some
2  of his publications, it's hard to assess them. He has
3  presentations in the section listing publications and
4  abstracts. For example, the New Orleans AGA meeting
5  in 1998, that's a presentation; that's not a
6  publication.
7      So I think that the publication record is meager
8  and does not reflect someone who has an in-depth
9  investigative experience in gastroenterology.
10     Q.  Anything else about your evaluation of his
11 CV?  Do you have any further opinion?
12     A.  I probably have said enough.
13     Q.  Doctor, I'm just going to show you your fee
14 schedule that was included in your report and mark it
15 as Government Exhibit #3.
16     A.  Yes.  I think that is -- that is my fee
17 schedule.
18     THE WITNESS:  And I notice that it's
19 substantially less than my colleagues at Johns
20 Hopkins, Ms. Cochrun.
21     Q.  And is that still your fee schedule, Doctor?
22     A.  Well, having reviewed Dr. Okolo's fee
23 schedule, I may consider amending my fee schedule.
24     MS. COCHRUN:  Thanks, Steve.
25     Q.  Do you know how much --

Page 123

1      THE WITNESS:  Yes.  Thank you.
2      Q.  Do you know how much you've billed to date on
3  this case?
4      A.  I don't, as a matter of fact.
5      MS. COCHRUN:  But I do, because I have two
6  invoices.  Well, actually -- yeah, two invoices.  One
7  invoice of $1,050, an invoice of $1,925.  And then, of
8  course, I sent Ann an invoice for today's
9  interactions.
10     Q.  Doctor, do you agree with the representations
11 just made by counsel?
12     A.  I do.
13     MR. DOYLE:  Let me take a moment to review my
14 outline.  And if you want to take a break, that's
15 fine.
16     MS. COCHRUN:  No.  I just have a couple of
17 things, and then I'm going to let him run out the
18 door.
19     Q.  (Mr. Doyle continuing:)  Doctor, is there any
20 long-term treatment required for a patient with a
21 successful surgical repair to an ulcer?
22     A.  Well, I guess if -- a patient should be
23 followed.
24     Q.  And how long should they be followed?
25     A.  Well, it depends on how long they're

Page 124

1  symptomatic.  This patient had an over-sewing of his
2  ulcer disease, so he will have fewer complications
3  than someone who has undergone a partial gastrectomy.
4  We don't see surgery for peptic ulcer disease very
5  much anymore because we are far more cautious nowadays
6  in the use of nonsteroidals and we treat the most
7  common cause, H. pylori bacteria, with antibiotics.
8  So surgery is used less often.
9      In his case, he had probably the best kind of
10 surgery because it will allow him to have the fewest
11 number of complications, although I noted at some
12 point in the record, he had some problems with his
13 wound.  He had some -- a wound hernia, if I'm not
14 mistaken, and some xyphoid bone, an ectopic bone
15 formation from his surgery.
16     Q.  Would a lifetime of medication be required
17 following that surgical repair of an ulcer?
18     MS. COCHRUN:  What kind of -- object to form.
19     Q.  That's fine.  You tell me, Doctor.
20     A.  So I would advise two things, and it depends
21 on the patient.  And in this patient, I would probably
22 make sure that he doesn't acquire H. pylori infection.
23     Q.  And that would be through periodic testing
24 for H. pylori?
25     A.  Right.  And then I would probably recommend

