**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN COGGIN,

        Plaintiff,

  vs.

UNITED STATES OF AMERICA,

        Defendant.

Civil Action
No.: 2:05-CV-1214-F

~~~~~~~~~~~~~~~~~~~~~~~~~~

**DEPOSITION OF**

**JOSEPH EDWARD PARIS, M.D.**

October 29, 2007
11:00 a.m.

United States Attorney's Office
75 Spring Street
Fifth Floor Conference Room
Atlanta, Georgia

Susan H. Horner, RPR, CCR-B-808



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free    (877) 495-0777   (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Joseph Edward Paris, M.D.

October 29, 2007

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOHN COGGIN,

       Plaintiff,        Civil Action
                     No.: 2:05-CV-1214-F
vs.

UNITED STATES OF AMERICA,

       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF

JOSEPH EDWARD PARIS, M.D.

October 29, 2007
11:00 a.m.

United States Attorney's Office
75 Spring Street
Fifth Floor Conference Room
Atlanta, Georgia

Susan H. Horner, RPR, CCR-B-808

---

**2**

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff
John Coggin:
JULIA T. COCHRUN, ATTORNEY AT LAW
Pate & Cochrun, L.L.P.
  P.O. Box 10448
  Birmingham, Alabama 35202-0448
  (205)323.3900
  (205)323.3906 (facsimile)
  e-mail: plfc5@mindspring.com

On Behalf of the Defendant
United States of America:
STEPHEN M. DOYLE, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
MIDDLE DISTRICT OF ALABAMA
  One Court Square
  Suite 201
  Montgomery, Alabama 36104
  (334)223.7280
  (334)223.7418 (facsimile)
  e-mail: stephen.doyle@usdoj.gov

---

**3**

Deposition of Joseph Edward Paris, M.D.
October 29, 2007

JOSEPH EDWARD PARIS, M.D., having been
first duly sworn, was examined and testified
as follows:
    EXAMINATION
BY-MR.DOYLE:
    Q.   Can you please state and spell
your name for the record?
    A.   Joseph Edward Paris.  P-A-R-I-S.
    Q.   And can you state your business
address, please?
    A.   2116 Lamplight Drive, in Marietta,
Georgia 30062.
    MR. DOYLE:  And this deposition is
being taken pursuant to a notice of
deposition dated October 16th, 2007, I'm
just going to attach that to the record
as Defendant's 1.
    (Defendant's Exhibit-1 was marked for
identification.)
    Q.   (By Mr. Doyle) Doctor, are you
currently retired?
    A.   Well, I retired from the Department

---

**4**

of Corrections in Georgia, I have continued to
practice medicine.
    Q.   And what is the nature of that
continuing practice?
    A.   I perform several activities.  I am
part-time physician at the DeKalb County
Public Health Department Clinic.
    Q.   Is that a volunteer position or is
that paid?
    A.   The payment at this time is minimum
wage which most people would interpret as a
volunteer or contribution of myself to the HIV
patients of Atlanta.
    I also have just signed a contract
to see a number of correctional patients for a
correctional healthcare company called
Correctional Health, they operate healthcare
services for about 28 or 29 jails in Georgia
and Alabama.
    Q.   And when did you sign that contract,
Doctor?
    A.   A few days ago.
    Q.   Have you actually started that
position yet?
    A.   No.

---



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

## 5

1    Q.  With respect to your duties and
2  responsibilities with the DeKalb County Public
3  Health Department, please describe those for
4  me.
5    A.  That consists of examining patients
6  and treating patients for HIV and any other
7  conditions that they may have.
8    Q.  Is that an HIV clinic?
9    A.  It's an HIV clinic.
10    Q.  And how many patients do you see a
11  week?
12    A.  I have in the past gone some months
13  four times a month and some months I have gone
14  twice a month.  When I go the clinic will be
15  between three and ten patients.
16    Q.  And have all of those patients been
17  diagnosed with HIV prior to you seeing them?
18    A.  They have to be HIV positive to
19  qualify for the grants in effect at this
20  clinic.
21    Q.  And where is that clinic physically
22  located?
23    A.  In Decatur.
24    Q.  Is it in a hospital or a
25  freestanding clinic?

## 6

1    A.  It's a big medical clinic called
2  Richardson Building, I think the address is
3  445 Winn, W-I-N-N, Way.
4    Q.  And when you perform a shift at the
5  HIV clinic, how long does that shift last?
6    A.  Some times four hours, some times
7  eight hours.
8        I need to add that I perform other
9  activity, I started listing them but I did not
10  finish, so whenever you are ready I will
11  continue.
12    Q.  Please continue.
13    A.  Okay.  Other activities consist of
14  the teaching of medicine, especially
15  correctional medicine which I perform between
16  three and six times a year for periods from
17  one day to five days long.
18    Q.  And is that in a continuing medical
19  education type setting?
20    A.  Yes.
21    Q.  Is there a particular institute
22  through whose auspices you do that?
23    A.  Several.  I have -- these
24  connections are national organizations that
25  request my educational services and these are

## 7

1  the Society for Correctional Physicians, the
2  National Commission on Correctional
3  Healthcare, the Correctional Medical Institute
4  and the CCHP which means Correctional
5  Healthcare Certified Provider.
6    Q.  And how long have you been teaching
7  continuing medical education on correctional
8  healthcare?
9    A.  Close to 20 years.
10    Q.  And how frequently do you do it now?
11    A.  As I stated, three to six times a
12  year for a period between one day and five
13  days in duration.
14    Q.  And is that in a seminar setting?
15    A.  Some times it's lectures, some times
16  a workshop, some times it's a seminar.
17    Q.  Any other current activities?
18    A.  Yes.  I am one of three senior
19  physician reviewers for the National
20  Commission on Correctional Healthcare.
21    Q.  And what do your duties and
22  responsibilities as a senior reviewer consist
23  of?
24    A.  Two responsibilities, basically.
25  One is the training of other physician

## 8

1  interviewers and the primary responsibility is
2  to perform the reviews themselves.
3    Q.  And for whom do you perform reviews?
4    A.  For the National Commission.
5    Q.  And what do those reviews consist
6  of?
7    A.  These reviews consist of visiting a
8  prison or jail or more than one anywhere in
9  the country when the institution seeks
10  accreditation by the National Commission.
11        During the review health records
12  will be reviewed, staff interviewed, both
13  correctional and medical and inmate patients
14  will be interviewed in order to assess the
15  ability of the institution to meet the
16  standards of the National Commission.
17    Q.  And when was the last time you
18  performed an accreditation review?
19    A.  I'm going on one tomorrow if that
20  helps.
21    Q.  And where is that going to be?
22    A.  Richmond County, Augusta, Georgia.
23    Q.  And is that at the request of the
24  government entity?
25    A.  The Richmond County Jail is a county

# BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.

October 29, 2007

---

**9**

1 institution. And, yes, the County Board of
2 Regents requests the National Commission to
3 come and perform an accreditation visit every
4 other year.
5    Q.   Okay.
6    A.   To maintain their accreditation
7 status.
8    Q.   How many of those do you perform a
9 year?
10    A.   Between 9 and 12.
11    Q.   And what type of compensation do you
12 receive for those accreditation reviews?
13    A.   It's an honorarium. That is a token
14 honorarium, I think it's $175 a day plus
15 expenses.
16    Q.   Let me just back up. On your
17 continuing medical education activities, what
18 type of compensation do you receive with that?
19    A.   It varies between $250 a lecture to
20 $1,500 a lecture.
21    Q.   Any other current activities?
22    A.   I write for publications of
23 specialized interests to correctional
24 physicians, this will be journals, newsletters
25 or books.

---

**10**

1    Q.   Can you list those for fee?
2    A.   They are listed in my CV one by one.
3    Q.   Is your CV comprehensive in that
4 area?
5    A.   I believe it lists all my
6 publications.
7    Q.   There's no need to go back through
8 them, we'll look at that.
9    A.   It's a long list, counselor.
10    Q.   Okay. Am I correct in saying that
11 you're retired from the Georgia Department of
12 Corrections?
13    A.   Yes.
14    Q.   And when did you retire from the
15 Georgia Department of Corrections?
16    A.   My last day of actual work was
17 December 31st, 2005.
18    Q.   And what position did you hold when
19 you retired?
20    A.   I was medical director statewide for
21 the Georgia DOC.
22    Q.   And what were your duties and
23 responsibilities as the Georgia DOC medical
24 director?
25    A.   They were multiple. Ultimately it

---

**11**

1 was insuring that all Georgia state inmates
2 receive comprehensive constitutional
3 healthcare which meant personally seeing
4 the most difficult cases, hiring and firing,
5 quality, managing all the physicians,
6 physician assistants and nurse practitioners,
7 producing all the state policy for what
8 medical care will entail, personally
9 conducting the visits to institutions,
10 performing audits to insure that the
11 healthcare was meeting standards at all
12 points and a number of one or more visits
13 per institution per year for over 100 total
14 institutions. The performance of peer review
15 on mortality reviews, the writing all the
16 policies, the teaching of education sessions
17 for the physicians and other practitioners
18 three or four times a year and ultimately the
19 advising of a commissioner for corrections on
20 matters of medical policy, budgets,
21 projections on future expenses and needs.
22    Q.   When you were a medical director
23 for the Georgia Department of Corrections
24 approximately how many inmate patients was
25 the Department of Corrections responsible

---

**12**

1 for?
2    A.   When I retired there were about
3 45,000 statewide.
4    Q.   And approximately how many doctors
5 were in the healthcare system for the Georgia
6 Department of Corrections?
7    A.   Full-time, approximately 46. There
8 were a number of part-timers and certainly
9 many consultants.
10    Q.   And how many other care providers,
11 say how many physician assistants?
12    A.   The total number of mid-levels was
13 a little under 46, that's adding NP and PA.
14    Q.   As medical director was that
15 primarily an administrative position?
16    A.   I would not call it that because we
17 had a rate of administrators including the
18 health services director who administratively
19 will supervise me so they concern themselves
20 with matters of budgeting, payroll, procuring
21 supplies, what I will consider straight
22 administration.
23        I was a physician who had mostly a
24 clinical mission which is to show the way of
25 where the resources should be applied to.

---



**BROWN & GALLO**

LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax   GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

---

**13**

1    I also had to perform many purely
2  clinical functions such as a teaching of
3  medicine, the writing of policy and ultimately
4  the seeing of the more difficult patients and
5  diagnosing them myself.
6    Q.  When you described your position as
7  mostly a clinical position is it fair to say
8  that it was a clinical management position?
9    A.  With a component of purely clinical,
10  as I said, which included the examination of
11  patients.
12    Q.  And how many patients would you see
13  a week?
14    A.  It's hard to say.  When the prison
15  system will be in trouble I may go to that
16  prison and see a goodly number of patients,
17  ten or 20.  When a prison was running much
18  better I may have to see one or two so it was
19  not a steady average.
20    Q.  Did you have regular clinical office
21  hours where you saw patients?
22    A.  It was ad hoc, meaning depending on
23  what the institution require at that
24  institution.  Some institutions like Metro in
25  Atlanta, a female prison, I had to go there

---

**14**

1  during a bad period virtually every day and
2  see patients every day.
3    Q.  And when was that?
4    A.  It happened around '94 -- my
5  mistake, 2004.
6    Q.  How long were you in that position
7  as medical director for the Georgia Department
8  of Corrections?
9    A.  About eight years.  Prior to that I
10  was deputy medical director.
11    Q.  And how did your duties and
12  responsibilities as deputy differ?
13    A.  At that point there were two
14  physicians at the top so the medical director
15  hired me in order to compliment the work that
16  he was performing.
17    The description is identical to what
18  I already have said, this gentleman was
19  phasing out and loaded his duties and
20  responsibilities onto me and eventually
21  disappeared, so from the very beginning I
22  started acquiring virtually the same
23  obligations that I have listed for you.
24    Q.  And how long were you the deputy
25  medical director?

---

**15**

1    A.  A little under two years.
2    Q.  And was that in 1995 and '96?
3    A.  I began '95 and then some time in
4  '96 Dr. Hipkens left, H-I-P-K-E-N-S.
5    Q.  Can you describe for me how the
6  healthcare system in the Georgia Department
7  of Corrections is organized?
