## 109

1    Q.  And H-E-E-N-T, what does that stand
2  for?
3    A.  Heads, eye, ear and nose and throat.
4    Q.  And would that indicate that Mr.
5  Rodriguez checked those, and what did he
6  indicate, what were his findings there?
7    A.  It would indicate that there were no
8  findings in that area.
9    Q.  Now with respect to his abdominal
10  examination, what did that show?
11    A.  It reads abdomen right upper
12  quadrant of abdomen -- I believe the word is
13  abdomen there, I can't read it, extremely
14  tender to the touch.  Bowel sounds decreased.
15  Pain radiates to the scapular region, left
16  side is normal.
17    Q.  Would you agree that that history
18  and physical was consistent with a classic
19  presentation of gallbladder disease?
20    A.  I am not sure.  And having a patient
21  like this I will be very uneasy about a
22  patient because it appears to be an acute
23  abdomen.  And anybody with the abdomen
24  extremely tender to the touch and decreased
25  bowel sounds that I have ever examined I have

## 110

1  sent them to an emergency room.  I have
2  radiological examinations performed virtually
3  immediately, within an hour, three at the
4  most, and I have had lab tests and other tests
5  performed.  So to me this is an acute abdomen
6  and I do not know what the diagnosis is at
7  this point.
8    Q.  Was Mr. Rodriguez's physical
9  examination of the patient adequate?
10    A.  It's not the best I have seen, it's
11  not the worst I have seen.  He did chart some
12  important findings.  I would have charted
13  others that are equally important such as
14  the size of the liver and spleen such as the
15  upper quadrant seems to be extremely tender,
16  I would have made that a drawing, that's
17  what all we doctors do of what is the area
18  of tenderness and I would have done a rectal
19  examination.  Without fail not to do a rectal
20  examination on the patient with this
21  presentation is probably what's bringing
22  us here because a rectal examination is an
23  essential part of the abdominal exam.
24    Q.  What do you believe a rectal
25  examination would have shown on July 25th,

## 111

1  2001?
2    A.  I don't know, but I can tell you
3  in a patient with acute abdomen a rectal
4  examination may lead to the diagnosis of
5  appendicitis in some patients because an
6  area of the rectal, when moved, will impinge
7  in areas where some swelling or abscessing
8  has began if the appendix is twisted into
9  that direction.  In addition to those
10  direct findings of pain or tenderness on
11  rectal examination the testing of stool
12  obtained during the procedure tells me if
13  there is GI bleed or not.
14    Q.  And in your opinion was a GI bleed
15  present on July 25th, '01?
16    A.  I can't tell.  I can only follow
17  the GI bleed over time by looking at this
18  patient's blood counts which did decrease
19  during his stay at the jail and then later
20  on during his admission after an acute event
21  to the hospital were extremely low.  So when
22  did it start, I can't tell.  Still it's quite
23  possible.
24    Q.  Well, why don't we take a look at
25  the labs for that day, Mr. Rodriguez ordered

## 112

1  some labs, didn't he?
2    A.  Yes.
3    Q.  And he ordered CP 24, can you tell
4  us what that is?
5    A.  Okay.  We're on Bates 043 for the
6  lab and following, Bates 044.
7    A comprehensive metabolic profile
8  was ordered and it's basically normal.
9    Q.  Okay.  Would you say that that was
10  appropriate clinically to order that
11  laboratory test?
12    A.  Yes.
13    Q.  Continue, please.
14    A.  And Bates 44 we have urinalysis,
15  which is unrevealing.
16    Q.  And with respect to the urinalysis,
17  would you agree that was an appropriate test
18  for the clinician to order at that point?
19    A.  It was very appropriate, especially
20  in view of the possible kidney stone that was
21  seen on the film of the abdomen.  There is no
22  blood in this urine.
23    Q.  And can you describe the blood work
24  that was done?
25    A.  The comprehensive blood count or CBC



**BROWN & GALLO**
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

---

113

1  include all normal values for the hemoglobin
2  and hematocrit platelet counts. And the total
3  white cell count is the previous page, yes,
4  somewhat elevated, 10.53. The normal values
5  for this parameter are variable because
6  laboratories, they report what they have seen
7  in their practice as their reference standards
8  and for this one lab they quote as low as 3.7,
9  as high as 10.7. This is somewhat of a very
10 broad spread for normal values. Virtually all
11 persons doing well will have 8,000, 8,500
12 white blood cell count with a few exception by
13 certain races and age groups.
14       So a blood count of 10.53 would
15 begin to concern me. This appears to be a
16 little bit of white cell count elevation and
17 then I would look at what's called a
18 differential, and I see that the neutrophil
19 count is a little bit on the higher side,
20 69.9.
21       Neither of these values is earth
22 shattering. However I would have made a
23 mental note of there appears to be a white
24 cell count here with a lot of neutrophils
25 which tends to be seen in infectious processes

---

115

1  settings. After taking a look and doing
2  what I do I will say this is an emergency
3  room run.
4       What can we do at the emergency
5  room. We can do the ultrasound right
6  away, we can do the x-rays right away,
7  and following my recommendation do a
8  rectal exam.
9       And here comes another medical
10 practice that is universal also. The
11 patient who's having abdominal pain, we
12 are not certain of what the diagnosis is
13 at this point, should not be treated with
14 pain relievers.
15       What emergency rooms do is they
16 stabilize the patient. Meaning either
17 this is an acute abdomen or it isn't.
18 All the diagnostic work will be performed
19 rapidly, usually no more than three or
20 four hours, and a better diagnosis will
21 be achieved at which point the patient --
22 if the patient is still in pain he will
23 likely be admitted because he has an
24 undiagnosed abdominal pain with a most
25 serious complication. If the patient's

---

114

1  or other processes.
2       Q.  Doctor, would you agree with me that
3  Mr. Rodriguez ordered the appropriate
4  laboratory work on 7/25?
5       MS. COCHRUN:  Object to form.
6       THE WITNESS:  Let me go back to the
7  visit. And putting myself inside the
8  situation, if a patient presented to me
9  with right upper quadrant pain extremely
10 tender to the touch, decreased bowel
11 sounds, pain radiating into the scapular,
12 this patient is going to have to have
13 what the type of work-up that we cannot
14 provide in any primary care settings,
15 this is the type of patient that needs
16 emergency room work.
17       Why, because in the course of the
18 next few hours we have to define what's
19 wrong with this abdomen. If we are
20 wrong, a patient may die, simple as that.
21       This patient is a prisoner in the
22 jail, once we tell the officer take him
23 back to his bunk, I'm finished with this
24 patient. So in my practice this patient
25 would not be worked up under these

---

116

1  pain goes away and the patient's
2  diagnosis is proven by whatever test then
3  he might be discharged, but nobody is
4  given pain relievers until the nature of
5  his abdominal pain is clarified.
6       Q  (By Mr. Doyle) So no analgesics at
7  all in your opinion?
8       A.  In emergency rooms they will not
9  give them to a patient. Patients, in fact,
10 bitterly complain about this, but until the
11 diagnosis is certain no one is given any
12 analgesics.
13       Q.  Doctor, is it your opinion that
14 the standard of care mandated transfer to the
15 emergency room at first presentation on
16 7/25/01?
17       A.  There the word mandate is so strong.
18 What I'm saying is if this had been my patient
19 I would have had him seen by the emergency
20 room. I would have examined the patient and
21 done some things but at that point I would say
22 this is an emergency room care.
23       Q.  Doctor, you gave me a written
24 opinion or rather a written report of your
25 opinions in this case, isn't that correct?

---



BROWN & GALLO

LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

---

**117**

1      A.   Yes.
2      Q.   Can you show me in there where you
3   talk about transfer to the emergency room?
4      A.   I didn't.
5      Q.   When did you change your opinion
6   with respect to that?
7      A.   It's not a change of opinion, we are
8   just discussing something else which is what I
9   personally would have done with this patient,
10  my opinions are well known and put into a
11  document.
12     Q.   We talked about the rectal
13  examination, we talked about the emergency
14  room, do you see anything else in this initial
15  evaluation on 7/25/01 that you consider
16  inadequate?
17     A.   The fact that the patient was given
18  pain relief before the diagnosis was certain.
19     Q.   Anything else?
20     A.   That's it at this time.
21     Q.   Now Mr. Rodriguez made a -- in the
22  "A" he wrote cholelithiasis; is that right?
23     A.   "A", assessment, cholelithiasis.
24     Q.   And given a history and physical,
25  was that a reasonable tentative diagnosis?

---

**118**

1      A.   Given the history and a physical he
2   should have charted a differential diagnosis,
3   there was no way he could be certain of
4   cholelithiasis at that point.
5      Q.   Well, isn't an assessment a
6   certainty in clinical practice, Doctor?
7      A.   What he's saying to the world is
8   this is what he knows the patient has.  And my
9   point again is at this time he couldn't have
10  been certain of that and he should have put a
11  differential diagnosis.
12     Q.   And his plan, was that reasonable?
13     A.   A use of pain relievers including an
14  injectable before a diagnosis is certain is
15  not good practice.
16     Q.   Anything else in the plan that you
17  consider poor clinical practice?
18     A.   The plan is under the standard of
19  care because it doesn't contemplate the
20  possibility that something else may be wrong
21  with the patient, which could be a number of
22  diseases which I already listed, therefore it
23  shorts the patient and therefore it may lead
24  to, as it did, incorrect diagnosis.
25     Q.   Generally aren't abdominal x-rays

---

**119**

1   used to diagnose gallbladder?
2      A.   Abdominal x-rays are a very weak
3   tool to diagnose gallbladder disease.  They
4   may be positive only if gallbladder disease
5   is very advanced.  They may be suggestive if
6   there are stones.  In the general area of the
7   right upper quadrant, it will have to still
8   be proven that they are inside the
9   gallbladder, there could be stones in other
10  organs.
11     Q.   Well, let me phrase it differently.
12  Doctor, would you agree that an abdominal
13  x-ray is not certainly limited to looking at
14  the gallbladder?
15     A.   An abdominal x-ray looks at all the
16  organs of the abdomen in a weak way.  It's one
17  of the tests that is done.  It's useful, it is
18  positive, it generally negative regardless of
19  process.
20     Q.   And would you agree with me that the
21  labs that Mr. Rodriguez ordered were in no way
22  limited to the gallbladder?
23     A.   Laboratory testing is pretty
24  widespread, those are nonspecific for any of
25  these conditions but...

---

**120**

1      Q.   They weren't --
2      A.   The diagnosis --
3      Q.   -- they weren't focused on the
4   gallbladder, were they?
5      A.   The diagnosis of gallbladder disease
6   will not generally be achieved by lab testing
7   in any case.
8      Q.   Doctor, that's not what I'm asking,
9   were those laboratory tests focused on the
10  gallbladder or were they broad-based tests
11  looking at a lot of factors?
12     A.   They were looking at a lot of blood
13  tests.
14     Q.   And the urinalysis?
15     A.   It's generally a test of kidney
16  function and bladder and ureters and it's
17  aimed at those organs.
18     Q.   And they're not aimed at the
19  gallbladder, are they?
20     A.   No.
21     Q.   So he wasn't focused strictly on the
22  gallbladder, was he?
23     A.   That's not what I'm saying.  What
24  I'm saying is this gentleman made a conclusion
25  when he had no basis to make that conclusion.



BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

---

121

1  A differential diagnosis is what is
2  appropriate at this point not a confirmed
3  diagnosis.
4      Q.  And your basis for believing that he
5  has a confirmed diagnosis is that's the only
6  thing that's written under "A"; is that right?
7      A.  It's the only thing he's thinking
8  of.  He educated the patient about and he put
9  it under assessment, that's all he's thinking
10  of.
11      Q.  Now I just want to invite your
12  attention, there's a note from the pharmacist,
13  David Fulmer, do you see that under there?
14      A.  Yes.  7/25/01, administrative note.
15      Q.  Yes.  And he writes written
16  information given and signs it, do you see
17  that?
18      A.  I see that.
19      Q.  Would you agree with me that it's
20  incumbent on the patient to read the patient
21  education materials on the proper use and side
22  effects of medications that are prescribed?
23      A.  I am not sure of that sentence at
24  all.  To begin with I'm not sure what this
25  one patient received or didn't receive.

