IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN COGGIN, | ) | |
| Plaintiff | ) ) ) | CIVIL ACTION NO: |
| VS. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | 2:05-cv-1214-F |
| Defendant | ) ) | |

**PLAINTIFF RESPONSE TO UNITED STATES' SECOND MOTION IN LIMINE TO LIMIT TRIAL TESTIMONY BY PLAINTIFF'S THREE RETAINED MEDICAL EXPERTS**

Comes now the plaintiff, by and through his counsel of record, and responds to the United States' Second Motion in Limine to Limit Trial Testimony by Plaintiff's Three Retained Medical Experts and says as follows:

1. The defendant is not "echoing some of the arguments raised by plaintiff" as asserted in this motion. It has once again misstated the law and failed to comprehend the various clear terms of the AMLA.

2. Plaintiff is not offering either Dr. Smith or Dr. Paris on the issue of standard of care for the nurse practitioners or physician assistant. These experts are offering testimony as to the standard of care that Dr. Garcia is held to as a physician, including one who supervises other practitioners, who must act only pursuant to his status as a physician. The AMLA however does not restrict these experts from testifying as to

1

causation issues. As licensed physicians they are qualified to give testimony as to whether or not the care provided by the non-physician personnel caused the injuries of the plaintiff. It is for the expert witness, who does qualify to give standard of care testimony by meeting the prerequisites of § 6-5-548 for the specific type of practitioner, to opine as to what the standard *is* for that practitioner and *whether or not it was met.* This circumstance is not a new concept under the AMLA.

In Alabama, medical causation issues are ordinarily the province of a physician[1]. What the defendant misses in this argument again is that the similarly situated statute goes to *"who can testify about standard of care"*, not causation. A simple example may be in order. A nurse gives a shot of Demerol ten times the ordered dose to a plaintiff patient. The plaintiff in that case under the AMLA must establish by substantial evidence via another nurse[2] that the standard of care requires the nurse to give the "ordered" dose and failing to do so breached that standard. That same nurse expert cannot give medical causation testimony. *Nelson v. Elba General Hospital and Nursing Home*, 828 So. 2d 301, 304, (Ala, 2001)[3]. Instead a physician must follow her and testify that the conduct of the defendant nurse, that is the failure of the nurse to meet the standard of care or the "breach" caused the injury to the plaintiff patient.

As to the defendant's declaration that David Folmar, the pharmacist, cannot testify "against anyone", the plaintiff can only say this: Who is he testifying "against"? This

---

[1] The Alabama Supreme Court has allowed some inroad into the province of the physician as to causation issues. In *Tidwell v. Upjohn Co.*, 626 So. 2d 1297 (Ala. 1993), a pharmacist could testify in an AMELD action as an expert on the question whether ingestion of a drug probably caused death.

[2] A nurse who meets the prerequisites of § 6-5-548.

[3] The Court in *Nelson* declined to determine if nurses with advanced degrees beyond registered nursing are qualified to testify as to medical causation. *Nelson* at 305.

person was a staff pharmacist at BOP Maxwell at the time in question. He is not retained by the plaintiff. His testimony was obtained when the defendant had him return from Japan where he is now stationed to give a deposition that was specifically noticed by the defendant for use at the trial of this case. Counsel for plaintiff cross-examined Mr. Folmar about the areas he delved into on direct which included his knowledge of the medication he filled upon order of Dr. Garcia directly or indirectly when Garcia approved the medications prescribed by the PA or nurse practitioners. No *standard of care* testimony was elicited "against" any person by the plaintiff. Questions were of course directed at the pharmacist's knowledge of the drug Motrin, potential drug interactions, side effects and its pharmacological impact on the human body. These are areas within the pharmacists expertise. On these issues, Mr. Folmar's testimony is in congruence with plaintiff's experts as to the nature of this drug and its properties. This may be viewed as "against" someone who may have acted in contravention to the known properties of the drug. However, going back to the example of the nurse who overdosed the patient hereinabove, certainly the pharmacist could not give nursing standard of care testimony. Additionally, the AMLA would not prevent evidence of the nature and properties of the Demerol if offered by a competent pharmacist whose profession is to know drugs and their characteristics. *Tidwell v. Upjohn Co.*, 626 So. 2d 1297 (Ala. 1993)

3.   The United States Government is one entity. It can be liable via one or more of its employees in this case. Plaintiff is offering no expert testimony on the standard of care for Nurse Practitioner Little. The only expert testimony offered as to Nurse Little's role will be directed toward Dr. Garcia, who sanctioned her prescription of an additional NSAID, as the physician that she must practice under pursuant to Alabama law[4].

