# DEFENDANT'S EXHIBIT 2

Case 2:05-cv-01214-MEF-SRW   Document 71-4   Filed 01/31/2008   Page 1 of 7

Joseph E. Paris, PhD, MD, CCHP-A
Consultant in Correctional Health Care
2116 Lamplight Drive
Marietta, Georgia 30062

Julia I. Cochrun, Esq.
Pate & Cochrun, LLP
400 Title Building
Birmingham, Alabama 35203

Marietta, August 29, 2007

Re: John Coggin v. United States of America. In the United States District Court for the Middle District of Alabama, Northern Division, Civil Action No. 2:05cv1214-F

Dear Ms. Cochrun:

I thank you for requesting my correctional medical advice for the Coggin v. US case. I am a Board Certified Internist, licensed for the practice of medicine in the states of Florida and Georgia. I have 22 years of experience in correctional health care and I am familiar with the standard of care for jails and prisons similar to the FBOP facility Montgomery FPC. Please find my qualifications in the attached CV which also describes my involvement in a number of defense or plaintiff cases with dates, venue, and outcome of known. My fee schedule is $300 per hour for consultation time in person or on the phone, reviewing records, or writing reports; $2,000 per day for Georgia depositions/testimony, $3,000 per day for out-of-town depositions/testimony, and $3,000 per day for trial testimony time, plus reasonable expenses. I reviewed the following documents:

Original complaint, entered 12-21-05
Health records of John Coggin at the FBOP facility Montgomery FPC
Health records of John Coggin at the Kirklin Internal Medicine Clinic
Health records of John Coggin at the Baptist Medical Center South
Medical-surgical exam of John Coggin by Antonio Williams, MD, dated 8-29-01
IVP and abdominal ultrasound reports for John Coggin
Affidavit by ex-inmate Ronald Rankin
Affidavit by ex-inmate Mario J. Zayas-Canizares
Affidavit by ex-inmate Jim Johnson
Deposition of Orenzio Garcia-Brenes, MD, taken 2-23-07
Affidavits by Jim Johnson, Ronald Rankin, and Mario Zayas
Deposition of Oscar Rodriguez
Deposition of Christopher Thomas
Deposition of Anita Rabidou
Prison Commissary purchase records
X-rays and reports for Mr. Coggin as of 7-25-01

1

**Synopsis of relevant medical events**

In August of 1999, John Coggin arrived to the Federal Prison Complex (FPC) Maxwell, and was later transferred to the FPC Montgomery, both run by the Federal Bureau of Prisons (FBOP). Since arrival, it was known that he had a history of a renal calculus (charted in his problem list as occurring in 1997), and controlled hypertension for which he received Lisinopril. The problem list did not chart any history of GI distress or gallstones.

On 7-25-01, at age 53, Coggin wrote a Sick Call Request that he termed "Second Emergency Sick Call Request". There is no record on file of his first request. His complaint was: "Severe, intense pain in the abdomen for 3 days". He stated that he had tried Tylenol for the pain but it had been completely ineffective. He was seen at 7:05 AM by PA Oscar Rodriguez. The PA quoted the chief complaint as "Discomfort of Right Upper Quadrant since four days; pain radiates straight back, it increases especially if the patient eats". Despite its absence in the problem list, the patient's "history of gallstones by ultrasound" was quoted. Vital signs were: BP 153/97, HR 74 and T. 98.4 F. HEENT, heart and lungs were normal by physical examination. An abdominal exam was abnormal, with the right upper quadrant being extremely tender to the touch. Bowel sounds were diminished. Abdominal rebound was not tested. Costo-Vertebral Angle punch test (a test of kidney tenderness used to diagnose kidney stones) was not performed. There was no rectal examination either. The PA ordered a CBC, urinalysis, a comprehensive metabolic profile, amylase, lipase and abdominal X-rays. The blood and urine tests were drawn at 9:54 AM and were reported at 16:00 hours of the same day, 7-25-01. The abdominal x-ray was obtained in short order and the PA performed his own "wet reading". The CBC was remarkable for the somewhat elevated white cell count of 10,530. All other blood tests were normal. The urine was completely negative and had no trace of blood. The PA's x-ray wet reading disclosed a stone on the left side. With this information, the PA made a diagnosis of "Cholelithiasis". The patient received a shot of 30 mg of Toradol (an NSAID) IM, a prescription for one or two Tylenol #3 TID for 3 days, and a refill of his usual hypertensive medication, Lisinopril. The plan was co-signed by the Physician, Dr. Orenzio Garcia-Brenes, who was the Clinical Director of the FPC Montgomery. The abdominal x-ray (AP and Lateral) was read by Radiologist Ep Vining. He opined that there was a 1.5 cm calcification at the upper pole of the left kidney, corresponding to a renal calculus seen during the patient's abdominal ultrasound of 7-30-01.

