# PLAINTIFF'S EXHIBIT 3

# In The Matter Of:

*John Coggin   v.*
*United States of America*

*Raymond P. Mooney, PA-C*
*October 24, 2007*

*Luzod Reporting Service, Inc.*
*The Ford Building*
*615 Griswold - Suite 815*
*Detroit, MI  48226*
*(313) 962-1176    FAX: (313) 962-7073*

*Original File 38919.ASC, 116 Pages*
*Min-U-Script® File ID: 0525236347*

**Word Index included with this Min-U-Script®**

[1] position to assess the acuity of
[2] patient problems seen in a particular
[3] setting. The supervising physician is
[4] able to plan for PA utilization in a
[5] manner that is consistent with the PA's
[6] ability, the physician's delegatory
[7] style and the needs of the patients
[8] seen in the practice."
[9]     Do you agree with that statement?
[10]    **A:** As far as its intent.
[11]    **Q:** And can you explain your answer.
[12]    **A:** Sure. I mean, I think when we talk about physician
[13] assistant scope of practice I am assuming to a
[14] certain degree, because I don't really get into
[15] politics, that this was a document that went before
[16] our various committees in the AAPA and was refined
[17] and said this is how we envision things to be done,
[18] okay. So when I say ideally that would be true.
[19] Is everything in here something that happens
[20] consistently on a daily basis in every practice
[21] setting, no.
[22]    **Q:** But is that something you agree with as a policy of
[23] the profession?
[24]    **A:** Definitely.
[25]    **Q:** I'm going to invite your attention now to the next

Page 53

[1] page where in the AAPA Issue Brief they say,
[2] beginning at the top, I'm going to invite your
[3] attention to the left:
[4]     "The AMA", the American Medical
[5] Association, recognized these concepts
[6] from its 1995 House of Delegates
[7] adopted the following guidelines for
[8] physician/physician assistant practice."
[9]     And the first bullet is:
[10]    "The physician significance is
[11] responsible for managing the health care
[12] of patients in all practice settings."
[13]    Do you agree with that?
[14]    **A:** Yes.
[15]    **Q:** The second bullet is:
[16]    "Health care services delivered
[17] by physicians and physician assistants
[18] must be within the scope of each
[19] practitioner's authorized practice as
[20] defined by state law."
[21]    Do you agree with that?
[22]    **A:** Yes.
[23]    **Q:** The next bullet:
[24]    "The physician is ultimately
[25] responsible for coordinating and managing

Page 54

[1] the care of patients and with the
[2] appropriate input of the physician
[3] assistant, ensuring the quality of health
[4] care provided to patients."
[5]     Do you agree with that?
[6]    **A:** Yes.
[7]    **Q:** The next bullet:
[8]    "The physician is responsible
[9] for the supervision of the physician
[10] assistant in all settings."
[11]    Do you agree with that?
[12]    **A:** Not as written.
[13]    **Q:** So you take issue with the AMA's policy that's
[14] reproduced here by the AAPA?
[15]    **A:** Sure.
[16]    **Q:** Okay. Well, explain your answer, please.
[17]    **A:** I would be ultimately responsible.
[18]    **Q:** So you would have wordsmithed it a bit?
[19]    **A:** Exactly.
[20]    **Q:** And by that is that because in certain practices
[21] the physician is available by telephone or is not
[22] on-site?
[23]    **A:** No. It's more from the point of view of the
[24] physician/PA relationship, including nurses and
[25] respiratory therapists and whomever is a team

Page 55

[1] concept.
[2]     The physician is the captain of the
[3] team. He's the one ultimately responsible. The
[4] respiratory tech is still responsible for what he
[5] or she does or doesn't do, as does the PA. That's
[6] why I would put in "ultimately."
[7]    **Q:** Okay. The next bullet is —
[8]    "The role of the physician
[9] assistant in the delivery of care should
[10] be defined through mutually agreed upon
[11] guidelines that are developed by the
[12] physician and the physician assistant
[13] and based on the physician's delegatory
[14] style."
[15]    Do you agree with that?
[16]    **A:** Yes, sir.
[17]    **Q:** And I'll skip down. I'll read one more of these.
[18] Skip the next one. Do you see the next bullet
[19] there that starts with:
[20]    "The extent of the involvement
[21] by the physician assistant in the
[22] assessment and implementation of
[23] treatment will depend on the complexity
[24] and acuity of the patient's condition
[25] and the training and experience and

