PLAINTIFF'S EXHIBIT 4

Case 2:05-cv-01214-MEF-SRW   Document 72-5   Filed 02/01/2008   Page 2 of 5

JOHN COGGIN v. UNITED STATES OF AMERICA
DEPOSITION OF ANTONIO JUAN WILLIAMS, SR.

12/27/2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOHN COGGIN,

    Plaintiff,

vs.                    CASE NO. 2:05-cv-1214-F

UNITED STATES
OF AMERICA,

    Defendant.



\* \* \* \* \* \* \* \* \* \*


DEPOSITION OF ANTONIO JUAN WILLIAMS, SR., M.D., taken pursuant to stipulation and agreement before Dee Coker, Registered Professional Reporter and Commissioner for the State of Alabama at Large, in the United States Attorney's Office, 131 Clayton Street, Montgomery, Alabama, on Thursday, December 27, 2007, commencing at approximately 2:14 p.m.


\* \* \* \* \* \* \* \* \* \*

Page 22

1  diagnostic work-up on this patient?
2     A.  No.
3     Q.  Was Mr. Coggin's gallbladder surgery required
4  on an emergency basis?
5     A.  No.
6     Q.  When would you have performed the surgery?
7     A.  Just whenever they got the paperwork and
8  everything settled and got him to me.
9     Q.  Was a GI consult required before the
10 gallbladder surgery?
11    A.  No.
12    Q.  Was an endoscopy required before the
13 gallbladder surgery?
14    A.  No.
15    Q.  Did you see Mr. Coggin again after August
16 29th, 2001?
17    A.  No.
18    Q.  Was Dr. Garcia's referral of this patient to
19 you appropriate?
20       MS. COCHRUN:  Object to the form.
21    A.  Yes.
22    Q.  Was Dr. Garcia's referral of this patient to
23 you timely?
24    A.  Yes.
25    Q.  Who did you work for --

Page 23

1        MS. COCHRUN:  Same objection.
2     Q.  Who did you work for at the time you examined
3  Mr. Coggin?
4     A.  Myself.
5     Q.  Did the Bureau of Prisons control or direct
6  the manner in which you performed your examination of
7  Mr. Coggin?
8     A.  No.
9     Q.  Did you exercise independent medical judgment
10 in your examination of Mr. Coggin?
11    A.  Yes.
12    Q.  Doctor, I'm going to show you another
13 exhibit.  It's a one-page exhibit that's been marked
14 Defendant's Exhibit #5 and has Bates number 14 at the
15 bottom.  It's a handwritten note.  It has a date
16 8/27/01 at the top, and it goes through an 8/28 note
17 and 8/29 note.  Can you take a look at that, Doctor?
18    I'm going to invite your attention to the note at
19 the center of the page, 8/29/01, and the one below
20 that.  Can you read that, sir?
21    A.  Yes.
22    Q.  I'm going to read it into the record.  Tell
23 me if you're reading the same thing.
24    Spoke with surgeon in regards to abdominal
25 ultrasound report.  States that he will need to

Page 24

1  examine the patient.  States that the patient does not
2  need gastro at this time unless he may have problems
3  with common bile duct and/or PUD -- peptic ulcer
4  disease -- et cetera.  Informed Dr. Garcia.  Will hold
5  gastro consult and schedule for surgeon.
6     And it's signed by Daphne Essex, CRMP.
7     Do you know Daphne Essex, Doctor?
8     A.  Yes.
9     Q.  Do you recall having a conversation with her
10 on August 28th of '01?
11    A.  Yes.
12    Q.  Okay.  Now, in this note, it says that
13 patient does not need gastro at this time unless he
14 may have problems with common bile duct and/or peptic
15 ulcer disease, et cetera.  Did you expect Dr. Garcia
16 to rule out peptic ulcer disease or problems with the
17 common bile duct?
18    A.  No.
19    Q.  Was that something that you would do in your
20 examination of the patient?
21    A.  Yes.
22    Q.  Doctor, after your examination on August
23 29th, 2001, did you see this patient again?
24    A.  No.
25       MR. DOYLE:  I tender the witness for

Page 25

1  cross-examination.
2        MS. COCHRUN:  Sure.
3            CROSS-EXAMINATION
4  BY MS. COCHRUN:
5     Q.  Dr. Williams, we've never met before, but I'm
6  Julia Cochrun.  I'm going to be asking you some
7  questions today.  If I ask you anything you do not
8  understand, please let me know, and I'll try to
9  rephrase.  Okay?
10    A.  Yes.
11    Q.  Now, you're up in Saginaw, Michigan?
12    A.  Yes.
13    Q.  And are you in a group practice up there, or
14 where are you working?
15    A.  I'm with one other guy that's getting ready
16 to retire.
17    Q.  All right.  And how is it that you made the
18 transition from here to Michigan?  What was the reason
19 for going to Michigan?
20    A.  Better opportunity.
21    Q.  Okay.  Now, you are not a family practice
22 physician either by training or board certification,
23 are you?
24    A.  No.
25    Q.  You're not an internal medicine physician by

JOHN COGGIN v. UNITED STATES OF AMERICA                    12/27/2007
DEPOSITION OF ANTONIO JUAN WILLIAMS, SR.