Page 125

1  that he not take nonsteroidals.
2      Q.  Okay.  And those would be the two follow-ups?
3      A.  Correct.
4      Q.  You testified, Doctor, that medical knowledge
5  of nonsteroidals has advanced.  Is that your -- I'll
6  try and state what you said.  We've become much more
7  careful about nonsteroidals?
8      A.  Correct.
9      Q.  Does that indicate an advancing medical
10 awareness of the risks of nonsteroidals?
11     MS. COCHRUN:  Object to form.
12     A.  Let's see.  I'm not quite -- sorry?
13     Q.  Okay.  You used the word -- you used the
14 words "we've become."
15     A.  Yes.  So we know much more about how
16 nonsteroidals cause ulcer disease through their
17 inhibition of the two enzymes that block prostaglandin
18 formation.  So the nonsteroidals block what are called
19 COX-1 and COX-2 enzymes.  Cycloxygen is 1.  Cycloxygen
20 is 2.  They're just called COX-1 and COX-2 enzymes,
21 which promote prostaglandin formation.  Prostaglandin
22 is like a protector.  They play a role in the
23 protection of the gastric mucosa.
24     And I think whenever we know more about the basic
25 pathophysiology of disease and immunobiology of the

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

33 (Pages 126 to 129)

Page 126

1 mucosal immune system, we're able to treat patients
2 more effectively and more cautiously. So we are --
3 and together with the clinical evidence that
4 nonsteroidals play an important role in peptic ulcer
5 disease, we use them cautiously and we use low doses.
6      Q.  And has that medical knowledge advanced since
7 2001?
8      A.  It probably has in the sense that certainly
9 as I've seen it at UAB. For example, the young house
10 staff are more and more aware of problems with
11 nonsteroidals. So I think at the level of young
12 physicians in training, I think that the information
13 is becoming more widely known and accepted.
14      Q.  Would you agree that since 2001, the standard
15 of care with respect to prescribing nonsteroidals has
16 changed?
17      MS. COCHRUN:  Object to form.
18      A.  No. We've been worried about nonsteroidals
19 for a long time. I mean, the important studies -- for
20 example, the important -- one of the most important
21 studies was published in 1991 in the Annals of
22 Internal Medicine, which they showed the direct
23 relationship between the dose of nonsteroidals and the
24 relative risk for peptic ulcer disease. So a lot of
25 the work has been published, and it was published in

Page 127

1 the '80s and in the '90s.
2      What we know more about today is this cyclooxygen,
3 these two enzymes leading to prostaglandin disease.
4 But in terms of the clinical importance of being
5 cautious and the clinical relationship between the use
6 of the drugs and the risk for peptic ulcers, it has
7 been known since the late '80 and since the '90s.
8      MR. DOYLE:  One moment.
9          (Brief pause)
10      Q.  Can you state with any degree of medical
11 certainty when Mr. Coggin's ulcer began?
12      A.  No.
13      MR. DOYLE:  I'm finished.
14          EXAMINATION
15 BY MS. COCHRUN:
16      Q.  Dr. Smith, in terms of his ulcer, when you
17 look at the totality of his circumstances, do you have
18 an opinion as to whether he was having ulcer disease
19 between the period 7/25/01, when he first presented,
20 and 9/2/01, when he was ultimately transferred to the
21 physicians at Baptist, who did, indeed, diagnose it
22 finally at that point?
23      A.  Well, I think in view of the record between
24 those dates, the level of suspicion that he had peptic
25 ulcer disease only increased; because the few tests

Page 128

1 that were obtained pointed against pancreatitis,
2 against renal disease, ultimately against
3 cholecystitis and against obstructive gallbladder
4 disease. So I think everything subsequently was
5 consistent with what would have been my suspicion at
6 the beginning, in that first encounter and certainly
7 by the second encounter, that he had peptic ulcer
8 disease.
9      Q.  All right, sir. In your report, you indicate
10 that had the standard of care -- I'm looking at the
11 end of your report here, Dr. Smith.
12      MS. COCHRUN:  And we're talking about the
13 August 29th, 2007, report, Steve.
14      Q.  You indicate that --
15      MR. DOYLE:  Have you got the one that's
16 marked?
17      MS. COCHRUN:  No, but it's the paragraph
18 starting on the second page --
19      Q.  Okay. We're on Defendant's Exhibit #2, so
20 that would be page 747 down here at the bottom. In
21 there, you indicate a listing of the treatment
22 diagnostics and modalities that, in your opinion, the
23 standard of care would have indicated in Mr. Coggin,
24 do you not?
25      A.  I'm sorry. What was your question?