8    A.  That's a very broad question,
9  counselor, what specific aspects do you want?
10    Q.  Do you run hospitals, primary care
11  clinics, how many of each?
12    A.  Yes.  All of those.
13    Q.  All right.
14    A.  There is a prisoner hospital in
15  Augusta that has to be run, as you said.
16  There is primary care clinic in every single
17  institution numbering more than 100 of which
18  42 or 43 are major institutions.
19    Q.  There is only one prison hospital;
20  is that correct?
21    A.  Correct.
22    Q.  And what is required to be performed
23  when an inmate patient would be transferred to
24  that prison hospital?
25    A.  The question is complex because the

---

**16**

1  prison hospital in Augusta is also a prison
2  where about 1,200 inmates reside, some of them
3  purely by chance.  Correctional officers like
4  to put prisoners in prisons close to their
5  homes, if possible, so there's a number of
6  prisoners that are in that compound for no
7  medical reason at all.
8    In addition there is several hundred
9  of those prisoners that are there by design as
10  outpatients because they are likely to get
11  sick from time to time so they require more
12  nurturing, and finally --
13    Q.  And just to ask a question --
14    A.  Yes.
15    Q.  -- with respect to those
16  outpatients, are those patients with chronic
17  conditions?
18    A.  Some of them have chronic
19  conditions, some have had a stroke or two and
20  a third one is perhaps suspected being in the
21  near future so they may belong in the prison
22  hospital.
23    Others have mobility impairments
24  and don't have any chronic disease, they have
25  been like that all their lives.

---

# BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

---

17

1    I will say that finally there is a
2  true prison hospital -- although it is
3  unlicensed it does function as a hospital
4  with IVs, x-rays and CT scan and operating
5  room, and the capacity has varied but it's
6  close to 100 beds.
7    Q.  And that's in Augusta?
8    A.  That's also in the same prison,
9  called Augusta State Medical Prison or ASMP.
10   Q.  And you testified a moment ago that
11 every correctional institution has a primary
12 care clinic; is that right?
13   A.  Yes.
14   Q.  And what types of services can they
15 render?
16   A.  In the average primary care clinic
17 in a prison in Georgia there will be clinics
18 held daily, and they call them sick call
19 clinics where nurses triage common medical
20 problems and look at the requests and examine
21 the patient and give them the first cut so
22 to speak.  Then there is physician sick call
23 clinics where physicians take first look at
24 new complaints or new problems.
25       There is also in all these clinics

---

18

1  what we call chronic care clinics where
2  conditions such as diabetes, hypertension,
3  pulmonary and so on are looked at in a
4  systematic way with periodic examinations and
5  monitoring.  There is also some minor surgery
6  provided.
7    Q.  What types of minor surgery?
8    A.  Mostly lacerations, boils, what the
9  primary care physician will handle when he or
10 she has not had surgical training.
11   Q.  What other types of services are
12 provided at primary care clinics?
13   A.  There could be some blood testing or
14 routine x-rays, in a few cases some physical
15 therapy.
16       In about a dozen of the Georgia
17 prisons they use Telemedicine with access to
18 consultants via remote.  In a few of the
19 Georgia prisons some consultants will visit
20 the prison and see prisoners on-site.  In
21 others the prisoners are driven to the
22 consultant offices.
23   Q.  You have described the primary care
24 clinics and the hospital in Augusta, is there
25 any level of care in between the two?

---

19

1    A.  Yes, there is.  It's called
2  infirmary care and it's only available in some
3  of the Georgia prisons.
4    Q.  And how many approximately?
5    A.  About a dozen.  With another ten or
6  so having and operating what is called an
7  observation infirmary, which is a lower level
8  of infirmaries, so two levels of infirmaries
9  are found in Georgia.
10   Q.  And what types of services are
11 available at the infirmary?
12   A.  In the full infirmary there will be
13 nursing 24/7.  There will be IV care, some
14 antibiotics and other IVs.  There will be
15 dressing changes, postoperative monitoring,
16 diabetes tune-up, so to speak, a bit of oxygen
17 except only for patient who are otherwise
18 stable.
19       In the observation infirmary the
20 admission must be under 12 hours as there is
21 no staff after hours and people are observed
22 for conditions like severe headache, some
23 postoperative care but the level of service
24 generally will not reach to the IV level.
25   Q.  And how do patients come to be

---

20

1  referred to the infirmary, in other words is
2  it just happenstance that they're at a
3  facility that has an infirmary or are they
4  transferred to a facility that has an
5  infirmary, how are inmates directed to the
6  infirmary?
7    A.  The system is run in what we call
8  the regional basis, it is cost effective to
9  have a full-fledged infirmary approximately
10 serving five institutions geographically
11 related so the patient can be driven by
12 correctional officers less than say 45 minutes
13 and therefore one infirmary will serve the
14 needs of four or five institutions.
15   Q.  And who makes the referral to the
16 infirmary?
17   A.  Only physicians.  A physician on
18 duty or on-call is the only one with the power
19 to admit.
20   Q.  Now you've described for me the
21 prison hospital, the primary care and the
22 infirmary, are there any other types of
23 healthcare services provided in the Georgia
24 Department of Corrections?
25   A.  There is consultation services and

---



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

## 21

1  there is access to the community hospitals
2  including tertiary care hospitals, do you need
3  a description of those?
4      Q.  Why don't you tell me what you
5  mean by consultation services?
6      A.  Patients in corrections in this
7  state have access, regardless of location,
8  to any medical and necessary consultation
9  services.  As previously stated some
10 consultants will hold clinic inside some
11 prisons including, as the most major example
12 of the breed, the prison hospital in Augusta
13 where there are a substantial number, ten or
14 12 consultants from Augusta will drive to the
15 prison hospital and hold clinic on-site but
16 other prisoners who are not in Augusta may be
17 driven to Augusta or other sites including the
18 physician's office to see a consultant.
19      In addition, as stated before, there
20 is about a dozen Telemedicine sites.  Mostly
21 the Telemedicine hub, H-U-B, sites are in the
22 bigger prisons that also have the infirmaries,
23 so with that link an inmate patient can be
24 consulted upon without leaving the
25 institution.

## 22

1      If this prisoner is in a nearby
2  prison he or she may be driven a few miles to
3  the HUB institution, do the Telemedicine
4  consultation with a consultant and then be
5  returned back to the prison of origin.
6      Q.  Are the consulting physicians
7  Department of Correction physicians from other
8  facilities or are they community based
9  physicians?
10     A.  The vast majority are community
11 based physicians.  At one point or another the
12 DOC has had on retainer a full-time surgeon
13 and a few psychiatrists but the vast majority
14 are part-time.
15     Q.  Does that fully describe the
16 healthcare services provided by the Georgia
17 Department of Corrections?
18     A.  I am not sure of that.  There is so
19 much more that goes on, if you have a specific
20 question I will entertain it.
21     Q.  Well, we've gone through the Augusta
22 hospital, primary care, infirmary care,
23 consultation services and access to community
24 health services, what other healthcare?
25     A.  There is physical therapy.  There is

## 23

1  -- some of the laboratories is operated by the
2  DOC, some is contracted out.  There is imaging
3  services throughout the state, some is
4  property of the DOC, some is performed via
5  portable units that are leased or contracted
6  upon, the same is true for CT scans and MRIs.
7      Q.  And when you were medical director
8  were you the highest level manager of that
9  whole healthcare system?
10     A.  Yes.
11     Q.  Now when did you come to Georgia?
12     A.  In 1995.
13     Q.  Prior to coming Georgia you were in
14 Florida; is that right?
15     A.  Yes.
16     Q.  Now why did you decide to move to
17 Georgia?
18     A.  I was the medical director of a
19 fairly large prison hospital in the town of
20 Lake Butler and I was offered to be deputy
21 medical director, a substantial career
22 advancement.
23     Q.  What was your position at the
24 hospital in Lake Butler, Florida?
25     A.  Medical director over all.

## 24

1      Q.  And what are your duties and
2  responsibilities as medical director?
3      A.  I had a personal clinic load.  I
4  had to conduct rounds on inpatients and see a
5  goodly number of outpatients.  In addition I
6  clinically supervised eight physicians and
7  four physician assistants or nurse
8  practitioners.
9      I had to write all the local policy.
10 I had to discuss with administrators budget
11 projections, procurement of necessary hospital
12 equipment.  I had to supervise a very large
13 consultative function of the prison hospital
14 which at one point was the referral site for
15 about half of the correctional patients for
16 the State of Florida.
17     Q.  And what did that supervising the
18 consultative service consist of?
19     A.  To insure that the right level of
20 consultant was secure and attracted to the
21 job, make an offer and we'll sign a contract,
22 then once they were on staff that they will
23 come timely to perform their functions, these
24 suitable volumes and all the clinical work
25 that was done and the prisons met the



BROWN&GALLO
LLC

Telephone GA - (404) 495-0777  FL - (954) 987-7779
Fax  GA - (404) 495-0766  FL - (954) 987-7780
Toll Free  (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

25

1  standards of care.
2     Q.  And what was the name of that
3  Florida prison hospital?
4     A.  It has changed names a couple of
5  times.  I started -- in 1985 it was called
6  Reception and Medical Center.  Some time
7  during my tenure it changed its name to North
8  Florida Reception Center and then in the past
9  four years gone back to Reception and Medical
10  Center, RMC.
11     Q.  How many prison hospitals did the
12  did the Florida Department of Corrections
13  fund?
14     A.  One.  That one.
15     Q.  How long were you medical director
16  there?
17     A.  I believe six years and change.
18     Q.  And Doctor, you testified that you
19  had a personal clinic load, how did you see
20  patients, was it through sick call, what was
21  the mechanism whereby you would see patients?
22     A.  I saw patients in numerous
23  conditions.  Starting from the top if they
24  were inpatients, I would do rounds, write
25  orders and treat the inpatient like any

26

1  hospital doctor would.
2        The outpatient clinic, I did three
3  basic types of encounters, one was internal
4  medicine consultations where physicians with
5  lesser training than myself would request an
6  internal medicine consult so I would see the
7  complicated patients.
8        In another type of visit if there
9  was any shortage of providers to do the
10  physician's sick call load I will pitch in and
11  see patients for whom I was the first port of
12  call so to speak.
13        And finally that Reception Medical
14  Center performed and performs today a very
15  voluminous number of what is called the
16  reception or receiving examination which is
17  when the inmate just arrives at state custody
18  and needs head to toe examination to determine
19  what his medical needs are going to be.
20        And the numbers are between 60 and
21  150 new prisoners per day five days a week.
22  When we were short of providers I will go to
23  that clinic and perform the reception process.
24     Q.  And does every prisoner committed to
25  the Florida Department of Corrections have his

27

1  or her reception examination done at that
2  hospital?
3     A.  No.  There are two other reception
4  centers in Florida so the load was split three
5  ways, the other two are one in Orlando called
6  Central Florida Reception Center and one in
7  Miami called South Florida Reception Center.
8     Q.  I gather from your prior testimony
9  those were not hospitals; is that right?
10     A.  They didn't have hospitals and they
11  don't have hospitals today.
12     Q.  Now with respect to the inpatient
13  population at the hospital, how did inmate
14  patients come to be inmates at that hospital,
15  how did they come to be inpatients at that
16  hospital?
17     A.  The prison hospital gets a referral
18  from all over the State of Florida.  And some
19  of the patients have already been transferred
20  very much like the place in Augusta to the
21  RMC because they are sickly to begin with so
22  they may be already in the population and
23  then get sick and be admitted to the hospital.
24        So again the admission would be
25  external referred from the other prisons or

28

1  internal from the 1,500 or so inmates that we
2  had at that time, I think it's more today.
3  The referrals are made by physicians and only
4  a physician has the power to admit.
5     Q.  And with respect to the outpatient
6  population at the prison hospital, would they
7  be from the inmate population at that prison,
8  the 1,500 that you just described?
9     A.  Yes.  And some will be transferred
10  from other institutions because physicians are
11  beginning to notice the increasing need for
12  higher level of medical services.
13     Q.  And if I didn't already ask you
14  this, how many beds were in that hospital?
15     A.  You didn't.  It's about 150.
16     Q.  And with respect to outpatients,
17  approximately how many would you have at any
18  given time?