---

122

1      Q.  Just in general would you agree from
2  your clinical experience when patient
3  education materials are given is it incumbent
4  on the patient to read them?
5      A.  Most patients do not.  We wish all
6  patients did.  Most patients just do not.
7  The patients tend to follow the instructions
8  given to them by their providers, they don't
9  have a medical education and the brochures may
10  be too difficult to read.
11      Q.  Okay.  Now you have made reference
12  to education, do you know what grade level
13  patient education materials are drafted at?
14      A.  They are drafted at a lower level
15  yet having --
16      Q.  Would you agree something like the
17  fifth grade level?
18      A.  I do not know what grade level.
19      Q.  But it's not a college level,
20  wouldn't you agree?
21      A.  It's lower than college, but having
22  practiced medicine now for the better part of
23  three decades it's rare the patient reads the
24  brochures given to the patient.
25      Q.  Let me ask you this, would you agree

---

123

1  that the patient is responsible in part for
2  his own care?
3      A.  Only in the very general sense.  The
4  patient is not responsible for diagnosing
5  themselves, the patient is not responsible for
6  knowing the side effects of medications, the
7  patient is responsible for following
8  clinicians instructions.
9      Q.  Doesn't the patient have to work
10  with the clinician as a team?
11      A.  Very general sense.  A patient is
12  expected to follow instructions from their
13  doctors.
14      Q.  And one of the things that a patient
15  can do to help themselves is to read the
16  education materials, isn't that right?
17      A.  That is wishful thinking.  The
18  majority of my patients did not rely on
19  anything I gave them in writing, even though
20  I did, and then instead they asked me
21  questions when they saw me and they try to
22  follow my instructions.
23      Q.  Now, Doctor, in your practice you
24  didn't stop giving written patient education
25  materials, did you?

---

124

1      A.  I didn't stop, that's true, but the
2  vast majority of encounters in corrections do
3  not entail giving the patient printed
4  instructions.
5      Q.  But you've had occasion to give
6  patients printed instruction, haven't you?
7      A.  I have.  And also in clinics in and
8  out of corrections and maybe pass the
9  brochures in waiting rooms.
10      Q.  Do you know Mr. Coggin's educational
11  level?
12      A.  No.  But I have an idea that it's
13  probably college-educated, an idea.
14      Q.  And just accept this as a
15  hypothetical fact, he's an attorney, would you
16  expect him to know how to read?
17      A.  I would expect him to read and
18  write, most attorneys do.
19      Q.  And do you typically do a lot of
20  things in your practice just to waste your
21  time?
22      MS. COCHRUN:  Object to form.
23      Q   (By Mr. Doyle) Do you do things in
24  your practice just as a waste of time?
25      A.  I don't understand your question.

---

# BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

125

1    Q.  Well, you said you give out written
2  patient information, right?
3    A.  Most patients did not seem to
4  benefit from that, counselor, so if I wanted
5  to teach something to a patient I would tell
6  them myself.
7    Q.  But you haven't stopped giving out
8  written information?
9    A.  We, in corrections, haven't stopped,
10  we give some.
11    Q.  We looked at the lab results from
12  7/25 that are on 043 and 44?
13    A.  7/25 again, page 043.
14    Q.  Okay.  Do you see anything in there
15  that's inconsistent with gallbladder disease?
16    A.  The question is almost a reversal of
17  the question that I would have formulated
18  because what is consistent with gallbladder
19  disease.  Gallbladder disease doesn't have, in
20  the vast majority of cases, any laboratory
21  abnormalities so any set of normal blood test
22  doesn't prove it or disprove it either way.
23    Q.  I'm going to ask the question one
24  more time and just ask for an answer to it,
25  is there anything in those labs that is

126

1  inconsistent with gallbladder disease?
2    A.  The general answer is no, it is not
3  inconsistent, but it's not consistent with it
4  either.
5    Q.  Okay.  And is there anything in
6  those laboratory results that is indicative of
7  peptic ulcer disease?
8    A.  I have to be very careful answering
9  this.  As such peptic ulcer disease does not
10  have a set of blood tests that are diagnostic
11  in any way either.  The beginning to rise of
12  the white cell count and a bit of that
13  neutrophil count, they are not meaning to the
14  presence of a process.
15        A process could be anything.  Could
16  be infection, could be the body is stressed
17  out, so since peptic ulcer disease can be very
18  stressful to the body it could have caused
19  this elevation of the white cell count.
20    Q.  But there's nothing in there that
21  makes it definitive?
22    A.  No, no.
23    Q.  Do you have an opinion as to whether
24  Mr. Coggin was experiencing gastrointestinal
25  bleeding on 7/25?

127

1    A.  He may have but I cannot know it
2  one way or the other.
3    Q.  Is there anything in these lab
4  results that would show whether he was or
5  wasn't?
6    A.  Not in this set.
7    Q.  Now I'm going to invite your
8  attention to the next day in the chart entry
9  for 7/26, do you see where I am?
10    A.  18?
11    Q.  Yes.  That indicates that Mr.
12  Rodriguez saw Mr. Coggin back at the health
13  services unit the next day, didn't he?
14    A.  Yes.
15    Q.  Would you agree that that was a
16  prompt follow-up?
17    A.  With the caveat that an undiagnosed
18  patient with abdominal pain, I wouldn't have
19  let him out of my sight, I would have begun
20  the work-up and either been able to obtain all
21  the tests on-site, which is possible, I
22  suppose, or obtain them at an emergency room
23  which is more much more practical but I
24  wouldn't have rested upon the patient with the
25  findings that he had and I would have done a

128

1  rectal examination.
2        Now within those constraints it is
3  good that the patient who had been released to
4  his bunk was called back.
5    Q.  You mentioned rectal examination
6  again, what would you have expected the rectal
7  examination to show on 7/26?
8    A.  It is as I said, in an undiagnosed
9  patient with abdominal pain it may show
10  certain areas of tenderness that will lead me
11  to other diagnosis such as appendicitis.
12        Let's not think with the
13  retrospective view on the hand, let's just
14  think with this presentation a rectal could
15  have been very positive for other processes,
16  certainly a stool test may have been possible
17  for a GI bleed.
18    Q.  Do you have an opinion whether it
19  would have been or not?
20    A.  I can't tell.
21    Q.  Now on this entry from 7/26, the
22  next day in the objective portion he wrote no
23  changes, do you see that?
24    A.  He wrote a subjective first and then
25  an objective.



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free  (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

---

129

1    Q.   All right.  And in the subjective he
2    wrote chart reviewed and complains of Tylenol
3    number 3 as causing GI discomfort, would you
4    agree that that's what that says?
5    A.   That's what he wrote.
6    Q.   And then in the objective he wrote
7    no changes; is that right?
8    A.   That's what he wrote.
9    Q.   And on follow-up when he'd seen the
10   patient the previous day in your experience do
11   practitioners frequently write shorter notes
12   when they've seen a patient the day before?
13   A.   I don't know what the answer to that
14   is.  If the patient has change, the changes
15   need to be charted.  If there is no change at
16   all, some practitioners choose to write no
17   change.  I personally don't, I try to chart
18   what I'm seeing today.
19   Q.   But it's not your opinion that
20   writing no change is inadequate, is that
21   something that practitioners do?
22   A.   A number of practitioners do it and
23   so I am not going to --
24   Q.   It's an acceptable practice?
25   A.   -- I'm not going to be uncomfortable

---

130

1    with that assuming that the comprehensive
2    examination that has been performed before
3    was, indeed, repeated.  That will forever be a
4    doubt in the mind of the reader if he were to
5    do all that again.
6         So I personally and a number of very
7    other conscientious practitioners try to chart
8    pertinent negatives.  In this case if it is
9    true there is no change, that's bad, that
10   means that the abdomen still is exquisitely
11   tender in a number of areas, and the bowel
12   sounds are diminished, what is this patient
13   doing in my clinic, so if I was Mr. Rodriguez
14   I would be extremely uncomfortable writing no
15   changes.
16   Q.   And in the assessment he writes
17   cholelithiasis and nephrolithiasis, do you see
18   that?
19   A.   Yes, I do.
20   Q.   So he has added to his assessment,
21   isn't that right?
22   A.   He added one word, yes.
23   Q.   And he added kidney stones, isn't
24   that right?
25   A.   Nephrolithiasis means kidney stones.

---

131

1    Q.   And would you agree that that shows
2    that on the second day he wasn't focused
3    solely on the gallbladder?
4    A.   He charted two diagnosis.
5    Q.   And in his plan he indicates one
6    ultrasound ordered right away.  Is that an
7    appropriate test to order?
8    A.   There are some answers to this,
9    counsel.  First, if this patient is still
10   having no changes and the previous exam reads
11   decreased bowel sounds, pain radiating into
12   the scapular region on the right upper
13   quadrant which is extremely tender to the
14   touch, so this patient at no point being
15   examined by a PA or a clinic, this patient
16   belongs somewhere else.
17        In addition the plan ignores the
18   fact that Tylenol number 3 is causing GI
19   distress which is the key of the whole deal,
20   this patient has a process that is not
21   understood at this time.
22        The clinician needs to open up and
23   consider all the other differential diagnosis.
24        The rectal exam still is not done so
25   I have a lot of qualms with this visit.  It's

---

132

1    a human being we are discussing here, this
2    patient, and the clinician continues on one
3    direction without considering the diagnostic
4    possibilities.
5    Q.   Doctor, you just testified about
6    the Tylenol number 3, I would like you to
7    elaborate on that a little bit.  In the
8    subjective portion it says complains of
9    Tylenol number 3 is causing GI discomfort
10   and then in 4 on the plan stop Tylenol number
11   3, is that appropriate?
12   A.   It would be, but in addition I have
13   to, as stated before, be very very leary of
14   giving any pain reliever to a patient with
15   undiagnosed abdominal pain, the patient said
16   he had it three or four days.  Now for two
17   days in a row there is abdominal findings
18   and they're giving him pain relievers by
19   mouth, and the Tylenol may be stopped, and
20   then Motrin which is much more irritating to
21   the GI tract, then Tylenol is added to the mix
22   so I think that this is below the standard of
23   care.
24   Q.   The Motrin is prescribed at 800
25   milligrams three times a day; is that correct?

---



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.