---

[4] The Alabama Nurse Practitioner Act allows for nurse practitioners to prescribe medication in collaboration with a physician following protocols prescribed under Alabama law. Code of Ala. §34-21-86.

3

4.      Again the defendant has lost site of the AMLA and its interpretation in the case law. The determination of what kind of expert will be "similarly situated" under § 6-5-548 is rests upon what specialty or area of expertise the accused practitioner was acting in when the incident took place. The law recognizes that practitioners often stray out of their specialty and provide care not strictly in their "specialty". The case law directs the trial court to first look to the area of medicine from which the breach arises. *Medlin v. Crosby*, 583 So. 2d 1290, 1294 (Ala. 1991). The Alabama Supreme Court outlined this process for determining the type of similarly situated expert in *Holly v. Huntsville Hosp.*, 865 So. 2d 1177 (Ala. 2003). The *Holly* Court first pointed to the holding in *Medlin* and identified the area of practice of the alleged malpractice: emergency room medicine. It held that a board certified emergency room physician met the statutory requirements for similarly situated because the area of practice of the alleged malpractice was that of emergency medicine. It found the trial court in error for excluding such an expert on the basis that the defendant physician was boarded in family practice when it was clear that at the time of the alleged malpractice he was acting as an emergency room physician.

Mr. Rodriguez at all times caring for the plaintiff acted as a physician assistant by his own testimony. (Exhibit 1, Rodriguez depo. at 27 line 14 -17). He has sworn that he has been employed as a PA at Maxwell since 1999. *Id.* The internal BOP designation of Mid-Level Provider, Rodriguez's current title, is just a label. And it is a label that has only recently been attached to the PAs at Maxwell. Rodriguez was labeled and practiced as a PA until 2006 when the mid-level label came about to ease the infighting among nurse practitioners and physician assistants as to who is more educated. *Id.* at page 29 line 5 to 25. Now nurse practitioners are likewise labeled mid-levels. *Id.*

The defendant's mistaken view of similarly situated as concerns Rodriguez would require the plaintiff to obtain an expert who:

4

      1)    was trained as a "physician" in a third world country;

      2)    never took any exams to establish that he is competent to practice any form of medicine in the United States;

      3)    works as an unlicensed non-physician under the license of another "physician"[5] . Of course he can only work as a physician assistant under these circumstances in a federal prison because of the federal exemption. Realistically the plaintiff can't hire such a person who likely is or has worked for the government in this license exempt realm for obvious reasons. But most importantly, Plaintiff would never want to do so since that kind of "similarly situated" person would fail the first prong of § 6-5-548 for lack of licensure and therefore lack competency to testify.

      5.    Plaintiff only seeks for the Court to apply the AMLA as written and interpreted by the courts. Plaintiff seeks to prosecute this case by the rules, that is all. If this makes little sense to the defendant, then so be it.

      6.    No "back door" here. Plaintiff through the "front door" will offer a PA expert who meets the § 6-5-548 prerequisites to speak to standard of care applicable to PA Rodriguez. Plaintiff will bring physician experts that meet the § 6-5-548 prerequisites to speak as to the standard of care for Dr. Garcia in all of his capacities, individually and as the supervising physician who must monitor the mid-level providers under his sway. Plaintiff still objects to any witness, Dr. Okolo or otherwise, who is not similarly situated under the statutory requirements of § 6-5-548, who would be offered to give evidence as to the standard of care for a PA.

---

[5] Of course he is practicing under the "license" of a non-licensed physician who also obtained a medical degree from a third world county and has not taken any licensing exam in the United States that would allow him to practice in Alabama but does so pursuant to exemption as a BOP "physician".

WHEREFORE, the Plaintiff submits that the Defendant's motion is due to be denied and each of Plaintiff's expert witnesses be allowed to testify.