On 7-26-01, Coggin saw PA Rodriguez again. The patient complained that the Tylenol #3 was causing GI distress. The PA charted no vital signs and no physical exams, stating "no change" instead. His assessment was that the patient had cholelithiasis and nephrolithiasis. He ordered an abdominal ultrasound and an IVP. He discontinued the Tylenol #3 and ordered instead the NSAID Motrin, 800 mg TID for 30 days.

On 7-30-01, Coggin had an abdominal ultrasound. There was a small (5 mm) echogenic focus in the gall bladder which could represent a poorly calcified gallstone, a polyp, or a small amount of "tumefactive sludge". The 1.5 cm left renal calculus was seen again.

On 7-31-01, a creatinine clearance was normal.

On 8-1-01, Coggin's IVP showed the previously seen 1.5 cm left renal calculus again. BUN and creatinine were normal.

On 8-6-01 PA Rodriguez followed up Coggin's problems. Charting was scant, including: "No pain", "Gallstone/Kidney stone", "Urine and Creatinine clearance".

On 8-8-01 PA Rodriguez performed a chronic care visit for hypertension. The progress note appears computer-generated, with pre-ordained sentences entered as descriptors for the examination of all organs. The note makes no mention of the previously noted problems such as the working diagnoses of gallstones or kidney stones. However, there were a few handwritten words added: "Ordered comprehensive Metabolic Profile 24, endoscopy, EKG, chest-x-ray and microalbumin".

On 8-11-01, certain laboratory reports were received, including an abnormal, very low creatinine clearance of 36.3 cc (the normal range is from 70cc to 130 cc).

On 8-22-01, Coggin visited Nurse Practitioner Doris Little, complaining of pain in the right upper quadrant of the abdomen, aggravated by food, plus nausea and vomiting since the previous night. He had not been able to eat for three days. Nothing relieved the pain. His vital signs were normal but the NP did elicit abnormal abdominal findings, such as right upper quadrant tenderness to palpation and guarding. No rectal exam was performed. The NP diagnosed possible cholelithiasis which was treated with a shot of IM Nubain (Nalbuphine, a narcotic).

On 8-23-01, NP Doris Little saw Coggin again. He continued to complain of right upper quadrant pain, stating that the Nubain had been effective only for two hours, and that the nausea and vomiting with any food intake had occurred three times during the night. There was a slight fever (99.5F) but other vital signs were normal. The abdomen was still tender with guarding of the right upper quadrant. No rectal exam was performed. The NP diagnosed cholelithiasis and cholecystitis and wrote a prescription for the NSAID Anaprox, 550 mg po bid for 14 days, a referral to a surgeon, and a return to clinic as needed, with no defined appointment. There is no record of anyone discontinuing Coggin's then current Ibuprofen 800 mg po tid before issuing Anaprox. There are Commissary purchase records disclosing that Coggin bought small amounts of Ibuprofen 200 mg tablets, but there are no records on how or when he used them.

On 8-27-01, Coggin saw the Clinical Director, Dr. Garcia Brenes. Coggin said that for the last three weeks he had been "in pain, which comes and goes". The pain was in the right upper front of the abdomen, sometimes radiating to the right upper quadrant, but not to the back. Sometimes the pain came together with nausea. A few days earlier he had been vomiting for two days. Eating had been difficult because even a plain turkey sandwich would cause pain. Coggin felt that he had lost about 15 lb in three weeks. The charted weights supported his perception, as he had weighed 175 lb on 1-30-01 and was down to 163 lb during the visit in question. Dr. Garcia's examination was significant for "slight right upper quadrant tenderness to palpation without rebound". No rectal examination was done. Dr. Garcia's diagnosis: "Question of cholelithiasis versus sludge (in the gall bladder). He prescribed Sulindac 200 mg po bid for 10 days. There was no documented attempt at removing the Ibuprofen or the Anaprox from the inmate's possession,

3

but the inmate was told not to take them anymore. The doctor ordered a CBC, a comprehensive metabolic profile 24, profile 9, urinalysis and a Gastroenterology consultation.