Page 56

[1] preparation of the physician assistant
[2] as adjudged by the physician."
[3]   **A:** I don't understand that one.
[4]   **Q:** Okay. Fair enough.
[5]   **A:** Because I don't know how you can know the extent of
[6] your involvement until you've already got into
[7] evaluating the patient.
[8]   **MS. COCHRUN:** All this was written
[9] by a bunch of doctors. What do they know?
[10]          **BY MR. DOYLE:**
[11]   **Q:** I think I'm going to invite your attention now to
[12] the conclusion section. I think you've used some
[13] of these exact words, but I'm going to jump down to
[14] the center paragraph under "Conclusion."
[15]      Do you see where I am? I'm going to
[16] read.
[17]      "What has not changed is the
[18] PA profession's commitment to team
[19] practice with the physician as the
[20] captain of the team."
[21]      I take it you agree with that?
[22]   **A:** One hundred and fifty percent.
[23]   **Q:** Would you agree with me that a PA is not
[24] professionally qualified to determine whether or
[25] not a physician has met the standard of care?

Page 57

[1]   **A:** Please hold that thought while I use the restroom.
[2]   **Q:** Sure.
[3]   **A:** Because it's not a real important question.
[4]   **Q:** Why don't you answer it.
[5]   **A:** Because it's going to be kind of a complicated
[6] answer. That's the only reason, okay.
[7]      All right. Thank you. I appreciate
[8] it.
[9]      (A brief recess was held.)
[10]          **BY MR. DOYLE:**
[11]   **Q:** Mr. Mooney, do you agree that a physician assistant
[12] is not professionally qualified to determine
[13] whether or not a physician has met the standard of
[14] care?
[15]   **MS. COCHRUN:** Object to form.
[16]   **A:** As phrased, yes.
[17]          **BY MR. DOYLE:**
[18]   **Q:** And you can explain your answer if you wish.
[19]   **A:** No, that's okay.
[20]   **Q:** And do you agree that a physician assistant is not
[21] professionally qualified to determine whether a
[22] nurse practitioner has met the standard of care?
[23]   **A:** As stated, yes.
[24]   **Q:** And you'd agree with me that a physician
[25] assistant's standard of care is determined by

Page 58

[1] reference to the duties that his supervising
[2] physician delegates to him, wouldn't you?
[3]   **A:** Say that one more time.
[4]   **Q:** Okay. Do you agree that a physician assistant's
[5] standard of care is determined by reference to the
[6] duties that are delegated to the physician
[7] assistant by the physician?
[8]   **A:** No.
[9]   **Q:** Okay. A physician delegates certain duties and
[10] responsibilities to the physician assistant; isn't
[11] that correct?
[12]   **A:** Yes.
[13]   **Q:** That's the nature of the profession, isn't it, the
[14] physician assistant profession?
[15]   **A:** It is a role, but I wouldn't expect you to know
[16] this. It's based more on a team concept. Equal
[17] partners trying to accomplish the same purpose. So
[18] it's not like the captain telling the sergeant, you
[19] know, make sure that you get this done today. So I
[20] think your emphasis is wrong.
[21]   **Q:** Well, the tasks that a PA is permitted to do by the
[22] supervising physician have a standard of care;
[23] right?
[24]   **A:** Yes.
[25]   **Q:** And, if the physician performed those tasks or if

Page 59

[1] the PA performed those tasks, it's the same
[2] standard of care, isn't it?
[3]   **A:** Exactly.
[4]   **Q:** There is no difference in the standard of care, is
[5] there?
[6]   **A:** That's correct.
[7]   **Q:** And your standard of care then is determined by
[8] reference to the delegated task?
[9]   **A:** That's why I'm getting confused.
[10]   **Q:** Okay. You don't like that word. Your standard of
[11] care is determined by the activity that you
[12] undertake as permitted by your supervising
[13] physician?
[14]   **A:** No. Let me paraphrase it and you tell me if we're
[15] saying the same thing, okay. If you're the doc and
[16] you suture a laceration and I'm the PA and I suture
[17] a laceration, the laceration must be sutured to the
[18] same standard whether you do it or I do it. That's
[19] what I — and I don't think that's what you're
[20] saying.
[21]   **Q:** That is what I'm saying.
[22]   **A:** Okay. Then we agree.
[23]   **Q:** Okay. There's not an independent PA standard of
[24] care, is there?
[25]   **A:** No, sir, there isn't.