6 (Pages 18 to 21)

Page 18

1   Defendant's Exhibit #2?
2      A.   Yes.
3      Q.   What, if anything, did you find significant
4   in the ultrasound report?
5      A.   That he had something in his gallbladder.
6   They wasn't sure if it was a polyp, sludge, or a
7   stone.
8      Q.   And what did that mean to you?
9      A.   Basically, that he had an abnormal
10  gallbladder ultrasound. And so it was kind of making
11  me -- you know, helped narrow down his differential.
12     Q.   Was another abdominal ultrasound necessary?
13     A.   No.
14     Q.   Did you review Mr. Coggin's July 25th, 2001,
15  and August 27th, 2001, labs?
16     A.   Yes.
17     Q.   What, if anything, did you find significant
18  in the labs?
19     A.   Significant finding?
20     Q.   Yes.
21     A.   Nothing that was significant.
22     Q.   Doctor, do you see where there's a change in
23  the hemoglobin and hematocrit from the first set of
24  labs on 7/25 to the second set of labs on 8/27?
25     A.   Yes.

Page 19

1      Q.   Did you find that change in hemoglobin and
2   hematocrit to be significant?
3      A.   No.
4      Q.   Why?
5      A.   This could just be a matter of being hydrated
6   versus being dehydrated. It just shows that he had a
7   small drop in his blood count. It's not specific for
8   anything.
9      Q.   Doctor, what was your diagnostic impression
10  of Mr. Coggin when you examined him on August 29th,
11  2001?
12     A.   I'm sorry. Repeat that, please.
13     Q.   Sure. What was your diagnostic impression of
14  Mr. Coggin when you examined him on August 29th, 2001?
15     A.   Possibility of having biliary colic.
16     Q.   And what is biliary colic?
17     A.   Crescendo, de-crescendo in abdominal pain,
18  usually experienced from passing of a gallstone.
19  Patients usually state that, you know, they have these
20  periods where they're feeling okay and then they get a
21  real high intensity of pain associated with some
22  nausea, vomiting, and fatty food intake.
23     Q.   Can biliary colic be caused by sludge?
24     A.   Yes.
25     Q.   As a general surgeon, are you qualified to

Page 20

1   diagnose biliary colic?
2      A.   Yes.
3      Q.   Is biliary colic something that you see
4   frequently in your practice?
5      A.   Yes.
6      Q.   Did you think that Mr. Coggin had an ulcer
7   when you saw him on August 29th, 2001?
8      A.   No.
9      Q.   As a general surgeon, are you qualified to
10  recognize peptic ulcer disease?
11     A.   Yes.
12     Q.   Are peptic ulcers something that you see in
13  your practice?
14     A.   Yes.
15     Q.   If you thought Mr. Coggin had an ulcer, what
16  would you have done?
17     A.   Probably started treating him empirically
18  with an H2 blocker and, if that did not improve his
19  symptoms, possibly do an upper endoscopy to see if he
20  had an ulcer; if so, get a biopsy. And then we were
21  trying to rule out H. pylori since he did not heal
22  with adequate treatment. And it depends on what we
23  find depends on what we'll do next.
24     Q.   What was your plan for Mr. Coggin?
25     A.   A laparoscopic cholecystectomy.

Page 21

1      Q.   And why was that?
2      A.   From his history and from the findings that I
3   had, he was leaning more towards that this could be
4   biliary colic.
5      Q.   And is it appropriate to perform gallbladder
6   surgery for a patient experiencing biliary colic?
7           MS. COCHRUN: Object to form.
8      A.   Yes.
9      Q.   What is laparoscopic cholecystectomy?
10     A.   Removing the gallbladder laparoscopically.
11     Q.   Did you communicate your plan for gallbladder
12  surgery to Dr. Garcia?
13     A.   Yes.
14     Q.   Did he agree with your plan?
15     A.   Yes.
16     Q.   Who was responsible for the care and
17  treatment of Mr. Coggin at that point?
18          MS. COCHRUN: Object to the form. Calls for
19  a conclusion.
20     Q.   I'll ask the question again. Who was
21  responsible for the care and treatment of Mr. Coggin
22  at that point?
23          MS. COCHRUN: Same objection.
24     A.   I am.
25     Q.   Did you expect Dr. Garcia to do any more

Case 2:05-cv-01214-MEF-SRW   Document 72-5   Filed 02/01/2008   Page 5 of 5

JOHN COGGIN v. UNITED STATES OF AMERICA                                12/27/2007
DEPOSITION OF ANTONIO JUAN WILLIAMS, SR.