Page 129

1      Q.  Okay. In your report, on 747, you start a
2 paragraph -- are you with me here? The applicable
3 standard of care, where you outline --
4      A.  Okay.
5      Q.  -- that standard. And then you go on on the
6 third page, which would be 748 --
7      A.  Okay.
8      Q.  -- and you say, His H. pylori infection
9 status would have been determined by serology and
10 gastric biopsy at the time of the EGD. And you go on
11 to say all nonsteroidal anti-inflammatory drugs, or
12 NSAIDs, I suppose, would never have been prescribed
13 and certainly not continued in the setting of
14 persistent symptoms. And then you go on to say he
15 would have been put on maximum dosages of proton pump
16 inhibitors. What are those, sir?
17      A.  Well, proton pump is a new class of drugs
18 that blocks the secretion of protons; namely, hydrogen
19 ions. So --
20      Q.  Is that what Pepcid and those kind of drugs?
21      A.  Well, the more commonly used drugs are
22 Nexium, for example.
23      Q.  All right. And would those have been
24 available to Dr. Garcia to prescribe in 2001?
25      A.  Yes, absolutely. Prilosec was not off label

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

34 (Pages 130 to 133)

Page 130

1  in 2001, but it certainly was common and has been used
2  for 15 years.
3      Q.  All right.  So that drug could have been
4  prescribed, then?
5      A.  Correct.
6      Q.  All right, sir.  You go on to say, These
7  measures.  Is that referring to the measures you've
8  outlined that would have been required under the
9  standard of care?
10     A.  Well, you would have made a diagnosis maybe
11 he had H. pylori infection.  You would have diagnosed
12 that, and you would have treated it effectively.  If
13 he didn't have H. pylori infection, then 99 percent of
14 the remaining ulcer disease is caused by NSAIDs.  You
15 would have stopped the NSAIDs, and you would have put
16 him on a proton pump inhibitor.
17     Q.  And your opinion goes on to say, If these
18 measures had been executed.  Am I correct, within the
19 standard of care, you would have -- or they would have
20 very likely effectively treated his peptic ulcer
21 disease, circumventing the surgery that he ultimately
22 underwent and the sequelae?  Is that your opinion in
23 terms of what you believe this man could have avoided
24 in terms of clinical condition had the standard of
25 care been provided to him while at Maxwell?

Page 131

1      A.  If I understand your question correctly, yes.
2      Q.  All right, sir.  A physician acting within
3  the standard of care should have known in 2001 that
4  NSAIDs were contraindicated in a patient with the
5  presentation and clinical signs and symptoms that John
6  Coggin had, would they not?
7          MR. DOYLE:  Objection to the form.
8      A.  A patient with undiagnosed abdominal pain,
9  not to mention extreme abdominal pain, should not have
10 been put on NSAIDs.  And that was common knowledge in
11 2001.
12     Q.  All right.  Dr. Smith, we've had your CV put
13 in; but does it reflect your education, training, and
14 clinical experience that is the basis of your medical
15 practice?
16     A.  I'm not sure what you mean.  I mean, it
17 doesn't talk --
18     Q.  That's lawyer talk.  Okay?  Let me just ask
19 you.  We've put your CV in.  Does it outline fairly
20 your education, training, and clinical experience?
21     A.  No.  It does not describe my experience.  It
22 doesn't describe the fact that I have two or three
23 months of attending on the GI wards or consult service
24 every year.  It doesn't talk --
25     Q.  All right.  Well, then, let me just ask you