19     A.  Me personally?
20     Q.  At the institution.
21     A.  The total number of prisoners when
22  I was medical director was about 1,500.  And
23  that includes the 150.  And today I think it's
24  swelled up to over 2,000, but I'm not sure.
25     Q.  And how many patients did you

BROWN & GALLO LLC
Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.

October 29, 2007

---

29

1 personally see per week?
2    A.  I will see no less than 30 patients
3 per day, some times more.
4    Q.  And how long were you medical
5 director at the North Florida Reception and
6 Medical Center Hospital?
7    A.  As previously stated, over six
8 years.
9    Q.  How many physicians did you
10 supervise in that position?
11    A.  Previously stated, also eight.
12    Q.  And how many mid-level providers?
13    A.  Four.
14    Q.  And how many contract physicians, if
15 any?
16    A.  More than 20.  I don't know, I don't
17 remember the exact number.
18    Q.  And what position did you hold prior
19 to becoming medical director at the North
20 Florida Hospital?
21    A.  For about two years I was medical
22 director of a prison called Union Correctional
23 Institution in the town of Raiford, Florida.
24    Q.  And how long did you hold that
25 position?

---

30

1    A.  About two years.
2    Q.  And what were your duties and
3 responsibilities there?
4    A.  Very similar to the duties and
5 responsibilities at the North Florida
6 Reception Center with the exception that it
7 was   a somewhat smaller clinical area, the
8 total compliment was, in addition to myself,
9 four physicians and one physician assistant.
10    The Union Correctional did not
11 have a hospital, it did have an infirmary with
12 a little under 40 beds and a total number of
13 prisoners in the vicinity of 1,200, 1,300.
14 Then the duties and responsibilities were
15 really pretty much the same as previously
16 stated.
17    Q.  And Doctor, you just testified
18 there was an infirmary there at the Union
19 Correctional Institute, is that the name in
20 Raiford, Florida?
21    A.  Yes.
22    Q.  Okay.  What type of patient care
23 could be provided there?
24    A.  Infirmary care as described for
25 Georgia, there was no difference in Florida,

---

31

1 included patients who may need IVs,
2 antibiotics, some oxygen, diagnosis of certain
3 conditions, but if the patient became in any
4 manner less than stable they will be referred
5 to the prison hospital or to our community
6 hospital.
7    Q.  And how did patients come to be
8 referred to the infirmary?
9    A.  That infirmary took patients only
10 from what we call the compound of the Union
11 Correctional Institution.
12    Q.  And who would make that referral?
13    A.  The primary care physicians, four
14 in number, or the PA or myself.
15    Q.  And how did you come to see patients
16 there, you personally?
17    A.  All the time.
18    Q.  In other words you weren't the
19 primary care physician; is that right?
20    A.  I had some clinics that I did
21 myself.  The physicians had a substantially
22 lower level of training than myself, none of
23 them was an internist, so the more difficult
24 diabetic patients, all the HIV patients, there
25 were virtually no drugs to treat them with so

---

32

1 they had postulate infections that I had
2 learned how to treat.  And any cardiac cases,
3 any pulmonary cases, all the complex cases
4 would be referred to me.
5    Q.  Is it fair to say that the primary
6 care physicians would make referrals to you
7 because of your expertise?
8    A.  Yeah.  I was a higher level of
9 primary care for many patients.  And in
10 addition I received consultations from my
11 colleagues.
12    Q.  Did you stand regular sick call
13 hours?
14    A.  Yes.
15    Q.  How frequently did you do that?
16    A.  Daily.
17    Q.  And how many patients would you
18 see on an average week?
19    A.  Gosh, it's been so long, 20 years
20 and change, I don't know.  Some days it's
21 going to be three or four, some days it's
22 going to be 20.  And in the infirmary cases
23 I saw them all, I visit them daily.
24    Q.  Okay.  Now prior to becoming the
25 medical director at the Union Prison in

---

BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax   GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

## 33

1    Raiford, Florida, what position did you hold?
2        A.   I was physician at the Reception
3    Medical Center from 1985 through some time in
4    '87.
5        Q.   Is that the Florida prison hospital
6    that you just testified about earlier?
7        A.   Same place.
8        Q.   And as a physician, what were your
9    duties and responsibilities?
10        A.   As a physician I had inpatient
11   duties and outpatient duties.  The outpatient
12   duties, again, is a mixture of three main
13   functions.  Consulting as internist, being
14   sick call primary care physician for some
15   cases and performing the reception diagnostic
16   process in order to finish the daily load.
17        Q.   And how long were you a physician at
18   that hospital?
19        A.   About two years.
20        Q.   Was that your first physician
21   position with the Florida Department of
22   Corrections?
23        A.   Yes.
24        Q.   And what did you do prior to joining
25   the Florida Department of Corrections?

## 34

1        A.   I was in private practice.
2        Q.   And where was that?
3        A.   At two locations, private practice.
4    Going in reverse order just before joining
5    the prison this private practice was in
6    Jacksonville, Florida and that lasted between
7    '82 and '85.
8        Q.   And what was the nature of that
9    practice?
10        A.   I was a solo internist with
11   privileges at several area hospitals.
12        Q.   And how did patients come to see
13   you?
14        A.   They will be referred by surgeons
15   or colleagues or they would just see my
16   office on the street and just knock at the
17   door.
18        Q.   And you testified a moment ago
19   that you had another private practice prior
20   to that; is that correct?
21        A.   Yes.  Prior to Jacksonville I set
22   up an office very similar in characteristics,
23   solo practitioner, internal medicine in the
24   town of Auburn, Massachusetts.
25        Q.   Now why did you decide to leave your

## 35

1    private practice in Jacksonville to join the
2    Florida Department of Corrections?
3        A.   It was not a decision made a
4    hundred percent in one day, I did have some
5    free time, the office was doing well but it
6    wasn't full form and a friend of mine who had
7    a contract to read the CT scans at the prison
8    hospital in Lake Butler told me that there was
9    a great need for once a week internal medicine
10   consultative services so my first signing in
11   was to go just Wednesdays to see some internal
12   medicine cases.  Within a few weeks the need
13   for somebody at my level of training to
14   diagnose and treat was so great that I was
15   convinced to go full-time.
16        Q.   And you wrapped up your private
17   practice; is that right?
18        A.   Yes.
19        Q.   Now why did you decide to move from
20   Massachusetts to Florida?
21        A.   Basically the climate, I already had
22   small children and I was not in love with
23   dealing with snow, slush and ice.
24        Q.   Okay.
25        A.   And I had this -- I had a friend

## 36

1    in Jacksonville who had a family practice
2    and was doing well and he said the climate
3    is much better here, why don't you try it?
4        Q.   And you did?
5        A.   (Moving head up and down.)
6        Q.   Can you describe for me in general
7    what an internist's specialty consists of?
8        A.   An internist, without additional
9    training into subspecialty such as
10   gastroenterology and so on or infectious
11   diseases, has a very unique position.
12   Because of all the specialists an internist
13   is the one that is both a consultant and a
14   primary care physician.  I'll explain.
15        A consultant, the internist will be
16   favored by a physician with lesser training
17   such as physicians with no specialty training,
18   and some times by family practitioners who do
19   have some postgraduate training but it is a
20   combination of surgery, OB, pediatrics, so
21   the internist is a consultant to this lesser
22   practitioners with no disrespect.
23        At the same time the internist is
24   probably the best suited primary care provider
25   for a patient to have as the port of first



BROWN & GALLO
LLC

Telephone GA - (404) 495-0777    FL - (954) 987-7779
Fax GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

## 37

1  call because of the broad understanding in
2  diagnosis of common disorders, arthritis,
3  hypertension, diabetes and so on. The
4  internist is uniquely suited to work-up the
5  patient and find out what more that this
6  patient need.
7       So in summary, internists are
8  considered both primary care practitioner
9  with huge following, most internists have
10 chronically for many patients, they consider
11 their doctor and in addition they consult.
12      Counselor, we've been at this for
13 about one hour, is it okay to stop for about
14 five or ten minutes?
15      MR. DOYLE: It certainly is.
16      THE WITNESS: Actually it's lunch
17 time.
18      MR. DOYLE: Why don't we go off the
19 record?
20      (Thereupon, a short break was held.)
21      Q    (By Mr. Doyle) Doctor, are you board
22 certified in internal medicine?
23      A.   Yes.
24      Q.   Is your board certification current?
25      A.   Yes.

## 38

1       Q.   When did you first become board
2  certified?
3       A.   '79.
4       Q.   And are you board certified in any
5  subspecialty?
6       A.   Only in internal medicine, but I do
7  hold two correctional quote unquote
8  certification, one is called a Fellowship of
9  the Society of Correctional Physicians or
10 FSCP, and I also hold an advanced degree,
11 Correctional Certified Healthcare Provider.
12      Q.   And who awarded that?
13      A.   The Fellowship is the Society of
14 Correctional Physicians award. The advanced
15 degree is the National Commission on
16 Correctional Healthcare/CCHP program.
17      Q.   And what was involved in getting
18 that certification?
19      A.   For the first one for the Society
20 of Correctional Physicians what it is required
21 is three year's membership in the Society and
22 a minimum of three year's experience seeing
23 correctional patients and then there's an
24 extensive series of requirements that boils
25 down to having published in the field of

## 39

1  corrections, having taught in the field of
2  corrections, having presented publications
3  in national meetings. For the --
4       Q.   Is there an examination requirement?
5       A.   Not for the Fellowship of the SCP.
6       Q.   And who does the evaluation?
7       A.   Committee of the previous past
8  presidents of the Society. There is fewer
9  than 30 persons ever awarded a fellowship in
10 the history of the Society.
11      Q.   And on the second?
12      A.   On the second the CCHPA or advance,
13 it is a two-step process. In addition to
14 showing so many years of correctional health
15 care work and a number of publications and
16 presentations the incumbent needs to take an
17 exam. For the plain degree the exam is a
18 proctor exam with multiple choice questions
19 and a minimum passing grade.
20      For the advanced degree, which is
21 also held by fewer than 30 persons and not
22 necessarily the same persons that have the
23 FSCP there is need to take another exam which
24 is also proctored, it's in writing and it
25 consists of writing in the term of four hours,

## 40

1  eight dissertations on randomly chosen by the
2  CCHP topics in the field of correctional
3  healthcare and the dissertations need to meet
4  a series of minimum condition to cover all the
5  important points.
6       Q.   And on the first, is that the
7  CCPH --
8       A.   The first is FSCP.
9       Q.   FSCP, when did you obtain that?
10      A.   Let me look at my CV to have the
11 dates right.
12      MR. DOYLE: This is probably a good
13 time, Doctor, I'm going to introduce an
14 exhibit, a copy of your report and mark
15 that Defendant's Exhibit 2. It says
16 Exhibit C on the front cover and it goes
17 from Bates Number 782 through 805 and
18 your CV begins at 789.
19      THE WITNESS: Thank you.
20      (Defendant's Exhibit-2 was marked for
21 identification.)
22      THE WITNESS: 1999 I became a
23 Fellow of the Society of Correctional
24 Physicians.
25      MR. DOYLE: And on the second one,

BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax   GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

41

1    the CCHP?
2        THE WITNESS: CCHP advance degree,
3    advanced in 2006, yeah. '91 for the
4    plain CCHP and advanced in 2006.
5        Q   (By Mr. Doyle) Okay. Doctor, can
6    you take a quick look at your CV from 789
7    through -- where does your CV end? I believe
8    it ends on 803?
9        A   Yes.
10       Q   Is this your current CV?
11       A   Current as of August 7. The CV --
12   since I teach and present nationally
13   frequently every few weeks I add a little
14   something but essentially this is good.
15       Q   Now we were just finishing with your
16   solo practice in Massachusetts?
17       A   Yes.
18       Q   I'll keep working backwards.
19   Prior to that you held a number of academic
20   positions; is that right?
21       A   Yes.
22       Q   And if you could, just run through
23   those quickly for me.
24       A   In reverse order before passing the
25   Boards om internal medicine I had the training

42

1    that is required, which means a total of four
2    years of postgraduate training, all of it in
3    Massachusetts.
4        From 1975 to '76 intern in medicine
5    at Boston City Hospital. '76 through '78
6    resident in various capacities also at the
7    Boston City Hospital in medicine.
8        '78 to '79, chief medical resident,
9    Saint Vincent Hospital, Worcester,
10   Massachusetts.
11       Before that '72 through '75 I was
12   simultaneously a medical student but I was
13   appointed assistant professor of biochemistry
14   at Boston University.