### 133

1  A.  Yes.
2  Q.  Is that how you read that note?
3  Do you know what amount of Motrin may be
4  prescribed per day?
5  A.  To a patient with abdominal pain,
6  none at all.  Abdominal patients should all
7  be treated with NSAIDs or nonsteroidal
8  antiinflammatory drugs, NSAID.
9  Q.  I understand your answer, I'm going
10  to ask you, putting aside for a moment the
11  issue of abdominal pain do you know the amount
12  of Motrin that may be prescribed per day by
13  the standard of care?
14  A.  For a patient say with arthritis?
15  Q.  Yes.
16  A.  Okay.  800 TID is a high dose but
17  it's not unheard of.  Up to 800 QID as being
18  even.
19  Q.  And 30 days isn't considered long
20  term use of Motrin, is it?
21  A.  For abdominal pain, bad.  For
22  arthritis the patient will have to be informed
23  that 1 or 2 percent of patients taking those
24  doses will have GI bleed and  that for the
25  symptoms of GI distress and all what peptic

### 134

1  ulcer are so the patient will be aware of
2  those and report to the doctor.
3  And also the patient should be told
4  that about 1 in 5 patients with GI bleed don't
5  have any symptoms, they just lose their blood.
6  So the patient will have to be very aware of
7  what black tarry stools means or if they feel
8  weak.
9  So patients are told in a few
10  sentences what long term high dose Motrin can
11  do, following which for arthritis, yes, you
12  can prescribe that dose for 30 days and then
13  see how the patient does and may even go
14  longer.
15  Q.  And with respect to the warnings
16  concerning GI bleeding, are those contained
17  in the patient education materials for Motrin,
18  do you know?
19  A.  I do not know what he got.
20  Q.  Okay.  Do you know if they're on the
21  warning labels that are on the bottle of
22  Motrin?
23  A.  The prisons and jails use blister
24  packs where they pack themselves.  I don't
25  know what they put in their blister packs

### 135

1  so I cannot answer that.
2  Q.  And just returning to the
3  ultrasound, do you think that was an
4  appropriate test to order?
5  A.  I believe working up this patient
6  slowly as an outpatient is inappropriate.
7  Even though the test fits the clinical
8  situation, it's not all the testing that he
9  needs and it's not the rapid testing that I
10  do in undiagnosed abdominal pain.
11  Q.  I'm going to ask the same question
12  with respect to the IVP, was that an
13  appropriate test?
14  A.  Same answer.  While the test appears
15  clinically appropriate in the sense that there
16  was what looked like a kidney stone on plain
17  film, the performance of tests one after the
18  other slowly put a patient with undiagnosed
19  abdominal pain is inappropriate.
20  Q.  Doctor, can you tell me what, if
21  anything, on 7/25 and 7/26/01 you believe fell
22  below the minimum standard of care?
23  A.  The answer would be a recapitulation
24  of concerts that we have already voiced.
25  A patient with this presentation

### 136

1  needs to be worked up until the nature of the
2  abdominal pain is established.  That should be
3  done with appropriate laboratory tests, some
4  of which were done, a physical examination
5  tests one of which was not done such as a
6  rectal examination.
7  The patient was treated with pain
8  relievers before the nature of this pain was
9  certain and the patient was sent back to his
10  bunk with what appears to be an acute abdomen
11  of uncertain nature, symptoms that he had
12  again on 7/26.
13  Q.  Anything else?
14  A.  I mentioned that -- thank you for
15  mentioning that, that the clues as to what
16  else can be going on with this patient are
17  found particularly on visit number 2 on 7/26
18  when the patient had clearly states that it is
19  the pills that are causing the GI distress.
20  Q.  Would you agree that a violation of
21  the standard of care is not always causally
22  related to complications?
23  A.  That's a very vague general
24  statement but I will accept it as stated.
25  It's also a similar statement, may I make one



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                October 29, 2007

---

### 137

1  which is not all departures of the standard of
2  care are ever caught by the patient and end up
3  in court at all.
4      Q.   And would you agree that a patient
5  can have complications that are not related to
6  any violation of the standard of care?
7      A.   In a very very general sense that
8  will be true.
9          Counselor, one more hour has gone
10  by, another break?
11      (Thereupon, a short break was held.)
12      Q   (By Mr. Doyle) Doctor, I'm going to
13  invite your attention to the IVP result which
14  is at Bates Number 50.
15      A.   Yes.
16      Q.   Would this IVP be significant to the
17  practitioner?
18      A.   This IVP report describes a calculus
19  or stem inside the left kidney certainly means
20  what it says, the patient has a kidney stone.
21      Q.   And why would that be significant to
22  the practitioner?
23      A.   Kidney stones may or may not give
24  trouble. When they do the trouble can be very
25  considerable with an acute renal colic, as

### 138

1  we call it, the urinary is obstructed, the
2  patient is in great pain, the urine cannot
3  come out, the kidney swells up, there is blood
4  in the urine, apparently this was not the case
5  for Mr. Coggin.
6      Q.   Doctor, can you state to any degree
7  of medical certainty that anything that Mr.
8  Rodriguez did or failed to do on those first
9  two visits, 7/25/01 and 7/26/01, caused Mr.
10  Coggin to have upper GI bleeding on September
11  2nd of '01?
12      A.   I think that is the essence of my
13  report that the lack of definition of a
14  broader differential diagnosis under lack of
15  attention to the patient's signs and symptoms
16  coupled with a utilization of nonsteroidal
17  antiinflammatories, the mainstay of the
18  treatment of this patient for such a long time
19  was below the standard of care and is directly
20  related to the eventual brisk GI bleed that he
21  evidenced.
22      Q.   And directing your attention again
23  to 7/25 and 7/26, in your opinion did Mr.
24  Coggin have gallbladder disease on those
25  dates?

### 139

1      A.   There is no way to know, it does not
2  to appear warranted by the information
3  gathered to conclude it one way or the other.
4      Q.   And in your medical opinion did
5  Mr. Coggin have peptic ulcer disease on 7/25
6  and 7/26?
7      A.   It's highly likely because of the
8  aggravation with symptoms caused by the
9  Tylenol number 3. In fact with the change to
10  Motrin later on the problem will become worse.
11      Q.   Doctor, in your medical opinion what
12  do you think caused the peptic ulcer disease
13  that you just testified that you thought was
14  highly likely on 7/25 and 7/26?
15      A.   The physician who operated on
16  Coggin later on at the hospital stated in
17  his discharge summary that he felt that the
18  peptic ulcer disease was caused by Motrin
19  and I concur.
20      Q.   And the Motrin wasn't prescribed
21  until 7/26, isn't that right?
22      A.   I believe that what the physician
23  had in mind when he wrote that was to try to
24  synthesize. The fact is that he may or may
25  not have had a comprehensive history of

### 140

1  exactly what pills the patient had been taking
2  all the time. He may, in fact, have got the
3  history from Coggin himself who may not have
4  remembered every last bit.
5          This patient at one point or another
6  was treated with Tylenol number 3, Motrin,
7  Clinoril and Anaprox. So he got, in different
8  succession, a combination which I cannot quote
9  by memory, but he got a barrage of
10  nonsteroidal antiinflammatory drugs and one
11  drug, which is Tylenol number 3 which is not a
12  nonsteroidal antiinflammatory, but he got a
13  succession of oral medications for pain all of
14  which are known to cause or aggravate peptic
15  ulcer disease.
16      Q.   And, Doctor, in your medical
17  opinion -- again I'm inviting your attention
18  to7/25, and specifically before any drugs
19  were prescribed, what do you think caused the
20  peptic ulcer disease at that point?
21      A.   I cannot opine on that because I do
22  not know what all the drugs that the patient
23  was taking before. Often times peptic ulcer
24  disease occurs because no nonsteroidal
25  antiinflammatory drugs are bought. Having

---

# BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

---

**141**

1  said that, over time over the course of about
2  a month he, Coggin, will receive large doses
3  of all these drugs.
4        (Defendant's Exhibit-3 was marked for
5  identification.)
6    Q    (By Mr. Doyle) Doctor, I know you've
7  seen these before, I'm going to mark this as
8  Defendant's Exhibit 3.  And I have an extra
9  copy, the purchase records from the prison
10 commissary.
11       And I'm going to invite your
12 attention to -- have you seen these before,
13 Doctor?
14   A    I believe I have.
15   Q    And first I'm going to invite your
16 attention to Bates Number 397.  And you can
17 see the date 7/24, the one in the center of
18 the page, 7/24/01?
19   A    Um-hum.
20   Q    And you see there's a purchase of
21 one Ibuprofen tablet and one Ibuprofen tablet
22 and one nonaspirin regular, one nonaspirin
23 regular, one GS aspirin, one GS aspirin one
24 Tums, one Tums, do you see those?
25   A    Yes, I do.

---

**142**

1    Q    So he bought two boxes of Ibuprofen,
2  two boxes of a nonaspirin regular pain
3  reliever, which is acetaminophen, and two
4  bottles of aspirin, do you see that?
5    A    Yes.
6    Q    Would you agree with me that if Mr.
7  Coggin took some or all of this
8  over-the-counter medication that he purchased
9  that it would contribute to the likelihood of
10 him developing GI bleeding?
11   A    These are drugs that are known to
12 promote GI bleeding.
13   Q    So would your answer be yes?
14   A    In the general sense, yes.
15   Q    And then I'm going to invite your
16 attention to the receipt for 8/14 and do you
17 see where Mr. Coggin bought an additional box
18 of Ibuprofen and an additional bottle of
19 aspirin, do you see that down towards the end
20 of the receipt?  The one in the center of the
21 page, I'm sorry, Doctor.
22   A    This one, yes, I see that.
23   Q    And the same question, if the
24 patient took some or all of that
25 over-the-counter medication, Ibuprofen and

---

**143**

1  acetaminophen that he purchased on 8/14,
2  would that contribute to the likelihood of
3  developing an upper GI bleed?
4    A    As stated, these are drugs that are
5  known to have a certain percentage of GI
6  bleed.
7    Q    So your answer would be yes?
8    A    Yes.
9    Q    And you have no idea whether or not
10 the patient took that over-the-counter
11 medication that he purchased, do you?
12   A    There are no records.
13   Q    Now turning back to the chart, at
14 the bottom of page 18 there's an entry for --
15 the next entry is August 6th, '01, do you see
16 that?
17   A    Yes.  August 6th, yes.
18   Q    And that's another clinical visit
19 with Mr. Rodriguez; is that right?
20   A    It's a contact with PA Rodriguez.
21   Q    In the subjective he writes FU
22 which I take to mean follow-up, is that  your
23 normal clinical practice?
24   A    Very poor clinical practice.
25   Q    Do you take it to mean the same

---

**144**

1  thing?
2    A    What he has to say is what's the
3  patient saying about his condition, we
4  discussed that.
5        Here for follow-up is not
6  acceptable, it doesn't mean anything.
7  Subjective means for the clinic to write he
8  has -- now he has told me that he's better,
9  that he's worse, that he has problem, he has
10 problems, what is he doing for his condition.
11   Q    Well, in the objective portion
12 there he writes no pain, do you see that?
13   A    Which is not understood by me
14 because it may be that it is truly an
15 objective finding that he put his hand there
16 pushing the belly and he did not elicit the
17 pain which would be proper for the "O" to
18 chart or he may be charting a subjective that
19 the patient says he has no pain today, so this
20 note is very weak, below the standard of care.
21   Q    In your experience as a practitioner
22 works a case towards his working diagnosis do
23 his chart entries frequently become shorter
24 and more focused?
25   A    Shorter notes perhaps as the patient

---

# BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.

October 29, 2007

145

1  is getting better.  Some times if the patient
2  is not getting better and still has a problem
3  the note should not be shorter.
4         More focused.  Notes always should
5  be focused so I do not know what the
6  terminology of not focused means.  Focus
7  should remain on what the patient problem
8  seems to be.
9      Q.  Would you agree with me that in
10  the vast majority of cases biliary colic
11  spontaneously resolves?
12      A.  I do not know exactly how to
13  answer that since it is a better question
14  for a surgeon.  I can tell you in my practice
15  the one thing that biliary colic do is they
16  could get better and then they could get
17  worse again.  They get better and worse.
18  And generally they get worse in a crescendo
19  fashion, more frequent, it's a more intense
20  episode so the gallbladder ends up being
21  taken out.
22      Q.  Well, the fact that Mr. Coggin had
23  no pain on August 6th, '01, that was
24  consistent with gallbladder disease, wasn't
25  it?

146

1      A.  Again, I'm not sure what this "O"
2  means.  It could be that there was no pain on
3  palpitation or that the patient said that he
4  had no pain, so I'm not sure what he meant, I
5  can't comment.
6      Q.  Hypothetically if he meant that the
7  patient said that he had no pain and that he
8  had no pain on palpation would that be
9  consistent with gallbladder bladder disease?
10      A.  He will not eliminate it.  It will
11  not be diagnostic but, yes, it could be
12  consistent.
13      Q.  And just to be sure we have your
14  answer on this, Doctor, would you agree that
15  frequently biliary colic spontaneously
16  resolves?
17      A.  The single episode may resolve to
18  be often times followed by additional
19  episodes.
20      Q.  And on this chart entry Mr.
21  Rodriguez wrote in his assessment
22  gallstone/kidney stone; is that right?
23      A.  That's what he wrote.
24      Q.  And in his plan he orders, one, a
25  24-hour urine; is that right?