Respectfully submitted,

_____
JULIA T. COCHRUN
Attorney for Plaintiff

OF COUNSEL:
PATE & COCHRUN, LLP
P. O. Box 10448
Birmingham, AL 35202-0448
Telephone: (205) 323-3900
Fax: (205) 323-3906
e-mail: filings@plc-law.com

CERTIFICATE OF SERVICE

I hereby certify that on this the \_\_\_24th\_\_\_ day of January, 2008, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, the CM/ECF system will send notification of such filing to the following:

Stephen M. Doyle, Esq.
Assistant U.S. Attorney
P. O. Box 197
Montgomery, AL 36101-0197

and I hereby certified that I have mailed the foregoing document by U.S. Mail, postage prepaid, to the following:

None

_____
OF COUNSEL

PLAINTIFF'S EXHIBIT 1

ASSOCIATED COURT REPORTERS, LLC
(205) 251-4227 / FAX (205) 251-4224

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOHN COGGIN,             )
                         )
        PLAINTIFF,       )
                         )
VS.                      )  CIVIL ACTION NO.:
                         )  2:05-cv-1214-MEF
                         )
UNITED STATES OF AMERICA,)
                         )
        DEFENDANT.       )


DEPOSITION OF OSCAR RODRIGUEZ, PA


    The Deposition of OSCAR RODRIGUEZ, PA, was taken before Kathy Colburn, CSR., on Friday, July 20, 2007, at the Office of U. S. Attorney, 131 Clayton Street, Montgomery, Alabama, commencing at 10:20 a.m., pursuant to the stipulations set forth herein:

301 Title Building/ 300 21st Street North
Birmingham, Alabama  35203

Page 26

```
 1  BOP --
 2  A    Right.
 3  Q    -- where did you begin working?
 4  A    They offered me a job in Louisiana;
 5  Oakdale, Louisiana.
 6  Q    Okay. And you worked as a PA?
 7  A    A PA.
 8  Q    All right. And how many years were
 9  you in Oakdale?
10  A    Eight years.
11  Q    All right. And then where did you
12  go?
13  A    And then I moved here to Alabama. I
14  was transferred here to Maxwell Air Force
15  Base.
16  Q    Okay. And how is it that you got
17  transferred? Did you request it or --
18  A    I put my name, you know, you ask for
19  a transfer and then they select the place for
20  you.
21  Q    Why did you want to transfer?
22  A    I really don't know that. I just
23  did. You know, I got tired of the place.
24  Q    Okay.
25  A    Maybe the environment, maybe a new
```

Page 27

```
 1  thing.
 2  Q    Pardon?
 3  A    I wanted to try a new thing.
 4  Q    Are you married?
 5  A    Yes.
 6  Q    And do you have children?
 7  A    Yes.
 8  Q    How old are your kids?
 9  A    I have a twelve year old and a seven
10  year old. Girls.
11  Q    What year did you start then here at
12  Maxwell?
13  A    '99. Actually, November of 1999.
14  Q    Okay. And have you held the
15  position of PA the whole time you've been at
16  Maxwell?
17  A    Yes, ma'am.
18  Q    Still there, right?
19  A    Yes.
20  Q    Okay. When you get the clinical
21  director circumstance, you get your boards
22  done and all that, will you stay at Maxwell
23  or will you probably be transferred out?
24  A    I really don't know.
25  Q    Okay. Have you worked in any health
```

Page 28

```
 1  care position at all since coming back to the
 2  United States outside the Bureau of Prisons
 3  system?
 4  A    No.
 5  Q    Okay. Always been in BOP from day
 6  one?
 7  A    Right.
 8  Q    Okay. Other than that little stint
 9  lobotomizing people up in New York?
10  A    For a year, right.
11  Q    Okay. Have you had any change
12  in grade or position while you've been at
13  Maxwell?
14  A    No.
15  Q    How many PAs do they have out at
16  Maxwell?
17  A    There is one.
18  Q    One slot?
19  A    How many positions?
20  Q    Yes.
21  A    Three.
22  Q    Three. And is that three full time
23  PAs?
24  A    Yes.
25  Q    All right. And back in 2001, was
```

Page 29

```
 1  that the case, did you have three?
 2  A    There might have been five.
 3  Q    How many nurse practitioners do you
 4  have?
 5  A    Well, let me clarify one thing.
 6  We're not considered PAs, or nurse
 7  practitioners. When you come into the
 8  bureau, you become -- since last year they
 9  changed the name to mid level practitioner.
10  Q    Okay.
11  A    So we are called now MLPs. And
12  that's to save face for the PAs that don't
13  recognize us or the nurse practitioners that
14  don't recognize us. They were all MLPs.
15  Q    All right. So it kind of levels the
16  playing field?
17  A    Right.
18  Q    So people can reduce their
19  territoriality; is that fair?
20  A    Yeah.
21  Q    Okay. Because sometimes nurse
22  practitioners think PAs don't have as much
23  training that they do, and there are PAs who
24  think that the NPs are just nurses?
25  A    Yes.
```

8 (Pages 26 to 29)