On 8-28-01, NP D. Essex charted an incidental note on Coggin's chart. The patient was not seen. According to the note, the NP had spoken to a Surgeon (presumably Dr. Antonio Williams) and discussed the ultrasound report (presumably the report dated 7-30-01). The Surgeon said that he would need to examine the patient and that he would not need a Gastroenterology consultation at this time "unless Coggin had problems with the common bile duct, peptic ulcer disease, etc." The NP notified Dr. Garcia, discontinued the request for Gastroenterology consultation and scheduled Coggin to see the Surgeon, Dr. Williams.
Also on 8-28-01, reports of the blood tests ordered on 8-27-01 reached Dr. Garcia-Brenes. Coggin's white cell count had risen to 11,280, and his hemoglobin had dropped to 13.1 grams. Of note, on 7-25-01 his hemoglobin had been 15.0 grams. The drop of nearly 2 grams of hemoglobin within a month, suggestive of blood loss, was not commented upon in the record or explored.

On 8-29-01, Coggin saw Dr. Williams. The consultation request read: "Abdominal pain in the right upper quadrant. See abdominal ultrasound attached. Please evaluate and treat accordingly" The Surgeon produced both a short, handwritten report and a dictated note which did not reach the institution until much later. The handwritten note read: "Impression of biliary colic, question of polyp versus cholelithiasis. Plan laparoscopic cholecystectomy, possible TAC (likely meaning trans abdominal cholecystectomy)". Later in the day, another incidental note was charted by NP Essex. The NP had spoken with Surgeon Dr. Williams, who recommended a gall bladder removal. Dr. Garcia was informed.

On 8-30-01, Coggin submitted another emergency inmate request, stating that he had been suffering excruciating upper abdominal pain for over a month. He requested an emergency medical furlough so he could have surgery in Birmingham, Alabama. Dr. Garcia-Brenes denied the request, stating that Coggin's surgery had been booked and was pending.

On 9-3-01, Nurse R. Lake charted an incidental note stating that inmate Coggin had been sent to the Baptist Medical Center during the previous night and was at the Medical Intensive Care Unit with active GI bleeding. After being transfused with four units of packed red cells, his hematocrit was still 19.9% (normal values, 38% to 56%). An esophago-gastro-duodenoscopy had been performed by a Dr. Hendricks revealing a gastric ulcer with a large clot. The admission history and physical describes an hypotensive patient with initial BP of 100/48 while lying down, pulse of 118, with BP dropping to 93/37 sitting up. Upper GI bleed was ascribed to NSAID use.

On 9-6-01, because of continuing bleeding and the need for transfusions, Coggin had an exploratory laparotomy. After surgery, the diagnosis was that he had a bleeding duodenal ulcer with a visible vessel (the gastroduodeal artery) plus a contained bowel perforation. The gastroduodenal artery was over-sewn in order to contain the bleeding. The duodenal perforation was repaired by means of an omental patch. Following this extensive abdominal surgery, Coggin slowly recovered and was discharged on 9-16-01, 13 days after admission.

**Analysis of medical care rendered to inmate/patient Coggin**

Coggin was a patient aged 53 who experienced over a month of severe abdominal pain and was seen a total of eight times by a jail Physician, a Physician Assistant and two Nurse Practitioners. Coggin was examined by these institutional practitioners on 7-25-01, 7-26-01, 8-6-01, 8-8-01, 8-22-01, 8-23-01, 8-27-01, and 8-29-01. While his chief complaints always included abdominal pain, none of the examinations included a rectal exam, which is indicated in the workup of abdominal pain. None of the practitioners requested a stool test for occult blood, also indicated in cases of abdominal pain. It is virtually certain that, at a certain point in his disease, Coggin had GI bleed. A positive stool test would have tipped his practitioners off regarding the peptic ulcerations he was experiencing.