Page 60

[1] **Q:** Now, as a practical matter, is there a difference
[2] between a PA's duties and responsibilities when a
[3] supervising physician is physically present with
[4] you and when they're only available on the
[5] telephone?
[6] **A:** Is there a difference?
[7] **Q:** Yes.
[8] **A:** No.
[9] **Q:** Okay. How does that work, I mean if the two of you
[10] are in the room together? There's got to be a
[11] difference, I mean.
[12] **A:** Okay. Maybe I — okay. I'm sorry. Maybe I didn't
[13] understand the question. Ask it to me one more
[14] time.
[15] **Q:** Is there a difference between how you approach your
[16] duties and responsibilities if you are right there
[17] with a doc, with a physician, as opposed to your
[18] operating independently and the physician has got
[19] to be called on the telephone or something of that
[20] nature?
[21] **A:** Well, practically speaking that would depend on who
[22] was in the room first.
[23] **Q:** What does that mean? Explain that.
[24] **A:** Say for instance if the doctor says to the PA, you
[25] know, come here, I want you to see this, I haven't

Page 61

[1] seen this in years, okay. Or, if the PA is in the
[2] room and says I think you might have a fracture
[3] here, I'm going to get Dr. Smith and see what he
[4] thinks. So there's a difference.
[5] **Q:** I see.
[6] **A:** And sometimes it's purely a consultation thing,
[7] which fosters the team, okay, when the doctor calls
[8] the PA in and asks him in front of the patient what
[9] do you think this is. Okay. It's fostering a team
[10] concept, the equality concept with respect to our
[11] role. That's the distinction I'm making.
[12] **Q:** Would you agree that a physician is qualified to
[13] determine whether a physician assistant has met the
[14] standard of care?
[15] **MS. COCHRUN:** Object to form.
[16] Do you mean on a legal standpoint or
[17] from a practical standpoint?
[18] **BY MR. DOYLE:**
[19] **Q:** I'll ask the question again.
[20] **A:** Okay.
[21] **Q:** Do you agree that a physician is qualified to
[22] determine whether a physician assistant has met the
[23] standard of care?
[24] **A:** It — okay.
[25] **Q:** And you just testified there's no independent

Page 62

[1] standard of care.
[2] **A:** You're exactly right. However, there are some
[3] jurisdictions, okay, that will permit a physician
[4] to offer testimony as to the standard of care of
[5] physician assistants. Most will not. Most are
[6] like for like.
[7] **Q:** That depends on the malpractice for the state.
[8] **A:** Right, exactly.
[9] **Q:** And you're not an expert on that, are you?
[10] **A:** No, no. But, you know, that's why I'm qualifying
[11] the question, because it's not really a-
[12] **Q:** (Interposing) I'm saying within your profession
[13] when evaluating a physician assistant's performance
[14] of a task-
[15] **A:** (Interposing) Yes.
[16] **Q:** -a physician is qualified to do that, isn't he?
[17] **A:** I have met my share that wouldn't be.
[18] **Q:** That's not the question.
[19] **A:** But see-
[20] **Q:** (Interposing) Professionally who supervises the
[21] physician assistant?
[22] **A:** The doc does.
[23] **Q:** Okay. And the doc judges whether you've met the
[24] standard of care; isn't that right?
[25] **A:** Practically speaking, I would have to agree with

Page 63

[1] that.
[2] **Q:** Now, in this case would you agree that Dr. Garcia
[3] was ultimately responsible for the care of John
[4] Coggin?
[5] **A:** Ultimately, yes.
[6] **Q:** And Dr. Garcia was responsible for supervising
[7] Oscar Rodriguez; isn't that right?
[8] **A:** Yes.
[9] **Q:** And Dr. Garcia was also responsible for supervising
[10] the nurse practitioners, Daphne Essex and Doris
[11] Little; isn't that right?
[12] **A:** Yes.
[13] **Q:** Dr. Garcia was the captain of the team; right?
[14] **A:** Yes.
[15] **Q:** And he was ultimately responsible for — he, Dr.
[16] Garcia, was ultimately responsible for the adequacy
[17] of John Coggin's care; isn't that right?
[18] **MS. COCHRUN:** Object to form.
[19] **A:** Ultimately responsible because he was the head of
[20] the medical care department. The answer would be
[21] yes.
[22] **BY MR. DOYLE:**
[23] **Q:** He also personally saw the patient, didn't he?
[24] **A:** Yes, he did also see the patient. That's true.
[25] **Q:** And Dr. Garcia was responsible for ensuring that