23 (Pages 86 to 89)

Page 86

1  provided back to them did not give them any
2  information that that had been ruled out?
3      MR. DOYLE: Objection, mischaracterizes his
4  testimony and as to form.
5      Q. Can you answer the question?
6      A. Oh, I'm sorry.
7      Q. I mean nothing about that sheet tells
8  Dr. Garcia or anybody over at Maxwell that you've
9  ruled out peptic ulcer disease, does it?
10     A. No.
11     Q. Okay. Most patients can take the H2 blockers
12 that you've described and that will treat their peptic
13 ulcer disease and they don't go on to having a massive
14 GI bleed requiring surgery; is that correct?
15     A. Most of the time.
16     Q. Most of the time; is that correct?
17     A. Right.
18     Q. And if a patient is suspected or has symptoms
19 consistent with peptic ulcer disease, if you withdraw
20 NSAIDs from their medication regimen and put them on
21 H2 blockers, would you expect that they will not go
22 on, in most circumstances, to have a massive GI bleed
23 and require surgical intervention?
24     A. Correct.
25     MS. COCHRUN: That's all I have right now.

Page 87

1      MR. DOYLE: I have one or two questions for
2  you, Doctor.
3          REDIRECT EXAMINATION
4  BY MR. DOYLE:
5      Q. When Mr. Coggin left your office on August
6  29th, 2001, what was the next step for him, in your
7  mind?
8      A. That he would be getting scheduled for
9  surgery.
10     Q. And did you expect Dr. Garcia to do any
11 further evaluation of Mr. Coggin before the surgery?
12     A. No.
13     Q. You testified that at some point, Dr. Garcia
14 asked you to begin the process that might allow you to
15 cover for him at the prison; is that right?
16     A. Yeah.
17     Q. When was that, if you recall?
18     A. That was like last Christmas. He was -- last
19 Christmas.
20     Q. Sometime in 2006?
21     A. Yeah.
22     Q. And did you, in fact, ever cover for him at
23 the prison?
24     A. No.
25     Q. And have you ever worked for the Federal

Page 88

1  Bureau of Prisons in any capacity?
2      A. For the Federal Bureau of Prisons? No.
3      MR. DOYLE: That concludes my examination.
4          RECROSS-EXAMINATION
5  BY MS. COCHRUN:
6      Q. Just so we're clear, you've never --
7      MR. DOYLE: I want to attach the notice of
8  deposition. Any objection?
9      MS. COCHRUN: Okay. No big deal.
10     Q. Just so we're clear, while you have never
11 worked directly for the Bureau of Prisons, you have
12 over the years, through a contractual circumstance
13 with another group, done work for the Federal Bureau
14 of Prisons?
15     A. No. No.
16     Q. Did you see John Coggin for free?
17     A. You said contract. I don't have a contract
18 with them. You said contractual.
19     Q. Well --
20     A. I'm just a surgeon that they refer their
21 patients to. We're not under any contract.
22     Q. Right. But I mean the point is you have seen
23 their patients and charged for seeing those patients
24 over the years on a frequent basis.
25     A. Yes.

Page 89

1      Q. All right. One last question, Doctor.
2      A. Yes, ma'am.
3      Q. To your best recollection, did Mr. Coggin
4  answer all the questions that you asked of him?
5      MR. DOYLE: Objection, beyond the scope of
6  redirect and object to the form.
7      A. I mean, it's been -- it's been too long. I
8  would assume from his history and physical, that he
9  answered -- answered what I asked. That's been so
10 long, I don't know.
11     Q. Well, I note that you said, Thank you for
12 this very pleasant consult. Were you describing
13 Mr. Coggin or his disease condition with that comment?
14     A. Mr. Coggin.
15     MS. COCHRUN: All right. Thank you, sir.
16     MR. DOYLE: That concludes the questions.
17         (The deposition concluded at
18         4:12 p.m.)
19         * * * * * * * * * *
20     FURTHER DEPONENT SAITH NOT
21         * * * * * * * * * *