Page 132

1  this.  You are a licensed physician?
2      A.  I am.
3      Q.  And you hold licenses in what states?
4      A.  Alabama and California.
5      Q.  All right, sir.  You are board certified in
6  internal medicine?
7      A.  Yes.
8      Q.  And you are board certified in
9  gastroenterology as well?
10     A.  Yes.
11     Q.  All right, sir.  And in the year 2001, were
12 you seeing patients in that year?
13     A.  Yes.
14     Q.  And you were providing physician clinical
15 evaluation, diagnosis, and treatment for patients in
16 the year 2001?
17     A.  Yes.  But as I said earlier, predominantly in
18 the fall, because I was on sabbatical until mid
19 September of 2001.  And it was -- I didn't see
20 patients during the first part of the year.  But as I
21 said, they -- I paid a price for that when I came back
22 because I had to make up for my clinical absence.
23     Q.  All right, sir.  My question, though, is
24 this.  Are you familiar with the standard of care that
25 would have been applicable to the care and evaluation

Page 133

1  and treatment of a patient such as John Coggin in the
2  year 2001?
3      A.  Absolutely.
4      Q.  Did the standard of care, in terms of how to
5  treat a patient with his presentation, change between
6  2000, 2001, and 2003 in any significant way?
7      A.  Well, as I said earlier, you know, medical
8  science and knowledge is always advancing and always,
9  hopefully, will advance.  So we know more, so the
10 standard of care is always inching forward.  So we
11 take better care of patients.
12     Q.  All right.  Well, then, let me ask you this
13 question.  In the year -- well, let's just say in the
14 year 1999 --
15     A.  Yes.
16     Q.  -- and the year 2000, the things that you
17 have described the standard of care would have
18 required of the Maxwell healthcare providers in their
19 treatment of John Coggin, were those things --
20     A.  I --
21     Q.  Let me finish my question, sir.  Were those
22 standards in place in those years as well as in 2001?
23 I mean, the things you've described, are those all
24 things that -- whether he had been seen in 2000 or
25 seen in 2001 or seen in 1999, for that matter, in

JOHN COGGIN v. UNITED STATES OF AMERICA                                    12/13/2007
Deposition of Phillip Smith, M.D.

35 (Pages 134 to 137)

Page 134

1  terms of his approach, those basic minimum standards,
2  would they have been essentially the same?
3          MR. DOYLE:  Object to the form.
4      A.  Yes.  I think that the things that we've
5  discussed, there have not been any new modalities of
6  diagnosis or treatment that I can think of between
7  2001 and now, so that everything that is available now
8  was also available then.  It's just that we know
9  more.  We know more about the basic pathophysiology of
10 disease and mechanisms of disease; but the diagnostic
11 evaluation and the therapy always lags behind science,
12 medical science, and novel findings.  And there's,
13 unfortunately, a lag -- appropriately a lag period.
14     But the diagnostic evaluation has not changed.
15 We've been doing rectal examinations for the past
16 hundred years.  And every medical student in the
17 United States does -- learns how to do a rectal exam,
18 if not on a patient, then on his classmates.  And that
19 has certainly not changed.  And nothing else has
20 changed.  There may be, you know, greater availability
21 of endoscopic ultrasonography now, but it certainly
22 was available back in 2001.
23     Q.  All right.  And that could be ordered by a
24 physician and have it performed -- I guess in
25 Montgomery, Alabama, you wouldn't have expected it to

Page 135

1  be -- let me withdraw that question.
2      Let me --
3      A.  It was certainly done at UAB.
4      Q.  If I withdraw the question, you don't have to
5  answer it.  Okay?
6      All right.  Do you have an opinion as to whether
7  or not Dr. Garcia, in his treatment of John Coggin,
8  met the standard of care?
9      A.  I do.
10     Q.  And what is that opinion?
11     A.  It is not of the level of care that the
12 patient deserved, and it is not the standard of care
13 available at that time.
14     Q.  All right, sir.  You have indicated when you
15 were talking to Mr. Doyle that -- let me withdraw
16 that.
17     Do you have an opinion as to whether or not had
18 the standard of care been met by Dr. Garcia and the
19 healthcare providers at Maxwell -- if it had been met,
20 would Mr. Coggin have avoided, in all likelihood,
21 having to undergo surgery to treat the
22 life-threatening bleed that was present in September
23 of 2001?
24         MR. DOYLE:  Object to the form.
25     A.  I have an opinion.