15       Q   Was that a paid position?
16       A   The position was paid until I
17   actively engaged into a medical school student
18   at which point I retained the position but I
19   did not draw a salary.
20       Q   I see.
21       A   Before that I was assistant
22   professor at another Boston university, the
23   Tufts University School of Medicine from '70
24   to '72. Previous to that from '69 to '70 my
25   title was instructor in therapeutic radiology

43

1    at Tufts.
2        Q   And when did you actually enter
3    medical school?
4        A   In '73, I only did three years.
5        Q   And where did you attend medical
6    school?
7        A   Boston University.
8        Q   And that was from '73 to --
9        A   '75.
10       Q   We're almost there, let's go through
11   here.
12       A   Keep going back?
13       Q   Yes. Where did you get your
14   undergraduate degree?
15       A   The undergraduate training, meaning
16   before being a physician it's split between
17   some training in my country of origin,
18   Argentina, listed on my CV on page 789, with
19   the equivalent of college, finished up in '56
20   then in pharmacology, still in Argentina up
21   until the date of 1960.
22       Q   Did you take a break between your
23   undergraduate and the school of pharmacy work
24   or was that continuous?
25       A   No, that was continuous. The Ph.D.

44

1    was awarded while I was already residing in
2    the U.S. What is required is that I perform
3    research, which I did, John Hopkins School of
4    Medicine in Baltimore from '67 to '69 and I
5    sent all the related documents to Argentina
6    and a Ph.D. was awarded.
7        Q   And in what field was your Ph.D.?
8        A   Biochemistry.
9        Q   Would you agree that Johns Hopkins
10   is probably the best hospital in the United
11   States?
12       MS. COCHRUN: Object to form.
13       THE WITNESS: I think the hospitals
14   are ranked -- not by my personal opinion,
15   I think they are ranked independently.
16   Yeah, I think that Johns Hopkins come
17   up on the top a number of times. It
18   certainly looked good when I was there.
19       Q   (By Mr. Doyle) When you got your
20   Ph.D. were you planning on working as an
21   academic, it's somewhat unusual for a doctor
22   to have a Ph.D. prior to going entering
23   medical school?
24       A   Two different questions, I will
25   answer both. One, what was I doing. My work



BROWN & GALLO
                    LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

October 29, 2007

Joseph Edward Paris, M.D.

45

1  was all research at that time. There is no
2  question about it, I did research in
3  Argentina, I did research in Baltimore, I did
4  research in Boston.
5      The question two, is it unusual for
6  a Ph.D. to go to medical school, not that
7  unusual, and there are some programs, in fact,
8  for the transition from Ph.D. to M.D. studies,
9  and there are some reverse program for M.D.s
10 to become Ph.D.s. Now I did not take any of
11 these transitional programs, I went to
12 straight medical school.
13     Q.  What was your field of research?
14     A.  Mostly radiation biology, meaning
15 the cause of cancer, the treatment of cancer.
16 All radiotherapy in animals, in laboratory
17 animals can be enhanced by other techniques
18 like the amount of oxygen saturation, the
19 temperature, the radiation, the temperature of
20 the animal at the time of radiation, how will
21 that affect the rate of cure of cancer.
22     Q.  Doctor, when was the last time that
23 you personally had to diagnose a patient
24 presenting with nonspecific abdominal pain?
25     A.  I see patients with abdominal

46

1  complaints presently. I have been seeing
2  patients with abdominal complaints all my
3  medical life.
4      Q.  And the question is when was the
5  last time?
6      A.  Probably last week. Again, I have a
7  stream of patients that I see and abdominal
8  complaints are very common.
9      Q.  And when you speak of last week, is
10 that in the Department of Health's HIV clinic
11 that you're speaking of?
12     A.  Yes.
13     Q.  When did you first start working as
14 an expert witness?
15     A.  I wouldn't call this a career or
16 even a line of work. I have been requested
17 since approximately 1986.
18     What happened is it's rather simple,
19 I was working in corrections since '85, and
20 inevitably such volume of patients seen in
21 the hospital, the prison hospital, two or
22 three cases of litigation came up, inmate
23 patients and I had to testify on my own
24 behalf.
25     At that point it appears that I was

47

1  noticed by the defense attorneys working for
2  the Attorney General's office in Florida that
3  I could analyze a case. In the beginning my
4  own case, that I could write a report. So
5  within the period of '86 or '87 attorneys,
6  defense attorneys started asking me to opine
7  not only on cases where I was a defendant but
8  other correctional cases where my colleagues
9  were involved.
10     I should add that in that function
11 no payment of any sort because I was on the
12 salary rolls of the Florida Department of
13 Corrections and I had to do whatever the job
14 required, but I gladly collaborated in the
15 defense of some of my colleagues cases.
16     In other cases I talked with all
17 honesty to the defense attorney from the AG
18 office that I saw weak points in the case
19 and they were not defensible and I would
20 analyze it for them and I would say I think
21 they are weak in the following areas.
22     So I did a number of those and
23 eventually I suppose attorneys who were not
24 necessarily related to the AG office requested
25 that I read their case.

48

1      Until 2005 exclusively agreed to
2  read cases for the defense attorneys only.
3  After 2005, having been released from my
4  obligations to the Department of Corrections,
5  I have agreed to review a case.
6      I don't consider this, again, a
7  career being expert, I have only been deposed
8  eight or nine times. I only went to court
9  twice, but really the merits of the case one
10 way or the other is something that only --
11 it seems to me only a handful of correctional
12 physicians seem to agree to do that, and I'm
13 one of those so I have gotten a number of
14 requests.
15     Q.  In how many cases has healthcare
16 that you have provided been the issue in the
17 case?
18     A.  It's as listed, let's read the exact
19 number, counselor.
20     Q.  Sure. In other words I'm talking
21 about cases where you were the defendant.
22     MS. COCHRUN: And I don't know that
23 that is in this CV.
24     THE WITNESS: Oh, no, it's not here.
25     MS. COCHRUN: He has a big fat CV

BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street. Suite 2700
Atlanta, GA 30303

1740 Peachtree Street. NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

## 49

1  that has everything in his whole life.
2  And this CV we put together based on the
3  requirements of the Rule according to
4  how many years to go back so that may
5  well not be in that section but I have
6  got that.
7      THE WITNESS:  I will speak from
8  memory, it's eight or so all together
9  between the Florida and Georgia, it's
10  something of that order, with the caveat
11  that I'm speaking out of memory because I
12  don't have the exact number.
13      Q   (By Mr. Doyle) And did that include
14  both medical malpractice cases and deliberate
15  indifference cases?
16      A   I don't think I ever been sued for
17  malpractice.  Now I hasten to say being sued
18  in Federal Court, which I have been, that's
19  not precluded, it may have been a parallel
20  litigation that didn't come through.  I have
21  never, quote, unquote, lost a case as a
22  defendant, so it went to Federal Court and it
23  stopped there.
24      Q   But you believe in the cases you've
25  just testified about where you were the

## 50

1  defendant those were deliberate indifference
2  cases?
3      A   Yeah, they were.  Although a
4  parallel filing could have existed.
5      Q   What percentage of your current
6  income comes from your work as an expert
7  witness?
8      A   I have no figures for 2007.  2006
9  there is tax returns, it is something under
10  50 percent.
11      Q   Do you think it's close to 50
12  percent?
13      A   I don't remember, counselor, I will
14  have to look.  My wife prepared my return, we
15  just sent it in April but it did not reach 50
16  percent.
17      Q   Do you advertise your services as an
18  expert witness?
19      A   I don't advertise although some
20  people have Googled my name and it comes up.
21  It has been listed by people who look at this
22  and have listings, but advertising as such
23  such as putting in a specialized publication
24  or an ad in the paper, absolutely not.
25      Q   Well, do you pay to have your

## 51

1  services as an expert listed anywhere?
2      A   There may be one website that has a
3  nominal charge.
4      Q   And do you know the name of that
5  website?
6      A   Not offhand, counselor, all I know
7  is they say people use Google and names come
8  up.
9      Q   Do you know how many of your cases
10  come through that listing on the website?
11      A   Practically none.  The vast majority
12  of my cases comes from word of mouth.
13      Q   I will invite your attention to your
14  report where you've listed your cases that you
15  spoke about, I believe it begins on page 803.
16  (Discussion ensued off the record.)
17      Q   (By Mr. Doyle) The first entry it
18  says cases where Dr. Paris was deposed, do you
19  see that?
20      A   Yes.
21      Q   Does this include every case where
22  you've given deposition testimony?
23      A   Except for today's, which will go up
24  next.  Yeah.  I believe it's complete.
25      Q   And beginning at page 805 there's

## 52

1  two pages listed where you've given testimony
2  in court, is that a complete list?
3      A   Yes.  I've been in court only twice
4  in recent times.  As a defendant in the remote
5  past I was in court in Florida.
6      Q   Now is this list limited by dates in
7  terms of the dates required by Rule 26?
8      A   That's my understanding.
9      Q   Okay.  Are there more cases prior to
10  four years ago that are not on this list?
11      A   Yes.
12      Q   Approximately how many?
13      A   Really without the papers, I can't
14  say.  I can tell you that the volume of cases
15  have increased greatly since 2005.
16      Q   Okay.
17      A   In 2005, 2004 I was getting very few
18  cases.
19      Q   And are all cases since 2005 listed
20  here?
21      A   Yes.
22      MS. COCHRUN:  Are you asking, Steve,
23  the outside cases or ones where he would
24  have been internally working for the AG's
25  office?

BROWN & GALLO LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

53

1    MR. DOYLE: In cases where he has
2    given testimony as an expert.
3    THE WITNESS: These are cases that I
4    have been deposed.
5    MR. DOYLE: Okay.
6    Q    (By Mr. Doyle) But just to make sure
7    I understand your testimony, there are
8    additional cases where you have been deposed
9    that were earlier in time, is that true?
10    A    Can I have a minute to think about
11    that one?
12    Q    Please.
13    A    The answer is there are some cases
14    where I was not deposed. The case never went
15    anywhere, it was dropped by one side or the
16    other, they're not listed here.
17    Q    Yes, sir.
18    A    And for the dates -- even the cases
19    that I have deposed are all listed here. And
20    I believe that's a complete listing of all the
21    depositions except when I was a defendant
22    myself in the remote past, talking 20 years.
23    Q    Okay. Now with respect to the cases
24    where you've given testimony in court, does
25    that include all cases or is that limited by

54

1    years as well?
2    A    These are the only times I have been
3    in court in recent times other than episodes
4    when I was a defendant 20 some years ago.
5    Q    Now in addition to cases on this
6    list, both the deposition list and the trial
7    testimony list, have you been retained in
8    other cases where you didn't give testimony by
9    deposition or at trial?
10    A    I have been retained in a number of
11    cases where all I did is to give an opinion to
12    an attorney.
13    Q    And in approximately how many cases
14    have you been retained to give an opinion?
15    A    In the past I would estimate three
16    or four times a year. The volume has been a
17    bit higher in 2006 and 2007, I don't have the
18    number in front of me.
19    Q    I understand. Were you retained by
20    the plaintiff or the defendant in those cases?
21    A    Right off the top of my head since
22    2005 is about 80 percent defendants and 20
23    percent plaintiffs, very roughly.
24    Q    What is your usual methodology for
25    evaluating a case?

55

1    A    I have to look at the totality and
2    the circumstance. I have to look at all
3    available health records. I have to look at
4    the length of the complaint regardless of
5    which side is requesting my services and I
6    have to look at logs or other documents that
7    indicate what was done or not done.
8    Frequent times I have to look at
9    medical documents prior to the event in
10    question, which could be medical records in
11    private hospitals or community physicians.
12    Frequent times I have to look at health
13    records of medical events after the
14    correctional events in question such as
15    hospital records or outpatients records.
16    If any of the healthcare providers has
17    been deposed I like to see what they said,
18    deposition time or if they gave any affidavits
19    or are sworn I will look at all that.
20    Again, getting all that medical
21    information allows me to look at the totality
22    of the circumstance and then I ask myself what
23    would the reasonable average correctional
24    physician or provider would have done under
25    these circumstances.

56

1    Q    And what do you do at that point?
2    A    I discuss it with counsel. And
3    many -- I dare say more than half the cases
4    after all this extensive reading I will call
5    counsel, be it for defense or plaintiff and
6    say I don't think there is any merit.