147

1      A.  Yes.
2      Q.  And creatine clearance; is that
3  right?
4      A.  Yes.
5      Q.  Urinalysis and creatine clearance
6  were appropriate given the large kidney stone
7  shown in the IVP, would you agree with that?
8      A.  It's not a bad idea.
9      Q.  And what would they show, what's he
10  looking for there in your opinion?
11      A.  Often times they will not show
12  anything, they only would be contributory  if
13  they are normal.  If the urine was tinged with
14  blood it will lead some credence to the idea
15  that a kidney stone was causing trouble.  If
16  the creatine clearance will be abnormal as
17  in diminished it may also lend credence to
18  the idea that the kidney stone was acting up.
19      Q.  Okay.  Why don't we take a look at
20  those labs that I believe are -- there's an
21  8/10 creatine clearance, do you see that?
22      MS. COCHRUN:  What page are you on?
23      THE WITNESS:  I see a first creatine
24  clearance on 7/31 and then there is
25  another one.

148

1      MR. DOYLE:  Yeah.  There's one on
2  8/1, do you see that at 40?
3      THE WITNESS:  On 40 what I see is
4  BUN and creatine which are slightly
5  different tests.
6      Q  (By Mr. Doyle) Okay.  And what are
7  those tests indicative of, if anything?
8      A.  They are blood tests, they are both
9  normal.  If abnormal they will signify bad
10  renal function.
11      Q.  And then let's look at the next,
12  the 8/10 which is at Bates number 39.
13      A.  I got it.
14      Q.  And what do these labs show, if
15  anything?
16      A.  The creatine urine is not very
17  revealing, although it's low.  The creatine
18  clearance is grossly abnormal, 36.3, which
19  is well below the normal limits.
20      Q.  And creatine clearance is used to
21  check kidney function, isn't the right?
22      A.  Yes.
23      Q.  And in your opinion was the
24  practitioner looking at the effects that
25  that kidney stone might have?



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                          October 29, 2007

---

149

1    A.  He was.
2    Q.  Was that an appropriate?
3    A.  It was appropriate to look, it was
4 not appropriate not to do anything with the
5 result.
6    Q.  What do you think should have been
7 done there?
8    A.  The standard of care for a value
9 less than half of the usual normal limits is
10 to either find if there is a laboratory error
11 or a real problem.
12    Q.  And do you know what, if anything,
13 was the case here?
14    A.  I don't know if he did anything with
15 those tests, I don't see documentation that he
16 did.
17    Q.  Well, is there a subsequent creatine
18 value?
19    A.  After 8/10, let me look.  On 8/23
20 there were some tests.
21    Q.  And what did they show?
22    A.  They show the creatine in the urine
23 and the value was normal.  And certain albumin
24 excretion rates, I don't see a creatine
25 clearance.

---

150

1    Q.  On the subsequent tests do you see
2 anything that would indicate an abnormal
3 kidney function?
4    A.  Not in this test, although they are
5 very indirect measurement.  The direct
6 measurements -- let me put it this way, the
7 standard of care for apparently very low
8 creatine clearance, which means the kidney is
9 not working well.  Is to repeat the creatine
10 clearance or to do a BUN and creatine in the
11 blood.  Both, if normal, will indicate that
12 the previous test was a fluke, abnormal report
13 due to laboratory error or incomplete urine
14 sample or something like that.
15    Q.  All right.  I want to invite your
16 attention now to the next chart entry which
17 is --
18    A.  The one here, 8/15?
19    Q.  Yes.  That's the typed entry.
20 And do you see in the subjective where Mr.
21 Rodriguez writes no somatic complaints.
22    A.  I see that.  This note gives me
23 pause.  It appears to be created with a
24 computer program where physicians or
25 practitioners do not actually type these

---

151

1 things, they just check a few boxes and then
2 the language is suggested.  I'm not sure of
3 it, but this is what it appears to me.  And
4 trust me, I do have my experience seeing these
5 type of notes everywhere -- that probably was
6 one single checkmark in a box that the
7 computer transform into this.  The no somatic
8 complaint, maybe the area was left blank.
9    All of this is saying -- I have to
10 be fair, counselor, he may have written that,
11 but I have my doubts.  I don't think that
12 anything in this note reflects entries typed
13 by the physician except for the medication
14 Lisinopril, that was entered, and some entries
15 done by him later on.
16    Also to keep blood pressure
17 record -- this is a machine made note with
18 very little content.
19    Q.  Your earlier testimony was that you
20 thought this patient had an acute abdomen when
21 he first presented; is that right?
22    A.  He thought -- I do not know what he
23 thought.  I know what I thought.
24    Q.  Yes.  Your earlier testimony was
25 what you thought?

---

152

1    A.  Yes.
2    Q.  Now when Mr. Rodriguez saw the
3 patient on August 6th and August 8th and the
4 patient had no pain, he didn't have an acute
5 abdomen on those days, did he?
6    A.  Now with respect to the abdomen is
7 canned language.  Abdomen is rotund with
8 functional bowel sounds, that is probably a
9 canned sentence.
10    I really don't know if he did or
11 did not examine the abdomen.  Most clinicians
12 seeing a patient for hypertension, unless
13 the patient has a history of belly problems,
14 they're not going to do a lot of abdominal
15 examination.  I have reason to believe that
16 Rodriguez didn't examine the abdomen but --
17    Q.  Well, he had just seen him two days
18 before, isn't that right, Doctor?
19    A.  That is true.
20    Q.  For a follow-up for abdominal pain?
21    A.  A patient who has an abdominal pain
22 and is still undiagnosed, hasn't been worked
23 up, the patient comes back, the standard of
24 care is we examine the abdomen again and be
25 very specific about it, I'm not convinced that

---



BROWN & GALLO
LLC

Telephone GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free  (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.

October 29, 2007

153

1    an examination occurred at time of this exam.
2        Q.   But you don't know, do you?
3        A.   I don't really know.
4        Q.   We do know on 8/6 he wrote no pain,
5    and when I say he, Mr. Rodriguez, right?
6        A.   When they comment that I am not sure
7    that he meant no complaint of pain or no pain
8    on palpation so I am a bit at a doubt there.
9        Q.   Okay. But with respect to 8/8 two
10   days later in the "S" subjective portion he
11   does say, Mr. Rodriguez writes no somatic
12   complaints, isn't that right?
13       A.   That's what the machine language
14   reads, I have my doubts.
15       Q.   Accept what the language says on
16   8/6 and 8/8, if the patient had no abdominal
17   pain on those dates would you agree that he
18   did not have an acute abdomen on those dates?
19       A.   A patient presenting with no
20   abdominal pain as a complaint and nothing on
21   physical examination will probably not have
22   an acute abdomen that day, but if the same
23   patient has presented earlier with all of
24   these symptoms I'll still be very leary of
25   a process that was started and I have no

154

1    diagnosis for.
2        Q.   And gallbladder pain can be
3    intermittent, isn't that right,
4    characteristically intermittent?
5        A.   It can.
6        Q.   Now the patient doesn't present
7    again until August 22nd; is that right?
8        A.   That will be Bates 16.
9        Q.   Yes. And are we on the same sheet,
10   August 22nd, '01?
11       A.   August 22nd, '01, 1635 hours.
12       Q.   Okay. And here now the patient is
13   seen by a nurse practitioner named Doris
14   Little, would you agree?
15       A.   Yes.
16       Q.   And take me through that note,
17   please.
18       A.   Complaints of pain left -- right
19   upper abdomen with nausea and vomiting since
20   last night. Has not been able to eat for
21   three days. The right pain is aggravated by
22   food. No identifiable alleviating factors.
23   Temperature normal. Blood pressure just about
24   normal. Pulse elevated at 96. Respiratory
25   rate normal. Weight 163 pounds.

155

1    Cardiovascular: Regular rhythm. Pulmonary:
2    Clear to breath sounds. Abdomen: Bowel
3    sounds active times four quadrants. Right
4    upper quadrant tender to palpation with
5    guarded. Liver age: Not palpable.
6        Assessment possible cholelithiasis.
7    Plan: Nubain, intramuscularly now,
8    10 milligrams and then where it was given.
9        Do urinalysis. Return to clinic at
10   10:00 a.m. tomorrow August 23rd for further
11   evaluation, signed Doris Little.
12       Q.   Okay. Would you agree that the
13   history and physical exam were adequate as
14   indicated in this note?
15       A.   There are some deficiencies. The
16   history does not list what the patient had
17   been taking, which by now is quite a
18   substantial amount of nonsteroidal
19   antiinflammatories. Does not discuss what
20   the response to those pills was, which at
21   least in one occasion they aggravated the
22   pain.
23       Doesn't discuss the x-ray findings
24   which have been quite, quite interesting in
25   the case of the gallbladder ultrasound which

156

1    was not really revealing, really. Does not
2    discuss the IVP, the kidney stone. Does not
3    perform a rectal examination which a patient
4    with abdominal pain is a very important part
5    of the physical exam.
6        Q.   And on this date what would you
7    expect the rectal examination to show, if
8    anything?
9        A.   The rectal examination should
10   correlate, if it is positive for blood in this
11   stool, with evidence, so let's read the blood
12   test.
13       By five days later on 8/27 there
14   will be a drop in the hemoglobin of about two
15   points and a drop of four points plus in the
16   hematocrit.
17       Now it is possible that on 8/22
18   that drop would not have initiated, initiated
19   a couple of days later, it's possible -- all
20   I'm saying is the drop is quite observable
21   by 8/27.
22       As we know from medical school if
23   there's going to be GI bleed due to peptic
24   ulcer at first it is likely to start being
25   microscopic bleeding, a little bit of blood



LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax   GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                        October 29, 2007

---

157

1  in the stool.  That may or may not change the
2  hematocrit and hemoglobin and yet he will be
3  quickly testing positive in the blood stool,
4  so some blood tests will reveal even
5  microscopic loss.
6          So while I cannot be certain that a
7  rectal exam would have been positive for him
8  on this day I suspect that it probably would
9  be.  And what I'm saying, if the standard of
10  care requires that it be performed, the nurse
11  practitioner did not correlate well what he
12  or she -- I think it's a she, was reading in
13  the previous chart entries that at least in
14  one of the chartings the pain was aggravated
15  by the medications, so she's buying into a
16  diagnosis of possible cholelithiasis and not
17  formulating a differential diagnosis.
18      Q.  And her plan?
19      A.  Her plan is to give a shot which,
20  again, when the diagnosis is not certain is a
21  bad plan, it will make the patient better
22  without giving us a diagnosis and will see
23  the patient tomorrow.
24          Well, that's much better than not
25  seeing the patient tomorrow and yet the visit

---

158

1  of 8/22 is short of the standard of care.
2      Q.  And you testified about the rectal
3  exam, what else do you believe was short of
4  the standard of care?
5      A.  As I mentioned, the lack of reading
6  of the chart to see what aggravates the pain
7  and see that's right, aggravated by food, and
8  does not pay attention to the chart just a
9  few days earlier was aggravated by Tylenol
10  number 3.
11      Q.  And what do you think that
12  indicated, if anything?
13      A.  As stated much earlier, peptic ulcer
14  disease pain may be aggravated by food or
15  medication so you need -- this nurse
16  practitioner needs to expand her differential
17  diagnosis, not just one diagnosis.
18      Q.  And if we continue to the next day
19  when she sees him the next morning?
20      A.  Continues to have right upper
21  quadrant pain.  Nubain effective for a couple
22  of hours only.  Nausea and vomiting with any
23  food intake three times during the night which
24  indicates to me this is an acute patient.
25  This patient is not doing well, the working

---

159

1  diagnosis is not working.
2          Examination objective, abdomen is
3  tender with guarding of the right upper
4  quadrant.  Again, acute abdomen.  Bowel sounds
5  present in all four quadrants.  Soft to touch
6  as opposed to being rigid.  Slight
7  temperature, 99.5.  The remainder of vital
8  signs are normal.
9          Assessment:  Cholelithiasis versus
10  cholecystitis.  Again, a differential
11  diagnosis without any other processes being
12  considered.
13          Plan:  Referral to a surgeon, to Dr.
14  Garcia.  Give the patient Anaprox, another
15  nonsteroidal antiinflammatory, 550 BID with
16  food.  Number 28.  Return as needed.
17      Q.  Now would you agree again that that
18  right upper quadrant pain with nausea and
19  vomiting was consistent with gallbladder
20  disease?
21      A.  It could occur with gallbladder
22  disease but it could occur with a number of
23  other processes.
24      Q.  Are NSAIDs contraindicated for
25  gallbladder disease?