The combination of persistent abdominal pain and a drop in hemoglobin is highly suggestive of GI bleed. However, none of the practitioners questioned the origin of Coggin's drop in hemoglobin charted on 8-28-01, and none of them included peptic ulcer disease in the differential diagnosis, despite the well known association between peptic ulcer disease and the use of NSAID. During his deposition dated 7-20-07, PA Rodriguez demonstrated failure to understand that an NSAID like Motrin (Ibuprofen) in doses like these prescribed to Coggin (800 mg TID) may promote GI tract ulcerations (pages 115 through 118 of his deposition).

Throughout eight encounters with jail medical practitioners during over a month period, none of the practitioners enacted simple measures such as the prescribing of oral antacids, H-2 blockers (such as Cimetidine or Ranitidine) or proton pump inhibitors (i.e. Prevacid, Protonix, etc.). An empirical trial of any of these (which are in such common use they are considered over-the-counter medications) would have afforded some relief and thus would have contributed to achieving a diagnosis.

The undersigned believes that the chain of medical errors in question began on 7-25-01 during Coggin's first visit to PA Rodriguez for abdominal pain. The PA was confronted with a patient with severe, intense abdominal pain for three days. The workup for such patient should include a rectal examination. As stressed in medical school, "no abdominal examination is complete without a rectal examination". It is not known why PA Rodriguez concluded that Coggin had a single diagnosis: cholelithiasis. The standard of care for abdominal pain, both in corrections and in the community, is to formulate a differential diagnosis. While right upper quadrant tenderness, sometimes called Murphy's sign, is suggestive of cholecystitis, the differential diagnosis includes ascending cholangitis, peptic ulcers, acute pancreatitis, appendicitis, mesenteric adenitis, Crohn's disease, mesenteric ischemia, bowel obstruction and other disorders. The practitioner is expected to have an open mind and to consider the various differential diagnoses, requesting tests or consultations as appropriate. Because some of the diagnoses in the differential may have disastrous consequences if not treated promptly (i.e., appendicitis, obstruction, perforated ulcers), the practitioner is expected to proceed with maximum expediency.

The use of pain relievers for abdominal pain when the diagnosis is not certain is contraindicated. Pain relievers may make the patient feel temporarily better but they make the diagnosis more difficult, thus increasing risk. In addition, the choice of prescribed pain relievers for Coggin relied heavily on NSAID, or non-steroidal anti-inflammatory drugs, such as Toradol (Ketorolac),

5

high-dose Motrin (Ibuprofen), Anaprox (Naproxen) and Clinoril (Sulindac). Sometimes these drugs were issued before previous drugs had run out and without retrieving previously issued medication packs. Consequently, it is possible that Coggin took more than one NSAID simultaneously, thus aggravating his peptic ulcer disease. All the NSAID are known to have peptic ulcer disease as a main side effect. Coggin had no medical education and was not expected to know the relationship between NSAID and peptic ulcer disease. He did experience some transient pain relief with NSAID so it is understandable that he would keep on taking the pain relievers prescribed to him by his practitioners. The undersigned believes that the use of an injectable NSAID, Toradol, before Coggin's diagnosis was certain was below the standard of care, and that the prolonged use of NSAID for over a month for a patient with abdominal pain was also below the standard of care. NSAID are generally not employed for abdominal pain.

The tests used in Coggin's case did not include an upper GI series, a lower GI series, or an endoscopy. These are indicated for the diagnosis of patient of patients with abdominal pain and would be of particular value if the diagnosis is not evident and pain persists for many weeks, as was the case here. In Coggin's case, a Physician Assistant made a first impression of "cholecystitis" based on insufficient evidence, and ordered only the tests that agreed with his pre-conception. Subsequently, the PA and other Practitioners ignored clues that did not fit the pre-conceived diagnosis while ignoring Coggin's request for help for his ever worsening pain, vomiting and weight loss. Throughout Coggin's care and treatment, the responsible Physician was Dr. Garcia-Brenes. He supervised PA Rodriguez, NP Little and NP Essex, he cosigned or signed the medical orders, and he was kept aware of developments by the three midlevel practitioners he supervised. He also saw personally Coggin as a patient.

The undersigned finds that care rendered to inmate/patient Coggin at the FPC Montgomery prior to surgery fell below the standard of care in several key areas, including delays in diagnosis, incorrect diagnosis, and the prescribing of medications inappropriate to the clinical situation on hand. These ministrations resulted in prolonged pain, weight loss, and eventually an episode of brisk GI bleeding that endangered his life, required extensive surgical treatment, and a lengthy recovery.

Joseph E. Paris, MD

6