Page 64

**Page 73**

[1] not. Now, when I read this opinion, I had not read
[2] Mr. Coggin's deposition. Okay. I had read the
[3] deposition of Rodriguez and Garcia. And again, I'm
[4] not a computer. I can't remember everything a
[5] hundred percent, but I thought that Rodriguez said
[6] Garcia didn't see him.
[7]   Am I wrong there?
[8] **Q:** Garcia saw him on the 25th, Dr. Garcia.
[9] **MS. COCHRUN:** I think Rodriguez said
[10] he didn't think he did.
[11] **MR. DOYLE:** That fact I don't
[12] recall. I know what happened.
[13] **THE WITNESS:** Okay.
[14] **MS. COCHRUN:** He was there.
[15] **A:** That's right. So I can't say that the information
[16] that I have before me that I would agree with you
[17] that Dr. Garcia did.
[18]         **BY MR. DOYLE:**
[19] **Q:** Okay. Well, if Dr. Garcia testified that he saw
[20] him on the 25th — would you accept that in my
[21] hypothetical?
[22] **A:** I was going to ask. Okay. Hypothetically
[23] speaking. Hypothetically, yes.
[24] **Q:** Okay. And do you know whose decision it would have
[25] been at the prison health services unit whether or

**Page 74**

[1] not to send Mr. Coggin to the emergency room?
[2] **A:** On the 25th or the 26th?
[3] **Q:** On the 26th.
[4] **A:** My impression, okay, from going over the deposition
[5] was the fact that it would have been the individual
[6] health care provider's decision whether or not to
[7] have sent him there.
[8] **Q:** But you're not sure of that fact, are you?
[9] **A:** I will testify that I'm convinced of the fact that
[10] they had the authority to do that.
[11] **Q:** Now, hypothetically if that decision were
[12] Dr. Garcia's, you aren't professionally qualified
[13] to challenge his decision, are you?
[14] **MS. COCHRUN:** Object to form. You
[15] know, we keep using the term "professionally
[16] qualified."
[17] **A:** Honestly, Counselor, professionally qualified is
[18] really confusing me. Maybe it's my interpretation.
[19]   No. I'm thinking professionally
[20] legally, you know. And I can't give legal opinion
[21] and, of course, you wouldn't ask me to give a legal
[22] opinion, but you're using the word "professionally"
[23] and that's what-
[24]         **BY MR. DOYLE:**
[25] **Q:** (Interposing) Well, Dr. Garcia is a physician?

**Page 75**

[1] **A:** Yes.
[2] **Q:** If Dr. Garcia made that decision, you as a
[3] physician's assistant could not second-guess it;
[4] isn't that right?
[5] **A:** I could second-guess it and document it in the
[6] chart, which I have done that my physician said
[7] this person doesn't need to go to the hospital and
[8] leave it at that.
[9] **Q:** So you consider your expertise to be that you could
[10] testify about whether or not a physician satisfied
[11] the standard of care?
[12] **A:** That's not what the question was.
[13] **Q:** Well, I'm going to ask that question.
[14] **A:** You already asked that one and we already agreed
[15] that I couldn't, you know.
[16] **Q:** Right. So, if Dr. Garcia made the decision not to
[17] send him to the emergency room, you can't render an
[18] opinion as to whether or not that satisfied the
[19] standard of care; isn't that right?
[20] **A:** Okay. What's your definition of render an opinion?
[21] **Q:** Testify about it in this case.
[22] **A:** Sure I can testify in this case and leave it up to
[23] the judge as to whether or not he's going to allow
[24] me in court or not.
[25] **Q:** Fair enough. So you as a physician assistant you

**Page 76**

[1] could testify that the physician didn't do his job?
[2] **A:** We're not to that stage yet, okay. I'm here to
[3] testify as to the standard of care for the
[4] physician assistant, and you keep trying to go over
[5] with a physician, you know.
[6]   What happens between those two and
[7] how Garcia responds and Rodriguez responds is
[8] really hypothetical, okay. I'm dealing with facts
[9] that are down on pieces of paper as to what the PA
[10] did and didn't do and that's what I'm here to
[11] testify.
[12] **Q:** Fair enough. Why do you believe that the standard
[13] of care mandated that John Coggin be transferred to
[14] a local emergency room on July 25th or 26th?
[15] **A:** Well, one thing that we went into at the beginning
[16] of the deposition was the standard of care is no
[17] different in a prison than it is in a community,
[18] okay. That's true, okay. And I mean it's fact.
[19] It can't be argued. But it is mitigated by, okay.
[20] And the reason I'm saying mitigated by is it would
[21] be no difference than me seeing a patient in the
[22] MediStation where I don't have a CAT scan, where I
[23] can't do a comprehensive panel, where I can't do an
[24] amylase and lipase, okay. And I have a patient
[25] that comes in and sees me on the 25th, okay, and I