Page 136

1      Q.  And what is that opinion?
2      A.  That his care, had it met the standard of
3  care at that time, would have resulted in him not
4  requiring surgery.
5      Q.  All right, sir.  You were asked what records
6  were significant to you and not significant.  You're
7  not telling the Court that you did not review the
8  entirety of all the records that we have described?
9      A.  No, I'm not.
10     Q.  All right, sir.  The incisional hernia and
11 the xyphoid bone formation, do you attribute that to
12 Mr. Coggin having to have surgical intervention of his
13 disease process?
14     A.  Yes.
15     Q.  Now, the opinions you have given us today
16 about the standard of care, are those opinions
17 applicable to the standard of care as it would apply
18 in 2001?
19     A.  Well, as I indicated, everything we do today
20 was done back in 2001.  The only one thing that is
21 probably more available is what's called endoscopic
22 ultrasonography or endoscopic EUS, but that certainly
23 was available back in 2001.  It was certainly
24 available at UAB and probably at Baptist.
25     Q.  All right, sir.  I'm going to refer you to

Page 137

1  page 78 from the records of the Maxwell Health
2  Services Clinic.
3      A.  Okay.
4      Q.  And in that gastroenterology consult that was
5  done --
6      A.  It was done?  It looks like it was canceled.
7      Q.  Well, that's my point.  Does it appear that
8  any gastroenterology consult was performed?
9      A.  It was -- to my knowledge, none was
10 performed.
11     Q.  All right.  And it appears to have been
12 canceled and signed off as canceled by Dr. Brenes, or
13 Garcia Brenes?
14     A.  It appears that occurred.
15         MS. COCHRUN:  I think that's all I have,
16 Steve.
17         MR. DOYLE:  I'm finished.
18         MS. COCHRUN:  Run away.
19         (The deposition concluded at
20         4:58 p.m.)
21         * * * * * * * * * *
22         FURTHER DEPONENT SAITH NOT
23         * * * * * * * * * *
24
25

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/13/2007
Deposition of Phillip Smith, M.D.

36 (Pages 138 to 139)

Page 138

1       REPORTER'S CERTIFICATE
2    STATE OF ALABAMA
3    ELMORE COUNTY
4       I, Dee Coker, Registered Professional Reporter
5    and Commissioner for the State of Alabama at Large,
6    hereby certify that on Thursday, December 13, 2007, I
7    reported the deposition of PHILLIP DOYLE SMITH, M.D.,
8    who was first duly sworn or affirmed to speak the
9    truth in the matter of the foregoing cause, and that
10   pages 4 through 137 contain a true and accurate
11   transcription of said witness by
12   counsel for the parties set out herein.
13      I further certify that I am neither of kin nor of
14   counsel to any of the parties to said cause, nor in
15   any manner interested in the results thereof.
16      This 26th day of December, 2007.
17
18
19      _____
        DEE COKER, CSR, RPR
20      Commissioner for the
        State of Alabama at Large
21      CCR LICENSE NO.: 85
22      MY COMMISSION EXPIRES: 1/25/2009
23
24
25

Page 139

1       SIGNATURE OF WITNESS
2       I, PHILLIP DOYLE SMITH, M.D., hereby certify
3    that I have read the transcript of my deposition
4    consisting of pages 4 through 137, and except for the
5    corrections listed below, certify that it is a true
6    and correct transcription.
7
8       _____
        PHILLIP DOYLE SMITH
9
10   SWORN TO AND SUBSCRIBED before me
11   this _____ day of _____, 20__.
12
     _____
13   NOTARY PUBLIC
14          * * * * * * * * * * *
15   Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25