7    And that's as far as -- I don't even
8    list those as having had a case. There is no
9    case, the litigation ended there, often times
10    it will be settled or dropped.
11    Some times they will go and ask
12    another expert, I suppose, but in general
13    those cases are dropped.
14    Q    In a case where you were retained by
15    the defense to evaluate a case have you ever
16    determined that there was a violation of the
17    standard of care?
18    A    Yes.
19    Q    And so advised the defense?
20    A    I will advise counsel of many weak
21    spots. I'm not going to tell counsel what to
22    do but I will say you cannot count on me to go
23    for this one.
24    Q    And approximately how many times
25    have you done that?



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

57

1    A. I would say half the cases get
2 dropped.
3    Q. And in a case where you are retained
4 by the plaintiff have you ever determined that
5 there was not a violation of the standard of
6 care?
7    A. Yes, sir, I have, and I have told
8 plaintiff's counsel, I said I don't think we
9 can go to bat on this one.
10    Q. Please define the term standard of
11 care for me.
12    A. Oh, it's many many things because it
13 pertains to medical standard of care and
14 certain correctional standards. If you will
15 indulge me a minute, I will go over those.
16    Q. Well, let's ask first the medical
17 standard of care.
18    A. The medical standard of care is not
19 crystal clear because it's the sum total of
20 certain guidelines which are mostly proposed
21 by the professional societies.
22    There is thousands, in fact, of
23 guidelines proposed by more than 1,200
24 medical societies pertaining on the management
25 of diabetes, hypertension. In fact for many

58

1 topics there may be more than one guideline
2 but some people say this constitutes some
3 sort of standard.
4    Then one has to become a sort of a
5 standard of a community, the standard of the
6 state and the national standard. While they
7 are beginning to blend with one another I
8 think it has been recognized for quite some
9 time that the medical standard for a certain
10 region may be somewhat different than the
11 medical standard for the rest of the country
12 as a nation. Plus there are standards that
13 are recognized for specialists, there are
14 standards for primary care physicians,
15 ultimately the standard of care may be so
16 blurry in a particular spot until the courts
17 decide what is the standard, that's what they
18 litigate about.
19    So the standard is not a bright
20 line, there are certainly departures such as
21 deviation from the standard is clear to all
22 that a standard has been breached, in other
23 cases it is litigated.
24    Q. Would you agree with me that the
25 same standard of care governs healthcare in

59

1 prisons as in the community-at-large?
2    A. I will say both yes and no. If you
3 allow me, because the general sense, yes,
4 meaning it will not be tolerable to subject
5 inmates to a lower or less than standard of
6 medical care.
7    The reason I qualify that is because
8 there are some subtle differences some times
9 in a few areas. Example, with diabetes the
10 American Diabetic Association recognizes two
11 standards, one for persons who are free and
12 one for correctional patients. And the reason
13 for that, actually, is quite, quite
14 interesting is the fact that it will not be
15 possible in corrections to give a Glucometer
16 to each prisoner to measure their own blood
17 sugars four times a day which is most of the
18 time routine for most diabetes, so the
19 standard of the ADA for the prisoners
20 contemplates that and contemplates other
21 things that can be done in lieu of the
22 Glucometer.
23    So there are some qualifiers here
24 but in the general sense a prisoner is owed
25 the same or similar standard of care that a

60

1 free person will benefit of under similar
2 circumstances.
3    Q. With respect to the standard of care
4 for diagnosing nonspecific abdominal pain,
5 would you agree that that's the same standard
6 of care in the prison setting and in the
7 community-at-large?
8    A. In the general sense, yes.
9    Q. Would you agree with me that
10 clinical decisions and actions regarding
11 healthcare provided to inmates to meet their
12 medical needs is the sole responsibility of
13 qualified healthcare professionals?
14    MS. COCHRUN: Object to form.
15    THE WITNESS: That is a very
16 meandering and contrite question, if
17 I might say so, but in general we
18 correctional physicians believe that
19 prisoners should have access to a
20 professional opinion which translate
21 into saying that the opinions should
22 be formulated by persons who are of the
23 level of training or expertise that is
24 commensurate with a medical need.
25    Q    (By Mr. Doyle) Let me ask it a

BROWN&GALLO
LLC

Telephone GA - (404) 495-0777    FL - (954) 987-7779
Fax    GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                October 29, 2007

---

61

1  different way. Prison guards aren't
2  responsible for providing healthcare to
3  inmates, are they?
4        MS. COCHRUN: Object to form.
5        THE WITNESS: I'm going to respond
6  to that the long way. They are not
7  responsible for medical ministrations,
8  and yet because of the nature of the
9  prisons they need to be trained in
10  cardiopulmonary resuscitation, first aid
11  to bleeding vessels, and they have to be
12  trained in being able to do two more
13  things. One, under some circumstances to
14  pass medications. And number 2 they have
15  to be trained into the orderly delivery
16  to physicians of the inmates' request for
17  healthcare. When physicians or nurses
18  are not in attendance, they have to be
19  transparent to that process and pass on
20  the word to the correctional
21  practitioners as not practicing medicine
22  in any manner but it is a way that the
23  security wing, the medical wing have to
24  interact.
25        Q    (By Mr. Doyle) And is it fair to say

---

62

1  that the correctional officers are what are
2  responsible for the security wing that you've
3  just described?
4        A.   They definitely are responsible for
5  the security of the institution and all the
6  persons inside of the institution.
7        Q.   And the medical practitioners are
8  responsible for providing healthcare, is that
9  fair?
10        A.   Yes.
11        Q.   And the prison guards don't have a
12  medical standard of care, do they?
13        MS. COCHRUN: Object to form.
14        THE WITNESS: I will first respond,
15  we don't call them guards any more.
16  Because of the training they have they're
17  called correctional officers or sheriff's
18  deputies in certain jails.
19        They are not responsible for quote,
20  unquote, the standard of medical care but
21  they must have certain minimum trainings
22  on certain ministrations that are in the
23  border zone such as the performance of
24  cardiopulmonary resuscitation, the
25  delivery of first aid which, essentially

---

63

1  translated, to stop bleeding and to
2  stabilize a fracture. And they have to,
3  as I previously stated, do two more
4  things, under certain conditions of
5  training be able to deliver medications
6  to inmate patients and to be transparent
7  to the process of delivering healthcare
8  requests to medical staff.
9        Within all of those missions that I
10  described, I wouldn't call it they have a
11  standard of care but they have to meet
12  certain minimal levels of training and
13  competence at those functions. For
14  instance a CPR card is not awarded just
15  by listening to a CPR lecture they have
16  to take a test and pass it.
17        Q    (By Mr. Doyle) Doctor, when you
18  testified about delivery of healthcare
19  requests to medical staff by correctional
20  officers, would you agree that that's part of
21  deliberate indifference?
22        MS. COCHRUN: Object to form. Calls
23  for a legal conclusion.
24        THE WITNESS: I will not say --
25  deliberate indifference is legal

---

64

1  terminology and --
2        Q    (By Mr. Doyle) You're familiar with
3  the term aren't you, Doctor?
4        A.   Am I familiar with deliberate
5  indifference, yes, I am familiar with
6  indifference inevitably because I'm a
7  correctional physician.
8        Q.   And you have testified in court
9  about what that means, haven't you?
10        A.   I try not to describe the legal
11  terminology regarding the deliberate
12  indifference but I immediately quote the
13  words of my esteem friend, Attorney Bill
14  Rold, William Rold who wrote the chapter on
15  this matter in the textbook Healthcare and
16  Corrections.
17        And I have written other chapters
18  for that book but the chapter that he wrote
19  states that in a translation the physician
20  will find it easier to understand in order to
21  avoid incurring into a deliberate indifference
22  the ability correctional practitioner need
23  to insure prisoners, A, have access to care.
24  B, have all the care that have been ordered
25  by practitioners and C, have access to a

---

# BROWN & GALLO

LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax   GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                    October 29, 2007

---

65

1   professional opinion, meaning somebody with
2   a level of training and expertise that will
3   allow him to be competent in the area of
4   medical need, so that type of translation of
5   a legal counsel into a medical concept is
6   something that I do understand.
7       Q.  And that's the legal concept of
8   deliberate indifference you've just described?
9       A.  No.  It's my medical understanding
10  of what is concept of the law that I have no
11  particular understanding about.
12      Q.  Doctor, in your opinion are there
13  times when a general practitioner should send
14  a patient for a consult with a specialist?
15      A.  The question again?
16      Q.  In your opinion are there times when
17  a general practitioner should send a patient
18  for a consult with a specialist?
19      A.  A general practitioner will not have
20  expertise in all areas so when the general
21  practitioner quote, unquote, runs out of
22  expertise in neurology, cardiology, pulmonary
23  and so on, yes, there is a definite medical
24  need and the patient should be referred to the
25  practitioner who possesses such expertise.

---

66

1       Q.  And once the specialist gives his
2   consultation is the general practitioner
3   permitted to rely upon it?
4       A.  Not exactly because -- and this is
5   especially true in corrections where the
6   patient has no choice of practitioners, the
7   general practitioner is held to a very high
8   order of duty there.
9       The general practitioner needs to
10  learn of the opinion of the consultant.  This
11  could be a verbal discussion on the phone,
12  could be a written report, then the
13  practitioner either agrees or disagrees with
14  the recommendation.
15      In the prisons and jails consultants
16  cannot write orders.  Nurses will only follow
17  orders that are written at the institution.
18  Therefore it is primary care who needs to look
19  at the report, very well written, just
20  received, and either agree with the
21  recommendations or disagree, and ultimately
22  only the primary care can write the orders.
23  Not infrequently primary care, dissatisfied
24  with the recommendations received and either
25  send the patient back to the same consultant

---

67

1   or to a different consultant.  Ultimately
2   primary care has the upper hand.
3       Q.  In your opinion how does the primary
4   care general practitioner have the training or
5   knowledge to second guess the specialist?
6       A.  The words second guess don't sit
7   well.  What it implies is that the
8   practitioner will be performing a specialty
9   consultation with a different outcome than
10  the original consultation, this was not my
11  intention to say that.
12      What happens in practice is the
13  recommendation of a consultant, while
14  important, they need to be processed in the
15  context of the totality of the circumstances
16  for that prisoner.
17      The consultant only sees the
18  prisoner for a few minutes, rarely for any
19  more than that and the consultant may receive
20  one, maybe two pages of information.  In
21  general throughout the country institutions
22  don't send out healthcare records from the
23  prison, they will be too valuable, they could
24  be lost so pending --
25      Q.  Doctor, let me stop there, do you

---

68

1   know the Federal Bureau of Prisons' policy
2   with respect to sending health records with
3   respect to consultation?
4       A.  I do not know the policy nationwide,
5   I do know that in this case the consultant
6   only had a certain slip with certain pieces of
7   information but not the whole record.  And as
8   I was saying that will be very commonly -- the
9   case in both Florida and Georgia, that's what
10  we did also, the whole record doesn't go out.
11      So the consultant, to summarize, has
12  limited information, and he has the inmate
13  patient to examine for a few minutes.  And
14  let's contrast that with primary care who has
15  knowledge of the patient for days, months or
16  years, has access to all the health records,
17  all the laboratory testing, has spoken to the
18  patient so many times, they have a better
19  idea of what the patient wants or doesn't
20  want.  So primary care is in a unique position
21  not to quote, unquote, second guess the
22  consultant but instead to try to synchronize
23  the recommendations of the consultant with the
24  totality of what's happening to the patient.
25      Q.  Let me ask it in slightly a

---

BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

October 29, 2007
Joseph Edward Paris, M.D.

## 69

1  different way, is it reasonable for a general
2  practitioner to rely upon the consultation
3  from a specialist?
4      A.  I'm going to answer in the same way,
5  the word rely is not appropriate.  In this
6  occasion the primary care physician should
7  certainly pay attention and understand what a
8  consultant is saying, and there could be great
9  value in the recommendation given.  At the
10 same time that does not absolve primary care
11 from a sense of responsibility on ultimately
12 deciding how much of the suggestion received
13 will be implemented.
14     Q.  Dr. Paris, would you agree with me
15 that a board certified general surgeon is well
16 qualified to determine whether a patient
17 presenting with acute abdominal pain requires
18 surgery?