---

160

1      A.  NSAIDs should not be used for
2  abdominal pain or chronic abdominal pain.
3      Q.  In any case?
4      A.  I am not a surgeon and yet I have
5  seen a number of patients who for one reason
6  or another have clear-cut gallbladder disease
7  and will have the surgery -- say a
8  laparoscopic cholecystectomy for one reason or
9  another cannot be done for a few days and the
10  surgeon, for instance, may have to work-up a
11  cardiac disease before operating or other
12  reasons, those patients are not carried with
13  nonsteroidal antiinflammatories.  Because they
14  are in pain they may get other medications
15  including oral Demerol, oral Darvon, but the
16  use of high dose of nonsteroidal
17  antiinflammatory for abdominal pain is just
18  not mentioned in any of the PDR or drug
19  reference, it's not what doctors do.
20      Q.  Now I want to invite your attention
21  now to the chart entry for 8/27, Dr. Garcia's
22  chart entry.
23      A.  I see 8/29.
24      Q.  I'm sorry, it's at 13.
25      A.  Yeah.  It's Bates 13, yes.

---

BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax   GA - (404) 495-0766   FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.
October 29, 2007

161

1    Q.  Please take a moment to review that,
2  Doctor.
3    A.  (Witness complies.)
4        Okay.  I'm ready.  I read the page
5  1, it continues on page 14.  Okay.  I read it.
6    Q.  Okay.  So the patient returns to the
7  health services unit a few days later on
8  Monday the 27th; is that right?
9    A.  Yes.
10    Q.  And can you take me through Dr.
11  Garcia's note, please?
12    A.  Dr. Garcia writes under subjective,
13  approximately for the last three weeks I have
14  had this pain which comes and goes.  The pain
15  is in the right upper front of the abdomen.
16  Some times it radiates to the upper quadrant
17  not to my back nor anywhere else.  I some
18  times get nausea associated with it.  Not
19  this last weekend but Wednesday and Thursday
20  night I had some vomiting.  Have problems
21  eating because I don't feel like it and then
22  when I eat something like a plain turkey
23  sandwich I feel pain.  I think I lost about
24  15 pounds in the last three weeks.
25    Q.  Is that an adequate patient history?

162

1    A.  It's good as a history.  In a case
2  like this it probably -- a clinician is
3  expected to write down what medication he have
4  been taking for the pain and whether they
5  were effective or not.
6        The case is now very long in
7  duration.  It's unresolved.  It involves
8  abdominal pain which is never a good sign.
9  So the clinical information voice is
10  appropriate but the information on the
11  previous medication is missing.
12        There is information -- I don't
13  know if it was added later on or on this
14  spot on what the previous IVP and abdominal
15  ultrasound showed.  You don't have to repeat
16  it, it's the same as on the report as written
17  by the radiologist.
18    Q.  And could you take a look at the
19  objective entry on the chart?
20    A.  It discusses the blood pressure.
21  Pulse, heart rate are normal.  It takes about
22  the weight which the patient already pointed
23  out he has lost weight.  Examined is charted
24  of what the lungs look like.
25        For the abdomen, the bowel sounds

163

1  are present.  There was a slight tenderness in
2  the right upper quadrant of the patient, no
3  rebound and the legs had no edema.
4    Q.  And is that an adequate physical
5  examination?
6    A.  The patient with undiagnosed
7  abdominal pain and 15-pound weight loss who
8  did not have a rectal exam, that's below the
9  standard of care.
10    Q.  And I know we've gone over this but
11  on 8/27 what would you expect the rectal exam
12  to show, if anything?
13    A.  Oh, blood, blood.  Because he's
14  already -- on 8/27 he's already lost part of
15  his hemoglobin and hematocrit.
16    Q.  Can you state to any reasonable
17  degree of medical certainty that he had GI
18  bleeding on 8/27?
19    A.  More likely than not that the GI
20  bleeding would have been detectable by stool
21  exam on 8/27.
22    Q.  What would be some other
23  explanations for the drop in hemoglobin and
24  hematocrit?
25    A.  In such a short period, bleeding is

164

1  the reason.  A cessation of the blood forming
2  organs as in acute leukemia that's
3  extraordinarily unlikely.
4    Q.  And why don't we look at that lab
5  that you referred to, the 8/27?
6    A.  Yes.
7    Q.  Well, first of all let me ask you,
8  since we're talking about it, in the plan --
9    A.  We didn't read the assessment or
10  plan yet.
11    Q.  Yes.
12    A.  You just wanted me to go directly
13  to the -- what was wrong with the physical,
14  I told you.
15    Q.  Right.  And you made reference to
16  the labs from that date and I just want to
17  ask you, in the plan where -- I guess it's
18  the second line down Dr. Garcia orders a
19  CBC, CP 24, CP 9 and urinalysis, were those
20  all appropriate labs to order on that day?
21    A.  Those are good labs to order.  In
22  addition I would have ordered a stool test,
23  rectal examination, gotten the blood because
24  of the findings on physical exam.  I do
25  understand that he didn't have this one lab

BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                    October 29, 2007

### 165

1  in front of him, he ordered it that day.
2  This laboratory test came presumably some
3  time later.
4      Q.  And would that lab test be also a
5  way to look for bleeding, you've pointed to
6  it several times?
7      A.  Yes, it is.  Blood testing of the
8  red blood cell count is a way to look for
9  bleeding.
10      Q.  And that's good lab to order, isn't
11  it?
12      A.  It's a good lab to order and now
13  that it came he better do something with it.
14      Q.  And let's go back to -- we've gone
15  through his physical exam, is your only
16  deficiency you see in the physical exam the
17  rectal exam?
18      A.  I find that the standard of care on
19  a patient that twice have had hypoactive bowel
20  sounds.  To write BS positive is not
21  sufficient, I would have said they are normal
22  bowel sounds diminished or increased.  It's a
23  little bit more of a minor comment but those
24  two comments about bowel sounds and the rectal
25  exam is what I have.

### 166

1      Q.  And what is the significance of the
2  bowel sounds?
3      A.  Twice being hypoactive, a bowel
4  which was not feeling happy, was not working
5  well, that's what surgeons will say, meaning
6  the process could be antiinflammatory or an
7  infectious process has slowed down bowel
8  sounds.  Never a good sign.
9          Now the patient now has bowel
10  sounds, that's good.  Since he was charted
11  before as hypoactive I would have wanted to
12  see well is it normal now or what.
13      Q.  Now in his assessment what did Dr.
14  Garcia write there?
15      A.  He talks about hypertension, the
16  history of this, both are pertinent, and now
17  he puts a question of cholelithiasis, which is
18  not a bad thought but he ignores all other
19  diagnosis and he does not one more time refer
20  to the history of all the medication that the
21  patient had been getting, and the medication,
22  as I said, in 1 to 2 percent of patients leads
23  to GI bleed.
24      Q.  So just to clarify --
25      A.  Yes.

### 167

1      Q.  The medications are certainly
2  reflected in the chart, right?
3      A.  Yeah.
4      Q.  Is it necessary to write them in the
5  entry again?
6      A.  In a patient with an undiagnosed
7  problem the physician is well advised to enter
8  a note, a brief note saying to the world, yes,
9  I know he's taking all of these because to do
10  otherwise is to chance.  If there is a problem
11  later on afterwards in defense to have to
12  defend himself and say yes I knew.  We don't
13  know if he knew or if he didn't, it's much
14  better to --
15      Q.  Well --
16      A.  -- to chart defensively and write
17  down the patient is on the following
18  medication.  You don't have to write all the
19  doses and the exact schedules but the doctor
20  is expected to recall these things are what
21  the medications in this case because often
22  times medications are the culprit from causing
23  problems.
24      Q.  Well, let's jump down a couple of
25  lines where Dr. Garcia writes discontinue

### 168

1  Motrin and Anaprox.  That was appropriate,
2  wasn't it?
3      A.  It's good, although he doesn't
4  explain why he does that.  He's, in fact,
5  substituting by another in saying essentially
6  the side effects of these two type of drugs
7  are the same and so he's telling the world,
8  okay, discontinue Motrin.  I have no problem,
9  don't take the other one, let's try it but
10  take this other one, so it's not changing the
11  situation at all.
12      Q.  Well, do you know whether or not the
13  patient ever took the Sulindac?
14      A.  I don't.
15      Q.  Would you agree that it was
16  appropriate for Dr. Garcia to discontinue the
17  Motrin and the Anaprox?
18      A.  If he had not started Sulindac it
19  would have been very good but by starting
20  Sulindac his actions are not appropriate.
21      Q.  And the Anaprox was started by Nurse
22  Little on 8/23, would you agree with that?
23      A.  Yes.
24      Q.  And Dr. Garcia discontinued that a
25  couple of days later on 8/27, isn't that

BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.
October 29, 2007

169

1    right?
2        A.   Yes.
3        Q.   And Anaprox was prescribed twice a
4    day; is that right?
5        A.   I believe so, I will have to go back
6    to that note, yes.
7        Q.   So twice a day from 8/23 to 8/27,
8    we're talking about a maximum of eight pills
9    of Anaprox, is that right, taken as
10   prescribed?
11       A.   That's what he was prescribed.
12       Q.   Would that have been clinically
13   significant?
14       A.   What will be clinically significant?
15       Q.   Eight pills of the Anaprox.
16       A.   If taken a full dose of NSAID day
17   after day a significant -- and at the
18   prescribed doses these drugs are known to
19   carry a substantial risk of GI bleed, so
20   when one is on a full dose of nonsteroidal
21   antiinflammatories the duration of a total
22   course with nonsteroidals is related to the
23   risk. The longer they are taken for the
24   higher the risk can be.
25       Q.   And now I'm going to ask you a

170

1    hypothetical here. Dr. Garcia writes in the
2    note gastroenterology consult done, will
3    follow-up after consult, results available.
4    Do you see that?
5        A.   I do.
6        Q.   Accept for purposes of my question
7    that a consult with a gastroenterologist was
8    not available until some time the following
9    week and he wanted him to be seen sooner,
10   and then do you see the next two chart entries
11   where the referral to Dr. Williams is made.
12   And Dr. Williams actually sees the patient two
13   days later from 8/27 to 8/29, do you see that?
14       A.   Yes.
15       Q.   Would you agree that that's a rapid
16   turnaround for a consult?
17       MS. COCHRUN:  Object to the form.
18       THE WITNESS:  We have to look at the
19   totality of this presentation.
20       What we have is a patient who
21   presented with an acute abdomen for which
22   he did not receive the standard of care.
23   Now the situation has prolonged itself,
24   it's many days into the situation, it's
25   almost a month, in fact. And the

171

1    standard of care for acute abdomen is to
2    resolve the situation in a few hours, not
3    in days or weeks, so he's not receiving
4    the standard of care and by 8/27 in the
5    latter part of the day, the hour being
6    when this is printed in the institution,
7    some time 16 hours 49 minutes, perhaps
8    the next day, 8/28, then, when it shows
9    that the patient is bleeding, this
10   patient is not receiving the standard of
11   care.
12       This patient with a GI bleed and a
13   month of abdominal pain, again, he should
14   receive diagnosis within a few hours.
15   That is most logically accomplished in
16   an emergency room. It can be done in a
17   clinic if all the tests are done quickly.
18       What tests, the tests to cover the
19   realm of possible etiologies for the
20   pain. They only did tests to fit the
21   original conception of what the problem
22   was, they never did tests addressed to
23   the differential diagnosis.
24       Q    (By Mr. Doyle) Let me ask you,
25   Doctor, do you know what the normal range

172

1    of hemoglobin is for a man in his 50s?
2        A.   Okay. All I can go by is what
3    is the range given by that laboratory.
4    Laboratories do both ranges for their patients
5    so they are slight differences between
6    laboratories.
7        As given here the hemoglobin of
8    13.1 is below what they expected which should
9    be between 14 and 18 grams. It is also lower
10   than what he, Coggin, had just a few weeks
11   earlier.
12       Q.   And it's lower by nine-tenths; is
13   that correct?
14       A.   Almost 1 gram of hemoglobin.
15       Q.   And do you consider that to be
16   clinically significant?
17       A.   What is more significant is the
18   difference between this value and the previous
19   value.
20       The answer, by the way, to your
21   question, yes, it is significant. And even
22   more significant is when we look at 7/25 and
23   we see he has 15 grams of hemoglobin and now
24   he has 13.1, he has lost two grams of
25   hemoglobin, that's almost 14 percent of all

BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax   GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

October 29, 2007
Joseph Edward Paris, M.D.