19     A.  It is not my intention to dissect
20 bit by bit the work of a general surgeon who
21 has access to the patient for a short period
22 and with limited information, especially
23 history kind of information.
24     Generally surgeons are good at
25 diagnosing abdominal pain, don't get me wrong,

## 70

1  and I respect surgeons.  At the same time
2  appropriate diagnosis of a patient requires
3  looking at the totality of the circumstance
4  including historical data.
5      Q.  Doctor, let me put it this way,
6  it's the surgeon who has to decide whether to
7  operate on the patient with acute abdominal
8  pain, isn't that right, with the informed
9  consent of the patient?
10     A.  We are mixing it up a little bit
11 because the tone of the question implies that
12 we are looking at emergency surgery.
13     Q.  No, not at all.
14     A.  Okay.  If we're talking about
15 chronic pains --
16     Q.  Define that for the record, please.
17     A.  Chronic pain is any pain lasting
18 more than two weeks.
19     Q.  Okay.  Continue, please.
20     A.  Any patient who a decision has to
21 be made on chronic pain and elective surgery,
22 certainly a surgeon has a great deal of
23 training in that respect but it's not
24 infallible.  Other practitioners may come
25 up with other reasons for chronic pain

## 71

1  but don't need surgery such as an inoperable
2  cancer, such as a form of infection or
3  arthritis, that would not be amenable to
4  surgery and other conditions.
5      Q.  Well, let me put is this way,
6  Doctor, a general practitioner doesn't send a
7  patient to a surgeon and tell him to perform
8  surgery, isn't that right?
9      A.  Generally not, so in general you are
10 right.
11     Q.  And wouldn't you agree that the
12 surgeon has to make an independent assessment
13 of whether he believes that surgery is
14 necessary?
15     A.  I agree the surgeons do make
16 independent assessments about the need for
17 surgery.
18     Q.  In the case of abdominal pain, to
19 make a determination as to whether a patient
20 requires surgery the surgeon must make a
21 diagnosis of the cause of the abdominal pain,
22 isn't that right?
23     MS. COCHRUN:  I'm going to object to
24 any line of questioning.  Under Alabama
25 law --

## 72

1      MR. DOYLE:  I'm asking the doctor a
2  medical question.
3      MS. COCHRUN:  Can I finish my
4  objection?
5      MR. DOYLE:  You can object to the
6  form of the question as are permitted by
7  the Federal rules.  If you want to put
8  that on the record, please do, I'm going
9  to continue asking the doctor questions.
10     MS. COCHRUN:  All right.  Then my
11 objection is I object to the form of the
12 question because such a question would be
13 inappropriate under the law of Alabama as
14 applies to this Federal tort claim, that
15 is that physicians who are asked to pass
16 comment on a specialty outside of theirs
17 in terms of standard of care or what a
18 surgeon should do or shouldn't do, that
19 falls within the surgeon's ability to
20 comment on that.  And that while I'm not
21 going to prevent this doctor from
22 testifying in that regard I just would
23 note for the record that asking questions
24 about the standard of care of the surgeon
25 is not necessarily appropriate under



**BROWN & GALLO**
LLC

Telephone  GA - (404) 495-0777    FL -  (954) 987-7779
Fax   GA - (404) 495-0766    FL -  (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

73

1     Alabama law of this witness, but with
2   that said, ask whatever you need.
3       THE WITNESS:  Following which I
4   will have to be read the question back.
5   (Thereupon, the requested portion was read
6   back by the reporter.)
7       MS. COCHRUN:  Same objection.
8       THE WITNESS:  Okay.  I will have
9   two answers to that.  One is I am not an
10  expert in the field of surgery and
11  therefore my answers are not considered
12  the ultimate in this topic.
13      Second, some times surgeons operate
14  and do an exploratory because they don't
15  know what's wrong, so in principal it
16  appears that the answer to the question
17  is no but I have no particular expertise
18  in the field of surgery.
19   Q    (By Mr. Doyle) Have you ever
20  referred a patient to a surgeon?
21   A.  Many times.
22   Q.  And you have had a surgeon recommend
23  surgery for your patients?
24   A.  Some times.
25   Q.  And in your experience has the

74

1   surgeon made an independent assessment of what
2   he or she feels is the underlying diagnosis?
3    A.  A surgeon looks at the circumstance
4   and if it's a good surgeon, made an assessment
5   on what he or she thought was needed.
6    Q.  And that's an independent assessment
7   made by the surgeon, isn't that right?
8    A.  I'm not sure to the answer of that,
9   counselor, whether they also have relied on
10  the information I prepare for them because
11  they haven't been seeing the patient all
12  along.
13   Q.  Do you have a copy of the medical
14  records with you?
15   A.  Allow me to use the copy where I
16  put my tabs so I can remember the dates.
17   Q.  I'm not going to put this whole
18  record in but I will use the Bates numbers.
19   A.  Yes.  I do have Bates numbers.
20   Q.  Doctor, I'm going to invite you,
21  I'm referring to the Bureau of Prisons health
22  record for the plaintiff, John Coggin, do you
23  have a copy of that with you?
24   A.  Yes.  I do.
25   Q.  And I invite your attention to Bates

75

1   Number 77.
2       MS. COCHRUN:  That's what it looks
3   like.
4       THE WITNESS:  Yeah.  You will have
5   to indulge me, I kept this in
6   chronological order therefore the Bates
7   numbers are not consecutive but I do have
8   Bates numbers so we do talk about the
9   same piece of paper.
10      MR. DOYLE:  It's the consultation
11  sheet of Dr. Antonio Williams dated
12  8/28/01.
13      THE WITNESS:  Yes.
14      MR. DOYLE:  Are you with me, Doctor?
15      THE WITNESS:  Yes.
16   Q   (By Mr. Doyle) Have you reviewed
17  this consultation sheet before?
18   A.  I have seen it before.
19   Q.  And would you agree with me that
20  it's a request for a consult to Dr. Antonio
21  Williams?
22   A.  Yes.
23   Q.  And the date is 8/28/01?
24   A.  Yes.
25   Q.  And do you see where there's a

76

1   block, a form that says reason for request?
2    A.  Reason for request, you want me to
3   read it to you?
4    Q.  Or I'll read it to you.
5    A.  Go ahead.
6    Q.  Where it says abdominal pain RUQ,
7   would you agree that's abdominal pain right
8   upper quadrant?
9    A.  Yes.
10   Q.  And it says see abdominal ultrasound
11  and attach to labs?
12   A.  Yes.
13   Q.  And then please evaluate and treat
14  accordingly?
15   A.  Yes.
16   Q.  And then in provisional diagnosis,
17  what does it say?
18   A.  Scribbled, difficult to read but I
19  can make out impression.
20   Q.  No.  Where it says provisional
21  diagnosis.
22   A.  Oh, provisional diagnosis, abdominal
23  pain.
24   Q.  Would you agree that this consult
25  asks Dr. Williams to perform an independent



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                October 29, 2007

---

77

1 evaluation of the patient's abdominal pain?
2     A.   It's asking Dr. Williams to perform
3 an evaluation of abdominal pain based on the
4 information that the physician is providing to
5 Dr. Williams.
6     Q.   And that's indicated as an abdominal
7 ultrasound and attached labs?
8     A.   Correct.
9     Q.   This consultation doesn't have any
10 preconceived diagnosis at all, does it?
11    A.   Abdominal pain is not a diagnosis,
12 it's a symptom.
13    Q.   In fact it doesn't suggest any
14 diagnosis at all, does it?
15    A.   There is no indication in this slip
16 that the patient is diagnosed.
17    Q.   So that would call for Dr. Williams
18 to make a diagnosis, wouldn't it?
19        MS. COCHRUN:  Object to form.
20        THE WITNESS:  Certainly the
21    practitioner, Dr. Williams, is expected
22    to have an impression of a case, and his
23    impression is going to be based on visit
24    to this inpatient patient and certain
25    attached laboratory and ultrasound

---

78

1 reports.
2     Q    (By Mr. Doyle) And Dr. Williams
3 determined that Mr. Coggin's problem was
4 gallbladder disease, didn't he?
5     A.   He had an impression where he said
6 biliary colic polyp versus cholelithiasis.
7     Q.   And could you for the record what
8 biliary colic is?
9     A.   Biliary colic is when there is spasm
10 of the biliary tree due to obstruction
11 somewhere in the biliary tree and therefore
12 pain.
13    Q.   And when you say biliary tree, are
14 you talking about the gallbladder?
15    A.   Biliary tree are the ducts that come
16 out of the gallbladder.
17    Q.   And cholelithiasis?
18    A.   Means stones in the gallbladder.
19    Q.   Okay.  So is Dr. Williams'
20 impression that there's gallbladder disease
21 present, is that accurate?
22    A.   In this slip of paper, yes.
23 There is also independent information in
24 the chart that he, Williams, spoke to the
25 correctional staff and said that other

---

79

1 diseases need to be ruled out.  And he's
2 quoted by one of the nurse practitioners
3 saying, so it raises the question of why was
4 not the additional information, historical
5 information that is so important on this case,
6 why was it not communicated to him.
7     Q.   Doctor, what was Dr. Williams' plan?
8     A.   In this slip of paper plan LC, most
9 likely meaning laparoscopic cholecystectomy.
10    Q.   And what does that mean?
11    A.   Meaning to take the gallbladder out
12 with a laparoscope, a long instrument.
13    Q.   So he's recommending gallbladder
14 surgery; is that right?
15    A.   This is what he wrote for his plan.
16    Q.   Now you just spoke of a note in the
17 chart, and you can take a look at that, I
18 believe what you're talking about is an entry
19 that appears in the progress notes at Bates
20 Number 14 dated 8/28/01 and it's signed by
21 nurse practitioner Daphne Essex.
22    A.   I'm getting there.  Here it is.
23 Yes, I spoke about a note of 8/28/01.
24    Q.   And what does that note say?
25    A.   Okay.  Spoke with a surgeon in

---

80

1 regard to abdominal ultrasound report.
2 States that he will need to examine the
3 patient.  States that the patient does not
4 need gastro, probably meaning gastrointestinal
5 or GI consultation at this time unless there
6 may be or may have problems with a common bile
7 duct or peptic ulcer disease, et cetera.
8 Informed Dr. Garcia.  Will call
9 gastroenterology consult and schedule for
10 surgery.
11    Q.   Well, it says schedule for surgeon,
12 doesn't it?
13    A.   What is very important -- yes,
14 surgery -- surgeon, surgeon.
15        What this very important note tells
16 me is that a surgeon is telling primary care
17 that these other problems, the differential
18 diagnosis need to be ruled out.
19    Q.   And would you agree with me it's the
20 surgeon who is going to rule them out?
21    A.   I do not agree with that sentence
22 because what the surgeon is saying, this
23 patient could have peptic ulcer disease, which
24 generally a medical disease is treated with
25 antacids, a protein pump inhibitors and H2

---



# BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

---

81

1   blockers.
2         Very few patients are operated for
3   peptic ulcer disease, it's become medical
4   disease. So what the surgeon is saying,
5   these will be surgical disease but these
6   other conditions need to be ruled out.
7   In other words have they been ruled out.
8         The sentence is a bit -- unless
9   there may be problems like peptic
10  ulcer disease. It puts a -- except let's
11  also say to ourselves this is a condensation
12  in a few lines of what the surgeon said.
13  It may be a very long conversation, we
14  probably will never know.
15        Q.  Doctor, let's take a look at the
16  note. It's very clear, is it not, it states
17  that he will need to examine the patient.
18        A.  Okay.
19        Q.  Do you agree with that?
20        A.  Yeah. I agree it says that.
21        Q.  Okay. And then it says states that
22  the patient does not need gastro, which you
23  took to mean a gastroenterology consult at
24  this time, isn't that right?
25        A.  Unless, the sentence continues.

---

82

1   The first part is right but the sentence
2   continues.
3         Q.  Well, isn't the logical implication
4   of that is that he is going to evaluate for
5   those and then determine -- he's not telling
6   them go send him to a gastroenterologist to
7   find out if he has these problems, is he?
8         MS. COCHRUN:  Object to form.
9         THE WITNESS:  His sentence is
10        difficult to interpret and it's also what
11        the surgeon said as charted through the
12        ears and the hand of a third person.
13        Q  (By Mr. Doyle) Does it say to send
14  him for a gastroenterology consult?