173

1  the hemoglobin that he has.
2      Q. From that can you tell the severity
3  of the GI bleeding that you have opined he was
4  experiencing?
5      A. You can tell that he has significant
6  GI bleeding. He has lost more than 10 percent
7  of his blood volume. 10 percent of 15 grams
8  would be one-and-a-half grams but he has lost
9  almost two.
10     Q. And in your medical opinion when did
11 that GI bleeding begin?
12     A. We would not be able to say that
13 with certainty. It probably, probably be in a
14 week or two earlier but I cannot pinpoint it,
15 all I can tell you is by 8/27 it's there.
16     Q. And Doctor, from this lab and your
17 analysis of the previous lab would you agree
18 that Mr. Coggin didn't have a perforation on
19 that date?
20     A. Oh, I don't know what he had that
21 date. I cannot tell you one way or the other,
22 I know that he is significantly bleeding.
23     Q. Would you expect the blood loss to
24 be greater if there were a perforation?
25     A. The two are not related. And it's a

174

1  territory for surgeons to tread on better.
2  Perforations in an area that doesn't go to a
3  main vessel can be a horrible perforation with
4  relatively little bleed and a terrible
5  peritonitis. Other patients are the reverse,
6  the perforation is minimal and one branch of
7  the gastric artery, it's eroded and bleeds
8  briskly, so the two phenomena are not directly
9  interconnected.
10     Q. Well, to use your term, Doctor, in
11 your opinion medical opinion was he bleeding
12 briskly on 8/27?
13     A. Bleeding of this magnitude having
14 lost nearly two grams of hemoglobin can be
15 rapid or can be slow, there is no good way to
16 tell.
17     I can tell you a little bit of this
18 by looking at what is called the MCV value.
19 MCV is a technical number that means the
20 corpuscular volume or the volume of each one
21 of the individual red blood cells. When the
22 volume is normal it suggests without proof
23 that a bleeding is brisk and the patient has
24 not lost a lot of iron. When the number is
25 very small it suggests without definite proof

175

1  that the bleeding has occurred for a longer
2  time and therefore now some iron has been lost
3  so this suggests rather a more brisk bleeding
4  without being conclusive.
5      Q. And if a patient were bleeding
6  rapidly what other signs and symptoms would be
7  associated with that?
8      A. One point, which is hard to
9  pinpoint, the stool may change color. At
10 another point, depending on how much the
11 patient has bled, there may be generalized
12 weakness, fatigue, and on one relatively
13 advanced point a patient may become postural,
14 meaning if he gets up in a hurry he may pass
15 out.
16     Q. Anything else?
17     A. Those are some of the major in GI
18 bleed. Pain, we have discussed that at length
19 today, I think.
20     Q. Would you agree that Dr. Garcia's
21 referral of Mr. Coggin to a specialist on the
22 27th was appropriate?
23     MS. COCHRUN: Object to the form.
24     THE WITNESS: One more time, a
25 patient with undiagnosed abdominal pain

176

1  that hasn't had a deferential, hasn't
2  had a stool test and are now within a
3  few hours of that visit will show what
4  are considered very likely a brisk
5  decrease of the hemoglobin is a patient
6  that needs to be diagnosed now as opposed
7  to continuing with a slow series of
8  referrals. To be diagnosed now he needs
9  more tests and he needs them in a hurry.
10     Q. (By Mr. Doyle) And what tests does
11 he need precisely?
12     A. The first and foremost is stool,
13 blood test. A rectal exam with stood blood
14 test would confirm the patient's GI bleed.
15 GI bleed patients should not be treated as
16 outpatients, they are generally worked up in
17 emergency rooms and most likely will end up
18 being admitted.
19     Q. And I know we've gone over some of
20 this, Doctor, but a referral was, in fact,
21 made to Dr. Antonio Williams, a surgeon, would
22 you agree with that?
23     A. Eventually a referral was made to
24 Dr. Williams, is that what you're saying, yes,
25 I agree with that.



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free    (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

177

1    Q.  And Dr. Williams recommended
2  gallbladder surgery for the patient, isn't
3  that right?
4    A.  That is true.
5    Q.  And Dr. Garcia could agree with
6  that and proceed with that course of action,
7  couldn't he?
8    A.  Theoretically upon receiving
9  suggestions from a specialist primary care
10 physician may agree or disagree with the
11 suggestions.
12   Q.  And if he agrees is he within the
13 standard of care?
14   A.  No.  There is duty of very high
15 order for primary care practitioners,
16 especially in the correctional setting,
17 first to make their own opinions on the
18 general course of a patient.
19       Second to insure that the
20 pertinent information is gathered and sent
21 to the specialist to have a sound basis for
22 the opinion.
23       And third upon receiving the
24 suggestion back it is still incumbent on
25 primary care to determine how reasonable those

178

1  suggestions are.
2    Q.  Doctor, how is a general
3  practitioner supposed to evaluate a surgeon's
4  recommendation that he needs to perform
5  surgery?
6    A.  A general practitioner, like
7  anybody practicing medicine, needs to look at
8  a patient and be able to discern patterns,
9  able to consider diagnosis, able to look at
10 laboratory reports like this one and able to
11 interpret them, how do you go about to cure a
12 patient who is losing his blood.
13       The primary care cannot be absolved
14 of thinking, sir, they do not leave their
15 brains at the door when they ask a
16 practitioner to give an opinion as a
17 specialist.
18   Q.  Well, Dr. Garcia suspected
19 gallbladder disease as his note from 8/27
20 reflects, isn't that right?
21   A.  He did suspect disease, yes.
22   Q.  And that seemed to be a reasonable
23 basis for that given that he looked at the
24 ultrasound report, isn't that right?
25   A.  I disagree with that.  First the

179

1  examination of the patient is incomplete.
2  Second, that ultrasound is a very very mild,
3  it does not give certainty about the presence
4  of gallbladder stones.
5        So a doctor will not consider his
6  diagnosis.  All the elements -- did not
7  consider all the medication the patient had
8  been on, the symptomatology in response to
9  the medication, the aggravation of the pain,
10 the inability of the patient to eat even a
11 turkey sandwich, as the chart reads.  There
12 are many inconsistencies with this, and now at
13 this advanced stage it's inconsistent with a
14 GI bleed.
15       So the physician cannot be absolved
16 of this responsibility to look at total
17 picture, he has the patient, he can see the
18 patient every day if he wants to.
19       And, in fact, this system, did
20 perform an examination of this patient rather
21 frequently so they have to take the surgeon's
22 response with a grain of salt and say what do
23 I think is wrong with my patient.
24   Q.  Let me ask it a different way.
25 Dr. Garcia suspected gallbladder disease,

180

1  isn't that right?
2    A.  He charted it that way, he put a
3  question, cholelithiasis.
4    Q.  And he sent him to a specialist,
5  isn't that right?
6    A.  A surgeon, yes.
7    Q.  And he didn't suggest any diagnosis
8  to that surgeon, did he?
9    A.  The note is very -- the referral
10 note is very incomplete, I agree with you in
11 that sense.
12   Q.  It doesn't say gallbladder anywhere
13 on it, does it?
14   A.  Let's read it again and see exactly
15 what it says.
16   Q.  It's at 77.
17   A.  This note does not reflect -- what
18 he wrote in his own note reads abdominal pain
19 right upper quadrant.  See abdominal
20 ultrasound attached and labs.  Please evaluate
21 and treat.
22       He doesn't say that he has done an
23 IVP on this patient, which he should have.
24 He doesn't say, by the way, there's a kidney
25 stone on the top of the kidney, which he

BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

181

1  should have. He doesn't say that the
2  patient have had these for a long time,
3  that the patient was on medications, what
4  the medications were and what the response to
5  the medication was which aggregated the pain
6  so it's an incomplete request.
7      Q.  Well, Dr. Garcia suspected
8  gallbladder disease, right?
9      A.  He did put a question of that.
10     Q.  And he sent him to a surgeon for an
11 expert consult, would you agree?
12     A.  I agree. And he sent an ultrasound,
13 which tantamount to say this is what I'm
14 thinking about, he sent the --
15     Q.  Well, it indicates he sent the labs
16 as well, doesn't it?
17     A.  He says abdominal ultrasound,
18 attach labs. Possibly he sent some lab tests,
19 he did not send the IVPs that I can see here.
20     Q.  Okay. And then Dr. Williams
21 recommended gallbladder removal, isn't that
22 right?
23     A.  He did say that.
24     Q.  Given that suspicion of gallbladder,
25 referral to a specialist who recommends

182

1  gallbladder surgery, under the standard of
2  care couldn't Dr. Garcia have proceeded with
3  the plan suggested by the specialist?
4      A.  Again I'm not going to agree to
5  that, counselor, with all due respect because
6  what we have seen is a failure -- primary care
7  provider, after primary care provider to look
8  at the totality of a patient. The actions of
9  the surgeon who sees the patient once who may
10 not have done a good job, maybe he did a very
11 poor job does not absorb primary care from
12 practicing medicine.
13     Q.  Then on September 2nd Mr. Coggin was
14 transferred to Baptist Medical Center, are you
15 familiar with that?
16     A.  Yes. And it says on September 3rd
17 found out patient was sent to the hospital.
18     (Defendant's Exhibit-4 was marked for
19 identification.)
20     Q.  (By Mr. Doyle) I'll show you an
21 exhibit that I'm going to mark as Defendant's
22 Exhibit 4 which is the discharge summary from
23 Baptist Medical Center signed by Dr. Reid.
24 The copier cut off the Bates number on it,
25 it's dated 9/17/2001 in the upper right-hand

183

1  corner.
2  (Discussion ensued off the record.)
3      THE WITNESS:  These two are the
4  same. One is an exhibit and the other
5  one is not.
6      MS. COCHRUN:  Okay.
7      Q.  (By Mr. Doyle) Have you seen that
8  before, Doctor?
9      A.  Yes.
10     Q.  And would you agree that on
11 September 6th that he had, Mr. Coggin had
12 surgery to repair a duodenal perforation?
13     A.  The exploratory laparotomy seemed
14 to have been geared to the oversewing of the
15 gastroduodenal artery. The repair of the
16 perforation was also performed. The gist of
17 it is that the perforation was not through
18 and through. And I don't think they talked
19 about entonitis at any time, but the
20 oversewing of that gastroduodenal artery, I
21 just know that if that is not done the patient
22 would probably die, so that was the thrust of
23 the surgery.
24     Q.  And see where it says the patient
25 did well after surgery with no complications?