15        A.  It says that he will not need it
16  unless he have peptic ulcer disease or other
17  conditions. Et cetera may mean a list of
18  other five or six conditions.
19        Q.  And doesn't it say that the surgeon
20  wants to evaluate him?
21        A.  In this sentence we are away from
22  the evaluation, and as quoted by this
23  practitioner a surgeon is saying this patient
24  will not need gastroenterology consult unless
25  he have peptic ulcer disease in which he

---

83

1   wouldn't need gastroenterology consult, that's
2   how I read it.
3         Q.  And he's saying he wants to examine
4   the patient, right?
5         A.  Which is that's true, but it's
6   independent from the fact that this sentence
7   literally means that he does not need
8   gastroenterology consultation unless there is
9   peptic ulcer disease in which case he does
10  need gastroenterology consult regardless of
11  the physical examination by surgeon or not.
12        Q.  And that's your interpretation of
13  that note?
14        A.  Yes, sir, it is.
15        Q.  Doctor, have you had occasion to
16  work with radiologists in the course of your
17  career?
18        A.  Have I had occasion to order x-rays
19  performed by others, yes, I have ordered many
20  x-rays. Other diagnostic images as well, I
21  have.
22        Q.  And what is a radiologist's primary
23  job?
24        A.  A radiologist's job -- again not
25  professing any particular expertise in that

---

84

1   field is expected to look at the totality of
2   the findings in a film and whatever history he
3   have been provided and try to provide what is
4   called a radiological diagnosis, not to be
5   confused with a clinical diagnosis.
6         Q.  Okay. And in your experience do
7   physicians rely on radiologist's diagnostic
8   reports?
9         A.  The answer is yes but no.
10  Clinicians are fairly comfortable in receiving
11  from radiologists technical reports on
12  radiological diagnosis. They are less
13  comfortable about having all of the
14  radiological and other techniques that
15  are needed for a case, so the primary
16  diagnostician is the primary care physician
17  who is incumbent upon those practitioners to
18  order the appropriate tests. If they order
19  one test and if the test comes back negative
20  but they haven't ordered all the tests that
21  are appropriate with this case, the
22  proposition relying on the radiologist turns
23  up wrong because the test that was ordered and
24  properly reported will not bring the total
25  diagnosis.

---



BROWN&GALLO
LLC

Telephone GA - (404) 495-0777    FL - (954) 987-7779
Fax GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

## 85

1      Q.   A general practitioner doesn't have
2   to look at the images himself, does he?
3      A.   It is in good practice and every
4   general practitioner, when given the
5   opportunity, will look at a film that has
6   just been produced.  In other occasions it's
7   not practical because a film is produced
8   distantly, but if a film is produced on-site
9   most GPs and internists will take a look too.
10  And then, of course, they will expect a report
11  being produced by the radiologist.
12     Q.   Does a GP have the same expertise
13  in evaluating a film or a diagnostic image
14  as a radiologist?
15     A.   Generally, no.
16     Q.   Would you agree that ultrasound
17  scanning is the preferred test for detecting
18  gallbladder disease?
19     A.   It's one of the better tests for
20  detecting gallbladder disease.  Although I'm
21  not an expert in the field I have been in --
22  for many years I have been cognizant of the
23  fact that some times gallbladder ultrasound do
24  not produce the diagnosis but in general they
25  are pretty good.

## 86

1      Q.   I'm going to invite your attention
2   in the Bureau of Prisons' health record to
3   Bates number 51.
4      A.   51?
5      Q.   Yes.  Which is the abdominal
6   ultrasound report dated 6/30/01.
7      A.   I see it.
8      Q.   Have you had a chance to look at
9   that before?
10     A.   Yes.
11     Q.   Would you agree that this abdominal
12  ultrasound shows an abnormal gallbladder?
13     A.   This is a report, not a film itself,
14  and the impression by the radiologist is that
15  he has seen what he calls a small echogenic
16  focus in the gallbladder.  I have no
17  particular training on even knowing what a
18  echogenic focus is.
19         It appears to be -- now I'm relying
20  on my experience in receiving literally
21  thousands of these reports over the years,
22  as an internist it appears like a very small
23  finding as opposed to other reports where
24  the radiologist is dead certain.
25         When the radiologist write I see a

## 87

1   one-and-a-half centimeter stone in the
2   gallbladder or the common bile duct I know
3   that he or she is seeing that.  This looks
4   like a very vague report to me, counselor.
5          Now is this a good point to request
6   another five minutes?
7          MR. DOYLE:  Sure.  Let's take a
8   break at the Doctor's request.
9          THE WITNESS:  Thank you very much.
10         (Thereupon, a short break was held.)
11     Q    (By Mr. Doyle)  Doctor, would you
12  agree that when a patient first presents with
13  acute abdominal pain a practitioner should
14  start his clinical evaluation with a patient
15  history?
16     A.   I will agree with that.
17     Q.   And some of the things that should
18  be obtained in a careful clinical history are
19  mode of onset, duration, frequency, character,
20  location, chronology and radiation of the
21  pain; is that right?
22     A.   So far so good.
23     Q.   And why are each of those important?
24     A.   The historical information and the
25  physical examination are very important for

## 88

1   diagnosis because it bring elements,
2   information that all together present a
3   picture for the practitioner to begin putting
4   together what is called a differential
5   diagnosis.
6      Q.   And should the practitioner also
7   determine the presence or absence of any
8   aggravating or alleviating factors?
9      A.   Yes.
10     Q.   And that's also important?
11     A.   Yes.
12     Q.   And would you agree that the purpose
13  of the patient history in the case of acute
14  abdominal pain is what is some times called
15  pattern recognition, are you familiar with
16  that term?
17     A.   I don't use the term that much,
18  counselor, but anything that represents a
19  pattern, pattern may be of some use to the
20  clinician.
21     Q.   I will use a different word.  Is
22  it fair to say the practitioner is looking
23  to match this new case to the classic
24  presentation of various diseases?
25     A.   That is a question that is actually

BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax   GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                October 29, 2007

---

89

1    very profound, how is diagnosis achieved.
2    And there are writings, some physicians may
3    try to do that much to something that they
4    have seen before.  Other physicians prefer
5    not to do that because it may lead to a
6    false impression so rather they try to
7    produce a differential diagnosis.  A
8    differential diagnosis will have a grouping
9    at the top of several conditions that could
10   match that pattern and then in decreasing
11   order of probability other condition that
12   match it a bit less.
13       Q.  Would you agree with me that the
14   classic presentation of gallbladder disease
15   includes the following, pain in the right
16   upper quadrant?
17       A.  I will have to comment something.
18   While I will be agreeable to answer your
19   questions, counselor, certainly I will try to
20   utilize the best of my training and experience
21   in so doing without professing any particular
22   expertise in all fields.  Okay, go ahead with
23   your question, please.
24       Q.  Okay.  Would you agree that the
25   classic presentation of gallbladder disease

---

90

1    include, and I'm going to list a few things,
2    pain in the right upper quadrant?
3        A.  Pain may be included together with
4    a constellation of other symptoms.  And the
5    location generally will be in that area, right
6    upper quadrant, but it could radiate to other
7    areas.  Also the pattern of how the pain comes
8    and goes may be important.
9        Q.  And would you agree that again in
10   the classic presentation of gallbladder
11   disease the pain may radiate to the right
12   scapular region or straight back?
13       A.  It may or may not.
14       Q.  Those would be in part of the
15   classic presentation, would you agree?
16       A.  A classic presentation is not
17   just where the pain is and how it radiates,
18   that would be very very vague.  It's what
19   provokes the pain, how many times has it
20   occurred, what the duration is, what the
21   intensity is so I have to qualify your
22   statements.
23       Q.  Well, along those lines that you
24   just suggested, Doctor, would you agree that
25   the pain associated with gallbladder disease

---

91

1    would be worse after eating?
2        A.  It tends to occur in response to a
3    meal but the classical association is in
4    response to certain meals whereas other
5    meals seem to pose much fewer problems.
6    These, too, in contrast with the pain in
7    peptic ulcer disease seem to be aggravated by
8    virtually any meal.
9        Q.  And would you agree in gallbladder
10   disease that typically nausea and vomiting
11   may be present?
12       A.  Nausea and vomiting are present
13   with virtually all kinds of abdominal pains
14   so they don't have a particular diagnostic
15   significance.
16       Q.  Now with respect to peptic ulcer
17   disease would you agree that it is
18   characterized, and I'm going to talk about a
19   few things, burning epigastric pain?
20       A.  Not always.  In fact peptic ulcer
21   disease frequently at times has been confused
22   with the pain of coronary artery disease.
23       Q.  Okay.  With respect to peptic ulcer
24   disease it would be typical for the pain to
25   occur on an empty stomach?

---

92

1        A.  It can occur with an empty stomach
2    and it can occur in response to meals.
3        Q.  And also the pain can be relieved by
4    food, isn't that right?
5        A.  In some patients relieved by eating.
6    In others it is aggravated by eating.
7        Q.  And one of the purposes of the
8    patient history would be to try and narrow
9    down the diagnosis, isn't that right?
10       A.  It's helpful to try to obtain as
11   much information as possible.
12       Q.  And following the patient history
13   would you agree that then the clinician
14   should perform a physical examination?
15       A.  Yes.
16       Q.  And the physical examination is
17   that the clinician is looking for specific
18   signs or findings that either rule out or
19   confirm diagnostic possibility?
20       A.  The sentence is correct if it's
21   diagnostic possibilities plural.
22       Q.  And would you agree that the
23   physical exam should include inspection,
24   auscultation, percussion and palpation of
25   the abdomen?

---



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

---

93

1      A.   It definitely should include that
2   plus a few other things.
3      Q.   And what are some of those other
4   things?
5      A.   Vital signs, which you didn't
6   mention.  It should include a rectal
7   examination and stool testing for occult
8   blood.
9      Q.   What is the practitioner looking
10  for in performing the physical examination?
11     A.   Physical examination of the abdomen
12  tells the practitioner many things.  Because
13  the abdominal wall may be rigid, boggy or
14  soft, bowel sounds may be present and notable,
15  present and hyperactive, present and
16  hypoactive or absent.
17        The hand may detect some of the
18  organs to be enlarged such as a spleen or the
19  liver or it may not.  The hand may detect
20  masses that shouldn't be there.  The hand may
21  elicit additional pain in touching certain
22  points so, yes, the physical examination is
23  important.
24     Q.   Doctor, would you agree with me that
25  abdominal examination in gallbladder colic and

---

94

1   cholecystitis usually shows right upper
2   quadrant tenderness, abdominal guarding and
3   may show the Murphy sign?
4      MS. COCHRUN:  Object to form.
5      THE WITNESS:  Having had gallbladder
6   disease myself and having had a
7   laparoscopic cholecystectomy I can tell
8   you that the examination is variable.
9   At certain points I had some of those
10  signs and symptoms, at certain points I
11  had none whatsoever.  And my own
12  examination and the examination, in fact,
13  by qualified friends of mine was very
14  variable.  The diagnosis was clinched by
15  an ultrasound echo in my case showing two
16  stones more than one centimeter in
17  diameter each.  End that by saying the
18  diagnosis of gallbladder disease by
19  physical examination alone is very
20  difficult and it should only be
21  entertained as part of a differential
22  diagnosis that encompasses a number of
23  other abdominal conditions.
24     Q    (By Mr. Doyle) Now Doctor, isn't
25  it true that tenderness to palpation is not

---

95

1   indicative of a peptic ulcer?
2      A.   Tenderness to palpation may be
3   indicative of a number of things.  If peptic
4   ulcer is pretty advanced there will be a
5   diffused tenderness to palpation in the
6   abdomen.  If there is any beginning of
7   perforation, which can occur with peptic
8   ulcer disease, there will be tenderness to
9   palpation.
10        So in summary, again speaking as a
11  general internist with no particular expertise
12  in this topic abdominal tenderness, presence
13  or absence of, is not a very strong indicative
14  of what is the nature of the condition in this
15  patient.
16     Q.   And as part of the diagnostic
17  process following the physical examination the
18  practitioner should then order laboratory
19  tests and diagnostic images; is that right?
20     A.   That, in the general sense, is true.
21     Q.   And would you agree that laboratory
22  and radiologic studies are often useful for
23  confirming the diagnosis suggested by the
24  history and physical exam?