184

1      A.  It does.
2      Q.  Okay. Should a patient who has
3  this type of surgery and does well with no
4  complications recover fully?
5      A.  Having had abdominal surgery myself
6  I can tell you that one never recovers. This
7  is why, if at all possible, surgery should be
8  laparoscopic because once you cut up the
9  belly, you cut open the belly, the patient
10 never fully recovers.
11     I'm not going to be passing myself
12 as an expert on the ability or disability of
13 this patient or any other patient, I'm just
14 going to talk in the general sense of a
15 physician.
16     People with a large incision will
17 probably not be able to do certain activities.
18 I use myself as an example, I cannot do a
19 number of things. And often times just like
20 me will pop up a hernia in the previous
21 incision and will need a repair with a mesh
22 to be done once or more than once. So they
23 recover to a point with certain residual from
24 major surgery.
25     Q.  But you would agree with me you're

BROWN & GALLO
LLC

Telephone GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free  (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

185

1  not an expert in that area?
2      A.  No, I'm not.
3      Q.  And you would agree that when Mr.
4  Coggin went to Baptist Medical Center he had a
5  duodenal ulcer?
6      A.  Yes.
7      Q.  Can you state with any degree of
8  medical certainty when that ulcer began?
9      A.  The symptomatology makes it more
10  likely than not that the ulceration was the
11  initial motivation for the patient to come
12  to the clinic.
13      At the time this surgery was
14  performed on this patient the gallbladder was
15  not even an issue and I believe it's not even
16  taken out.
17      So it appears more likely than not
18  more than 50 percent that the patient had
19  problems with duodenal pain, origin of the
20  pain from the beginning.
21      Q.  Would it be possible for the patient
22  to have both gallbladder disease and an ulcer
23  at the same time?
24      A.  For any patient, it's possible,
25  although not very common.  For this one

186

1  patient, and now that we have all the
2  information that we have it is more likely
3  than not that he had duodenal problems all
4  along.
5      Q.  Do you know whether he had
6  gallbladder disease as well?
7      A.  I don't know.  I cannot say one way
8  or the other, whatever he had was not
9  significant.
10      Q.  Would you agree with me that Mr.
11  Coggin's Bureau of Prisons health record shows
12  that he had good access to medical care?
13      MS. COCHRUN:  Object to form.
14      THE WITNESS:  It's very hard for me
15  to comment on the totality of times that
16  he may have requested to go to the
17  clinic and may or may not have gone.
18  For instance his self-titled emergency
19  request number 2, where was number 1, was
20  he seen or not seen?  It's possible that
21  sometimes he asked to go to the clinic
22  and he didn't go.  On the other hand I am
23  agreeing that he was seen at the clinic a
24  substantial number of times.
25      MR. DOYLE:  Is this a good time for

187

1  a break?
2      THE WITNESS:  Yes, thank you.
3  (Thereupon, a short break was held.)
4      MR. DOYLE:  I'm done.
5  EXAMINATION
6  BY-MS.COCHRUN:
7      Q.  Dr. Paris, you are a licensed
8  physician?
9      A.  Yes.  Two states.
10      Q.  Florida and Georgia?
11      A.  Yes.
12      Q.  All right, sir.  And in 2001 were
13  you a licensed physician?
14      A.  Yes, I was.
15      Q.  We have looked at your curriculum
16  vitae that was attached to -- did you enter
17  that as an exhibit?
18      MR. DOYLE:  I did.
19      Q  (By Ms. Cochrun) The U.S. Attorney
20  has an exhibit which was the Rule 26 report
21  and attached documents to that report; is that
22  correct?
23      A.  Yes.
24      Q.  And does it reflect your education,
25  training and clinical experience in both

188

1  medicine and correctional medicine?
2      A.  Yes.
3      Q.  All right, sir.  And in Alabama I
4  will tell you our law says that the standard
5  of care will be a national standard of care.
6  And with that understanding do you have an
7  opinion or are you familiar with the national
8  standard of care for a physician such as Dr.
9  Garcia providing care to a patient such as
10  John Coggin under the same or similar
11  circumstances that he presented in 2001?
12      A.  Yes.
13      Q.  All right, sir.  And are you
14  familiar with a national standard of care
15  that would apply in that situation for this
16  gentleman while under the care of Dr. Garcia
17  and mid-level providers that he assigned for
18  care for John Coggin in the circumstances?
19      A.  Yes.
20      Q.  And as the prison physician do you
21  have an opinion as to what Dr. Garcia, as the
22  supervising physician what his responsibility
23  is in terms of oversight to insure standard of
24  care is provided by these mid-level providers?
25      A.  The responsibilities of the



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.

October 23, 2007

---

189

1  physician of record are very close oversight
2  of both nurse practitioners and physician
3  assistants.
4      Q.  All right.
5      A.  While the state laws are slightly
6  different between the states with respect to
7  mid-levels, and also slightly different for
8  these two levels of mid-levels PAs or NPs
9  but the general statement can be made that
10  both nurse practitioners and physician
11  assistants are practicing under the
12  physician's license who therefore is
13  responsible for their actions.
14     Q.  All right, sir.  And in this chart
15  does it appear that Dr. Garcia did, indeed,
16  review the notes and sign off the notes of the
17  care of his mid-level providers?
18     A.  Yes.  It does, plus he signed off on
19  the orders as well.
20     Q.  All right, sir.  In this case have
21  you been provided medical records, deposition
22  and documentation as listed in your Rule 26
23  report, Mr. Coggin's deposition thereafter
24  and documents provided such as the declaration
25  of Dr. Williams and the declaration of Dr.

---

190

1  Garcia, have you been provided these
2  documents?
3      A.  Yes, I have.
4      Q.  And are they sufficient to form
5  opinions as to whether or not the standard of
6  care by Dr. Garcia was met in and about his
7  treatment of John Coggin?
8      A.  Yes.  The documentation was
9  sufficient.
10     Q.  All right, sir.  And the answers
11  you have given heretofore in the deposition to
12  Mr. Doyle about your opinions, are those
13  answers based on the national standard of care
14  that is applicable to this situation?
15     A.  Yes, they are.
16     Q.  All right, sir.  Do you have an
17  opinion, Dr. Paris, whether or not Dr. Garcia
18  in and about his care and treatment of John
19  Coggin met the standard of care?
20     A.  I have an opinion.
21     Q.  And what is that opinion?
22     A.  That the care of Mr. Coggin fell
23  below the standard of care.
24     Q.  All right, sir.  And in your opinion
25  did this failure to meet the standard of care

---

191

1  cause or contribute to cause the injuries that
2  Mr. Coggin suffered including the delay in
3  diagnosis, prolonged pain, weight loss, GI
4  bleed that endangered his life and thereafter
5  required extensive surgical treatment and
6  lengthy discovery?
7      MR. DOYLE:  Object to the form of
8  the question.
9      THE WITNESS:  Agreed to the question
10  as presented.
11     Q.  (By Ms. Cochrun)  Do you have an
12  opinion as to whether the failure to meet the
13  standard of care did cause or contribute to
14  cause these conditions?
15     THE WITNESS:  Yes.  I have an
16  opinion that he did by virtue of delay in
17  diagnosis.
18     Q.  (By Ms. Cochrun)  All right, sir.
19  And in the years 2000 and 2001, sir, were you
20  performing hands-on medical care of inmates on
21  a regular basis within the prison facility?
22     A.  Yes, I was.
23     Q.  All right, sir.  You were asked
24  about deliberate indifference a little bit but
25  I want to ask you something apart from that,

---

192

1  sir.
2      In terms of correctional officers,
3  do you have an opinion as to whether they can
4  be negligent or fail to completely deliver
5  information in terms of inmate requests for
6  healthcare?
7      MR. DOYLE:  Objection.  Calls for a
8  legal opinion.
9      THE WITNESS:  What I can respond to
10  that question is that correctional
11  officers in prisons and jails, some times
12  called sheriff deputies, are expected to
13  convey information on healthcare requests
14  that the prisoners make, and they're
15  expected to do so in a confidential
16  manner.  The most common manner in which
17  this occurs is when inmates write their
18  request, put it in an envelope and the
19  officers deliver those to medical.
20     A second manner in which these occur
21  during nights and weekends in prisons and
22  jails where there is no healthcare staff,
23  then the correctional officer may have to
24  listen to inmates having emergency
25  requests, may have to convey those to

---

# BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Faris, M.D.                                    October 29, 2007

193

1    medical staff on-call.
2    Q    (By Ms. Cochrun) If they fail to
3    convey these kinds of requests, would that be
4    inappropriate under the scheme of how care
5    should be delivered to patients within the
6    facility?
7    A    Failure of a correctional officer or
8    deputy to convey a request for emergency care
9    after hours to medical will constitute a very
10   serious access to care breach and may endanger
11   the health of the inmate patient.
12   Q    All right, sir. I refer you to page
13   78 of Mr. Coggin's chart, which is the
14   gastroenterology consult that was signed on
15   August 27th, 2001 by Dr. Garcia. In terms of
16   this consult what does it reflect in terms of
17   whether it was ever performed or followed
18   through with?
19   A    It appears to have been cancelled.
20   Q    And is it signed by Dr. Garcia as
21   cancelled?
22   A    It is.
23   Q    Okay. I'm going to ask you a
24   hypothetical question, sir.
25          If, indeed, the nurse is contacting

194

1    Dr. Williams, the surgeon for a consult, upon
2    the request of Dr. Garcia was told, as she
3    says in her 8/28/01 note, states that patient
4    does not need gastro at this time unless he
5    may have problem with the common bile duct or
6    peptic ulcer disease, et cetera.
7          Would it be reasonable for the
8    surgeon to rely on the referring physician to
9    have made those determinations and ruled out
10   those diagnoses utilizing the tests that you
11   have described today prior to sending him to
12   the surgeon under that directive?
13   MR. DOYLE: Object to the form of
14   the question.
15   THE WITNESS: A short answer is that
16   consultants have -- are forced to depend
17   on primary care physicians conveying the
18   right information.
19          The consultants don't have all the
20   time in the world during a consultation
21   to start calling all the laboratories
22   that this one patient may have visited,
23   all the x-ray services that they have
24   gone through and to ask the patient a
25   nearly endless number of historical

195

1    questions.
2          So, again, by force, consultants,
3    they do get information from primary care
4    that they have to use in formulating
5    their diagnosis, that information they
6    get may or may not be complete.
7    Q    (By Ms. Cochrun) You have reviewed
8    the short consult note which we have
9    identified on page 77 of the chart?
10   A    Yes.
11   Q    And have you likewise reviewed the
12   dictated consult note that is reflected in the
13   BOP chart at 73 and 74?
14   A    Yes.
15   Q    Before we talk specifically what is
16   contained in there, what date does Dr. Garcia
17   indicate that he has reviewed the dictated
18   consult note from Dr. Williams?
19   A    February 25th, 2003.
20   Q    In your opinion in terms of dealing
21   with Mr. Coggin and his presentation in and
22   about the time of that consult, would that
23   meet the standard of care to not obtain the
24   actual full consult until some 18
25   months to two years later?

196

1    A    It is a very very lengthy period.
2    While there is no written standard of care
3    nationally my tendency of experience with
4    the correctional system indicates that reports
5    of consultation of this nature are expected
6    within 30 or 60 days, something of that order
7    but certainly not a year or two.
8    Q    You have also read these reports,
9    and in the reports that were placed on this
10   gentleman's chart and that were dictated
11   actually at the time of the visits by Dr.
12   Williams does he in any where reflect that he
13   had available to him in these consultant's
14   reports both the 7/27/01 labs and the 8/27/01
15   labs?
16   MR. DOYLE: Object to the form of
17   the question.
18   THE WITNESS: The report, as
19   written, does not reflect that the 8/27
20   labs were available to the consultant.
21   The date of the visit is somewhat early
22   for anyone to expect that that second
23   laboratory test will be sent to him.
24   MS. COCHRUN: All right.
25   THE WITNESS: In all likelihood he

BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax   GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                    October 29, 2007

---

197

1    did not have those reports.
2        Q.   (By Ms. Cochrun) All right.  But in
3    his declaration he does state that he had a
4    hemoglobin of 13.1.  If, indeed, Dr. Williams
5    had simply the labs of 8/27 without the 7/27
6    labs for comparison would he be able to
7    determine that there had been this drop in
8    hematocrit and hemoglobin that you have
9    described?
10       A.   The question as asked is very
11   simple, what does it take to tell of a drop.
12   At least two points, the high and the low,
13   and he had only one point, he could not see
14   the drop.
15       Q.   Does it appear that he evaluated
16   any drop in these blood labs at the time of
17   his evaluation?
18       A.   Dr. Williams did not.
19       Q.   In your opinion, Dr. Paris, was the
20   prescription of 800 milligrams of Motrin TID
21   over the nearly thirty-day period sufficient
22   to cause GI bleeding in Mr. Coggin?
23       A.   A short answer is yes, the long
24   answer is all nonsteroidal antiinflammatory
25   drugs in the usual doses can cause GI bleed

---

198

1    even with a short period of use of a few days
2    and the risk goes up with the longer that
3    period is.
4        Q.   All right, sir.  Then in your
5    opinion would a GI bleed only result if Mr.
6    Coggin took his over-the-counter NSAIDs or
7    aspirins in addition to this prescribed
8    NSAIDs?
9        A.   The risk of GI bleed goes into
10   higher percentage points with higher doses
11   so it does increase the risk.  Can a GI
12   bleed occur with just over-the-counter, it
13   can.  Can it occur with just the prescribed
14   dose, it can.  So a general answer is the
15   higher the dose of nonsteroidal
16   antiinflammatories the higher the risk of GI
17   bleed.
18       Q.   All right, sir.  And the
19   prescription of Anaprox by the nurse
20   practitioner, does it appear that that was
21   done under the supervision of Dr. Garcia?
22       A.   Yes.
23       Q.   Sir, can ulcer pain or peptic ulcer
24   disease pain be intermittent as well?
25       A.   Yes.