25     A.   Yes.

---

96

1      Q.   And would you agree that a complete
2   blood count, metabolic profile and urinalysis
3   are some of the labs that should typically be
4   ordered?
5      A.   Among others.
6      Q.   And why are those important?
7      A.   Complete blood count becomes
8   important should the patient ever bleed.  The
9   patients with abdominal conditions may bleed
10  as it was the case here, so a complete blood
11  count may show that the patient has already
12  bled, or in the future if this blood count is
13  normal, when measured again in a few days or a
14  week may show a change in the red cell count
15  indicative of a blood loss.
16        Another very important but not a
17  complete blood count is a platelet count.
18  Patients with low platelet counts are much
19  more likely to bleed than a patient with a
20  normal platelet count.
21        Another very important factor in a
22  complete blood count is the white cell count
23  because the combination of any abdominal
24  symptomatology with an elevated white cell
25  count is indicative of a much more urgent

---

# BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

| 97 | 99 |
|---|---|

**97**

1  problem that even white cell count is normal.
2      Of all the activities, I forgot what
3  they were, I will do them one by one if you
4  will repeat them, please.
5      Q.  Metabolic profile, why is that
6  important?
7      A.  A metabolic profile comprises
8  essentially electrolytes, BUN and creatine
9  and a sugar.  Depending on the lab it may
10  bring a few other tests but let's discuss
11  those first.
12      A sugar is always a good idea, a
13  patient that wasn't diabetic previously may be
14  diabetic now, the doctor needs to know that in
15  order to refine the diagnosis.
16      Electrolytes, if in any way change
17  from normal values, will represent a much more
18  urgent need, medical need than if they are
19  normal.
20      A BUN or blood urine nitrogen is
21  important because if a patient has renal
22  failure it will show it or if a patient is
23  dehydrated it will show it.  A patient with
24  dehydration represents a more urgent problem
25  for the clinician than one that is properly

**99**

1  explain abdominal pain.
2      If there are stones anywhere in
3  the films -- if the stones are in the general
4  location of the gallbladder they may or
5  may not be an artifact but I will leave
6  the clinician to do more tests aimed at
7  gallbladder disease as a possible problem.
8      In other cases if the bowel is
9  inflamed and there are distended loops there
10  is a great deal of information that the
11  clinician can gain regarding an abdominal
12  process.  In many cases, however, the
13  abdominal film is unrevealed and another test
14  need to follow.
15      Q.  Now among those other tests, when
16  the history and physical suggests gallbladder
17  disease as the tentative diagnosis the
18  practitioner should order an abdominal
19  ultrasound, isn't that right?
20      A.  The question is complicated by the
21  fact that it assumes the clinician is on the
22  right track from the beginning.
23      In the cases of abdominal pain the
24  clinician should keep their senses open to
25  the diagnostic possibilities and generate a

**98**

1  hydrated.
2      Q.  And did you go through urinalysis?
3      A.  Urinalysis in a patient with
4  abdominal complaint may be very significant.
5  Some times abdominal pain is due to a urine
6  infection, for whatever reason the patient is
7  experiencing abdominal pain when the problem
8  may be the kidneys, the ureters or the urinary
9  bladder so the urinalysis will tell the
10  clinician about that.
11      Other urine features that are
12  important is whether or not there is red
13  cells in the urine.  The presence of red
14  cells in the urine may explain abdominal pain
15  as pertaining to a renal colic or obstruction
16  of the ureters which invariably are
17  accompanied with red cells in the urine and
18  it might have first been perceived as a
19  possible abdominal problem without reference
20  to the kidneys.
21      Q.  And abdominal x-rays would also be
22  appropriate, isn't that right?
23      A.  Most clinicians will order those.
24  Although a highly known specific test, if
25  there is anywhere a mass in the film it may

**100**

1  differential diagnosis.  A differential
2  diagnosis may include other abdominal process
3  including appendicitis, cholangitis,
4  abscesses, Crohn's Disease, malignancies,
5  peptic ulcer disease and other conditions.
6  So while an ultrasound is a good test for
7  some of these conditions, for other conditions
8  other tests will be appropriate such as upper
9  GI series, upper endoscopies or lower GI
10  series.
11      Q.  Doctor, would you agree with the
12  following statement, the tentative
13  differential diagnosis suggested by the
14  clinical history should be narrowed down to a
15  working diagnosis by the physical examination
16  and information provided by the laboratory and
17  diagnostic imaging studies.  Once this working
18  diagnosis has been established subsequent
19  management depends on the accepted treatment
20  for the condition believed to be present.
21      A.  I will not agree with the sentence
22  as written because it makes a series of
23  assumptions.  Let's dissect it from the
24  beginning, could I have the first two lines,
25  please?



BROWN & GALLO LLC

Telephone GA - (404) 495-0777  FL - (954) 987-7779
Fax  GA - (404) 495-0766  FL - (954) 987-7780
Toll Free  (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

## 101

1    Q.  Sure.  The tentative differential
2  diagnosis suggested by the clinical history
3  should be narrowed down to a working diagnosis
4  by the physical examination and information
5  provided by the laboratory and diagnostic
6  imaging studies.
7    A.  Let's stop there.  That is true only
8  provided that the narrowing from differential
9  diagnosis, which is many, four or five, to one
10  working diagnosis has been affected by
11  ordering the appropriate tests.  Nowhere in
12  your sentence it says it should be narrowed to
13  a working diagnosis by virtue of having
14  performed all the appropriate tests.  And your
15  sentence implies that once some tests are
16  done, and not necessarily all the appropriate
17  tests that it's time to narrow them down, it
18  can only be narrowed down if all the
19  appropriate tests that were commensurate with
20  the original differential diagnosis have been
21  performed.
22    Q.  Well, would you agree with me that
23  there are almost limitless causes of abdominal
24  pain?
25    A.  No.  There is seven or eight major

## 102

1  ones and it is incumbent upon clinicians to
2  consider the more important ones, the
3  commonest ones first.
4    Q.  And what are they, list them for me,
5  please.
6    A.  Abdominal pain can be due in many,
7  many a patient, more than gallbladder patients
8  to indigestion, gastritis, hyperacidity,
9  reflux, peptic ulcer disease, all these
10  diagnosis are exceedingly common, the sales of
11  antacids at any supermarket would prove my
12  point, gallbladder disease is much less common
13  although it does occur.
14    Q.  Do you feel that there are certain
15  tests that the standard of care requires to
16  be performed in every case of abdominal pain?
17    A.  That's asking a very complex
18  question, it's like saying what are the
19  guidelines for abdominal pain.  It depends on
20  the pain presentation, duration, intensity,
21  location, aggravating factors.  The history,
22  as we already discuss the --
23    Q.  And that's a clinical judgment,
24  would you agree with me?
25    A.  It is clinical judgment, which means

## 103

1  a physician, clinician must keep a mind open
2  to the diagnostic possibilities and order the
3  appropriate tests.
4    Q.  Well, what do you think are the
5  appropriate tests given abdominal pain?
6    MS. COCHRUN:  And I'm going to
7  object to the form.  For the record when
8  you say abdominal pain are you talking
9  about just generalized abdominal pain?
10    MR. DOYLE:  Yes.
11    MS. COCHRUN:  Okay.
12    THE WITNESS:  I already answered
13  that.  Without discussion of what are
14  the -- for this abdominal pain, the
15  presentation, aggravating factors,
16  location, intensity, duration and so on
17  and so forth, no answer can be given.
18    Q.  (By Mr. Doyle) And it is through
19  that process of taking the history, physical
20  and labs that the clinician narrows down what
21  might be the appropriate tests, isn't that
22  right?
23    A.  I will agree with that.
24    Q.  And then just to follow up on this
25  statement that we're dissecting --

## 104

1    A.  Yes, sir.
2    Q.  -- once the working diagnosis has
3  been established subsequent management depends
4  on the accepted treatment for the condition
5  believed to be present, would you agree with
6  that?
7    A.  No.  I will disagree with that part
8  too because subsequent management depends both
9  in performing what is acceptable, as you just
10  miscast in your sentence, plus one must insure
11  that the patient is getting better.  If one
12  is performing the accepted treatment and the
13  patient fails to improve then one is in the
14  wrong track and should go back and reexamine
15  the situation.
16    Q.  Doctor, I'm going to invite your
17  attention to the clinical note for when the
18  patient first presented on July 25th, '01,
19  and I'll invite your attention to the page
20  as soon as I find it.
21    A.  There was a sick call request when
22  he requested care.  And 17 is --
23    Q.  But I want to look at the chart,
24  I'm at 17.
25    A.  17.  7/25/01.



BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

---

105

1    Q.  Okay.  And just to make sure we're
2  looking at the same thing, that's a note
3  dated 7/25/01 signed by Oscar Rodriguez, PA?
4    A.  Yes.
5    Q.  Mr. Rodriguez took a history, and
6  that's indicated on the note, isn't it?
7    A.  He, under subjective, put some
8  historical data, yes.
9    Q.  And would you agree with me it says
10  complains of discomfort in the right upper
11  quadrant since four days.  Pain radiates
12  straight back.  It increases especially after
13  I eat.  Would you agree that's what that says?
14    A.  Yes.
15    Q.  This is an adequate history within
16  the standard of care, isn't it?
17    A.  It's incomplete.  It doesn't say the
18  patient is in pain at the time of the
19  examination or not.
20    Q.  Well, I think it occurs later when
21  he's doing his physical examination but --
22    A.  Well, you asked me a question, I
23  give you my fair answer.  I will say is this
24  patient in pain or not.  My first opening
25  sentence, subjective, I'm in pain.

---

106

1    Q.  Well, it says complains of
2  discomfort.
3    A.  It says complains of pain especially
4  after he eats but it doesn't say how much pain
5  he has right now.  Trust me, that's an
6  important piece of data that any clinician
7  would want to chart.
8        There are other data missing as
9  well.  One will write here whether or not he
10  ever had it before in his life.  One will
11  write if the patient is taking anything to
12  relieve this pain or not.
13    Q.  In just speaking of this history
14  does this meet the minimum required by the
15  standard of care?
16    A.  I can't answer that.  I say it's a
17  weak note.  I don't want to say it's above or
18  below the standard I just say it's clinically
19  weak because it doesn't tell if the patient is
20  in pain or not at time of presenting to the
21  doctor.
22    Q.  Well, first of all you're familiar
23  with this SOAP format, are you not?
24    A.  Yes.
25    Q.  Can you, for the record, just tell

---

107

1  us what that is?
2    A.  Subjective was already, was already
3  in use in 1985 when I started correctional
4  care and you have, you have a propound impact
5  in medical care documentation for both doctors
6  and nurses because it forces the clinician to
7  write for the record what's the patient is
8  saying about his condition whereas before
9  people have kept very scant records, he's here
10  for a gallbladder and that's all that anyone
11  reviewing the record will see.
12        Now "S" or subjective meant let's
13  put down what the patient is saying about his
14  condition.  Part of what the patient is saying
15  is here.  The other part that is missing is
16  where we see is he in pain now or not.
17        Objective is describing what the
18  doctor is observing for the patient,
19  laboratory, whatever other observation the
20  doctor is making, physical and so on.
21        Assessment is an impression or
22  diagnostic impression.  The plan is what's
23  he going -- the doctor going to do about the
24  presenting problem.  "E", when it's used in
25  patient education.

---

108

1    Q.  And is this SOAP E format typically
2  used in the clinical setting now?
3    A.  It's universally employed, yes.
4    Q.  Now the objective portion of the
5  examination, does that show that Mr. Rodriguez
6  did a physical examination?
7    A.  It was a physical examination.
8    Q.  Okay.  Did he take the patient's
9  vital signs?
10    A.  Vital signs, some are charted, a few
11  are not like weight or respiratory rate but
12  three vital signs are charted.
13    Q.  And did you see anything abnormal in
14  those vital signs?
15    A.  Slight elevation of the blood
16  pressure, the pulse appears to be normal and
17  the temperature, as charted, is normal.
18    Q.  Now lungs clear to A&P, what does
19  that mean?
20    A.  Auscultation and percussion, I
21  believe.
22    Q.  So that would indicate that Mr.
23  Rodriguez did perform some auscultation and
24  percussion?
25    A.  So he charted.

---



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax   GA - (404) 495-0766    FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301