---

199

1        Q.   When the laboratories of 8/27 were
2    returned to the facility, what should Dr.
3    Garcia have done in follow-up if he was acting
4    within the standard of care?
5        MR. DOYLE:  Object to the form of
6    the question.
7        THE WITNESS:  The standard of care
8    for a primary care practitioner who has
9    been evaluated personally or through his
10   mid-levels, a patient for this lengthy
11   period, about a month and is observing
12   noticeable and significant drop of a
13   hemoglobin and hematocrit is to
14   immediately investigate the reasons for
15   GI bleed.
16       Q.   (By Ms. Cochrun) And would the fact
17   that he had sent him out to a surgeon absolve
18   him of that responsibility?
19       A.   Primary care physicians are never
20   absolved from thinking and taking a patient to
21   the standard of care.
22       MS. COCHRUN:  That's all I have.
23       MR. DOYLE:  Just a few follow-up.
24   FURTHER EXAMINATION
25   BY-MR.DOYLE:

---

200

1        Q.   Doctor, you're not an expert in
2    Alabama tort law, are you?
3        A.   No.
4        Q.   And Doctor, you don't have any idea
5    what duties Alabama tort law may or may not
6    impose on correctional officers, do you?
7        A.   I have no specific training on
8    Alabama law with respect to what correctional
9    officers do or do not do, I do have some
10   acquaintance with a national standard of care
11   of what correctional officers are expected to
12   do with respect to medical matters.
13       Q.   And does that national standard of
14   care come from the Eighth Amendment?
15       A.   There are several sources of that,
16   counselor.  Certainly the Eighth Amendment has
17   some bearing on it, which I'm not going to
18   talk like an attorney, but by prohibiting
19   cruel and unusual appointment by extension
20   signify that medical care shall be available
21   to inmates.
22       I have far more acquaintance with
23   the standards of the National Commission on
24   Correctional Healthcare which are national,
25   those standards are voluntary and not

---

BROWN & GALLO
LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free  (877) 495-0777

201

1  mandatory, but even though only one in ten
2  facilities is accredited by the National
3  Commission the vast majority of correctional
4  facilities through all the country follow the
5  standard more or less closely because to fail
6  to do so will create grave problems.
7      So I am familiar, to state it one
8  more time, with what correctional officers
9  are supposed to do or not do with respect to
10 medical situations.
11     Q.  Just to follow-up again, but you're
12 not holding yourself out as any kind of
13 authority on Alabama law with respect to that,
14 are you?
15     A.  No.
16        MR. DOYLE:  That's all.
17        MS. COCHRUN:  I have one question.
18 FURTHER EXAMINATION
19 BY-MS.COCHRUN:
20     Q.  If there's actually a statute on the
21 Alabama books that says those who are
22 correctional officers are in charge of
23 prisoners who are incarcerated are statutorily
24 obligated to get these inmates to medical care
25 should the situation present then would,

202

1  indeed, it become incumbent upon correctional
2  officers to do so?
3        MR. DOYLE:  Object to the form of
4  the question.
5        THE WITNESS:  The question is a bit
6  compound but my answer would be that such
7  statute would just rephrase the Eighth
8  Amendment and it would be compatible
9  with everything I have learned about the
10 performance of correctional officers with
11 respect to medical issues throughout the
12 country, it would be completely
13 consistent.
14        MS. COCHRUN:  All right.  Thank you.
15 (Whereupon, the deposition was concluded
16 at 5:10 p.m.)
17
18
19
20
21
22
23
24
25

203

DESCRIPTION OF EXHIBITS

Exhibit          Description

1        notice of taking deposition
2        Exhibit C
3        prison commissary purchase records
4        Baptist Medical Center records

204

1  STATE OF GEORGIA:
2  COUNTY OF FULTON:
3        I hereby certify that the foregoing
4  transcript was reported, as stated in the
5  caption, and the questions and answers
6  thereto were reduced to typewriting under my
7  direction; that the foregoing pages represent
8  a true, complete, and correct transcript of
9  the evidence given upon said hearing, and I
10 further certify that I am not of kin or
11 counsel to the parties in the case; am not
12 in the employ of counsel for any of said
13 parties; nor am I in any way interested in
14 the result of said case.
15
16
17
18
19
20
21
22
23
24
25



BROWN & GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

## 205

1     Disclosure Pursuant to Article
2  8(B) of the Rules and Regulations of the
3  Board of Court Reporting of the Judicial
4  Council of Georgia, I make the following
5  disclosure:
6     I am a Georgia Certified Court
7  Reporter, here as a representative of
8  Brown & Gallo, L.L.C., to report the
9  foregoing matter. Brown & Gallo, L.L.C.,
10  is not taking this deposition under any
11  contract that is prohibited by O.C.G.A.
12  5-14-37 (a) and (b).
13     Brown & Gallo, L.L.C., will be
14  charging its usual and customary rates
15  for this transcript.
16
17
18
19
20     SUSAN H. HORNER CCR-B-808
21
22
23
24
25

## 207

1              CERTIFICATE
2  STATE OF                    :
3  COUNTY/CITY OF              :
4  Before me, this day, personally appeared,
5  JOSEPH EDWARD PARIS, M.D., who, being duly sworn, states that the
6  foregoing transcript of his/her Deposition, taken in the
7  matter, on the date, and at the time and place set out
8  on the title page hereof, constitutes a true and accurate
9  transcript of said deposition.
10     _____
11        JOSEPH EDWARD PARIS, M.D.
12
13  SUBSCRIBED and SWORN to before me this
14  _____ day of _____, 20___ in the
15  jurisdiction aforesaid.
16
17  _____
18  My Commission Expires   Notary Public
19
20  *If no changes need to be made on the following two pages,
21  place a check here _____, and return only this signed page.*
22
23
24
25

## 206

1              CAPTION
2     The Deposition of JOSEPH EDWARD PARIS, M.D.,
3  taken in the matter, on the date, and at the time and
4  place set out on the title page hereof.
5     It was requested that the deposition be taken
6  by the reporter and that same be reduced to
7  typewritten form.
8     It was agreed by and between counsel and the
9  parties that the Deponent will read and sign the
10  transcript of said deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 208

1       DEPOSITION ERRATA SHEET
2  RE:     Brown & Gallo, L.L.C.
3  File No.  22119
4  Case Caption: JOHN COGGIN
5  vs. UNITED STATES OF AMERICA
6  Deponent:  JOSEPH EDWARD PARIS, M.D.
7  Deposition Date:  October 29, 2007
8  To the Reporter:
9  I have read the entire transcript of my Deposition taken
10  in the captioned matter or the same has been read to me.
11  I request that the following changes be entered upon the
12  record for the reasons indicated.  I have signed my name to
13  the Errata Sheet and the appropriate Certificate and
14  authorize you to attach both to the original transcript.
15
16  Page No._____Line No._____Change to:_____
17  _____
18  Reason for change:_____
19  Page No._____Line No._____Change to:_____
20  _____
21  Reason for change:_____
22  Page No._____Line No._____Change to:_____
23  _____
24  Reason for change:_____
25



**BROWN & GALLO** LLC

Telephone  GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

206

1                              CAPTION

2              The Deposition of JOSEPH EDWARD PARIS, M.D.,

3      taken in the matter, on the date, and at the time and

4      place set out on the title page hereof.

5              It was requested that the deposition be taken

6      by the reporter and that same be reduced to

7      typewritten form.

8              It was agreed by and between counsel and the

9      parties that the Deponent will read and sign the

10     transcript of said deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BROWN&GALLO
LLC

Telephone  GA - (404) 495-0777    FL - (954) 987-7779
Fax  GA - (404) 495-0766    FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

207

CERTIFICATE

STATE OF                                    :

COUNTY/CITY OF                              :

Before me, this day, personally appeared,

JOSEPH EDWARD PARIS, M.D., who, being duly sworn, states that the

foregoing transcript of his/her Deposition, taken in the

matter, on the date, and at the time and place set out

on the title page hereof, constitutes a true and accurate

transcript of said deposition.

_____

JOSEPH EDWARD PARIS, M.D.


SUBSCRIBED and SWORN to before me this

_____day of_____, 20___ in the

jurisdiction aforesaid.


_____     _____

My Commission Expires     Notary Public


*If no changes need to be made on the following two pages,

place a check here ____, and return only this signed page.*

BROWN & GALLO
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

208

DEPOSITION ERRATA SHEET

1

2      RE:          Brown & Gallo, L.L.C.

3      File No.    22119

4      Case Caption: JOHN COGGIN

5      vs.   UNITED STATES OF AMERICA

6      Deponent:    JOSEPH EDWARD PARIS, M.D.

7      Deposition Date:   October 29, 2007

8      To the Reporter:

9      I have read the entire transcript of my Deposition taken

10     in the captioned matter or the same has been read to me.

11     I request that the following changes be entered upon the

12     record for the reasons indicated.  I have signed my name to

13     the Errata Sheet and the appropriate Certificate and

14     authorize you to attach both to the original transcript.

15

16     Page No. 32 Line No. 1 Change to: THEY HAD

17     OPPORTUNISTIC INFECTIONS THAT I HAD

18     Reason for change: WRONG WORD TYPED

19     Page No. 80 Line No. 8 Change to: INFORMED DR GARCIA

20     WILL CALL OFF

21     Reason for change: OMISSION OF KEY WORD

22     Page No. 98 Line No. 24 Change to: ALTHOUGH A

23     HIGHLY NON-SPECIFIC TEST, IF

24     Reason for change: WRONG WORD TYPED

25



BROWN & GALLO
                        LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301

Joseph Edward Paris, M.D.                                    October 29, 2007

209

1   Deposition of JOSEPH EDWARD PARIS, M.D.

2   Page No. _107_ Line No. _4_ Change to: CARE AND IT HAD,

3   _IT_HAD_A__PROFOUND__IMPACT_____

4   Reason for change: _____TYPOS_____

5   Page No. _135_ Line No. _24_ Change to: OF CONCEPTS THAT

6   _I_HAVE__ALREADY__VOICED_____

7   Reason for change: _____TYPOS_____

8   Page No. _182_ Line No. _11_ Change to: POOR JOB DOES NOT

9   ABSOLVE__PRIMARY__CARE__FROM_____

10  Reason for change: _____TYPO_____

11  Page No. _183_ Line No. _19_ Change to: ABOUT___PERITONITIS

12  AT__ANY__TIME__BUT__THE_____

13  Reason for change: _____

14  Page No. _____ Line No. _____ Change to: _____

15  _____

16  Reason for change: _____

17  Page No. _____ Line No. _____ Change to: _____

18  _____

19  Reason for change: _____

20

21

22

23  SIGNATURE: _____ DATE: 11/19/07

24          JOSEPH EDWARD PARIS, M.D.

25



**BROWN & GALLO**
LLC

Telephone GA - (404) 495-0777   FL - (954) 987-7779
Fax  GA - (404) 495-0766   FL - (954) 987-7780
Toll Free   (877) 495-0777

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

110 East Broward Boulevard
Suite 1700
Fort Lauderdale, FL 33301